**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IVANA FRECH, | |
| Plaintiff, | Civ. No. 1:23-cv-02530-CRC |
| v. | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.* | |
| Defendants. | |

## MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

For more than a decade, Plaintiff Dr. Ivana Frech ("Dr. Frech" or "Plaintiff"), has gone about her life following an unfortunate, and misguided, decision by the University of Utah ("UU") to terminate her employment following an investigation it conducted on the behalf of the Office of Research Integrity ("ORI") at the U.S. Department of Health and Human Services ("HHS") into allegations of research misconduct that arose in 2011. Settling down into a small rural Iowa community and having left the world of federally-funded research behind her, Dr. Frech continued to pursue her passion for science, eventually taking on an administrative role at the local hospital. Though displeased with how her time at UU had ended, life was otherwise well in Iowa for Dr. Frech.

In July 2023, approximately ten (10) years after the UU investigation had concluded and been provided to ORI for its action, ORI appeared seemingly out of nowhere and informed Dr. Frech that it agreed with UU's decade-old findings and that it was debarring her from participating in certain transactions involving the federal government. Because Dr. Frech's employment did

not involve any such transactions at the time, nor did Dr. Frech have any intent (or interest) in becoming involved in such covered transactions in the future, ORI's improper debarment action could be legally challenged in due course.  Now, however, circumstances have dramatically changed and immediate action is necessary to protect Dr. Frech from irreparable harm.

On January 31, 2024, ownership of the community hospital where Dr. Frech worked was to change hands, with the University of Iowa ("UI") taking ownership of the hospital.  Based on Dr. Frech's invaluable contribution to the hospital under its previous ownership, UI wished to retain Dr. Frech in the same role and offered to employ her, contingent on passing UI's background screening.  During that screening, UI learned that Dr. Frech had been debarred by ORI (a fact that she has not tried to hide, and which she informed UI she is in the process of challenging) and rescinded her employment offer, thus rendering Dr. Frech unemployed with little to no prospects of other employment in her trained field due to the limited number of related employers within a reasonable distance from her home, where she had already become woven into the fabric of the community.

To be sure, Dr. Frech has been told by UI that, in the absence of a debarment, she would be warmly welcomed back to her job—but time is of the essence, lest the job be permanently filled by another individual.   In short, after more than a decade of inaction by the Defendants, Dr. Frech was debarred, despite having long since abandoned any federally-funded research and having changed careers entirely (leaving scientific research behind for an administrative position at a community hospital).  As a foreseeable result of the governments substantially delayed and improper debarment, on January 30, 2024, Dr. Frech was constructively terminated from her job— based solely on the debarment—even though her duties have no relation to covered transactions or federal procurement activities.

Dr. Frech therefore moves to enjoin the government-wide debarment of her from participating in covered transactions and federal procurement activities as imposed by defendant, the Department of Health and Human Services ("HHS"), acting by and through defendants, the Secretary of Health and Human Services, the Office of Research Integrity ("ORI"), ORI's Director, and HHS's Deputy Assistant Secretary for Acquisitions and Suspension and Debarment Official ("SDO").  The debarment of Dr. Frech constitutes a final agency action that is so lacking in supporting evidence that it is arbitrary, capricious, an abuse of discretion, contrary to law, regulation, and public policy, and in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  For purposes of this motion, Dr. Frech relies on the Complaint filed in this matter and the below.  Dr. Frech requests that an emergency hearing be set at the Court's earliest convenience.

I.    **INTRODUCTION**

Dr. Frech (then known as Dr. De Domenico) arrived in Salt Lake City as an exchange student from Italy to attend the University of Utah ("UU") in 2004.  From approximately 2005 to 2008, Dr. Frech was a member of Dr. Jerry Kaplan's laboratory at UU, until she was promoted in or about April 2008 to become a tenure-track assistant professor and independent investigator at UU.  While a member of Dr. Kaplan's lab, Dr. Frech's scientific research was supervised by both Dr. Kaplan and by Dr. Diane Ward, who managed Dr. Kaplan's lab.  Dr. Ward was responsible for overseeing the experiments conducted by lab members such as Dr. Frech, writing manuscripts, and generating figures for publication.

When Dr. Frech left Dr. Kaplan's lab, she sought to redirect her own research focus to pursue lines of research other than those she had engaged in during her time in Dr. Kaplan's lab. Nevertheless, due to a lack of senior research presence in Dr. Kaplan's and Dr. Ward's lab, Dr. Frech was occasionally asked to guide their technicians on some experiments and, if necessary, to assist in assembling figures for publication.  During those times when Dr. Frech assisted in figure assembly, she necessarily relied on the data generated and provided by Drs. Kaplan and Ward's technicians.  Drs. Kaplan and Ward had ultimate responsibility for any final manuscripts and figures, which they submitted to journals.

