UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IVANA FRECH,

        Plaintiff,

    v.

DEPARTMENT OF HEALTH AND HUMAN
SERVICES, et al.,

        Defendants.

Civil Action No. 23-2530 (CRC)

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY
<u>RESTRAINING ORDER OR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 1

I.     Legal Background ............................................................................................. 1

     A.     Research Misconduct Investigations and Findings ............................... 1

     B.     Debarment and Suspension .................................................................... 2

II.     Factual Background .......................................................................................... 5

     A.     The University of Utah's Research Misconduct Investigation of Frech ................ 5

     B.     The Office's Findings That Frech Had Engaged In Research Misconduct ........... 8

III.     Procedural Background ................................................................................... 13

LEGAL STANDARDS ............................................................................................ 14

I.     Temporary Restraining Order ........................................................................ 14

II.     Preliminary Injunction .................................................................................. 15

ARGUMENT ............................................................................................................ 15

I.     Frech is Unlikely to Succeed on the Merits ................................................... 15

     A.     Frech is Unlikely to Succeed on Her Challenge to the Office's Findings of Research Misconduct Against Her ........................................ 16

          1.     Frech is Unlikely to Succeed on Her Argument That the Office Failed to Specify the Level of Culpability With Which She Acted ..................... 16

               a.     The Office Expressly Found that Frech's Research Misconduct Was Knowing and Intentional ....................... 17

               b.     Any Omission as to Frech's Specific Level of Culpability Would Not Have Been Erroneous ................................. 17

               c.     Any Omission as to Frech's Particular Degree of Culpability Would Not Have Been Prejudicial .............................. 18

          2.     Frech is Unlikely to Succeed on Her Challenge to the Office's Findings That She Committed the Charged Misconduct Knowingly and Intentionally ........................ 19

               a.     The Administrative Record Supports the Office's Finding That Frech Committed the Charged Research Misconduct ................. 19

          b.     The Administrative Record Supports the Office's Finding That Frech Committed the Misconduct Knowingly and Intentionally.. 21

     3.     Frech is Unlikely to Succeed on Her Argument that the Office Erred in Finding That She "Falsified and/or Fabricated" Images ...................... 23

     4.     Frech is Unlikely to Succeed on Her Challenge to the Office's Finding That She Solely Planned, Initiated, and Carried Out the Wrongdoing ..... 25

     5.     Frech is Unlikely to Succeed on Her Argument That the Office's Findings Contradict Utah's Investigative Findings .................................. 25

  B.     Frech is Unlikely to Succeed on Her Challenge to Her Debarment ..................... 26

     1.     Frech's Ostensible "Voluntary Exclusion" From Service-Funded Research Does Not Preclude Debarment .................................................... 27

          a.     "Voluntary Exclusion" is a Term of Art That Does Not Apply Here .................................................................................... 27

          b.     Frech's Asserted Voluntary Forbearance is Irrelevant Under the Debarment Regulations ........................................................... 28

          c.     Frech's Asserted Voluntary Forbearance Furnishes the Public Inadequate Protection Against Future Misconduct By Her .......... 28

          d.     Frech Has Continued to Engage In Covered Transactions .......... 29

     2.     The Time That Has Elapsed Since Frech Engaged In Research Misconduct Does Not Preclude Debarment ............................................. 31

II.     Frech Is Unlikely to Experience Irreparable Harm Absent Preliminary Relief ............... 35

  A.     Frech Fails to Show Imminent Irreparable Harm Based on Loss of Her Job ....... 36

  B.     Frech Fails to Show Imminent Irreparable Reputational Harm ........................... 38

III.    Frech Fails to Show That the Balance of Equities Favors Preliminary Relief ................. 40

CONCLUSION ................................................................................................................... 44

Pursuant to Federal Rule of Civil Procedure 65, Defendants Department of Health and Human Services ("the Department"); Xavier Becerra, Secretary of Health and Human Services; Office of Research Integrity ("the Office"); Sheila Garrity, Director of the Office; and H. Katrina Brisbon, Deputy Assistant Secretary for Acquisitions and Suspension and Debarment Official, by and through undersigned counsel, respectfully oppose Plaintiff Ivana Frech's motion for temporary restraining order or preliminary injunction, ECF No. 20.

## BACKGROUND

I.   **Legal Background**

A.     **Research Misconduct Investigations and Findings**

An institution receiving or applying for funding from the Public Health Service ("Service") for certain biomedical or behavioral research projects is responsible for responding to allegations of research misconduct against an individual. 42 C.F.R. §§ 93.102, 93.300. "Research misconduct means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results." *Id.* § 93.103. "Fabrication is making up data or results and recording or reporting them." *Id.* § 93.103(a). "Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record." *Id.* § 93.103(b). "Research misconduct does not include honest error or differences of opinion." *Id.* § 93.103(d). An institution must make a finding as to whether the individual has committed research misconduct. *Id.* § 93.313(f). A research misconduct finding requires that: (1) "[t]here be a significant departure from accepted practices of the relevant research community," (2) "[t]he misconduct be committed intentionally, knowingly, or recklessly," and (3) "[t]he allegation be proven by a preponderance of the evidence." *Id.* § 93.104(a)-(c).

The Office is a component of the Department with authority to make research misconduct findings. 42 U.S.C. § 289b; 42 C.F.R. Part 93. After receiving an institution's investigative report,

the Office conducts an oversight review of the institution's investigation to determine whether the institution complied with its regulatory responsibilities. 42 C.F.R. §§ 93.400(a)(6), 93.403. The Office may also conduct its own additional analyses, develop its own evidence, and make its own research misconduct findings. *Id.* §§ 93.400(a)(7), 93.400(c), 93.403(d)-(g), 93.404(a). If the Office makes research misconduct findings and the Department proposes administrative actions, it notifies a respondent via a charge letter. *Id.* § 93.405. If a respondent does not contest the charge letter within thirty days of receiving it, the Office's research misconduct findings and proposed administrative actions become final Department actions, and the matter is referred to the debarring official to impose the debarment or suspension. *Id.* § 93.406. The debarring official is an official authorized by the Department "to impose debarment or suspension." *Id.* § 93.206.

A respondent can avail herself of administrative procedures to contest findings of research misconduct and proposed administrative actions. After receiving notice of the Office's research misconduct findings and proposed administrative actions, a respondent has an opportunity to contest them by requesting a hearing before an Administrative Law Judge ("ALJ") affiliated with the Department's Departmental Appeals Board. 42 C.F.R. §§ 93.500, 93.501. A respondent must request an ALJ hearing within thirty days of receiving the charge letter. *Id.* § 93.501(a). "The ALJ provides an independent *de novo* review of the [Office's] findings of research misconduct and the proposed [Department] administrative actions," and "does not review the institution's procedures or misconduct findings or [the Office's] research misconduct proceedings." *Id.* § 93.517(b).

### B.    Debarment and Suspension

The Department has adopted and given effect to the Office of Management and Budget Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement), codified at 2 C.F.R. Part 180. 2 C.F.R. Part 376. The purpose of debarment or suspension is "[t]o protect the public interest" and for "the Federal Government [to] ensure[] the integrity of Federal

2

programs by conducting business only with responsible persons." *Id.* § 180.125(a). An agency thus may impose debarment or suspension "to exclude from Federal programs persons who are not presently responsible." *Id.* § 180.125(b). An agency may debar or suspend "any person who has been, is, or may reasonably be expected to be a participant or principal in a covered transaction." *Id.* § 180.150. Whenever an agency considers debarment or suspension, it must determine whether cause for debarment exists. Agencies may debar based on causes set forth in Part 180, including "[a]ny other cause of so serious or compelling a nature that it affects [an individual's] present responsibility," *id.* § 180.800(d), including research misconduct, 42 C.F.R. § 93.407(a)(11).

An agency may address and resolve conduct that gives rise to a cause for debarment and that raises present responsibility concerns through a settlement agreement. One type of settlement agreement is a voluntary exclusion agreement. "Voluntary exclusion means a person's agreement to be excluded under the terms of a settlement between the person and one or more agencies. Voluntary exclusion must have governmentwide effect." 2 C.F.R. § 180.1020(a).

Debarment and suspension for nonprocurement programs and/or activities extends to all "covered transaction[s]." 2 C.F.R. § 180.200. All federal nonprocurement transactions, including "[g]rants" and "[c]ooperative agreements," as well as certain procurement transactions that relate to nonprocurement transactions, are "covered transactions," with exceptions that do not apply here. *Id.* §§ 180.210, 180.220, 970(a)(1)-(2). Such transactions may be at "[t]he primary tier, between a Federal agency and a person," or else "[a] lower tier, between a participant in a covered transaction and another person." *Id.* § 180.200. Debarment and/or suspension in the procurement transaction context covers all contracts governed by the Federal Acquisition Regulation. 48 C.F.R. § 9.405(a).

A respondent is entitled to both notice and an opportunity to respond before a proposed debarment takes effect. When an agency proposes debarment, it must notify a respondent, among

other things, that it has proposed debarment, the reasons for the proposal, and the cause upon which it has relied. 2 C.F.R. § 180.805(a)-(c). If the debarring official proposes debarment, she cosigns the Office's charge letter, which serves as a notice of proposed debarment. 42 C.F.R. § 93.405(a). A respondent can contest a debarment proposal "by requesting [an ALJ] hearing within 30 days of receipt of the charge letter." *Id.* § 93.501(d). "Where a proposed debarment or suspension action is based upon [a] finding of research misconduct," a respondent may avail herself of extensive administrative "procedures" that "provide the notification, opportunity to contest, and fact-finding required under the [Department's] debarment and suspension regulations." *Id.* § 93.500(d).

An agency bears the burden to prove by a preponderance of the evidence that cause for debarment exists. 2 C.F.R. §§ 180.850, 180.855. Even if cause for debarment exists, an agency does not need to impose debarment, but rather, "may consider the seriousness of [the] acts or omissions and [ ] mitigating or aggravating factors." *Id.* § 180.845(a); *see also id.* § 180.860 (listing aggravating and mitigating factors); 42 C.F.R. § 93.408 (same). Once an agency establishes a cause for debarment, a respondent "ha[s] the burden of demonstrating to debarring official's satisfaction that [she is] presently responsible and that debarment is not necessary." 2 C.F.R. § 180.855(b); *see also* 42 C.F.R. § 93.106(b)(3) ("The respondent has the burden of going forward with and proving by a preponderance of the evidence any mitigating factors that are relevant to a decision to impose administrative actions following a research misconduct proceeding."). A period of debarment is "based on the seriousness of the cause(s)" for debarment and generally "should not exceed three years." 2 C.F.R. § 180.865(a). But "if circumstances warrant, the debarring official may impose a longer period of debarment." *Id.* A respondent may seek reconsideration of the debarring official's final decision. *Id.* § 180.875. When the Department takes action, through debarment, suspension, or settlement, to exclude a person under the nonprocurement or procurement debarment regulation,

it enters that person's name in a system called the General Services Administration's System for Award Management Exclusions, which contains the names of and other information about persons who are excluded from covered transactions. *Id.* §§ 180.500, 180.945.

