## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IVANA FRECH,

                        Plaintiff,

        v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES, *et al.*

                        Defendants.

Civ. No. 1:23-cv-02530-CRC

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

*Twelve years*.  From initial reports to the Defendants of potential research misconduct to Dr. Ivana Frech's[1] 2023 debarment, twelve years passed.  In those twelve years, Dr. Frech went from lab assistant, to business school graduate, to marrying and becoming a mother, to hospital administrator, to trusted and respected member of her community, to fighting for insurance coverage for the treatment of cancer patients, to mentoring others, to engaging in philanthropic endeavors, to securing public transportation for the low-income and underserved population of her city, to improving patient care experience.  Twelve years of personal and professional growth and maturity.  But the sum of who Dr. Frech is and all that she accomplished in those twelve years means nothing to the Defendants.  Instead, the Defendants define and measure Dr. Frech's present responsibility by one fact: Dr. Frech refuses to agree that she knowingly and intentionally committed research misconduct more than 14 years ago, despite the institution that originally investigated her case finding that she did not knowingly or intentionally commit

---

[1] During the time of the alleged research misconduct, Dr. Frech went by the name Dr. Ivana De Domenico. For purposes of this motion, Plaintiff will be referred to as Dr. Frech, to include any instance when "Dr. De Domenico" appeared in the original text.

misconduct. As explained below, for the Defendants, this case is no longer about Dr. Frech's personal accountability; this case is about punishment.

On November 8, 2024, the Office of Research Integrity ("ORI"), an office under the umbrella of the U.S. Department of Health and Human Services ("HHS"), (collectively, "the Agency") issued its Notice of Final Debarment Decision for Ivana Frech, Ph. D ("Notice of Final Debarment"), and The Office of Research Integrity's Amended Findings of Research Misconduct Against Ivana Frech, Ph. D. ("ORI Findings"), respectively. Both documents were the product of the Agency's re-examination of Dr. Frech's case on remand after the Court voiced concerns regarding certain aspects of Dr. Frech's 2023 debarment. On remand, the Agency aimed to better explain the rationale underpinning ORI's research misconduct findings and debarment action. But rather than justifying their action, the Agency only confirmed Dr. Frech's longstanding belief that her debarment is punitive, arbitrary, and capricious. Accordingly, the Court should grant summary judgment in favor of Plaintiff and permanently enjoin Defendants from enforcing Dr. Frech's debarment and immediately remove her name from the System for Award Management ("SAM") as an excluded party.

## **FACTUAL BACKGROUND**[2]

On November 3, 2011, allegations of research misconduct pertaining to data appearing in a series of scientific publications by Dr. Ivana Frech and her colleagues at the University of Utah ("UU") were raised to ORI. AR0570. These allegations were then forwarded to Dr. Jeffery Botkin at UU, in his capacity as UU's Research Integrity Officer ("RIO").[3] AR0606. Dr. Jerry

---

[2] Local Civil Rule 7(h)(1) does not apply to actions filed under the Administrative Procedure Act. *See* Local Civil Rule 7(h)(2). In record review cases, motions for summary judgment "shall include a statement of facts with references to administrative record." *Id.*

[3] A RIO is the institutional official responsible for administering institutional policies and procedures to address research misconduct allegations consistently with the federal research misconduct regulations, 42 C.F.R. Part 93.

Kaplan, head of the laboratory in which the concerning data originated, informed Dr. Botkin that mistakes were made in the generation of figures but that these mistakes did not affect data interpretation or results and that independent repeat experiments had been performed in the lab producing consistent results. AR0607. Other results that had raised concerns were independently confirmed by third parties. Id. And so, while Dr. Kaplan agreed there were mistakes in his lab's figures, he asserted that those mistakes did not affect the results in the papers and stated that he stood by his studies' conclusions. AR0608.

An Inquiry Committee formed by UU found, according to Dr. Botkin, "a pattern of sloppy science" but no willful data manipulation had been identified. AR0610. Dr. Botkin also stated his belief that Dr. Frech and Dr. Kaplan had "demonstrated that they have primary datasets that support all of the conclusions in the papers in question." Id. On February 16, 2012, UU's Inquiry Committee published its findings. AR0612-0616. "The Committee did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question. Rather, there was extreme carelessness on the part of Dr. [Frech] in preparing the figures and little oversight from Dr. Kaplan[.]" AR0615 (emphasis in original). The committee also explained that "[t]he fact that acceptable and accurate data were frequently present on the film, but not used, argues against any intention to deceive." Id. However, due to the discovery of additional errors in other papers for which no allegations had been raised, the committee recommended "all papers jointly authored by Drs. [Frech] and Kaplan be independently reevaluated." Id.

On February 22, 2012, Dr. Botkin, serving as the RIO, issued his report. AR0620. He, like the Inquiry Committee, interviewed both Drs. Frech and Kaplan. Id. His report recounted that the Inquiry Committee had not identified any instances of intentional fabrication or falsification and that the committee did not recommend further investigation. AR0620-21. The

RIO noted that the Inquiry Committee had done a thorough job and that both Drs. Frech and Kaplan had been fully cooperative and "acknowledge the multiple errors made in preparation of the manuscript." AR0621. The RIO similarly concluded the issues identified did not suggest an intent to deceive and that a full investigation of the allegations was not warranted. Id. Upon review of this report, Drs. Frech and Kaplan wrote to the RIO and again acknowledged that they had made mistakes but that there was no duplicity involved. AR0625-32.

On March 7, 2012, the RIO revised his report following additional allegations suggesting deliberate alteration of images in two publications and decided that a full investigation was warranted. AR 0633-34. The UU Investigation Committee established to investigate these matters was charged with reviewing all irregularities, including previously reviewed allegations. AR0635. On March 14, 2012, the RIO informed ORI of his decision to launch a full investigation. AR0707.

On March 26, 2012, ORI's Division of Investigative Oversight ("DIO") informed the RIO that it had received the full inquiry report for the matter and conducted a preliminary review of the case. AR0751. Additionally, DIO "noted specific issues relevant to the PHS interest in this case." AR0751-53. DIO informed the RIO that it expected the Investigation Committee's report on or about August 6, 2012. AR0753.

On July 21, 2012, at the request of Dr. Wes Sundquist, Dr. Frech emailed the RIO to clarify that a questionable image of western blots related to a publication under investigation came from Dr. Kaplan's lab, and specifically that "a [sic] image was generated by me" and that Dr. Frech believed the duplication came from her. AR0763. On August 8, 2012, the RIO requested that DIO grant UU an extension of time with which to complete its investigation.

AR0768-69. The RIO requested a further extension on October 5, 2012, and DIO granted a 60-day extension the same day. AR0776-77.

On December 14, 2012, the Investigative Committee issued its final report. AR 0962-1058. In the summary portion of its report, the committee noted that its investigation involved allegations of "multiple irregularities found in 11 papers published by the respondents over the years 2007 to 2011." AR0962. As described by the committee:

> The majority of alleged irregularities involved figures representing autoradiograph films of western blot experiments, such as the re-use of the same image in multiple figures in the same or different papers. Other allegations concerned unreasonably small error estimates reported for quantitative assays. In the course of the investigation, the Committee identified additional areas of concern and investigated these as well. The investigation included examination of the published papers and the corresponding research notes and data, including autoradiograph films and computer files; and interviews with the respondents and other parties, conducted either in person, by telephone or via e-mail.

Id.

The investigation concluded that, "[t]he large number of instances, over a period of several years, indicates a *reckless disregard* for the integrity of the research record, as opposed to the occasional lapses that might occur in any laboratory...", Id. (emphasis added), and that, "[t]he publications in question exhibit a *systematic pattern of carelessness and reckless disregard for the fidelity of the primary data,* which in some cases led to misrepresentation of data in publications." AR0965 (emphasis in the original). The committee explained that, per University Policy, that a finding of misconduct requires, *inter alia*, that the misconduct be "committed intentionally, or knowingly, or in reckless disregard of accepted practices[.]" AR0966. The committee then expressed its finding that Dr. Frech's "misconduct was committed

5

in reckless disregard of accepted practices[.]" Id.  The committee recommended, effectively, that Dr. Frech be terminated from UU. AR0967.

On January 18, 2013, Ms. Vivian Lee, Senior Vice President for Health Sciences at UU, informed Dr. Frech that her appointment as a tenure-track faculty member at UU would be revoked and her position with the university terminated absent her appealing the Investigation Committee's findings. AR1073.  Dr. Frech filed her appeal to a university Consolidated Hearing Committee ("CHC") on January 28, 2013. AR3847-49.

On March 15, 2013, members of the Investigation Committee, along with the RIO, Ms. Lee, and other UU officials, wrote to the CHC and noted "the CHC should take into consideration the thorough and complex nature of the investigation and accord the Investigation Committee significant deference in this process." AR3853 (further noting that Dr. Frech's dismissal would be warranted even if her "actions had not met the federal standards for research misconduct"). The Investigative Committee also explained:

> For her appeal, Dr. [Frech] has submitted a cover letter from her legal counsel and various materials that she previously submitted on November 16, 2012 as her response to the initial draft report of the Investigation Committee. The Investigation Committee considered the November 16, 2012 materials and then issued its Final Report on December 14, 2012 (the "Final Report"). *The Final Report carefully and thoroughly addresses all of the scientific issues, findings and conclusions related to the research misconduct investigation.*

AR3854 (emphasis added).

On April 29, 2013, the CHC Panel heard Dr. Frech's appeal.  AR4044.  At her appeal, Dr. Frech provided the CHC with information showing that the irregularities that she was being held accountable for appeared in other publications for which she had no role, but that involved Dr. Ward. AR4850-67.  On May 8, 2013, the CHC Panel issued its report and recommendations.