Dr. Frech's employment at UU was terminated in or about June 2013.  After leaving UU, Dr. Frech sought and obtained an MBA, and eventually returned to scientific research – though ***not*** Public Health Service ("PHS") supported research – on or about September 29, 2015, when she joined the lab of Dr. Fenghuang Zhan at the University of Iowa ("UI").  When Dr. Zhan left UI to join the University of Arkansas, Dr. Frech declined to follow.  Dr. Frech's last day in Dr. Zhan's lab was on or about December 18, 2019, and Dr. Frech resigned from UI entirely as of May

1, 2020, when no suitable new position at UI could be identified for her.  Since 2020, Dr. Frech

had been working as an administrator at a community hospital in Iowa City.  This employment

was abruptly brought to an end on January 30, 2024, due to the Defendants' improper debarment

of Dr. Frech.  Nevertheless, UI has represented to Dr. Frech that, should the debarment be lifted,

it would like to have her in the same position, with the same job duties, that she had been in for

years before the community hospital's sale.  However, no job can remain unstaffed indefinitely,

and UI has already made an interim hire.  Absent immediate injunctive relief, Dr. Frech will

forever lose the opportunity to reclaim her employment.

As described in greater detail herein, every factor in determining whether preliminary

injunctive relief should be granted weighs in Dr. Frech's favor.  Moreover, the Defendants have

entirely failed to identify any evidence demonstrating that she is not presently responsible given

that the purported conduct upon which the debarment action is based took place ***more than a***

***decade ago***, about which the Defendants have been fully informed for ***at least*** nine years, if not

more.  The debarment is, on its face, astoundingly untimely, purely punitive, unjustified, and

improper—and, thus, arbitrary and capricious.

## II.     STATEMENT OF RELEVANT FACTS FOR PURPOSES OF THE MOTION[1]

### A.   The UU Research Misconduct Process

In or about October 2011, allegations of research misconduct arose involving multiple

papers coauthored by Dr. Frech that were published from Dr. Kaplan's lab.  Pursuant to the

applicable federal regulations (42 C.F.R. Part 93) and UU's corresponding research misconduct

policy, UU conducted an inquiry and an investigation into the allegations.  The allegations

involved research published between 2007 and 2011 (and, therefore, involved data that had been

---

[1] For a full discussion of facts, see Dr. Frech's complaint.

generated even earlier) that was supported by PHS funding.  ORI, a component of HHS, acts on behalf of HHS as the office responsible for overseeing and directing PHS research integrity activities.  ORI does not itself conduct research misconduct inquiries and investigations.  Instead, ORI refers allegations to the relevant institution where the research was conducted for inquiry and investigation.  *See* 42 C.F.R. §§ 93.400(a), 93.402.  ORI then conducts an oversight review of an institution's findings and process, and may then make a federal finding of research misconduct and propose HHS administrative actions.  *See* 42 C.F.R. §§ 93.400(a)-(c), 93.403.  Thus, when allegations in this matter arose, ORI relied upon UU to conduct the inquiry and investigation.

Despite the fact that UU's inquiry concluded that it "did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question," UU nevertheless determined that an investigation was necessary and appointed an investigation committee.  *See* Exhibit 1, Feb. 16, 2012 UU Inquiry Report, AR 612-619 at AR 615; Exhibit 2, Mar. 7, 2012 RIO Report, AR 633-635 at AR 634-635.  The investigation committee reviewed allegations of research misconduct in 11 papers, but expressly disclaimed any review of publications arising from Dr. Kaplan's lab for which Dr. Frech was not a coauthor.  *See* Exhibit 3, Dec. 14, 2012 Final UU Investigation Report, AR 962-1058 at AR 968.

UU's investigation report concluded that Dr. Frech had engaged in research misconduct. The basis for this determination was a purported "pattern of recklessness," which the investigation committee defined as "actions that are marked by lack of proper caution and care with respect to the consequences of the actions, and are therefore negligent and a breach of expected professional responsibility."  *See* Exhibit 3, Dec. 14, 2012 Final UU Investigation Report at AR 966. Furthermore, the investigation committee found that the alleged research misconduct "was committed in reckless disregard of accepted practices."  *See id*.  UU's finding as to Dr. Frech's

level of intent was thus that her actions were reckless, rather than intentional or knowing. Even a finding of recklessness by UU, however, was erroneous because (1) UU utilized so broad a definition of recklessness as to include negligence and carelessness (neither of which rise to the level of recklessness), and (2) UU conflated two separate elements of research misconduct (a finding of intent and a significant departure from accepted practices of the research community).

Additionally, although UU made research misconduct findings against Dr. Frech, it also determined that she was not solely responsible for the errors, and that Dr. Kaplan, Dr. Ward, and others also had varying degrees of responsibility. *See* Exhibit 3, Dec. 14, 2012 Final UU Investigation Report at AR 967-969. Indeed, the investigation committee recommended that UU "relieve Dr. Kaplan of his senior leadership duties" based on his role in the errors and the "systematic" issues in his lab. *See id.* at AR 967-968.