Unlike with debarment, an individual is not entitled to notice or an opportunity to respond before a suspension can take effect. Suspension is an interim measure "for a temporary period pending the completion of an investigation or resulting legal or debarment proceedings." 2 C.F.R. § 180.715(e). An agency may impose a suspension only if it determines that (1) "[t]here exists an indictment for, or other adequate evidence to suspect, [certain] offense[s]," or else (2) both "[t]here exists adequate evidence to suspect any other [listed] cause for debarment" and "[i]mmediate action is necessary to protect the public interest." *Id.* § 180.700. A suspension thus takes effect immediately, and a respondent receives notice of and an opportunity to contest the suspension only after the fact. *Id.* §§ 180.710, 180.715, 180.720. Once an agency initiates debarment proceedings, a suspension may continue until the proceedings conclude. *Id.* § 180.760(a).

## II.   <u>Factual Background</u>

### A.   The University of Utah's Research Misconduct Investigation of Frech

Frech is a former assistant professor at the University of Utah ("Utah") School of Medicine, Department of Internal Medicine. Administrative Record ("AR") 59. She had been a postdoctoral fellow in Dr. Jerry Kaplan's laboratory, and eventually became an assistant professor, continuing to publish research with Dr. Kaplan on the molecular mechanisms of cellular iron regulation. *Id.*

In Fall 2011, the Office received allegations of research misconduct involving papers that Frech and Kaplan had published. AR 571-97. The Office forwarded the allegations to Utah, which investigated the matter. AR 962-1058. During the investigation, Frech wrote a letter to Utah's research integrity officer, admitting that she had "generated" the "image" in one publication, an

article in the journal *Developmental Cell* from July 2008 (the "2008 Article"),[1] and that "the duplication came from me." AR 763. She also admitted that she "generated the figures in" another publication, an article in the journal *Cell Metabolism* from November 2011 (the "November 2011 Article"),[2] AR 828, for which she had been the first, or lead, author, AR 547. Utah's investigating committee found that Frech had committed research misconduct in ten distinct publications and that there were several instances of intentional falsification, and recommended that Utah terminate her employment. AR 962-1058. Utah accepted the findings and recommendation. AR 1071-73.

Frech appealed the decision to Utah's Office of the Academic Senate. AR 3847-49. In her appeal, she again admitted that she assembled the figures at issue in the November 2011 and 2008 Articles. AR 3968-69. Utah then convened a Consolidated Hearing Committee Panel ("Panel"), which conducted a hearing and issued a report and recommendation. AR 4045-53. The Panel did not conduct a *de novo* review of the evidence. AR 4047. Instead, "[t]o simplify understanding of the record, [the Panel] constructed a table listing each paper by number along with the types of alleged irregularities, the Investigating Committee conclusions regarding the allegations, and some indication of the evidence behind those conclusions." *Id.*

---

[1]     The 2008 Article's full title is *Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding*. *Developmental Cell*, vol. 15, iss. 1, at 62-73 (July 8, 2008), https://www.cell.com/developmental-cell/fulltext/S1534-5807(08)00239-6. The Office's research misconduct findings refer to it as "*Dev. Cell* 2008."

[2]     The November 2011 Article's full title is *The Role of Ubiquitination in Hepcidin-independent and Hepcidin-dependent Degradation of Ferroportin*. *Cell Metabolism*, vol. 14, iss. 5, at 635-46 (Nov. 2, 2011), https://www.cell.com/cell-metabolism/fulltext/S1550-4131(11)00354-8. The Office's research misconduct findings refer to it as "*Cell Met.* Nov. 2011." The *Cell Metabolism* journal later the November 2011 Article in its June 2012 edition. *See* Retraction Notice, *Cell Metabolism*, vol. 15, iss. 6, at 927 (June 6, 2012), https://www.cell.com/cell-metabolism/fulltext/S1550-4131(12)00157-X.

The Panel found that the falsifications in the November 2011 Article were the result of reckless disregard of accepted practices. AR 4048. It further found that the 2008 Article "contained images that were intentionally manipulated to present false data," and that "[t]his was done by computer copying of information from one scanned image to another or in some instances by splicing of gel images to make one image." *Id.* The Panel determined, however, that it "cannot conclude that it was done by [Frech] as opposed to an unknown third person,"[3] without addressing her admission she had generated and/or assembled the images in these publications. *Id.* As to a third publication, an article in the journal *Cell Metabolism* from January 2011 (the "January 2011 Article"),[4] for which Frech also was the first author, AR 559, the Panel found that "the evidence that she fabricated notebook pages is confusing and not sufficiently persuasive of intentional falsification." AR 4049. Six grants from the National Institutes of Health in total supported the research reported in these three publications, and one of the grants supporting the research in the November 2011 Article identified Frech as the principal investigator for the research. AR 48, 557.[5]

The Panel ultimately found that Frech had engaged in research misconduct through her "reckless disregard of accepted practices." AR 4045. The Panel did not determine that Frech had intentionally falsified research, as it did not determine that she, rather than someone else, had been

---

[3]   The panel's findings referred to Frech by her maiden name, Ivana De Domenico. AR 4048. For ease of reference, Defendants refer to her as Frech throughout.

[4]   The January 2011 Article's full title is *Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion*. *Cell Metabolism*, vol. 13, iss. 1, at 57–61 (Jan. 5, 2011), https://www.cell.com/cell-metabolism/fulltext/S1550-4131(10)00445-6. The Office's findings of research misconduct refer to it as "*Cell Met.* Jan. 2011." *Cell Metabolism* later retracted the January 2011 Article in its June 2012 edition.  Retraction Notice, *Cell Metabolism*, vol. 15, iss. 6, at 927 (June 6, 2012), https://www.cell.com/cell-metabolism/fulltext/S1550-4131(12)00152-0.

[5]   For this reason, Frech's allegation that she "was not the Primary Investigator [ ] for the research at issue in [the Office's] findings; Dr. Kaplan was," Compl. ¶ 29, ECF No. 7, is incorrect.

responsible for the intentional falsification in the 2008 Article. AR 4046. The Panel also found that "[t]here was complicity in this misconduct within the laboratory that goes substantially beyond Dr. [Frech]," insofar as other coauthors should have spotted the errors in the publications, although the Panel did not find that anyone else in the laboratory manipulated research results or otherwise engaged in research misconduct. AR 4050. The Panel agreed with the investigating committee's recommendation that Utah terminate Frech's employment. *Id.* In its final decision, Utah agreed with the Panel's finding of research misconduct and terminated Frech's employment. AR 4060.

**B.     The Office's Findings That Frech Had Engaged In Research Misconduct**

The Office received the reports of both Utah's investigating committee and the Panel and conducted an oversight review of Utah's proceedings. As part of this review, it conducted its own image analysis of Frech's work. AR 4208-20. Based on the evidence Utah had gathered and its own analysis, it made six research misconduct findings against Frech, finding by a preponderance of the evidence that she intentionally and knowingly falsified and/or fabricated scientific images by reusing, relabeling, and manipulating images to falsely report data in eight figures across three papers: the 2008 Article, the November 2011 Article, and the January 2011 Article. AR 4783-803.

First, the Office found that Frech "duplicated" an image in the 2008 Article, "spliced [it] into a composite image, and relabeled [it] to represent [ ] different" results. AR 4792 ¶ 35. The Office credited Frech's earlier admissions that she "generated" the images and that "the duplication came from me," and determined that "[i]t is implausible that the reuse and relabeling of the image is attributable to honest error rather than intentional and knowing" manipulation. *Id.* ¶¶ 37-38.

Second, the Office found that Frech "reused and relabeled the same image . . . in the top and bottom panels" of a figure in the November 2011 Article to represent different experiments, with the top image being a copy "flipped horizontally" of the bottom image. AR 4794 ¶ 46. The Office found that "[t]he manipulation of the [images] shows that the falsification and/or fabrication

is attributable to intentional and knowing conduct rather than honest error." *Id.* ¶ 51. The Office also noted that Frech was the first author of the publication, that she had admitted to generating the figure at issue, that the manipulated results "show ideal results, strongly supporting [Frech's] hypothesis," and finally, that "ideal results could not be achieved without knowing and intentional falsification and/or fabrication," all of which supported its finding that Frech had "knowingly and intentionally" manipulated the images at issue. *Id.* ¶¶ 47-50.

Third, the Office found that Frech "reused and relabeled" images in the November 2011 Article to represent "results from a different experiment." AR 4795 ¶ 57. It explained that Frech had "cropp[ed] out" parts of one image to create the second image, such that the second image was "identical" to a part of the first image. *Id.* It noted that Frech was the first author of the publication and admitted to generating the images at issue, *id.* ¶¶ 58-59 and determined that "[t]he image manipulation (cropping of the larger image to create the smaller image) shows that the image reuse and relabeling was not honest error but rather knowing and intentional." AR 4796 ¶ 60.

Fourth, the Office found that Frech used "the same . . . images" in the November 2011 Article "to represent different experimental treatments" by "copy[ing]" images, and in one case, "flipp[ing]" them "horizontally." AR 4797 ¶¶ 69-71. The Office found that "it was not honest error but rather knowing and intentional falsification and/or fabrication because the top left panel in [a figure] was copied, flipped horizontally, and relabeled to represent a different experiment in [another figure]." *Id.* ¶ 74. The Office also noted that Frech was the first author of the publication, and admitted to generating the figures. *Id.* ¶¶ 72-73. And it explained that certain "corresponding [ ] panels are different but support the expected outcome for the different illustrated experiments" such that the manipulated result "supports the authors' hypothesis," which "also shows that the falsification and/or fabrication was knowing and intentional and not honest error." *Id.* ¶ 75.