AR4045-4053.  The CHC Panel "concluded that Dr. Frech has engaged in research misconduct

by 'reckless disregard of accepted practices' in her area of research." AR4045.  Summarizing its

conclusions based on three specific publications, the CHC explained:

> What we have gleaned from these and Dr. Yost's summary is that
> there was intentional misrepresentation of data in at least one
> instance but we cannot determine who did it, that Drs. [Frech] and
> Kaplan as either lead author or senior author bore responsibility for
> spotting what seemed in at least two instances to be attention-getting
> misrepresentations, that Dr. Ward was probably responsible for at
> least one irregularity that was beyond the knowledge base of Dr.
> [Frech], and that in sum total the number of instances of
> irregularities in these papers shows reckless disregard for accepted
> practices in the research community.

AR4047; see also AR4050 (Dr. Frech "violated the Faculty Code through Research Misconduct

based on 'reckless disregard of accepted practices.'").  The CHC panel concurred with the

Investigation Committee's recommendation that Dr. Frech be fired from the university or

permitted to resign. Id.  On June 3, 2013, David Pershing, the President of UU, terminated Dr.

Frech's employment from UU. AR4060.

On June 10, 2013, the RIO provided ORI with his report, the Inquiry Committee report,

the Investigation Committee Report, and the CHC report, among other documents. AR1078.  On

September 6, 2013, Dr. Frech's attorney, fearing that some relevant documents were not

included with the RIO's June 2013 submission, sent a letter to ORI requesting information as to

what documents UU had provided ORI so that Dr. Frech could confirm that no important

documents had been omitted. AR4061-62.

On November 12, 2013, Dr. Sundquist wrote ORI updating previous correspondence

concerning the case. AR4063-4075.  On June 2, 2014, ORI responded to Dr. Sundquist,

acknowledging that the case was complicated and time-consuming, and stating that it was in

receipt of his letter and that ORI reviews the complete record once it receives the final

investigation report from the university. AR4076.

On September 19, 2014, Dr. Frech's attorney provided additional documentation to ORI

because Dr. Botkin, UU's RIO, would not provide assurance to Dr. Frech that he had sent the

complete UU file to ORI. AR4078-80.  Dr. Frech's attorney also requested a status update from

ORI as to the matter so that Dr. Frech could properly plan her professional pursuits free from the

threat of additional actions implemented by ORI; specifically, ORI was requested to identify

whether it intended to review UU's findings. AR4079.  ORI did not respond.

On November 21, 2017, ORI asked Dr. Frech if she planned to respond to a previously

communicated settlement offer from the Agency. AR4819.  Specifically, the Agency stated that:

> [i]f we do not settle this case, ORI plans to file a charge letter seeking
> to debar your client from receiving federal funds, including NIH-grant
> funds. Alternatively, the proposed settlement agreement would allow
> your client to receive supervision and education, instead of debarment.
>
> As you know, the University of Utah's Investigation Report included
> more publications and figures than were included in the proposed
> voluntary settlement agreement. The Charge Letter, which ORI
> plans to file in order to formally charge your client with research
> misconduct, may include more findings of research misconduct, more
> figures, and more publications than were included in the proposed
> voluntary settlement agreement …
>
> If you do not respond to our settlement offer in time, it would be
> unfortunate if Dr. De Domenico loses her opportunity to settle for
> lesser research misconduct findings and loses her opportunity to avoid
> debarment.

*Id.*

Seven (7) years later, on July 18, 2023, the Agency issued Dr. Frech a Charge Letter

setting forth the basis of ORI's findings of research misconduct as well as proposed

administrative actions.  AR4783-4803.  In sum, the Agency made six (6) findings that Dr. Frech

intentionally, knowingly, or recklessly falsified and/or fabricated images in three (3) published papers; specifically Figure 5B of *Dev. Cell* 2008, Figure 1C of *Cell Met.* Nov. 2011, Figures 1D and 3 of *Cell Met.* Nov. 2011, Figures 2Aii and 2B of *Cell Met.* Nov. 2011, Figures 2Aii and 5 of *Cell Met.* Nov. 2011, and Figure 4B of Cell Met. Jan 2011. *Id.*  The findings included one less research paper and misconduct finding than the Agency had included in its November 2017 proposed settlement agreement offering Dr. Frech supervision and education, but no debarment. Indeed, the proposed settlement agreement, predating the Charge Letter by nearly six (6) years, included all the same findings that the Agency used in its July 2023 Charge Letter and as the basis for Dr. Frech's debarment. *See* Exhibit 1.[4] Additionally, the Agency proposed sending the journal *Developmental Cell* a notice of the Agency's findings and the need for retraction or correction of *Dev. Cell* 2008. AR4803. The other two papers underlying the Agency's findings had been retracted no later than 2012.

On August 17, 2023, Dr. Frech, through her attorney, wrote to the Agency to address statements by the Agency that Dr. Frech "is listed as an author on several research papers published in 2017-2021 that cite NIH funding" and was included on grant applications submitted to NIH between 2016 and 2018. AR4805-09.  This correspondence explained Dr. Frech's position that a closer examination of the surrounding circumstances demonstrated that she did not participate in any PHS-funded research since 2013. Id.

On August 29, 2023, the Agency informed Dr. Frech that, having failed to request a hearing on the Agency's findings and proposed administrative actions, to include debarment, those findings and actions were considered final and had been implemented. AR4812-13.  The Agency affirmatively stated that it would send to the journal *Developmental Cell* a notice of

---

[4] This document is the subject of Plaintiff's Unopposed Motion to Supplement the Administrative Record which Plaintiff is filing contemporaneously with this motion.

ORI's findings and the need for retraction or correction of *Dev Cell.* 2008. AR4813. The same day, Dr. Frech brought suit in this court challenging the Agency's findings and administrative actions. ECF 1.

While this suit was pending, Dr. Frech's employer, Mercy Hospital in Iowa City, IA, was purchased by the University of Iowa ("UI"). ECF 20. Initially, Dr. Frech was offered the opportunity to continue her position at UI following the hospital's purchase; however, following a routine employee check, UI discovered that Dr. Frech was debarred and retracted its offer of employment. *See* Exhibit 2, Declaration of Ivana Frech ("Frech Decl."), ¶ 5. Facing the unanticipated and immediate loss of employment, Dr. Frech sought a temporary restraining order against the debarment action. ECF 20. A hearing on Dr. Frech's motion was held on March 11, 2024. By minute order, this Court denied Dr. Frech's motion. Minute Order (March 11, 2024). However, at the hearing, the Court expressed its concerns with (1) whether Dr. Frech was personally responsible for the manipulation of Figure 4B in the January 2011 article, (2) the significance of the passage of time between the alleged research misconduct and the decision to propose Dr. Frech's debarment, and (3) whether Dr. Frech solely planned, initiated, and carried out the alleged wrongdoing. Accordingly, the Agency sought, and was granted, a voluntary remand to re-examine the Agency's action in light of the Court's concerns. ECF 31; Minute Order (April 1, 2024). As part of that remand, the Agency permitted Dr. Frech "to submit any information to [the Agency] bearing on the matters raised by the Court." ECF 31. The Agency, upon receipt and review of such information, committed to "reexamine, in good faith, its findings and administrative actions, to include Dr. Frech's debarment." *Id.*

Pursuant to the remand, on September 24, 2024, Dr. Frech submitted to the Agency's Suspension and Debarring Official ("SDO") "an amplification of information already in the

administrative record as well as information" that Dr. Frech did not believe the SDO

"considered, or had an opportunity to consider, prior to proposing Dr. Frech for debarment."

AR4822-4914.  On September 25, 2024, Dr. Frech submitted to the SDO a supplemental

declaration in favor of her present responsibility, a prior declaration having been included with

her submission a day earlier. AR4915.

On November 8, 2024, the Agency issued its findings of research misconduct and

proposed administrative actions following its reexamination of the record as well as Dr. Frech's

September 2024 submissions. AR4916-47.  Additionally, the SDO issued a "Notice of Final

Debarment Decision for Ivana Frech, Ph.D." AR4948-54.   The Agency concluded that Dr. Frech

"intentionally and knowingly engaged in research misconduct by falsifying and/or fabricating

research results in three (3) published papers funded by the U.S. Public Health Service ("PHS")."

AR4916.  The SDO proposed Dr. Frech for debarment for a period of three (3) years,[5] among

other administrative actions the Agency imposed.[6] AR4917-18.

## <u>STANDARD OF REVIEW</u>

### I.    Summary Judgment

Summary judgment may be granted when the pleadings and the evidence demonstrate

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law. *Celotex Corp v. Catrett,* 477 U.S. 317, 322 (1986); *Diamond v.

Atwood,* 43 F. 3d 1538, 1540 (D.C. Cir.1995). All evidence and the inferences drawn therefrom

---

[5] The debarment period was retroactive to August 20, 2023, meaning that Dr. Frech remains ineligible to participate in Federal Government procurement and non-procurement programs until August 20, 2026. AR4954.

[6] Dr. Frech was also "prohibited from serving in any advisory capacity to PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant."  AR4947.

must be considered in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp,* 475 U.S. 574, 587 (1986).