After receiving UU's final investigation report in or about December 2012, Dr. Frech appealed UU's findings and recommendations to a Consolidated Hearing Committee ("CHC") at UU. The CHC heard Dr. Frech's appeal on April 29, 2013 and issued its report on May 8, 2013. Despite also finding that Dr. Frech engaged in research misconduct "based on 'reckless disregard of accepted practices'[,]" the CHC – similarly to the UU investigation – found that "[t]here was complicity in this misconduct within the laboratory that goes substantially beyond Dr. De Domenico." *See* Exhibit 4, May 8, 2013 CHC Report, AR 4045-4053 at AR 4050. Notably, the CHC found that responsibility was shared with Dr. Kaplan and Dr. Ward (and, potentially, others) and therefore recommended "further investigation of the laboratory procedures uncovered in this investigation." *See id.*; *see also id.* at AR 4045, 4048-4049.

**B. ORI's Charge Letter**

After UU's investigation concluded in early 2013, UU sent the records of its inquiry and investigation to ORI for ORI's oversight review and to determine what findings and actions, if any, should be made by HHS.  ORI and HHS have thus been considering this matter for <u>more than 10 full years</u>.  Furthermore, on September 19, 2014, Dr. Frech—through counsel—wrote to ORI to express concerns that UU may not have provided ORI with the entirety of the record, and, in an effort to mitigate that possibility, provided ORI with relevant materials.  *See* Exhibit 5, Sept. 19, 2014 Letter to ORI and Index of Enclosed Documents, AR 4078-4081.  In that letter, Dr. Frech offered to provide any other materials that ORI determined were missing.  *See id*. at AR 4080.  ORI never responded nor did it request any additional information from Dr. Frech or UU, indicating that ORI had all of the information it needed to conduct its oversight review by no later than September 19, 2014.  On or about July 19, 2023, ***more than a decade*** after the process at UU concluded (and approximately nine years after the latest possible date that ORI received relevant materials), Dr. Frech received a Charge Letter from ORI identifying its findings and administrative actions.  Despite the numerous allegations involving 11 papers at issue during UU's investigation, ORI made six research misconduct findings with respect to only three papers.

In each of ORI's six findings of research misconduct, ORI states that Dr. Frech acted "intentionally, knowingly, or recklessly" and that she "falsified and/or fabricated" figures in the three papers.  *See* Exhibit 6, July 18, 2023 HHS Charge Letter, AR 4783-4803 at AR 4791-4801.  ORI also states that Dr. Frech's "actions were knowing and intentional" and that she "solely planned, initiated, and carried out the wrongdoing."  *See id*. at AR 4802.  These conclusions are not only erroneous, but are also directly contradicted by the evidence, including UU's findings upon which ORI necessarily relied.  Additionally, these conclusions do not represent a legitimate

finding as required by the regulations since they only name all of the possible outcomes, without concluding by a preponderance of the evidence as to a particular finding.  In addition to describing ORI's findings, the Charge Letter also informs Dr. Frech that she will be debarred from participation in covered transactions for a three-year period as an administrative action imposed by HHS.  Significantly, since her employment at UU was terminated in 2013, Dr. Frech has voluntarily excluded herself from participation in covered transactions.  Specifically, Dr. Frech has refrained from engaging in any scientific research supported by PHS funds.  Thus, had ORI imposed its debarment of Dr. Frech contemporaneously with UU's findings, its imposed debarment would have been fully satisfied ***three times over*** by the time the Charge Letter was prepared.

Following receipt of ORI's Charge Letter, Dr. Frech requested copies of the exhibits to the Charge Letter, which were not provided concurrently with the Charge Letter itself.  ORI provided those exhibits on August 10, 2023.  After receiving the exhibits, beginning on August 15, 2023, Dr. Frech sought in good faith to negotiate with ORI to resolve this matter in a mutually acceptable manner.  Through August 18, 2023, Dr. Frech and ORI exchanged correspondence that made it clear that, although Dr. Frech disagreed with and contested ORI's findings, she was willing to reach a settlement.  Although ORI rejected the specific proposals by Dr. Frech during this time, it did not foreclose the possibility of reaching an agreement.

On August 18, 2023, following ORI's rejection of Dr. Frech's most recent proposal, Dr. Frech, through counsel, informed ORI that she would convey a settlement proposal to ORI the following week.  ORI did not respond.  Consistent with Dr. Frech's representation, on August 22, 2023, Dr. Frech contacted ORI to engage in further discussion.  Only then did ORI respond, taking the position that the deadline to contest ORI's findings had passed and that the findings and

administrative actions (including debarment) had therefore become final.  Dr. Frech promptly responded, noting that her communications seeking to resolve the matter amicably had made it abundantly clear that she contested the findings.