Fifth, the Office found that Frech used "the same . . . images" in the November 2011 Article "to represent results from different, unrelated experiments." AR 4798 ¶ 85. Specifically, "[t]he image in [one of the figures] is flipped horizontally and has a lighter contrast than the identical image in" a different figure. *Id.* ¶ 83. The Office determined that "[t]he manipulation (flipping and contrast adjustment) of the duplicated images" showed that Frech's image manipulation "was knowing and intentional rather than honest error." AR 4799 ¶ 86. The Office also considered that Frech was the first author of the publication and had admitted to generating the figures at issue, and that the manipulated results "support the authors' hypothesis," which "also shows that the falsification and/or fabrication was knowing and intentional and not honest error." *Id.* ¶¶ 87, 89-90.

Sixth, the Office found that Frech reused and relabeled images from an X-ray film in her laboratory notebook in two panels of a figure in the January 2011 Article. In the figure's top left panel, she labeled "identical images [ ] differently to represent different experimental conditions" than she documented on the film. AR 4800 ¶¶ 98-100. In the bottom left panel, she "flipped" an image from the film "both horizontally and vertically, i.e., around both the x and y axes." *Id.* ¶ 101. The Office noted that "[i]n response to the [Utah] inquiry committee's finding that the lower left panel . . . was flipped compared to the original film, [Frech] stated: 'The committee is correct that the panel was flipped around the vertical axis BUT represents the lanes as published.'" *Id.* ¶ 102. The Office found, however, that flipping the image "misrepresents the molecular weight," which is "critical in interpreting" the results, misrepresenting "the overall conclusion." *Id.* ¶ 103.

The Office found that "[t]he falsification and/or fabrication was intentional and knowing and did not result from honest error." AR 4801 ¶ 105. The Office explained that the image "in the lower left panel" was "flipped vertically and horizontally. Inadvertent, vertical flipping of both the right- and left-hand [images] would not lead to [the image] in the bottom left image panel to be

selectively flipped horizontally." *Id.* It further explained that "both the right- and left-hand" images in the film "were labeled as deriving from experiments with iron treatment. Inadvertent flipping of the images in the film around the vertical axis would not have changed that labeling. However, in [the January 2011 Article figure's] top left image panel, the image" is labeled '-Fe' [i.e., without iron treatment] . . . . Thus, [Frech's] honest error argument is not credible." *Id.* ¶ 106. The Office also explained, "[i]f only inadvertent flipping had occurred, the molecular weight markers shown in the bottom left and right image panels would have corresponded to the markers in the film, as flipping around the vertical axis would not have changed the molecular markers' positions on the vertical axis." *Id.* ¶ 107. But "[t]he [image] as reported in the figure do[es] not match the conditions and molecular weight represented in the X-ray film." *Id.* The Office noted that Frech was the first author of the publication, and the manipulated results "support [her] hypothesis." *Id.* ¶¶ 108, 110.

Finally, as to all six instances of Frech's image manipulation, the Office considered that the "falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers." AR 4793 ¶ 39, 4794 ¶ 52, 4796 ¶ 61, 4797 ¶ 76, 4799 ¶ 88, 4801 ¶ 109.

The Office and debarring official then considered the aggravating and mitigating factors enumerated in 42 C.F.R. § 93.408 and 2 C.F.R. § 180.860. AR 4802 ¶ 113. Aggravating factors were that Frech's "actions were knowing and intentional;" Frech "solely planned, initiated, and carried out the wrongdoing;" her "research misconduct was not an isolated event but rather was a pattern that occurred over the course of several years in three (3) [Service]-supported papers;" and her "research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare." *Id.* ¶¶ 114-17. Specifically, her "falsified and/or fabricated research results were included in three [Service]-supported published

papers and utilized funds that [the Service] otherwise could have spent on research that was not falsified or fabricated;" her "falsifications and/or fabrications led to retraction of two (2) published papers and [an Office] finding that an additional paper should be retracted or corrected;" her "fabricated and/or falsified research papers led to waste of valuable time and resources;" and her "three affected papers have been cited by others a total of 142 times in the scientific literature." *Id.* ¶¶ 118-21. Finally, the Office found that Frech "failed to accept responsibility for [her] misconduct and failed to recognize the seriousness of [her] misconduct." *Id.* ¶ 122. A mitigating factor was her "cooperat[ion] with the institution's research-misconduct proceeding," including "admitt[ing] to the creation of certain figures and the duplication of one of the images in question." *Id.* ¶ 123.

The Office found that Frech's "falsification and/or fabrication in three published papers constitutes research misconduct." AR 4803 ¶ 124. The debarring official further found that Frech's "intentional, knowing, or reckless research misconduct establishes a lack of trustworthiness and is so serious and compelling in nature that it demonstrates a lack of present responsibility to be a steward of federal funds," and recommended that Frech "should be debarred." *Id.* ¶¶ 128-29. The Department proposed, "[b]ased on the preponderance of the evidence supporting the [Office's] findings of research misconduct . . . that for a period of three (3) years, [Frech] be debarred from participating in 'covered transactions' as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1)." *Id.* ¶ 130. The Department further proposed "that, for a period of three (3) years, [Frech] be prohibited from serving in any advisory capacity to [the Service] including but not limited to service on any [Service] advisory committee, board, and/or peer review committee, or as a consultant." *Id.* ¶ 131. Finally, the Department proposed that the Office "send to the journal *Developmental Cell* a notice of [the Office's] findings and the need for retraction or correction of" the 2008 Article. *Id.* ¶ 132.

III.    **Procedural Background**

On July 18, 2023, the Office mailed Frech a charge letter notifying her of its findings of research misconduct against her, the bases for these findings, and the Department's proposed administrative actions, including debarment. AR 4783-804. The letter notified her of her right to contest the findings and proposed administrative actions by requesting a hearing before an ALJ. AR 4785. It also notified her that she must seek a hearing "within 30 days of receipt of this letter," and that if she did "not request a hearing, the research misconduct findings and administrative actions set forth above will become effective 30 days from the date of receipt of this letter." *Id.* It reiterated this point on the next page: "If you do not request a hearing, the research misconduct findings and administrative actions set forth above will become effective 30 days from the date of receipt of this letter." AR 4786. Frech received the letter on July 19, 2023. Ex. A, Delivery Proof. She did not request an ALJ hearing. The Office's research misconduct findings and Department's proposed administrative actions, including debarment, thus became final on August 19, 2023.

Before the deadline to request an ALJ hearing had passed, Frech had contacted the Office through counsel seeking to settle the case, but the Office had declined her proposed settlement terms. On August 22, 2023, Frech again contacted the Office through counsel seeking to settle the case. Ex. B, Ltr. (Aug. 22, 2023). The Office informed Frech's counsel that the deadline to request an ALJ hearing had passed and that the findings and administrative actions were final. Ex. C, Email (Aug. 22, 2023). Through counsel, Frech stated that it had been her "working assumption" that her settlement efforts had "the operative effect of suspending related deadlines, including the deadline to request a hearing," and requested an "extension to the deadline to submit a hearing request." Ex. D, Email (Aug. 22, 2023). The Office explained that because it had issued a charge letter, it lacked discretion to extend the deadline to request an ALJ hearing, Ex. E, Email (Aug. 23, 2023).

On August 29, 2023, Frech filed this action, and moved for leave to file both the complaint and a motion for a temporary restraining order under seal. ECF Nos. 1-2, 9. On August 30, 2023, the Department entered Frech's name in the General Services Administration's System for Award Management Exclusions. Ex. F, Exclusion. On August 31, 2023, this Court denied Frech leave to file under seal. ECF No. 5. The Office submitted its findings of research misconduct for publication in the Federal Register, which made the findings available on its website for public inspection on September 1, 2023, and officially published them the next business day, on September 5, 2023. *See Findings of Research Misconduct*, 88 Fed. Reg. 60,694, 60,695 (Sept. 5, 2023) ("Filed 9-1-23; 8:45 am"). That same day, Frech refiled her complaint on the public docket. ECF No. 7.[6]

On February 9, 2024, Frech moved for a temporary restraining order and preliminary injunction. ECF No. 20. According to Frech, the University of Iowa recently acquired the hospital where she worked and rescinded its offer to employ her after discovering her debarment during a background check. *Id.* at 2, 10. Frech asserts that the university "represented that, were it not for the debarment, it would be interested in having [her] to continue to work in the role," but "has already filled the role on an interim basis," and claims that "[w]ithout immediate injunctive relief, the opportunity for [her] to reclaim her job will pass." *Id.* at 22.

## LEGAL STANDARDS

### I.  <u>Temporary Restraining Order</u>

"A temporary restraining order is an extraordinary remedy, one that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Nat'l Lawyers Guild v. Exec. Off. Of Immigr. Rev.*, 456 F. Supp. 3d 16, 25 (D.D.C. 2020) (cleaned up). To obtain such

---

[6]     Frech's claim that she "filed suit in this court on September 5, 2023," Pl.'s Mot. at 10, is incorrect. She filed suit on August 29, 2023, and refiled her complaint publicly on September 5.

an order, a plaintiff must show (1) "that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the proposed relief is in the public interest." *Id.*

## II.     Preliminary Injunction

The standard to obtain a preliminary injunction is virtually identical to the standard to obtain a temporary restraining order. "A preliminary injunction is an extraordinary remedy that requires a moving party to make a clear showing that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (quotation marks omitted).

## ARGUMENT

Frech fails to satisfy any of the factors necessary to obtain emergency preliminary relief. She is unlikely to succeed on her challenges to the Office's findings of research misconduct against her and/or her debarment, as she identifies no error in these actions. She also fails to show that she will experience immediate irreparable harm absent preliminary relief, as any harm to her reputation has already occurred; any prospect that she may recover her former job if the Department lifts her debarment is speculative at best; and her injuries are self-inflicted. Finally, neither the balance of equities nor public interest favor preliminary relief, given the strong interest in protecting public funds against persons found to have knowingly and intentionally committed research misconduct.

## I.     Frech is Unlikely to Succeed on the Merits

A reviewing court must uphold an agency action under the Administrative Procedure Act unless that action is, as relevant here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted). "This review is highly deferential to the agency." *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 800 (D.C. Cir. 2022) (cleaned up). As explained further below, Frech is unlikely to succeed on her challenges to the Office's research misconduct findings or her debarment.