The standard in Rule 56(a) does not apply to actions in which the court is reviewing a final agency action under the APA. *Ardmore Consulting Group, Inc v. Contreras-Sweet*, 118 F.Supp.3d 388, 393 (D.D.C. 2015). Instead, in APA cases, the court "reviews the agency's decision as an appellate court addressing issues of law." *Ashtari v. Pompeo*, 496 F.Supp.3d 462, 467 (D.D.C. 2020) (internal citation omitted). "Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ardmore Consulting,* 118 F.Supp.3d at 393 (internal quotes and citation omitted).

## II.    Administrative Procedure Act

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the Court has the authority to "'hold unlawful and set aside' agency actions[, findings, and conclusions] that are [found to be] 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.'" *Oceana, Inc. v. Ross,* 363 F. Supp. 3d 67, 76 (D.D.C. 2019). "[T]he Supreme Court 'insists that an agency examine the relevant data and articulate a satisfactory explanation for its action." *Bois v. U.S. Dept. of Health and Human Services,* Civ. No. 11-1563, 2012 WL 13042904 at *4 (D.D.C. Mar. 2, 2012) (quoting *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 513). "Such a review 'is not merely perfunctory. We are to engage in a searching and careful inquiry, the keystone of which is to ensure that the agency engaged in reasoned decisionmaking.'" *See id.* (quoting *Int'l Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795, 815 (D.C. Cir. 1983).

### III.    Debarment

The decision to debar must be judged by the reason invoked.  *Roemer v. Hoffman*, 419 F. Supp. 130, 131 (D.D.C. 1976).  "The starting point for whether a person should be debarred must be the Statement of Chief Justice Burger . . . [Debarment] … directs the power and prestige of the government at a particular person and … may have serious economic impact on that person." *Id*. (citing *Gonzalez v. Freeman*, 118 U.S. App. D.C. 180, 334 F.2d 570, 578 (D.C. Cir. 1964). Accordingly, the "decision-maker must take great care, then, to be certain that his decision is the correct one." *Id*.

Debarments are discretionary acts. 2 C.F.R. § 180.845 ("the [debarring] official need not debar you even if a cause for debarment exits"); 2 C.F.R. § 180.800 ("A federal agency *may* debar a person for …) (emphasis added); 42 C.F.R. § 93.407 ("In response to a research misconduct proceeding, HHS *may* impose administrative actions that include … debarment") (emphasis added). The government uses the nonprocurement debarment system to exclude persons who are not presently responsible. 2 C.F.R. § 180.125(b).  **The government may not exclude a person for purposes of punishment**.  *Id*. § 180.125(c) (emphasis added).

In determining whether debarment is appropriate, the SDO "may consider the seriousness of [the] acts and omissions and … mitigating and aggravating factors."  A non-exhaustive list of mitigating and aggravating factors for the SDO's consideration are set forth at 2 C.F.R. § 180.860.  However, "the debarring official may consider other factors if appropriate in light of the circumstances of a particular case." *Id*.; *see also id*. § 180.860(s) ("the debarring official may consider … other circumstances that are appropriate to the circumstances of a particular case"); 42 C.F.R. § 93.408 ("HHS considers aggravating and mitigating factors in determining

appropriate HHS actions and their terms. HHS may consider other factors as appropriate in each case").

## **ARGUMENT**

### I. **Dr. Frech's Debarment is Improper because it is Punitive**

#### A. The Agency is Punishing Dr. Frech for Refusing to Agree with the Agency's Findings

The purpose of the federal research misconduct regulations is remedial. It is not intended to be punitive, but rather to safeguard science and allow for the rehabilitation of even those scientists who engage in intentional research misconduct. *See* 42 C.F.R. §§ 93.100(a), 93.101(e), 93.408. The government may not exclude a person for purposes of punishment. 2 C.F.R. § 180.125(c).

The Agency's proffered justification for Dr. Frech's debarment is straightforward: "Respondent has not sufficiently accepted responsibility for the research misconduct that is at issue in this case." AR4943. This statement, in recurring iterations, appears more than a half-a-dozen times between ORI's Findings and Notice of Final Debarment. *See* AR4941 ("Respondent continues to deny that she committed knowing and intentional misconduct"); *id.*, ("Respondent never took responsibility for her knowing and intentional research misconduct…"); *id.* ("she does not state that she was the one who falsified and/or fabricated the figures and does not admit that her 'mistakes' were intentional and knowing falsification and fabrication"); *id.*, at 4944 (… Respondent's failure, even today, to accept responsibility for and recognize the seriousness of her misconduct"). Lest there be any doubt where the Defendants motives lie, the Agency's Suspension and Debarment Official ("SDO") explained:

> I find that Dr. Frech's past wrongdoing continues to present harm because she has not accepted responsibility for the wrongdoing, as evidenced by the fact that Dr. Frech

> continues to deny that she committed knowing and
> intentional misconduct, despite the findings presented by
> ORI.

AR4950-51 (emphasis added).

Thus, Dr. Frech's present responsibility rests on the Agency's *Hobson's choice*, "Agree with us entirely or be debarred."  Contrary to the Agency's belief, however, unconditional surrender of one's reputation to placate the Agency is not a metric of present responsibility.   In fact, this ultimatum-like approach to Dr. Frech's present responsibility turns applicable debarment regulations on their head by effectively reading out any other factors the SDO is to consider.  Instead, the SDO's debarment decision boils down to the answer to just one question: does Dr. Frech "sufficiently" accept responsibility for her conduct.  It is evident here that what the Agency really means is: has Dr. Frech unconditionally accepted responsibility for our view of her conduct.  This is the Agency's sole test in measuring Dr. Frech's present responsibility.  It is not simply short-sighted and misguided, but it is arbitrary, meaningless, and repugnant to due process.

Under the Agency's "rationale," there are two outcomes.  If the answer to whether she has sufficiently accepted responsibility for her conduct is "yes" (i.e., if she admitted she engaged in knowing and intentional misconduct), then Dr. Frech is presently responsible.[7]  If the answer to that question is "no," then Dr. Frech is not presently responsible.  Either way, the result is arbitrary as it is not a true measure of Dr. Frech's, or anyone else's, present responsibility.  To be sure, the only way that Dr. Frech can achieve a "yes" from the Agency is to agree, without reservation, that she committed knowing and intentional misconduct, regardless of whether she *actually* agrees that she did.  A determination of Dr. Frech's present responsibility based on such

---

[7] Of course, the Agency could just as easily take an admission as validation that the Agency's action was correct all along and maintained her debarment - a figurative "heads we win, tails you lose."

an admission is not only arbitrary, but meaningless.  Is that what the Agency wants – to coerce people into trading an admission of a higher level of scienter for a finding of present responsibility?  For people to surrender their opposition (and reputation) to spare themselves debarment?  How does any such horse-trade with the Agency advance the remedial nature of debarment?  It does not; instead, the Agency's figurative "arm-twisting" is an arbitrary and valueless measurement of present responsibility.  If the Court were to sanction the Agency's rationale in this case, then the protection of the government's interests rests solely on Dr. Frech's willingness to appease the Agency, not her present responsibility.  Not only does this not protect the government, but it is also not how debarment works, and certainly not how due process does.

    This supposed lack of accountability, of course, discounts the numerous times that Dr. Frech expressed remorse for her conduct throughout this saga.  In her April 24, 2013, letter to Prof. McCormack, the Chair of the UU's CHC panel, Dr. Frech stated "I agree that I made mistakes and I admitted them." AR 3908.  In a September 24, 2012 letter to Dr. Botkin, Dr. Frech similarly acknowledged "I'm aware that the mistakes were made and I'm [*sic*] always admitted them but I believe I deserve a fair and impartial investigation from each member."  AR 3914.  During the CHC hearing, Dr. Frech professed, "I'm extremely sorry and deeply regret the mistakes I made." AR 4044 at 2:47:19. In that same statement, Dr. Frech also offered, "Here, today, is my last chance to save my career in science acknowledging that these mistakes will haunt me for the rest of my life.  As I said, I have always felt extremely remorseful during the investigation …."  *Id.*, at 2:51:18.  Dr. Frech also acknowledged, "[I]t is true that I have made some unintentional mistakes, for which I apologize and have taken responsibility."  *Id.*, at 2:53:20. Finally, in her September 23, 2024, declaration to the SDO, Dr. Frech stated:

> As I have always maintained, *mistakes were made at the University of Utah.  I acknowledge them and I accept responsibility for them,*

16

> *as I have for many years.* More than that, *I regret that these mistakes detracted from the hard work that everyone involved in the research at the University of Utah put into our work. The mistakes made in Dr. Kaplan's lab diminished those efforts and for that I am sorry.* But, as I hope you can see from the information provided above, I am not the same person I was 13 years ago. I am much more than that. Since my separation from the University of Utah, I have established myself as a valued and dedicated member of my community without a single allegation or insinuation that I have conducted myself in any manner other than with honesty and integrity. Thus, I would ask that you assess my present responsibility in a holistic picture, rather than with just a snapshot from over a decade ago.

AR4855-56. (Emphasis added).

Aside from the above, Dr. Frech's attorney, acting on her behalf, conveyed to UU's president that Dr. Frech "accepts that she has made mistakes, and takes responsibility for those mistakes." *See* AR 4058. Additionally, the RIO, in reporting the Inquiry Committee's failure to identify instances of intentional data fabrication or falsification, noted that Dr. Frech "acknowledge[d] multiple errors and [her intent] to work with the journals to address these concerns." *See* AR 4083; *see also* AR 4104 ("we are embarrassed by the duplicated images..."). It is undisputable that Dr. Frech has accepted responsibility for the conduct underlying the debarment action. But the Agency clearly is not satisfied with that concession and wants more.