The following day, August 23, 2023, Dr. Frech and ORI exchanged further communications, both via email and telephone.  Despite Dr. Frech's shock at being sandbagged by ORI's silence until it asserted the deadline had already passed, ORI insisted that it could neither continue to negotiate nor could Dr. Frech now request a hearing, despite her communications with ORI detailing her disagreement with the findings.  ORI repeatedly expressed that any hearing request now would be denied.  Dr. Frech therefore filed suit in this court on September 5, 2023.

### C. Dr. Frech's Employment Is Terminated

On or about November 6, 2023, Mercy Iowa City—the community hospital that Dr. Frech had been working for since 2020—was approved by a bankruptcy court for a sale to UI.  Ownership of the hospital was set to officially change to UI as of January 31, 2024.  Like other employees of Mercy Iowa City, Dr. Frech received an offer of employment by UI, formalized through a transition agreement.  However, on January 30, 2024—hours before the ownership change—UI rescinded Dr. Frech's transition agreement based solely on Dr. Frech's debarment.  This decision was reached despite the facts that (1) the hospital will remain a community hospital; (2) nothing in Dr. Frech's job description or duties would change with the ownership transition; and (3) Dr. Frech's debarment has no impact on her ability to fulfill the duties of that position.  Instead, the decision was reached based on a UI Policy that precludes UI from employing anyone who has been excluded or debarred from participation in federal programs.  Thus, the Defendants' improper and grossly untimely debarment of Dr. Frech has caused her actual and substantial harm.  Dr. Frech

therefore moves to enjoin Defendants from enforcing the debarment and seeks to have the debarment lifted pending the resolution of this action.

## III.   <u>ARGUMENT</u>

### A.  **Standard of Review**

#### 1.   <u>Temporary Restraining Order or Preliminary Injunction</u>

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders ("TROs") and preliminary injunctions.  To obtain a TRO or a preliminary injunction, the moving party must establish that she "is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. Dec. 20, 2022) (explaining that the same factors applicable to analysis of whether to grant a preliminary injunction apply to consideration of a TRO).

As this court has noted, prior to *Winter*, "courts in this circuit applied a 'sliding-scale' approach under which a 'strong showing on one factor could make up for a weaker showing on another'" and that "[s]ince *Winter*, the D.C. Circuit has hinted on several occasions that 'a likelihood of success is an independent, free-standing requirement,' but it 'has not yet needed to decide the issue.'"  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 109 (quoting *Sherley*, 644 F.3d at 392-393 and *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016)); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 12 (D.D.C. 2009). However, when pursuing a TRO or preliminary injunction, "the movant has the burden to show

that all four factors, taken together, weigh in favor of the injunction." *Chef Time 1520 LLC*, 646

F. Supp. 3d at 109 (quoting *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014)).

      2.  Administrative Procedure Act

      Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the Court

has the authority to "'hold unlawful and set aside' agency actions[, findings, and conclusions] that

are [found to be] 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

law.'" *Oceana, Inc. v. Ross*, 363 F. Supp. 3d 67, 76 (D.D.C. 2019).  "[T]he Supreme Court 'insists

that an agency examine the relevant data and articulate a satisfactory explanation for its action."

*Bois v. U.S. Dept. of Health and Human Services*, Civ. No. 11-1563, 2012 WL 13042904 at *4

(D.D.C. Mar. 2, 2012) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513).  "Such

a review 'is not merely perfunctory.  We are to engage in a searching and careful inquiry, the

keystone of which is to ensure that the agency engaged in reasoned decisionmaking.'"  *See id.*

(quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

**B.  Dr. Frech Is Entitled To Injunctive Relief**

      1.  Dr. Frech Has A Substantial Likelihood Of Success On The Merits

      A party seeking a TRO or a preliminary injunction must show clearly that it is likely to

succeed on the merits. *Tate v. Pompeo*, 513 F.Supp.3d 132, 140-141 (D.D.C. 2021).  The party

"need not establish an absolute certainty of success on the merits" but must "raise[] serious legal

questions going to the merits, so serious, substantial, difficult as to make them a fair ground of

litigation and thus for more deliberative investigation." *Akiachak Native Community v. Jewell,* 995

F. Supp. 2d 7, 13 (D.D.C. 2014) (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078

(D.C. Cir. 1986)).  For the reasons set forth below, Dr. Frech will likely succeed on the merits of

her challenge to HHS's and ORI's debarment action.

a.   The Federal Research Misconduct Regulations

In imposing its debarment, the Defendants relied on the general proposition that research misconduct is, at times, a cause for debarment.  *See* Exhibit 6, July 18, 2023 HHS Charge Letter, AR 4783-4803 at AR 4803.  While this may be true, the circumstances here demonstrate that the Defendants' imposition of debarment against Dr. Frech is entirely arbitrary and capricious, given HHS' mere formulaic recitations of the elements of research misconduct and the ***vast*** amount of time that passed between when Defendants became aware of the conduct and when debarment was imposed.