A.     **Frech is Unlikely to Succeed on Her Challenge to the Office's Findings of Research Misconduct Against Her**

Frech raises four challenges to the Office's research misconduct findings, but is unlikely to succeed on any of them. Specifically, she argues that the Office (1) failed to specify the level of culpability with which she acted, (2) erred in finding that her research misconduct was knowing and intentional, (3) erred in finding that she "falsified and/or fabricated" the images, (4) erred in finding that she solely planned, initiated, and carried out the wrongdoing, and (5) contradicted Utah's finding that she acted recklessly. As explained below, none of these arguments have merit.

1.     Frech is Unlikely to Succeed on Her Argument That the Office Failed to Specify the Level of Culpability With Which She Acted

Frech is unlikely to succeed on her argument that the Office failed to specify the level of culpability with which she acted, for three reasons. First, the Office expressly found that Frech's misconduct was knowing and intentional. Second, any omission as to Frech's level of culpability would not have been erroneous, given that the Office found that Frech acted with at least one of the requisite levels of culpability. Third, any such omission would not have been prejudicial, as she fails to explain how such an omission harmed her, and there is not the slightest uncertainty that on remand, the Office would find that her research misconduct was knowing and intentional.

a.   *The Office Expressly Found that Frech's Research Misconduct Was Knowing and Intentional*

Frech's claim that the Office failed to specify the level of culpability with which she acted is demonstrably incorrect. The Office expressly, repeatedly, and unambiguously stated, as to all six instances of Frech's research misconduct, that she acted knowingly and intentionally, not just recklessly. AR 4792 ¶ 38, 4793 ¶ 39, 4794 ¶¶ 49-52, 4796 ¶¶ 60-61, 4797 ¶¶ 74-76, 4799 ¶¶ 86-88, 4801 ¶ 105, 109, 4802 ¶ 114. While the Office's findings occasionally stated that Frech acted "intentionally, knowingly, or recklessly," *e.g.*, AR 4789 ¶ 6, these statements when read in context mean only that Frech met the culpability standard for research misconduct, which requires that "[t]he misconduct be committed intentionally, knowingly, or recklessly," 42 C.F.R. § 93.104(b), and do not negate or detract from the Office's express, repeated, and unambiguous findings that she acted knowingly and intentionally. *See Brodie v. Dep't of Health & Hum. Servs.*, 796 F. Supp. 2d 145, 152 (D.D.C. 2011) ("while the [agency] may have occasionally used the word 'reckless,' [it] did in fact employ a knowing and intentional standard. . . . [any] argument that the occasional use of the term 'reckless' demonstrates that the [agency] either used a lower state-of-mind standard or an inconsistent state-of-mind standard is unpersuasive" as agency "makes clear" it found party acted "knowingly and intentionally," which was "sufficient to prove use of the higher standard"). Curiously, Frech admits that the Office found that her "actions were knowing and intentional," but takes this as a "discrepancy" with its so-called "finding" that she "acted with any of the three levels of intent," Pl.'s Mot. at 18, rather than an indication that it did not make this latter "finding" at all.

b.   *Any Omission as to Frech's Specific Level of Culpability Would Not Have Been Erroneous*

Even had the Office failed to specify Frech's level of culpability, such an omission would not have been erroneous. Research misconduct can "be committed intentionally, knowingly, or recklessly," 42 C.F.R. § 93.104(b), so a finding that Frech acted intentionally, knowingly, and/or

recklessly, *id.*, would support the Office's finding that she committed research misconduct, as it would mean that she acted with at least one of the necessary levels of culpability. *See Brodie*, 796 F. Supp. 2d at 151-52 ("even if the [agency] did employ a recklessness standard, such a standard is consistent with . . . the misconduct regulation and thus cannot be arbitrary or capricious").

> c.     *Any Omission as to Frech's Particular Degree of Culpability Would Not Have Been Prejudicial*

Finally, even if the Office failed to specify Frech's level of culpability and such omission was erroneous, it would not be prejudicial, for two independent reasons. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *RadNet Mgmt v. NLRB*, 992 F.3d 1114, 1124 (D.C. Cir. 2021) ("In administrative law . . . there is a harmless error rule"). First, Frech cannot "show that any purported lack of notice prejudiced" her because she "would have presented different evidence" or arguments "if [she] had thought [that she] was being judged on a [specific] standard," *Brodie*, 796 F. Supp. 2d 154, given that she did not seek an ALJ hearing at all. And in any event, the evidence or arguments that Frech might have presented under any of the culpability standards seemingly would have been "inextricably intertwined," *id.*, i.e., there does not seem to be any evidence or arguments that Frech would have presented under one standard but not another.

Second, an agency error is harmless "where there is not the slightest uncertainty as to the outcome of the agency's proceedings on remand," such that remand would amount to "an idle and useless formality." *Calcutt v. FDIC*, 598 U.S. 623, 630 (2023) (per curiam) (cleaned up). Given the Office's express, repeated, and unambiguous statements that Frech's research misconduct was knowing and intentional, not just reckless, *see supra* § I.A.1.a, there is not the slightest uncertainty that on remand, the Office would find that her research misconduct was knowing and intentional.

2.    Frech is Unlikely to Succeed on Her Challenge to the Office's Findings That
      She Committed the Charged Misconduct Knowingly and Intentionally

Frech also is unlikely to succeed on a challenge to the Office's findings that she committed

the charged research misconduct knowingly and intentionally. While the substantial evidence rule

does not formally apply to informal adjudications unless a statute specifically so requires—only

to rulemaking and formal adjudications, *see* 5 U.S.C. § 706(2)(E); *Concert Inv'r, LLC v. SBA*, 616

F. Supp. 3d 25, 37 n.5 (D.D.C. 2022) (standard does not apply in "informal adjudications")—as a

practical matter, "arbitrary and capricious review and the substantial evidence test are one and the

same insofar as the requisite degree of evidentiary support is concerned," *Am. Radio Relay League,*

*Inc. v. FCC*, 524 F.3d 227, 244 (D.C. Cir. 2008) (quotation marks omitted). Substantial evidence

"is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pham v. Nat'l Transp. Safety Bd.*, 33 F.4th 576, 581 (D.C. Cir. 2022). This "requires more than a

scintilla, but can be satisfied by something less than a preponderance of the evidence." *Saunders*

*v. Kijakazi*, 6 F.4th 1, 4 (D.C. Cir. 2021). Whether analyzed under the rubric of either arbitrary and

capricious or substantial evidence review, the Office's findings that Frech both (1) committed the

charged misconduct and (2) did so knowingly and intentionally are "reasonable and must be upheld

under the applicable standard of review." *Burke v. EPA*, 127 F. Supp. 2d 235, 241 (D.D.C. 2001).

a.    *The Administrative Record Supports the Office's Finding That*
      *Frech Committed the Charged Research Misconduct*

Two buckets of evidence support the Office's findings that Frech, rather than a different

individual, committed the charged research misconduct: her (1) admissions that she had assembled

many of the images at issue, and (2) status as first author on two of the three publications at issue.

*First*, Frech repeatedly admitted, during the Utah investigation and appeal, that she had

assembled the figures at issue in the November 2011 and 2008 Articles. *See* AR 828 (Detailed

Response to Investigation Report) (Frech "generated the figures in [the November 2011 Article]");

AR 3968-69 (Table of Admissions) (stating, as to the November 2011 Article, that "[a]ll the western blots were in one film, which was the primary problem during the preparation of figures by [Frech]."); *id.* (stating, as to the 2008 Article, that "Dr. [Frech] assembled the figure"); AR 763 (July 21, 2012 correspondence from Frech to Utah Research Integrity Officer stating, as to a figure in the 2008 Article, "a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008," and "the duplication came from me"); *see also* AR 4792 ¶ 37, 4794 ¶ 48, 4795 ¶ 59, 4797 ¶ 73, 4799 ¶ 90 (crediting Frech's admission that she assembled the figures at issue).

Although Frech now alleges, as to her 2008 Article admission, that she "was pressured into writing [her July 21, 2012 admission letter] under threat of losing her employment," Compl. ¶ 50, no evidence in the administrative record supports this belated and self-serving assertion. To the contrary, Frech reaffirmed that she "assembled the figure" in the 2008 Article in her April 2013 appeal to the Panel, nine months after she first made that admission in her July 12, 2012 letter. AR 3968-69. And she ignores her admission, in response to Utah's investigation report, to assembling the figures containing manipulated images in the November 2011 Article. The Office reasonably took Frech at her word in admitting responsibility for the manipulated images. *See City of Portland v. EPA*, 507 F.3d 706, 713 (D.C. Cir. 2007) (action had "ample support in the record," including party's "own submissions"); *Dart Containerline Co. Ltd. v. Fed. Maritime Comm'n*, 722 F.2d 750, 756 (D.C. Cir. 1983) (plaintiff's "own submissions . . . provide substantial evidence" for agency action); *Atl. Arts Found. v. SBA*, Civ. A. No. 22-2109 (DLF), 2023 WL 8101074, at *4 (D.D.C. Nov. 21, 2023) ("It is reasonable for an agency to accept the facts submitted by a party as true.").

*Second*, Frech is the first and lead author on both the January 2011 and November 2011 Articles. AR 547, 559; *see also* AR 4794 ¶ 47, 4795 ¶ 58, 4797 ¶ 72, 4799 ¶ 89, 4801 ¶ 110 (putting weight on this fact). That is significant because "[s]cientific research papers usually have multiple

authors. The listing of authors follows a convention . . . . The first author listed is the 'lead author,' the scientist who conducted the experiment being reported and who took a primary role in drafting the paper." *Croce v. Sanders*, 459 F. Supp. 3d 997, 1002-03 (S.D. Ohio 2020), *aff'd*, 843 F. App'x 710 (6th Cir. 2021); *see also id.* at 1024 ("Academic papers often have multiple authors, with the scientists who perform the hands-on work listed at the beginning."); *Fisher v. Vassar Col.*, 852 F. Supp. 1193, 1200 (S.D.N.Y. 1994) ("The practice in science and among scientists in producing major research papers is . . . [t]he first author on a multi-authored paper is the principal investigator, with the other listed authors having supporting roles."); *Bois v. Dep't of Health & Hum. Servs.*, Civ. A. No. 11-1563 (ABJ), 2012 WL 13042904, at *10 (D.D.C. Mar. 2, 2012) (considering fact that plaintiff's "name appeared first on the list of authors for the article" in affirming misconduct finding); *Off. of Res. Integrity v. Kreipke*, No. 5109, at *82, 2018 HHSDAB Lexis 752 (HHS Dep't Appeals Bd. May 31, 2018) ("the basic fact that one is . . . a first listed author of a report . . . supports the inference that that person is responsible for the content of the report"). The Office thus reasonably rejected Frech's implausible suggestion that she had earned first author status "for occasionally being asked to guide [ ] technicians on some experiments." Compl. ¶ 2.