According to the Agency, Dr. Frech's remorse and accountability is "disingenuous," and "far from accepting responsibility for the intentional and knowing research misconduct that is the underlying cause of the debarment." AR4952. And so, because Dr. Frech, in good faith, contests ORI's specific findings of her scienter – an opposition with support in the evidentiary record – Dr. Frech is *per se* not presently responsible? The Agency's "red-line in the sand" borders on the preposterous. Dr. Frech has every right to disagree with ORI. That disagreement is not the equivalency of non-responsibility. Moreover, her disagreement is not imagined. ORI says she

17

acted knowingly and intentionally. Dr. Frech maintains she only acted recklessly. The learned bodies at UU that thoroughly investigated and considered the matter agree with Dr. Frech. They concluded that Dr. Frech's conduct amounted merely to the reckless disregard of accepted scientific practices, without finding her conduct was knowing or intentional. Penalizing Dr. Frech with debarment because she holds a good-faith disagreement with ORI is neither rational nor justified.

In the main, it is evident that there is no substance behind the debarment action other than Dr. Frech's refusal to unconditionally agree with the Agency's finding of her scienter. If debarring someone for refusing, in good faith, to agree with the Agency is not punitive, then one would be hard pressed to know what it is.

### B.  Dr. Frech's Refusal to Agree with ORI's Finding that Dr. Frech Acted Knowingly and Intentionally is Reasonable

Dr. Frech's refusal to agree that she committed misconduct knowingly and intentionally is not a basis to impose and maintain a debarment action, particularly when that refusal is supported by the record. As explained above, Dr. Frech, on numerous occasions, took accountability and apologized for the mistakes in the research record and publications at issue in this matter. And the investigative bodies at UU that thoroughly investigated this matter concluded several times that Dr. Frech's conduct amounted to reckless disregard of accepted practices. Acting recklessly and acting knowingly and intentionally are not the same. Dr. Frech admits her conduct falls into the former, not the latter, and UU agreed. The Agency is within its rights to disagree with that contention, but applicable regulations do not allow it to punish Dr. Frech for refusing to agree with the Agency's interpretation.

To show that Dr. Frech's refusal to agree with the Agency's Findings is demonstrative of her non-responsibility, the Agency attempts to distance itself from the conclusion reached by the

Investigation Committee and the CHC panel at UU – finding that Dr. Frech's conduct was reckless.  To do so, the Agency claims (mistakenly) that it reviewed evidence those learned bodies did not. AR4936.  For example, regarding Figures 2Aii and 5 of *Cell Met.* Nov. 2011, the Agency found that Dr. Frech's "manipulation of images involved affirmative acts, namely, duplication, flipping, and contract adjustment, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally." AR4936.  But UU **did** consider that evidence.

For example, the Investigation Committee report noted that "Fig. 2Aii was flipped." AR 0977.  Indeed, the Investigation Committee reviewed specific allegations that, "The top panels in Fig 2Aii are duplicated … [that] Figure 5 panels are cropped and flipped and a lighter exposure is used." AR 0974.  There is no record evidence that the Investigation Committee abandoned its consideration of those allegations – the RIO, the Investigation Committee, and others at UU termed the investigation as "thorough."  The Investigation Committee found these actions amounted to a "systematic pattern of carelessness and *reckless disregard* for the fidelity of primary data." AR 0965; *see id.*, at 0966 (this pattern of *recklessness* is the primary basis on which we find the conclusion of scientific misconduct") (emphasis added). Similarly, the CHC Panel found that *Cell Met.* 2011 "contained several instances of *flipped* images." AR 4048 (emphasis added).

The Agency maintains that it, unlike UU, considered Dr. Frech's behavior as a broad pattern of manipulation across multiple papers. *See* AR4936.  But UU considered this as well, as reflected by the Investigation Committee's repeated emphasis on the *pattern* of carelessness and recklessness. *See*, *e.g.*, AR 0965-66; *see also* AR 0962 ("This report summarizes the work done by the Committee …based on multiple irregularities found in 11 papers published by

respondents over the years 2007 to 2011"); *id.* ("the large number of instances, over a period of several years, *indicates a reckless disregard for the integrity of the research record*…") (emphasis added). Significantly, the CHC Panel specifically cited the Investigation Committee's report as one of the "principal items of evidence" in reaching its conclusion. *See* AR4047 ("This proceeding has produced a rather voluminous record. The principal items of evidence consisted of the report of the Investigation Committee…"). And so, contrary to the Agency's assertion, UU *did* consider the same evidence that the Agency considered and concluded that no intentional irregularities can be attributed to Dr. Frech and that "the number and severity of errors …*show reckless disregard for accepted practices*." AR 4049 (emphasis added).

      The Agency also contends that the CHC did not address Dr. Frech's admissions in her July 2012 email to the ROI, whereas ORI did. AR4927. First, Dr. Frech did not admit that she *manipulated* any images. Second, the contention that the CHC did not consider her email is mere speculation as the Defendants do not cite any source confirming that the email was not considered. Third, Dr. Frech's email was sent directly to UU's RIO. Dr. Botkin, the RIO, wrote to the CHC on March 15, 2023. AR3853-62. There is nothing in the record to suggest the RIO withheld this email from either the Investigation Committee or the CHC, both of which found that Dr. Frech acted with reckless disregard, and not that she acted knowingly or intentionally.

      Thus, the Agency has still not explained how it reached a different conclusion than UU regarding Dr. Frech's scienter. This is a critical void in the Agency's rationale because Dr. Frech's debarment is premised on her unwillingness to admit she committed knowing and intentional misconduct.

## II.    Dr. Frech's Debarment is Arbitrary and Capricious

### A. The SDO Failed to Meaningfully Consider the Period of Time Between the Underlying Conduct and the Debarment Action

The penultimate question as to Dr. Frech's present responsibility is whether Dr. Frech can be entrusted with public funds at the present time or going forward.  *See Uzelmeier v. United States Department of Health and Human Services, et al.*, 541 F. Supp. 2d 241, 248 (D.D.C. 2008) ("the relevant question is whether or not one could or should be entrusted with public funds . . . at the present time or going forward, not whether one is currently so entrusted").

Beyond the mitigating and aggravating factors set forth at 2 C.F.R. § 180.860, "the debarring official may consider other factors if appropriate in light of the circumstances of a particular case." Id.; *see also* 42 C.F.R. § 93.408 ("HHS considers aggravating and mitigating factors in determining appropriate HHS actions and their terms. HHS may consider other factors as appropriate in each case").  One of those factors is the length of time that has passed since the conduct underlying the debarment action.

Dr. Frech does not disagree that no statute or regulation mandates that a debarment action be taken within a specified time. *See Uzelmeier v. U.S. Dept. of Health and Human Services, et al.*, 514 F. Supp. 2d. 241, 248 (D.D.C. 2008).  However, this does not mean that the period between the underlying conduct and a debarment action is irrelevant.  Indeed, this Court has found that the length of time between the underlying conduct and a debarment action is a factor that the debarring official is to consider as it "appear[s] to diminish the force of the [misconduct] as an indication of present responsibility." *Roemer v. Hoffmann, et al.*, 419 F. Supp. 130, 132 (D.D.C. 1976).  Beyond just this gap in time, the court in *Roemer* observed also that matters of the plaintiff's conduct before and after the misconduct were relevant indicators of the plaintiff's present responsibility. *Id.*; *see also Silverman v. U.S. Depart. of Defense*, 817 F. Supp. 846, 849

(S.D. Cal. 1993) ("The *Roemer* court's analysis of present responsibility was properly focused on the seriousness of the offense, *the length of time that had passed since the offense, and the contractor's conduct in the interim*") (emphasis added).

In *Roemer*, the court remanded the matter back to the agency because the SDO failed to explain "why [he] attributed little or no importance" to these factors, among others, and "what it was about the offense which necessitates, despite these factors, a debarment of three years." *Id*. The court concluded that "it must have specific answers to these questions if it is to exercise properly its limited review of the administrative decision." *Id*.

In *Canales, et al. v. Paulson, et. al.*, 2007 U.S. Dist., LEXIS 50924 (D.D.C. July 16, 2007), the plaintiff was debarred following her 2004 guilty plea to making a false writing during an official investigation in 2002. In 2005, the Treasury Department initiated debarment proceedings against Canales. In opposing the debarment, Canales offered that she had a spotless record before her criminal conviction, that five (5) years had passed without incident from the conduct underpinning her debarment, and she continued to do business with other federal agencies in the interim. *Id*., at *16. Noting that the record failed to explain the SDO's reasoning, the court found that the SDO's failure to address in any detail mitigating factors raised by Plaintiff or "to explain why he gave them so little weight, makes it impossible to evaluate whether there was a rational connection between the facts of her case and his decision to impose debarment." *Id*. The Agency's explanation (or lack thereof) here is similarly fatal to establishing a rational connection between Dr. Frech's case and the SDO's decision to impose debarment.

The SDO initially did not even mention, let alone consider, the mitigating factors found important by the courts in *Roemer* and *Canales*; namely, the amount of time that had passed

since Dr. Frech's misconduct or Dr. Frech's conduct during the intervening 10 years. And so, as

the court in *Canales* explained:

> [T]he DO acknowledged that such factors existed, but imposed the
> maximum term of debarment without explaining why he found them
> unpersuasive. In the absence of such an explanation, the Court must
> reach the same conclusion as did the *Roemer* court. Accordingly,
> because [the DO] did not in any way explain his decision to impose
> debarment rather than a lesser sanction given the strength of the
> mitigating factors, the Court cannot conclude that that decision was
> rational…

At the conclusion of the hearing on Dr. Frech's motion for a temporary restraining order,

this Court raised several concerns with the Agency's debarment action, to include the Agency's

failure to consider the period that had passed since the conduct underlying the debarment action

and the debarment action itself (10 years). The Court's concerns aligned with Dr. Frech's

position that the SDO made no assessment of either Dr. Frech's character prior to the misconduct

or Dr. Frech's conduct following the misconduct.