The purpose of the federal regulations applicable to PHS-funded research for which ORI has oversight and pursuant to which ORI and HHS make findings and institute administrative actions is remedial in nature.  Indeed, the regulations are intended to "[p]rotect the health and safety of the public, promote the integrity of PHS supported research and the research process, and conserve public funds."  42 C.F.R. § 93.101(e).  "Any interpretation of this part must further the policy and purpose of the HHS and the Federal government to protect the health and safety of the public, to promote the integrity of research, and to conserve public funds."  42 C.F.R. § 93.107.

Research misconduct is defined as "fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results."  *See* 42 C.F.R. § 93.103. "Fabrication" is defined as "making up data or results and recording or reporting them" whereas "falsification" is defined as "manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record."  *See id.* at (a) and (b).[2]  Honest error is expressly excluded from the definition of research misconduct.  *See id.* at (d).

---

[2] There is neither an allegation nor any purported finding of plagiarism in this matter.

A finding of research misconduct requires more than simply finding that the definition of research misconduct has been met through fabrication, falsification, or plagiarism.  Specifically, a finding of research misconduct requires that "(a) [t]here be a significant departure from accepted practices of the relevant research community; and (b) [t]he misconduct be committed intentionally, knowingly, or recklessly; and (c) [t]he allegation be proven by a preponderance of the evidence."  *See* 42 C.F.R. § 93.104.  Each of these elements is separate and must be met for each allegation to support a research misconduct finding.

ORI does not itself conduct research misconduct inquiries and investigations, instead referring allegations to the relevant institution (or HHS component) where the research was conducted for inquiry and, should one be found warranted, investigation.  *See* 42 C.F.R. §§ 93.400(a), 93.402.  ORI conducts an oversight review of an institution's findings and process, and may then make a federal finding of research misconduct and propose HHS administrative actions. *See* 42 C.F.R. §§ 93.400(a)-(c), 93.403.  ORI thus relies heavily on the institutional reports and record developed during the institutional inquiry and investigation.

> b.   The Research Misconduct Findings Violate the APA

Under the APA, agency findings and actions may be held "unlawful and set aside . . . if . . . [they are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . or if [they are] unsupported by substantial evidence."  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 109 (internal quotation marks and citations omitted).  Agency action may be considered arbitrary and capricious where, *inter alia*, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).  A court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  Similarly, "[a]gency fact-finding warrants considerable deference" only when "it is supported by substantial evidence."  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 110 (internal quotation marks and citation omitted).

Here, the findings described in the Charge Letter are contradicted outright by the UU investigation and CHC report.  The Defendants have not provided – and cannot provide – any explanation for finding that Dr. Frech <u>solely</u> engaged in research misconduct, when the evidence plainly demonstrates that there were systemic problems in Dr. Kaplan's lab and that responsibility for the errors at issue in the allegations went substantially beyond Dr. Frech, including to Dr. Kaplan, Dr. Ward, and others.  ORI's finding in contradiction to the UU investigation upon which it necessarily relied – and in contradiction to a preponderance of the evidence – is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation and thus violates the APA.

Similarly, the defendants cannot provide any evidence for declaring that Dr. Frech's actions were intentional and knowing, when the available evidence led the CHC to conclude that, with respect to the only manipulation that appeared intentional, there is insufficient evidence to conclude "that it was done by Dr. De Domenico as opposed to an unknown third person."  Instead, both the UU investigation and the CHC found, based on a preponderance of the evidence, that – at most – Dr. Frech was reckless.

Furthermore, both the UU investigation and the CHC utilized a broad definition of recklessness that included ordinary negligence and mere carelessness, neither of which rise to the level necessary to support a research misconduct finding.  Indeed, a HHS Administrative Law

15

Judge ("ALJ") considering research misconduct findings by ORI has previously adopted the Black's Law Dictionary definitions as "the common definitions for intentional, knowing, and reckless and their adverb forms." *In re Decision of Kreipke*, Recommended Decision, Docket No. C-16-402, Decision No. CR5109 (May 31, 2018) at p. 14. The definition for "reckless" in Black's Law Dictionary and adopted by the ALJ is "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash. Reckless conduct is <u>much more than mere negligence</u>: it is a gross deviation from what a reasonable person would do." *See* Black's Law Dictionary (emphasis added); *see also Kreipke* at p. 14. The UU investigation expressly based its finding that Dr. Frech was reckless on its conclusion that recklessness "mean[s] actions that are marked by lack of proper caution and care with respect to the consequences of the actions, and are therefore <u>negligent</u> and a breach of expected professional responsibility." This improper inclusion of negligence and carelessness in the definition of recklessness suggests that, if anything, ORI's findings should be that Dr. Frech lacked <u>any</u> requisite level of intent to engage in research misconduct. Regardless, a finding that Dr. Frech acted intentionally or knowingly is entirely unsupported by the evidence and, thus, is arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation in violation of the APA. "Reasoned decisionmaking . . . precludes the agency from offering an explanation that runs counter to the evidence before the agency." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 533 (internal quotation marks and citations omitted). But ORI's findings here are counter to the evidence.