> b.    *The Administrative Record Supports the Office's Finding That Frech Committed the Misconduct Knowingly and Intentionally*

Likewise, three buckets of evidence support the Office's findings that Frech's research misconduct was knowing and intentional: Frech's (1) manipulation of images involved affirmative acts such as flipping and splicing images, (2) manipulated results always supported her scientific hypotheses, and (3) behavior was part of a broad pattern of manipulation across multiple papers.

*First*, Frech's manipulation of images involved affirmative acts such as "duplicat[ion]," "splic[ing]," "relabel[ing]," "flipp[ing]," "cropping," and altering "contrast" levels. AR 4792 ¶ 35, 4794 ¶ 46, 4795 ¶ 57, 4797 ¶ 70, 4798 ¶ 83, 4800 ¶¶ 99-100. Such acts are hard to ascribe to honest

error, suggesting that Frech acted knowingly and intentionally. AR 4792 ¶ 38 ("It is implausible that the reuse and relabeling of the image is attributable to honest error rather than intentional and knowing falsification and/or fabrication because the duplication occurred within an image panel and thus involved splicing two images together to make a composite image"), 4794 ¶ 51 ("The manipulation . . . shows that the falsification and/or fabrication is attributable to intentional and knowing conduct rather than honest error"), 4796 ¶ 60 ("The image manipulation (cropping of the larger image to create the smaller image) shows that the image reuse and relabeling was not honest error but rather knowing and intentional falsification and/or fabrication"), 4797 ¶ 74 ("It was not honest error but rather knowing and intentional falsification and/or fabrication because the top left panel . . . was copied, flipped horizontally, and relabeled to represent a different experiment"), 4799 ¶ 86 ("The manipulation (flipping and contrast adjustment) of the duplicated images shows that the falsification and/or fabrication was knowing and intentional rather than honest error."), 4801 ¶ 105 ("The bands in the lower left panel . . . were flipped vertically and horizontally. Inadvertent, vertical flipping of both the right- and left-hand sets of bands in the film would not lead to the bands in the bottom left image panel to be selectively flipped horizontally.").

*Second*, the fact that Frech's manipulation of images always supported her hypotheses also suggests that her actions were knowing and intentional. *See* AR 4794 ¶ 49 (manipulated images "show ideal results, strongly supporting [Frech's] hypothesis"), 4797 ¶ 75 ("the falsification and/or fabrication supports the authors' hypothesis"), 4799 ¶ 87 ("The results . . . support the authors' hypothesis," which "shows that the falsification and/or fabrication was knowing and intentional and not honest error"), 4801 ¶ 108 (manipulation "support[s] [her] hypothesis"). Had her actions been honest error, the Office would have expected at least some of the results to not support her

hypotheses. The Office reasonably concluded, based on its scientific expertise, that the fact that

these results all supported Frech's hypotheses suggests her actions were knowing and intentional.

*Third*, each instance of image manipulation "was not an isolated event, but rather part of a

pattern of image reuse, relabeling, and manipulation in multiple figures across three papers." AR

4793 ¶ 39, 4794 ¶ 52, 4796 ¶ 61, 4797 ¶ 76, 4799 ¶ 88, 4801 ¶ 109. The Office reasonably inferred

from this pattern of repeated behavior that Frech's multiple instances of image manipulation were

knowing and intentional. *See Deaver v. United States*, 155 F.2d 740, 745 (D.C. Cir. 1946) ("The

fraudulent nature of the plan may be inferred from a series of isolated acts."); *McKenzie v. Risley*,

842 F.2d 1525, 1535 (9th Cir. 1988) (the "acts took place over a relatively long period of time and

at different locations; they involved a variety of actions wholly inconsistent with any state of mind

other than intentional conduct"); *Weiss v. United States*, 122 F.2d 675, 683 (5th Cir. 1941) ("the

recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each

instance) to negative accident or inadvertence or self-defense or good faith or other innocent

mental state"); *cf. United States v. Breedlove*, 204 F.3d 267, 273 (D.C. Cir. 2000) (in the criminal

sentencing context, "planning is deemed present in any case involving repeated acts over a period

of time, unless it is clear that each instance was purely opportune" (quotation marks omitted)).

### 3.     Frech is Unlikely to Succeed on Her Argument That the Office Erred in Finding that She "Falsified and/or Fabricated" Images

Frech's argument that the Office erred by finding that she "falsified and/or fabricated"

images likewise is meritless. She argues that by finding that she "falsified and/or fabricated" results

rather than just one or the other, the Office "abandons its burden for determining whether data

were made up or altered," and that if the Office "cannot make a determination as to . . . the specific

type of research misconduct she purportedly engaged in, it cannot plausibly satisfy its burden of

making a research misconduct finding by a preponderance of the evidence." Pl.'s Mot. at 17. But

a "finding of research misconduct" does not require the Office to specify whether a particular act of misconduct constitutes fabrication, falsification, or plagiarism. 42 C.F.R. § 93.104. It requires only that (1) "[t]here be a significant departure from accepted practices of the relevant research community," (2) "[t]he misconduct be committed intentionally, knowingly, or recklessly," and finally, (3) "[t]he allegation be proven by a preponderance of the evidence." *Id.* So long as these three conditions are satisfied, a research misconduct finding is valid even if it fails to specify the type of research misconduct at issue, i.e., whether it is fabrication, falsification, or plagiarism. *Id.*

That makes sense, because research misconduct can entail behavior that reasonably can be characterized as either falsifying or fabricating results, or both, such as altering original results and passing them off as new results. *See Croce*, 459 F. Supp. 3d at 1004 ("[R]elevant to this case are the terms 'image manipulation' and image or data 'duplication.' It is unclear whether the parties would place these concepts into a certain category (fabrication, falsification or plagiarism) or would view them as a hybrid."). Indeed, Frech's acts of research misconduct each had this character, such as when she "duplicated" results, "spliced [them] into a composite image, and relabeled [them] to represent different" results, AR 4792 ¶ 35, or "reused and relabeled the same image," AR 4794 ¶ 46; *see also* AR 4795 ¶ 57, 4797 ¶ 69, 4798 ¶ 85, 4800 ¶ 100 (same). The Office's findings that Frech had "falsified and/or fabricated" images thus were accurate—she both falsified original results and fabricated new results.

Finally, any suggestion that the Office's use of the term "falsified and/or fabricated" means that it failed to specify the nature of Frech's research misconduct is meritless. The Office's detailed factual findings make clear the specific research misconduct that it found her to have committed for all six acts of her research misconduct. The Office's use of the term "falsified and/or fabricated" in connection with these findings do not negate or detract from the findings' high level of detail.

4.     Frech is Unlikely to Succeed on Her Challenge to the Office's Finding That <u>She Solely Planned, Initiated, and Carried Out the Wrongdoing</u>

Frech takes issue with the Office's finding that she "solely planned, initiated, and carried out the wrongdoing," AR 4802 ¶ 116, but points to no evidence that casts doubt on it. While Frech argues that "the evidence plainly demonstrates that there were systemic problems in Dr. Kaplan's lab and that responsibility for the errors at issue in the allegations went substantially beyond [her]," Pl.'s Mot. at 15, this mischaracterizes the evidence in the record, which does not show that anyone else contributed to her misconduct. Although the Committee found that Kaplan, as the laboratory's leader, was lax in his oversight of and systematically failed in supervising Frech, it also "found no evidence that [he] directly contributed to the misrepresentation or manipulation of data." AR 967. The fact that Kaplan was lax in his oversight and should have caught Frech's errors does not render him culpable for, or mean that he helped Frech plan, initiate, or carry out, her research misconduct.

5.     Frech is Unlikely to Succeed on Her Argument That the Office's Findings <u>Contradict Utah's Investigative Findings</u>

Finally, Frech is unlikely to succeed on her argument that the Office's research misconduct findings "are contradicted outright by" Utah's investigative findings, Pl.'s Mot. at 15, for two separate reasons: (1) the Office was not required to defer to Utah's findings, and (2) the Office's findings are not necessarily inconsistent with Utah's findings.

*First*, the Office was not required to defer to Utah's findings. Rather, the Office was entitled to conduct additional analyses, develop evidence, and make its own research misconduct findings separate from and independent of Utah's findings. *See* 42 C.F.R. §§ 93.400(a)(7), 93.400(c), 93.403(d)-(g), 93.404(a); *accord Brodie v. Dep't of Health & Hum. Servs.*, 715 F. Supp. 2d 74, 77 (D.D.C. 2010) (Office can "make its own independent determination as to whether misconduct occurred"); *Bois*, 2012 WL 13042904, at *2 (Office "conducted additional analysis"); *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 171 (1st Cir. 2016) (Office has "authority to obtain

additional input from virtually any source, supplement the evidence, and develop its own analysis"). Pursuant to that authority, the Office conducted its own image analysis of Frech's work. AR 4208-20. Based on its scientific expertise, independent review of the evidence, and additional analysis, it reasonably found that Frech's research misconduct was knowing and intentional.

*Second*, the Office's findings do not necessarily conflict with Utah's finding that Frech was reckless. Even Utah concluded that some images "were intentionally manipulated to present false data." AR 4048. While Utah did not find that Frech specifically, "as opposed to an unknown third person," had manipulated the images, it failed to consider her admissions that she had been the one to generate, duplicate, and assemble the images, AR 763, 828, 3968-69, which might explain its different finding on her level of culpability. And notably, Utah did not find that Frech's actions were *not* knowing or intentional. AR 4046. Its finding that Frech acted with at least the lesser level of culpability of recklessness thus is logically compatible with a finding that she acted with the greater levels of culpability of knowledge and intent. *See Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) ("Recklessness is a lower bar than intent"); *United States v. Bailey*, 444 U.S. 394, 404 (1980) (listing, "[i]n descending order of culpability . . . purpose, knowledge, [and] recklessness").