In light of the Court's concern over the amount of time that had elapsed from the

underlying conduct and the related debarment action, the Agency, at the Court's suggestion,

voluntarily sought, and was granted, a remand to address this concern. *See* ECF 31. But as is

evident from ORI's Findings and the Notice of Debarment, on remand, the Agency did nothing

to address the Court's unease. Instead, the SDO parroted the same conclusions, but in a more

direct tone, set forth in the 2023 debarment action. *See* AR4915-47. As to the duration of time

that had passed since Dr. Frech's conduct and the debarment action, the SDO meagerly noted:

> As a mitigating factor, the September 24, 2024, letter argues that the
> length of time between when the misconduct occurred and when the
> debarment action was implemented should be considered. I
> acknowledge the amount of time that passed between, and in making
> the debarment decision, the length of time that elapsed was considered.
> On balance, debarment was determined to still be appropriate because
> of the countervailing factors discussed herein and in the HHS Charge

> Letter and HHS Amended Charge Letter, including Dr. Frech's failure,
> even today, to accept responsibility for and recognize the seriousness of
> her misconduct. Therefore, based on the information in the record, I do
> not find the duration of time to be a mitigating factor in this case.

AR4953.

The Agency ignored the Court's concerns, managing to muster only an acknowledgement that the "length of time that elapsed was considered." *Id.* There is no explanation of the way it was considered and how it was weighed against "countervailing factors." The Agency simply stated that, "Due to the large and growing volume of ORI's responsibilities relative to its staffing levels, some time has elapsed since Respondent committed her research misconduct." AR4944. The Agency had already provided this explanation during the temporary restraining order hearing, after which this Court still expressed concerns with the amount of time that had passed between the underlying conduct and the debarment action. The Agency cannot rely on the same information that the Court already found concerning to explain away the decade-long delay in addressing what the Agency continues to assert is "serious and compelling" misconduct that warrants debarment 12 years later.

In any event, there is not one shred of evidence that connects the substantial delay in debarring Dr. Fech to ORI's staffing levels, or any other factor. Indeed, the SDO did not even mention the statement of Dr. Alexander Runko, who offered only metrics regarding the number of cases ORI closes each year and the number of full-time scientist investigators ORI has. *See* AR4819-21. Perhaps this omission is a concession to Dr. Frech's position that Dr. Runko's statement contributes no value in explaining, let alone justifying, the enormous amount of time that passed between the underlying conduct and the debarment action.

Moreover, in 2017, the Agency proposed a settlement with Dr. Frech that was based on all the findings ultimately made against Dr. Frech in 2023. *Compare* Exhibit 1 and AR4783-

4803.  In the Agency's November 21, 2017, email to Dr. Frech's attorney, the Agency stated that a charge letter might ultimately include ***more*** findings, figures, and publications.  The 2023 Charge Letter did not include more findings. AR4783-4803.  In fact, it contained fewer findings.  Thus, it is apparent that ORI had reached all the conclusions used in the 2023 Charge Letter six (6) years earlier.  Accordingly, the Agency's yearslong delay in finally charging Dr. Frech and taking administrative action cannot be attributed to the Agency's workload and staffing issues, as implied by Dr. Runko.  And so, the Court's concern with the period that passed between Dr. Frech's conduct and the debarment action in relation to consideration of Dr. Frech's present responsibility remains equally troubling today as it was a year ago when the Court encouraged the Agency to request a remand.

By failing to meaningfully evaluate the passage of time and its impact on Dr. Frech's present responsibility, the Agency has failed to provide specific answers to the Court's concerns and rendered the Court, as in *Roemer* and *Canales*, unable to exercise properly its limited review of the Agency's decision.  As that is the case, the Court may find that the SDO has failed to reasonably evaluate Dr. Frech's present responsibility.  Accordingly, the debarment should be deemed an arbitrary and capricious Agency action.

### B.  Dr. Frech's Conduct Since Her Time at the University of Utah Demonstrates She is Presently Responsible

Dr. Frech, in recognition of the seriousness of the situation she was facing, refrained from immediately seeking a new position in research after her termination from UU.  AR4824.  Instead, Dr. Frech stepped away from science altogether and obtained her MBA. *Id.*  ORI received the entirety of the record of UU's process in or about June 2013.  At or about that time, Dr. Frech had been told it would take approximately six months for ORI to complete its review.

More than two years after UU's investigation concluded, during which time Dr. Frech had abstained from engaging in any scientific research—federally funded or otherwise—ORI's oversight review was still ongoing.  At that time, in or about September 2015, Dr. Frech was offered a position as an assistant research scientist in Dr. Fenghuang Zhan's lab at the University of Iowa ("UI").  AR4854.  Through her then counsel, Dr. Frech informed ORI about her intent to accept the offer, sought an update on the status of ORI's review, and asked ORI for guidance on whether her research activities should be supervised or if there were other measures that should be taken.  ORI did not respond.

In the absence of the requested guidance and given that it had been more than two years since ORI's oversight review began, Dr. Frech accepted the job opportunity, but disclosed the UU findings and ORI's ongoing review to UI. *Id.*, at ¶ 1.  Dr. Frech and UI agreed that her work would be overseen and monitored by an internal Data Monitoring Committee consisting of Dr. Zhan, Dr. Guido Tricot, and Dr. Zhan's lab manager.  *Id.*, at ¶ 2; *see also* AR4832-33.  To date, no questions or concerns have ever been raised regarding Dr. Frech's research activities while a member of Dr. Zhan's lab. AR4854, at ¶ 3.

Dr. Frech's conduct following her termination from UU is not the behavior of someone with a propensity for acting irresponsibly.  On the contrary, following initiation of UU's investigation, Dr. Frech cooperated fully with the investigation, answered questions completely and candidly, and initiated contact with ORI to keep the office up-to-date on her professional endeavors as well as to stay abreast of ORI's review timeline.  Moreover, Dr. Frech affirmatively disclosed the existence of ORI's ongoing review of UU's investigation to Dr. Zhan's lab and proactively worked with UI to establish a framework under which her work was overseen and monitored so that her employment did not undermine the important and vital work UI was

performing.  Indeed, in her position, Dr. Frech flourished.  Her dedication, mentoring, attention

to detail, and other contributions to Dr. Zhan's lab were highlighted in a spotlight article on UI's

Department of Internal Medicine blog in December 2018.  *See* AR4854, at ¶¶3-5.[8]  This included

noting Dr. Frech's burgeoning interest in health care administration (noting that "she is still

curious about what she could bring to a more purely administrative role"), and her work in

managing lab staff and mentoring younger researchers.  *See id.*  Notably, by the time the blog

was published in 2018, Dr. Frech's role had evolved to become a manager of the lab, "essentially

running the operations side of a small business, from keeping track of grant funding to making

sure enough reagents are stocked."  *Id.*  At no point were there, or have there ever been, any

concerns or irregularities pertaining to Dr. Frech's stewardship of lab funds, whether from grants

or otherwise.

　　　　Despite Dr. Frech's positive impact and unblemished record at UI, the Agency's hostility

toward Dr. Frech is laid bare in ORI's findings.  For example, the Agency criticizes her

characterization of abstaining from the research field and obtaining her MBA as "self-serving" as

"there is no evidence to reason to believe that Respondent went to business school in order to

protect federal funds."  AR4944-45.  As an initial matter, Dr. Frech did not claim that she

pursued her MBA to protect federal funds; rather, she said she stepped away from science

altogether and obtained an MBA. *See* AR4824 ("Dr. Frech, acutely aware of the potential

consequences of a research misconduct finding and ORI's need for time to conduct its oversight

review of UU's investigation, refrained from immediately seeking a new position in research.

Instead, Dr. Frech stepped away from science altogether and obtained her MBA.")

---

[8] The cited blog can be located at https://internalmedicineiowa.org/2018/12/03/december-2018-ivana-frech/ (last
visited February 26, 2025).

Regardless of the reason Dr. Frech went to business school, the Agency now concedes that for those two years federal funds were protected from Dr. Frech. That time alone, coupled with the time under Dr. Frech's present debarment (August 20, 2023 up and through the date on which excerpts of the administrative record in this litigation are due), equates to nearly four years of protection of the government's interests from Dr. Frech (the purpose of her debarment). This period is one year longer than the 3-year debarment imposed by the Agency in 2023. Thus, Dr. Frech's continued debarment is unnecessarily and unjustifiably punitive.

The Agency next discounts Dr. Frech's oversight and monitoring plan that Dr. Zhan and UI agreed to when she accepted a position with Dr. Zhan's lab. Citing that the document is unsigned and undated, the Agency claims that the only evidence that exists that this plan was agreed to is Dr. Frech's "say so," implying that Dr. Frech's representation is not credible. *See* AR4945. Dr. Frech made this representation under penalty of perjury and the Agency has offered nothing that calls its veracity into question. The Agency has not cited any requirement that such a document must be signed or dated to be valid or competent evidence of what she and the UI agreed to. Of course, when Dr. Frech and UI entered into this agreement, it is certainly possible that neither party would have foreseen that its authenticity would be challenged. Naturally, if the Agency has information beyond mere speculation to show that no such agreement existed, Dr. Frech would certainly welcome the opportunity to address it.