In each of its six research misconduct findings against Dr. Frech, ORI purports to find that Dr. Frech acted "intentionally, knowingly, or recklessly" and that she "falsified and/or fabricated" figures in the three papers. By simply listing all possible outcomes, ORI treats multiple elements

of finding research misconduct as a mere box-checking exercise without identifying substantial evidence to support its conclusions.  The first of these statements, repeated as to each finding, abdicates responsibility for finding a single level of intent for each allegation by a preponderance of the evidence in favor of simply regurgitating the requirement and concluding that an element has been satisfied.  In the second statement, ORI abandons its burden for determining whether data were made up or altered.  If ORI cannot make a determination as to Dr. Frech's specific level of intent or the specific type of research misconduct she purportedly engaged in, it cannot plausibly satisfy its burden of making a research misconduct finding by a preponderance of the evidence.  In essence, these conclusory statements that merely claim that Dr. Frech possessed any requisite level of intent and engaged in any form of research misconduct (other than plagiarism) are a "mere assertion" that does not "articulate a satisfactory explanation" for the agency's findings.  *See*, *e.g.*, *Water Quality Ins. Syndicate v. U.S.*, 225 F. Supp. 3d 41, 68 (listing cases where agency findings were contradicted by evidence and agency's unsupported assertions were insufficient).

Thus, Dr. Frech is likely to succeed on the merits that the research misconduct findings by HHS and ORI violate the APA.  Accordingly, use of those findings in support of debarment should be enjoined pending Dr. Frech's challenge of those findings in this litigation.

c.  Imposing Debarment Is Purely Punitive And Violates The APA

The purpose of the federal research misconduct regulations is remedial.  It is not intended to be punitive, but rather to safeguard science and allow for the rehabilitation of even those scientists who engage in intentional research misconduct.  *See* 42 C.F.R. §§ 93.100(a), 93.101(e), 93.408.  Indeed, the regulations expressly state that "[t]he purpose of HHS administrative actions is remedial."  42 C.F.R. § 93.408 (additionally identifying mitigating and aggravating factors that

HHS considers in determining administrative actions).  Debarment is the most severe potential administrative action enumerated in the regulations.  *See* 42 C.F.R. § 93.407(a).

The purpose of debarment is to protect the public interest by ensuring that the Federal Government conducts business only with responsible persons, and utilizes the suspension and debarment system "to exclude from Federal Programs persons who are not *presently* responsible." 2 C.F.R. § 180.125 (emphasis added).  In recognition of the potentially financially-crippling consequence and irreparable reputational stigma that attaches to a person from being debarred, the regulations permit HHS to only debar a person in order to protect the public interest; HHS cannot use debarment as means of punishment.

The Charge Letter asserts that, with respect to each research misconduct finding, Dr. Frech acted intentionally, knowingly, or recklessly.  However, this fails to explain which of these three levels of intent the evidence shows Dr. Frech acted with in carrying out the alleged research misconduct.  As described above, this is itself contradicted by the UU investigation report, which concluded only that Dr. Frech acted "in reckless disregard of accepted practices."  Furthermore, although the Charge Letter repeatedly states that Dr. Frech acted with any of the three levels of intent, it inexplicably claims in its consideration of mitigating and aggravating factors that Dr. Frech's "actions were knowing and intentional."  Defendants provide no explanation for this discrepancy, nor for how they reached a conclusion contrary to UU's findings and thus inconsistent with the evidence before the agency.  Acting recklessly is not the equivalent of acting knowingly or intentionally, and the SDO fails to explain under which level of intent the cause for debarment was considered, the aggravating and mitigating factors were analyzed, and the length of debarment evaluated.  Indeed, whether a respondent acted recklessly as opposed to knowingly or intentionally is one of the mitigating factors that should be considered.  *See* 42 C.F.R. § 93.408(a).

Similarly, the extent to which a respondent planned, initiated, or carried out the wrong doing is another aggravating or mitigating factor that should be considered.  *See* 2 C.F.R. § 180.860(f).  As with the inexplicable jump from UU's finding that Dr. Frech acted, at most, with reckless intent, HHS contradicts the evidence before it by finding that she "solely planned, initiated, and carried out the wrongdoing."  This is directly contradicted by extensive evidence of systematic problems in Dr. Kaplan's lab, leading both the UU investigation and the CHC to conclude that responsibility and complicity in any wrongdoing went "substantially beyond" Dr. Frech.  These failures render the SDO's debarment decision arbitrary and capricious and unsupported by substantial evidence.