## B.      Frech is Unlikely to Succeed on Her Challenge to Her Debarment

The Department's decision to debar Frech for three years was not arbitrary or capricious. The Office made extensive factual findings regarding her research misconduct. AR 4791-801. And the Department carefully weighed aggravating and mitigating factors in fashioning its action, AR 4802, reasonably determined that her "intentional, knowing, or reckless research misconduct establishes a lack of trustworthiness and is so serious and compelling in nature that it demonstrates a lack of present responsibility to be a steward of federal funds," and that her actions thus were cause for debarment, AR 4803 ¶¶ 124, 128, and determined that debarment was proper, *id.* ¶ 129. The bulk of Frech's challenges to her debarment merely recycle her challenges to the Office's

research misconduct findings, and fail for the same reasons. In addition, Frech argues that (1) her ostensible "voluntary exclusion" from Service-funded research and (2) the time that has elapsed since her research misconduct precludes her debarment. Neither one of these arguments has merit.

1.   Frech's Ostensible "Voluntary Exclusion" From Service-Funded Research
Does Not Preclude Debarment

Frech's assertion that she "has voluntarily excluded herself from participating in [Service]-funded research for more than a decade," Pl.'s Mot. at 19, does not render the decision to debar her arbitrary or capricious. "Voluntary exclusion" is a term of art in the debarment context and does not apply in the present circumstances because there is no settlement agreement between the parties containing a voluntary exclusion provision (or any settlement agreement at all). Further, Frech's asserted voluntary forbearance is irrelevant under the debarment regulations, does not offer the public adequate protection against future wrongdoing, and appears to be simply inaccurate— Frech has continued to engage in covered transactions even after leaving Utah, and does not even claim to abstain from covered transactions other than Service-funded research, such as research supported by other sources of federal funds. Her asserted voluntary forbearance thus is irrelevant.

a.   *"Voluntary Exclusion" is a Term of Art That Does Not Apply Here*

"Voluntary exclusion means a person's agreement to be excluded under the terms of a settlement between the person and one or more agencies." 2 C.F.R. § 180.1020(a). But the parties have not executed a settlement agreement, *see supra* p. 12, so Frech cannot have excluded herself from covered transactions pursuant to any such agreement. Moreover, "[v]oluntary exclusion must have governmentwide effect," *id.*, and Frech is conspicuously silent on whether she has abstained from covered transactions other than Service-funded research. Her asserted voluntary forbearance thus does not meet the "voluntary exclusion" regulation's procedural or substantive requirements.

27

>    b.    *Frech's Asserted Voluntary Forbearance is Irrelevant Under the*
>          *Debarment Regulations*

Frech's asserted voluntary forbearance is irrelevant under the debarment regulations. "[A]
Federal agency may exclude any person who has been, is, or may reasonably be expected to be a
participant or principal in a covered transaction," regardless of whether she currently is involved
in a covered transaction. 2 C.F.R. § 180.150; *accord Uzelmeier v. Dep't of Health & Hum. Servs.*,
541 F. Supp. 2d 241, 248 (D.D.C. 2008) ("a person may be debarred even if not currently involved
in a covered transaction, so long as he or she has been or reasonably may be expected to be so
involved"). And Frech identifies no mitigating factor to which her so-called voluntary forbearance
is relevant, *see* 42 C.F.R. § 93.408, much less satisfy her burden to prove that any mitigating factor
exists, *see id.* § 93.106(b)(3); 2 C.F.R. § 180.855(b). Frech's asserted voluntary forbearance from
Service-funded research does not indicate that she is "presently responsible to conduct [Service]
supported research," 42 C.F.R. § 93.408(g), because "the phrase 'present responsibility' does not
refer to [a person's] job, but rather to whether [a person's] exclusion is in the public interest."
*Uzelmeier*, 541 F. Supp. 2d at 247. "That is to say, the relevant question is whether or not [Frech]
could or should be entrusted with public funds or a public contract at the present time or going
forward, not whether [Frech] currently is so entrusted." *Id.* at 248. Given that her misconduct was
knowing and intentional, involved multiple publications over several years, and had significant
impacts, and that Frech has failed to accept responsibility for or recognize the seriousness of her
misconduct, AR 4803 ¶¶ 114, 116-17, 122, the Department did not err in finding that Frech should
not presently be entrusted with public funds or a public contract and so is not presently responsible.

>    c.    *Frech's Asserted Voluntary Forbearance Furnishes the Public*
>          *Inadequate Protection Against Future Misconduct By Her*

Frech's asserted voluntary forbearance from Service-funded research also furnishes the
public inadequate protection against further misconduct by her—it is unenforceable, difficult to

monitor, and subject to unilateral reversal at her whim. *See In re Grand Jury Investigation*, 315 F. Supp. 3d 602, 628 (D.D.C. 2018), *aff'd*, 916 F.3d 1047 (D.C. Cir. 2019) ("shackles [that one] may remove anytime, for any reason, do not meaningfully restrict"). Just as a criminal defendant cannot avoid the imposition of a sentence that is necessary "to protect the public from further crimes of the defendant," 18 U.S.C. § 3885(a)(2)(C)—a consideration wholly separate from and independent of the need "to provide just punishment for the offense," *id.* § 3885(a)(2)(A)—merely by claiming that she will forbear voluntarily from engaging in further criminal activity, Frech likewise cannot avoid debarment that is necessary "to protect the public interest," 2 C.F.R. § 180.125(c), just by claiming that she will forbear voluntarily from any Service-funded research. Simply put, the public is entitled to firmer protection against further misuse of federal funds by Frech than her own bare assertion of voluntary forbearance from Service-funded research. *See Uzelmeier*, 541 F. Supp. 2d at 244 (debarment appropriate despite plaintiff's "assert[ion] that she has no intention of returning to the sciences or working on any project sponsored by or paid for by the federal government").

### d.     Frech Has Continued to Engage In Covered Transactions

Finally, Frech's asserted voluntary forbearance from covered transactions since leaving Utah is simply incorrect as a factual matter. A debarment's scope is not limited to Service grants—it reaches all "covered transactions," 2 C.F.R. §§ 180.200, 180.210, a term that includes "any" federal "[g]rants," *id.* § 180.970(a)(1), with just limited exceptions not relevant here. Frech does not even claim to have abstained from covered transactions other than Service-funded research, such as research supported by other sources of federal funds, and the administrative record shows that she participated in many covered transactions not involving Service funds since leaving Utah. For example, she published research in 2017 to 2021 funded by the Departments of Defense and Veterans Affairs, as these publications' Acknowledgements expressly recognize. AR 4259-85.

Even Frech's claim to have avoided Service-funded research after leaving Utah appears to be doubtful. She seems to have continued to perform Service-funded research at the University of Iowa ("Iowa"). AR 4535-39. There, she was a named author on papers from the Zhan Laboratory that cite Service funding as supporting the published research—her reported author contributions included performing, designing, and supervising experiments and analyzing data. AR 4221-97; *see also* Ex. G, *Off. of Res. Integrity v. Bois*, No. C-10-436, at *3 (Dep't Appeals Bd. Nov. 2, 2010) (respondent's "claims ring hollow in light of his own published acknowledgments that [federal] money funded his research in both of the cited instances" (emphasis omitted)). She also played a role in the Zhan Laboratory's efforts to seek Service funding—the laboratory attempted to secure a National Institutes of Health salary for Frech in three grant applications by Iowa. AR 4548, 4563, 4589-91, 4600, 4633, 4648, 4660, 4676, 4706, 4745. Finally, Frech is a named inventor on a United States patent on novel methods of cancer therapy that references Service-funded research by Frech and Dr. Zhan to support the invention's merits. AR 4298-99. Both Frech's ongoing involvement with Service-funded research and apparent lack of candor about that fact underscore that her claim that she has voluntarily left the world of Service-funded research provides the public inadequate protection against future research misconduct by her, further justifying her debarment.

While Frech asserts that her work in the Zhan Laboratory involved no Service-funded research, AR 4805, this claim is doubtful for several reasons. First, she takes an unduly narrow view of what constitutes involvement with Service funding. While she claims that she assisted in experiments for just a single Service-funded paper, AR 4806, she does not deny that she performed analysis relating to other Service-funded experiments. While she claims that she was not involved with Service funds granted to certain other researchers, AR 4806, 4808, she does not deny that she was in active collaboration with those researchers in their Service-funded research. And while she

asserts that certain Service grants that funded research projects on which she worked had ended by the time she joined the laboratory, AR 4807-08, she does not deny that she used equipment and materials that the laboratory had procured using Service funds back when those grants were active.

Lastly, Frech provides no actual evidence that she performed no work supported by Service funds during her time at Iowa. All that she offers is her own unsupported claim to that effect, which the Department was not required simply to accept uncritically at face value. *See Affum v. United States*, 566 F.3d 1150, 1164 (D.C. Cir. 2009) ("the agency need not accept [a] claim"); *Comm. for Nuclear Resp. v. Seaborg*, 463 F.2d 783, 787 (D.C. Cir. 1971) (an agency "is not foreclosed from noting . . . that it accepts certain contentions or rejects others"); *MomoCon LLC v. SBA*, Civ. A. No. 21-2386 (RC), 2023 WL 8880335, at *6 (D.D.C. Dec. 22, 2023) (agency need not accept "self-serving statements"); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) (a "self description may not reflect [ ] reality"); *Nw. Immigr. Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 75 (D.D.C. 2020) ("agencies need not accept uncritically" all materials submitted). And conspicuously, Fech at times appears to back away from any categorical assertion that she never participated in any Service-funded research in the Zhan Laboratory at all, offering more nuanced and hedging language. At one point, Frech claims that Dr. Zhan had no active Service grants while she worked at his laboratory "[t]o [her] knowledge." AR 4808. Elsewhere, she claims that "it was her understanding that the funding from the grant had ended," AR 4807—ambiguous words that suggest that at least one Service grant funding a project of hers might have been active at the time.

### 2. The Time That Has Elapsed Since Frech Engaged In Research Misconduct Does Not Preclude Debarment

Nor does the time that has elapsed since Frech committed her research misconduct preclude debarment. No statute, regulation, or authority prohibits the Office from debarring a researcher once a long enough period has elapsed. *See Uzelmeier*, 541 F. Supp. 2d at 248 (seven-year gap in

time between misconduct's discovery and initiation of proceedings did not make debarment unlawful because "Plaintiff cites no statute or regulation which would mandate that the debarment proceeding have been dismissed as untimely"). At most, this gap in time might be "just one factor" to consider, but certainly not "the dispositive factor" or "the primary one." *Id.* And even that is doubtful, as Frech fails to identify any mitigating factor to which the passage of time might be relevant. To the extent that she invokes the "[p]resent responsibility" factor, 42 C.F.R. § 93.408(g), she fails to explain, and it is unclear to Defendants, how the gap in time is relevant to this factor— how it bears on whether Frech "could or should be entrusted with public funds or a public contract at the present time or going forward," *Uzelmeier*, 541 F. Supp. 2d at 248, especially in light of the knowing and intentional nature of her misconduct; its scope, duration, and significance; and her failure to accept responsibility for it or acknowledge its seriousness. AR 4803 ¶¶ 114, 116-17, 122.