Perhaps more telling about the Agency's inability to evaluate Dr. Frech objectively is the Agency's conclusory claim that Dr. Frech "has not been transparent" about her time in Dr. Zhan's lab and that her statement about having not participated in PHS funded research since 2013 "is false" AR4945. The Agency is wrong.

To be sure, even if Dr. Frech participated in federally funded research in Dr. Zhan's lab, that participation was not prohibited. Dr. Frech worked in Dr. Zhan's lab from 2015 to 2019. Dr. Frech was not debarred until August 29, 2023. The Agency cannot penalize Dr. Frech for doing something she was permitted to do. In any event, Dr. Frech explained the details behind every instance in which her name appeared in research papers originating from Dr. Zhan's lab and why her participation did not involve PHS funding. AR4805-09. And for the only paper in which Dr. Frech assisted with a single experiment, Dr. Frech demonstrated that her assistance could not have involved PHS funds because PHS funds were not awarded until Dr. Zhan had left UI for the University of Arkansas in 2020. AR4805-06. This was *after* Dr. Frech had left research altogether. *Id.*

Despite Dr. Frech's explanation, the Agency remained undeterred, resorting to mischaracterizing information to fit its narrative and moving the goal post for Dr. Frech's truthfulness. For example, the Agency asserts misleadingly that Dr. Frech claims "she assisted in *experiments* for just a single PHS-funded paper." AR4945-46 (emphasis added). That is not what Dr. Frech claimed. What Dr. Frech said was that she "helped the first author, Dr. Can Li, perform *one experiment*." AR4806 (emphasis added). And again, the Agency knows that at the time of her assistance, PHS funding was not in place.

Recognizing its allegations regarding Dr. Frech's post-UU participation in PHS-funded research unraveled, the Agency resorted to attempting to prove a positive through a negative. That is, the Agency weaponized Dr. Frech's failure to deny specific conduct that she had not been accused of engaging in. *See* AR4945 ("she does not deny that she performed analysis relating to other PHS-funded experiments … she does not deny that she was in active collaboration with those researchers in their PHS-funded research… she does not deny that she

29

used equipment and materials that the laboratory had procured using PHS funds back when those grants were active"). Aside from the Agency's admission that it never examined Dr. Frech's conduct with Dr. Zhan's lab, *see* AR4947, the Agency's efforts to poke holes in Dr. Frech's explanation ignore the statement of Dr. Frech, through her counsel, stating "We believe that the additional information reflected above makes it abundantly clear that Dr. Frech did not receive any PHS funding and *did not engage in any research or other activities supported by PHS funds during her time in Dr. Zhan's lab*." AR4809 (emphasis added). Thus, Dr. Frech <u>did</u> deny what the Agency claims she did not.

The Agency also claimed that Dr. Frech hedged on her denials, claiming that "Dr. Zhan had no active PHS grants while she worked at his laboratory '[t]o [her] knowledge' and that 'it was her understanding that the funding from the grant had ended' … ambiguous words that suggest that at least one PHS grant funding a project of hers *might have been active* at the time." AR4946 (emphasis added). There is nothing ambiguous about Dr. Frech's words; instead, it is clear that Dr. Frech is stating what she knew and understood at the time, and what Dr. Frech believes to this day – a belief the Agency has not shown to be incorrect. Second, none of the projects at Dr. Zhan's lab is "a project of hers" (whatever that is supposed to mean). Lastly, use of the speculative "might have been" is insufficient to justify an aggravating factor in the evaluation of an individual's present responsibility. Nor has the Agency offered any evidence contradicting that "Dr. Frech's inclusion in the grant applications was due solely to the fact that she was a lab member," which was believed to be part of Dr. Zhan's standard practice in including all lab members in his grant applications. *See* AR4809. In sum, there was nothing objectively "false" in Dr. Frech's statement about her time with Dr. Zhan's lab.

Importantly, even if the Agency was correct that Dr. Frech participated in covered transactions, including PHS-funded transactions, following her departure from UU, the Agency's debarment action appears more arbitrary, not less. Accepting the truth of the Agency's contention would mean that Dr. Frech has been prolifically engaged in federally funded scientific research for years since the conduct underlying the debarment action. In the entirety of that time, there has not been one allegation, let alone a scintilla of evidence, that Dr. Frech engaged in any malfeasance. Indeed, UI celebrated Dr. Frech's contributions to Dr. Zhan's laboratory (institutions do not typically highlight the achievements of irresponsible and untrustworthy employees). AR4854, ¶¶3-5. And so, if, as the Agency maintains, Dr. Frech has worked with federal funds during the past 10 years without issue or objection, including that of the Agency, then it would seem Dr. Frech very much can be trusted as a steward of public funds, both now and in the future.

### C. The SDO Arbitrarily Held Dr. Frech Responsible for the Same Misconduct Others Committed

The SDO also concluded that Dr. Frech <u>solely</u> planned, initiated, and carried out the misconduct, despite ORI never reaching that conclusion and the UU investigation directly contradicting it. *Id.*; AR 4050 ("Dr. [Frech] violated the Faculty Code through Research Misconduct based on "reckless disregard of accepted practices … There was complicity in this misconduct within the laboratory that goes substantially beyond Dr. [Frech]"). Originally, the SDO did not attempt to reconcile these inconsistent findings or explain why she found ORI's analysis more persuasive than the multiple analyses performed by investigative and appellate bodies at UU. AR 4802. *See* 2 C.F.R. § 180.845(b) ("The debarring official bases the decision on all information in the official record").

31

Due to this Court's concerns with that conclusion, on remand, the SDO refined her position contending that the evidence "does not show that anyone else *contributed* to Dr. [Frech's] intentional and knowing research misconduct in the three papers at issue." AR4942 (emphasis added).

In the main, UU's Investigation Committee determined that Dr. Frech was not *solely* responsible for the errors, noting that Dr. Kaplan, Dr. Ward, and others all also had varying degrees of responsibility.  *See* AR 967-969.  In fact, the Investigation Committee suggested that Dr. Kaplan should be relieved "of his senior leadership duties" based on his role in the errors and the "systematic" issues in his lab.  *See id.* at AR 967-968.  The CHC concluded that the "complicity in [the] misconduct within the laboratory . . . goes substantially beyond Dr. [Frech]," and that because *the responsibility was shared with Dr. Kaplan, Dr. Ward, and possibly others*, there should be "further investigation of the laboratory procedures uncovered in this investigation."  *See* AR 4050 (emphasis added); *see also id.* at 4045 ("The Panel also finds that [Dr. Frech's] behavior was part of a larger pattern of complicity in misconduct within the Kaplan laboratories.  We emphasize that the institutional responsibility for these matters should not end with sanctions against Dr. [Frech]").  Neither the UU nor the Agency took up the CHC Panel's recommendation and neither body claimed Dr. Frech was *solely* responsible for the underlying conduct.

Significantly, the UU expressly disclaimed engaging in any review of publications arising from Dr. Kaplan's lab for which Dr. Frech was not a coauthor.  *See* AR 0968.  And despite the justified criticism of Dr. Kaplan, the Investigation Committee appeared to make excuses for Dr. Kaplan, observing that:

> Dr. Kaplan has made substantial, selfless contributions, in
> leadership positions, to the enhancement of the training and research

> environment at the University of Utah. These activities are to be
> highly commended.  Perhaps this high level of involvement, time
> and energy commitment to the research and training community led
> to distractions from the intricacies of laboratory supervision of Dr.
> [Frech]'s work.

AR0968.  Unfortunately, Dr. Frech was offered no similar presumptions or excuses – excuses

that Dr. Kaplan did not even offer the Investigation Committee.  And even today, the Agency is

entirely dismissive of the accountability of Dr. Kaplan and others with respect to the subject

publication.  Nowhere is this arbitrary and disparate treatment of Dr. Frech more on display than

with respect to Dr. Ward.  Regarding Dr. Ward, the Investigation Committee noted:

> *Dr. Ward performed unacknowledged splicing of western blot
> images, some of which were obvious in the figures*. The
> Committee does not understand how Dr. Ward could have built
> the figures with bands upside-down and other obvious errors.
> The large number of irregularities and mistakes suggests that
> there was a lack of attention to detail, failure to examine the raw
> data, inadequate mentorship in protecting the fidelity of data,
> and the failure to insist on rigorous and clear assurance of the
> integrity of the data. The Committee found no evidence that
> there was intent to deceive or manipulate data on the part of Dr.
> Ward. Nonetheless, the sloppiness and carelessness in the
> production of figures, and laxness in the examination of all
> primary data were disconcerting to the Committee and suggest a
> dereliction of responsibility to assure the accurate representation
> of primary data.

AR 0968 (emphasis added).

One could easily substitute Dr. Frech's name for Dr. Ward's in the above entry

without otherwise altering the Investigation Committee's findings concerning Dr. Frech

submitted to the Agency.  That is, Dr. Frech was determined to have engaged in the same

conduct that the Investigation Committee determined Dr. Ward engaged in.  Indeed, the

Investigation Committee, in examining a paper containing image splicing, explained:

> It appears that Drs. De Domenico and Ward had full control over
> presentation of the experimental data and *both of them must be*

> held responsible for the misrepresentations that have come to light. The Investigation Committee considers it unlikely that these errors were due to simple carelessness during the preparation of the figures for publication.

AR1010.

In a memo to the CHC Panel, the Investigation Committee, perhaps perceiving the obviousness of its incongruous treatment of Drs. Frech and Ward, claimed that it "did not give Dr. Ward a pass on her conduct." AR 3860, n. 3. But that is precisely what it did (and precisely why Dr. Frech's debarment is arbitrary). Instead of suggesting terminating Dr. Ward, as it did for Dr. Frech, the Investigation Committee recommended "Dr. Ward examine the work flow and processes in the lab in order to ensure that mistakes in data representation do not occur in the future." Id.