Moreover, simply repeating over and over that Dr. Frech acted "intentionally, knowingly, or recklessly" is insufficient to establish that research misconduct is cause for debarment, particularly where, as here, Dr. Frech has voluntarily excluded herself from participating in PHS-funded research for more than a decade.  The SDO fails to explain why the alleged misconduct here is so serious and compelling as to impact Dr. Frech's present responsibility, particularly after having waited for more than 10 full years to act on the record before HHS.  Indeed, HHS's very failure to take action in the span of time it has had the evidence in this matter vitiates any contention that the alleged misconduct is so serious or compelling that the Federal Government's interests must be protected from Dr. Frech today by debarring her for what is, in essence, an additional three-year term that has already been completed three times.  *See*, *e.g.*, *Inchcape Shipping Services Holdings Ltd. v. U.S.*, No. 13-953C, 2014 WL 12838793 (Fed. Cl. Jan. 2, 2014).  As *Inchcape* made clear, even when there is adequate evidence to support a suspension or debarment, the lack of an immediate need to do so to protect governmental interests can preclude such severe sanctions. *See id*. at *2.  In that case, the Navy's delay of just over a year (from November 21, 2012 to

November 26, 2013) to suspend the plaintiff "cast[] serious doubt on the government's claim that immediate action was necessary."  *See id*.  As with *Inchcape*, here there is no explanation as to why HHS waited nine years—or more—to debar Dr. Frech, nor is there any "evidence of an ongoing threat against which the Government need[s] to be protected."  *See id*.

As with the research misconduct findings themselves, the Charge Letter's conclusory statements that merely claim that the SDO considered the appropriate aggravating and mitigating factors are a "mere assertion" that does not "articulate a satisfactory explanation" for the agency's findings.  *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 68.  As with the research misconduct findings, the debarment itself and the SDO's scant analysis provide no basis for the Defendants to reach conclusions directly contradicted by the evidentiary record, as reflected in the UU investigation and the CHC report.  Because HHS has failed to demonstrate by a preponderance of the evidence that Dr. Frech engaged in research misconduct so serious or compelling in nature that it affects her present responsibility to conduct business with the Federal Government, Dr. Frech is likely to succeed on the merits of her APA claim challenging the debarment.  Thus, as with *Inchcape*, "the suspension looks like a punishment more than a protective measure."  *See id*.; *see also Lion Raisins, Inc. v. U.S.*, 51 Fed. Cl. 238, 247 (2001) (finding that the USDA SDO abused his discretion in determining that "evidence of plaintiff's lack of integrity in April 1998, which was known to the agency as of May 1999, 'seriously and directly' affected plaintiff's 'present responsibility' as a Government contractor in February of 2001").

2.  <u>Dr. Frech Will Suffer Irreparable Harm If The Defendants Are Not Enjoined From Enforcing The Debarment</u>

More than a decade ago, Dr. Frech was terminated from UU as a result of this matter, and voluntarily abandoned any federally-funded research.  When it became clear to Dr. Frech that continuing to work as a scientific researcher in academia without utilizing federal funds would

require her to uproot her life and her family yet again, she left science entirely.  Since 2020, Dr.

Frech has been entirely out of scientific research, working in an administrative position at a

community hospital.  As a direct result of the debarment that the Defendants waited **nine years or**

**more** to impose, Dr. Frech has now been terminated once again, and is once again faced with the

prospect of needing to try to start yet another new career or trying to find a similar job in another

city or state, should one even be available anywhere.  Dr. Frech has a limited window of time to

lift the debarment and reclaim her job at the community hospital she has worked for without

incident for years.  Without injunctive relief, that opportunity will vanish.

"The cornerstone of preliminary injunctive relief is irreparable harm that injures the

moving party in a manner that cannot be remedied through other types of relief."  *Clevinger v.*

*Advocacy Holdings, Inc*., Civ. Nos. 23-1159 & 23-1176, Slip Op., 2023 WL 4560839 at \*4 (D.D.C.

Jul. 15, 2023) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  Reputational damage is a valid,

non-economic harm upon which to grant a TRO or preliminary injunction.  *See Luokong Tech.*

*Corp. v. Dept. of Defense*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021); *see also Celsis in Virto, Inc.*

*v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage

to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm"

(emphasis added)).