Frech's failure to accept responsibility for and recognize the seriousness of her misconduct makes the passage of time since her misconduct especially unimportant. AR 4802 ¶ 122 (Frech "failed to accept responsibility for [her] misconduct and failed to recognize the seriousness of [her] misconduct"); 42 C.F.R. § 93.408(d)(1), (3) (whether "the respondent accepted responsibility for the misconduct by . . . [a]dmitting the conduct" or "[d]emonstrat[ed] remorse and awareness of the significance and seriousness of the research misconduct" are mitigating factors). Even today, Frech continues to deny that her misconduct was knowing and intentional, and attempts to shift the blame onto her former colleagues. *See, e.g.*, Pl.'s Mot. at 15 (denying that her "actions were intentional and knowing," and claiming "that there were systemic problems in [the] lab and that responsibility for the errors at issue in the allegations went substantially beyond" herself); *compare Uzelmeier*, 541 F. Supp. 2d at 248 (debarment proper because "plaintiff has admitted no past wrongdoing and has not demonstrated that her present responsibility has changed or improved since the underlying

incidents"); *Brodie*, 796 F. Supp. 2d at 156 (agency "did consider whether Plaintiff had expressed remorse or accepted responsibility for his actions, finding that he had done neither"); *Burke*, 127 F. Supp. 2d at 242 ("failure to take personal responsibility for [the] offense" supported debarment).

While Frech cites two cases from the Court of Federal Claims for the idea that the time that has elapsed since her misconduct precludes debarment, *Inchcape Shipping Services Holdings Ltd. v. United States*, No. 13-0953, 2014 WL 12838793 (Fed. Cl. Jan. 2, 2014), and *Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238 (2001), both are distinguishable. Neither one involved debarment, and in both, the court doubted that there was need to protect government interests, as there is here.

*Inchcape* and *Lion Raisins* both involved suspension, which is an interim measure "for a temporary period pending the completion of an investigation or resulting legal or debarment proceedings," 2 C.F.R. § 180.715(e), not debarment. Because suspension does not afford prior notice or opportunity to respond, it is proper only if "[i]mmediate action is necessary to protect the public interest." *Id.* § 180.700(c); *see also Env't Fed. Fund v. Ruckelshaus*, 439 F.2d 584, 595 (D.C. Cir. 1971) ("Suspension is designed to protect the public from an imminent hazard during the course of further administrative proceedings" (quotation marks omitted)); *United States v. E-Gold, Ltd.*, 521 F.3d 411, 417 (D.C. Cir. 2008) ("in extraordinary situations notice and a hearing may be postponed until after the deprivation" (cleaned up)). Debarment, in contrast, affords both prior notice and opportunity to respond, and thus is not limited to those contexts where immediate action is necessary to protect the public interest. *See* 2 C.F.R. §§ 180.805-.855. Suspension thus is akin to a temporary restraining order entered ex parte, which requires a movant to show that "[t]he asserted irreparable injury" is so "imminent" that immediate injunctive relief is necessary, *Singh*, 56 F.4th at 109 (cleaned up); *accord Al-Fayed v. CIA*, 254 F.3d 300, 303 n.2 (D.C. Cir. 2001) ("the

same factors apply in evaluating requests for preliminary injunctions and temporary restraining orders"), whereas debarment is more akin to a permanent injunction entered with final judgment.

In *Inchcape*, 2014 WL 12838793, at *2, the court determined that the interval of time that had elapsed between the government's discovery of a contractor's misconduct and a suspension "casts serious doubt on the government's claim that immediate action was necessary."[7] In *Lion Raisins*, 51 Fed. C. at 248, the court rejected the government's "conclu[sion] that suspension was immediately necessary to protect government interests." But while failure to show that immediate action is necessary to protect the public interest is fatal to suspension, it is irrelevant to debarment.

Further, in both *Inchcape* and *Lion Raisons*, the court doubted that there was need to protect government interests, which is present here. In *Inchcape*, 2014 WL 12838793, at *2, the court was skeptical "that there is any evidence of an ongoing threat against which the Government needed to be protected." Frech, in contrast, remains an ongoing threat to federal funds given the knowing and intentional nature of her research misconduct; its scope, duration, and significance; and her failure to accept responsibility for or acknowledge the seriousness of it. AR 4803 ¶¶ 114, 116-17, 122. In *Lion Raisins*, 51 Fed. Cl. at 247, meanwhile, the government had "awarded [a contractor] five contracts between the completion of its investigation . . . and its decision to suspend" the contractor, despite the fact that it "statutorily was obligated to make an affirmative finding of [the contractor's] responsibility before awarding each of those contracts." Nothing remotely like that has happened here—the Department made no affirmative finding of Frech's responsibility since it began its oversight review, much less since it completed its review. Accordingly, the critical facts

---

[7]      *Inchcape*, 2014 WL 12838793, at *2 (citing 48 C.F.R. § 9.407-1(b)(1)), involved a section of the Federal Acquisition Regulation, not the nonprocurement regulations, but that distinction is immaterial as the relevant regulations are phrased identically in all material respects.

in both *Inchcape* and *Lion Raisins* that, as those courts viewed it, undermined the government's determinations that the plaintiffs posed ongoing threat to the public interest are wholly absent here.

Lastly, the time that has elapsed between Frech's research misconduct and debarment does not support an inference that her debarment has a punitive purpose given the innocent facts that readily explain this interval—the large and growing volume of the Office's responsibilities. Over the last decade, the Office has been responsible for reviewing hundreds of allegations of research misconduct submitted each year, with a staff of about six to eight full-time scientist-investigators. Runko Decl. ¶¶ 7-8, ECF No. 22-1.[8] In Fiscal Year 2022, for example, the Office received 269 research misconduct allegations and closed seventy-eight cases. *Id.* ¶ 8. Through its oversight reviews and compliance and assurance programs, moreover, the Office is also responsible for ascertaining whether institutions are following regulations that govern their responses to research misconduct allegations. *See id.* ¶¶ 3-5. In Fiscal Year 2022 alone, for example, the Office managed over 5,800 institutional assurance records. *Id.* ¶ 4.

## II. Frech Is Unlikely to Experience Irreparable Harm Absent Preliminary Relief

Frech also fails to show that she is likely to experience imminent irreparable harm absent preliminary relief. Frech frames the harm that she alleges in narrow terms—she acknowledges that she "has now been terminated" already, asserting only that she "has a limited window of time to lift the debarment and reclaim her [old] job," and that "[w]ithout injunctive relief, that opportunity will vanish." Pl.'s Mot. at 21. But while she characterizes this asserted harm in terms of both loss of her former job and injury to her reputation, *see id.*, neither of these characterizations supports a colorable allegation of imminent irreparable harm, as explained further below.

---

[8]     This Court may consider the declaration because the reason for the interval of time between Frech's misconduct and her debarment "is not adequately explained in the record" as it stands. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *see also* Mot. Suppl. AR, ECF No. 22.

### A.    Frech Fails to Show Imminent Irreparable Harm Based on Loss of Her Job

Frech cannot and does not claim to face an imminent risk of losing her job, as she has lost her job already. Instead, she argues that she is at risk of missing a limited opportunity to reclaim her former job before it is filled on a permanent basis. But even loss of a job itself is insufficient to show irreparable harm. Further, any possibility that Frech might be able to reclaim her former job is entirely speculative, and thus insufficient to show irreparable harm, as she fails to show, or even allege, that she would reclaim her former job if the Department lifts her debarment.

*First*, mere loss of a job is insufficient to show irreparable harm, so loss of an opportunity to reclaim a job previously lost cannot be irreparable harm, either. *See Fort Myer Constr. Corp. v. Shrensky*, Civ. A. No. 23-2275 (CJN), 2024 WL 181075, at *3 (D.D.C. Jan. 17, 2024) ("[Plaintiff] contends that his loss of employment is special. The Court is not convinced."); *Navy SEAL 1 v. Austin*, 600 F. Supp. 3d 1, 21 (D.D.C. 2022) ("loss of pay and benefits is not, as a matter of law, irreparable harm"); *Acosta v. District of Columbia*, Civ. A. No. 20-1189 (RC), 2020 WL 2934820, at *4 (D.D.C. June 3, 2020) ("The normal difficulties faced by loss of employment simply do not constitute irreparable harm, however substantial they may be," even in "an extremely sympathetic case"); *Gilliard v. McWilliams*, 315 F. Supp. 3d 402, 417 (D.D.C. 2018) ("loss of employment is not legally irreparable"); *Colley v. James*, 254 F. Supp. 3d 45, 69 (D.D.C. 2017) ("the loss of employment income does not necessarily establish irreparable harm—even when the loss is unrecoverable"); *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) ("cases are legion holding that loss of employment does not constitute irreparable injury").

While "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found," Frech offers no reason to think hers is one of the "extraordinary cases" for which "[u]se of the court's injunctive power . . . should be reserved." *Sampson v.*

*Murray*, 415 U.S. 61, 92 n.68 (1974). Rather, hers is a "routine case" for which injunctive relief is inappropriate. *Id.* The only harm that she may experience from her inability to obtain a job is "an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—[which] will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.* This is not to downplay the difficulty that missing out on a job opportunity can entail—only to say that it is not, as a matter of law, irreparable harm. *Id.*

*Second*, Frech does even not assert that she will be unable to find any job at all, or even a job of comparable pay, benefits, and stature where she currently lives—only that she will not find a job in her chosen "career" where she currently lives, and must look to "another city or state" for "a similar job." Pl.'s Mot. at 21. But "the loss of some employment opportunities does not amount to an alteration of a legal right." *Info. Agency v. Krc*, 905 F.2d 389, 397 (D.C. Cir. 1990).