For reasons still unclear to Dr. Frech, the Agency seems uninterested in exploring Dr. Ward's "sloppiness" and "carelessness" in the fidelity of data even though the Investigation Committee concluded she "performed unacknowledged [and obvious] splicing of western blot images." AR 0968. Splicing images, according to the Agency, is evidence of "intentional and knowing falsification and/or fabrication." See AR4927. It is the same conduct the Agency debarred Dr. Frech for. But here, the Agency arbitrarily spares Dr. Ward and vilifies Dr. Frech.

Moreover, Dr. Frech demonstrated during the CHC hearing that other publications from Dr. Kaplan's lab, in which she was not an author and had no role in the underlying research, contained the same sort of errors as those at issue in the allegations against her. AR4857-60. Dr. Ward was involved in each publication, including as first author for one of the publications. Id. The Agency dismisses the point, asserting that the errors that Dr. Frech raised are not directed at

ORI's findings here or the conclusion that Dr. Frech alone committed the research misconduct underlying her debarment. AR4942.  The Agency is missing the forest for the trees.

Treating two people inconsistently for the same conduct within the same lab without explanation is the definition of acting arbitrary.  That is, there is no rational basis for the Agency to find that Dr. Frech's splicing of western gel blots in research publications constitutes knowing and intentional research misconduct, but Dr. Ward's splicing of western blot images does not. Recall, the Investigation Committee stated, "Drs. De Domenico and Ward had full control over presentation of the experimental data and *both of them must be held responsible for the misrepresentations that have come to light*." AR1010.  Indeed, when Dr. Frech pushed back on the Investigation Committee's authority to investigate new allegations of research misconduct without first forming a new Inquiry Committee, the University explained:

> The Investigation Committee is charged with pursuing diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of additional instances of possible research misconduct, and continue the investigation to completion.

AR3856.

But in Dr. Frech's case, neither UU nor the Agency were interested in pursuing any leads it discovered with respect to Dr. Ward's engagement in the same type of misconduct that led to Dr. Frech's debarment – information that UU assuredly discovered and forwarded to ORI. Recall, UU forwarded the Investigation Committee's Report, with the observations of Dr. Ward's involvement in splicing western blots, to ORI in June 2013. *See* AR 1078.  There is no rational basis for the Agency to investigate and debar Dr. Frech, but not Dr. Ward.  And so, if the SDO is correct in that "research misconduct undermines the integrity of the scientific community

and can lead to severe and irreparable harm," then the SDO arbitrarily singled out Dr. Frech and allowed Dr. Ward to remain unaccountable.

To be sure, this is not a matter of attempting to excuse or diminish Dr. Frech's misconduct; instead, this is a matter of the arbitrary manner in which the Agency administratively addresses the same conduct among two people both determined by the same Investigation Committee to have engaged in the same unacceptable practices in the same laboratory. Moreover, neither UU nor the Agency appear to have considered Drs. Kaplan and Ward's roles in leading the lab and instructing Dr. Frech and other lab members on how to conduct their research in the systematic problems reflected in the papers published from the lab. It is this still unexplained disparate and arbitrary treatment that is fatal to the Agency's insistence on Dr. Frech's debarment in this case.

### D. The SDO's Refusal to Consider Certain Mitigating Factors Renders the Agency's Debarment Action Arbitrary

In her September 23, 2024, submission to the SDO, Dr. Frech provided several pieces of information bearing on her present responsibility. Instead of viewing this information in a light favorable to Dr. Frech, the Agency took pain-staking steps to marginalize it, if not outright discredit it. On this point, the SDO stated:

> While I commend Dr. Frech's contributions to the community and acknowledge the character references presented, I do not find these activities and statements to be relevant to the underlying debarment cause and wrongdoing at issue, which is research misconduct. I do not find that any of these activities and character references, or purported good conduct, are appropriate to diminish Dr. Frech's period of disbarment or its length. Therefore, based on the information in the record, I do not find Dr. Frech's philanthropic activities and character references to be a mitigating factor in this case.

AR4953.

It is not clear how the Agency defines "present responsibility." Dr. Frech submitted a declaration from Ms. Bernadine Brandenburg, the Chief Compliance Officer at Mercy Hospital where Dr. Frech worked for several years preceding her debarment. In that letter, Ms. Brandenburg noted that Dr. Frech "was responsible for leading a team of over 70 professionals and the operation of the laboratory, including the employment of personnel who are competent to perform medical test procedures, *record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable health care regulations*." AR4840 (emphasis added). Ms. Brandenburg continued:

> I have had the opportunity to get to know Ms. Frech and *I can say without a doubt that she upholds the highest integrity*, morals, and ethical character in all that I have witnessed ... [o]n a personal level, I am grateful to consider Ms. Frech a trustworthy colleague and friend.

AR4840-41 (emphasis added).

Incredibly, the SDO determined that a hospital's Chief Compliance Officer's statement as to Dr. Frech's integrity, trustworthiness, morals, and ethical character are not relevant to her present responsibility (*i.e.*, whether she can be a trusted steward of public funds). *See* AR4953. Yet, the SDO asserted that Dr. Frech's desire to return to her same position as a hospital administrator at Mercy Hospital (now UI Hospital) "still presents a risk" to the government. *Id*. These determinations are at direct odds with each other; if Dr. Frech's desire to return to her role as a hospital administrator at Mercy/UI implicates her present responsibility, then surely the Chief Compliance Officer's statements regarding Dr. Frech's integrity, trustworthiness, morals, and ethical character *while serving* as a hospital administrator at Mercy/UI are relevant to an analysis of Dr. Frech's present responsibility. To claim otherwise defies logic.

Dr. Frech also provided the SDO with a UI article touting Dr. Frech's contributions to

Dr. Zhan's laboratory.  In that article, Dr. Zhan was quoted as saying:

> Ivana is an invaluable mentor who helps our students to develop
> projects, ask focused questions, design experiments, and
> *accurately interpret data. She emphasizes the importance of
> academic integrity and best lab practices*, creating a positive lab
> culture. With many projects running simultaneously, it is easy for
> a student's efforts to become mired or overwhelmed and escape
> notice. Under Ivana's guidance, the efforts of our lab are
> efficiently organized and no one has the opportunity to slip
> through the cracks. *We are training better scientists for her effort.*

AR4854, ¶¶ 3-4 (emphasis added).

Like Ms. Brandenburg's letter, the SDO dismissed Dr. Zhan's statement out of hand.

AR4953 ("I do not find these activities and statements to be relevant to the underlying debarment

cause and wrongdoing at issue, which is research misconduct").  The Agency's claim that a

member of the scientific community's statement about Dr. Frech's "academic integrity," her

contribution to helping students "accurately interpret data," and her emphasis on "best lab

practices" is not relevant to her present responsibility is astonishing.  There is simply no credible

way the Agency can spin this information as unrelated to Dr. Frech's present responsibility.  The

SDO's discounting of this information is demonstrably arbitrary and undermines the entirety of

her evaluation of Dr. Frech's responsibility.  On this basis alone, the Court may find that Dr.

Frech's debarment is arbitrary and capricious.

### E.  The SDO Failed to Demonstrate that Dr. Frech's Misconduct Was <u>Serious and Compelling</u>

The SDO asserts that "Dr. Frech's research misconduct is of so serious a nature that a

debarment period is necessary to protect the United States Federal Government's interests."

AR4953-54.  But the Agency's actions demonstrate quite the opposite.  Regarding the significant

passage of time between Dr. Frech's misconduct and the Agency's debarment action, the Agency

offered the declaration of Alexander Runko, then the Director of DIO in ORI.  AR4819-21.

Respectfully, Dr. Runko provided zero explanation for the 10-year interval between the

misconduct and Dr. Frech's debarment.

Dr. Runko addressed only ORI's annual staffing and workload. *Id.*  For example, Dr.

Runko provided metrics pertaining to the number of cases ORI closed in various fiscal years, but

did not even once mention Dr. Frech's case, which ORI received in 2013.  Indeed, the only

mention of Dr. Frech's name is in the case caption on the first page of Dr. Runko's declaration.

*Id.*, at 4819.  Presumably, the Agency wants to leave the Court with the impression that the

Agency's workload is the sole reason the Agency did not act on Dr. Frech's case sooner.

However, Dr. Runko does not state that.  In fact, none of the Defendants have stated that, likely

because the record does not support such an explanation.

In fact, ORI was in regular contact and consulting with UU about this case from its

inception. For example, following reports of suspected scientific misconduct involving Dr.

Frech, Dr. John Dahlberg, then ORI's Director of DIO, replied, in part:

> It seems clear that the issues with the images that you
> identify are real, and I share your concerns about the
> implications of exceptionally small error bars on graphs. I
> will communicate with Jeff Botkin, k [sic] whom I have
> worked with on several occasions, and ask him to keep
> ORI appraised of UT's progress on reviewing Dr. Frech's
> publications.

AR0598.

Dr. Dahlberg contacted Dr. Botkin on November 4, 2011, and informed him that ORI

"will be tracking this while we wait to hear from you an [sic] an appropriate time." AR0605.