This Court has noted that "harm to reputation has been recognized repeatedly as a type of

irreparable injury[.]"  *Brodie v. U.S. Dept. of Health and Human Services*, 715 F. Supp. 2d 74, 84

(D.D.C. 2010) (citation omitted).   In *Brodie*, this Court nevertheless declined to grant the

preliminary injunction because "there is no indication . . . that Dr. Brodie's employer or any

particular colleagues are likely to learn of the ALJ's decision in the near future . . . .  The

generalized risk that individuals in the scientific community may learn of the ALJ's findings

against Dr. Brodie during the pendency of this matter is not the sort of threat that can be neutralized by court order." *Id*. In part, this conclusion was based on the fact that a summary of the ALJ's decision against Dr. Brodie had already been published. *See id*. at 84-85. In contrast, here the publication of ORI's and HHS's erroneous findings has not only occurred, but the fact of those findings and the institution of debarment resulted in Dr. Frech losing her job ***outside*** of science. Dr. Frech may no longer work in scientific research, but has already suffered reputational and economic harm due to the allegations in this matter (which resulted in the termination of her employment by UU, and, now, the rescission of her transition agreement by UI). Dr. Frech already voluntarily left scientific research, and has now been prevented from continuing her chosen career outside of science. Dr. Frech lives in Coralville, Iowa, with limited opportunities for work similar to the role she held at Mercy Iowa City. UI has represented that, were it not for the debarment, it would be interested in having Dr. Frech to continue to work in the role she had been in up through January 30, 2024. However, UI has already filled the role on an interim basis. Without immediate injunctive relief, the opportunity for Dr. Frech to reclaim her job will pass.

Therefore, the irreparable harm to Dr. Frech weighs in favor of granting injunctive relief.

3. The Balance Of Harms And Equities Weighs In Favor Of Dr. Frech

"The balance the equities weighs the harm to Plaintiffs absent a TRO against the harm to the agency if the Court grants the motion." *Chef Time 1520 LLC*, 646 F. Supp. 3d at 116 (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)). Here, ORI has waited for more than a decade to make its findings and take administrative actions against Dr. Frech. In that vast amount of time, Dr. Frech has not conducted any PHS-funded research. For more than three full years, Dr. Frech has not conducted any scientific research whatsoever. There is therefore no harm whatsoever to the Defendants if they are enjoined from enforcing debarment against Dr.

Frech pending adjudication of this matter.  In contrast, Dr. Frech will suffer immediate, irreparable harm if the debarment is not lifted.  The balance of the equities thus plainly weighs in favor of Dr. Frech and in favor of granting injunctive relief.

    4.   <u>The Public Interest Favors Issuance Of A TRO Or An Injunction</u>

Where, as here, the non-moving party is the government, "the government's interest *is* the public interest" making the balance of equities "and the public interest factor . . . one and the same[.]"  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 116 (quoting *Pursuing America's Greatness*, 831 F.3d at 511).  Because neither the Defendants nor the public would be harmed by the issuance of a TRO or preliminary injunction in this matter pending adjudication of the merits, the public interest weighs in favor of granting Dr. Frech such relief.  *See*, *e.g.*, *N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting that "[t]he public interest is served when administrative agencies comply with their obligations under the APA").  If anything, this factor additionally weighs in favor of granting injunctive relief to Dr. Frech due to "the public's interest to ensure that the government's suspension and debarment process is administered in a fair manner."  *See Inchcape*, 2014 WL 12838793 at *3 (further stating that "the limited scope of a temporary injunction is no great threat to the government's concern in" protecting from any potential wrongdoing by plaintiff).

<b><u>CONCLUSION</u></b>

For the foregoing reasons, Dr. Frech respectfully requests that the Court grant her Order for a Temporary Restraining Order or Preliminary Injunction and award Dr. Frech all relief the Court deems appropriate, including her reasonable attorneys' fees and costs under the Equal Access to Justice Act.  Dr. Frech further asks that an emergency hearing be set at the Court's earliest convenience.

Dated:  February 9, 2024         COHEN SEGLIAS PALLAS GREENHALL & FURMAN PC

By:  */s/ Jackson S. Nichols*
Jackson S. Nichols (D.C. Bar #975511)
Stephen D. Tobin (D.C. Bar #90020495)
(D.D.C. *pro hac vice*)
Paul E. Simon (D.C. Bar #1023006)
(D.D.C. *pro hac vice*)
900 Seventh Street, NW
Suite 725
Washington, DC 20001
Tel: 202.466.4110
jnichols@cohenseglias.com

**STATEMENT OF CONFERRAL**

On February 7, 2024, counsel for Dr. Frech informed counsel for Defendants of Dr.

Frech's intent to seek preliminary injunctive relief.  Counsel for Defendants replied that

Defendants oppose this motion.

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on February 9, 2024, a true and accurate copy of

the foregoing document was filed via the Court's CM/ECF system and notification of such filing

was sent to all counsel of record.

*/s/ Jackson S. Nichols*
Jackson S. Nichols