*Third*, while Frech asserts that Iowa "has represented that, were it not for the debarment, it would be interested in having [her] to continue to work in [her former] role," Pl.'s Mot. at 22, she offers no evidence to corroborate this claim, like a declaration by the individual who allegedly made this statement. Frech's "mere allegations in [her] brief . . . are not evidence." *Sierra Club v. EPA*, 292 F.3d 895, 901 (D.C. Cir. 2002); *see also Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) ("briefs are not evidence" (quotation marks omitted)); *Brown v. INS*, 775 F.2d 383, 388 (D.C. Cir. 1985) ("But these allegations, upon analysis, were just that. They were assertions of counsel, not evidence."). Frech's failure to offer any evidence that anyone at Iowa actually made the statement that she attributes to Iowa precludes her from carrying her burden of persuasion to show that emergency relief is merited. *See Olu-Cole ex rel. M.K. v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) ("the degree of proof required for irreparable

harm is high"); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 672 (D.C. Cir. 1985) ("unsubstantiated" allegation of irreparable harm insufficient); *Nat'l Lawyers Guild.*, 456 F. Supp. 3d at 25 (emergency relief available only if movant, "by a clear showing, carries the burden of persuasion"); *Fed'n Internationale De Football Ass'n v. Nike, Inc.*, 285 F. Supp. 2d 64, 69 (D.D.C. 2003) (emergency relief unavailable if party offers "no evidence").

  *Fourth*, even assuming an Iowa official told Frech that "were it not for the debarment, it would be interested in having [her] to continue to work in [her former] role," Pl.'s Mot. at 22, this cryptic, ambiguous statement is a far cry from a commitment to rehire Frech if the Department lifts her debarment. It could mean as little as that Iowa would have rehired Frech had she not been debarred, not that it necessarily will hire her now if she ceases to be debarred, and certainly is not a pledge to that effect. At most, there is a speculative possibility that Frech might be able to recover her old job, but mere speculation is inadequate to establish the irreparable harm necessary to obtain emergency relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) ("the irreparable injuries asserted fail to rise beyond the speculative level"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006) ("Such an injury is far too speculative to warrant preliminary injunctive relief").

### B.  Frech Fails to Show Imminent Irreparable Reputational Harm

  Frech also fails to show that emergency relief is necessary to prevent imminent irreparable harm to her reputation. To obtain emergency relief, a movant "must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *England*, 454 F.3d at 297 (cleaned up). Harm thus cannot be irreparable "unless

the threatened injury [is] both great and immediate." *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1121 (D.C. Cir. 2004). Further, a party seeking prospective "injunctive relief must establish an ongoing or future injury that is certainly impending and may not rest on past injury." *Weissman v. Nat'l R.R. Passenger Corp.*, 21 F.4th 854, 857 (D.C. Cir. 2021) (quotation marks omitted).

Frech cannot establish that any harm to her reputation is imminent because any such harm has occurred already. Frech was debarred in August 2023, meaning that any harm to her reputation owing to her debarment already occurred over six months ago. *See* Compl. ¶ 36. Further, the Office's research misconduct findings against her were published in September 2023. *See* 88 Fed. Reg. 60,694. Indeed, Frech admits that she "has already suffered reputational and economic harm due to the allegations in this matter." Pl.'s Mot. at 22. And her own framing of her asserted injury makes clear that Iowa is aware of her debarment already, so there is no risk of further reputational harm in Iowa's eyes. *Id.* (alleging that Iowa represented to her that "were it not for the debarment, it would be interested in having [her] to continue to work"). Because the reputational harm Frech aims to prevent has already come to pass, she cannot show that further reputational harm is likely.

Further, any reputational harm to Frech owing to her debarment is self-inflicted, and thus cannot support a showing of irreparable harm. *See Steele v. Dep't of Def.*, Civ. A. No. 22-3604 (CJN), 2022 WL 22329872, at *1 (D.D.C. Dec. 8, 2022) ("self-inflicted injuries do not constitute irreparable harm"); *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 35 (D.D.C. 2014) ("the harm is self-inflicted and, therefore, not the irreparable harm that supports injunctive relief"); *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury"); *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable"); *cf. Pub. Citizen v. Nat'l Highway Transp. Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007) (no standing to challenge

"'self-inflicted' injury not caused by the agency action" at issue); *Nat'l Family Planning & Repro. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.").

Any reputational harm is self-inflicted because Frech failed to exhaust her administrative remedies before, or pursue preliminary relief after, her debarment became final. Frech did not seek an ALJ hearing before her debarment became final—had she done so, the proposed debarment would not have become final while proceedings were pending. 42 C.F.R. § 93.406. Nor did Frech lack notice that she could have requested an ALJ hearing—beyond the notice that the regulations themselves provide, the Office expressly notified Frech of her opportunity to contest the findings and proposed administrative actions before an ALJ. AR 4785-86. Even after the debarment became final, Frech did not seek reconsideration of the debarment decision. 2 C.F.R. § 180.875. Nor did she pursue emergency relief after the debarment became final. Although she made an initial abortive attempt to seek emergency relief under seal last August, ECF No. 9, Chief Judge Boasberg denied her leave to file under seal, ECF No. 5, and she curiously did not renew her efforts to seek emergency relief on the public docket. Whatever her reasons for that were, her failure to exhaust administrative remedies or pursue emergency relief after her debarment became final precludes her from seeking emergency relief to remedy such self-inflicted injuries now, six months later.

## III.  <u>Frech Fails to Show That the Balance of Equities Favors Preliminary Relief</u>

The balance of equities and public interest "merge when, as here, the Government is the opposing party." *Singh*, 56 F.4th at 107. In weighing equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. At the threshold, because Frech fails to show a likelihood of success on the merits or imminent irreparable harm absent preliminary relief, the equities and public interest alone cannot warrant relief. *See Shaw v. Austin*, 539 F. Supp. 3d 169, 184 (D.D.C.

2021) ("Because the Court concludes that Plaintiff has failed to show either a likelihood of success on the merits or irreparable harm, the Court need not consider the balance of equities or the public interest."); *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 116 (D.D.C. 2016) ("if [a party] is unable to demonstrate a likelihood of success on the merits, the equities alone cannot justify an injunction"); *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 22 (D.D.C. 2013) ("where plaintiff's showing on [the first two] factors is particularly weak, the other factors are unlikely to compensate").

Regardless, the balance of equities and public interest weigh firmly against any preliminary relief. "The government—and, by extension, the public—has a compelling interest in enforcing the debarments of [individuals] who have properly been found presently irresponsible." *Campbell v. Schmidt*, Civ. A. No. 20-1785 (CRC), 2020 WL 6445874, at *14 (D.D.C. Nov. 3, 2020). After all, "[d]ebarment reduces the risk of harm to the system by eliminating the source of the risk, that is, the unethical" individual. *Caiola v. Carroll*, 851 F.2d 395, 399 (D.C. Cir. 1988). The Office debarred Frech based on the need "to protect the federal government from an individual who has proven to be untrustworthy." AR 4803 ¶ 125. There is a strong public interest in preventing federal funds from flowing to an individual who engaged in knowing and intentional research misconduct across multiple papers over several years, with significant impacts on the proposed and reported research record, other researchers, institutions, and the public health and welfare, and still refuses to accept responsibility for or recognize the seriousness of her misconduct today. *Id.* ¶¶ 114-22.

Even if Frech "has no plans" to participate in federally-funded research—a doubtful claim, as explained above, *see supra* § I.B.1—that "does not mean that the government has no reason to debar her." *Campbell*, 2020 WL 6445874, at *14. Research institutions that accept federal research funds "occupy a position of public trust, given their ability to bill the government for services." *Id.* "Debarring irresponsible individuals may help protect the public against waste, fraud, and abuse

by preventing those individuals" from misusing and abusing federal funds. *Id.*; *accord Figg Bridge Engineers, Inc. v. Fed. Highway Admin.*, Civ. A. No. 20-2188 (CKK), 2020 WL 4784722, at *9 (D.D.C. Aug. 17, 2020) (the balance of equities disfavored a temporary restraining order requiring agency to lift debarment of individuals who "have been found responsible" for a bridge collapse, as "there is a credible public safety interest reflected in their . . . suspensions").

There also is a public interest in Defendants' unimpeded enforcement of duly promulgated regulations that serve the public interest. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (cleaned up)); *JEM Broad. Co. v. FCC*, 22 F.3d 320, 325 (D.C. Cir. 1994) ("We place a high value on finality in administrative processes"); *United States v. Fed. Mar. Comm'n*, 694 F.2d 793, 802 (D.C. Cir. 1982) (stressing "the legitimate interest of public officials and administrative commissions . . . to resist the endeavor to prevent enforcement of statutes in relation to which they have official duties"); *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1182 (D.C. Cir. 1973) ("the relief sought would gravely interfere with the on-going conduct of the Government's business").

Frech's interest in preliminary relief, meanwhile, is comparatively modest. Whatever the weight of the interest she might have had in avoiding the disruption of firing in the first instance, she has a lesser interest in re-securing a job that she already has lost. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 736 (D.C. Cir. 2016) ("declining to hire someone is usually less disruptive to the individual than firing someone"); *Shea v. Kerry*, 796 F.3d 42, 61 (D.C. Cir. 2015) ("Hiring decisions upset settled expectations to a lesser degree (because an applicant has no absolute entitlement to a job), and they affect a more diffuse group (all potential applicants) than do layoffs,

which target specific employees."); *Willner v. Thornburgh*, 928 F.2d 1185, 1190 (D.C. Cir. 1991) ("Denial of a future employment opportunity is not as intrusive as loss of an existing job").

And notably, Frech asserts only a limited loss of some employment opportunity. As noted earlier, she does not claim that she cannot find employment, or even that she cannot find a job of comparable pay, benefits, and stature where she lives—only that she cannot find a job in her chosen "career" where she currently lives, and must look to "another city or state" for "a similar job." Pl.'s Mot. at 21; *but see Krc*, 905 F.2d at 397. Defendants' and the public's interest in protecting federal funds against someone who knowingly and intentionally committed serious research misconduct, and still has not accepted responsibility for or acknowledged the seriousness of the misconduct to this day, outweighs Frech's interest in obtaining a similar job where she currently lives.

\*      \*      \*

**CONCLUSION**

This Court should deny Frech's motion for temporary restraining order or preliminary injunction.

Dated: February 23, 2024                    Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:        */s/ Bradley G. Silverman*
      BRADLEY G. SILVERMAN
      D.C. Bar #1531664
      Assistant United States Attorney
      601 D Street NW
      Washington, DC 20530
      (202) 252-2575
      bradley.silverman@usdoj.gov

*Attorneys for the United States of America*

OF COUNSEL

LUCY M. STARK
Senior Attorney
Public Health Division
Office of the General Counsel
Department of Health and Human Services
(301) 443-2644
lucy.stark@hhs.gov