Exchanges between Dr. Botkin and ORI continued during the entirety of the investigation.  *See*

AR0609-10 (January 20, 2012 email in which ORI requests UU send it the Inquiry Committee's

report for ORI's evaluation); AR0707 (Dr. Botkin's March 14, 2012 letter providing ORI with

RIO summary report, Inquiry Committee Report, PowerPoints related to allegations received, the

publications involved in the allegation, and the respondent's initial response); AR0751-53 (ORI

acknowledging receipt of UU's materials, informing UU that ORI conducted a preliminary

review of the case, and noting areas of specific interest to ORI); AR0768; AR0776-77; AR0958-

0961; AR1068-1070.   Moreover, Dr. Tomas Ganz emailed ORI on February 28, 2012, and again

on March 1, 2012, with his detailed analysis of Dr. Frech's case using the same investigative

materials that ORI received from UU. AR0708-0749.

 Despite the Agency's close attention to the matter and ongoing consultation and review

with UU, the Agency asks the Court to accept that Dr. Frech's conduct was in 2023 (and remains

today) "so serious and compelling in nature that it demonstrates a lack of present responsibility

to be a steward of federal funds." AR4803.  If this were true, it would seem logical for the

Agency, which was aware of the underlying conduct in great detail as of March 2012, to have

taken some form of protective measure on behalf of the government well before 12 years had

passed.

 In any event, in 2017, the Agency informed Dr. Frech that it "plans to file a charge letter

seeking to debar" her if she did not agree to the Agency's proposed settlement agreement.

AR4818.  By "plans to file," Dr. Frech did not understand that the Agency meant it planned to

seek debarment six (6) years later.  Regardless, for several reasons, Dr. Frech did not agree to the

terms of the Agency's settlement proposal, thus leaving Dr. Frech free for the next **six (6) years**

to engage in PHS-funded research without limitation despite the purported "serious and

compelling nature" of her conduct – the same conduct the Agency had been following since

2011.  Critically, it was around 2017 that publications with Dr. Frech's name appeared in the

scientific community, which, as the Agency noted, referred to the use of federal grant funding. AR4805-09.  And still, despite Dr. Frech's supposed "serious and compelling" misconduct, the Agency took no prophylactic measures.  In fact, after Dr. Frech did not agree to settle, years passed before the Agency contacted either Dr. Frech or her representative.  There is simply no way to square these facts with the Agency's position that Dr. Frech's misconduct a decade earlier was so serious and compelling that the government needs to be protected from her *now* by way of debarment, when in 2017, 2018, 2019, 2020, 2021, and 2022, no such protection was needed.

Furthermore, the Agency framed Dr. Frech's conduct as serious and compelling because "research misconduct undermines the integrity of the scientific community and can lead to severe and irreparable harm."  AR4950.   The irony is not lost on Dr. Frech, and should not be lost on the Court, that because Dr. Frech's conduct was so serious and posed a threat to the integrity of the scientific community, the Agency <u>plans</u> to send a notice of a need for retraction or correction to the journal *Developmental Cell* pertaining to a ***2008*** article containing an "intentional" image manipulation **<u>sixteen (16) years</u>** after it was published. AR4947.  Sixteen (16) years later even though Dr. Frech's "fabricated and/or falsified research papers led to waste of valuable time and resources." AR4943.  In other words, the Agency has allowed Dr. Frech's falsified research, which wasted valuable time and resources, to remain uncorrected in the scientific community for sixteen (16) years.  Of course, the Agency knew, as of April 19, 2023, that this publication was one of three by Dr. Frech that had been cited by others 142 times. AR4802.  Yet, more than a year later, the Agency still had not taken any action to have it corrected or retracted.  It is difficult to imagine how Dr. Frech's supposed intentional manipulation of an image in this research presents a serious and compelling matter of misconduct if the Agency has done nothing about it for sixteen (16) years.

F.   Plaintiff Satisfies the Remaining Elements for Obtaining Permanent Injunctive Relief

1.   Dr. Frech Will Suffer Irreparable Harm if the Defendants Are
Not Enjoined from Enforcing the Debarment

More than a decade ago, Dr. Frech was terminated from UU as a result of this matter, and voluntarily abandoned participation in any federally-funded research.  In 2020, when it became clear to Dr. Frech that continuing to work as a scientific researcher in academia without utilizing federal funds would require her to uproot her life and her family yet again, she left science entirely.  Since 2020, Dr. Frech had been entirely out of scientific research, working in an administrative position at a community hospital.  As a direct result of her debarment, Dr. Frech lost her job and is now faced with the prospect of needing to try to start yet another new career or trying to find a similar job in another city or state, should one even be available.  There are no hospital positions in and around where she lives that are not operated by UI.  Frech Decl., ¶ 8. UI does not employ people who are debarred.  *Id.*, at ¶ 5.

Dr. Frech lives in Coralville, Iowa, with limited opportunities for work similar to the role she held at Mercy Iowa City. Frech Decl. ¶ 8.  UI has represented that, were it not for the debarment, it would be interested in having Dr. Frech to continue to work in the role she had been in up through January 30, 2024. *Id.*, ¶¶ 6-7. Because hospitals in and around Coralville, IA, principally, if not exclusively, operated by UI, do not employ excluded persons, without injunctive relief, the opportunity for Dr. Frech to obtain employment in the profession for which she is educated, trained, and experienced will not be possible.

Without enjoining Dr. Frech's debarment, she will continue to be unemployed in the profession in which she is educated and trained, unless she uproots her family.  Debarment is not supposed to result in individuals having to move to find work.

42

"The cornerstone of preliminary injunctive relief is irreparable harm that injures the moving party in a manner that cannot be remedied through other types of relief." *Clevinger v. Advocacy Holdings, Inc*., Civ. Nos. 23-1159 & 23-1176, Slip Op., 2023 WL 4560839 at *4 (D.D.C. Jul. 15, 2023) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Reputational damage is a valid, non-economic harm. *See Luokong Tech. Corp. v. Dept. of Defense*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021); *see also Celsis in Virto, Inc. v. CellzDirect, Inc*., 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, *damage to reputation*, and *loss of business opportunities* are all valid grounds for finding irreparable harm") (emphasis added).

This Court has noted that "harm to reputation has been recognized repeatedly as a type of irreparable injury[.]" *Brodie v. U.S. Dept. of Health and Human Services*, 715 F. Supp. 2d 74, 84 (D.D.C. 2010) (citation omitted)*; Patriot, Inc. v. U.S. Dep't of Hous. &Urb. Dev.,* 963 F. Supp. 1, 5 (D.D.C. 1997) (granting injunctive relief against a government agency when it was determined that the agency's "characterization" of the plaintiff in public letter caused "irreparable harm in damage to their business reputation"); *Beacon Assocs., Inc. v. Apprio, Inc.,* 308 F. Supp. 3d 277 (D.D.C. 2018) (finding irreparable harm based on a reputational "black mark" that "will result in many lost contract opportunities").

In this case, the ongoing debarment constitutes agency action that is the principal source of Dr. Frech's reputational harm. *See Figg Bridge Engineers*, No. CV 20-2188 (CKK), 2020 WL 4784722 at *8. The debarment is similar to a "characterization" or "black mark," and has already directly resulted in at least one certain loss of opportunity. *See Patriot*, 963 F. Supp. at 5; *Beacon Assocs.*, 308 F. Supp. 3d at 288. Dr. Frech's ongoing debarment continues to cast a dark pall over Dr. Frech's reputation and is preventing her from earning a living in the field that she is trained, practices, and excels at in the community and surrounding area where her and her family

are established.  Therefore, the irreparable harm to Dr. Frech weighs in favor of granting injunctive relief.

2.    The Balance of Harms and Equities and the Public Interest
Favors Enjoining Dr. Frech's Debarment

Where, as here, the non-moving party is the government, "the government's interest *is* the public interest" making the balance of equities "and the public interest factor . . . one and the same[.]"  *Chef Time 1520 LLC*, 646 F. Supp. 3d at 116 (quoting *Pursuing America's Greatness*, 831 F.3d at 511).  Because neither the Defendants nor the public would be harmed by the issuance of a permanent injunction given that Dr. Frech's debarment is arbitrary and capricious, the public interest weighs in favor of granting Dr. Frech such relief.  *See*, *e.g.*, *N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting that "[t]he public interest is served when administrative agencies comply with their obligations under the APA").  If anything, this factor additionally weighs in favor of granting injunctive relief to Dr. Frech due to "the public's interest to ensure that the government's suspension and debarment process is administered in a fair manner."  *See Inchcape*, 2014 WL 12838793 at *3.  Naturally, there is no public or private interest advanced by allowing an arbitrary and capricious debarment to remain enforceable by the Agency.

**CONCLUSION**

For the reasons stated above, Dr. Frech asks that the Court find the debarment action

arbitrary and capricious and permanently enjoin the Defendants from enforcing it.


Dated: March 4, 2025                    Respectfully submitted,

                                        By: /s/ *Jackson S. Nichols*
                                        Jackson S. Nichols (D.C. Bar #975511)
                                        Stephen D. Tobin (D.C. Bar #90020495)
                                        (D.D.C. *pro hac vice*)
                                        Paul E. Simon (D.C. Bar #1023006)
                                        (D.D.C. *pro hac vice*)
                                        Cohen Seglias Pallas Greenhall & Furman, P.C.
                                        900 Seventh Street NW
                                        Suite 725
                                        Washington, DC 20001
                                        Tel: (202) 466-4110
                                        Email: jnichols@cohenseglias.com

                                        *Attorneys for Plaintiff*


**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on March 4, 2025, a true and accurate copy of the

foregoing document was filed via the Court's CM/ECF system and notification of such filing

was sent to all counsel of record.

                                        /s/  *Jackson S. Nichols*_____
                                        Jackson S. Nichols