| PI: **De Domenico, Ivana** | Title: Regulation of Iron Homeostasis | |
|---|---|---|
| Received: 02/01/2010 | FOA: PAS10-046 | Council: 10/2010 |
| Competition ID: ADOBE-FORMS-B | FOA Title: Stimulating Hematology Investigation:  New Endeavors (SHINE) (R01) | |
| **1 R01 DK090257-01** | Dual: | Accession Number: 3262249 |
| IPF: 514002 | Organization: UNIVERSITY OF UTAH | |
| Former Number: | Department: Hematology/Internal Medicine | |
| IRG/SRG: INMP | AIDS: N | Expedited: N |
| <u>Subtotal Direct Costs</u><br>(excludes consortium F&A)<br>Year 1:    250,000<br>Year 2:    250,000<br>Year 3:    250,000<br>Year 4:    250,000<br>Year 5:    250,000 | Animals: Y<br>Humans: N<br>Clinical Trial: N<br>Current HS Code: 10<br>HESC: N | New Investigator: Y<br>Early Stage Investigator: Y |
| | | |
| *Senior/Key Personnel:* | *Organization:* | *Role Category:* |
| Ivana DeDomenico Ph.D. | University of Utah | PD/PI |

*Additions for Review*

Supplemental Material          DeDomenico 1R01DK090257-01.pdf

# BIOGRAPHICAL SKETCH

Provide the following information for the Senior/key personnel and other significant contributors.
Follow this format for each person.  **DO NOT EXCEED FOUR PAGES.**

| NAME<br>De Domenico, Ivana | POSITION TITLE<br>Research Assistant Professor of Medicine |
|---|---|
| eRA COMMONS USER NAME (credential, e.g., agency login)<br>idedomenico | |

EDUCATION/TRAINING  *(Begin with baccalaureate or other initial professional education, such as nursing, include postdoctoral training and residency training if applicable.)*

| INSTITUTION AND LOCATION | DEGREE<br>*(if applicable)* | MM/YY | FIELD OF STUDY |
|---|---|---|---|
| University of Messina, Messina, Italy | B.S. | 06/02 | Biological Science |
| University of Messina, Messina, Italy | Ph.D. | 11/05 | Cell Biology and Biotechnology |
| University of Utah, Utah | Postdoctoral | 12/05 | Iron Metabolism |

## A. Personal Statement

The goal of the proposed research is to determine how iron and hepcidin affect transcription and to determine the physiological consequences of changes in transcription profiles, particularly in regard to iron export by macrophages and intestinal cells. I have the expertise, leadership and motivation necessary to successfully carry out the proposed work. The current application builds logically on my prior work, as a postdoctoral fellow at the University of Utah with Dr. Kaplan and continue to I still collaborate with him and I have assembled a independent group dedicated to the characterization of iron overload disorders.  I generated several peer-reviewed publications from each of my project and I have a demonstrated record of successful and productive research in an area of high relevance. My expertise and experience have prepared me to lead the project proposed in this application.

## B. Positions and Honors

**Positions and Employment**
2007-2008      Research Associate, Dept. of Pathology, Univ. of Utah, Salt lake City, Utah
2008-          Research Assistant Professor, Dept. of Internal Medicine, Univ. of Utah, Salt lake City, Utah

**Other Experience and Professional Memberships**
2005-     Member, BioIron Society
2007-     Member, European Iron Club
2008-     Member, American Society for Nutrition (ASN)

**Honors**
2007     Young  Investigator Award, BioIron, Kyoto, Japan
2008     Poster  Award, FASEB, Snowmass Colorado
2009     "Hiromi Gunshin Award" BioIron, Porto, Portogal

## C. Selected Peer-reviewed Publications (Selected from 32 peer-reviewed publications)

**Most relevant to the current application**
1.  De Domenico I., Ward D.M., Nemeth E., Ganz T., Musci G. and Kaplan J.  (2007). The Molecular Mechanism of Hepcidin-mediated Ferroportin Down-Regulation.*Mol Biol Cell.*, 18(7):2569-78

2. De Domenico I., Vaughn M.B., Yoon D., Kushner J.P., Ward D.M. and Kaplan J. (2007) Zebrafish as a Model for Defining the Functional Impact of Mammalian Ferroportin Mutations. Blood. 110(10):3780-3

3. De Domenico I., Nemeth E., Phillips J.D., Ajioka R.S., Kay M., Kushner J.P., Ganz T., Ward M.D. and Kaplan J. (2008) The hepcidin-binding site on ferroportin is evolutionarily conserved. Cell Metabolism 8(2):146-56.

4. De Domenico I. , Lo E.,  Ward M.D., and Kaplan J. (2009) Hepcidin induced internalization of ferroportin requires binding and cooperative interaction with Jak2 Proc. Natl. Acad. Sci. USA, 106(10):3800-5.

5. Koening C.L., Miller J.C., Nelson J.M., Ward D.M., Kushner P.J., Bockenstedt L.K., Weis J.J., Kaplan J., and De Domenico I. (2009) Toll-like receptors mediate induction of hepcidin in mice infected with *Borrelia Burgdorferi.*  Blood, 114(9):1913-8.

6. Koening C.L., Mu H.M., Van Schelt A., Ward D.M., Kaplan J. and  De Domenico I. (2009) Hepcidin is elevated in mice injected with *Mycoplasma arthritidis.* Journal of  inflammation *In press*

**Additional recent publications of importance to the field (in chronological order)**

1. Felice M.R.*, De Domenico I.*, Li L., Ward D.M., Bartok B., Musci G. and Kaplan J.  (2005). Post-transcriptional Regulation of High Affinity Iron Transport in *S. cerevisiae.*  J. Biol. Chem. 280:22181-22190. (* Both authors contributed equally to this work).

2. De Domenico I., Ward D.M., Nemeth E., Vaughn M.B, Musci G., Ganz T. and Kaplan J.  (2005).  Molecular Basis for Ferroportin-Linked Hemochromatosis.  *Proc. Natl. Acad. Sci. USA.* 102:8955-8960.

3. De Domenico I., Vaughn M.B, Li L., Bagley D., Ward D.M. and Kaplan J.  (2006). Ferroportin-Mediated Mobilization of Ferritin Iron Precedes Ferritin Degradation by the Proteasome. EMBO J. 15;25(22):5396-404.

4. DeDomenico I., Ward D.M., Musci G. and Kaplan J.  (2007). Evidence for the Multimeric Structure of Ferroportin. Blood, 1;109(5):2205-9.

5. Zohn I.E.*, De Domenico I.*, Pollock A., Ward D.M., Goodman J.F., Liang X., Sanchez A.J., Niswander L. and Kaplan J.(2007) The Flatiron Mutation in Mouse Ferroportin Acts as a Dominant Negative to Cause Ferroportin Disease. Blood,15;109(10):4174-80 (* Both authors contributed equally to this work).

6. De Domenico I, Ward DM, di Patti MC, Jeong SY, David S, Musci G, Kaplan J.  (2007). Ferroxidase Activity is Required for the Stability of Cell Surface Ferroportin in Cells Expressing GPI-ceruloplasmin. EMBO J., 20;26(12):2823-31.

7. De Domenico I., Ward D.M. and Kaplan J. (2007)  Hepcidin Regulation : Ironing out the Details. J Clin Invest. 117(7):1755-8.

8. Keel S.K., Doty R.T., Yang Z., Quigley J.G., Chen J., Knoblaugh S., Kingsley P., De Domenico I., Vaunghn M.B., Kaplan J., Palis J. and Abkowitz J.L. (2008)  A Heme Export Protein is Required for Red Cell Differentiation and Iron Homeostasis Science, 8;319(5864):825-8

9. Silvestri L, Pagani A, Nai A, De Domenico I, Kaplan J, Camaschella C. (2008) The serine protease matriptase-2 (TMPRSS6) inhibits hepcidin activation by cleaving membrane hemojuvelin. Cell Metabolism, 8(6):502-11

10. De Domenico I., Ward D.M. and Kaplan J. (2009) Specific iron chelators determine the route of ferritin degradation. Blood 114(20):4546-51.

11. De Domenico I., Lo E., Ward D.M. and Kaplan J. (2009) Human Mutation D157G in Ferroportin Leads to Hepcidin-Independent Binding of Jak2 and Ferroportin Downregulation. Blood *In press*

12. Gao J, Chen J, De Domenico I, Koeller DM, Harding CO, Fleming RE, Koeberl DD and Enns CA. HFE Is Limiting in the HFE/TFR2 control of hepcidin expression in mice. Blood *In press*

**D. Research Support**

**Ongoing Research Support**

None

**Completed Research Support**

None

Cell Metabolism
## Article



# The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin

Ivana De Domenico,[1] Eric Lo,[2] Baoli Yang,[3] Tamara Korolnek,[4] Iqbal Hamza,[4] Diane McVey Ward,[2] and Jerry Kaplan[2,5,*]
[1]Department of Internal Medicine
[2]Department of Pathology
School of Medicine, University of Utah, Salt Lake City, UT 84132, USA
[3]Department of Obstetrics and Gynecology, Carver College of Medicine, University of Iowa, Iowa City, IA 52242, USA
[4]Department of Animal and Avian Sciences
[5]Department of Cell Biology and Molecular Genetics
University of Maryland, College Park, MD 20742, USA
*Correspondence: jerry.kaplan@path.utah.edu
DOI 10.1016/j.cmet.2011.09.008

## SUMMARY

The iron exporter ferroportin (Fpn) is essential to transfer iron from cells to plasma. Systemic iron homeostasis in vertebrates is regulated by the hepcidin-mediated internalization of Fpn. Here, we demonstrate a second route for Fpn internalization; when cytosolic iron levels are low, Fpn is internalized in a hepcidin-independent manner dependent upon the E3 ubiquitin ligase Nedd4-2 and the Nedd4-2 binding protein Nfdip-1. Retention of cell-surface Fpn through reductions in Nedd4-2 results in cell death through depletion of cytosolic iron. Nedd4-2 is also required for internalization of Fpn in the absence of ferroxidase activity as well as for the entry of hepcidin-induced Fpn into the multivesicular body. *C. elegans* lacks hepcidin genes, and *C. elegans* Fpn expressed in mammalian cells is not internalized by hepcidin but is internalized in response to iron deprivation in a Nedd4-2-dependent manner, supporting the hypothesis that Nedd4-2-induced internalization of Fpn is evolutionarily conserved.

## INTRODUCTION

Systemic iron physiology is regulated by the interaction of the peptide hormone hepcidin and the iron exporter Fpn (Lee and Beutler, 2009). Hepcidin is synthesized in response to inflammation and iron sufficiency. Conditions that require increased iron demand, such as hypoxia or iron insufficiency, lead to decreased hepcidin expression. Hepcidin is a negative regulator of iron entry into plasma, as it binds to Fpn and induces Fpn degradation, resulting in decreased iron export into plasma and cellular iron retention (Nemeth et al., 2004). Hepcidin regulates Fpn levels by binding to a specific extracellular domain of Fpn, which induces the binding of the cytosolic Janus kinase (Jak2) to Fpn (De Domenico et al., 2009). Once bound, Jak2 is autophosphory-lated and then phosphorylates Fpn, leading to Fpn internalization by clathrin-coated pits and its degradation in the lysosome (De Domenico et al., 2007b, 2009). The interaction of hepcidin with Fpn provides a mechanism for coordinating iron entry into plasma with iron utilization and storage.

Fpn-mediated iron export is dependent on the ferroxidase activity of the multicopper oxidases ceruloplasmin (Cp) and hephaestin. The absence of Cp in macrophages or neural cells leads to cellular iron retention due to the internalization and degradation of Fpn (De Domenico et al., 2007a). Internalization of Fpn in the absence of Cp is hepcidin-independent and results from ubiquitination of Fpn lysine 253. In the absence of multicopper oxidases, Fe (II) remains bound to Fpn, suggesting that Cp, by oxidizing iron, generates a gradient that drives iron transport. In the absence of that gradient, Fpn may be trapped in a transport intermediate conformation that is recognized by an E3-ubiquitin ligase.

In the present study, we define an alternate pathway that results in hepcidin-independent internalization of Fpn. Depletion of cytosolic iron results in the internalization and degradation of cell-surface Fpn. We show that internalization of Fpn, in the absence of iron, is mediated by the E3 ubiquitin ligase Nedd4-2 and its accessory protein Ndfip-1. Ubiquitination of Fpn is a mechanism that protects cells from Fpn-mediated depletion of cytosolic iron. We further show that Nedd4-2 is responsible for the ubiquitination of the Fpn once Fpn is internalized by the hepcidin-dependent pathway. We demonstrate that iron-limited ubiquitination and internalization of Fpn may have preceded hepcidin-induced Fpn internalization, as the invertebrate *Caenorhabditis elegans* (*C. elegans*) Fpn, which is insensitive to hepcidin, is internalized through the iron-limited ubiquitin-dependent pathway.

## RESULTS

### Fpn Is Internalized in Response to Low Cytosolic Iron

Previously, we described a stable cell line, HEK293TFpn-GFP, in which expression of a Fpn-green fluorescent protein (Fpn-GFP) chimera is regulated by the ecdysone promoter (Nemeth et al., 2004). Addition of the ecdysone analog ponasterone induced

0547



**Other Procedures**

Western analysis was performed with either rabbit anti-Fpn (1:1000); rabbit anti-GFP (1:10,000; Abcam, Cambridge, MA); mouse anti-tubulin (1:1000; GeneTex, San Antonio, TX); rabbit anti-nedd4-1, rabbit anti-nedd4-2 (1:1000; Abcam, Cambridge, MA), rabbit anti-ndfip-1, rabbit anti-ndfip-2 (1:1000; Abcam, Cambridge, MA); and mouse anti-ubiquitin (1:1000; Covance, Berkeley, CA) followed by either peroxidase-conjugated goat anti-rabbit IgG (1:10,000; Jackson ImmunoResearch Labs, West Grove, PA) or peroxidase-conjugated goat anti-mouse immunoglobulin IgG (1:10,000; Jackson ImmunoResearch Laboratories, West Grove, PA). All western blots were normalized for total protein concentration with the bicinchoninic acid assay (Pierce Chemical, Rockford, IL). Biotinylation of the macrophage plasma membrane was performed with sulfosuccinimidyl-2-(biotinamido)ethyl-1,3-dithiopropinate (sulfo-NHS-SS-biotin) (Pierce Chemical, Rockford, IL) according to the manufacturer's instructions. Capture of biotinylated Fpn was performed as described previously (De Domenico et al., 2007b). Ferritin levels were determined by ELISA as described previously (De Domenico et al., 2007a). All experiments were performed a minimum of three times. Data are represented as mean ± standard deviation (SD). Mean values were compared with the Student's t test (*, p < 0.05; **, p < 0.005; ns, not significant).

**SUPPLEMENTAL INFORMATION**

Supplemental Information includes three figures and can be found with this article online at doi:10.1016/j.cmet.2011.09.008.

**ACKNOWLEDGMENTS**

The authors express their appreciation to members of the Kaplan lab for critically reading the manuscript. This work is supported by National Institutes of Health (NIH) grant DK070947 to J.K. and NIH grant DK090257 to I.D.D.

Received: April 22, 2011
Revised: August 2, 2011
Accepted: September 12, 2011
Published online: October 20, 2011

**REFERENCES**

Abriel, H., and Staub, O. (2005). Ubiquitylation of ion channels. Physiology (Bethesda) 20, 398–407.

Aydemir, F., Jenkitkasemwong, S., Gulec, S., and Knutson, M.D. (2009). Iron loading increases ferroportin heterogeneous nuclear RNA and mRNA levels in murine J774 macrophages. J. Nutr. 139, 434–438.

Beutler, E., Gelbart, T., Lee, P., Trevino, R., Fernandez, M.A., and Fairbanks, V.F. (2000). Molecular characterization of a case of atransferrinemia. Blood 96, 4071–4074.

Craven, C.M., Alexander, J., Eldridge, M., Kushner, J.P., Bernstein, S., and Kaplan, J. (1987). Tissue distribution and clearance kinetics of non-transferrin-bound iron in the hypotransferrinemic mouse: a rodent model for hemochromatosis. Proc. Natl. Acad. Sci. USA 84, 3457–3461.

Damke, H., Baba, T., Warnock, D.E., and Schmid, S.L. (1994). Induction of mutant dynamin specifically blocks endocytic coated vesicle formation. J. Cell Biol. 127, 915–934.

De Domenico, I., Ward, D.M., di Patti, M.C., Jeong, S.Y., David, S., Musci, G., and Kaplan, J. (2007a). Ferroxidase activity is required for the stability of cell surface ferroportin in cells expressing GPI-ceruloplasmin. EMBO J. 26, 2823–2831.

De Domenico, I., Ward, D.M., Langelier, C., Vaughn, M.B., Nemeth, E., Sundquist, W.I., Ganz, T., Musci, G., and Kaplan, J. (2007b). The molecular mechanism of hepcidin-mediated ferroportin down-regulation. Mol. Biol. Cell 18, 2569–2578.

De Domenico, I., Nemeth, E., Nelson, J.M., Phillips, J.D., Ajioka, R.S., Kay, M.S., Kushner, J.P., Ganz, T., Ward, D.M., and Kaplan, J. (2008). The hepcidin-binding site on ferroportin is evolutionarily conserved. Cell Metab. 8, 146–156.

De Domenico, I., Lo, E., Ward, D.M., and Kaplan, J. (2009). Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. Proc. Natl. Acad. Sci. USA 106, 3800–3805.

Fernandes, A., Preza, G.C., Phung, Y., De Domenico, I., Kaplan, J., Ganz, T., and Nemeth, E. (2009). The molecular basis of hepcidin-resistant hereditary hemochromatosis. Blood 114, 437–443.

Flores, S.Y., Debonneville, C., and Staub, O. (2003). The role of Nedd4/Nedd4-like dependant ubiquitylation in epithelial transport processes. Pflugers Arch. 446, 334–338.

Foot, N.J., Dalton, H.E., Shearwin-Whyatt, L.M., Dorstyn, L., Tan, S.S., Yang, B., and Kumar, S. (2008). Regulation of the divalent metal ion transporter DMT1 and iron homeostasis by a ubiquitin-dependent mechanism involving Ndfips and WWP2. Blood 112, 4268–4275.

Foot, N.J., Leong, Y.A., Dorstyn, L.E., Dalton, H.E., Ho, K., Zhao, L., Garrick, M.D., Yang, B., Hiwase, D., and Kumar, S. (2011). Ndfip1-deficient mice have impaired DMT1 regulation and iron homeostasis. Blood 117, 638–646.

Galy, B., Ferring-Appel, D., Kaden, S., Gröne, H.J., and Hentze, M.W. (2008). Iron regulatory proteins are essential for intestinal function and control key iron absorption molecules in the duodenum. Cell Metab. 7, 79–85.

Hadziahmetovic, M., Song, Y., Ponnuru, P., Iacovelli, J., Hunter, A., Haddad, N., Beard, J., Connor, J.R., Vaulont, S., and Dunaief, J.L. (2011). Age-dependent retinal iron accumulation and degeneration in hepcidin knockout mice. Invest. Ophthalmol. Vis. Sci. 52, 109–118.

Hänninen, M.M., Haapasalo, J., Haapasalo, H., Fleming, R.E., Britton, R.S., Bacon, B.R., and Parkkila, S. (2009). Expression of iron-related genes in human brain and brain tumors. BMC Neurosci. 10, 36.

Hettema, E.H., Valdez-Taubas, J., and Pelham, H.R. (2004). Bsd2 binds the ubiquitin ligase Rsp5 and mediates the ubiquitination of transmembrane proteins. EMBO J. 23, 1279–1288.

Howitt, J., Putz, U., Lackovic, J., Doan, A., Dorstyn, L., Cheng, H., Yang, B., Chan-Ling, T., Silke, J., Kumar, S., and Tan, S.S. (2009). Divalent metal transporter 1 (DMT1) regulation by Ndfip1 prevents metal toxicity in human neurons. Proc. Natl. Acad. Sci. USA 106, 15489–15494.

Jeong, S.Y., Rathore, K.I., Schulz, K., Ponka, P., Arosio, P., and David, S. (2009). Dysregulation of iron homeostasis in the CNS contributes to disease progression in a mouse model of amyotrophic lateral sclerosis. J. Neurosci. 29, 610–619.

Kimura, T., Kawabe, H., Jiang, C., Zhang, W., Xiang, Y.Y., Lu, C., Salter, M.W., Brose, N., Lu, W.Y., and Rotin, D. (2011). Deletion of the ubiquitin ligase Nedd4L in lung epithelia causes cystic fibrosis-like disease. Proc. Natl. Acad. Sci. USA 108, 3216–3221.

Lee, P.L., and Beutler, E. (2009). Regulation of hepcidin and iron-overload disease. Annu. Rev. Pathol. 4, 489–515.

Malik, B., Price, S.R., Mitch, W.E., Yue, Q., and Eaton, D.C. (2006). Regulation of epithelial sodium channels by the ubiquitin-proteasome proteolytic pathway. Am. J. Physiol. Renal Physiol. 290, F1285–F1294.

Malik, I.A., Naz, N., Sheikh, N., Khan, S., Moriconi, F., Blaschke, M., and Ramadori, G. (2011). Comparison of changes in gene expression of transferrin receptor-1 and other iron-regulatory proteins in rat liver and brain during acute-phase response. Cell Tissue Res. 344, 299–312.

Melis, M.A., Cau, M., Congiu, R., Sole, G., Barella, S., Cao, A., Westerman, M., Cazzola, M., and Galanello, R. (2008). A mutation in the TMPRSS6 gene, encoding a transmembrane serine protease that suppresses hepcidin production, in familial iron deficiency anemia refractory to oral iron. Haematologica 93, 1473–1479.

Nemeth, E., Tuttle, M.S., Powelson, J., Vaughn, M.B., Donovan, A., Ward, D.M., Ganz, T., and Kaplan, J. (2004). Hepcidin regulates cellular iron efflux by binding to ferroportin and inducing its internalization. Science 306, 2090–2093.

Shi, P.P., Cao, X.R., Sweezer, E.M., Kinney, T.S., Williams, N.R., Husted, R.F., Nair, R., Weiss, R.M., Williamson, R.A., Sigmund, C.D., et al. (2008). Salt-sensitive hypertension and cardiac hypertrophy in mice deficient in the ubiquitin ligase Nedd4-2. Am. J. Physiol. Renal Physiol. 295, F462–F470.

0557



Cell Metabolism
## Article

# Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion

Ivana De Domenico,[1] Michael B. Vaughn,[2] Prasad N. Paradkar,[2] Eric Lo,[2] Diane M. Ward,[2] and Jerry Kaplan[2,*]
[1]Department of Internal Medicine
[2]Department of Pathology
School of Medicine, University of Utah, Salt Lake City, UT 84132-2501, USA
*Correspondence: jerry.kaplan@path.utah.edu
DOI 10.1016/j.cmet.2010.12.003

## SUMMARY

Ferritin is a multisubunit protein that is responsible for storing and detoxifying cytosolic iron. Ferritin can be found in serum but is relatively iron poor. Serum ferritin occurs in iron overload disorders, in inflammation, and in the genetic disorder hyperferritinemia with cataracts. We show that ferritin secretion results when cellular ferritin synthesis occurs in the relative absence of free cytosolic iron. In yeast and mammalian cells, newly synthesized ferritin monomers can be translocated into the endoplasmic reticulum and transits through the secretory apparatus. Ferritin chains can be translocated into the endoplasmic reticulum in an in vitro translation and membrane insertion system. The insertion of ferritin monomers into the ER occurs under low-free-iron conditions, as iron will induce the assembly of ferritin. Secretion of ferritin chains provides a mechanism that limits ferritin nanocage assembly and ferritin-mediated iron sequestration in the absence of the translational inhibition of ferritin synthesis.

## INTRODUCTION

Ferritin is the major iron storage molecule of vertebrates. The mature protein complex, referred to as a nanocage, contains 24 subunits of a mixture of L- and H-ferritin monomers. Ferritin is capable of storing up to 4500 atoms of iron (Theil, 2004). Ferritin synthesis is regulated transcriptionally by a variety of inflammatory cytokines and posttranscriptionally by cytosolic iron (Rouault, 2006). In the absence of iron, cytosolic iron regulatory protein (IRP)-1 and/or IRP-2 binds to a stem-loop structure in the 5' untranslated region of ferritin mRNA termed the iron-responsive element (IRE), preventing translation. Increased cytosolic iron releases the IRP from the IRE, permitting translation of ferritin mRNA and subsequent iron storage in the ferritin nanocage.

Ferritin can also be found in the serum of vertebrates. There are three notable conditions that result in high levels of serum ferritin: genetic and transfusion iron-overload diseases, inflammation (Rambod et al., 2008), and the rare human genetic disorder hyperferritinemia with cataracts (Hetet et al., 2003). This disorder is due to mutations in the 5' IRE of either L- or H-ferritin, which prevents binding of the IRP to the IRE, resulting in the uncoupling of ferritin synthesis from iron-mediated control.

Serum ferritin is frequently used in clinical settings, but the mechanism of secretion as well as the function of serum ferritin is unclear. In contrast to cytosolic ferritin, serum ferritin is relatively iron poor and has only a fraction of the iron content of cytosolic ferritin. For example, serum ferritin found in highly iron-overloaded individuals may have as little as 2.0% of the iron content of cytosolic ferritin (ten Kate et al., 2001). Ferritin does not have a canonical signal sequence, and the mechanism of its release from cells remains unclear. Except for the terminal stages of liver disease, the presence of serum ferritin cannot be ascribed to cell damage, as the usual indicators of cell death such as cytosolic enzymes are not present in serum when serum ferritin levels are high (Worwood, 1979). Secreted human ferritin was reported to contain N-linked sugars as well as bind to concanavalin A, another indicator of carbohydrate content (Cragg et al., 1981), although the extent of glycosylation is highly variable and has not been seen consistently. Secretion of ferritin by cultured hepatocytes has been reported to be the product of a unique mRNA (Tran et al., 1997) and has been reported for hepatocytes grown in the absence of serum (Ghosh et al., 2004) or in canine lens cells transfected with plasmids expressing H- or L-ferritin, although the mechanism of secretion was not determined (Chen et al., 2005; Coffman et al., 2009; Goralska et al., 2003). A recent study suggested that serum ferritin was primarily derived from the release of ferritin from macrophage lysosomes (Cohen et al., 2010). Here, we demonstrate that secretion of ferritin results from insertion of ferritin monomers into the secretory apparatus and that many cell types are capable of secreting ferritin. Secretion of ferritin results from ferritin synthesis in the relative absence of free cytosolic iron, and ferritin nanocage assembly is iron dependent. We suggest that secretion of ferritin protects cells from excessive depletion of free cytosolic iron when ferritin chain synthesis is uncoupled from IRP regulation.

## RESULTS

### Ferritin Chain Secretion Results from Increased Cytosolic Iron

Increased serum ferritin is seen in iron overload disorders where iron can be found in hepatocytes or macrophages, depending on the nature of the mutant gene. Mutations in the iron exporter ferroportin (Fpn) are the cause of Type IV hemochromatosis (Pietrangelo, 2004). Defective cellular iron export leads to high

0559

Cell Metabolism

## Retraction

# Retraction Notice to:
# Decoupling Ferritin Synthesis from Free
# Cytosolic Iron Results in Ferritin Secretion

Ivana De Domenico, Michael B. Vaughn, Prasad N. Paradkar, Eric Lo, Diane M. Ward, and Jerry Kaplan*
*Correspondence: jerry.kaplan@path.utah.edu
DOI 10.1016/j.cmet.2012.04.012

(Cell Metabolism 13, 57–67; January 5, 2011)

We, the authors, wish to retract "Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion" by De Domenico et al. (Cell Metabolism 13, 57–67; January 5, 2011; 10.1016/j.cmet.2010.12.003) and "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico et al. (Cell Metabolism 14, 635–646; November 2, 2011; 10.1016/j.cmet.2011.09.008) because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory. We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors. However, we believe that the most responsible course of action is to retract the paper. We are preparing a new expanded version of this study for future submission. We deeply apologize to the community for the inconvenience.

---

# Retraction Notice to:
# The Role of Ubiquitination in Hepcidin-
# Independent and Hepcidin-Dependent
# Degradation of Ferroportin

Ivana De Domenico, Eric Lo, Baoli Yang, Tamara Korolnek, Iqbal Hamza, Diane McVey Ward, and Jerry Kaplan*
*Correspondence: jerry.kaplan@path.utah.edu
DOI 10.1016/j.cmet.2012.04.017

(Cell Metabolism 14, 635–646; November 2, 2011)

We, the authors, wish to retract "Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion" by De Domenico et al. (Cell Metabolism 13, 57–67; January 5, 2011; 10.1016/j.cmet.2010.12.003) and "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico et al. (Cell Metabolism 14, 635–646; November 2, 2011; 10.1016/j.cmet.2011.09.008) because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory. We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors. However, we believe that the most responsible course of action is to retract the paper. We are preparing a new expanded version of this study for future submission. We deeply apologize to the community for the inconvenience.

0570

## Dahlberg, John E (HHS/OASH)

**From:**          Ganz, Tomas, M.D. [TGanz@mednet.ucla.edu]
**Sent:**          Thursday, November 03, 2011 8:53 PM
**To:**            Dahlberg, John E (HHS/OASH)
**Subject:**       Report of Scientific Misconduct
**Attachments:**   De Domenico et al.pptx

Alg - 2
x . . d
w /Cor - 4

John Dahlberg, Ph.D.
ORI Director of Investigative Oversight

Dear Dr. Dahlberg,

I am hereby reporting suspected scientific misconduct deduced from data that appear in a series of scientific publications funded by the NIH. As of today, the case is already under investigation by the editorial team at Cell Metabolism and by Jeffrey R. Botkin, M.D., M.P.H., Associate Vice President for Research Integrity, University of Utah. The irregularities involve multiple publications in Cell Metabolism, Blood, JCI and PNAS by Ivana De Domenico and her colleagues at the University of Utah where data appear to have been fraudulently manipulated by cutting and pasting altered duplicate images (Western blots, microphotographs) in different contexts. In addition, quantitative data presented in bar graphs contain error bars that are consistently smaller than the methodology allows. Multiple irregularities were identified by me and several colleagues worldwide, after we noticed a particularly egregious example in a recent online publication in Cell Metabolism. I am attaching a Powerpoint presentation detailing specific examples of irregularities in publications by these authors. I have only notified Cell Metabolism (the most recent publication) but not the other journals.

Sincerely,

Tomas Ganz, PhD, MD
Professor of Medicine and Pathology
CHS 37-055, Department of Medicine
David Geffen School of Medicine
Los Angeles, CA 90095-1690

Tel.: +1 310 825-6112
E-mail: tganz@mednet.ucla.edu
Fax: +1 310 206-8766

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

0571

De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. Cell Metab. 2011 Oct 18. [Epub ahead of print] PubMed PMID:22019085. :

# Figure 1C (next three slides)
Western blot inappropriately manipulated and duplicated

# Figure 1C: as it appears in the paper



# Figure 1C: Reconstruction: Bottom panel flipped horizontally



0574

# Figure 1C: Reconstruction: High resolution detail

## Superposition, 50% transparent top layer



## Superposition 50% transparent top layer, offset



0575

De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. Cell Metab. 2011 Oct 18. [Epub ahead of print] PubMed PMID:22019085. :

# Figure 2: problem 1 (next two slides)
## Western blot inappropriately manipulated and duplicated

# Figure 2: as it appears in the paper



# Figure 2 enhanced



Panel A ii

Panel B

0578

De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. Cell Metab. 2011 Oct 18. [Epub ahead of print] PubMed PMID:22019085. :

# Figure 2: problem 2 (next two slides)
Western blot inappropriately manipulated and duplicated

0579

# Figure 2

Panel B as it appears
in the paper



Panel B inverted



Panel A ii

Figure 2 (enhanced): arrows point to identical blot artifacts in different figures



Panel B inverted

Panel A ii

De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. Cell Metab. 2011 Oct 18. [Epub ahead of print] PubMed PMID:22019085. :

Figure 1D & Figure 3 (next two slides)
Western blot inappropriately manipulated and reused in another Figure

# Figures 1D and Figure 3 as they appear in the paper



# Figures 1D and Figure 3 enhanced: arrows show identical blot artifacts



0584

Problems in additional
publications (PNAS, JCI, Blood,
Cell Metabolism)

Each slide is a different problem

0585

De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. Proc Natl Acad Sci U S A. 2009 Mar 10;106(10):3800-5. PubMed PMID: 19234114; PubMed Central PMCID: PMC2656160.

# Figure 2A middle panel vs. Figure 1 middle panel



Arrows point to identical blot artifacts

Duplication and manipulation of Western blot with reuse in another Figure

De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. Proc Natl Acad Sci U S A. 2009 Mar 10;106(10):3800-5. PubMed PMID: 19234114; PubMed Central PMCID: PMC2656160.

# Figure 4A top panel vs. Figure 3B bottom panel



Arrows point to identical blot artifacts

Duplication and manipulation of Western blot with reuse in another Figure

De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. Proc Natl Acad Sci U S A. 2009 Mar 10;106(10):3800-5. PubMed PMID: 19234114; PubMed Central PMCID: PMC2656160.

Ivana De Domenico, Tian Y. Zhang, Curry L. Koening, Ryan W. Branch, Nyall London, Eric Lo, Raymond A. Daynes, James P. Kushner, Dean Li, Diane M. Ward, Jerry Kaplan *J Clin Invest.* 2010; 120(7):2395–2405

# PNAS Figure 3 vs. JCI Figure 2



Arrows point to identical blot artifacts

Duplication and manipulation of Western blot with reuse in another underline{manuscript}

Case 1:23-cv-02530-CRC    Document 49-1    Filed 08/15/25    Page 26 of 489

De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. Proc Natl Acad Sci U S A. 2009 Mar 10;106(10):3800-5. PubMed PMID: 19234114; PubMed Central PMCID: PMC2656160.

Ivana De Domenico, Tian Y. Zhang, Curry L. Koening, Ryan W. Branch, Nyall London, Eric Lo, Raymond A. Daynes, James P. Kushner, Dean Li, Diane M. Ward, Jerry Kaplan *J Clin Invest.* 2010; 120(7):2395–2405

# PNAS Figure 3B vs JCI Figure 2A



Duplication and manipulation of Western blot with reuse in another manuscript

# PNAS Figure 2A vs Blood 4A



## Figure 2A

Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2.
De Domenico I, Lo E, Ward DM, Kaplan J.
Proc Natl Acad Sci U S A. 2009 Mar 10;106(10):3800-5. Epub 2009 Feb 20.

## Figure 4A

Toll-like receptors mediate induction of hepcidin in mice infected with Borrelia burgdorferi.
Koening CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I.
Blood. 2009 Aug 27;114(9):1913-8. Epub 2009 Jul 8.

Duplication and manipulation of a photomicrograph with reuse in another manuscript

0590

# Blood Figure 1B



Identical photos, the bottom one is blurred

Zebrafish as a model for defining the functional impact of mammalian ferroportin mutations.
De Domenico I, Vaughn MB, Yoon D, Kushner JP, Ward DM, Kaplan J.
Blood. 2007 Nov 15;110(10):3780-3. Epub 2007 Aug 28.

Blurred version of the above image

Duplication and manipulation of a microphotograph with reuse in the same Figure

In all of the papers where DeDomenico is the first author, bar graphs have error bars that are too small for the techniques involved and the number of replicates (next three slides are examples from one paper)

Suggest statistical consultation to verify this, e.g. by examining papers by other authors who use the same technique

# Supplemental Figure 2





Cell Metab. 2011 Jan 5;13(1):57-67.
**Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion.**
De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J.

Error bars are too small to reflect the error of the technique and stated replicates

0593

De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J. Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. Cell Metab. 2011 Jan 5;13(1):57-67. PubMed PMID: 21195349; PubMed Central PMCID:PMC3035985.



Figure 2: Error bars are too small to reflect the error of the technique and stated replicates

De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J. Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. Cell Metab. 2011 Jan 5;13(1):57-67. PubMed PMID: 21195349; PubMed Central PMCID:PMC3035985.





Figure 3: Error bars are too small to reflect the error of the technique and stated replicates

Cites an antibody that does not exist (phosphotyrosine-specific Fpn Ab (Y302/Y303))

**Human mutation D157G in ferroportin leads to hepcidin-independent binding of Jak2 and ferroportin down-regulation**

Ivana De Domenico[1], Eric Lo[2], Diane M. Ward[2], and Jerry Kaplan[2]

## Other procedures

Immunoprecipitation of Fpn-GFP was performed as described previously[6] using protein A/G resin (Santa Cruz Biotechnology) and rabbit anti-Fpn. To determine whether Fpn bound Jak2 is phosphorylated, the Fpn immunoprecipitate was further immunoprecipitated using rabbit anti-Jak2. Immunoprecipitation of phosphotyrosine was performed using mouse antiphosphotyrosine antibody (1:500; Calbiochem) and protein A/G resin (Santa Cruz Biotechnology). Western analysis was performed using either rabbit anti-Fpn (1:1000), mouse antiphosphotyrosine clone 16F4 (1:500; Calbiochem), with a rabbit phosphotyrosine-specific Fpn antibody (Y302/Y303; 1:500; Cell Signaling); or mouse anti-Jak2 (1:1000; Cell Signaling), followed by either peroxidase-conjugated goat anti–mouse IgG (1:10 000; Jackson ImmunoResearch Laboratories) or peroxidase-conjugated goat anti–rabbit IgG (1:10 000; Jackson ImmunoResearch Laboratories). All Western blots were normalized for total protein concentration using the bicinchoninic acid assay (Pierce Chemical). Fluorescence images were visualized using an epifluorescence microscope (Olympus Inc) with a 60×/1.4 numeric aperture oil-immersion objective. Images were acquired using Magnafire analysis software (Optronix). All experiments were performed a minimum of 3 times.

Antibody doesn't exist
See next page





De Domenico I et al. Blood 2010;115:2956-2959

## Dahlberg, John E (HHS/OASH)

**From:** Dahlberg, John E (HHS/OASH)
**Sent:** Friday, November 04, 2011 9:36 AM
**To:** Ganz, Tomas, M.D.
**Cc:** Dahlberg, John E (HHS/OASH)
**Subject:** RE: Report of Scientific Misconduct

Dear Dr. Ganz,

Thank you for sending your concerns to the Office of Research Integrity. It seems clear that the issues with images that you identify are real, and I share your concerns about the implications of exceptionally small error bars on the graphs. I will communicate with Jeff Botkin,k whom I have worked with on several occasions, and ask him to keep ORI appraised of UT's progress on reviewing Dr. De Domenico's publications.

Sincerely,

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity
240-453-8800

**From:** Ganz, Tomas, M.D. [mailto:TGanz@mednet.ucla.edu]
**Sent:** Thursday, November 03, 2011 8:53 PM
**To:** Dahlberg, John E (HHS/OASH)
**Subject:** Report of Scientific Misconduct

John Dahlberg, Ph.D.
ORI Director of Investigative Oversight

Dear Dr. Dahlberg,

I am hereby reporting suspected scientific misconduct deduced from data that appear in a series of scientific publications funded by the NIH. As of today, the case is already under investigation by the editorial team at Cell Metabolism and by Jeffrey R. Botkin, M.D., M.P.H., Associate Vice President for Research Integrity, University of Utah. The irregularities involve multiple publications in Cell Metabolism, Blood, JCI and PNAS by Ivana De Domenico and her colleagues at the University of Utah where data appear to have been fraudulently manipulated by cutting and pasting altered duplicate images (Western blots, microphotographs) in different contexts. In addition, quantitative data presented in bar graphs contain error bars that are consistently smaller than the methodology allows. Multiple irregularities were identified by me and several colleagues worldwide, after we noticed a particularly egregious example in a recent online publication in Cell Metabolism. I am attaching a Powerpoint presentation detailing specific examples of irregularities in publications by these authors. I have only notified Cell Metabolism (the most recent publication) but not the other journals.

Sincerely,

Tomas Ganz, PhD, MD
Professor of Medicine and Pathology
CHS 37-055, Department of Medicine
David Geffen School of Medicine

1

4554

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Jeff Botkin [Jeffrey.Botkin@hsc.utah.edu] |
| **Sent:** | Friday, November 04, 2011 2:34 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | Re: new allegations of misconduct |

John -- Thank you very much. I received the allegations on Wed afternoon. I am in DC this week but have received some information about the allegations and have scheduled an interview for Tuesday. I will be in touch as the inquiry progresses.

Best regards,

-- Jeff

Jeffrey R. Botkin, M.D., M.P.H.
Professor of Pediatrics
Chief, Division of Medical Ethics and Humanities
Associate Vice President for Research Integrity
University of Utah
Phone: 801-581-7171

On Nov 4, 2011, at 1:58 PM, Dahlberg, John E (HHS/OASH) wrote:

Hello Jeff,

I received the attached powerpoint file from a complainant yesterday who wishes to remain anonymous. The complaint noted that you are already conducting an "investigation:" into allegations concerning Dr. Ivana De Domenico and her colleagues involving publications in*Cell Metabolasima, Blood, JCI* and *PNAS*, so I doubt that any of this will be new. Evidently, all of the editors have also been notified of problems with the papers cited in the attached file. Since ORI has not been notified of any activity on the part of the University of Utah, I assume you are a the inquiry phase. This is just to let you know that we will be tracking this while we wait to hear from you an an appropriate time.

I will ask Tracy Morgan of the DIO staff to provide you with an accession number once one can be assigned. Let us know if there is any way we can provide assistance.

Regards, John

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity
240-453-8800

<De Domenico et al.pptx>

1

0605

## Dahlberg, John E (HHS/OASH)

| | |
|---|---|
| **From:** | Dahlberg, John E (HHS/OASH) |
| **Sent:** | Friday, November 04, 2011 1:59 PM |
| **To:** | Jeffrey Botkin |
| **Cc:** | Dahlberg, John E (HHS/OASH); Morgan, Tracy S (HHS/OASH) |
| **Subject:** | new allegations of misconduct |
| **Attachments:** | De Domenico et al.pptx |

Hello Jeff,

I received the attached powerpoint file from a complainant yesterday who wishes to remain anonymous. The complaint noted that you are already conducting an "investigation:" into allegations concerning Dr. Ivana De Domenico and her colleagues involving publications in *Cell Metabolasima, Blood, JCI* and *PNAS*, so I doubt that any of this will be new. Evidently, all of the editors have also been notified of problems with the papers cited in the attached file. Since ORI has not been notified of any activity on the part of the University of Utah, I assume you are a the inquiry phase. This is just to let you know that we will be tracking this while we wait to hear from you an an appropriate time.

I will ask Tracy Morgan of the DIO staff to provide you with an accession number once one can be assigned. Let us know if there is any way we can provide assistance.

Regards, John

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity
240-453-8800

1



The University of Utah
School of Medicine

Jerry Kaplan, Ph.D.
Benning Presidential Endowed Chair
Professor of Pathology
Associate Dean for Research, School of Medicine
Assistant Vice President for Basic Sciences
   at the Health Sciences Center

November 28, 2011

Jeffrey R. Botkin, M.D., M.P.H.
Associate Vice President for Research
Research Administration Building, 1st Floor

Dear Dr. Botkin:

I have reviewed the issues that have been brought up. Below are some of my thoughts on this matter.

1. We now recognize that mistakes were made in the generation of the figures. I am not excusing the mistakes, but none of the mistakes affected the data interpretation or results. Critically, we have independent repeats for experiments that have been performed in the laboratory and reported in the studies. All independent repeats give consistent results. We have also saved many of the samples used in these experiments, which are available for independent analysis. Additionally, discoveries reported in our papers (J. Clin Invest.) on the transcriptional response to hepcidin, have been independently confirmed by other groups (e.g. Nai et al, Blood 2011). Finally, I have had critical experiments reported in the PNAS, J Clin Invest and Cell Metabolism papers repeated by myself and a new person in the laboratory. The results have been confirmed. I stand by the data and the results we reported.

2. One of the issues raised identified that the same panels were shown in two different papers (PNAS, JCI). As stated, we originally had one large manuscript that we then divided into two. The panels showed data that were relevant to both papers (hepcidin induces Jak2 binding to ferroportin (PNAS); Jak2 bound to ferroportin leads to a transcriptional response (JCI). The inclusion of those panels did not alter the results of the manuscripts. In the JCI manuscript we refer to the PNAS manuscript and those findings.

3. As stated above we have saved all samples. There are a few cases where the data are not available because a dismissed technician destroyed laboratory data books. This destruction was reported to the institution (Human Resources) before the issues were brought up.

4. The issue alleging the fabrication of an antibody from Cell Signaling is completely erroneous. We have forwarded emails from Dr. Xiaowu Zhang from Cell Signaling regarding this issue. I have also communicated previously with Dr. Roberto D. Polakiewicz, Ph.D., Chief Scientific Officer, Cell Signaling Technology, Inc. (rpolakiewicz@cellsignal.com), regarding our interest in an antibody and Dr. DeDomenico in her detailed response has

Office of the Senior Vice President for Health Sciences
30 North 1900 East, 5C124 SOM
Salt Lake City, Utah 84132-2501
Phone: (801) 581-7427
Fax: (801) 585-6364
Email: jerry.kaplan@path.utah.edu

included those emails as well. Even before NIH required sharing of reagents it was our policy to share every reagent used in our laboratory. This includes yeast strains, plasmids, cell lines (including our inducible ferroportin-GFP cell line), mutant mouse strains and antibodies. For us to state the existence of an antibody that did not exist would be insane. We have been and are prepared to share this antibody with anyone who asked.

5. The issue regarding our error bars on ELISAs can be answered in two ways. First, we have provided the committee with the raw data that we used. Second, Dr. De Domenico has provided the committee with examples taken from the literature of error bars on ELISAs performed on ferritin and cytokines. Our data are in the same range as others. My only comment is that it might be expected that error bars on measurements performed in humans (which are not genetically homogenous) might be different from that performed on either cultured cells or inbred mice.

I am embarrassed about the mistakes in our figures. We will rectify these matters by an erratum in the affected journals as soon as the investigation is completed. I believe that the mistakes did not affect the results reported in the papers, and I stand by the conclusions of those studies.

Sincerely,

Jerry Kaplan, Ph.D.
Professor, Department of Pathology

## Dahlberg, John E (HHS/OASH)

| | |
|---|---|
| **From:** | Dahlberg, John E (HHS/OASH) |
| **Sent:** | Friday, January 20, 2012 3:46 PM |
| **To:** | Jeff Botkin |
| **Cc:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | RE: new allegations of misconduct  DIO 4554 |

Hello Jeff,

Thanks for asking for guidance on what is often a tricky matter of differentiating between sloppy behavior and a significant pattern of alterations of images that implies a level of intent.  As a  general matter, certainly when it comes to numerical data in tables at so forth, when "errors" are encountered at some unusual frequency, it is proper to ask what fraction favor the investigators hypothesis and what fraction do not.  If it is 50:50 or so, then clearly the investigator was careless and/or not very inteliigent.  If it is 90-100 percent favoring the hoped for outcome, the strong pattern can help t establish that the errors were actually intentional and knowing.

Similarly, if all or nearly all of the falsified figures are better looking than the actual data, this pattern might establish an intent to mislead.  My suggestion is to send the inquiry report to ORI (with all of the documents relied on by the committee), and by citing 42 C.F.R. Part 93.316, ask us if it is appropriate to consider not moving to an investigation even though there is evidence for possible research misconduct.  DIO staff can evaluate the preliminary findings of the inquiry committee and evaluate whether there is any possibility that they might rise to a level of recklessness or even knowing or intentional misrepresentation that we could find legally sufficient.  We have seen quite a few cases where investigators throw up their hands and say everything was an honest error, and while any one or two incidents could well have been, how could 20 or 30 such incidents over a number of years have all been careless? ++

At the end of the day, we might agree that little more could be done, and  would depend on your university to handle the matter, perhaps as academic misconduct  with administrative remedies short of research misconduct findings by Utah or ORI.  Let me know if you wish to discuss this further.  The section of the regulation I am referring to states:

*Sec.  93.316  Completing the research misconduct process.*

*a) ORI expects institutions to carry inquiries and investigations through to completion and to pursue diligently all significant issues. An institution must notify ORI in advance if the institution plans to close a case at the inquiry, investigation, or appeal stage on the basis that the respondent has admitted guilt, a settlement with the respondent has been reached, or for any other reason, except the closing of a case at the inquiry stage on the basis that an investigation is not warranted or a finding of no misconduct at the investigation stage, which must be reported to ORI under Sec. 93.315.*
*(b) After consulting with the institution on its basis for closing a case under paragraph (a) of this section, ORI may conduct an oversight review of the institution's handling of the case and take appropriate action including:*
*(1) Approving or conditionally approving closure of the case;*
*(2) Directing the institution to complete its process;*
*(3) Referring the matter for further investigation by HHS; or,*
*(4) Taking a compliance action.*

Regards, John

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity
240-453-8800

1

**From:** Jeff Botkin [mailto:Jeffrey.Botkin@hsc.utah.edu]
**Sent:** Thursday, January 19, 2012 8:12 PM
**To:** Dahlberg, John E (HHS/OASH)
**Subject:** Re: new allegations of misconduct

Dear Dr. Dahlberg — The Inquiry Committee for this complaint is developing its findings. They have asked me for guidance and I am, in turn, seeking guidance from you.

I believe the Committee has found a pattern of sloppy science. They have not identified evidence of willful data manipulation that would constitute fabrication or falsification. But a number of figures in publications are in error due to poor quality control and oversight in the laboratory. I believe the respondents have demonstrated that they have primary datasets that support all of the conclusions in the papers in question and they argue that they therefore had no motivation for intentionally falsifying or fabricating data.

A finding of misconduct requires that "The misconduct be committed intentionally, or knowingly, or recklessly." So my question pertains to the "or recklessly" phrase. The definition also excludes honest errors. Do you have any guidance on the distinction between reckless behavior and honest errors? Does a series of honest errors become misconduct at some point?

The Inquiry Committee has done a thorough job. It will make its own determination but I would prefer that the Inquiry Committee not recommend an investigation due simply to uncertainty over the "recklessly" issue if it is unlikely that additional investigation will uncover new facts. The University can address the quality of science problem without a finding of misconduct.

Thanks for your thoughts.

Best regards,

--Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
University of Utah

---

**From:** "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>
**Date:** Fri, 4 Nov 2011 11:58:36 -0600
**To:** Jeffrey Botkin <jeffrey.botkin@hsc.utah.edu>
**Cc:** "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>, "Morgan, Tracy S (HHS/OASH)" <Tracy.Morgan@hhs.gov>
**Subject:** new allegations of misconduct

Hello Jeff,

I received the attached powerpoint file from a complainant yesterday who wishes to remain anonymous. The complaint noted that you are already conducting an "investigation:" into allegations concerning Dr. Ivana De Domenico and her colleagues involving publications in *Cell Metabolasima, Blood, JCI* and *PNAS*, so I doubt that any of this will be new. Evidently, all of the editors have also been notified of problems with the papers cited in the attached file. Since ORI has

**Inquiry Committee for Allegations of Scientific Misconduct by Drs. De Domenico and Kaplan**
16 February 2012
Dana Carroll, Ph.D., Professor of Biochemistry
Gary Schoenwolf, Ph.D., Professor of Neurobiology and Anatomy
Carl Thummel, Ph.D., Professor of Human Genetics

The committee met with Dr. Jeff Botkin on December 22, 2011 to hear their responsibilities and to discuss the allegations against Drs. De Domenico and Kaplan. We decided to schedule two meetings – one with Dr. De Domenico on January 6, 2012 and one with Dr. Kaplan on January 17, 2012. Based on our findings, a second meeting with Dr. De Domenico was held on February 7, 2012.

**Meeting 1: January 6, 2012**
This meeting focused on the allegations. We asked Dr. De Domenico to go through each of the figures in question, show us the primary data on the autoradiographs, and explain how the scanned images were used to make the final figures. She stated that in all cases, one person did the experiment, a second person scanned the data, and she used the scanned images to make the figures.
Fig 1C in Nov 2, 2011 Cell Metabolism paper: Dr. De Domenico did not know who did the original experiment. The plasma membrane (PM) and flow through (FT) samples were run on separate gels in opposite order such that one set of data would need to be flipped around the vertical axis to be aligned with the other in the final figure. As a result, two scans were made, with one an inverse image of the other. Dr. De Domenico used the same data from each scan (from the FT samples) to create the erroneous figure – i.e., the same 4 lanes were used in both tiers of the figure. The fact that the correct data were available and looked quite convincing, but were not used, indicates that this error was due to carelessness rather than an intention to deceive. The committee also noted that the central two lanes (36 h FAC; 0 h DFX) are not distinguished from each other in the figure – they are labeled identically.  Yet the left lane (lane 2 in the gel) represents a sample without iron while the right lane (lane 3) represents a sample with iron. There would be no way to know this from the legend or figure.
Fig 2Aii in Nov 2, 2011 Cell Metabolism paper ("IP:Strepavidin" data on left): Dr. De Domenico confirmed that the same scanned image was used twice – in this figure and in panel B – as alleged. Looking at the film, however, revealed that the image was flipped around the vertical axis from the original data and was taken from samples in the FT, not the PM as labeled. It thus has no relation to what is labeled in either panel A or B. In addition, upon looking at the lower two panels in this figure (FT, α-GFP), the data for the right panel (36 hr, α-GFP) were found to be flipped from what was on the original film, and taken from PM samples rather than FT as labeled. It thus has no relation to what is labeled in the figure. The data for the lower left panel could not be found on the film at that time (although we returned to this later). There are thus two problems with this figure in addition to the alleged duplication of data. Neither of these problems could have been detected without looking at the original film.
Fig 4A and 3B in March 10, 2009 PNAS paper: The original data behind this allegation could not be found and may have been lost with the notebooks that were taken from the lab.

0612

Fig 2A in PNAS paper and Fig 4A in 2009 Blood paper: Dr. De Domenico indicated that the labeling in the PNAS paper is correct. The "control media" sample in the Blood is thus treated with siRNA for human Jak2 and does not represent a control as labeled.

Fig. 1B in 2007 Blood paper: The images of zebrafish were all captured blindly to avoid any bias in interpretation. The use of a control image to represent the Fpn-GFP N144H mutant sample was an accident according to Dr. De Domenico.

We had no way to confirm or deny the allegation that the phospho-specific anti-Fpn antiserum does not exist. Dr. De Domeico (and Dr. Kaplan later) asserted its existence and stated that no one had requested it from them. It is true that the company (Cell Signaling) never offered it commercially.

**Meeting 2: January 17, 2012**
The second meeting, with Dr. Kaplan, was relatively brief. Dr. Kaplan expressed deep regret at the errors that were made but emphasized that an independent person in the lab had duplicated all the experiments in question. The committee did not look over data from those experiments. He told us that the replicated experiments, in all cases, look similar to the data that were published and thus the overall conclusions of those papers are sound. Dr. Kaplan expressed strong support for Dr. De Domenico as an excellent research scientist, both within and outside his group. He stated the intention of replacing each of the erroneous figures with corrected data in a published erratum.

Neither Dr. De Domenico nor Dr. Kaplan disputed any of the allegations, except those regarding the existence of the phospho-specific antiserum and the size of the error bars in various histograms. Dr. Kaplan asserted that the latter were similar to those in other papers in the field and that the statistical analyses were correct.

**Meeting 3: February 7, 2012**
The committee asked to meet with Dr. De Domenico again in order to follow up on discussions from the first meeting. In particular, the discovery of two additional errors in Fig 2Aii in the Nov 2, 2011 Cell Metabolism paper raised the possibility that more errors might be revealed if the original films were compared with the published data. Accordingly, the committee asked Dr. De Domenico to present the original data for all of the autoradiographs published in the Nov 2, 2011 Cell Metabolism paper. In addition, we asked Dr. De Domenico to present the original data for all the autoradiographs in the Jan 5, 2011 Cell Metabolism paper, for which no allegations had been raised. Because of excellent preparations on the part of Dr. De Domenico, we were able to cover all of the January paper and part of the November paper in the allotted two-hour time. All published data in the Jan 5, 2011 paper matched the data on the original films with the following exceptions. Dr. De Domenico emphasized that all of the figures for this paper were prepared by her.

Fig 4B in Jan. 5, 2011 Cell Metabolism paper – lower two panels (+Fe): The left panel is flipped around the vertical axis compared to the original film and thus does not represent the lanes as published. The data for the right lower panel were not on the same film and could not be found. These were the only data in the paper that could not be found.

Fig 5A in Jan. 5, 2011 Cell Metabolism paper: The right-most band in the upper panel is shifted to the right from its proper location, under the heading "65". The two bands in the lower panel

2

0613

should correspond to the lanes "65" and "75", not "75" and "85" as indicated. There is a blank lane to the right of the lower band in the original data for this panel that is not shown in the figure (corresponding to lane "85"). The figure thus misrepresents the original data.

<u>Fig 5B in Jan. 5, 2011 Cell Metabolism paper:</u> The published data are flipped from the original film and thus do not represent what is shown.

<u>Fig 7B in Jan. 5, 2011 Cell Metabolism paper:</u> The upper left panel is flipped from the original film and thus does not represent what is shown. The lower panel shows loading controls that were run on a separate gel and thus cannot be directly compared to the experimental samples shown above. In addition, one loading control has not been included and they are not aligned with the upper panel. There are 16 lanes depicted in the upper panel and only 15 in the lower. The last sample on the right of the lower panel was cut off in making the figure.

<u>Fig 1A in Nov. 2, 2011 Cell Metabolism paper:</u> The films for the autoradiographs could not be found.

<u>Fig 1C in Nov. 2, 2011 Cell Metabolism paper:</u> Allegation discussed above.

<u>Fig 1D in Nov. 2, 2011 Cell Metabolism paper:</u> It was unclear whether the data in the upper right panel (+DFX, α-ubiquitin) are the same as the bands that were presented on the film. The data in the lower left panel (-DFX, α-GFP) are flipped from the original film and thus do not represent what is shown. The data for the lower right panel (which is alleged to be duplicated in Fig. 3) could not be found.

<u>Fig 2Aii in Nov. 2, 2011 Cell Metabolism paper:</u> We returned to these panels in which problems had been discovered during our first meeting, as described above. The original data for the lower left panel (18 hr, FT), which could not be found during our first meeting with Dr. De Domenico, were found on the film. They appear to match the data that were used for the two right lanes in the upper panel in Fig. 5 of this paper. The film used for Fig. 5 is a darker exposure from what was used in Fig. 2Aii, and the data were flipped and inverted from that shown in Fig. 5. An overlay of these images in Photoshop is attached. The data in Fig. 2Aii thus have no relation to what is labeled in the figure.

<u>Fig 3 in Nov. 2, 2011 Cell Metabolism paper:</u> The original data could not be found.

<u>Fig 5 in Nov. 2, 2011 Cell Metabolism paper:</u> The Western blot data in the upper panel (α-GFP) are flipped from the original film and thus do not represent what is shown.

<u>Figs 4 & 7 in Nov. 2, 2011 Cell Metabolism paper:</u> There was no time to discuss these figures.

All of the errors described above, aside from the original allegations, were identified by the committee and not by Dr. De Domenico.

**Additional analysis**

We asked Greg Stoddard to reanalyze some of the primary data from the Nov. 2, 2011 Cell Metabolism paper. His report is attached. He concludes that the error bars for the graph in Fig. 7B, as published, faithfully represent the primary data. He raises a question about the overall design of the experiment, but we did not discuss this issue with either Drs. De Domenico or Kaplan. He also notes that "in Figure 7B, the two top y-axis labels are shown as 300 and 350, but should be 250 and 300, to correctly reflect the data." He assumes that this is a typo. Given the frequency of errors cited above, however, the committee believes that a more complete assessment of the accuracy of the graphical data is warranted.

3

0614

During the interviews with Dr. De Domenico the committee was made aware of several uses of poor laboratory practice that, taken together, contributed to the problems listed above.

1. Dr. De Domenico informed us that all of the lanes and size markers were properly marked on the original autoradiographs immediately after developing the film. Instead of then scanning those films, however, she or a technician would remove all the markings with alcohol, scan the images, and then relabel the films. In addition, a number of exposures that were used to make figures were entirely unlabeled. Some of these films had no date or other information to relate them to lab notes.

2. Western blot detection of loading controls (anti-tubulin) was done using a separate gel, rather than stripping and re-probing the blot with the experimental samples.

3. Data from different experiments were combined to make a figure rather than re-doing the experiments and loading them onto one gel.

4. Some experiments were not repeated at the time of the initial discovery, but were repeated over a long period of time – on occasion over more than a year after the initial work was done.

**Conclusions**

The Committee did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question. Rather, there was extreme carelessness on the part of Dr. De Domenico in preparing the figures and little oversight from Dr. Kaplan in ensuring that the figures in the papers accurately represented the primary data. The arrangement and approximate intensity of the bands was symmetrical in all cases where the data were erroneously flipped, and thus careful attention was needed. In addition, most of the data were binary – either a band or no band – and thus care was needed to select the correct bands that represented the corresponding experiment. The fact that acceptable and accurate data were frequently present on the film, but not used, argues against any intention to deceive. In addition, because of the symmetry of the flipped panels, the overall conclusions from these figures are likely to be correct. However, given the multiple errors discovered in the Jan. 5, 2011 Cell Metabolism paper – for which no allegations had been raised – and the additional errors discovered in the Nov. 2 Cell Metabolism paper, the committee concludes that each of these papers, and perhaps others from these combined authors, contain misrepresentations of the primary results and thus deviate significantly from accepted scientific practice. We recommend that the authors fully disclose the errors discovered during the course of this inquiry to the editors of the journals involved. In addition, we recommend that all papers jointly authored by Drs. De Domenico and Kaplan be independently reevaluated, and if additional errors are found, that these be fully disclosed to the editors of the journals involved.

4

0615

Comparison of Figs 2Aii and 5 in Nov. 2, 2011 Cell Metabolism paper

**Fig. 2Aii aligned with Fig. 5, which is flipped, inverted, and shifted over one lane**



**Above with Fig. 2Aii aligned**



5



THE
UNIVERSITY
OF UTAH

Jeffrey R. Botkin, M.D., M.P.H.

Associate Vice President for Research Integrity

75 South 2000 East #108  Salt Lake City, Utah 84112  (801) 581-7170  FAX (801) 585-9588

**Research Integrity Officer Report**
University of Utah Case: 02-2011
Federal Office of Research Integrity Case: DIO 4554
February 22, 2012

<u>Summary</u>

I, the Research Integrity Officer, Jeffrey Botkin, was initially contacted by Dr. Kaplan and, shortly thereafter, by several journals regarding concerns identified in several publications jointly authored by Drs. De Domenico, Kaplan and others. Dr. De Domenico is an Assistant Professor in Hematology and Dr. Kaplan is Professor of Pathology and Associate Dean for Research in the School of Medicine. The concerns involved multiple instances of figures that appeared to be duplicated or otherwise manipulated. A detailed set of PowerPoint slides were submitted by an outside investigator who reviewed a number of recent publications by the Utah group and identified several instances of duplication of western blots and other concerns.

Federal grants were used for some of the work in question including: NIH grants DK030534, DK070947, and SP30 DK072437 to Dr. Kaplan, and DK090257 to Dr. De Domenico.

I interviewed Drs. De Domenico and Kaplan separately about the concerns. Original films and notebooks were sequestered. One set of films was discarded by a former laboratory employee and the loss of these data were documented in emails that pre-date the current allegations.

The respondents acknowledged multiple errors in the published articles in question but ascribed those to mistakes in preparation of the manuscripts. They contend that the original data, including repeated runs at the time of the relevant experiments, illustrate that there was no rationale for data fabrication or falsification and that the conclusions of the papers remain valid.

An Ad Hoc Inquiry Committee was seated including Drs. Thummel, Schoenwolf, and Carroll. These are all senior members of the University faculty who have expertise in the experimental techniques in question. Committee members also were chosen who would be able to review the work of a senior individual such as Dr. Kaplan.

The Inquiry Committee reviewed the primary data and interviewed Drs. De Domenico and Kaplan over the course of three meetings. Their report was submitted on 2/16/12. Their primary finding was that multiple errors were present in several manuscripts but these were due to poor laboratory methods and procedures. The Inquiry Committee did not identify instances of intentional data fabrication or falsification.

0620

The Inquiry Committee did not recommend that further investigation be conducted. A detailed response was received from Drs. De Domenico and Kaplan on 2/22/12. The respondents acknowledge multiple errors and intend to work with the journals in question to address these concerns.

My assessment is that the Inquiry Committee has done a thorough job in reviewing the primary data and interviewing the respondents. The respondents have been fully cooperative through the inquiry and they acknowledge the multiple errors made in the preparation of manuscripts. As observed by the Inquiry Committee, the pattern of problems identified in the figures does not suggest an intent to deceive. The allegation concerning the antibody was addressed by emails provided by Dr. Kaplan documenting the acquisition of the antibody from Cell Signaling. The allegation concerning the error bars was addressed through independent analysis by a statistician. The error bars are accurate with respect to the primary datasets obtained.

As the Research Integrity Officer, I will not pursue a full investigation of these allegations for research misconduct. The federal Office of Research Integrity was notified of the allegations and will receive a full report from my office. They may initiate an investigation.

This summary, allegations, the report of the Inquiry Committee, and the response of the respondents will be shared with the journal editors who contacted me about these concerns and with the independent investigator who documented irregularities in the manuscripts in question (the complainants).



**Timeline**

11/2/11 – I received an email from Dr. Kaplan notifying me of concerns by the journal Cell Metabolism.

11/3/11 – I received an email from Nikla Emambokus, Ph.D.
Editor, Cell Metabolism, raising concerns about figures in a journal article in the November 2011 issue, "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The journal had been contacted by a group of ten concerned readers about the apparent irregularities in the manuscript figures. The editor indicated that there had been communication with Dr. Kaplan about the concerns but a decision was made to notify me in my capacity as Research Integrity Officer.

11/3/11 - Additional material received from an outside investigator documenting concerns about figures.

11/7/11 An email was received from Ushma S. Neill, Ph.D., Executive Editor, The Journal of Clinical Investigation regarding the concerns in the JCI publication: Ivana De Domenico, Tian Y. Zhang, Curry L. Koening, Ryan W. Branch, Nyall London, Eric Lo, Raymond A. Daynes, James P. Kushner, Dean Li,

2

nature of the data (band or no band) and the symmetry of the panel lead to erroneous figures but did not lead to misrepresentation of the data. These mistakes were made in the assembly of the figures for publication, the conclusions of the figures are correct. All the previous publication and discoveries by Dr. De Domenico and Dr. Kaplan were validated by publications from others, as detailed below.

We had originally contacted the editors from *Cell Metabolism*, *PNAS*, *JCI* and *Blood* and now after the investigation is concluded we are planning to fully disclose the errors with the editors of the journals and have ready errata of the now corrected figures.

We are able to replace each figure with repeat experiments (these data are in Dr. Botkin's custody) or by re-running the original samples. As was noted by the committee the original samples were coded, inventoried and stored in a laboratory freezer.

We are embarrassed by the duplicated images but there was no duplicity involved. They were mistakes, but again there was no attempt at falsification. New policies in the laboratory will prevent a recurrence. These policies, suggested also by the committee, include: stripping gels for loading control rather than using a separate gel, not erasing labels on the film before scanning during figure preparation and not having more than two gels in each film. We currently have an individual from outside of the lab that analyzes the data for each figure for publications. Finally, Dr. Kaplan will personally supervise the generation of the figures.

Sincerely
Jerry Kaplan
Ivana De Domenico

List of research papers in which Dr. Kaplan is a senior author and Dr. De Domenico is a first author:

1. De Domenico I., Ward D.M., Nemeth E., Vaughn M.B, Musci G., Ganz T. and Kaplan J. (2005). Molecular Basis for Ferroportin-Linked Hemochromatosis. *Proc. Natl. Acad. Sci. USA.* 102:8955-8960.

2. De Domenico I., Ward D.M., Nemeth E., Ganz T., Corradini E., Ferrara F., Musci G., Pietrangelo A. and Kaplan J. (2006). Molecular and Clinical Correlates in the Ferroportin Disease. *Haematologica.* Aug;91(8):1092-5.

3. DeDomenico I., Ward D.M., Musci G. and Kaplan J. (2007). Evidence for the Multimeric Structure of Ferroportin. *Blood.* Mar 1;109(5):2205-9.

*The above papers show that Fpn is a multimer. These data has been confirmed by McGregor JA et al, 2005 J Membr Biol*

4. De Domenico I., Vaughn M.B, Li L., Bagley D., Ward D.M. and Kaplan J. (2006). Ferroportin-Mediated Mobilization of Ferritin Iron Precedes Ferritin Degradation by the Proteasome. *EMBO J.* Nov 15;25(22):5396-404.

*The above paper shows that Ferroportin export induces iron release from ferritin. These data has been confirmed by Mehlhase J et al, 2005 Free Radical Biology and Medicine.*

5. De Domenico I, Ward DM, di Patti MC, Jeong SY, David S, Musci G, Kaplan J. (2007). Ferroxidase Activity is Required for the Stability of Cell Surface Ferroportin in Cells Expressing GPI-ceruloplasmin. *EMBO J.* Jun 20;26(12):2823-31.

*The above paper shows that Ferroportin stabilization on the plasma membrane required a functional multicopper oxidase. These data has been confirmed by Bonaccorsi di Patti MC et al, 2009 J Bio Chem. and Kono S. et al, 2010 BBA*

6. De Domenico I., Nemeth E., Phillips J.D., Ajioka R.S., Kay M., Kushner J.P., Ganz T., Ward M.D. and Kaplan J. (2008) Indentification of Hepcidin Binding Site on Ferroportin *Cell Metabolism* Aug;8(2):146-56

*The above paper shows that an extracellular loop in Ferroportin is responsible for hepcidin binding. These data has been confirmed by Fernandes A et al, 2009 Blood*

7. De Domenico I., Ward D.M., Nemeth E., Ganz T., Musci G. and Kaplan J. (2007). The Molecular Mechanism of Hepcidin-mediated Ferroportin Down-

Regulation.
*Mol Biol Cell*. Jul;18(7):2569-78

8. <u>De Domenico I.</u> , Lo E.,  Ward M.D., and Kaplan J. (2009) Hepcidin induced internalization of ferroportin requires binding and cooperative interaction with Jak2 *Proc. Natl. Acad. Sci. USA*  Mar10;106(10):3800-5

9. <u>De Domenico I.</u>, Lo E., Ward D.M. and Kaplan J. (2009) Human Mutation D157G in Ferroportin Leads to Hepcidin-Independent Binding of Jak2 and Ferroportin Downregulation. *Blood* April 8; 115(14):2956-9 PMID: 20124516

*The above papers show Ferroportin after hepcidin binding is internalized. The signal for internalization is phosphorylation and after internalization ferroportin is ubiquitinated. <u>These paper show that two adjacent  tyrosines in ferroportin  are important for this process.  Kono S. et al, 2010 BBA, have recently confirmed that these tyrosines are essential for ferroportin internalization. This paper also confirmed the role of ceruloplasmin in ferroportin internalization reported in De Domenico et al, 2007 EMBO J.</u>*

10. <u>De Domenico I.</u>, Zhang T.Y., Koening C.L., Branch R.W., London N., Daynes R.A., Kushner J.P., Li D., Ward D.M. and Kaplan J. Hepcidin Modulates Cytokine Induced Inflammatory Responses *Journal of Clinical Investigation* Jul 1;120(7):2395-405

*The above paper shows hepcidin after binding to ferroportin induced a transcriptional response.  Therefore hepcidin modulates inflammation.  This paper has been confirmed by Pagani et al, 2011 Blood; Pan CY et al, 2011 Fish Shellfish Immunol., Rajanbabu V, et al 2010 JBC and Hsieh et al, 2010 Fish Shellfish Immunol.*

# Errata

List of the publications that will be corrected:

### 1. *De Domenico et al Cell Met 2011 Oct 18*

The following figures will be corrected:
Figure 1C (1 panel)
Figure 2Aii and 2B
Figure 3 (1panel)

### 2. *De Domenico et al Cell Met 2011 Jan5*

The following figure will be corrected:
Figure 7 B (1 panel)

### 3. *De Domenico et al PNAS 2009 Mar 10*

The following figures will be corrected:
Figure 1 (1 panel)
Figure 2A (1panel)
Figure 3 (1 panel)

### 4. *De Domenico et al Blood 2007 Nov 15*

The following figure will be corrected:
Figure 1B (1 panel)



STRATAGENE

3-29-2010

①- We make cytosolic ferritin and reduce associated ferritin in vitro  -/+ Fe

② Superdex 200 FPLC ( Mike's column )

③ We collected the fraction and run the gel. We loaded every 10 fraction:

Ladder | 5 | 15 | 25 | 35 | 45 | 55 | 65 | 75 | 85

Gel 1
⤷ + Fe
   + Reduce

Gel 2
⤷ - Fe
   + Reduce

Ladder | 85 | 75 | 65 | 55 | 45 | 35 | 25 | 15 | 5

(note) => we left 1 lane empty because the comb break the gel.

→ Remember => after Ladder 1 empty lane!

(note) => these gels were run in 12 well gels because we do not want loose sample on the side!

5-20-2010

- in vitro synthesis of ferritin

- Medium → + Fe (<10 μM)
            → - Fe (10 μM

- based on the column as be done in the
  experiment performed on 3-29-2010

- We use 12 well gels (ready)

- Gel :

| ladder | 75 | 75 | 5 | 5 | Special | 75 | 75 | 5/5 |
|--------|----|----|---|---|---------|----|----|-----|

       └───────────────────┘        └──────────────┘
              + Fe                         - Fe

- O/N  1:1000 ferritin antibody (rabbit serum)

0631

9-19-2010

- Eric put in cells IRE-GFP

- He did all experiment also the movie @ the core

- Note => from his notes appears that the linear gel order is flipped

- Note 2 => The correct orders for these gels:

| Label | 6 | 12 | 18 | 24 | | | |
|---|---|---|---|---|---|---|---|
| | + / - | - / + | + / - | - / + | + / - | - / + | + / - |



| Label | 6 | 3 | 1 | 0.5 | 0 | | | |
|---|---|---|---|---|---|---|---|---|
| | + / - | + / - | - / + | - / + | - / + | + / - | - / + | + / - | - / + |

Note => label on the films is flipped!



THE
UNIVERSITY
OF UTAH

Jeffrey R. Botkin, M.D., M.P.H.

Associate Vice President for Research Integrity

75 South 2000 East #108  Salt Lake City, Utah 84112  (801) 581-7170  FAX (801) 585-9588

**Research Integrity Officer Report**
University of Utah Case: 02-2011
Federal Office of Research Integrity Case: DIO 4554
Revised: March 7, 2012

## Summary

I, the Research Integrity Officer, Jeffrey Botkin, was initially contacted by Dr.
Kaplan and, shortly thereafter, by several journals regarding concerns identified
in several publications jointly authored by Drs. De Domenico, Kaplan and others.
Dr. De Domenico is an Assistant Professor in Hematology and Dr. Kaplan is
Professor of Pathology and Associate Dean for Research in the School of
Medicine. The concerns involved multiple instances of figures that appeared to
be duplicated or otherwise manipulated. A detailed set of PowerPoint slides
were submitted by an outside investigator who reviewed a number of recent
publications by the Utah group and identified several instances of duplication of
western blots and other concerns.

Federal grants were used for some of the work in question including: NIH grants
DK030534, DK070947, and SP30 DK072437 to Dr. Kaplan, and DK090257 to Dr.
De Domenico.

I interviewed Drs. De Domenico and Kaplan separately about the concerns.
Original films and notebooks were sequestered. One set of films was discarded
by a former laboratory employee and the loss of these data were documented in
emails that pre-date the current allegations.

The respondents acknowledged multiple errors in the published articles in
question but ascribed those to mistakes in preparation of the manuscripts. They
contend that the original data, including repeated runs at the time of the relevant
experiments, illustrate that there was no rationale for data fabrication or
falsification and that the conclusions of the papers remain valid.

An Ad Hoc Inquiry Committee was seated including:

- Dr. Carl Thummel, Ph.D. Professor of Human Genetics,
- Dr. Gary Schoenwolf, Distinguished Professor of Neurobiology and
  Anatomy
- Dr. Dana Carroll, Ph.D., Professor of Biochemistry

All three are senior members of the University faculty who have expertise in the
experimental techniques in question. Committee members also were chosen
who would be able to review the work of a senior individual such as Dr. Kaplan.

The Inquiry Committee reviewed the primary data and interviewed Drs. De
Domenico and Kaplan over the course of three meetings. Their report was
submitted on 2/16/12. The Inquiry Committee identified several additional

1

0633

irregularities not in the original allegations. Their primary finding was that multiple errors were due to poor laboratory methods and procedures. The Inquiry Committee did not identify instances of intentional data fabrication or falsification.

Although the Committee was concerned about the number of errors identified, it did not recommend that a formal research misconduct investigation be conducted. The Committee did recommend that a thorough review be conducted of all publications by the respondents to identify any additional irregularities. A response was received from Drs. De Domenico and Kaplan on 2/22/12. The respondents acknowledge multiple errors and intend to work with the journals in question to address these concerns.

My assessment was that the Inquiry Committee had done a thorough job in reviewing the primary data and interviewing the respondents. The respondents have been fully cooperative through the inquiry and they acknowledge the multiple errors made in the preparation of manuscripts. The Committee's findings, and my acceptance of their findings, were based on several considerations: 1) a lack of evidence that the irregularities were intentional, 2) plausible explanations about how the irregularities occurred through poor laboratory practices, 3) evidence that the correct figures existed and could have been used by the respondents without changing the scientific findings of the papers, 4) a lack of evidence that the errors in the figures led to false conclusions in the scientific literature, and 5) the admission of error for all allegations (except the error bar issue and the existence of the antibody) and for all the new irregularities identified by the Inquiry Committee. Given the admission of error, it was considered unlikely that an additional evaluation would uncover evidence of an intent to deceive. The review of other publications might trigger an inquiry or investigation if additional irregularities were identified.

The initial decision not to pursue an investigation was communicated to the respondents, the complainant, and the relevant journals.

---

A new communication was received on 3/4/12 from the complainant. Additional irregularities were identified in the literature, specifically western blots in two publications:

- De Domenico et al. The molecular mechanism of hepcidin-mediated ferroportin down-regulation. Mol Biol Cell. 2007 Jul;18(7):2569-78 (NIH Grants DK-070947 and HL-26922 (to J.K.) and AI-051174 (to W.I.S.)); and
- De Domenico et al. Evidence for the multimeric structure of ferroportin. Blood. 2007 Mar 1;109(5):2205-9 (NIH Grant DK070 947 (J.K.)).

The complainant sent PowerPoint slides that appear to indicate that a western blot in each of these publications were spliced together from separate images. Given the complexity of the original allegations and a new set of information suggesting deliberate alterations of images, the decision was made on 3/5/12 to conduct a full investigation of the irregularities.

2

0634

I am recruiting a 5 member Investigation Committee that will review all irregularities, including the new and the previously reviewed allegations. The Investigation Committee also will review other publications by the respondents for evidence of additional irregularities.

Jeffrey R Botkin, MD, MPH
Research Integrity Officer
University of Utah

3



THE
UNIVERSITY
OF UTAH

Jeffrey R. Botkin, M.D., M.P.H.

Associate Vice President for Research Integrity

75 South 2000 East #108  Salt Lake City, Utah 84112  (801) 581-7170  FAX (801) 585-9588

4554

March 14, 2012

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity

RE: DIO 4554

Dear Dr. Dahlberg:

This case involves irregularities in multiple images in a number of publications
by Drs. Ivana De Domenico and Jerry Kaplan at the University of Utah. The
Inquiry Committee originally recommended that a investigation not be
conducted for the reasons outlined in the enclosed documents. Subsequently,
additional irregularities were identified. We have decided to proceed with a full
investigation of the matter.

Enclosed are the following materials in paper and electronic format:

- My summary report
- A timeline of the key events
- The Ad Hoc Inquiry Committee Report
- The initial response to the concerns by the respondents titled "Initial
  Response"
- A response from the respondents to the Inquiry Committee Report titled
  "Respondents' Response."
- PowerPoint of the original allegations (11/3/11)
- PowerPoint of the additional allegations (3/4/12)
- Copies of 9 publications by the respondents

Please let me know if you would like any additional materials. I look forward to
working with ORI to address these concerns.

Best regards,

Jeffrey R. Botkin, MD, MPH
Research Integrity Officer
University of Utah

0707

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Ganz, Tomas, M.D. [TGanz@mednet.ucla.edu] |
| **Sent:** | Tuesday, February 28, 2012 9:49 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | De Domenico et al., U. of Utah (Report of the Botkin Committee) |

Dear John,

I recently received the report of Prof. Botkin and the faculty committee on the De Domenico case, and was told that you received (or will receive) the same materials. As you may recall, the case involves irregularities in multiple publications in Cell Metabolism, Blood, JCI and PNAS by Ivana De Domenico and her colleagues at the University of Utah where data appear to have been fraudulently manipulated by cutting and pasting altered duplicate images (Western blots, microphotographs) in different contexts. In addition, quantitative data presented in bar graphs contain error bars that are consistently smaller than the methodology allows.

The investigating committee confirmed essentially all our allegations and found at least one additional instance of the same pattern of misrepresentation of data in the most recent publication. The Utah investigation concluded that: "The Committee did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question. Rather, there was extreme carelessness on the part of Dr. De Domenico in preparing the figures and little oversight from Dr. Kaplan in ensuring that the figures in the papers accurately represented the primary data." As I argue below, even these damning conclusions understate the case against Dr. De Domenico. Although the committee appropriately recommended that "all papers jointly authored by Drs. De Domenico and Kaplan be independently reevaluated", this recommendation was softened in the cover letter by Prof. Botkin.

Here are my reasons for contesting the conclusion of the Utah investigation that scientific misconduct did not take place:

1) The misrepresentations are numerous and involve multiple papers published over several years. Instances of pieces of the same blot being used to represent different data in different papers are particularly egregious. As indicated by the additional problems discovered during a 1 hour session of the committee with Dr. De Domenico, our limited sampling is likely to have revealed only the tip of the iceberg.

2) Important primary data are missing, including data relevant to the very recent Nov. 2, 2011 Cell Metabolism paper.

3) The multiple impossibly small error bars in ELISA assays, a concern shared by the examining statistician, are not explained by invoking data entries in the lab book. A dated printout from the ELISA reader containing raw absorbances should have been examined also.

4) Although Dr. Kaplan claims that "an independent person in the lab had duplicated all the experiments in question" no one has examined these data. The veracity of the reported data is further put in doubt by the inability of multiple investigators to replicate the key findings of De Domenico et al. over the last five years. These concerns were shared with Dr. Kaplan by several investigators but never resolved. Paradoxically, the inability of the field to reproduce Dr. De Domenico's results was ascribed by Dr. Kaplan to our collective technical deficits.

1

0708

The report is asking us to accept that these two brilliant and successful scientists, publishing in the best journals and receiving multiple NIH grants, made many errors due to poor laboratory technique and "extreme carelessness". I find this hard to swallow.

As you know, intent is hard to prove. At the very least, I see a pattern of deliberate disregard for the most elementary rules of scientific inquiry.

The many dedicated scientists in our field have been disheartened by these events and deserve a careful inquiry into what happened.


With best regards, Tom

Tomas Ganz, PhD, MD
Professor of Medicine and Pathology
CHS 37-055, Department of Medicine
David Geffen School of Medicine
Los Angeles, CA 90095-1690

Tel.: +1 310 825-6112
E-mail: tganz@mednet.ucla.edu
Fax: +1 310 206-8766

Shipping:
UCLA Medical Receiving
650 Charles E. Young Drive South
CHS 52-164
Attn: Tomas Ganz
Los Angeles, CA 90095
USA

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

0709

Figure 2A

Mol Cell Biol. 2004 May; 24(10): 4341–4350.

**FIG. 2.**

Coimmobilization assays reveal altered oligomerization affinity of different Gro mutants. (A) Untagged wild-type full-length Gro was cotranslated in vitro with wild-type (wt) or point mutant forms of histidine-tagged Gro N-terminal region containing the Q and GP domains (His-GroN) (lanes 2 to 8) or translated alone (lane 1) in the presence of [$^{35}$S]methionine. The translation products were incubated with Ni-NTA beads, and after extensive washing, Ni-bound proteins were eluted and analyzed by SDS-PAGE and autoradiography. Upper panel shows input proteins, while lower panel shows Ni-NTA bound proteins.

The single mutations in these residues (His-GroN$^{38D}$ and His-GroN$^{87D}$) reduced binding by ~60 to 70%, while the double mutation (His-GroN$^{38,87D}$) abolished binding





Single mutations show image removal

Double mutation is blank

erasures

**FIG. 6.**
Both wild-type and mutant Gro bind to Brk in vitro. [35S]methionine-labeled Gro proteins were incubated with glutathione-agarose beads bearing GST or GST fusion proteins. After extensive washing, bound proteins were eluted and analyzed by SDS-PAGE and autoradiography. (A) Full-length Gro (lanes 1 to 4) or Gro(2-194) (lanes 5 to 8) were incubated with glutathione-agarose beads containing GST (lanes 2 and 6), GST-Brk (lanes 3 and 7), or GST-Brk(441-589), designated in the figure as GST-BrkΔ (lanes 4 and 8). (B) Full-length Gro$^{WT}$ (lanes 1 to 3), Gro$^{38P}$ (lanes 4 to 6), Gro$^{87P}$ (lanes 7 to 9), or Gro$^{38,87P}$ (lanes 10 to 12) were incubated with glutathione-agarose beads bearing GST (lanes 2, 5, 8, and 11) or GST-Brk (lanes 3, 6, 9, and 12). The percentage of input protein that bound GST-Brk beads is indicated at the bottom of the GST-Brk lanes.

Figure 6
Mol Cell Biol. 2004 May; 24(10): 4341–4350.



Images pasted in; background is blank

The article in question is the following:

> Song, H., P. Hasson, Z. Paroush, and A. J. Courey. 2004. Groucho oligomerization is required for repression in vivo. *Mol Cell Biol* 24:4341-50.

The introduction to the article ends with the following paragraph (numbers and highlights added by DIO):

> In the experiments presented here, we show that [1] Gro oligomerization is very probably mediated by two coiled-coil motifs in the Q domain. Furthermore, we show that [2] mutations that disrupt the hydrophobic faces of these coiled coils prevent both tetramerization and the formation of higher-order Gro oligomers. Finally, we show that [3] the same point mutations that disrupt oligomerization prevent Gro-mediated repression in transfected cells and in vivo, strongly suggesting that **oligomerization is a prerequisite for repression**.

The point in contention in the *Qui Tam* is the third one.

The paper presented the results in the following order:

### 1. Oligomerization of Groucho is mediated by putative coiled-coil motifs (p. 4342).

Figure 2 which supports this conclusion has clearly been constructed from another experiment or tampered with.  See PowerPoint slide 1



## 2. Gro oligomerization is required for repression in transfected cells (p. 4344)

Figure 4 has no obvious falsifications, erasures or evidence of tampering with the blots.

This section of the paper concludes:

"…the robust repression directed by wild-type Gal4-Gro is largely independent of endogenous Gro. However, when oligomerization is weakened by the disruption of a single coiled-coil motif, repression is enhanced by endogenous wildtype Gro. This further supports the idea that oligomerization contributes to repression, since the endogenous Gro lacks a Gal4 DNA binding domain and can presumably be recruited to the reporter only by oligomerization with Gal4-Gro."



## 3. Oligomerization is required for the lethality and developmental defects that result from Gro overexpression

There is no obvious falsification of these images in Figure 5.



**4. Oligomerization is required for Gro-mediated repression of Brk targets in the wing disk.**



Figure 6 has obvious falsifications as can be seen in the PowerPoint slide.

This article is frequently cited in the following grant application:

**2 R01 GM044522-18** Repressor/co-repressor oligomerization and development

2008-03-18    Application entered into NIH computer; 2008/09/15 budget start

The Song et al. *Mol. Cell Biol.* 2004 article received the following citations (reference # 70) in the grant application and supported the funding of this application by NIGMS

**Specific Aims**

Page 27

- Both Groucho (Gro) and Yan contain homo-oligomerization domains that mediate the formation of high order oligomers, and this oligomerization appears to be essential for repression (58, 70).

- Point mutations in the Q domain that prevent oligomerization also prevent repression in S2 cells and in wing disc ectopic expression assays (70).

**Background and Significance**

Page 29

- Two examples where more concrete links have been made between transcription factor oligomerization and repression are those of Groucho (Gro) and Yan-mediated repression (58, 70).

Page 30

- Studies from our lab and other labs have shown that the highly conserved Q-domain mediates Gro homo-oligomerization (12, 53, 70).


**Prelim Studies/Progress report**

Page 33

- Third, a structure/function analysis of Gro, a critical Dorsal-interacting corepressor, has led to the further characterization of roles for Gro oligomerization and Gro/histone deacetylase interactions in Gro-mediated repression ((70) and unpublished data).

- Although corepressor oligomerization has been invoked in many instances of long-range repression including heterochromatic silencing and Gro mediated repression, there are few definitive links between the ability of a factor to oligomerize and its ability to repress transcription in vivo. To fill this gap, we determined the oligomeric state of Gro in vitro and then determined the requirement for oligomerization in repression by designing oligomerization-defective point mutations and assaying them in cultured cells and wing discs (70).

- A variety of hydrodynamic studies including native gel electrophoresis, velocity sedimentation, and gel filtration chromatography indicate that native full-length Gro forms oligomers of various size (12, 70).

Page 34

- As shown in pull-down assays using in vitro translated proteins, mutations in the hydrophobic faces of the coiled-coil motifs weaken or abolish Gro self-association, while control mutations in the hydrophilic faces of these motifs have no effect on self-association (70).

- We assayed the ability of oligomerization domain mutants to repress transcription in two ways. First, we tethered wild-type and mutant Gro to luciferase reporters by fusing Gro to the Gal4 DNA binding domain. These experiments show that wild-type Gal4-Gro mediates >10-fold repression of an S2 cell reporter, while mutations in AH1 and/or AH2 significantly reduce or abolish repression (12, 70).

- We also assayed repression in wing discs (70).

**Research Design**

Page 41:  **Is Gro oligomerization required for repression of all Gro targets in vivo? Rationale**

- Our previous studies showing that Gro oligomerization is required for repression relied on S2 cell assays and wing disc assays in which Gro was expressed throughout much of the wing disc or in clonal patches within the wing disc (70). The findings of these experiments are consistent with an absolute requirement for oligomerization in Gro-mediated repression.

- We therefore prefer to use the site directed coiled-coil motif point mutant alleles that we have already characterized biochemically (70).

- We will create the single point mutants in AH1 and AH2 as well as the double point mutant in both coiled-coil motifs, since our biochemical analysis and cell culture analysis (70) indicate that these different mutants have different effects on oligomerization and repression. In addition, to facilitate the ChIP assays described below (section 1b), we will use recombineering-mediated mutagenesis to incorporate N-terminal FLAG tags into the constructs. Our previous studies indicate that N-terminal FLAG tags are compatible with Gro function (12, 70).

Page 46:  **Does the formation of a Gro-bound chromosomal domain require spreading?**
- However, the double mutant containing point mutations in both AH1 and AH2 displays no ability to bind wild-type Gro in vitro reducing the chance of an interaction in vivo (70).

Page 49:  **Developing forms of Yan SAM with increased oligomerization affinity**

- Mutations that abolish Yan polymerization lead to Ras-independent, Crm1-dependent nuclear export of Yan (70).

45 54

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Ganz, Tomas, M.D. [TGanz@mednet.ucla.edu] |
| **Sent:** | Thursday, March 01, 2012 10:57 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | De Domenico et al., U. of Utah (Report of the Botkin Committee) |
| **Attachments:** | Allegations 02-2011 updated.pptx |

Addendum: I have attached an updated summary of the various misrepresentations in six different papers by De Domenico et al. It now includes the additional findings of the Utah Committee. Best regards, Tom

Dear John,

I recently received the report of Prof. Botkin and the faculty committee on the De Domenico case, and was told that you received (or will receive) the same materials. As you may recall, the case involves irregularities in multiple publications in Cell Metabolism, Blood, JCI and PNAS by Ivana De Domenico and her colleagues at the University of Utah where data appear to have been fraudulently manipulated by cutting and pasting altered duplicate images (Western blots, microphotographs) in different contexts. In addition, quantitative data presented in bar graphs contain error bars that are consistently smaller than the methodology allows.

The investigating committee confirmed essentially all our allegations and found at least one additional instance of the same pattern of misrepresentation of data in the most recent publication. The Utah investigation concluded that: "The Committee did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question. Rather, there was extreme carelessness on the part of Dr. De Domenico in preparing the figures and little oversight from Dr. Kaplan in ensuring that the figures in the papers accurately represented the primary data." As I argue below, even these damning conclusions understate the case against Dr. De Domenico. Although the committee appropriately recommended that "all papers jointly authored by Drs. De Domenico and Kaplan be independently reevaluated", this recommendation was softened in the cover letter by Prof. Botkin.

Here are my reasons for contesting the conclusion of the Utah investigation that scientific misconduct did not take place:

1) The misrepresentations are numerous and involve multiple papers published over several years. Instances of pieces of the same blot being used to represent different data in different papers are particularly egregious. As indicated by the additional problems discovered during a 1 hour session of the committee with Dr. De Domenico, our limited sampling is likely to have revealed only the tip of the iceberg.

2) Important primary data are missing, including data relevant to the very recent Nov. 2, 2011 Cell Metabolism paper.

3) The multiple impossibly small error bars in ELISA assays, a concern shared by the examining statistician, are not explained by invoking data entries in the lab book. A dated printout from the ELISA reader containing raw absorbances should have been examined also.

1

0717

4) Although Dr. Kaplan claims that "an independent person in the lab had duplicated all the experiments in question" no one has examined these data. The veracity of the reported data is further put in doubt by the inability of multiple investigators to replicate the key findings of De Domenico et al. over the last five years. These concerns were shared with Dr. Kaplan by several investigators but never resolved. Paradoxically, the inability of the field to reproduce Dr. De Domenico's results was ascribed by Dr. Kaplan to our collective technical deficits.

The report is asking us to accept that these two brilliant and successful scientists, publishing in the best journals and receiving multiple NIH grants, made many errors due to poor laboratory technique and "extreme carelessness". I find this hard to swallow.

As you know, intent is hard to prove. At the very least, I see a pattern of deliberate disregard for the most elementary rules of scientific inquiry.

The many dedicated scientists in our field have been disheartened by these events and deserve a careful inquiry into what happened.

With best regards, Tom

Tomas Ganz, PhD, MD
Professor of Medicine and Pathology
CHS 37-055, Department of Medicine
David Geffen School of Medicine
Los Angeles, CA 90095-1690

Tel.: +1 310 825-6112
E-mail: tganz@mednet.ucla.edu
Fax: +1 310 206-8766

Shipping:
UCLA Medical Receiving
650 Charles E. Young Drive South
CHS 52-164
Attn: Tomas Ganz
Los Angeles, CA 90095
USA

IMPORTANT WARNING: This email (and any attachments) is only intended for the use of the person or entity to which it is addressed, and may contain information that is privileged and confidential. You, the recipient, are obligated to maintain it in a safe, secure and confidential manner. Unauthorized redisclosure or failure to maintain confidentiality may subject you to federal and state penalties. If you are not the intended recipient, please immediately notify us by return email, and delete this message from your computer.

0718

4554

# Summary of the Utah Committee findings in De Domenico case

# PAPER 1

De Domenico et al. The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. **Cell Metab 2011 Nov 2**;14(5):635-46

0720

# <u>Figure 1C</u>

• Top panel reused for the bottom panel



Enlarged on the next page

0721

Continued from the previous page…
Figure 1C reconstruction: arrows point to
identical artifacts on the blot



0722

# Figure 2Aii and 2B

- Published images do not correspond to original films
- Same Western blots used for <u>different</u> treatments



Figure 2A ii

In the original film this is <u>FT</u> sample, not PM

This is cropped and flipped Fig 5 (see the next slide)

Flipped vertically

Identical

In the original film this is <u>PM</u> sample, not FT, and is flipped

Figure 2B

A different treatment from 2Aii, but the top panels are the same. The same top panels were matched to different bottom panels.

0723

# Figure 2A ii vs Figure 5

- Published image does not correspond to original film
- Same Western blots used for <u>different</u> treatments



## Figure 5
Cells expressing Fpn-GFP, treated with DFX and ZnSO$_4$

The panel is flipped compared to the original film and does not represent what is labeled

Image cropped, flipped, exposure changed

## Figure 2A ii
Cells expressing Fpn-GFP transfected with siRNA

Next page – the committee's analysis

0724

# U of Utah committee analysis of Figures 2Aii and 5

**Fig. 2Aii aligned with Fig. 5, which is flipped, inverted, and shifted over one lane**



Fig. 2Aii

Fig. 5

**Above with Fig. 2Aii aligned**



0725

# Figure 1D and Figure 3

- Same Western blot used for two <u>different</u> treatments
- Original data missing

Unclear whether the image corresponds to the bands presented on the original film

Figure 1D
Cells <u>transiently transfected</u> with Fpn-GFP and dynamin K44A, then treated with DFX

Flipped from the original film

Original data could not be found

Identical but cropped differently (enlarged image on the next page)

Figure 3 - the original data could not be found
Cells <u>stably expressing</u> Fpn-GFP, transfected with siRNA, then treated with hepcidin



0726

Continued from the previous page…
Figures 1D and Figure 3 enhanced: arrows point to
identical blot artifacts



# Figure 1A

- Original data missing



# **Figure 7B**

• Error bars are too small to reflect the error of the technique and stated replicates

Scale mislabeled



Statistics for Figure 7B ELISA to analyze cytosolic ferritin (N=3 per displayed bar)

| Sample: bars in graph from left to right | Mean* | SEM* | SD* | CV* |
|---|---|---|---|---|
| +FAC empty vector | 224.3 | 1.8 | 3.1 | 0.01 |
| +/- FAC empty vector | 189.7 | 6.1 | 10.5 | 0.06 |
| +FAC mFpn | 241.0 | 2.3 | 4.0 | 0.02 |
| +/- FAC mFpn | 46.0 | 2.1 | 3.6 | 0.08 |
| +FAC cFpn | 224.3 | 2.7 | 4.7 | 0.02 |
| +/- FAC cFpn | 62.0 | 1.5 | 2.6 | 0.04 |

An order of magnitude smaller than what is expected for the technique

Erhardt JG et al. J Nutr. 2004: % CV for ferritin ELISA = 11.4

0729

# PAPER 2

De Domenico et al. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. **PNAS 2009**; Mar 10;106(10):3800-5

# Figure 1 and Figure 2A

• Same Western blot used for two <u>different</u> treatments

Figure 1
WT and Jak2-deficient cells (γ2A)
<u>transiently transfected</u> with Fpn-
GFP, then treated with hepcidin

Figure 2A
Cells <u>stably expressing</u> Fpn-GFP,
transfected with siRNA, then
treated with hepcidin

Cropped differently and flipped vertically
(enlarged image on the next page)



0731

Continued from the previous page…
Figure 1 and Figure 2A: Arrows point to identical blot artifacts



0732

# Figure 3B and Figure 4A

• Same Western blot used in two <u>different</u> treatments for two <u>different</u> antibodies

Figure 3B
<u>Primary mouse bone marrow derived macrophages</u>, treated with hepcidin
Blotted for Jak2

Identical but cropped differently
(enlarged image on the next page)

Figure 4A
<u>HEK293 cells transiently transfected</u> with Fpn-GFP and Dynamin K44A then treated with hepcidin
Blotted for Fpn



0733

Continued from the previous page…
Figure 4A vs. Figure 3B: Arrows point to identical blot artifacts



# PAPER 2 AND PAPER 3

## Same blots used in <u>two different papers</u>

De Domenico et al. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. **PNAS 2009;** Mar 10;106(10):3800-5.

De Domenico et al. Hepcidin mediates transcriptional changes that modulate acute cytokine-induced inflammatory responses in mice. **J Clin Invest 2010**; 120(7):2395–2405

# PNAS Figure 3B vs JCI Figure 2A

• Same Western blots used in two <u>different papers</u>

Figure 3B PNAS 2009

Figure 2A JCI 2010



0736

# PAPER 2 AND PAPER 4

## Same microscopy image in <u>two different papers</u>

De Domenico et al. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with Jak2. **PNAS 2009**; Mar 10;106(10):3800-5.

Koening CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I. Toll-like receptors mediate induction of hepcidin in mice infected with Borrelia burgdorferi. **Blood 2009;** Aug 27;114(9):1913-8.

# PNAS Fig 2A vs Blood Fig 4A

- Same microscopy image used in <u>different papers</u> for different treatments



# PAPER 5

De Domenico et al. Zebrafish as a model for defining
the functional impact of mammalian ferroportin
mutations. **Blood 2007** Nov 15;110(10):3780-3.

# <u>Figure 1B</u>

• Same microphotograph used for two different conditions and manipulated



Identical photos, the bottom one is blurred (enlarged below)

0740

# PAPER 6

De Domenico et al. Decoupling ferritin synthesis
from free cytosolic iron results in ferritin secretion.
**Cell Metab 2011** Jan 5;13(1):57-67.

# Figure 4B

- Published image does not correspond to original film
- Original data missing



Flipped vertically compared to the
original film and thus does not
represent the lanes as published

The data could not be found

# Figure 5A
• Published images misrepresent the original data



The band was shifted to the right
from its proper location (under "65"
in the original film)

These two bands correspond
to the lanes "65" and "75", not
"75" and "85" as indicated

A blank lane corresponding
to lane "85" is missing

0743

# Figure 5B

• Published image misrepresents the original data

**B**    Data are flipped from the original film and thus do not represent what is shown



# **Figure 7B**
• Published images misrepresent the original data



Panel flipped from the original film and
thus does not represent what is shown

Controls run on a separate gel and thus
cannot be directly compared to the
experimental samples shown above

One sample missing, not
aligned with the upper panel

The last sample was cut
off in making the figure

0745

# Supplemental Figure 2

• Error bars are too small to reflect the error of the technique and stated replicates





# Figure 2

• Error bars are too small to reflect the error of the technique and stated replicates



# Figure 3

• Error bars are too small to reflect the error of the technique and stated replicates





General Problem:
For original autoradiographs, a number of exposures
that were used to make figures were entirely unlabeled.
Some of these films had no date or other information to
relate them to lab notes.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 750
Rockville, MD 20852

Phone:  240-453-8800
FAX:    301-594-0043
Email:  Susan.Garfinkel@hhs.gov

**CONFIDENTIAL**

March 26, 2012

Jeffrey Botkin, M.D., M.P.H.
Associate Vice President for Research Integrity
75 South 2000 East #108
Salt Lake City, Utah 84112

RE: DIO 4554

Dear Dr. Botkin:

The Division of Investigative Oversight (DIO), Office of Research Integrity (ORI), has received the report of the inquiry with attachments from the University of Utah into allegations of possible research misconduct for the falsification of data on the part of Dr. Ivana De Domenico, Assistant Professor and Dr. Jerry Kaplan, Professor of Pathology, School of Medicine, University of Utah. DIO also received your letter, dated March 7, 2012, with the decision that this matter proceed to a formal investigation.

DIO has conducted a preliminary review of this case.   The allegations in this case involve potentially false data included in several publications:

1. *Cell Metabolism* 14, 635–646, (2011) November
2. *Cell Metabolism* 13, 57–67, (2011) January
3. *JCI* 120, 2395-2405 (2010)
4. *PNAS* 106, 3800–3805 (2009)
5. *Blood* 114,1913-1918 (2009)
6. *MBC* 18, 2569–2578, (2007)
7. *EMBO J* 26, 2823–2831(2007)
8. *Blood* 110, 3780-3783 (2007)
9. *Blood* 109, 2205-2209 (2007)

In an attempt to help you and the investigation committee complete this process, DIO has noted specific issues relevant to the PHS interest in this case.

1. The University of Utah must attach copies of all data reviewed by the committee that was used to make its decision, including copies of all original films, notebook pages, and other lab records, when the investigation report is submitted to ORI.   A <u>Checklist</u> of documents that should be provided with the investigation report is provided for your convenience.

**CONFIDENTIAL/SENSITIVE**  **Dr. Botkin**  **Page 2**

2. If Dr. Kaplan is being considered a respondent, an investigation with two respondents requires two investigation reports which separate the findings related to each respondent. ORI has had cases where one respondent was shown to have falsified data while a 2nd more senior respondent reported the false data in publications.   This type of finding requires proof that the 2nd respondent knew that the data were false when s/he wrote or submitted the paper.

3. Please ensure that the investigation committee allows enough time in the interview(s) to address all of the allegations with the respondent and all witnesses.   If more time is needed, please schedule additional interviews.

4. Please note that *all* allegations must be addressed in a misconduct proceeding.   DIO found that 12 allegations were raised in the complainant's PowerPoint slides.   The allegations were primarily alleging duplication of images that represent different experiments.   The committee should determine, for each allegation, whether the images are duplicates and whether the duplicated images represent different experiments as alleged.   DIO found that the inquiry report did not discuss allegations 3, 4, 5, 7 and 8.   The allegations raised by the complainant are as follows:
   1. *Cell Metabolism* (2011) Nov:
      Figure 1C, PM and FT panels are identical but flipped horizontally
   2. *Cell Metabolism* (2011) Nov:
      Figure 2Aii (36hr) panel is identical to Fig 2B (left)
   3. *Cell Metabolism* (2011) Nov:
      Fig 2Aii (18 hr) panel is identical to Fig 2B
   4. *Cell Metabolism* (2011) Nov:
      Fig 1D (+DFX) panel is identical to Fig 3(α GFP) 2 right bands
   5. *PNAS* (2009)
      Fig 1 (middle panel) is identical to Fig 2A (middle panel) but flipped vertically
   6. *PNAS* (2009)
      Fig 3B (bottom panel, right band) is identical to Fig 4A (top panel, left band) (Note: Fig 3B bottom is also referred to in allegation 8)
   7. *PNAS* (2009) and *JCI* (2010)
      *PNAS* Fig 3B (top panel) is identical to *JCI* Fig 2A (bottom panel)
   8. *PNAS* (2009) and *JCI* (2010)
      *PNAS* Fig 3B (bottom panel) is identical to *JCI* Fig 2A (top panel)
   9. *PNAS* and *Blood* (2009)
      *PNAS* Fig 2A(human JAK2, -Hepcidin) image is identical to *Blood* (2009) Fig 4A (control)
   10. *Blood* 110, (2007)
      Fig 1 B uninjected (panel 1) is identical to N114H (panel 4)
   11. *Cell Metabolism* (2011) Jan
      Statistical analysis is false in Fig 2, Fig 3, and Suppl Fig 2
   12. Experiments conducted with the phospo-Fpn antibody are false since the antibody does not exist

CONFIDENTIAL/SENSITIVE          Dr. Botkin                    Page 3

5.  The inquiry committee should be commended for attempting to reconcile whether the
    original raw data matched the published figure.  Although additional allegations were
    identified when the original data were compared to the published figures, it is important to
    determine whether the altered published figure could have been due to an honest error. The
    additional allegations are:

    13. *Cell Metabolism* (2011) Jan: published figures do not match original data
            Fig 4B (lower left panel +Fe) is vertically flipped compared to original film
            Fig 5A (top panel) mis-labeling of the published figure
            Fig 5B (panel not specified) is flipped compared to original film
            Fig 7B (upper left) is flipped compared to original film
    14. *Cell Metabolism* (2011) Nov:
            Fig 5(α GFP) flipped compared to original film

As you know, an investigation into allegations of possible research misconduct should be
completed within the 120 days specified by the PHS regulations.   Therefore, we would expect to
receive your investigation report on or about August 6, 2012.

The investigation report should include the composition of the investigation committee and charge
to the committee; the scope of the alleged misconduct; the sources of support for the questioned
research or publications; a summary or transcripts of the interviews with the complainant (if
applicable), the respondent and witnesses, if any; the conclusion of the committee as to whether
research misconduct occurred, if so, who was responsible and how serious was the misconduct;
and the rationale supporting the conclusion (see detailed Outline attached).

The institution should act, if not already done, to secure the appropriate research records related to
the questioned work, so that they can be reviewed during the investigation.

If you have any questions regarding the handling of this case, or questions about technical matters,
please call me or Dr. John Dahlberg, DIO Director, at 240-453-8800.

                            Sincerely,

                            Susan Garfinkel, Ph.D.
                            Deputy Director, Division of Investigative Oversight
                            Office of Research Integrity

Enclosure

Dear Dr. Botkin,

Today, July 21, 2012, I met Dr. Sundquist and he requested to clarify to you and the Investigation Committee that the duplication for the tubulin blot came from our laboratory for the allegation Kieffer et al, 2008. I already stated this on July 17, 2012  during my second interview and few days earlier to you. However, I'm going with this letter to summarize the events as requested.

Dr. Sundquist also reported that he sent a statement to the Investigation Committee yesterday, July 20, 2012.

Events details:

As stated on July, 17 2012 during the second interview with the Investigation Committee:

1. the western blots for the publication under consideration were run in our laboratory by a tech and a image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008 (see attached email).
2. As stated in the email in the same (March 3, 2008) day Dr. Kieffer came and "gather the western results", (see attached email). I do not remember what he picked up.  All repeats and the correct tubulin western blots still in our notebook. It is missing only the films were the duplication is coming from.
3. Quantification was done as stated in the paper: "Blots were scanned and quantified using Quanti One software (BioRad)." and "Average fluorescence per cell was calculated with ImageJ (rsbweb.nih.gov) software".  According to the exchanged emails Dr. Dr. Kieffer did the quantifications BUT it is hard for me to reconstruct the event.

In summary: I believe that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist shows already the error.  According to the emails and notes some of the western blots and data quantification should be in Dr. Kieffer's notebook.   However, Dr. Sundquist this morning verbally communicated that Dr. Kieffer does not have the western blots and he might have the quantification analysis.

Sincerely
Ivana De Domenico

4554



THE
UNIVERSITY
OF UTAH

Jeffrey R. Botkin, M.D., M.P.H.

Associate Vice President for Research Integrity

75 South 2000 East #108  Salt Lake City, Utah 84112  (801) 581-7170  FAX (801) 585-9588

August 8, 2012

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity

RE: Utah Misconduct case #02-2011,
DIO #4554

Dear Dr. Dahlberg:

As the Research Integrity Officer at the University of Utah, I am writing to request an extension of the investigation in this case. This case involves data irregularities in multiple publications by Drs. Jerry Kaplan and Ivana De Domenico.

The Investigation Committee received its charge on April 13, 2012 with a due date of August 14, 2012 for the completed report from the University. The original allegations involved a large number of data irregularities. However, the justification for the requested extension is that two new concerns have arisen during the investigation.

On June 28, 2012 the complainant submitted an allegation with respect to a paper published in 2008 in Developmental Cell by Kieffer et al. (NIH Grants GM082545, AI51174, HL26922, and DK070947). The allegation is attached. Drs. Kaplan and De Domenico are authors on this paper, although neither the first or senior author. The first author on this paper is no longer at the University of Utah, although the senior author, Wes Sunquist, Ph.D., remains at the University. The allegation involves evidence of a spliced western blot. This allegation required intake interviews, data sequestration, and a new element added to the Investigation Committee's agenda. Drs. Keiffer and Sunquist have been fully cooperative with the investigation and, based on the responsibilities in the research involved, neither are considered respondents at this time. That is, Dr. De Domenico acknowledges responsibility for the figure involved.

A second new concern was identified by the Committee on July 25, 2012. The attached email from a Committee member, Dr. David Goldenberg, presents the concern involving circular dichroism data in a paper in Cell Metabolism in 2008 with De Domenico as first author. The concern is whether the data were inappropriately "smoothed" to create a published result that is not

representative of the primary data. The email illustrates the level of detail with which the Committee is pursuing its work.

The Committee has done an outstanding job to date and has met on multiple occasions to conduct interviews and discuss the allegations. However, they will not be able to finish their investigation and complete a report within 120 days. The Committee chair requested an extension to September 28, 2012 in order to complete their work in a comprehensive fashion.

Drs. Kaplan and De Domenico have been informed of this request and do not object to an extension.

Thank you for considering this request and please let me know if I can provide additional information to support your decision.


Best regards,

Jeffrey R. Botkin, MD, MPH
Research Integrity Officer
University of Utah

Kieffer C, Skalicky JJ, Morita E, De Domenico I, Ward DM, Kaplan J, Sundquist WI.
Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding.
Dev Cell. 2008 Jul;15(1):62-73.

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Jeff Botkin [Jeffrey.Botkin@hsc.utah.edu] |
| **Sent:** | Friday, October 05, 2012 6:12 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | Re: DIO 4554 |

John — Thank you very much.


Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

---

**From:** <Dahlberg>, "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>
**Date:** Friday, October 5, 2012 4:10 PM
**To:** Jeffrey Botkin <jeffrey.botkin@hsc.utah.edu>
**Cc:** "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>, "Fleming, Sheila P (HHS/OASH)"
<Sheila.Fleming@hhs.gov>, "Garfinkel, Susan J (HHS/OASH)" <Susan.Garfinkel@hhs.gov>
**Subject:** RE: DIO 4554

Jeff,

As you might expect, ORI is concerned that respondents have an ample, although not excessive, opportunity to address
draft reports and that institutions fully address whatever rebuttals are provided, since our work is simplified and can
proceed more rapidly when we receive a well crafted report that fully addresses the issues, as well as mitigating and
exacerbating circumstances. ORI therefore grants a total of 60 days for this process. Our current date is October 19,
2012, so we will expect your final report on or before December 19, 2012.

Regards, John

John Dahlberg, Ph.D.
Deputy Director
Office of Research Integrity
240-453-8800
john.dahlberg@hhs.gov
ORI Web Site: http://ori.hhs.gov/

---

**From:** Jeff Botkin [mailto:Jeffrey.Botkin@hsc.utah.edu]
**Sent:** Friday, October 05, 2012 5:12 PM
**To:** Dahlberg, John E (HHS/OASH)
**Subject:** DIO 4554
**Importance:** High

1

Dear Dr. Dahlberg — The Investigation Committee submitted its report on 10/2/12 and I shared the report with the respondents, Drs De Domenico and Kaplan, on 10/3/12. Our institutional policy permits a comment period for them of 10 days.

The report is 95 pages in length and addresses 20 allegations involving 11 publications. Dr. De Domenico plans to submit detailed comments on the report and, with the support of her external legal counsel, has requested an extension of the comment period to 40 days. I believe federal policy permits a 30 day comment period.

I want to give her an opportunity to fully respond to the report and I want to provide the University an opportunity to fully consider her comments.

Can I reasonably request another extension from you and, if so, what do think might be most appropriate in this circumstance? Thanks for your guidance.

Best regards,


Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

0777

**SUMMARY OF FINDINGS**

The Investigation Committee found multiple irregularities in ten of eleven publications. No irregularities were detected in Paper 4; a figure from this paper was inappropriately reproduced in Paper 3. The irregularities are categorized as: 1) serious carelessness in figure preparation; 2) falsification and misrepresentation of data; 3) fabrication of data; and 4) alteration of the primary record. These irregularities are described in the following sections.  Figures for each paper can be found in the subsequent sections. The Committee is also providing a DVD with copies of relevant electronic files; see "Summary of Hard Drives and DVD".

1.  The publications in question exhibit a *systematic pattern of carelessness and reckless disregard for the fidelity of the primary data*. There are multiple instances in which bands utilized in the generation of figures for publication were inverted, taken out of order, spliced into other images, and lacked careful tracking to assure that the bands were derived from the experiments stated in the paper. In some cases, accurate and convincing data were found on the films, but were not used for publication, suggesting the possibility that figure preparation was rushed and careless (Paper 1, Figs. 1C and 5;  Paper 7, Figs. 4A,B and 6A,B).  In other cases, the Committee was not able to ascertain whether there was deliberate intent to falsify/fabricate (Paper 8, Fig. 3A). Given the large number of such instances and a continuing pattern of data manipulation the Committee considers it unlikely that these errors were due to simple carelessness during the preparation of the figures for publication.

**We want to point out that the committee is correct that "*systematic pattern of carelessness and reckless*" is present in the publications under investigation.  The examples reported are correct BUT the committee omitted that Dr. De Domenico generated the figures in Paper 1 and Dr. Ward generated the figures in Paper 8. How it is possible that the committee is aware that two people made the same mistake and only one, Dr. De Domenico, is accused of falsification.**

2.  There appear to be cases of *falsification or misrepresentation* of data. There were multiple findings in which the same western blot band images were utilized in multiple figures, either in the same paper or in two different papers, which were labeled as representing distinct experiments.   For example, the same western blot bands identified as representative of different antibody labels (Paper 2, Figs. 3B and 4A; Papers 2 and 3, Fig. 3B and Fig. 2A; Paper 7, Figs. 4E and 3D; Paper 7 and 8, Figs. 3D and 4E) or images of cells or embryos were reused and indicated as different treatments (Papers 2 and 4, Fig. 2A and Fig. 4A; Paper 5, Fig. 1B).  In other cases, published images appear to have been enhanced and manipulated to show differences in intensity that were not apparent on original films (Paper 1, Figs. 2Aii,  2B and 5), or to show changes in protein positions on blots that were much more accentuated than seen in original data (Paper 6, Fig. 4B). There were also multiple instances of mixing and matching control samples run on separate western blots from experimental samples (Paper 8, Fig. 1A; Paper 6, Fig. 7B).   In some cases, other data were found or subsequently provided by Dr. De Domenico to support the conclusions of the figure (Paper 1, Fig. 1C), but it was unclear to the committee why these data were not used in the publication instead of the erroneous, manipulated images. The Committee was unable to establish a cogent explanation for these irregularities aside from the possibilities of carelessness, negligence, or reckless disregard for fidelity of the published report to the original data. Given the large number of such instances and a continuing pattern of data manipulation the Committee considers it unlikely that these errors were due to simple carelessness during the preparation of the figures for publication. The Committee is also struck by the conspicuous failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication.

University of Utah Investigation Committee Report

Page 3

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Jeff Botkin [Jeffrey.Botkin@hsc.utah.edu] |
| **Sent:** | Monday, November 19, 2012 11:32 AM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | Guidance |

Dear Dr. Dahlberg — I have received the response of the respondents in Case #DIO4554. The respondents have a procedural complaint about which I would welcome your input.

The case began with a set of allegations that were evaluated by an Inquiry Committee. The Committee noted numerous irregularities in multiple publications but did not find evidence of intent. This was a hard call for the Inquiry Committee but they did not recommend an investigation. Shortly after the report, I received a second set of allegations that included multiple additional concerns of the same general nature.

I (the University) made the decision to initiate an investigation at that point. The respondents claim that we were required to seat a new Inquiry Committee to address only the new allegations in this situation.

What is your interpretation of the regulations in this regard? Was the initiation of an investigation proper without a second inquiry process? Thanks for your guidance.

Best regards,


Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

0958

**Dahlberg, John E (HHS/OASH)**                                                4554

| | |
|---|---|
| **From:** | Dahlberg, John E (HHS/OASH) |
| **Sent:** | Tuesday, November 20, 2012 5:48 PM |
| **To:** | Jeff Botkin |
| **Cc:** | Dahlberg, John E (HHS/OASH) |
| **Subject:** | RE: Guidance |

Dear Jeff,

My first thought when reading your description of the first inquiry was that the committee's recommendation not to go to an investigation ought to have been overturned based on our regulatory requirement that if there is a basis for believing that misconduct may have happened, an investigation is required to carry out a thorough review.   Proving intent is often difficult and should be relegated to the investigation committee when it is not clear.  In any event, the institution's deciding official is entitled to overrule a committee or remand the case back for further review.  As long as the respondent has received notice of what the allegations are that will be examined during the investigation.  Some of the provisions of 42 CFR Part 93 that may apply here include:

Sec. 93.304  Institutional policies and procedures.

Institutions seeking an approved assurance must have written policies and procedures for addressing research misconduct that include the following--
(a) Consistent with Sec. 93.108, protection of the confidentiality of respondents, complainants, and research subjects identifiable from research records or evidence;
(b) A thorough, competent, objective, and fair response to allegations of research misconduct consistent with and within the time limits of this part, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional, or financial conflicts of interest with the complainant, respondent, or witnesses;
(c) Notice to the respondent, consistent with and within the time limits of this part;
(d) Written notice to ORI of any decision to open an investigation on or before the date on which the investigation begins;
(e) Opportunity for the respondent to provide written comments on the institution's inquiry report;

Sec. 93.307  Institutional inquiry.

(c) Review of evidence. The purpose of an inquiry is to conduct an initial review of the evidence to determine whether to conduct an investigation. Therefore, an inquiry does not require a full review of all the evidence related to the allegation.
(d) Criteria warranting an investigation. An inquiry's purpose is to decide if an allegation warrants an investigation. An investigation is warranted if there is--
(1) A reasonable basis for concluding that the allegation falls within the definition of research misconduct under this part and involves PHS supported biomedical or behavioral research, research training or activities related to that research or research training, as provided in Sec. 93.102; and
(2) Preliminary information-gathering and preliminary fact-finding from the inquiry indicates that the allegation may have substance.
(e) Inquiry report. The institution must prepare a written report that meets the requirements of this section and Sec. 93.309.
(f) Opportunity to comment. The institution must provide the respondent an opportunity to review and comment on the inquiry report and attach any comments received to the report.

Sec. 93.308  Notice of the results of the inquiry.

(a) Notice to respondent. The institution must notify the respondent whether the inquiry found that an investigation is warranted. The notice must include a copy of the inquiry report and include a copy of or refer to this part and the institution's policies and procedures adopted under its assurance.
(b) Notice to complainants. The institution may notify the complainant who made the allegation whether the inquiry found that an investigation is warranted. The institution may provide relevant portions of the report to the complainant for comment.

So depending on what has already been accomplished with respect to the above requirements, you may wish to go ahead with the investigation, or with a truncated inquiry that would allow you to show that you paid some attention to their complaints without unnecessarily slowing the process.  Perhaps one way to deal with this would be to make a decision, based of further reflection (or ORI's understanding of the regulation), to open the investigation based on the initial inquiry, and then provide additional notice of the new allegations and add them to the ongoing investigation.

Let me know if you want to talk more about this.  I will be on leave the rest of the week, but will be checking email.

Regards, John

John Dahlberg, Ph.D.
Deputy Director
Office of Research Integrity
240-453-8800
john.dahlberg@hhs.gov
ORI Web Site: http://ori.hhs.gov/

---

**From:** Jeff Botkin [mailto:Jeffrey.Botkin@hsc.utah.edu]
**Sent:** Monday, November 19, 2012 11:32 AM
**To:** Dahlberg, John E (HHS/OASH)
**Subject:** Guidance

Dear Dr. Dahlberg — I have received the response of the respondents in Case #DIO4554.  The respondents have a procedural complaint about which I would welcome your input.

The case began with a set of allegations that were evaluated by an Inquiry Committee.  The Committee noted numerous irregularities in multiple publications but did not find evidence of intent.  This was a hard call for the Inquiry Committee but they did not recommend an investigation.  Shortly after the report, I received a second set of allegations that included multiple additional concerns of the same general nature.

I (the University) made the decision to initiate an investigation at that point.  The respondents claim that we were required to seat a new Inquiry Committee to address only the new allegations in this situation.

2

What is your interpretation of the regulations in this regard?  Was the initiation of an investigation proper without a second inquiry process?Thanks for your guidance.

Best regards,


Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

0961

**INVESTIGATION COMMITTEE REPORT**
University of Utah Case: 02-2011
Federal Office of Research Integrity Case: DIO 4554
Final Report December 14, 2012

## MASTER SUMMARY

### OVERVIEW

This report summarizes the work done by the Committee charged with investigating allegations of research misconduct at the University of Utah, with Dr. Ivana De Domenico and Dr. Jerry Kaplan named as respondents. The allegations were based on multiple irregularities found in 11 papers published by the respondents over the years 2007 to 2011, as well as reports from the complainant that some of the results in these papers could not be reproduced in other laboratories. The majority of alleged irregularities involved figures representing autoradiograph films of western blot experiments, such as the re-use of the same image in multiple figures in the same or different papers. Other allegations concerned unreasonably small error estimates reported for quantitative assays. In the course of the investigation, the Committee identified additional areas of concern and investigated these as well. The investigation included examination of the published papers and the corresponding research notes and data, including autoradiograph films and computer files; and interviews with the respondents and other parties, conducted either in person, by telephone or via e-mail.

From its investigation, the Committee has concluded that the irregularities identified by the complainant constitute misrepresentations of the primary data and reflect a serious breakdown in the processes required to ensure that the scientific literature is a faithful record of research results. The large number of instances, over a period of several years, indicates a reckless disregard for the integrity of the research record, as opposed to the occasional lapses that might occur in any laboratory, and the resulting record is now nearly impossible to reconstruct. Furthermore, the Committee found evidence that this disregard for integrity extended beyond negligence to instances of intentional falsification (including the duplication of western blot bands in the same image to represent different samples, and false published statements regarding the calculation of error estimates) and the fabrication of data (circular dichroism spectra). In some cases, primary data could not be found. Finally, there is strong evidence that the research record has been altered so as to hide misconduct or shift responsibility to others. The Committee concludes that the nature and pattern of these irregularities constitute research misconduct of a highly serious degree.

### IMPACT ON SCIENTIFIC COMMUNITY

The Committee stresses that its investigation and report have focused on the relationship between the published papers and the research record maintained by the respondents. The Committee has not attempted to determine whether or not the conclusions of the published papers are valid. It is entirely possible, as claimed by the respondents, that many or all of the results are reproducible. However, subsequent reproducibility of a scientific observation by the same research group or by other groups does not address the question of whether or not the original experimental data were accurately represented in the published papers. The reckless or deliberate misrepresentation of research results is unacceptable, even if other data may support the conclusions. Research misconduct can occur through faulty practices and processes that lead to a published conclusion, even if that conclusion eventually is found to be correct. Conversely, the findings of misconduct do not directly bear on whether the conclusions are valid. Indeed, the very ambiguity that has been introduced into an important body of work is perhaps the major cost of the breakdown of scientific integrity described in this report. The Committee holds that professional ethics and standard practices in the field require that the process of accurately representing scientific results and primary data are just as important as the conclusions found in a publication.

0962

**SUMMARY OF PROCESS**

An Inquiry Committee of three senior faculty submitted their report on 02/16/2012. Their finding was that multiple errors were due to poor laboratory methods and procedures and did not identify instances of data fabrication or falsification. New allegations concerning two additional publications were received by Dr. Botkin in the Research Integrity Office (RIO) on 03/04/2012, and a decision was made on 03/05/12 to open a full investigation. A committee of five senior faculty members was recruited to examine previous allegations and newly arising allegations and irregularities. After the formation of the Investigation Committee, two other allegations concerning additional publications were received by the RIO.

This Investigation Committee examined the report by the Inquiry Committee, the primary data that consisted predominantly of western blot films and accompanying notes, as well as electronic data on hard drives and computer printout data, all sequestered by Dr. Botkin's office. Eleven publications were examined, nine with Dr. De Domenico as first author, one as middle (collaborating) author and one as last (corresponding) author. In the eleven papers, the Committee found irregularities in numerous (over 20) figures. Some irregularities were identified by the complainant (Papers 1- 6), some additional irregularities by the Inquiry Committee (Papers 1, 6), some in subsequent communications with Dr. Tomas Ganz (03/04/12, Papers 7- 9; 6/28/12, Paper 11) and some by the Investigation Committee (Paper 10). The Investigation Committee reconstructed the published versions of figures from primary data and films from notebooks, compared primary data and scanned films found on computer hard drives with published data, and reconstructed and analyzed some of the primary quantitative data found on hard drives. For ease of reference, each paper was assigned a number (see list below), and each paper is discussed in the Summary below. Additional data are available on the accompanying DVD; see "Summary of Hard Drives and DVD".

The Investigation Committee conducted in-person interviews with Dr. De Domenico three times (7/02/2012, 7/17/2012, and 7/19/2012), Dr. Kaplan once (7/03/2012) and Dr. Diane Ward, a co-author once (7/16/2012). Dr. Ganz initially brought forward the allegations and self-identified to this Committee and allowed this Committee to convey this information to Drs. De Domenico and Dr. Kaplan during the investigation.  Dr. Ganz was interviewed by telephone conference call (6/19/12). All interviews were audio-recorded, and written summaries were provided by Dr. Botkin's office and were made available to the interviewees for corrections and comments. In addition, the committee corresponded by email through Dr. Botkin's office with questions to Drs. De Domenico and Kaplan, as well as other collaborators in some of the studies.  The interviewees fully cooperated with the investigation, and promptly provided written responses to questions conveyed through Dr. Botkin's office.

The committee provided numerous opportunities for Dr. De Domenico to provide supporting data for the papers being investigated, through three interviews and multiple email exchanges via Dr. Botkin's office.  In response to a draft of this report, Dr. De Domenico expressed concern that she was not interviewed for a fourth time. In this instance, however, the Committee had decided that email exchange was a more efficient and appropriate venue through which Dr. De Domenico could identify specific computer files and other supporting documentation, and these email exchanges occurred (summarized in the reviews of papers 6 and 10). Given the requirement that researchers maintain the integrity of research data and records pertinent to publications, the absence of primary data can be seen as evidence for practices outside the standards in the field. Similarly, Dr. De Domenico expressed concern that she did not have an adequate opportunity to review the accompanying DVD that collated some of the files from her computer hard drive.  Nevertheless, the existence of the summary DVD was clearly stated in the draft report (10/10/12) and Dr. De Domenico obtained it with sufficient time before her final response to the draft report, which she submitted on 12/10/10.

**PAPERS EXAMINED**

**Paper 1:** De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J (2011). The role of ubiquitination in hepcidin-Independent and hepcidin-dependent degradation of ferroportin. *Cell Metabolism* Nov 2;14(5):635-46. Corresponding author: Jerry Kaplan.

**Retracted**: *Cell Metabolism* 15:927, 6 June 2012 "We, the authors, wish to retract [ ] "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico et al. (*Cell Metabolism 14*, 635–646; November 2, 2011; 10.1016/j.cmet.2011.09.008) because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory. We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors. However, we believe that the most responsible course of action is to retract the paper. We are preparing a new expanded version of this study for future submission. We deeply apologize to the community for the inconvenience".

**Paper 2:** De Domenico I, Lo E, Ward DM, Kaplan J (2009). Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with JAK2.
*PNAS,*106: 3800-3805. Corresponding author: Jerry Kaplan.
**Correction**: *PNAS* (2012), 109:7583-7586. One panel replaced in each of three figures: Figure 1; Figure 2A; Figure 3.

**Paper 3**: De Domenico I, Zhang TI, Koenig CL, Branch RW, London N, Lo E, Daynes RA, Kushner JP, Li D, Ward DM, Kaplan J (2010). Hepcidin mediates transcriptional changes that modulate acute cytokine-induced inflammatory responses in mice. *Journal of Clinical Investigation* 20:2395-2405. Corresponding authors: Jerry Kaplan and Ivana De Domenico.
**Corrigendum**: *Journal of Clinical Investigation* (2012),122: 2326-2326 doi: 10.1171/JCI63977 stating that the anti-Fpn and anti-Jak2 rows in Figure 2A of Paper 3 were reprinted from Paper 2 without attribution. "The anti-Fpn row in Figure 2A was reprinted from I. De Domenico et al. (reference 10) without attribution. It represents the same row as was present in Figure 3B of that manuscript. The authors regret the error."

**Paper 4:** Koenig CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I (2009). Toll-like receptors mediate induction of hepcidin in mice infected with *Borrelia borgdorferi*. *Blood*,114:19 13-1918. Submitted March 6, 2009, accepted June 13, 2009. Corresponding author: Ivana De Domenico.

**Paper 5:** De Domenico, Vaughn MB, Yoon D, Kushner JP, Ward DM, Kaplan J (2007). Zebrafish as a model for defining the functional impact of mammalian ferroportin mutations. *Blood* 110:3780-3783. Corresponding author: Jerry Kaplan.
**Corrected**: "On page 3781 of the 15 November 2007 issue, there is an error in Figure 1. The panel depicting Fpn-GFP N144H in Figure 1B was inadvertently duplicated from another panel in the original published figure. The authors have replaced the panel with the correct image. The findings of the paper have not been affected by the error. The authors apologize to the editors and readers for this mistake. The corrected figure is shown."

**Paper 6:** De Domenico I., Vaughn, M.B, Paradkar, P.N., Lo, E., Ward, D.M. and Kaplan, J. (2011). Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. *Cell Metabolism* 13, 57-67. Corresponding author: Jerry Kaplan
**Retracted**: "We, the authors, wish to retract "Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion" by De Domenico et al. (*Cell Metab*., 13 (2011) 57–67,http://dx.doi.org/10.1016/j.cmet.2010.12.003 and "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico et al. (*Cell Metab*., 14 (2011) 635–646,http://dx.doi.org/10.1016/j.cmet.2011.09.008) because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory. We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors. However, we believe that the most responsible course of action is to retract the paper. We are preparing a new expanded version of this study for future submission. We deeply apologize to the community for the inconvenience".

**Paper 7:** De Domenico, I., D. M. Ward, M. C. di Patti, S. Y. Jeong, S. David, G. Musci & J. Kaplan.(2007). Ferroxidase activity is required for the stability of cell surface ferroportin in cells expressing GPI-ceruloplasmin. *EMBO J*, 26(12):2823-2831. Corresponding author: Jerry Kaplan

0964

**Paper 8:** De Domenico, I., D. M. Ward, C. Langelier, M. B. Vaughn, E. Nemeth, W. I. Sundquist, T. Ganz, G. Musci and J. Kaplan (2007). "The molecular mechanism of hepcidin-mediated ferroportin down-regulation." *Mol Biol Cell* 18(7):2569-2578. Corresponding author: Jerry Kaplan

**Paper 9:** De Domenico, Ivana Diane McVey Ward, Givoanni Musci and Jerry Kaplan (2007). Evidence for the multimeric structure of ferroportin. *Blood* Mar 1;109(5):2205-9. Corresponding author: Jerry Kaplan

**Paper 10:** De Domenico I., Nemeth, E, Nelson, JM, Philips, JD, Ajioka, RS, Kay, MS, Kushner, JP, Ganz, T, Ward, DM and Kaplan, J (2008). The hepcidin-binding site on ferroportin is evolutionarily conserved. *Cell Metabolism* 8:146-156. Corresponding author: Jerry Kaplan

**Paper 11:** Kieffer, C., Skalicky, JJ, Morita, E, De Domenico, I, Ward, DM, Kaplan, J and Sundquist, W I (2008). Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding. *Dev Cell* 15: 62-73. Corresponding author: Wesley Sundquist

## SUMMARY OF FINDINGS

The Investigation Committee found multiple irregularities in ten of eleven publications. In the eleventh paper (Paper 4) a figure was inappropriately reproduced in Paper 3, but this issue was resolved with the journal by a published clarification. The Committee has categorized the various irregularities as: 1) extensive carelessness in figure preparation; 2) falsification and misrepresentation of data; 3) fabrication of data; and 4) alteration of the primary record. These irregularities are described in the following sections. The Committee does not feel that it can address the question regarding the reproducibility of the peptide-binding assay for hepcidin in Paper 10 from the information available, and a resolution will most likely require additional experiments. Please note that the points listed here are summaries, the evidence and figures for each point can be found in the subsequent sections, organized by the assigned paper number. The Committee is also providing a DVD with copies of relevant electronic files; see "Summary of Hard Drives and DVD".

**1. Extensive carelessness and negligence in data reporting:** The publications in question exhibit a *systematic pattern of carelessness and reckless disregard for the fidelity of the primary data*, which in some cases led to misrepresentation of data in publications. Errors in figures containing images of western blots were especially common. There are multiple instances in which bands utilized in the generation of figures for publication were inverted, taken out of order, and spliced into other images. In some cases, the same western blot band images were utilized in multiple figures for different experimental conditions either in the same paper or in two different papers. In a few cases, other data were found or subsequently provided by Dr. De Domenico to support the conclusions of the figure, but it was unclear to the Committee why these data were not used in the publication instead of the erroneous, manipulated images. Because many of the films have undergone extensive relabeling, acknowledged by Dr. De Domenico, reconstructing the research record is now nearly impossible. In addition to the western blot examples, images of cells or embryos were reused and indicated as different treatments in different papers. The result of these errors was pervasive misrepresentation of the primary data in the published figures. Given the large number of such errors, the Committee concluded that there was a persistent pattern of reckless disregard for appropriate representation of primary data in the published papers. The Committee is also struck by the conspicuous failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication.

**2. Falsification and misrepresentation of data:** In one instance, Fig. 5B of Paper 11, a set of three western blot bands were duplicated within the same panel to represent another set of samples. Unlike the examples described above, this manipulation is not easily explained as simple carelessness or systematic negligence, and the Committee concludes that it represents falsification of data. The Committee also investigated a general allegation that the error bars in numerous graphs were unusually small, given the experimental techniques used. The Committee carefully examined 12 such figures and, where possible, compared the published figures with computer files from which they appeared to be derived. In four examples, the error bars were found to be calculated from only two values, clearly contradicting statements in the figure legends and text indicating that they were calculated from a minimum of three or five measurements.

**3. Fabrication of data:** Circular dichroism (CD) spectra published in Fig. 4 of Paper 10 were found to be extensively and inappropriately manipulated. For two panels of the figure (inset to panel A and panel C), the Committee concludes that the published data were most likely fabricated by manipulation of data also used in panel A. In her response to the initial draft of this report, Dr. De Domenico provided CD spectra recently recorded by an independent laboratory. Though these data are apparently meant to refute the conclusions of the Investigation Committee, they are, in fact, significantly different from the published data and contradict the conclusions drawn in the paper.

**4. Alteration of the primary record:** As noted elsewhere, there are numerous inconsistencies among the published figures, labeled films and hand written research notes, making it difficult or impossible to reconstruct the research record. In some cases, however, the Committee found evidence that the record has been deliberately altered to hide misconduct or direct responsibility to others. In one instance, a western blot film for figures in Paper 1 appears to have been relabeled in such a way as to artificially create patterns of bands consistent with published figures. For another paper, Paper 6, the dates found on films and handwritten notes are several months after the corresponding figures were submitted for publication. The most serious of these instances is a set of handwritten notes related to the CD spectra in Paper 10 and provided to the Committee late in the investigation (on 9/11/2012). In these notes, Dr. De Domenico states that Dr. Ganz provided guidance, via communication through Dr. Kaplan, in the processing and analysis of the CD data. Dr. Ganz has directly contradicted this account and has provided an e-mail message (from Dr. Kaplan) that supports Dr. Ganz's contention that he first became aware of the CD data after the dates shown on the notes and after the figures were completed. Dr. Kaplan has confirmed the date and content of the e-mail message and has stated that he does not recall Dr. Ganz playing a role in analyzing the CD data. Dr. De Domenico has not provided any supporting documentation for her account, leaving the Committee to conclude that the notebook pages were most likely created to shift responsibility for misconduct to Dr. Ganz. These findings are summarized in the section titled "Alterations of the Research Record."

## CONCLUSIONS AND RECOMMENDATIONS FOR SANCTIONS

### Dr. Ivana De Domenico

Dr. De Domenico was the lead or corresponding author on 10 of the 11 publications examined in this investigation. The earliest of these papers was published in 2007 when Dr. De Domenico was a postdoctoral associate in Dr. Kaplan's laboratory, and the irregularities continued to 2011 after her promotion to Assistant Professor. The number and nature of errors are such that they - in aggregate - deviate from expected scientific practice in a fashion that is reckless. This pattern of recklessness is the primary basis on which we find the conclusion of scientific misconduct. The Investigation Committee takes "recklessness" to mean actions that are marked by lack of proper caution and care with respect to the consequences of the actions, and are therefore negligent and a breach of expected professional responsibility.

According to University policy (6.1.1 Rev 2, section 6)
*"6. A finding of misconduct requires that:*
*a. There is a significant departure from accepted practices of the research community for maintaining the integrity of the research record.*
*b. The misconduct be committed intentionally, or knowingly, or in reckless disregard of accepted practices and*
*c. The allegation is proven by a preponderance of evidence."*

This committee concludes that misconduct was committed by Dr. De Domenico, based on findings of:
a. Significant departures from accepted practices of the research community for maintaining the integrity of the research record.
b. The misconduct was committed in reckless disregard of accepted practices and
c. The allegation is proven by a preponderance of evidence.

The Committee recognizes from testimonies of Drs. Kaplan and Ward that Dr. De Domenico worked hard and is dedicated to science. The Committee also recognizes that external forces, deficits in training, and the enticements of rapid success in a highly competitive field might have led to hasty work and shortcuts. Nonetheless, the long and extensive record of reckless data manipulation uncovered in this investigation, as well as her minimization of the severity of the "irregularities" and lack of remorse for the errors during interactions with the Committee, indicate that Dr. De Domenico is unaware of, or indifferent to, the requirements for ethical representation of primary research data in publication. These patterns raised concerns about Dr. De Domenico's training and qualifications to be an independent principal investigator, without further supervision and other mechanisms in place to address these deficits and to ensure that such irregularities do not occur again.

**Sanctions**: Because diligent and ethical attention to the conduct of research and publication of results is central to the scientific endeavor, and the Committee found numerous instances of recklessness and significant deviation from accepted scientific practices, the Committee recommends that the University of Utah either immediately revoke or decline to renew Dr. De Domenico's present appointment as a tenure-track faculty member.

**Dr. Jerry Kaplan**
Dr. Kaplan was the corresponding author on most of the papers that were examined and was responsible for the training of Dr. De Domenico, who was a fellow until 2009. The Committee found no evidence that Dr. Kaplan directly contributed to the misrepresentation or manipulation of data. Nevertheless, there appears to have been a systematic lack of attention to detail on Dr. Kaplan's part, coupled with inappropriate and unacceptable distance from primary findings and their reduction to figures and other displays for publication that led to ignoring data or inconsistencies that were contrary to the preconceptions or conclusions of a paper.

While the Committee recognizes that a certain level of trust is essential among co-workers and supervised laboratory personnel in a collegial research environment, the Committee is concerned that Dr. Kaplan missed opportunities to recognize concerns about irregularities in Dr. De Domenico's laboratory practices, and to repair her training in a timely fashion. Perhaps most notably, on 3/13/2008, Dr. Ganz, who was then collaborating with the Kaplan lab, notified Dr. Kaplan that a figure sent to him by Dr. De Domenico contained inappropriately spliced and duplicated western blot lanes. Strikingly, a similarly falsified western blot image was included in another paper submitted for publication less than one month later (Paper 11, submitted 4/11/2008). Dr. Kaplan apparently failed to convey the gravity of this issue, and a lesson in professional ethics, to Dr. De Domenico. The Committee is concerned that this lax oversight reinforced a pattern of misconduct established during Dr. De Domenico's training period, which then continued as she moved toward an independent position.

It is important for Dr. Kaplan, as principle investigator, to take full responsibility for issues raised by the irregularities in the published data and systematic failure of supervision of Dr. De Domenico. In his response to the initial draft of this report, Dr. Kaplan states that he is "mortified by the errors", but the majority of his short response is devoted to his efforts to confirm the scientific conclusions of the papers, as opposed to the question of misconduct. Drs. Kaplan and De Domenico stated, in their response to the Inquiry Committee report, that several irregularities identified by that committee (involving Paper 6) were resolved by examination of research notes. The Investigation Committee reexamined these irregularities and concluded that they were not, in fact, so easily resolved. When asked about them by the Investigation Committee, Dr. Kaplan acknowledged that he had not examined the films and notes himself. We thus remain deeply concerned about Dr. Kaplan's responses to serious allegations of misconduct in his laboratory.

Given that the extensive irregularities of data in the published record have significant impact on the field, it would be appropriate for Dr. Kaplan to review the details, reliability and reproducibility of the experimental data in these papers, and if at all possible repeat key experiments for the scientific community. Dr. Kaplan has stated that he and Dr. Ward have spent substantial effort over the last year repeating the experiments in question.

The Committee recognizes that Dr. Kaplan is a leader in his field, and that the irregularities outlined in this report appear to be isolated to publications generated predominantly by Dr. De Domenico's work. It should be noted, however, that the Investigation Committee did not examine any reports on which Dr. De Domenico was not a co-author. In addition, the Committee recognizes that Dr. Kaplan has made substantial, selfless contributions, in leadership positions, to the enhancement of the training and research environment at the University of Utah. These activities are to be highly commended. Perhaps this high level of involvement, time and energy commitment to the research and training community led to distractions from the intricacies of laboratory supervision of Dr. De Domenico's work.

**Sanctions**: The extensive pattern of irregularities in the published data, and the failure of appropriate supervision of Dr. De Domenico, undermine the credibility of a senior leader and the reputation of the University. The Committee recommends that the University relieve Dr. Kaplan of his senior leadership duties. The Committee recommends that Dr. Kaplan's laboratory repeat the research experiments that have been brought into question, which Drs. Kaplan and Ward indicate is ongoing.  It will be important for the University to provide careful scrutiny of the funded research that is specifically related to these projects. The Committee recommends that the University establish a scientific panel to review the newly repeated experimental results generated by Dr. Kaplan and Dr. Ward, including examination of the primary data and its appropriate documentation, and that this panel provide a scientific review of new papers or other publishable communications that might be submitted to either substantiate, modify or retract the findings in question.

## Dr. Diane Ward

Dr. Ward was not a respondent of this investigation. Dr. Ward was directly involved in making figures for Dr. De Domenico's publications up to 2007, but after 2007, she relinquished her role in figure preparation.  Dr. Ward was a coauthor on all the papers examined in this investigation, and was responsible for day-to-day training of Dr. De Domenico.  During this period, Dr. Ward had a high level of trust in Dr. De Domenico's work.  In generating figures, Dr. Ward performed unacknowledged splicing of western blot images, some of which were obvious in the figures. The Committee does not understand how Dr. Ward could have built the figures with bands upside-down and other obvious errors. The large number of irregularities and mistakes suggests that there was a lack of attention to detail, failure to examine the raw data, inadequate mentorship in protecting the fidelity of the data, and failure to insist on rigorous and clear assurance of the integrity of the data. The Committee found no evidence that there was intent to deceive or manipulate data on the part of Dr. Ward. Nevertheless, the sloppiness and carelessness in the production of the figures, and laxness in the examination of all of the primary data were disconcerting to the Committee and suggest a dereliction of responsibility to assure the accurate representation of primary data.

**Recommendations:** The Committee recommends that Dr. Ward examine the work flow and processes in the lab in order to ensure that mistakes in data representation do not occur in the future.  Greater systematic efforts and mechanisms should be enacted to carefully and permanently mark, track and evaluate primary data, to clearly record multiple replications of experiments, and to assure that lab personnel are adequately trained and supervised in these practices.  The Committee further recommends that Dr. Ward participate with Dr. Kaplan in the repetition of research experiments that have been brought into question, as outlined above. It will be important for the University to provide careful scrutiny of the funded research that is specifically related to these projects. The Committee recommends that the University establish a scientific panel to review the newly repeated experimental results generated by Dr. Kaplan and Dr. Ward, including examination of the primary data and its appropriate documentation, and that this panel provide a scientific review of new papers or other publishable communications that might be submitted to either substantiate, modify or retract the findings in question.

## Dr. Tomas Ganz

Dr. Ganz was co-author on two publications in this case, Papers 8 and 10.  Dr. Ganz voluntarily included these two papers in the broader group of allegations that he and his colleagues brought forward to the attention of journal editors and the University of Utah. As a co-author on two of the papers, and with areas of expertise that are complementary to Drs. De Domenico and Kaplan, it is disappointing that Dr. Ganz did not catch inconsistencies in the process of collaboratively assembling the papers for publication.

0968

**Dr. Wes Sundquist and Dr. Colin Kieffer**
Dr. Sundquist was the corresponding author and Dr. Kieffer, a graduate student at the time, was the primary author on Paper 11. The Committee has determined that the altered and manipulated mages in Figure 5B were provided by Dr. De Domenico for this paper. The loading controls were inappropriately manipulated in the figure. The splicing and image duplication were subtle, and the Committee found no evidence that Dr. Sundquist and Dr. Kieffer were aware of the manipulations in advance of recent notification by Dr. Botkin's office.  Given the subtlety of the image manipulation, the Committee finds that Dr. Sundquist and Dr. Kieffer might not be expected to have noticed the manipulations, and that they are not culpable for these problems in their paper. The Committee recommends that Dr. Sundquist repeat the experiment, and recently has been informed that repeat experiments are in progress, in collaboration with Dr. Ward. Regardless of the outcome, Dr. Sundquist should submit an erratum to the journal.

**Dr. Michael Kay**
Dr. Kay was included as an author on Paper 10 predominantly for his collaboration in providing the equipment and training required for the generation of circular dichroism (CD) data. Given that the process of generating the CD figures was one of the most grievous examples of scientific misconduct found in this case, the Committee is concerned that Dr. Kay did not sufficiently examine the purported primary data and purported multiple replications of raw data, which would have uncovered the inconsistencies and data manipulation. As the co-author specifically associated with the CD experiments, Dr. Kay must accept responsibility for not catching the falsification and fabrication that is apparent in this set of analyses. There appears to have been minimal discussion among the coauthors on the appropriate use of this experimental approach. In addition, as discussed in detail in the Committee's analysis of Paper 10, there appears to have been little or no discussion among the various collaborators in the structural analysis, especially between Drs. Kay and Skalicky, regarding possible inconsistencies that might be apparent in comparing CD data and NMR data.  Given the expertise of these two individuals, it is unlikely that the contradiction between the CD and NMR data would have gone unnoticed if they each had been fully aware of both sets of results. The circumstances leading to the publication of falsified and fabricated data indicate flaws in the management of the laboratory practices and collaborations.

The Committee recommends that in the future Dr. Kay exercise adequate oversight of collaborative projects, that he fully evaluate the raw data and results for which he has cognizant scientific expertise, and that he provide assurances that the data are appropriately represented in publication.

**Journal Reviewers**
The Committee takes this opportunity to recognize that the manuscript review and editorial process in some of these publications were deeply flawed. In retrospect, it is astonishing that reviewers of *Cell Metabolism* Paper 6 did not recognize some of the very obvious errors in the western blot figures, for example, an unequal number of lanes in a row of experimental samples compared to a row of loading controls immediately below the experimental samples (Fig. 7B) and mislabeled molecular weight standards (Fig. 4B).

**Procedural Concerns**
Lastly, the Committee is obligated to point out some aspects of the process that hampered our investigation. First, there appears to be a gap between the time when an editor of the journal *Cell Metabolism* contacted Dr. Kaplan (October 28, 2011) and when Dr. Botkin's office sequestered data notebooks (November 9, 2011). Some of the primary data may have been altered during this period in response to allegations. Second, some of the electronic data available on computer hard drives was not sequestered until July.  The Committee requested that Information Technology (IT) experts evaluate the hard drive data for deleted or altered files, but their evaluation indicated that this was not possible. Third, additional allegations arrived late in the investigation process (June 28, 2012), which prompted further investigation and delayed the process and the date of this final report. In spite of these procedural concerns, the Committee found numerous and compelling examples of manipulated images, data fabrication, a lack of experimental repetitions, and other substantive errors in the publications in question.

**OTHER RECOMMENDED ACTIONS**

1.  The data in Figure 4A in Paper 4 appear to be correct as labeled. The duplication and misrepresentation were in Paper 3, the PNAS article. This conclusion should be communicated to Dr. Cynthia Dunbar, the editor of *Blood.*

2. Regarding Paper 9, the Committee could not conclude that the flow-through samples were processed at the same time as the input/eluate samples, as requested by Dr. Dunbar the editor of Blood. The films were not labeled with dates and there were inconsistencies in the hand labeling of films and scans. Therefore, the Committee finds that the conclusions for this experiment are not substantiated in a manner consistent with accepted practices in the field. This conclusion should be communicated to Dr. Dunbar. Dr. Kaplan has requested that this action wait for repetition of the experiments. In this case, if the results are consistent with the published conclusion, the published figure should be replaced by a figure generated by accepted practices in the field.

3. The Committee recommends that Paper 10, which appears to contain falsified and fabricated data, be retracted from the journal *Cell Metabolism.*

4. The Committee finds that Fig. 5 of Paper 11 (*Developmental Cell*) contains several instances of image manipulation, data fabrication and/or misrepresentation, and recommends that the experiments in this figure be repeated and the figure formally corrected or retracted in the journal. These data were collaboratively provided to Dr. Wes Sundquist and Dr. Collin Kieffer, who were the primary authors of the paper. The Committee recommends that Dr. Sundquist take the lead in contacting the journal in a timely fashion, coordinate with Dr. Botkin in notifying the journal of the conclusions (confined to this paper) of this Committee investigation, negotiate an appropriate resolution with the journal to extirpate the inappropriate figure from the published record, and keep Dr. Botkin and the other authors informed of the outcome.  Beyond those actions, Dr. Sundquist and Dr. Kieffer are acknowledged for their rapid response to queries from this Committee.

5. The Inquiry Committee recommended that all of the publications co-authored by De Domenico and Kaplan be reviewed independently for irregularities. The Investigation Committee has reviewed some of these publications. The Investigation Committee recommends that Dr. Kaplan and Dr. Ward thoroughly examine all of the publications co-authored with Dr. De Domenico, searching for misrepresentations and other irregularities. The Investigation Committee further recommends that Dr. Kaplan and Dr. Ward inform the Office of Associate Vice President for Research Integrity and the relevant journals if additional irregularities are found.

0970

**PAPER 1**

**Citation**:  De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. (2011).  The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. *Cell Metabolism*  Nov 2;14(5):635-46

**Background**
The original allegation identified by the complainant included inappropriately manipulated images (Figure 1), reuse of images in the same publication (Figure 1C, Figure 2Aii and Figure 2B, Figure 1D and Figure 3) and errors bars in a ferritin ELISA (Figure 7B) that appear too small to reflect the error of the technique and stated number of replicates. The Inquiry Committee met with Dr. De Domenico on 6 January 2012 and Dr. Kaplan on 17 January 2012 to discuss these concerns.  A second meeting with Dr. De Domenico was held on 7 February 2012.  Dr. De Domenico was asked to provide the primary data (gel scans and films) for the figures in question and explain how the scanned images were used to prepare the published figures.  Dr. De Domenico stated that one person did the experiment, a second person scanned the data and she used the scanned images to make the figures.  On further analysis of the original data, the Inquiry Committee discovered additional errors, which included inappropriately manipulated and reused images (Figure 2Aii and Figure 5), flipped data panels (Figure 5) and missing original data (Figure 1A and Figure 3).  Dr. De Domenico stated that all of the figures for this paper were prepared by her.

In response to the allegations, Drs. De Domenico and Kaplan stated that they "do not dispute any of the allegations" except those regarding the size of the error bars in the ferritin assays". They further stated that "the binary nature of the data (band or no band) and the symmetry of the panel lead to erroneous figures but did not lead to misrepresentation of the data. These mistakes were made in the assembly of the figures for publication, the conclusions of the figures are correct. All the previous publication and discoveries by Dr. De Domenico and Dr. Kaplan were validated by publications from others".

Paper 1 was retracted in Cell Metabolism 15:927, 6 June 2012 with the statement: "We, the authors, wish to retract [ ] "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico et al. (Cell Metabolism *14*, 635–646; November 2, 2011; 10.1016/j.cmet.2011.09.008) because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory.  We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors.   However, we believe that the most responsible course of action is to retract the paper. We are preparing a new expanded version of this study for future submission.  We deeply apologize to the community for the inconvenience".

The Investigation Committee decided to reexamine the original gel films and scans in Dr. De Domenico's notebooks and computer hard drive to determine the source of errors in the published figures.

**Figure 1A Allegation**
The Inquiry and the Investigation Committees could not find the original data for this figure.

**Figure 1C Allegation**

0971

Gel scans were duplicated in PM and FT samples.  The PM scan was flipped horizontally and used for the FT sample.   Figure 1C is an annotated copy from the Inquiry Committee report.





**Investigation Findings:**   A film was found in the laboratory notebook that contains the PM samples used for the published figure.  The film also contained FT samples that appear convincing.

**Dr. De Domenico's Response:**  Dr. De Domenico presented the original gel film for Fig. 3 during an interview on 17 July, 2012.  She stated in a PowerPoint document that "I now realize that the film was flipped during figure preparation. Three different individuals participated in these experiments. Unfortunately, the film was not scanned by me or who ran the experiment".

**Conclusion:**  The Investigation Committee concurs with the Inquiry Committee that the PM sample was flipped and reused for the FT samples.  It is unclear why the FT samples on the original film were not used for publication.  The error in this figure suggests carelessness in figure preparation.

**Figure 1D and Figure 3 Allegations**
The same GFP Western blots in Figs. 1D and 3 are used for different experimental treatments. The GFP blot in Fig. 1D (right panel) is identical to two lanes in the middle panel in Figure 3. In addition, the GFP blot in Fig. 1D (left panel) is flipped from the original film. Figures 1D and 3 are annotated copies from the Inquiry Committee report.



**Investigation Findings**: The Investigation Committee concurs with the Inquiry Committee's report that the same Western blot was used for two different treatments in Figures 1D and 3, and that the published data have no relationship to the original data. The Investigation Committee also could not find the primary data for Figs. 1D and 3.

**Dr. De Domenico Response:** In an interview with Dr. De Domenico on 17 July 2012, she presented a PowerPoint document to explain how the Western blot lanes were duplicated in Figs. 1D and 3. Dr. De Domenico showed a gel scan containing data for both Fig. 1D and Fig. 3 (see below). The scan is labeled "Part of figure 1D" and "Part Figure 3". In this document she stated "As shown in the original blot (left bottom) the bands belonging to Fig. 1D were next to the bands belonging to Fig. 3 (see red asterisk on the film). The gel was scanned before the lanes were clarified. "I now realize that the film was flipped during figure preparation. Three different individuals participated in these experiments. Unfortunately, the film was not scanned by me or who ran the experiment".

0973



**Investigation Conclusion:**   The lanes labeled "Part Figure 3" in the gel scan appear to be a repeat of the published experiment, but it is not the data used for publication.   Similarly, Figure 1D data are not the data used for publication.  Given that the original data for Figs. 1D and 3 could not be found, this cast doubt on the accuracy of the published data.

**Dr. De Domenico's Response to Missing Original Data in Figures 1A, 1D and 3**:   In a PowerPoint document presented to the Committee on 17July 2012, Dr. De Domenico stated that "I have provided to the committee some repeats of all experiments and most importantly of the experiments were the original films are missing because were kept in the books that the technician Mrs. Nazzicone threw away".  I want to pint [point] out that the lost of these laboratory's notebooks was reported to the Human Resource Office before these concerns were communicated to us.  These emails were given to Dr. Botkin".

**Figure 2 Allegations**
There are several irregularities in this figure.  First, the same Western blots are used for different experimental treatments.  The top panels in Fig. 2Aii are duplicated and used for the top panels of Fig.  2B. The original data for these panels could not be found.  Second, the lower left panels in Fig. 2Aii match the two right lanes in the upper panel in Fig. 5.  Figure 5 panels are cropped and flipped and a lighter exposure is used for Fig. 2Aii. Third, the top panels in each figure are matched to different bottom panels unrelated to the experiment. The data in Figs.2Aii, 2B and 5 have no relationship to what is labeled in the figure.  Figures 2Aii, 2B and 5 below are annotated copies from the Inquiry Committee report.

0974

## Figure 2Aii and 2B
• Published images do not correspond to original films
• Same Western blots used for _different_ treatments



## Figure 2A ii vs Figure 5
• Published image does not correspond to original film
• Same Western blots used for _different_ treatments



**Investigation Findings:** In a document to the Inquiry Committee, Dr. De Domenico provided a gel scan containing data for Figures 2Aii, 2B and 5 (large film below labeled "Gel scan provided by Dr. De Domenico"). To evaluate the data in Figure 2Aii, the Investigation Committee reconstructed the data labeled "Fig 2Aii" in the film and compared it to the published Fig. 2Aii (below).   A reconstruction of the original data for Figure 2Aii reveals that the reconstructed figure differs from the published figure. The reconstructed figure does not show a reduction in the biotin-labeled Fpn-GFP in the 36 h "N.S." sample (red arrows) and a much smaller difference between the 36 h flow-through (FT) "N.S." and "Nedd4-2" fractions (blue arrows).   The result stated in the paper  "In cells treated with control oligonucleotides, Fpn-GFP was degraded 36 hr post expression (Fig. 2A, panel ii)" is thus not supported by the original film scan.  The published data shows a greater effect compared to the original data.  Figure 5 was found on the film (large film below), and corresponds to the published figure with the exception that the PM upper panel was flipped horizontally compared to the original film and does not represent the published figure.

**Gel scan provided by Dr. De Domenico**

University of Utah Investigation Committee Report                               Page 14

0975



Figs. 2Aii and 2B

Fig. 5

**Committee's reconstruction of Figure 2Aii from the original data**



**Dr. De Domenico's Response to Figure 2 Allegations:** In response to the errors in these figures, Dr. De Domenico provided a PowerPoint document to the Committee on 17 July 2012 that stated "Again, three different individuals participated in these experiments. The order of the gel loading was not "linear" and I did not keep the labels clear when generating the figure and the scan was flipped."

0976

The Committee questioned Dr. De Domenico further regarding the inconsistencies found in Fig. 2Aii. Dr. De Domenico was shown the Committee's reconstructed version of the original notebook scan for Figure 2Aii. Dr. De Domenico asked "where the reconstructed figure came from" and the Committee replied "that it was made from the gel scan that she provided to the Inquiry Committee". The Committee stated that there is a "pronounced difference in the intensity in the publication [compared with the original data] and "that the published version shows a bigger effect than what was in the original gel". Dr. De Domenico was asked if this "is a misrepresentation" and she "agreed on this point". The Committee also noted that Fig. 2Aii was flipped and that Fig. 2B has the same lanes, and so it misrepresents the text. More importantly, "the primary data do not represent a strong case". Dr. De Domenico said "that she went to the repeats and is sure that it has been validated".

In response to the Committee's reconstruction of Fig. 2Aii, Dr. De Domenico subsequently showed the Committee's reconstructed Fig. 2Aii and compared it to the original gel scan (PowerPoint file provided on 17 July). She stated that "one Committee member reconstructed Fig. 2Aii using a higher exposure film" as compared to the published experiment". (The higher exposure is most likely due to Dr. De Domenico's photographing of the Committee's paper copy of the reconstructed gel scan). Even though the figure is a higher exposure, the published version still shows a better outcome than the original gel.

Dr. De Domenico's revised her response in the 2 July 2012 meeting minutes to indicate that she did not agree with her response to the question as to whether Figure 2Aii "is a misrepresentation". She revised the text to indicate that ""she does not think [so] I agree on this [is a misrepresentation] because Dr. Goldenberg reconstructed figures was generated with a different film"".

Regarding irregularities in Fig. 2B, Dr. De Domenico provided a film containing an experiment labeled Fig. 2B (cropped from the large film previously shown) and reconstructed the data for comparison to published Fig. 2B (below). Dr. De Domenico stated in a PowerPoint document that the reconstructed figure shows that "Not [a] misrepresentation of the data". In other words, Fig. 2B shows the same result as the published data. It is unclear to the Committee why this data was not used for publication.



Fig. 2B from original data in Dr. De Domenico's notebook compared to published Fig. 2B

**Additional Irregularities in Figure 2 Identified by the Investigation Committee**

0977

An earlier image of the film for Figures 2Aii, 2B and 5 (file 1-2-1, dated 20 July 2011) was found on the hard drive of Dr. De Domenico and is shown below alongside the version presented to the Inquiry Committee:



Create Date: 2011:07:20 12:09:34-06:00        Create Date: 2011:10:29 13:23:02-06:00

The labels on the earlier version suggest that the blots were to be used for Figs. 1B, 1C, 2A, 2B, 5 and 7. While the original labeling suggests that the middle blot on the left-hand side was for the experiment shown in Fig. 1C, the later labeling indicates that it is a repeat of the experiment shown in Fig. 2Aii. The later labeling also indicates that roughly equal amounts of ferroportin were detected in both the plasma membrane and cytoplasmic fractions. This is not consistent with the results shown in the published versions of either Fig. 1C or 2Aii. In addition, Fig. 7 has no relationship to the published figure, and lane 7 in this figure is unlabeled.

Examination of the film for Figures 2Aii, 2B and 5 also raised concerns regarding possible alteration of the research record. Particular attention was focused on the blot for Figure 2B, which is labeled as coming from a 12-lane gel. The Committee noted that the spacing of lanes in this blot is indistinguishable from those of the other blots on this film, which are purported to represent 10-lane gels. The Committee questioned Dr. De Domenico on this point and was told that the discrepancy was due swelling of the 12-lane gel, but not the 10-lane gel. As discussed in detail elsewhere in this report (see Section on Post-Allegation Irregularities), the Committee is unconvinced by this explanation and believes it likely that the film was deliberately mislabeled in order to show the results desired by the authors.

**Conclusion**

0978

The Committee concurs with the Inquiry Committee report that Western blot images were reused for different experimental treatments and that the published figures have no relation to the primary data.

The Committee also identified irregularities in the film provided by Dr. De Domenico as the primary data for Figures 2Aii, 2B and 5. The labeling of the film for Fig. 2B is of particular concern. As discussed in detail above, the spacing on the film matches closely that of a 10-well comb, but the spacing of a 12-lane gel must be expanded by a full 20% in order to match the film. The Committee concludes that these labels most likely represent a falsification of data and that the labels on other blots (e.g. Figs. 1C and 7) on this film may have been falsified as well. Specifically, we suggest that the labels were configured to place the ones indicating reduced protein concentrations in the flow-through fractions at positions where either no sample or molecular weight markers were loaded.

It should be noted that the relabeled film was originally provided by Dr. De Domenico to the Inquiry Committee as the primary data for the experiments shown in Figs. 2Aii, 2B and 5, and to demonstrate that the correct data were consistent with those published.

The earlier scans of the film found on Dr. De Domenico's computer (files 1-2-1 and 1-2-2) also raise doubts about the original explanation provided for the appearance of the same gel bands in different figures (Figs. 2Aii, 2B and 5). This and other cases of mislabeled gel images were explained by Dr. De Domenico as arising because the initial markings on the films were removed before scanning. In this case, however, the scanned image is clearly labeled by the figure numbers for which the individual blots are to be used. While the individual lanes might have been mixed up, it is very difficult to understand how the experiments could have been, unless Dr. De Domenico deliberately chose to reuse the images that best fit the expected outcomes. If, as suggested above, the labeled film represents a fabrication, then we must also conclude that Dr. De Domenico deliberately misled both the Inquiry and Investigation Committees. When the issues outlined above were raised during interviews with the Committee, Dr. De Domenico adamantly denied that there had been any relabeling of the films. Dr. De Domenico was specifically asked to state when the hand labeling was applied to the films, and she indicated that the labels were placed contemporaneously with the generation of the data and the use of the films for generation of figures for publication, not after concerns or allegations were brought forward.


**Figure 7B Allegation**
The original allegation regarded errors bars in a ferritin ELISA (Fig. 7B and in other publications) that appear too small to reflect the error of the technique and stated replicates. The Inquiry Committee report stated that they asked Dr. Greg Stoddard (Co-Director of the University of Utah Biostatistics Center) to analyze the primary data in Figure 7B. He concluded that "data in the laboratory notebooks, the figures, both the height of the bars in the bar charts, representing the mean, as well as the length of the error bars, representing the standard errors, were correctly drawn". However, he also questioned whether the data are actually from "independent" experiments as reported in the paper. The committee recommended that a "more complete assessment of the accuracy of the graphical data is warranted".

**Investigation Findings**: The Committee examined Dr. De Domenico's computer hard drive for files related to Figure 7B. One SigmaPlot file (filename: Notebook1.JNB, December 17, 2010) was found for this figure that includes the error bars, but no replicate data or any indication of where the error bars come from. The description of data analysis for the ELISA in Figure 7B in the published paper states that "Ferritin levels were determined by ELISA as described previously (De Domenico et al.

0979

2007a).  All experiments were performed a minimum of three times. Data are represented as mean standard deviation (SD)".

**Conclusion**:  The Committee could not determine whether the data originated from "independent replicates" as reported in the paper or from replicate measurements from single experiments.


**Summary**
The Investigation Committee concurs with the Inquiry Committee report that found duplication of data in Figure 2Aii and Figure 2B, Figure 2Aii and Figure 5, and Figure 1D and Figure 3.  We conclude that the published data have do not represent the original data.  The Committee also found that the data in published Figure 2Aii shows a better outcome compared with the primary data.

 The Committee concludes that the film for Figures 2Aii, 2B and 5 was deliberately mislabeled in order to show the results desired by the authors.  This suggests that the primary record was altered and that the labeled film is falsified.

The original allegation regarding the small size of error bars in an ELISA could not be addressed from the Committee's investigation because files containing replicate data from additional experiments could not be found Dr. De Domenico's computer hard drive.

The Committee's findings support the retraction of this manuscript.

0980

**PAPER 2**

**Citation:** De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with JAK2. *Proceedings of the National Academy of Sciences USA* 2009; 106: 3800-3805
Submitted December 31, 2008, accepted January 14, 2009. Corresponding author, Jerry Kaplan.

**Background:** The allegations specifically related to Paper 2 involve Figures 1, 2A, 3B, and 4A and potential duplication and misrepresentation of data, and were previously examined by the Inquiry Committee. The Inquiry Committee's final report was reviewed by the Investigation Committee. Additional allegations of duplication of data in Paper 2 and in Papers 3 and 4 were also raised and were examined by the Inquiry Committee; these issues are discussed separately in summaries of Papers 3 and 4.

The Investigation Committee interviewed Dr. De Domenico on 7/02/2012, 7/17/2012, and 7/19/2012 and specifically reviewed allegations and details related to Paper 2 with her in the meetings on 7/02/2012 and 7/19/2012. In addition, the Investigation Committee discussed allegations and details related to Paper 2 in interviews with Dr. Kaplan (7/03/2012) and Dr. Ward (7/16/2012).

**Individual Figure Irregularities**
**Figures 1 and Figures 2A in Paper 2:** The Inquiry Committee concluded that the same western blot image was used in different figures indicating two different treatments, and were cropped differently and flipped vertically in Figures 1 and 2A. Annotated copies of these figures with arrows indicating the irregularities and enlarged versions of some of the blots were included with their final report. Figures from the Inquiry Committee report are reproduced here (see below). After review of the Inquiry Committee's findings and interviews of Dr. De Domenico, Dr. Kaplan, and Dr. Ward, the Investigation Committee agrees with the conclusion that the same blot was shown in panels in Figure 1 and 2A of Paper 2 and was identified as resulting from analysis of lysates from 2 different cell lines. **This represents duplication of data in the same report.**



**(Reproduced from the Inquiry Committee report)**

**Responses from the authors to the findings regarding Figures 1 and 2A:** The Inquiry Committee's conclusion was not contested or rebutted by Dr. Kaplan and Dr. De Domenico in their response letter on 2/23/2012. In a meeting with the Investigation Committee on 7/02/2012 Dr. De Domenico stated that she believes that the duplication occurred when the gels were scanned. In interviews with the Investigation Committee Dr. Kaplan (7/03/2012) and Dr. Ward (7/16/20120) provided no additional insights on how the irregularities may have occurred. In a powerpoint document provided to the Investigation Committee by Dr. De

Domenico in conjunction with her meeting with the Committee on 7/17/2012, she offered the defense that "I believe that the film was flipped during figure preparation. Both experiments are in the same film next to each other (see arrow). The film was not scanned by me." A photocopy identified as a copy of the original film with red arrows pointing to different blots on the film was included. No date or other identification can be seen on this photocopy.

 A correction was published in the journal (*PNAS* 2012; 109: 7583-7586.) The correction states that "The authors note that several figures appeared incorrectly." They further state that "In Figure 1, the anti-Jak2 panel was replaced due to errors in preparing the figure for publication." A similar statement was made for Figure 2A. In the meeting with Dr. De Domenico on 7/19/2012, the Investigation Committee inquired about the data and new figures used in the published correction to Paper 2. Dr. De Domenico stated that the journal asked them just to replace the panels that displayed erroneous data in the original publication, and outlined how this was done. Nevertheless, she also subsequently included a copy of an email with instructions for correction from the *PNAS* editorial office (from Daniel Salsbury; 9 March 2012) in a powerpoint file (7/23/2012). These instructions say that "…the correction will reproduce the entire figures, not just the panel(s) in question." Dr. De Domenico's 7/23/2012 powerpoint file also contained a list saying that the corrected versions of Figures 1 and 2A were generated from frozen samples that were the same as those used in the original figures. It appears from inspection of the original and published corrected figures that only the middle panels of the western blot portions of figures 1 and 2A, labeled anti-Jak2 in each case, were replaced. In her interview with the Investigation Committee on 7/16/2012, Dr. Ward stated that she did not construct the figures for the *PNAS* correction, but that she saw the data and that she and Dr. Kaplan made sure that Dr. De Domenico had replicates.

**Figure 3B and 4A in Paper 2:** The Inquiry Committee concluded that the same western blots were used in two different treatments with two different antibodies, and that panels in Figures 3B and 4A were identical but cropped differently. The Inquiry Committee report noted that the original data could not be found and may have been lost with the notebooks that were taken from the lab. Annotated copies of the figures with arrows indicating the irregularities and enlarged copies of blots were included. Figures from the Inquiry Committee's report are reproduced here (see below). After reviewing the findings of the Inquiry Committee, meeting with Dr. De Domenico on 7/02/2012 and 7/19/2012, and reviewing powerpoint files that Dr. De Domenico supplied, the Investigation Committee agrees that the same western blots were identified as resulting from detection with two different antibodies (anti-Jak2, anti-Fpn) and displayed as outcomes of two different experiments in Figures 3B and 4A. **This represents duplication of data in the same report and misrepresentation of data.**

## Figure 3B and Figure 4A
• Same Western blot used in two <u>different</u> treatments for two <u>different</u> antibodies



Figure 3B
<u>Primary mouse bone marrow derived macrophages</u>, treated with hepcidin
Blotted for Jak2

Identical but cropped differently (enlarged image on the next page)

Figure 4A
<u>HEK293 cells transiently transfected</u> with Fpn-GFP and Dynamin K44A then treated with hepcidin
Blotted for Fpn

**(Reproduced from the Inquiry Committee report)**

**Responses from the authors:** The original allegations and the Inquiry Committee's conclusion were not contested by Drs. Kaplan and De Domenico in the 2/23/2012 response letter. In her meeting with the Investigation Committee on 7/02/2012, Dr. De Domenico said that she thinks Figure 4A is wrong and Figure 3B is correct. She was asked how this happened and replied that she thinks this was "a crop of the same band". No additional insight into this irregularity was provided by Dr. Kaplan in his meeting with the Investigation Committee on 7/03/2012 or by Dr. Ward in her meeting with the Committee on 7/16/2012. No additional defense or comments were included in the powerpoint document provided to the Investigation Committee by Dr. De Domenico in conjunction with her meeting with the committee on 7/17/2012.

A published correction (*PNAS* 2012; 109:7583-7586), mentioned above, stated that "Fig. 3B was replaced due to errors in preparing the figures for publication." A similar statement was made for Figure 4A. In her interview with the Investigation Committee on 7/19/2012, Dr. De Domenico stated that both the anti-Jak2 and anti-Fpn panels were replaced in Figure 3B; it is unclear from the written summary of the meeting that she stated that more than one panel was reproduced in Figure 4A. Inspection of the published corrected figure indicates that both panels in Figure 3B were replaced and that the top panel, labeled anti-Fpn, was replaced in Figure 4A. In the 7/23/2012 powerpoint file supplied to the Investigation Committee by Dr. De Domenico, a list indicates that "a repeat available in the lab was used to generate all the panels" in Figure 3B and that a gel was run using frozen samples that were the same as those used in the original figure to generate corrected 4A. Dr. Ward commented on the figures used for the correction in her meeting with the committee on 7/16/2012, as noted above.

**Conclusions from the Investigation Committee's findings:** In summary regarding the allegations related to Figures 1, 2A, 3B, and 4A in Paper 2, the Investigation Committee concludes that there was duplication and misrepresentation of data in this report. We were unable to establish a cogent explanation for these irregularities aside from the possibilities of carelessness, negligence, capriciousness with flagrant or reckless disregard for fidelity of the published report of the original data, and/or intent. The versions of the figures in Paper 2 published as corrections may need to be further revised or amended because of apparent discrepancies between the published corrected figures and instructions from the *PNAS* (substitutions of panels instead of completely new figures).

**PAPER 3**

**Citation:** De Domenico I, Zhang TI, Koenig CL, Branch RW, London N, Lo E, Daynes RA, Kushner JP, Li D, Ward DM, Kaplan J. Hepcidin mediates transcriptional changes that modulate acute cytokine-induced inflammatory responses in mice. *Journal of Clinical Investigation* 2010; 120: 2395-2405. Submitted December 11, 2009, accepted in revised form April 7, 2010. Corresponding authors Jerry Kaplan and Ivana De Domenico.

**Background:** The allegation related to this report was that Figure 3B in Paper 2 (PNAS, 2009; see previous summary of allegations related to Paper 2) was reproduced as a new data figure, Figure 2A, in Paper 3. The Inquiry Committee examined this issue. The final report of the Inquiry Committee was reviewed by the Investigation Committee. In addition, the Investigation Committee specifically discussed papers 2 and 3 with Dr. De Domenico in meetings on 7/02/2012, and 7/19/2012. Papers 2 and 3 were briefly discussed in interviews of Dr. Kaplan (7/03/2012) and Dr. Ward (7/16/2012).

**Individual Figure Irregularities:** From their analysis, the Inquiry Committee concluded that the same western blots were used in the two different figures. An annotated photocopy of panels from the two figures with arrows indicating duplications are included with Inquiry Committee's final report and is reproduced here (see below). The Investigation Committee agrees with the conclusion of the Inquiry Committee after review of their findings and the Investigation Committee's interviews of Dr. De Domenico, Dr. Kaplan, and Dr. Ward. **Therefore this represents duplication of data in two separate publications.**

**Responses from the Authors:** In a letter to Jeff Botkin (November 28, 2011), Dr. Kaplan explained that the data in Papers 2 and 3 were originally included in one large manuscript that was later separated into two. He stated that the panels in question in the two reports were relevant to both papers and that the "inclusion of those panels did not alter the results of the manuscripts…". He further stated that in the JCI report they referred to the PNAS manuscript and to findings illustrated by the duplicated figure. Subsequently, the conclusion of the Inquiry Committee was not contested in the February 23, 2012 letter from Drs. Kaplan and De Domenico in response to the Inquiry Committee report. Drs. Kaplan and De Domenico then published a corrigendum in the *Journal of Clinical Investigation* stating that the anti-Fpn and anti-Jak2 rows in Figure 2A of Paper 3 were reprinted from Paper 2 without attribution (*JCI* 2012; 122: 2326-2326 doi: 10.1171/JCI63977). The Investigation Committee reviewed the correction with Dr. De Domenico in the meeting with her on 7/02/2012 and again in the meeting on 7/19/2012. In an explanationin the powerpoint document provided to the Investigation Committee by Dr. De Domenico in conjunction with her meeting with the committee on 7/17/2012, she again outlined that the data in Papers 2 and 3 were originally included in one manuscript that was later divided into two reports. She stated "In the course of dividing the manuscript into two papers, the same panels were included into the two separate manuscripts." This suggest that the figure was inappropriately constructed in the original manuscript before it was divided. She further stated that "we also have provided to the committee repeats of the experiments…" and included a photocopy of a page from a notebook showing western blot data and labeled "2-20-2008 (repeat of Fig. 3 PNAS)". No additional insights into how this irregularity occurred emerged from the Investigation Committee's interviews of Dr. Kaplan and Dr. Ward.

**Conclusions from the Investigation Committee's Findings:** In summary regarding the allegation related to Paper 3, the Investigation Committee concludes that there was duplication of data in two separate published reports. The findings are most consistent with carelessness, but the Committee could not exclude negligence, capriciousness with flagrant or reckless disregard for fidelity of the original data, or intent. The correction in the *Journal of Clinical Investigation* appears to have satisfied the requirements of the journal.

0984

## PNAS Figure 3B vs JCI Figure 2A

• Same Western blots used in two <u>different papers</u>



Figure 3B PNAS 2009

Figure 2A JCI 2010

**(Reproduced from the Inquiry Committee report)**

0985

**PAPER 4**

**Citation:** Koenig CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I. Toll-like receptors mediate induction of hepcidin in mice infected with Borrelia borgdorferi. *Blood* 2009; 114: 1913-1918.
Submitted March 6, 2009, accepted June 13, 2009. Corresponding author, Ivana De Domenico.

**Background:** The allegation related to Paper 4 was that a microscopy image in Figure 4A in this report was the same image as published in Figure 2A in Paper 2 (PNAS, 2009; see previous summary of allegations related to Paper 2). This issue was examined by the Inquiry Committee. The Investigation Committee reviewed the Inquiry Committee's final report, and also interviewed Dr. De Domenico, Dr. Kaplan, and Dr. Ward as outlined in the summary of Paper 2.

**Individual Figure Irregularities:** The conclusion from the analysis by the Inquiry Committee was that the same microscopy image was used in Papers 2 and 4, and that the images were identified as resulting from different treatments in the two published articles. An annotated copy of some of the panels from the two figures with markers identifying the duplicated images is included in their final report. This illustration from the Inquiry Committee report is reproduced here (see below). After review of the Inquiry Committee's findings and interview of Dr. De Domenico, Dr. Kaplan, and Dr. Ward the Investigation Committee agrees that the same image was published in Figure 4A in Paper 4 labeled as Fpn-GFP detected in control cells, and in Figure 2A in Paper 2 labeled as human Jak2 detected in cells transfected with Jak2 siRNA **Therefore, this represents duplication of data in two separate publications.** Because  the two images are labeled as resulting from different cellular manipulations (siRNA for human Jak2; incubation with control media), **there is misrepresentation of data**.

## PNAS Fig 2A vs Blood Fig 4A

- Same microscopy image used in underline(different papers) for different treatments



**(Reproduced from the Inquiry Committee report)**

**Responses from the Authors:** The report by the Inquiry Committee included this statement: "Figure 2A in PNAS paper and Figure 4A in 2009 Blood paper: Dr. De Domenico indicated that the labeling in the PNAS paper is correct. The "control media" sample in the Blood paper is thus treated with siRNA for human Jak2 and

0986

does not represent a control as labeled." (Top of p.2 in the Inquiry Committee report.) In their response letter (2-23-2012), Drs. Kaplan and De Domenico stated "It could be a misunderstanding during the meeting but from the laboratory notes it appears that the figure belongs to the Blood paper, therefore it is the figure in PNAS that needs to be replaced." As a specific detail, the Investigation Committee subsequently noted that the *PNAS* paper was submitted and accepted before the *Blood* paper was submitted.

In the published correction of Paper 2 mentioned previously (*PNAS* 2012; 109: 7538-7586; discussed in the summary of Paper 2), a new image was substituted in Fig. 2A and it is stated that the original differential interference contrast figure was replaced due to errors in preparing the figures for publication. Inspection of the published corrected Figure 2A reveals that the two left hand panels of the second row of micrographs have been replaced. The left most panel displays cells that have different morphology from those in the original figure, and the second panel is of much poorer quality than that published in the original figure. The other six micrograph panels of corrected Figure 2A appear to be the same as those in the original figure.

In the powerpoint document provided to the Investigation Committee by Dr. De Domenico in conjunction with her meeting with the Committee on 7/17/2012, she outlined a defense if the original publication of the same data in Papers 2 and 4 in which she stated that the two experiments were conducted on the same day and the microscopy images were saved on the same CD. She stated "The technician that took the data did not notice the comment in Dr. De Domenico's notebook…that the same CD has two sets of experiments. This is the reason why the same images were shown in two different publications." No additional insights into how the same figure was published in Paper 2 and Paper 4 were provided by Dr. Kaplan in his meeting with the Investigation Committee on 7/03/2012 or by Dr. Ward in her interview on 7/16/2012.

**Conclusions from the Investigation Committee's findings:** In summary regarding the allegation related to Paper 4, the Investigation Committee concludes that there was duplication and misrepresentation of data in the two separate published papers. The data in Figure 4A in Paper 4 appear to be correct as labeled, based on the statements of Drs. Kaplan and De Domenico. Therefore, the duplication and misrepresentation were in Paper 3, the PNAS article. **This conclusion should be communicated to Dr. Cynthia Dunbar, the editor of *Blood,* in response to her inquiry to Jeff Botkin regarding Paper 4 (email note from Anna Trudgett at *Blood* on March 27, 2012).**

**PAPER 5**

**Citation:** De Domenico, Vaughn MB, Yoon D, Kushner JP, Ward DM, Kaplan J. Zebrafish as a model for defining the functional impact of mammalian ferroportin mutations. *Blood* 2007; 110: 3780-3783. Submitted July 9, 2007, accepted August 22, 2007. Corresponding author, Jerry Kaplan.

**Background:** The allegation regarding this paper was that the same photomicrograph was used to indicate a zebrafish phenotype resulting from two different conditions. This allegation was examined by the Inquiry Committee. The Investigation Committee reviewed the final report of the Inquiry Committee and interviewed Dr. De Domenico, Dr. Kaplan, and Dr. Ward as outlined in the summary of Paper 2.

**Individual Figure Irregularities:** The Inquiry Committee concluded that the images labeled as "uninjected" and "Fpn-GFP N1444H" in Figure 1B show the same zebrafish larva and were manipulated differently. An annotated copy of the figure with arrows indicating the images in question is included in the Inquiry Committee's final report and is reproduced here (see below). After review of the findings of the Inquiry Committee, the Investigation Committee agrees that the same larva was shown in the top-most panel labeled as uninjected and in the fourth panel labeled as Fpn-GFP N144H. **This represents duplication of data in the same publication**.

## Figure 1B

• Same microphotograph used for two different conditions and manipulated



Identical photos, the bottom one is blurred (enlarged below)

Uninjected

Fpn-GFP N144H

**(Reproduced from Inquiry Committee report)**

**Responses from the Authors:** The report by the Inquiry Committee stated "Figure 1B in 2007 Blood paper: the images of zebrafish were all captured blindly to avoid any bias in interpretation. The use of a control image to represent the Fpn-GPP N144H mutant sample was *an accident according to Dr. De Domenico*." (Top of p.2 in the Inquiry Committee report; italics added.) No further comments or rebuttal related to this paper were made in the 2-23-2012 response letter by Drs. Kaplan and De Domenico. In the powerpoint document provided to the Investigation Committee by Dr. De Domenico in conjunction with her meeting with the committee on 7/17/2012, she included detailed comments regarding this figure. She stated that the data were transferred to a portable hard drive and the code was kept in a notebook that was one of the four notebooks illicitly discarded by the dismissed technician. Dr. Domenico further stated that the same image was shown twice but "…there was not image manipulation or image misrepresentation… the individual that captured all the images for each slide took three different exposure times." She also indicated that they did not notice that the same image was being included twice because the specific mutation (Fpn-GFP N1444H) did not give an obvious phenotype different from control.

0988

**Conclusion from the Investigation Committee's findings:** In summary regarding this allegation, the Investigation Committee concludes that there was duplication of data in this publication. The findings are suggestive of carelessness, but the Committee cannot exclude negligence, extreme capriciousness, or intent.

0989

**PAPER 6**

**Citation:** De Domenico I., Vaughn, M.B, Paradkar, P.N., Lo, E., Ward, D.M. and Kaplan, J. (2011) Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. *Cell Metabolism*. **13**, 57-67.

**Background:** In the original allegations of November 2011, figures from this paper were identified as containing examples of unreasonably small error bars, especially for ELISA assays. No irregularities concerning Western blots or other images were identified. However, the Inquiry Committee asked Dr. De Domenico to present other figures in the paper and the corresponding primary data. During this interview, the Inquiry Committee identified four instances in which there appeared to be a discrepancy between Western blot autoradiographs and the corresponding published figures. In their response to the Inquiry Committee report, Drs. De Domenico and Kaplan stated that examination of laboratory notes corresponding to the Western blots indicated that, in most cases, the handwritten labels on the films were incorrect and that the published figures were correct. None the less, this paper and Paper 1 were publically retracted in the 6 June 2012 issue of Cell Metabolism, with the statement that "We, the authors, wish to retract [. . .] because a number of errors have been detected in the assembly of the figures, and some of the original data were inappropriately removed from the laboratory. We stand by the validity of our studies; the data are reproducible, and the conclusions were not affected by the errors."

Despite the retraction, the Investigation Committee chose to consider Paper 6 further in order to better understand the origin of the multiple discrepancies between the laboratory notes, the films and the published figures, and how these discrepancies might reflect on general laboratory practices and the integrity of other data published by the respondents.

**Error Bars in Graphs**

Allegation: The original allegations presented by Prof. Tomas Ganz who indicated he was conveying concerns from other colleagues as well, stated that "In all of the papers where De Domenico is the first author, bar graphs have error bars that are too small for the techniques involved and the number of replicates." The complainants identified three specific figures in Paper 6: Figure 2, Figure 3 and Supplemental Figure 2, which are reproduced below.

Figure 2.



Figure 3.





Supplemental Figure 2.





The legend to each of these figures includes the statement "Error bars represent the standard error of the mean of three independent experiments."

To address the issue of error bars, the Inquiry Committee asked a statistician, Dr. Gregory Stoddard (Co-Director of the Study Design and Biostatistics Center at the University of Utah) to examine the data from similar plots in Paper 1. Using primary data provided by Dr. De Domenico, Dr. Stoddard re-calculated the means and standard errors and concluded that "From the data in the laboratory notebooks, the figures, both the height of the bars in the bar charts, representing the mean, as well as the length of the error bars, representing the standard errors, were correctly drawn."

Dr. Stoddard also noted that "The concern raised by Tomas Ganz, however, is clearly present.", and went on to discuss the very low coefficients of variance (the standard deviation divided by the mean) for the data. Dr. Stoddard suggested that the low values might indicate that the data do not represent truly independent replicates, but rather separate measurements of the same samples. The Inquiry Committee did not discuss this issue further with Drs. De Domenico or Kaplan.

In their response to the Inquiry Committee report, Drs. De Domenico and Kaplan stated: "Regarding the correspondence between Dr. Stoddard, Dr. Botkin and the reader. Dr. Stoddard is correct that for these experiments we used cells that came from the same flasks. The biological variability is due to different transfections each time. The Erhardt paper analyzed serum samples and not cell lysates or culture media. Furthermore, that paper used a self-made Elisa. In Dr. Kaplan's laboratory a commercial Elisa was used for most of the experiments. Each Elisa run in the laboratory has lower "CV" that the Erhardt s paper."

"The Nemeth et al, Science 2004 was the first paper where this assay was used, the error bars are also low and this paper was not considered in the allegation."

**Investigation Findings:** After obtaining copies of Dr. De Domenico's computer drives, the Committee attempted to trace the analysis leading to the error bars shown in this and other papers. Towards this end, the Committee asked Dr. De Domenico (via an E-mail exchange on 7-26-12) to identify the relevant files on the drives. Although she did provide lists of files for Papers 7 and 10, she did not for Paper 6,explaining that she did not have time before leaving on a previously-scheduled overseas trip. Dr. De Domenico also provided (in the form of a PowerPoint file labeled "CD_fromIvana_31July.ppt") a description of the procedure used to calculate the means and errors. According to the PowerPoint file, the data from individual experiments were entered into Excel spreadsheets and the program's statistical functions were used to calculate the means and errors. The results were then transferred to the program SigmaPlot for graphing.

Thorough examination of the computer drives did not reveal any Excel files in the directories containing other data for Paper 6 (the directories labeled "documents/Ivana's Documents/secret ferritin" and "documents/Ivana's Documents/secreted ferritin revision")." We did find numerous SigmaPlot files (identified by the .JNB file name extension) in these directories. While many of the graphs in these files appear to be related to the published figures, it was quite difficult to link the final figures to specific files. In addition, many of the files did not contain error information at all, and only two contained replicate data from which the errors were calculated. Based on the data column labels, the two files (6-1B-1 and 6-2C-1) containing replicate data appeared to be closely related to the graphs show in Figs. 1B and 2C, respectively, but the plotted values were different from those in the published figures. For each of these files, the error values were calculated from only two data sets.

The legends for the graphs in this and the other papers we examined specifically state that the error bars represent standard errors of the mean (SEM). However, in the cases noted above (and those related to other papers for which we found more than one data set), the errors were all calculated as standard deviations (SD). Also, in the Excel spreadsheet that Dr. De Domenico provided as an example (in the form of a computer screen capture), it appears that the built-in SD function was used. Indeed, the standard Excel function library does not include the SEM, which is defined as:

SEM = SD/$\sqrt{n}$

where $n$ is the number of observations. The situation is further confused by the statement in the Methods section that ". . . the error bars, calculated using Student's t test, represent the standard error of the mean". Though related to the standard deviation, the t-test does not define a calculation of the standard error. It seems most likely that all of the error bars are, in fact, standard deviations. This makes the small magnitudes of the reported errors even more problematic, as the SD should always be greater than the SEM.

**Response from Dr. De Domenico:** As noted above, Dr. De Domenico provided information about the procedures used to generate the final figures, but did not identify the specific files used for the figures in this paper. The issue of error bars was not discussed further with her or Dr. Kaplan in the interviews.

**Conclusions:** As noted in the original allegations, the error bars shown in many of the figures in this and other papers are very small, generally less than 10% of the measured values. Since the measurements are presumed to involve multiple pipetting operations (with errors of a few percent each), along with an enzyme assay with finite precision, the sample standard deviation for the overall measurement is unlikely to be less than 5% for repeated measurements of the same sample, under ideal circumstances. (See Hayashi, Y.,

0992

Matsuda, R. & Maitani, T. (2004). Precision, limit of detection and quantitation in competitive ELISA. *Anal. Chem.*, 76, 1295–1301. http://dx.doi.org/10.1021/ac0302859.)  The additional variability from different biological experiments is expected to increase the errors substantially.

We thus share the concern expressed by the complainant, and by the previously-consulted statistician.  This concern is heightened by the absence of computer files containing the replicate data and calculations.  The issue of error bars is also addressed in the report for papers 1 and 10.

**Figure 4B**

**Allegation:** During a meeting of the Inquiry Committee with Dr. De Domenico, the Committee noted a discrepancy between this figure and a labeled autoradiography film provided by Dr. De Domenico.  Referring to the lower two panels of the figure, the Committee reported that "The left panel is flipped around the vertical axis compared to the original film and thus does not represent the lanes as published. The data for the right lower panel were not on the same film and could not be found. These were the only data in the paper that could not be found."

The figure in question is shown below:



The following is a scan of the film shown to the Inquiry Committee, confirming that the image for the lower-left panel is rotated:



It is also apparent that the lanes on the right-hand side of this film do not correspond to those in the lower left panel in the published figure.

In their response to the Inquiry Committee report, the respondents stated that "The committee is correct that the panel was flipped around the vertical axis BUT represents the lanes as published."

While this response suggests that the inversion of the image does not affect the interpretation of the data, it should be noted that the vertical positions of the bands are critically important. One of the key results conveyed in the published figure is the shift in electrophoretic mobility of ceruloplasmin upon treatment with endoglycosidase H (Endo H), an indication that the polypeptide had entered microsomes and been glycosylated. The apparent molecular weights, as indicated by the positions of the bands relative to the molecular weight markers, thus represent critical information. The inversion makes this comparison with the markers meaningless.

**Investigation Findings:** Further examination of the films for this experiment and files from Dr. De Domenico's computer revealed additional discrepancies between the data records and the published figures, particularly with regard to molecular weight markers.

In addition to the labeled film shown above, the Committee examined a similar film in the notebooks, with labels indicating that it represented the upper panels of Fig. 4B (-Fe):

0994



The Investigation Committee's initial concern with this film was that the difference in electrophoretic mobilities of the samples treated with and without Endo H appear to be much smaller than indicated in the published figure.

Further inconsistencies were discovered when computer files (6-4B-1 and -2) containing scans of these films were found:

File 6-4B-1
Modify Date: 2009:08:01 13:16:35



File 6-4B-2
Modify Date: 2009:08:01 13:14:22



Other than the marking "cp No Endo H", neither of these images contained any labeling of the specific lanes.

Comparison of the films (with their current labeling) and the computer images reveals the following inconsistencies:

1.  The dates of the computer files (August 2009) precede those on the films currently in the notebooks (7-21-2010 and 7-22-2010) by nearly one year.

2.  The dates currently on the films are after the date the manuscript was submitted to Cell Metabolism (with Figure 4 in its final form).  There are no dates on the notebook pages corresponding to these films.

3.  The marks indicating the positions of the molecular weight markers in the earlier images have been changed on the films, in some cases shifted to indicate different molecular weights.

4.  The MW marks in the earlier images indicate that all of the bands on each blot displayed the same mobilities, consistent with one blot representing the treatment with Endo H and the other without.  The lane labels currently on the films indicate that one film represents –Fe and the other +Fe, with the right-hand lanes treated with Endo H and the left-hand lanes untreated.  The current MW markers appear to have been placed to indicate differences in MW among bands on the same blot.

Comparison of the computer files and the published figure enabled us to identify the source of all four panels in Fig. 4B, as illustrated in the diagram below:



If the MW markers in the original scans are correct, then the panels on the left- and right-hand side of the published figure are reversed: The panels indicating treatment with Endo H, and a higher apparent molecular weight, are actually those from the treatment without Endo H. Furthermore, there are inconsistencies between the MW markers indicated in the published figure and those in the original scans.

The Committee also found what appeared to be traces of another set of MW marks on the film labeled "cp No Endo H" in the scan. These marks do not appear to be the same as those in the scan.

**Responses from Dr. De Domenico:** Figure 4B was discussed during two of the interviews with Dr. De Domenico (on 7-2-12 and 7-19-12). In the first interview, before the scan files were found, the discussion focused on the apparent discrepancies between the molecular weight markers in the labeled films in the notebooks and the published figure. In the second, the scan images were also discussed. In neither interview, was Dr. De Domenico able to provide a clear explanation of how the figure was generated or the origins of the multiple discrepancies. The discrepancies in dates was discovered after the 7-19-12 interview, and the Committee did not have an opportunity to discuss this with Dr. De Domenico.

**Conclusions:** The original allegation (from the Inquiry Committee) concerned the inversion of the lower-left panel of Figure 4B, and the failure to find the film for the lower-right panel. Our investigation confirmed the inversion, but also revealed additional discrepancies, as well the source of the lower-right panel. Given all of the discrepancies, it is difficult or impossible to conclude whether or not the published figure accurately represents the experimental results. From the limited labels present in the original scanned images, it is possible that the results are as described, but with the +Endo H and –Endo H panels switched.

Our major conclusion is that the path from the primary data to the publication has been so poorly documented and corrupted by relabeling that no confidence can be placed on the published figure.

**Figure 5A**

**Allegation:** During a meeting of the Inquiry Committee with Dr. De Domenico, the Committee noted a discrepancy between this figure and a labeled autoradiography film provided by Dr. De Domenico. The Committee reported that "The right-most band in the upper panel is shifted to the right from its proper location, under the heading '65'. The two bands in the lower panel should correspond to the lanes '65' and '75', not '75' and '85' as indicated. There is a blank lane to the right of the lower band in the original data for this panel that is not shown in the figure (corresponding to lane '85'). The figure thus misrepresents the original data."

0997

The figure in question is shown below:



A scan of the film shown to the Inquiry Committee is shown below:



0998

In their response to the Inquiry Committee report, the respondents stated that "During the meeting the committee suggested we examine the notes regarding these experiments. This was done in Dr. Botkin's office. The notes reveal that the data represented in the figures are correct. The notes show that the order of the samples in the figure was correct. Furthermore, repeats of this experiment agree with the presented data. Therefore there is no misrepresentation of the original data. Please see the original notes, which are attached to this letter."

**Investigation Findings:** Comparison of the published figure and the film do not confirm the claim in the response, that "the data represented in the figures are correct", and raise additional questions:

1.  In the upper panel, the band in question is located between the labels on the film for fractions 75 and 85, not between 65 and 75, as indicated in the published figure. In this respect, the Inquiry Committee appears to have been mistaken in stating that the "proper location" was under 65, but it also the case that the location is different in the film and the published figure.
2.  The Inquiry Committee appears to have been correct in stating that, in the lower panel, the two bands below the labels 75 and 85 in the published figure are labeled 65 and 75 on the film.
3.  For the upper panel, the labeling of both the film and the published figure is ambiguous. In both, the spacing of the labels is uneven and a band is located between two labels.
4.  If the left-most band (as oriented in the film) in the upper panel corresponds to fraction 75, there are three lanes indicated between this and the lane for fraction 35. The space available for these lanes may not be sufficient. More generally, it is not clear how the lanes could be unambiguously assigned, since there are no traces of bands to the left of the one positioned between the labels for fractions 75 and 85. These issues are discussed further below.

On the disk copied from Dr. De Domenico's computer, a file (6-5A-1) containing a scanned image of this film was found:



File 6-5A-1
Modify Date: 2009:08:03 13:50:16

The MW markers and the lane labels appear to be the same as those currently present on the film, but the labels on the right hand side of the gel are different.

The date indicated for the computer file is eight months earlier than the date indicated on the labeled film in the notebook and the hand-written notes for this experiment. (The notes are dated "3-29-2010".) The manuscript was submitted on 4-20-10 (with Fig. 5), making the earlier date indicated on the computer file more likely.

The scan file was used to analyze further the spacing of the lanes.  In the left-hand image below, a box has been drawn around the space identified with fractions 15, 25 and 35.  In the right-hand image, this box is shifted to the left of the lane labeled 35, where it covers the space shown for fractions 45, 55, 65 and 75.



This comparison suggests that is unlikely that three lanes could fit between the lanes labeled 35 and 75, that the labels are incorrect and that the left-most band corresponds to fraction 65

**Responses from Dr. De Domenico:** As noted earlier, in their response to the Inquiry Committee report, Drs. De Domenico and Kaplan indicated that "the data represented in the figures are correct".  This figure was not discussed further with the respondents by the Investigation Committee.

**Conclusions:** The labeling of the gel lanes in the published figure (and the film) is, at best, ambiguous.  Given the absence of reference points other than the MW markers, on only one side of each gel, it is not clear how the lanes could have been accurately labeled, and the spacing suggests that the upper panel was mislabeled. The available records are inadequate to resolve these questions and do not support the respondents previous response to the Inquiry Committee report.  The inconsistencies between the dates of the computer files, the film labels and the notes raise additional doubts about the reliability of the notes.

**Figure 5B**

**Allegation:** During a meeting of the Inquiry Committee with Dr. De Domenico, that Committee noted a discrepancy between this figure and a labeled autoradiography film provided by Dr. De Domenico. The Committee reported that "The published data are flipped from the original film and thus do not represent what is shown."

The figure in question is shown below:



The following is a scan of the film shown to the Inquiry Committee and currently in the notebook:



As noted by the Inquiry committee, the bands labeled fraction 75 in the published figure are labeled 5 on the film, and vice versa.

In their response to the Inquiry Committee report, the respondents stated that "Again the committee suggested analyzing the notes for this experiment and this has been done. The film was flipped because the original labeling of the film was different. The notes reveal that the data represented in the figures are correct. The notes were followed to generate the figure. Furthermore, repeats of this experiment agree with the presented data. Therefore there is no misrepresentation of the original data. Please see the original notes, which are attached."

**Investigation Findings:** For this figure, the committee was not able to find computer files for the film scans, which might have helped clarify the history. The notebook pages provided by Dr. De Domenico do indicate the order of samples indicated in the published figure, rather than that indicated by the labels on the film. It is still not clear, however, why there is a discrepancy or whether the notes or labeled film is correct. Furthermore, the dates shown on the notebook page (5-20-2010) and the film (6-3-2010) raise doubts about the reliability of

either, as both are later than the date the manuscript was submitted to Cell Metabolism (4-20-10), with this figure included.

**Responses from Dr. De Domenico:** As noted earlier, in their response to the Inquiry Committee report, Drs. De Domenico and Kaplan indicated that "the data represented in the figures are correct". This figure was not discussed further with the respondents by the Investigation Committee.

**Conclusions:** The available records are inadequate to determine whether the published figure was correctly labeled. The inconsistencies between the dates shown on the film, the notes and the submission date raise additional doubts about the reliability of the notes.

**Figure 7B**

**Allegation:** During a meeting of the Inquiry Committee with Dr. De Domenico, the Committee noted a discrepancy between this figure and a labeled autoradiography film provided by Dr. De Domenico. The Committee reported that "The upper left panel is flipped from the original film and thus does not represent what is shown. The lower panel shows loading controls that were run on a separate gel and thus cannot be directly compared to the experimental samples shown above. In addition, one loading control has not been included and they are not aligned with the upper panel. There are 16 lanes depicted in the upper panel and only 15 in the lower. The last sample on the right of the lower panel was cut off in making the figure."

The figure in question is shown below:



As noted by the Inquiry Committee, the upper left panel contains 9 lanes, while the panel below it contains only 8.

The films presented to the Inquiry Committee are shown below:

 

In their response to the Inquiry Committee report, the respondents stated that "The upper panel was not flipped and the notes were followed to generate the figure therefore there is no misrepresentation of the results. However, the committee is correct regarding one band that was cut off for the lower panel for the loading control. This will be corrected."

**Investigation Findings:** The notes provided by Dr. De Domenico are consistent with the order of lanes indicated in the upper left panel of the published figure, rather than that shown on the film. However, further examination of the films and notes by the Investigation Committee raised additional concerns regarding this figure:

1. This panel was not included in the original manuscript submission, but was in the revised version submitted on 9-10-10. The notebook page is dated 9-19-2010, and the films are dated 10-2-2010 and 10-11-2010. Thus, both the notes and the film labels are of questionable reliability.

2. The blot used to make the lower left panel of the figure is labeled "0 to 5 hr", but only contains eight lanes, rather than the ten necessary for samples corresponding to 0, 0.5, 1, 3 and 6 hr. On the other hand, the blot used to make the lower right panel is labeled "12 $\Rightarrow$ 24 hr", but contains eight lanes, rather than six corresponding to 12, 18 and 24 hours. Without more specific labeling, it is not possible to tell which lanes actually correspond with the different time points and treatments.

3. The anti-tubulin blots show a second prominent band with a higher electrophoretic mobility, which was cropped out of the published figure. This band is present only in the lanes labeled +IRE/-EV on the film and thus appears to be correlated with the experimental treatment.

1003

During the interview of Dr. Diane Ward, anti-tubulin blots were discussed in another context and Dr. Ward noted that these blots are usually very clean. When shown the blots described above, she was surprised by the presence of a second band and had no explanation for either its appearance or its correlation with the experimental treatment.

For this figure, the committee was unable to find computer files for the film scans.

**Responses from Dr. De Domenico:** During the interview of 2 July 2012 Dr. De Domenico was asked about the second band described above, but did not offer any explanation for its origin the correlation with the experimental treatment.

**Conclusions:** The relationship between the films and published figure remains unclear. While the response of Drs. De Domenico and Kaplan to the Inquiry Committee report suggests that only a minor correction to the figure is necessary (the addition of a missing lane), the records make it difficult to know just what lane was omitted or whether there may be additional labeling errors.

The presence of a second band in the anti-tubulin blot is very troubling. Given all of the other inconsistencies, we believe that the published blot may have been probed with a different antibody, or may have come from another experiment entirely.


**Summary of findings for Paper 6.**

The original allegation regarding this paper, concerning the sizes of reported uncertainties, is difficult to address conclusively, given the limited records and near complete absence of computer files containing the relevant data and calculations. None the less, we concur with the complainants in finding that the reported errors are unreasonably small given the methods and sample sizes.

With regard to the irregularities identified by the Inquiry Committee, the results of our investigations fail to support some of the assertions by the respondents (in their responses to the Inquiry Committee Report), which tended to minimize the discrepancies between the labeled Western blot films and the published figures. Indeed, comparisons of the films with computer files on Dr. De Domenico's computer revealed additional discrepancies, which added to the uncertainties regarding the relationships between the published figures and the primary data. For some of the figures under question, the computer files could not be found at all.

This investigation also revealed significant discrepancies among the dates on notebook pages, on films, on computer files and the manuscript submission dates. The earliest date found on any of the written notes or films in the notebook compiled by Dr. De Domenico was 3-5-2010, whereas most of the computer files had dates several months earlier. Most of the dates on the films and notes are later than the manuscript date of submission (4-20-10). The original manuscript included all of the figures discussed here, except for Figure 7B, which was added to the revised manuscript submitted on 9-10-10. The films and notes for this figure have dates of 9-19-2010 or later.

The discrepancies in dates greatly undermine any confidence in the notebook records. In her interviews with the Investigation Committee, Dr. De Domenico repeatedly emphasized that the written notes were reliable and were used to make the final figures. She attributed discrepancies between the published figures and films to errors made when re-labeling the films after they were digitized. The dates on the notebook pages and films suggest that the notes (or, at least the, dates) were written or altered at some point after the experiments were completed.

The findings regarding this paper are also troubling with regard to the responses of Drs. De Domenico and Kaplan to the Inquiry Committee report, in which they stated that examination of the records confirmed, in most cases, the published figures. It appears that these responses were made without careful re-examination of the films, and likely no examination of the computer files. In his interview with the Committee, Dr. Kaplan indicated that he did not examine the notes or films himself and relied on Dr. De Domenico's report. Given the

seriousness of the allegations and their implications for the integrity of his research, this omission is difficult to understand.

Finally, our findings fully support the decision to retract this paper, but they also call into question the reassuring statements from the authors regarding the fundamental reliability of the results.

In his response to the initial draft of this report, the attorney representing Dr. De Domenico, Mr. Ryan B. Bell, challenges both the procedures used by the Committee to investigate the allegations related to this paper and the Committee's conclusions.  One of Mr. Bell's major criticisms is that the Committee interpreted the absence of computer files and other records supporting the published data as evidence of possible misconduct.  The federal ORI policy on this question (policy 93.106, Evidentiary standards) states:

> The destruction, absence of, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the institution or HHS establishes by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community.

The failure of Dr. De Domenico to provide the computer files documenting the data analysis in the published paper (and the failure of the Committee to find such files through a systematic search) is evidence of recklessness in maintaining the research record. Dr. De Domenico was specifically asked to identify the files associated with the error bar calculations for this and other papers.  This request was made on 7/26/12, allowing more than two months to respond before the Committee submitted its report. Although she did provide (incomplete) information for the other papers, she did not identify any files for this one.

Mr. Ryan also suggests that the absence of the relevant files on Dr. De Domenico's computer is explained by the transfer of data from a Windows computer to a Macintosh, the latter being incompatible with the SigmaPlot program used for much of the data analysis.  In fact, the files that are most conspicuously missing are the Microsoft Excel files in which, according to Dr. De Domenico, the error calculations were carried out.  Excel files are compatible with both the Windows and Macintosh systems and are routinely transferred between the two.  Furthermore, numerous SigmaPlot files were found on Dr. De Domenico's computer, and she explained in one of her interviews that her Macintosh computer was equipped with emulation software that allowed her to work with the SigmaPlot files.

**PAPER 7**

De Domenico, I., D. M. Ward, M. C. di Patti, S. Y. Jeong, S. David, G. Musci & J. Kaplan (2007). "Ferroxidase activity is required for the stability of cell surface ferroportin in cells expressing GPI-ceruloplasmin" *EMBO J* **26**(12): 2823-2831.

**PAPER 8**:

De Domenico, I., D. M. Ward, C. Langelier, M. B. Vaughn, E. Nemeth, W. I. Sundquist, T. Ganz, G. Musci and J. Kaplan (2007). "The molecular mechanism of hepcidin-mediated ferroportin down-regulation." *Mol Biol Cell* **18**(7): 2569-2578.

**ALLEGATIONS**

The allegations concerning these two publications are related and fall into two categories: (1) spliced gel images and (2) re-use and misrepresentation of western blot data.

**Allegation 1: spliced gel images**

In paper #7 (Fig. 4A, 4B, 6A & 6B) western blot gel images are spliced, but not those of the loading controls [see figure below].



Images from Fig. 4A, 4B, 6A & 6B of paper #7. (Arrows indicate splice sites).

In paper #8 (Fig. 1A & 3A) images are spliced from two different blots [see figure below]



Images from Fig. 1A & 3A of paper #8. NB: brightness, contrast, and exposure levels were adjusted to emphasize the splice sites (indicated by arrows).

**COMMITTEE FINDINGS REGARDING ALLEGATION 1**

In discussions with the Investigation Committee and in rebuttal PowerPoint presentations, Dr. De Domenico acknowledged that the gel images in question had been spliced, but that "at the time those images were made (2005-2007) there was no policy prohibiting that practice in the journals in which those studies were published." Further, "they were not done in an attempt to misrepresent the data."

**Allegation 2: reuse and misrepresentation of data**

In paper #7 (Fig. 4E) two gel bands, labeled as an anti-tubulin western blot, appear again in paper #8 (Fig. 3D) as bands detected with anti-GFP [see figure below].

**Duplicated gel bands from paper #7 (Fig. 4E) and paper #8 (Fig. 3D).**



**COMMITTEE FINDINGS REGARDING ALLEGATION 2**

The gel bands of Fig. 4E in paper #7 are upside-down and at least one of these gel images must be incorrect, since the same bands are labeled as representative of anti-tubulin in one case and anti-GFP in the other case. Thus, **these figures misrepresent the primary data**. In discussions with the Investigation Committee, Dr. De Domenico stated that she doesn't know how these mistakes occurred, but that she is certain that the GFP gel (paper #8, Fig. 3D) is not correct, effectively acknowledging that the figures misrepresent the actual data.

Dr. De Domenico further stated that she did not assemble the figures and does not have digital files for these figures. According to Dr. De Domenico, the gel figures for paper #7 were assembled ("nondigitally") by Eric Lo, her technician at the time. The figures for paper #8 were assembled in PhotoShop by Dr. Diane Ward, a coauthor on many of the challenged publications. Discussions with Dr. Ward confirmed that she assembled figures for publications through 2007, at which time Dr. De Domenico began assembling the final figures for her own publications. The general procedure was for Drs. Ward and De Domenico to sit together and assemble the figures from image files made by Dr. De Domenico by scanning developed films. According to Dr. Ward, the digitized films often weren't explicitly or clearly labeled, in which case Dr. De Domenico would identify the lanes and labels to use in the figure.

**ADDITIONAL FINDINGS**

Several Committee findings raise additional concerns about Fig. 1A in paper #8 [see below]. The figure legend states that the hepicidin-treated sample in the anti-phosphotyrosine western was a 15-minute incubation. Note also the appearance of the anti-GFP bands, which purportedly represent the immunoprecipitated samples analyzed in the other panels of Fig. 1A.



**Fig. 1A (published version in paper #8)**



A PhotoShop file (8-1A-1), found on Dr. Ward's computer and dated 12/16/2005, appears to be an earlier version of the published figure [see below].

**File 8-1A-1 from Dr. Ward's computer:**



In this draft figure the anti-phosphotyrosine bands corresponding to those in the published figure are labeled as a 30-minute sample. Moreover, the accompanying anti-GFP immunoprecipitated samples do not match those in the published figure. Finally, although the "-" lane in the draft figure corresponds to the one in the published figure, it is positioned or scaled differently relative to the size standards in the two figure versions [see below].

**Control lanes and accompanying size standard positions in "Figure 3a" from Dr. Ward's computer (left) and in published Fig. 1A of paper #8 (right). Note positions of dark spots in each gel image.**



This last discrepancy illustrates the uncertainties introduced by splicing gel lanes: The MW markers on at least one of these figures are incorrect and misrepresent the data. Which, if either, of the images is the correct one? Can we be certain that the MW markers are correct for the antiphosphotyrosine bands in the published figure?

Two later draft versions of Fig. 1A of paper #8 were found on Dr. De Domenico's hard drive [files 8-1A-2 and -3, see below].



**File 8-1A-2, dated 7-29-2006;**
**author = Jerry Kaplan**

**File 8-1A-3, dated 12/28/2006;**
**author = dianeward**

The anti-ubiquitin and antiphosphotyrosine panels in these figures are identical to one another and to those in the published figure. However, the anti-GFP blots are different from one another and from those in the earlier "Fig. 3A" version mentioned above. The image dated 12/28/2006 contains the published anti-GFP blot. The Committee was unable to determine whether the three anti-GFP blots represented repeats with the same immunoprecipitated samples purportedly analyzed in the other panels or whether some or all of them came from unrelated experiments.

**CONCLUSIONS**

The act of splicing gel lanes in digital images is a matter best left to the two journals in question. The splices in the figures of paper #7 would be readily apparent to casual readers and should have been to reviewers and journal editors at the time. The splices in the figures of paper #8 are more difficult to discern and could conceivably have gone unnoticed during the review and production process. However, if this practice was explicitly proscribed by the journals' instructions to authors at the time, the journals and their reviewers should have been more vigilant.

The larger issue raised by these splicing episodes, particularly those involving negative control lanes, is whether the images presented are accurate representations of the experimental results. Dr. De Domenico asserted that the controls were run at the same time, but for reasons unclear to the Committee, on different gels from the matching experimental samples. Moreover, samples from the same experiment were not necessarily run on the same gel. This explanation defies common sense and accepted scientific practice, but the Committee cannot discount the possibility that it could be true. Nevertheless, the fact that negative control lanes in other gel figures of the same papers were not spliced does cast reasonable doubt on Dr. De Domenico's explanation and, consequently, on the validity of the experimental results reported in these two papers.

The Committee found multiple errors and discrepancies in the figures of papers #7 and #8 that cast doubt on the accuracy of the representation of data in both papers. In Fig. 4E of paper #7, gel bands labeled as an anti-tubulin western were published upside-down. In Fig. 3D of paper #8, several of the same band images were

published in correct orientation and labeled as an anti-GFP western.  In addition, Fig. 1A of paper #8 contained several gel images of dubious provenance and inconsistent labeling, when compared to draft versions of the figures found on Drs. De Domenico's and Ward's computer drives.  It appears that Drs. De Domenico and Ward had full control over presentation of the experimental data and both of them must be held responsible for the misrepresentations that have come to light.  The Investigation Committee considers it unlikely that these errors were due to simple carelessness during the preparation of the figures for publication.  The Committee is also struck by the conspicuous failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication.

**Paper  9**

**Citation:**  De Domenico, I, McVey Ward, D,  Musci, G  and Jerry Kaplan
Evidence for the multimeric structure of ferroportin. *Blood* 2007 Mar 1;109(5):2205-9

**Background**
After completion of the Inquiry Investigation, the University received a new communication on 3-4-2012 from the complainant regarding an irregularity in Dr. De Domenico's publication in Blood 2007 109(5):2205-9, "*Evidence for the multimeric structure of ferroportin*".  The concern regarded a Western blot in Figure 3A that was spliced together from separates images.   In a communication to Dr. Dunbar the Editor of Blood, Drs. De Domenico and Kaplan acknowledged that the lanes were digitally spliced into the blots, but stated that the lanes were added to show the efficacy of the immunoprecipitation and that there was no intent to mislead the reader.  They further stated that they were not aware of the splicing rules at that time and thought that splicing was an accepted practice at the time the paper was submitted.  The University Research Integrity Office asked Blood for clarification of the editorial policy regarding splicing in 2006.   The Editorial Director noted "Our instructions for authors at that time were not as detailed as they are now, but they were clear that no specific feature within an image was allowed to be moved or enhanced, and Blood was one of the first biomedical journals to have any such policy at the time. That policy would have applied to cutting out a gel lane or replacing any part of the original gel without indicating it clearly in the image itself (by vertical black lines) as well as in the legend".  Drs. De Domenico and Kaplan clarified the experimental protocol stating that "two different gels were run BUT the samples used were from the same experiment".  "The figure /experiment did not violate the splicing policy at the time as the samples were from the exact same experiment, probed with the same antibodies at the same dilution".  Dr. Dunbar questioned why the samples were "not simply run on the same gel in the first place, if they were part of the same experiment".  In the end, Dr. Dunbar decided not to post a Notice of Concern until the University Investigation Committee completes its examination of the notebooks and original films describing these experiments.

**Figure 3A Allegation**
The center lanes in the Western blots in Figure 3A are digitally spliced together from separate gels and inappropriately manipulated.  An annotated copy of Figure 3A from the complainant with arrows indicating spliced lanes is shown below.



**Investigation Committee Findings:**  The Investigation Committee examined the original films, scans and notes for Figure 3A found in Dr. De Domenico's notebook and computer hard drive.  Dr. De Domenico also provided the original films used to assemble Figure 3A.  The Investigation Committee focused on determining whether the evidence supports Drs. De Domenico and Kaplan assertion that the flow-through (FT) samples originated from the same experiment as the input and eluate samples, and that the samples were processed at the same time.

---

The original notebook films for the input and eluate samples (below, top left image) and flow-through samples (below, Flow-through film ) are shown below.  The input/eluate film shows that the α-Flag and α-Myc blots were processed at the same time and correspond to the published figure.  The notes associated with this experiment were found in Dr. De Domenico's notebook.  The flow-through film shows the published flow-through samples, but it is unclear which lanes were spliced into the published figure.

**Input/Eluate film**:



**Flow-Through film**:



Comparison of the original films and notebook notes shows the following inconsistencies:

1. The input/eluate film is marked with an exposure time of 5 minutes (top right corner of film), whereas no exposure time is marked on the flow-through film. Without an exposure time on the flow-through film, it is impossible to compare band intensities with samples on the input/eluate film.

2. The notes for the input/eluate experiment indicate that it was carried out on 3-3-2006, but the film itself is not dated (below, left). The notes for the flow-through experiment are on a separate notebook page following the input/elate notes and are not dated (below, right). The notes for the flow-through experiment indicate that "30 ml of milk [were used] because we have multiple blots (2 each box)". This level of detail is not observed in the notes for other Western blots, and appears to echo the *Blood* Editor's request for confirmation that the blots were processed at the same time. This is also in contrast to discussions during interviews with Dr. De Domenico, in which she explained that her general approach was to not write specific details for each experiment in the notes that accompany films, because these details are to be found in standard protocols that are kept in a separate binder in the lab.

3. The handwritten markings on the films for the flow-through and input/eluate samples are different. The markings for α-Flag and α-Myc on the input/eluate film are red and molecular weight markers are black, while markings for α-Flag, α-Myc and the molecular markers on the flow-through film are blue. If the blots were processed at the same time, it would be expected that the labels on the films would be the same.

University of Utah Investigation Committee Report                                    Page 52



The Investigation Committee also examined a scan (file 9-3A-1) of the film found on Dr. De Domenico's computer hard drive (below, left scan), and compared it to the film in the notebook (below, right film). The scan has a create date of 4-28-2006. As mentioned above, the original film in the notebook does not have a date, but the film is associated with notes dated 3-3-2006.





| Computer version | Notebook version |
|---|---|

Examination of the scan with the film currently in the notebook used for publication show two inconsistencies:

1. The lanes on the scan from the hard drive and the film are differently labeled. In the scan from 4-28-06 (left film scan), the two lanes are labeled "flow through" and "elution", while the handwritten labels now on the film indicate that the first lane contained the input sample for the column. In the published figure, this lane is also labeled "input".

2. The legend in the published figure indicates that "The volumes of the input and flow-through analyzed were twice that of the eluate ". The labeling in the scan (left) indicates that the α-Flag "Flowthrou" sample is 4-fold less than the eluate sample.

**Responses from the Authors:**   The Investigation Committee interviewed Dr. De Domenico on July 17, 2012 to discuss the allegation regarding Figure 3A.   In a PowerPoint document, Dr. De Domenico stated that she "did not make the figures for this publication, she has not digital images that belong to this publication. Second, the gels were run at the same time on 3-3-2006 according to the notes.  Furthermore, the notes reported that the gels were incubated in the same container with the antibodies.   Therefore, we can be sure that the antibodies had the same activity and that protein degradation due to storage was not an issue.  Since the gels were run on the same day, from the same experiment and probed at the same time with the antibodies we felt comfortable generalizing about the amounts.  Dr. Ward found two images[s] of this image one which the Flow Through was not shown and a second one with the addition of the Flow Through.  This was added to show the efficacy of the immunoprecipitation".

The Investigation Committee questioned Dr. De Domenico further regarding experimental protocols related to Figure 3A.   Dr. De Domenico stated that "she did not make the figures", but that she ran the gels, and that she or the technician scanned the gels.  The films were then given to Dr. Ward for assembly of the final figures. The Committee asked Dr. De Domenico whether the flow-through and input/eluate samples, which were run on separate gels, were processed at the same time. "She said yes".  Dr. De Domenico stated that the Western blots were exposed for 30 sec, 2 min and 5 min.  The Committee found one exposure (5 min) for the input/eluate film in the notebook.  The flow-through film did not contain an exposure time.  No other exposures were found in the notebook for either blot.   The Committee asked Dr. De Domenico whether the films had dates.   "She said there are some do and some don't, but if they don't have dates they are [from] the technicians."  She explained "that now she puts the date on [the films] when the technician gives her the film". The The Committee asked Dr. De Domenico to explain why the scan found on the hard drive was labeled differently than the original film found in the notebook.   She said the "flow through label [in the hard drive version] was a mistake, and that it should be input".   The Committee also questioned why the volumes of samples indicated in the hard drive scan and notebook films differ.  Dr. De Domenico "agreed that this did not make sense", and said that "she does not have any comment on this".

Dr. De Domenico showed a replicate experiment dated 3-5-2006 in a PowerPoint file. This experiment contained input, flow-through and eluate samples on one gel.  The slides in the PowerPoint slide were made from photographs of the notebook page and film, but a scan of the film was prepared later by a Committee member and is shown below:



As the notes do not indicate the amount of protein in each sample that was loaded on the gel, it is difficult to compare this result with the published one. It should be noted, however, that the band intensities for the eluate samples, relative to the input and flow through samples, are much smaller than indicated in the published figure. For the lower blot on the film above (labeled anti-myc), the band for the flow-through sample appears to be at least at least as intense as that for either the input of eulate.

The Committee interviewed Dr. Ward on July 2, 2012 to get a better understanding of how the figures were assembled for publication. The Committee asked Dr. Ward to provide an overview of her role in the lab. Dr. Ward said that she and Dr Kaplan design and analyze the experiments, and that historically her primary role is to design figures and edit manuscripts. Dr. Ward was shown a list of the papers provided by Dr. De Domenico in a previous meeting that highlighted papers in which Dr. Ward made figures for. Dr. Ward was asked if she made the figures for the four publications published in 2007. She replied "yes, this would be true". Further, she stated "that she performed none of the science". Dr. Ward said that she discontinued making figures for Dr. De Domenico after 2007. Dr. Ward was shown a Figure 3A and was asked if she made it. She said "she thinks so". Further she said "the figure would have been made on what Ivana provided to her".

**Conclusion**
The original allegation concerned the inappropriate splicing of lanes from one gel into another gel. The respondents acknowledged the splicing and stated that the intent was not to mislead the reader. The Committee noted that the splicing is obvious, and that the respondents were not attempting to hide the splice. The more important concern was whether the input and eluate samples were from the same experiment as the

flow-through samples and whether the samples were processed at the same time.  This is critical in order to compare the relative amounts of protein in each sample.

The Committee examined notes and original data from Dr. De Domenico's notebook and computer hard drive. Several inconsistencies were identified.

1. The Committee found dated notes associated with the input/eluate samples, but the film is not dated. The flow-through notes and film are not dated.   In addition, there is no exposure time on the flow-through film making it impossible to compare the band intensities in the two experiments.

2. The relabeling of the hard drive and notebook versions of the film calls into questions the actual identity of the sample in the published figure.

3. These inconsistencies do not allow the Committee to conclude that *the input/eluate and flow-through samples were from the same experiment and processed at the same time.*  The relabeling of the samples corresponding to "flow through" in the initial scan to "input" for the published figure raises further doubts about the actual identity of these samples.   Based on the inconsistencies in the execution of the experiments and in the preparation of the figures, little confidence can be placed on the accuracy of the published data.

**PAPER 10**

**Citation:** De Domenico I., Nemeth, E., Nelson, J.M., Philips, J.D., Ajioka, R.S., Kay, M.S., Kushner, J.P., Ganz, T, Ward, D.M. and Kaplan, J. (2008) The hepcidin-binding site on ferroportin is evolutionarily conserved. *Cell Metabolism.* **8**, 146-156.

**Background:** This paper was not mentioned in either the original allegations of November 2011 or the expanded ones submitted by Dr. Thomas Ganz on 3-4-12.  However, Dr. Ganz submitted an additional allegation questioning the integrity of this paper on 5-25-12.  No specific irregularities in the published paper (of which Dr. Ganz was a co-author) were identified, but Dr. Ganz stated that important results could not be repeated in other laboratories, including his own.  In particular, Dr. Ganz reported that a biochemical assay for hepcidin, based on binding to a peptide fragment of its receptor, was not reproducible. After consulting with the NIH Office of Research Integrity, Dr. Botkin instructed the Investigation Committee to examine this paper along with those identified in the earlier allegations.

After examining the paper and allegations, the Committee initially concluded that it would be extremely difficult to assess the validity of the hepcidin assay from the review of existing data and that this was issue that was best resolved through additional experiments in other laboratories.  None the less, the Committee noted that the error bars in many of the graphs were very small, and chose to investigate these further as part of its investigation of the more general question of error bars.  In the course of examining the data files, the Committee identified additional problems concerning circular dichroism (CD) spectra in one of the figures and NMR data not included in the published paper.

**Error Bars in Graphs**

**Allegation:** The error bars in several of the published figures are very small, often a few percent, or less, of the measured values.  Errors of 10% or greater are typically reported for biochemical assays.  Except for Fig. 1B, discussed below, the legend for each of the data-containing figures of the paper contains the statement "All experiments were repeated a minimum of five times, and the error bars represent the standard error of the mean."

**Investigation Findings:** After obtaining copies of Dr. De Domenico's computer drives, the Committee attempted to trace the analysis leading to the error bars shown in this and other papers.  Towards this end, the Committee asked Dr. De Domenico (via an E-mail exchange on 7-26-12) to identify the relevant files on the drives.  For the six data-containing figures in paper 10, Dr. De Domenico identified a total of 37 files (either by file name or by the enclosing folder names).

One of the Investigation Committee members systematically examined all of the files listed by Dr. De Domenico and attempted to identify those from which the published figures were derived and to determine how the error estimates were calculated.  All of these files were generated with the program SigmaPlot and typically contained a single data table and a graph of the data. Although Dr. De Domenico explained to the Committee that the means and errors were usually calculated using Excel spreadsheets, none of the files that she identified were from Excel, and the Committee was unable to find such files.

**Figure 1B:** This graph represents manual counting of cells and the figure legend states that "The data are reported as the standard error of the mean and were determined by counting ten fields containing 20–30 cells/field." No files associated with this figure were identified by Dr. De Domenico, but the Committee found a SigmaPlot file (10-1B-1) on her computer that matches the published figure, as shown below:

University of Utah Investigation Committee Report                                    Page 57





The data from this file are listed below:

| VAR1 | 1h | VAR3 | 24h | VAR5 |
|---|---|---|---|---|
| -Hep | 1.000000 | 1.000000 | 1.000000 | 1.000000 |
| +Hep | 66.000000 | 4.242641 | 97.500000 | 0.707107 |
| +Hep+HBD wt | 4.000000 | 1.414214 | 3.250000 | 1.060660 |
| +Hep+HBD Scramble | 53.000000 | 2.828427 | 88.500000 | 2.121320 |
| +Hep+HBD Mutant | 66.500000 | 0.707107 | 94.000000 | 1.414214 |

The numbers in the columns labeled "1h" and "24h" correspond to the values plotted in the graph, and those in the columns "VAR3 and VAR5" correspond to the error bars.  Note that all but one of the values are exact multiples of 0.5, as expected for the average of two integers.  The one exception to this pattern is a multiple of 0.25.

Though it is conceivable that the values were rounded in this way after calculating the average, all but one of the error estimates also appear to have been generated from two integers.  For a sample of just two values, $x_1$ and $x_2$, the expression used to calculate the sample standard deviation reduces to:

$$SD = \sqrt{\frac{\sum(x - \bar{x})^2}{n - 1}}$$
$$= \sqrt{\frac{(x_1 - x_2)^2}{2}}$$
$$= \frac{|x_1 - x_2|}{\sqrt{2}}$$

For two integers, the square of the standard deviation will always be an integer multiple of 0.5.  The errors found in the SigmaPlot file and their squares are listed below:

| VAR3 | VAR3^2 | VAR5 | VAR3^2 |
|---|---|---|---|
| 1.000000 | 1.000000 | 1.000000 | 1.000000 |
| 4.242641 | 18.000000 | 0.707107 | 0.500000 |
| 1.414214 | 2.000000 | 1.060660 | 1.125000 |
| 2.828427 | 8.000000 | 2.121320 | 4.500000 |
| 0.707107 | 0.500000 | 1.414214 | 2.000000 |

All but one of the means and errors represented in Figure 1B appear to have been calculated from two integral values, in clear contradiction to statement in the legend.

**Figure 1C.** Two files (10-1C-1 and -2) were identified by Dr. De Domenico, but neither of these corresponded to the published figure.  Another file (10-1C-3) that appeared to be closely related to the figure was, however,

found by the Committee. This was one of the few files containing any replicate data and the graph from it is reproduced below along with the published figure:



The data and error bars for the control sample, the wt hepcidin and mutant hepcidin appear to be similar or identical in the two plots. However, the signal for the "scrambled" hepcidin is more than two-fold smaller in the published figure. There is also an additional pair of values for "Beads +Pep Random" in the unpublished figure.

The data from the SigmaPlot file are reproduced below:

| VAR1 | 37C | VAR3 | 0C | VAR5 |
|---|---|---|---|---|
| Beads | 95 | 2.828427125 | 81 | 4.242640687 |
| Beads+Pep wt | 4829.5 | 47.37615434 | 108 | 5.656854249 |
| Beads+Pep scramble | 1879.5 | 118.0868325 | 106 | 11.3137085 |
| Beads +Pep Mutant | 139 | 11.3137085 | 113.5 | 9.192388155 |
| Beads +Pep Random | 110.5 | 3.535533906 | 101.5 | 0.707106781 |
| | | | | |
| Beads | 93 | 97 | 84 | 78 |
| Beads+Pep wt | 4796 | 4863 | 112 | 104 |
| Beads+Pep scramble | 1963 | 1796 | 98 | 114 |
| Beads +Pep Mutant | 147 | 131 | 120 | 107 |
| Beads +Pep Random | 113 | 108 | 101 | 102 |

The lower group of rows appears to contain data for two replicates, with the second and third columns containing the data for 37° C and the last two columns data for 0° C (as labeled in the unpublished graph). The upper lines appear to be the means and errors calculated from the two data sets. These values were reproduced using the AVERAGE and STDEV functions of Excel.

It thus appears that error bars in this figure represent the standard deviation of two values, rather than a standard error of the mean of a minimum of five experiments, as indicated in the figure legend. In addition, it is not clear how the value shown in the published figure for the scrambled peptide is related to the data in this file, if at all.

The errors shown in both the published and unpublished graphs are very small, ranging from less than 1% to 10.7% of the measured values. Especially since these data represent raw counts per minute, without any normalization, it is very unlikely that such small variations could be obtained from independent experiments. Simply aliquoting individual samples of the derivitized beads is expected to generate greater variation.

**Figure 1D.** Two files (10-1D-1 and -2) were identified by Dr. De Domenico. Both appeared to be related to the published figure but contained fewer data points, which were expressed in counts per minute (CPM), rather than as percentages in the published figure. Neither file included replicate data or error estimates.

**Figure 2B.** Two files were identified by Dr. De Domenico, but only one (10-2B-1) appeared to be related to the published figure, but was not identical to it. The file contains two data sets, but no calculations of means or errors. Another file (10-2B-3), identified by Dr. De Domenico as that for Figure 2D was found to contain data that appeared to be closed related to this figure, as indicated by the labeling related to peptides. The data did not match the published figure exactly, however. The file included error estimates, but no replicate data.

**Figure 2D.** One file (10-2B-3) was identified by Dr. De Domenico, but the data and graph in this file resemble that of Figure 2B, as noted above. The Committee did not find any other files related to this figure.

**Figure 3A.** No files associated with this figure were identified by Dr. De Domenico, but two related files were found by the Committee. One of these (10-3A-1)) contained data that matches very closely that in the published figure, though the form of the graph is different, as shown below:




The data from the SigmaPlot file are shown below:

| Beads | 45 | 49 |
|---|---|---|
| Beads+125 Hep 37C | 3065 | 3001 |
| Beads+125 Hep RT | 2841 | 2811 |
| Beads+125 Hep 15C | 2693 | 2763 |
| Beads+125 Hep 10C | 1123 | 1104 |
| Beads+125 Hep 4C | 186 | 172 |

| Beads | 47 | 2.828427125 |
|---|---|---|
| Beads+125 Hep 37C | 3033 | 45.254834 |
| Beads+125 Hep RT | 2826 | 21.21320344 |
| Beads+125 Hep 15C | 2728 | 49.49747468 |
| Beads+125 Hep 10C | 1113.5 | 13.43502884 |
| Beads+125 Hep 4C | 179 | 9.899494937 |

The upper rows appear to contain two data sets, and the lower rows the average and errors calculated from the two sets. The values in the lower rows were reproduced using the AVERAGE and STDEV functions in Excel.

A second file (10-3A-2) contained a very similar graph:

---

1021



This file also contained data organized as described above, with two data sets, and means and errors calculated from these. Though the labeling and pattern of the data are very similar in the two graphs, the plotted values differ significantly. This difference would reasonably be expected for two fully independent experiments, but are clearly not consistent with the very small error bars shown in the published figure.

The two sets of data are plotted together in the figure below:



The raw CPM are plotted on the left, while the values on the right are normalized to the values measured at 37° C for each experiment. After normalization, there is a reasonable degree of reproducibility for this type of experiment, but the differences are still significantly greater than indicated by the error bars in the published figure.

**Figure 3B.** Two files (10-3B-1 and -2) were identified by Dr. De Domenico. These files contain data that appeared to be similar to that shown for 4° C in the figure. Another file (10-3B-3) found by the Committee contained the full set of data and a plot similar to the published figure, the major difference being that the results were expressed as raw counts per minute, rather than percent binding. The data table included what appear to be two data sets, with means and errors calculated from these. Yet another file (10-3B-4) found by the Committee contained a graph that matched the published figure, with error bars but no replicate data.

**Figure 3C.** Two files (10-3B-1 and -2) were identified by Dr. De Domenico. These files each contain a single data set expressed as raw CPM, rather than "% Binding" as shown in the figure. Both of these data sets more closely match the curve for "HBD+NEM" than the one labeled "Complex+NEM" in the published figure, but do not match it exactly. There were no replicate data sets or error estimates found in these files. The Committee identified another SigmaPlot file (10-3C-3) that did contain a graph that matched the published figure, with error bars, but this file did not contain replicate data sets.

---

University of Utah Investigation Committee Report

**Figure 4.** Panels A and C of this figure are CD spectra, for which error bars would not usually be expected, and Panel B represents [125]I counts for column fractions, with no error bars shown. Dr. De Domenico identified one file for this panel, which contained data and a graph closely matching the published figure. The data table included only one data set and no error estimates. That there are no errors for the CD spectra, which are discussed further below, or the column profile is not surprising for these types of data, except in light of the statement in the legend that "All experiments were repeated a minimum of five times . . ."

**Figure 5C.** Dr. De Domenico identified three files and a directory containing another five files. One of the files (10-5C-1) contains a graph identical to the published figure. Another (10-5C-2) is very similar except that it does not include the data for *Xenopus*. Both of these files include error estimates, but no data replicates or indication of how the errors were calculated. The other files contain what appear to be data for individual experiments, but are not clearly identified. In none of the files did we find a compilation of replicate experiments or statistical calculations.

**Figure 5D.** Two files were identified by Dr. De Domenico. One of these (10-5D-1) closely matches the published figure. This file includes error estimates, but no replicate data or statistical calculations. The other file (10-5D-2) appears to be related to this experiment, but the vertical axis of the graph is labeled "CPM", while the primary data in this experiment was colony counts. This file does not contain any error estimates.

**Figure 6A.** For this figure, Dr. De Domenico identified a directory (labeled "Standard curves") containing seven SigmaPlot files. As suggested by the directory name, each of these files contained data and a graph apparently representing CPM for [125]I-labeled hepcidin bound to beads as a function of unlabeled hepcidin concentration. The seven files were labeled with monthly dates from June 2007 to June 2008. It is not known which of these curves was used to convert raw CPM data to hepcidin concentrations for specific figures in the paper, but the original manuscript was submitted on 2-25-08, and a revised version on 6-2-08. This directory did not contain any files corresponding to the graph actually shown in Figure 6A, but the Committee did find a file matching the published figure (10-6A-8). This file included error estimates, but no replicate data.

Though the standard curve files do not directly represent the final graphs shown in the figure, they were examined by the Committee as a means to assess the general features of the assay and its variability. One of the standard curves (from file 10-6A-4, June 2007.JNB) is shown below:



The graph as it appears in the SigmaPlot file is shown on the left. The curve was generated from 5 points (for 0, 50, 75, 100 and 500 ng) which have been added to the plot on the right. The curve appears to be a spline fit though the points. Similar spline curves was found for all but one (10-6A-7) of the seven files. If this form of the data was actually used for converting CPM to hepcidin concentration, interpolation would obviously be problematic.

Each of the standard curve files contained similar data, though some contained data for only 4 points: 0, 50, 100 and 500 ng. Although hepcidin quantities are expressed as only "ng" in the file, a protocol provided by Dr.

1023

De Domenico specifies that the standard curves are made using stock solutions containing 0 to 500 ng/mL hepcidin, and we presume that the quantities shown in the files represent concentrations in these units.

The data from all seven files are plotted below:



The plots on the left are the raw CPM data found in the SigmaPlot files, while the plot on the right shows the same data normalized relative to the zero-hepcidin sample for each set. The following points may be relevant to the precision of the assay:

1. Even after normalization, there is considerable variation in the standard curves. This variation, seen using what are presumed to be well-defined, purified samples, does not appear to be consistent with the very small error bars shown in the published figures, especially those in Figure 6A, shown below:



2. The range over which the standard curves provide useful information is limited to values less than 100 ng. The reported concentrations of hepcidin plotted in Figure 6A extend to approximately 150 ng/mL.

3. Two of the calibration curves, for February and April 2008, include identical values for 0, 50 and 75 ng, but not for the higher values, as listed below:

| ng | Feb. 2008 | April 2008 |
|----|-----------|------------|
| 0 | 50000 | 50000 |
| 50 | 22369 | 22369 |
| 75 | 14698 | 14698 |
| 100 | 13001 | 11236 |
| 500 | 11023 | 3140 |

It is impossible to know the origins of these files, but one is clearly a manipulation of the other.

**Figure 6C.** Dr. De Domenico identified five files associated with this figure. Of these, one (10-6C-1) contained a graph similar to the published figure, as shown below:



There are two major difference between these two graphs:

1. The unpublished contains two more values than does the published one. It appears that the values for "wt" and "HFE-/-" in the published figure correspond to those labeled "wt young" and "HFE-/-" in the SigmaPlot file.

2. The values plotted in the published figure are very nearly twice those in the file.

Another file (10-6C-4) found by the Committee more closely matches the published figure, except that, again, the maximum plotted value is 50 rather than 100 ng/mL:



This file and the one identified by Dr. De Domenico contain the same numerical data, consisting of two data sets. The plotted means and errors were calculated from the two data sets.

Of the other four files identified by Dr. De Domenico, two (10-6C-2 and -3) were found to contain data related to different mice strains, but the relationship to the published figure was not clear, and the other two were found to contain data more closely related to Figure 6D (see below).

**Figure 6D.** Dr. De Domenico identified one file (10-6D-1) associated with this figure. This file was found to contain raw CPM data for what appeared to be a single experiment with two samples identified as "+LPS". As noted above, two other files (10-6D-2 and -3) were identified by Dr. De Domenico for Figure 6C, but were found to contain data similar to that found in file 10-6D-1, with CPM data for one –LPS and two +LPS samples. The numerical values in the three files were different, however, suggesting that they came from different experiments.

University of Utah Investigation Committee Report                                      Page 64

Another file (10-6D-4) was identified by the Committee and contains a graph similar to the published figure, except that the values are expressed as ng/mL, rather than "% of normal":



Adjusted for the normalization in the published figure, the data plotted in the two graphs appear to be identical. The SigmaPlot file contained only the values and errors, but these were found to be identical to those in file 10-6D-2, which included additional data from which the plotted values were derived.  The data from file 10-6D-2 is listed below:

| ng/ml | No Serum | VAR3 | -LPS | VAR5 | +LPS | VAR7 |
|---|---|---|---|---|---|---|
| 0 | -0.913 | 0.086267027 | 43.106 | 3.122583546 | 85.70425 | 11.97025715 |
| 50 | | | | | | |
| 75 | | | | | | |
| 100 | | | | | | |
| 500 | | | | | | |

| | |
|---|---|
| -0.913 | 0.086267027 |
| 43.106 | 3.122583546 |
| 77.24 | 2.709633186 |
| 94.1685 | 3.990203566 |

| | | | | |
|---|---|---|---|---|
| 0 | 4923 | 4881 | Hep125 | -0.852 | -0.974 |
| 50 | 2845 | 4327 | -LPS | 40.898 | 45.314 |
| 75 | 1982 | 1844 | +LPS | 75.324 | 79.156 |
| 100 | 1073 | 1344 | +LPS | 96.99 | 91.347 |
| 500 | 968 | | | | |

The boxes in the table above have been added to help clarify the inferred relationships among the various data:

1.  The data in the top box matches exactly that in file 10-6D-4, which, in turn appears to correspond to the data shown in the published figure, before normalization.

2.  The data in the lower left box may correspond to a calibration curve for the hepcidin assay.

3.  The lower right box contains two data sets that were used to calculate averages and standard deviations in the middle box.

4.  For "No Serum" and "-LPS", the values and errors in the top row (and the graph) are those from the top two rows of the middle box.

5. For "+LPS", the value and error were calculated from the two bottom average values in the middle box. Thus, the error bars in the final graph appear to have been calculated from two averages of two values each.

6. The significance of the data between the two boxes in the bottom section of the table is unclear. They could be raw CPM data used to calculate some of the data on the right, but not all of the values appear to be consistent with this.

It thus appears that the error bars in Figure 6D were calculated from two values for –LPS and, in an inappropriate way, from four values for +LPS.  From the labels in the table it seems likely that the –LPS value came from a single sample, perhaps assayed or counted twice, while the +LPS value came from two samples. In any case, the evidence contradicts the statement in the legend that "All experiments were repeated a minimum of five times, and the error bars represent the standard error of the mean."

**Response from Dr. De Domenico:**  As noted above, Dr. De Domenico provided information regarding the procedures for calculating the published mean values and errors, using Excel spreadsheets, and a list of files for the graphs in this paper.  The issue of error bars was not discussed further with her during the interviews.

After submitting her responses to the initial draft of this report and being provided with the files used by the Committee, Dr. De Domenico was invited (on 11/26/2012) to respond to the allegations above regarding the error bars.  Her response (submitted on 12/10/2012) included the following explanation of the error calculations (referring specifically to the example of Fig. 1C in Paper 10):

"Each single value came from two- - - pulled independent experiments. In a technical terminology in a same tube for this particular experiment (or in the same well in case of an ELISA) two independent samples were pulled together. Therefore, the presence of four values is really 8 independent experiments."

The meaning of this statement is not entirely clear to the Committee, but it suggests that individual measurements were pooled and averaged, and then the errors were calculated from the averaged values. This is appears to be what was done for some of the data in Fig. 6D, described above. **This is an entirely inappropriate method for calculating error estimates and will, more often than not, lead to significantly reduced error estimates.**  This calculation is also inconsistent with the statements in the paper.

Dr. De Domenico also indicated that many of the experiments were conducted by other lab members:

"In cases where others in Dr. Kaplan's laboratory ran the experiment, Dr. De Domenico stored the data already analyzed by the individual who ran the experiment. However, she always saw the raw data generated by each individual. It is important to point out that Dr. De Domenico was not involved in the writing of each paper during her training. Drs. Kaplan and Ward piloted this."

"It is also true that Dr. Kaplan never put all the repeats together when he was writing a manuscript but he used to analyze each experiment, daily, when it was carried out."

These statements leave a great deal of ambiguity as to who actually compiled data from repeated experiments and calculated averages and errors.


**Conclusions regarding error bars:** In total, the Committee analyzed computer files for 12 figure panels containing graphs with error bars.  The findings can be summarized as follows:

1. Although Dr. De Domenico stated that the averages and errors were calculated using the program Excel, no files from this program containing data relevant to these figures were identified by her, or found by the Committee.

2. For seven of the figure panels, the origins of the error estimates could not be found in any of the SigmaPlot files identified by Dr. De Domenico or found by the Committee.

1027

3. For four of the figures (1C, 3A, 6C and 6D), replicate data were found in SigmaPlot files and appear to have been used to calculate the averages and error bars. In each of these cases, two data sets were used (rather than the minimum of five specified in the figure legends), and the errors were calculated as standard deviations, rather than standard errors of the means, as indicated in the paper. It may be, as indicated by Dr. De Domenico, that the individual values are, themselves, averages of multiple measurements, a procedure that would tend to reduced the reported errors. These approaches are outside the standard practices of the field.

4. For the cases where two data sets were found, the nature of the replicates is not clear. For two of these (Figures 1C and 3A), the plotted values are raw CPM, making it very unlikely that such small deviations could arise from independent experiments. In one case (Fig. 3A) a file containing what appears to be a truly independent experiment shows much larger deviations than indicated in the published figure.

5. For one figure (1B), analysis of the averages and errors enabled us to infer that all but one of the data points (and errors) was calculated from two integer values each. The figure legend states that "The data are reported as the standard error of the mean and were determined by counting ten fields containing 20–30 cells/field."

6. Standard curve data examined by the Committee suggest that variability in the hepcidin assay is significantly greater than implied by the error bars.

Collectively, the evidence supports the allegation that the published error bars do not accurately reflect the uncertainties in the measurements and that the calculations of the averages and errors were misrepresented in the paper. In addition, the published claim that the errors were calculated from a minimum of five experiments cannot be substantiated, and in some cases appears to be a clear **falsification**.

**Circular Dichroism Spectra (Figure 4)**

In the course of examining other data associated with this paper, the Committee discovered that the plots of CD spectra in panel A of Figure 4 were generated from data that had been extensively and inappropriately manipulated, and that those in panel C were likely fabricated.

**Investigation Findings:**

**Figure 4A (main plot):** Data and a plot corresponding closely to the spectra in panel A were found in a SigmaPlot file (10-4A-1) on Dr. De Domenico's computer. The published figure and the graph from the file are shown below:



Aside from the colors of the curves, the major difference between this graph and the published figure is that the values in the published figure appear to be displaced upwards along the y-axis. The total range of the data appears to be approximately the same. No files were found that more closely match the published figure.

The data table in this file was discovered to contain data spaced at 10 nm intervals, as listed below:

| VAR1 | Pep 37C | Hep 37 | Pep+Hep 37 | Pep 4C | Hep 4C | Pep+Hep 4C |
|---|---|---|---|---|---|---|
| 200 | -4.371 | 13.385 | 7.232 | -3.184 | -2.032 | -1.66 |
| 210 | -2.635 | -7.6 | -9.477 | -2.489 | -3.37 | -2.277 |
| 220 | -1.755 | -2.471 | -5.26 | -1.615 | -2.485 | -1.715 |
| 230 | -1.05 | -0.659 | -2.314 | -0.574 | -1.478 | -1.111 |
| 240 | -0.524 | -0.391 | -0.932 | -0.72 | -1.129 | -0.859 |
| 250 | 0.084 | -0.335 | -0.656 | -0.335 | -0.656 | -0.416 |

The curves in the graph appear to have been generated using a spline function in SigmaPlot.  The curves shown above are reproduced below with markers for the individual points added:



This is a highly unusual way of presenting CD data, which are typically recorded at intervals of 1 nm or less.  Further examination of the drive copied from Dr. De Domenico's computer identified files containing the primary data for this graph, both raw text files from the spectropolarimeter (files 10-4A-4 to -11) and Excel files (10-4A-12 to -16) in which background-subtraction calculations had been performed.  As would be expected for CD spectra, these files contained closely-spaced data, with 0.5 nm intervals.  These data were used by the Committee to generate the plots shown below, with the 4° and 37° C data plotted separately for clarity:



The data points corresponding to those used to generate the spline fit in the published figure are highlighted with circles..

1029

Comparison of the published figure with the plot of the full data shows that the manipulations used lead to substantial changes in the data and their interpretation:

1.  The noise in the primary data is completely hidden, making it impossible for the reader to assess the quality of the data. CD spectra are, by nature, rather noisy, but these are more so than typically found in published spectra.

2.  The shapes of the spectra are significantly altered. In particular, the location and intensity of the minima, which provide information about the type and extent of secondary structure, are altered. Most significantly, the curves shown in the published figure for the peptide and peptide-hepcidin mixture at 37° C have very similar shapes, while the actual spectra are quite different. (The change in shape of the 37° C hepcidin curve is also due in part to the additional manipulation of the data point for 200 nm, described below.)

After the Committee discovered this manipulation of the data, Dr. Michael Kay, who provided the instrumentation and expertise for the CD measurements, was contacted through Dr. Botkin's office. In addition to confirming that the manipulation was inappropriate, Dr. Kay noted additional irregularities in the data. The first of these is that the background subtraction for the samples containing peptide+hepcidin was not carried out correctly. Instead of simply subtracting the buffer signal from the sample signal, the signals from the peptide-only and hepcidin-only samples were, in addition to the buffer, also subtracted from that of the peptide+hepcidin sample. Although this caused only small changes to the peptide+hepcidin spectrum at 4° C (because all of the spectra were essentially flat at this temperature), this manipulation had a significant effect on the 37° C spectrum as shown below:



The blue dashed curve is the one in the published figure, and the black curve is a spline fit to the correctly processed data. While the subtraction of the signals from the individual components might be a useful analysis (provided the buffer contribution was correctly accounted for), it is not the spectrum described in the text and legend.

The second irregularity noted by Dr. Kay is that the sign of the signal for hepcidin at 200 nm and 37° C has been changed. This leads to a dramatic change in the shape of the spline curve used to represent the data:



1030

The red dashed curve is the one in the published figure, with the sign of the first point reversed, while the solid black curve represents a spline fit to the correct raw data.  This change has important consequences for the interpretation of the curves.  The figure below (adapted from Creighton, 1993, *Proteins: Structures and Molecular Properties*, W.H. Freeman, p. 191) shows stereotypical CD spectra for peptides in different conformational states.



Together the reduction of the data to just 6 points and altering the sign of the 200 nm point change the spectrum from one typical of a disordered (random coil) polypeptide to the curve expected for a mixture of alpha-helical and beta-strand structure.  Furthermore, the change makes the curve shape match more closely that of CD spectra (recorded at 25°C) previously published for hepcidin. The figure below is taken from a publication (Nemeth et al., 2006, Blood, 107, 328-333) from the laboratory of Dr. Thomas Ganz, who is both the complainant and a co-author of the disputed paper.



The darker curve is the spectrum for wild-type hepcidin, while the lighter one is for a mutant.  Comparison of this spectrum with the unmodified data of De Domenico et al. suggest that the hepcidin samples used in the two studies were not equivalent: The spectrum in paper 10 indicates a more disordered conformation.  This raises further doubts about the significance of the reported temperature dependence on the hepcidin conformation.

Another issue raised by Dr. Kay was the scaling of the spectral intensities to units of degree-$cm^2$/dmol, the standard (if rather arcane) units for protein CD spectra.  The data from the spectropolarimeter (files 10-4A-4 to -11) are expressed as ellipticity with units of millidegrees.  The correct scaling requires dividing the measured ellipticity by the concentration (expressed as amino acid residues in units of dmol/$cm^3$) and by the cell path length (in units of cm).  The values in the Excel files and the SigmaPlot files all matched those in the raw data

1031

files, indicating that no correction for concentration and path length had been made.  As noted above, the values shown in the published figure are all shifted upwards by about 5 units, relative to those in the computer files, but do not appear to be scaled.  It thus appears that the data have not been converted to the units indicated by the axis label.  The significance of this is that the spectra from different samples can only be compared if properly normalized for concentration.

In summary, the spectra in Figure 4A appear to have undergone the following manipulations:

1. Data at 10 nm intervals have been selected and used to draw a spline curve, essentially discarding 95% of the experimental data points and replacing them with a smooth curve.

2. The numerical values have all been sifted upwards by about 5 millidegrees.

3. The sign on a data point (200 nm for hepcidin at 37° C) has been changed, leading to a dramatic change in the shape of the published curve.

4. The spectra for the hepcidin + peptide have been modified by subtracting the signals for the individual components.

5. The plotted values are represented as mean residue ellipticities (degree-cm$^2$/dmol), but have not been properly scaled for protein concentration and cell path length.

The net result of these manipulations is to create curves that are more aesthetically pleasing and hide all of the noise in the data.  In addition, the final curve for hepcidin much more closely matches a published CD spectrum for this protein.

**Figure 4A (inset):** The inset shows the ellipticity at 210 nm as a function of temperature.  The Committee identified two related SigmaPlot files on Dr. De Domenico's computer, containing the graphs shown below:



The graph on the left (from file 10-4A-3) matches the published figure, while the one the right (file 10-4A-2) appears to represent the corresponding spectra recorded at the indicated temperatures.  Like the spectra in Figure 4A, the curves in the right-hand panel were generated from six data points each (at 10 nm intervals) and a spline function. The data for the right-hand graph are listed below:

| VAR1 | Hep 37 | Hep 25 | Hep 15 | Hep 10C | Hep 4C |
|---|---|---|---|---|---|
| 200 | 14.001 | 13.587 | 12.147 | -2.1 | -2.032 |
| 210 | -7.41 | -7.51 | -6.6 | -3.18 | -3.363 |
| 220 | -2.324 | -2.403 | -2.39 | -2.254 | -2.481 |
| 230 | - 0.6413 | - 0.6486 | -0.691 | -1.196 | -1.471 |
| 240 | - 0.3978 | - 0.3947 | -0.403 | -1.017 | -1.128 |
| 250 | - | - | -0.334 | -0.559 | -0.646 |

        0.3214      0.3307

The values for 210 nm in this file match those found in the file for the final figure.

The values in the first two columns (37 and 25° C), in particular, are remarkable for their consistency: The maximum deviation between the corresponding values is 3.4%. The values for 15° C are also close to those for the higher temperatures. The values for 37 and 25° C also match closely, but not exactly, those for hepcidin at 37° C in the file (10-4A-1) used for the main graph of the figure, which are reproduced here again, along with the values for 4° C:

| VAR1 | Hep 37 | Hep 4C |
|------|--------|--------|
| 200 | 13.385 | -2.032 |
| 210 | -7.6 | -3.37 |
| 220 | -2.471 | -2.485 |
| 230 | -0.659 | -1.478 |
| 240 | -0.391 | -1.129 |
| 250 | -0.335 | -0.656 |

The values for 4° C in the two data sets are also very similar, but not identical. According to the laboratory notes provided by Dr. De Domenico, the experiment at five temperatures was performed on or after 8-10-07, one week after the initial measurements at 4° and 37° C.

That some of the spectra recorded at different temperatures are similar is not surprising, especially if the same sample was used and the spectra were recorded sequentially, but the near identical values at each of the selected wavelengths is inconsistent with the substantial noise seen in the data for the full spectra. The scatter is particularly large in the region near 200 nm, as shown below for the 37° C hepcidin data:



For the data between 198 and 202 nm (enclosed in the box), the values cover a range of 4.2 mdeg (with a sample standard deviation of 1.26 mdeg), as compared to the difference of 0.4 mdeg between the values found in file 10-4A-2 for 25 and 37° C.

It should also be noted that the incorrect sign for the ellipticity at 200 nm (used in the curve for hepcidin 37° C in the main figure) is also found in all of the data sets for 15, 25 and 37 ° C.

In contrast to the main panel of Figure 4A, no primary data for spectra recorded at the intermediate temperatures shown in the inset could be found on Dr. De Domenico's computer. The very small variations in the data found in SigmaPlot file 10-4A-2 and the incorrect sign for the 200 nm data lead us to believe that these data were likely fabricated by making small adjustments to the data used in the main panel of the figure.

Although the comments above focus on the data for 200 nm, which were not included in the published figure, we believe that they are important in establishing the origin and integrity of the published inset. An image file (10-4A-20) containing the full spectra (with the name "Fig 4B.tif" and matching the graph in SigmaPlot file 10-4A-2) was found on Dr. De Domenico's computer. Another file (10-4A-21) in the same directory is named "Figure 4A insert.tif" and, as indicated by the name, contains the inset graph. The date on "Fig4B.tif" is 8-26-07,

1033

and that for "Figure 4A insert.tif" is 8-31-07, which is also the date on the SigmaPlot file (10-4A-3) used to make the inset. It thus appears that the authors decided, at some time between the two dates, to present only the graph of ellipticities at 210 nm.  If, as suggested above, the data in the earlier version were fabricated, those shown in the final figure are presumed to be as well.

If the CD data shown for 10, 15 and 25° C are, in fact, manipulations of the curves from 4 and 37° C (the latter of which was manipulated also), then the conclusion of a temperature-dependent structural change is based on very little solid data.

**Figure 4C:** This panel shows CD spectra of a 20-residue fragment of hepcidin (hep-20) recorded at different temperatures, showing no significant temperature dependence.  No data files corresponding to this figure were initially found by the Committee, but Dr. De Domenico, upon request, identified a SigmaPlot file (10-4-C1, on the hard-drive copy already in the Committee's possession) that matched the published figure, shown below:



In examining the various files associated with Figure 4, the Committee discovered that three of the curves shown in panel C match closely those found in the SigmaPlot file (10-4A-2) identified as the data source for the inset to panel A. This was confirmed by comparing the data tables in the two SigmaPlot files:

File 10-4C-1 (used for Figure 4C)

| VAR1 | Hep 37 | Hep 25 | Hep 15 | Hep 10C | Hep 4C |
|------|--------|--------|--------|---------|--------|
| 200 | 14.001 | 13.587 | 12.147 | 12.651 | 12.369 |
| 210 | -7.41 | -7.51 | -6.6 | -6.18 | -6.31 |
| 220 | -2.324 | -2.403 | -2.39 | -2.254 | -2.481 |
| 230 | 0.6413 | 0.6486 | -0.691 | -1.196 | -1.471 |
| 240 | 0.3978 | 0.3947 | -0.403 | -1.017 | -1.128 |
| 250 | 0.3214 | 0.3307 | -0.334 | -0.559 | -0.646 |

File 10-4A-2 (used for precursor to Figure 4A inset)

| VAR1 | Hep 37 | Hep 25 | Hep 15 | Hep 10C | Hep 4C |
|------|--------|--------|--------|---------|--------|
| 200 | 14.001 | 13.587 | 12.147 | -2.1 | -2.032 |
| 210 | -7.41 | -7.51 | -6.6 | -3.18 | -3.363 |
| 220 | -2.324 | -2.403 | -2.39 | -2.254 | -2.481 |
| 230 | 0.6413 | 0.6486 | -0.691 | -1.196 | -1.471 |

1034

|     |        |        |        |        |        |
|-----|--------|--------|--------|--------|--------|
|     | -      | -      |        |        |        |
| 240 | 0.3978 | 0.3947 | -0.403 | -1.017 | -1.128 |
|     | -      | -      |        |        |        |
| 250 | 0.3214 | 0.3307 | -0.334 | -0.559 | -0.646 |

**The values in the two tables are identical, except for those enclosed in boxes.**

This comparison leaves little doubt that the published curves purported to represent spectra of hep20 at 37, 25 and 15° C, are the ones from the file containing data for the full length protein (and the source of the data for the inset to Figure 4A). As noted above, these curves are, themselves, suspected of being fabrications. The curves for hep20 at 4 and 10° C appear to have been generated by manipulation of two values each in the hepcidin file. These manipulations convert a set of curves meant to show a temperature effect on hepcidin into curves showing the absence of such an effect on hep20. (Though, the manipulation could have taken place in the opposite direction, the file dates are consistent with the hep20 data being derived from the other.)

**CD Data Provided by Dr. De Domenico:**

As noted earlier, no primary data could be found on Dr. De Domenico's computer for either panel C or the inset to panel A. On 9-5-12, Drs. De Domenico and Kay were each asked (via correspondence through Dr. Botkin's office) to provide a summary of their respective understanding of the steps leading to the published CD data, and also to provide any additional computer files they might have access to. They were asked specifically for data related to panel C and the inset to panel A. Neither author was able to provide any electronic files, and both have noted that the instrument and its associated computer were retired some years ago. Dr. De Domenico, however, stated:

> "Dr. De Domenico stored the printouts from these experiment as row data. These data are in the laboratory notebooks; one of these books is in Dr. Botkin' office the others still in Dr. Kaplan's laboratory."

She was then asked to locate the data in the notebook already in Dr. Botkin's office and to provide the other printouts. She promptly complied with the request, and the Committee carefully examined the material she provided. Although both notebooks contained printouts of CD data, all of it appeared to be derived from computer files already identified by the Committee. In particular, all of the high resolution data was the same as found in the Excel files (10-4A-12 to -16), corresponding to panel A of the published figure. There were no primary data corresponding to panel C or the inset to panel A.

The notebooks also included several handwritten pages of notes for the CD experiments. The notes already in Dr. Botkin's office were undated. Those provided on 9-11-12 had dates from 8-10-07 and 9-1-07. The notes indicate that, other than a first set of experiments, all of the spectra were recorded by a technician, Mr. Eric Lo. There a one page printout of data, attributed to Mr. Lo, that matches that found in the SigmaPlot file 10-4A-2. The notes also indicate that there were discussions between Drs. Kaplan and Dr. Ganz regarding the CD data. As discussed elsewhere in this report, the Committee believes that these notes were likely written after Dr. De Domenico was informed of concerns regarding the CD spectra.

The Committee is left to conclude that there are no existing primary CD data other than the single set of measurements represented in panel A. As detailed above, these data were extensively and inappropriately manipulated to generate panel A, and were further used to fabricate data shown in panel C and the inset of panel A.

**Responses from Dr. De Domenico:** Following the initial discovery that the published CD curves had been generated from data spaced at 10 nm intervals, Drs. De Domenico and Kay were asked (near the end of July 2012) to review their notes and existing data and to provide an account of their involvement in producing the figure. Later, near the end of the Committee's deliberations, on 9-10-12, the authors were each asked to provide a summary of the history and any additional data files they might have (see above). Their responses to these requests are summarized here.

Dr. De Domenico's initial response was in the form of a PowerPoint file (provided on 7-31-12), which included the following list of points (copied verbatim):

1035

1. *The CD analysis was run in Dr. Kay laboratory from February 2007 to August 2007, according to email stored by Dr. De Domenico sent to reserve the instrument. Couple experiments were run by Dr. De Domenico and others by technician.*

2. *The raw data were given to Dr. De Domenico or the technician by floppy disk or print out. The machine used was attached to a very old PC computer.*

3. *The CD analysis also was done in collaboration with Dr. Nemeth and Ganz because they had published it for hepcidin in 2006. Nemeth et al, 2006 Blood. Dr. Ganz analyzed and approved the data and final figures. They provided all the peptides for these analysis.*

4. *Dr. De Domenico does not recall who decided to pick every 10nm for the figure generation. However, most of the lines were dotted to show discontinuity.*

5. *Dr. De Domenico sent one set of the data to Dr. Kay for analysis (see email next page). Dr. De Domenico was not involved in the communication with Dr. Kay during manuscript submission.*

6. *On July 26, 2012 Dr. Kay told (by phone) Dr. De Domenico that during paper submission he received a copy of the paper for approval from Dr. Ward (this needs to be confirmed).*

Most of these points are reiterated in Dr. De Domenico's statement of 9 September, which includes the following:

"Once the data were converted in August 2007 sigma plot graphs were generated most of the time according to Dr. Kaplan and Dr. Ganz's instructions. Dr. Ganz was at the time consulted on CD and NMR analysis because he published couple years before the same experiments. After the sigma plots were generated were sent to Dr. Ganz for approval. Only one experiment (the first one run by Dr. De Domenico) was sent to Dr. Kay and he made his comments by emails (emails are available)."

"Someone made the suggestion to plot the data as they are presented to Dr. De Domenico. Nobody in Dr. Kaplan's laboratory is CD expert. The laboratory notebooks reveal that Dr. Kay analyzed only the Excel file and later Dr. Ganz and Dr. Kaplan discussed CD and NMR data. Dr. De Domenico laboratory notes reported that Dr. Kaplan request to generated the insert in Figure 4A, this is why the file is named "Figure 4A jerry". Dr. De Domenico does not remember any further communication with Dr. Kay regarding how to plot the data. The last communications in August 2007 were regarding reservation of the instruments for the technicians to run new spectra. Dr. De Domenico was not in charge/involve to communicate with the other authors for final comments before the submission of the paper. However, Dr. De Domenico stored in the laboratory notebook an email sent from Dr. Kay to Dr. Kaplan with comments on the manuscript and figures. Suggesting that he saw a semifinal version of the manuscript. Dr. Kay remembers this email."

"<u>We also want to point out that in the Experimental procedures not details were given regarding how often the spectra were recorder. However, we understand that will be appropriate specify in the figure legends that the dotted lines represent a reading every 10nm.</u>" (underlining in the original).

In her responses to the initial draft of this report, Dr. De Domenico supplied (as Appendix 17) CD spectra of hepcidin recorded by an independent laboratory, Alliance Protein Laboratories (APL). These spectra, which were recorded at temperatures from 4° to 60° C, are reproduced below (right panel), along with Fig. 4A from the original publication.



Published Figure                                                                    From Alliance Protein Laboratories

Although Dr. De Domenico submitted the new spectra as evidence that "hepcidin goes to a temperature-dependent conformational change" (from page 75 of the file "Detailed response by Dr. De Domenico.pdf"), these spectra are very different from those published and contradict the conclusion drawn by the authors. Specifically:

1. The minima in the APL spectra are located at approximately 200 nm, as compared to 210 nm in the published spectra. As discussed above, the minima at 210 nm in the published spectra are due to the change in sign of the 200 nm points and the application of a spline curve.

2. The temperature dependence of the APL spectra indicate a small <u>increase</u> in secondary structure upon lowering the temperature from 37° to 4° C, while the published data indicate a major <u>decrease</u> in structure at the lower temperature.

3. The inset to the published figure indicates a temperature-dependent change of approximately two-fold in the ellipticity at 210 nm, with most of that change occurring between 10 and 15° C. In contrast, the APL spectra recorded at 4°, 15° and 37° C display almost no difference at this wavelength,

Thus, the spectra provided by Dr. De Domenico fail to support the authenticity of the published data or the conclusions drawn from those data.

In a subsequent response (submitted 12/10/2012), Dr. De Domenico stated that the experiments reported in Fig. 4C were, in fact, conducted:

The experiment in Figure 4C was not run by her. However, she has no doubt that the experiment was run and the technicians gave to her the final results as shown in the file identified in "Ivana's Documents/Peptide Fpn from ivana v1/Paper folder/". To support this, recently Dr. De Domenico has queried one of the technicians (Mr. Lo) that were involved in that experiment. This technician, who still works in Dr. Kaplan's laboratory, remembers that he went to Dr. Kay's laboratory and ran the experiment. He, also, remembers that the room where the experiment was performed, because it was "very cold," since each individual performing the experiment had to sit next to a nitrogen tank. However, he does not remember where the raw data were stored because in the past years he has changed 3 computers and desks in the laboratory multiple times.

That a technician remembers doing an experiment does not offer any evidence that the published data actually came from that experiment, and Dr. De Domenico has not addressed the evidence (based on analysis of the data used to prepare the figure) indicating that the published figure was fabricated.

**Responses from Dr. Kay:** Dr. Kay provided initial responses to questions from the Investigation Committee via e-mail exchanges on 30 and 31 July 2012. As noted earlier, he pointed out additional inconsistencies in the data processing, including the change of sign for one of points in the 37° hepcidin spectrum, though he did not address the significance of this change. Upon request from the Committee, he subsequently provided a

1037

single-document summary of his role in the CD experiments and preparation of the manuscript, which included the following statements:

"My role in this paper was to design the CD experiments, teach Ivana how to use the CD instrument, and to assist Ivana with data interpretation of her first set of CD data. Ivana (or technicians working under her direction) collected all data using our lab's CD instrument. I met and corresponded with Ivana (and sometimes Jerry Kaplan) during August 2007 to discuss data processing and analysis. I recall discussing the initial conclusions being drawn from the first set of CD data and agreeing that the results supported the conclusion that hepcidin's structure is temperature sensitive. Ivana sent me an initial set of CD data (0.5 nm spacing, unsmoothed) for my review. I suggested the acquisition of repeat data and a correction relating to blank subtraction (Excel files sent on 8/6/07). We never discussed removing x-axis points or curve smoothing, and I do not know when or why this improper processing occurred. As I suggested, additional CD data was acquired soon afterwards, but I have no record of ever seeing this data."

"In November 2007, Jerry Kaplan handed me a late-stage printed manuscript draft (including figures) for my review. On 11/16, I e-mailed Jerry a list of comments and asked for an electronic file to allow me to make more detailed comments using "track changes" mode. I received an electronic version of the manuscript text from Diane Ward (Peptide manuscript v6doc.doc) that did not include figures. On 11/25, I sent annotated manuscript corrections to Diane. On 11/26, I answered a followup question from Diane (about the y-axis of CD plots)."

"I do not recall (and have no record of) seeing the final submitted Cell Metabolism manuscript (submitted in Feb. 2008) or proofs. I cannot recall if the paper draft I saw in 11/07 contained the final Figure 4. If it did, then I failed to notice the improper data processing, which I certainly would have corrected if I had known about it."

**Responses from Dr. Kaplan:** As described above, Dr. De Domenico indicated in her responses that Dr. Ganz played a role in the analysis of the CD data, with Dr. Kaplan serving as an intermediary.  Following receipt of responses to the initial draft of this report, the Committee sought clarification on this point from Dr. Kaplan. The questions asked of Dr. Kaplan and his responses are provided in the section on "Alterations of the Research Record". In brief, Dr. Kaplan stated that, based on his recollections and e-mail correspondence, he did not believe that Dr. Ganz had played a role in analyzing the CD data and had not been aware of those data prior to 9/13/07, after the figures were essentially complete.

**Responses from Dr. Thomas Ganz:** Because Dr. De Domenico indicated in her responses that Dr. Ganz played a role in the analysis of the CD data, the Committee asked Dr. Ganz, via e-mail through Dr. Botkin's office, to explain his role in this aspect of the paper, as well as in the analysis of the NMR data described below. In his response, Dr. Ganz stated that his role in the paper was in providing samples, including the hepcidin forms used. He also stated that he was aware of the CD and NMR data, but does not indicate that he played any role in the analysis of these data.


**Conclusions regarding circular dichroism spectra:**  The data published in the main panel of Fig. 4A have been extensively and inappropriately manipulated, while that in panel C and the inset to panel of A were most likely fabricated.  So far as the Committee can determine, there currently exists only one set of primary CD data, corresponding to that shown in the main graph of panel A.  Analysis of the computer files from which the other two graphs were drawn indicates that they were generated by manipulation of the same data.

The manipulation of the data panel A not only hid the natural noise in the spectra but dramatically changed the shape of the spectrum for hepcidin at 37° C.  Examination of the unmanipulated data indicates that this sample was probably not hepcidin in its native conformation, and the conclusion that hepcidin undergoes a major temperature-dependent conformational change is most likely incorrect, as indicated by NMR studies (discussed below).

**Unpublished NMR data**

---

While tracing the origins of the CD spectra shown in Figure 4, the Committee discovered what appears to be a preliminary version of the published figure (file 10-4A-22, dated 9-5-07), with the name "Figure 4 final2.tif". This figure is nearly identical to the published version, except that it includes a fourth panel containing a series of one-dimensional NMR spectra:



The Committee also discovered, on the copy of Dr. De Domenico's computer drive, two documents containing text apparently related to this figure. The first of these (file 10-X-1, dated 9-5-07) contained a description of NMR methods and a figure legend that appears to correspond to the figure above:

> Figure. Stacked plots of one dimensional NMR spectra recorded at 5 to 30 °C. The similar positions for most of the proton signals suggest Hepcidin does not undergo significant structural change over this temperature range. There are smaller changes in some of the signals that may reflect a local change in structure and/or oligomerization state.

From the file metadata, the creator is Dr. Jack Skalicky, the Director of the Biomolecular NMR Center at the University of Utah.

The second file (10-X-2) is a draft manuscript for paper 10, dated 26 September 2007. Dr. Skalicky is listed as a co-author, and the manuscript includes place holders in the Methods section (page 4) and the legend to Figure 4 (page 13) for NMR-related material. In addition, the Results section (page 8) contains the following text:

> These results suggest that the temperature-dependent changes in hepcidin structure requires the presence of the amino terminal domain of hepcidin. <span style="color:red">We used NMR to assess temperature-dependent structural changes in hepcidin. At temperatures ranging from 37ºC to 15ºC hepcidin showed the predicted …………(Figure 4D)</span>.

(The red highlighting is in the original.) This text suggests that the NMR data were to be included in the paper to support the conclusion that hepcidin undergoes a substantial temperature-dependent structural change.

From the spectra and the draft figure legend, it appeared to the Committee that the NMR results might contradict the CD data and that there may have been a deliberate decision to omit the former from the paper to hide this contradiction. The Committee therefore asked (through emails from Dr. Botkin's office) Drs. De Domenico and Kaplan, and subsequently, Drs. Ganz and Skalicky, for their recollections regarding the NMR data. In making these inquiries, the Committee did not inform any of the individuals of the evidence regarding

falsification of the CD spectra, though Dr. De Domenico had previously been questioned about the use of only the data spaced at 10 nm intervals.

**Responses from Drs. De Domenico and Kaplan:** Drs. De Domenico and Kaplan were sent excerpts of the material above and were asked the following specific questions about the decision to remove the NMR data from the paper:

1. Is it a correct interpretation that the NMR data in the draft figure and figure legend contradicts the CD data and the model in the published paper?

2. Why was it decided to exclude the apparently contradictory NMR data and to remove Dr. Skalicky from the list of contributing authors?

3. What authors participated in the decision to exclude the NMR data?

4. Specifically, was Dr. Michael Kay, who collaborated on the CD studies, aware of the NMR data and the decision to exclude those data from the paper?

On 9-10-12, Dr. Kaplan responded to these questions, via e-mail to Dr. Botkin, as follows:

1. I have attached an email from Jack Skalicky. Please note his comment….. "Figure. Stacked plots of one dimensional NMR spectra recorded at 5 to 30 °C. The similar positions for most of the proton signals suggest Hepcidin does not undergo significant structural change over this temperature range. There are smaller changes in some of the signals that may reflect a local change in structure and/or oligomerization state. "

2. As stated by Dr. Skalicky (see forwarded email)- "There are subtle changes in the NMR spectra with temperature that I will show you - but their interpretation is not straight-forward."

3. The reason that we did not include NMR data was that we could not assign NMR changes that we did see to specific amino acids. There were two reasons for this, first the author of the published structure could not find the assignments. I think he might have told me that by phone but he did tell Jack Skalicky (see forwarded email). The second reason is that Tom Ganz, who was a co-author on that paper- told us that the published structure was wrong and that a new structure would be coming out from his colleagues at Amgen. Since the NMR changes we saw could not be assigned to specific amino acids, and we could not rely on the published data, we did not include the data,

4. I do not recall if Michael Kay saw the NMR data or not. It was sent to Tom Ganz.

Dr. Kaplan also provided copies of e-mail exchanges between Drs. Skalicky and De Domenico, during the period from 8-22-07 to 10-16-07, which included a forwarded message from Dr. Hans Vogel of the University of Calgary. Dr. Vogel is the senior author of an earlier NMR study of hepcidin, and the e-mail exchanges indicate that Dr. Skalicky was attempting to obtain NMR resonance assignments, consistent with Dr. Kaplan's statements above.

Dr. De Domenico responded via e-mail on 9-11-12. Her response did not include direct answers to all of the questions asked by the Committee, but instead listed the following points:

1. Dr. De Domenico was not involved in the experimental procedure that generated the data.

2. NMR is outside of Dr. De Domenico's expertise. She did not analyzed the data or made any decision regarding.

3. Dr. De Domenico was not the corresponding author in this paper (as well in all the papers under the committee's evaluation) therefore she did not make decision regarding insertion or exclusion of data or authors.

4. Dr. De Domenico was not in charge to communicate with Dr. Kay regarding NMR data or manuscript's files.

Dr. De Domenico's response also provided copies of e-mail exchanges with Dr. Skalicky, including the one in which he provided the text for the figure legend, with these comments:

"Attached is a first attempt at the NMR Spectroscopy description and Figure Legend. I'm sure more can be added but I will need to read a draft of your text before elaborating much more. What I wrote is very conservative.

If you/Jerry get the chemical shifts for Hepcidin I'd be happy to generate a surface coloring map illustrating regions of the Hepcidin that are likely changing in structure with temperature."

Dr. De Domenico also describes her recollections of communications between Drs. Kaplan and Ganz and states that "Therefore, Dr. De Domenico believes that any further action taken by Dr. Kaplan to exclude the NMR data was suggested by and in agreement with Dr. Ganz."

**Responses from Dr. Ganz:** After receiving the responses quoted above from Drs. De Domenico and Kaplan, the Committee contacted Dr. Ganz via e-mail (through Dr. Botkin's office) and asked the following specific questions:

1. What, if any, was your role in the analysis of the CD or NMR data?

2. Who else was involved in the analysis of the data?

3. What authors participated in the decision to exclude the NMR data?

Dr. Ganz's response included the following key statements:

"In general, my participation in this paper was very limited except that our group provided key reagents for the study, including the hepcidin forms that are one of the subjects of this paper."

"The first version of the paper, which I received by e-mail on October 28, 2007, did not contain the NMR data, only the CD spectra. I first became aware of the NMR/CD data on Sept. 13, 2007 as a result of the e-mail quoted below" [from Dr. Kaplan].

"In response to this e-mail, I arranged for Hans Vogel, an NMR expert from Alberta, Canada, to provide whatever NMR data he generated several years before on hepcidin peptides we synthesized or purified. My intention was to get Dr. Vogel to help Drs. Kaplan and DeDomenico interpret their NMR data."

"I do not recall examining any of the NMR data myself, mostly because I am not an expert, and trusted Hans Vogel to take care of it."

"So, in summary, I do not recall seeing a version of the manuscript that had NMR data in it but I was aware that such data existed and tried to help indirectly by connecting Dr. Skalicky and Dr. Vogel so that they could interpret the data."

"I do not know how the decision not to include the NMR data was reached and by whom, and I did not know that the NMR data contradicted the CD data."

"If indeed the NMR data do contradict the hypothesis that hepcidin undergoes a temperature-dependent conformational change between 4 and 37C, the omission is important. The conclusion that hepcidin undergoes a conformational change was important enough for the paper that it was included in the abstract."

**Responses from Dr. Skalicky:** Dr. Skalicky was asked the following questions:

1. What is your memory of why it was decided to not include the NMR data in this paper, and to remove your name as a contributing author?

2. Do you recall any discussions concerning the relationship between the NMR data and the CD data that appeared in the published paper?

3. What authors participated in the decision to exclude the NMR data?

His responses included the following:

"Dr. Kaplan asked me in 2007 to investigate the temperature dependence of human hepcidin using NMR. This was done by myself and presented to the Kaplan research group (my memory is sketchy about the meeting but I recall that Jerry Kaplan, Ivana De Domenico, John Phillips, and Diane Ward were present). The data were discussed, however I don't recall a followup meeting nor did I see a version of the manuscript with my name included as coauthor, although authorship was discussed early in the process."

"I don't recall details regarding discussion of CD and NMR but I assume we talked about both. My interpretation of the NMR data is the same between then (2007) and now: The NMR is consistent with globally-similar structures over the entire temperature range of 4 to 37C and inconsistent with a folded-unfolded transition."

"The following manuscript published in 2009 is quite useful in interpreting the pertinent De Domenico, 2008 results (Jordan et al, 2009 'Hepcidin Revisited, Disulfide Connectivity, Dynamics, and Structure' JBC, 284 pp 24155-24167). The major finding of Jordan, 2009 is that hepcidin exists in a low and high temperature form (the NMR structures are nearly identical to one another with exception of a flexible loop and cystine side chain rotamers; Figures 4 and 7 in Jordon, 2009)."

"It is quite likely that Figure 4A in De Domenico, 2008 is also showing the interconversion of the low and high temperature structures (low temperature form, 4 °C, dashed yellow line and high temperature form, 37 °C, dotted red line). I suggest the differences in CD spectra are NOT the result of a folding-unfolding transition but instead a folded(low T) – folded(high T) transition."

"The summary of De Domenico states "The increased dissociation rate is due to temperature dependent changes in hepcidin structure", in fact they probably got this right in general but not in detail. The NMR data may have allowed them to eventually hypothesize that the temperature dependent changes are subtle and within the context of a folded peptide, however I don't believe the major conclusions will change."

"I was not involved in the decision to exclude the NMR data and I can only assume the decision was made by the primary authors."

**Conclusions regarding unpublished NMR data:** Initial analysis by the Investigation Committee suggested that the NMR data may have been removed from the manuscript because it contradicted the CD data and the authors' model. The omission of data that could change significantly the conclusions of a paper is, potentially, a form of data falsification, as stipulated in both University of Utah Policies and the NIH Rules and Regulations. There is, however, an obvious need for judgment, as it is rarely appropriate to publish all of the data generated in a study.

Dr. Kaplan's responses to the Committee's questions indicate that the NMR data were removed from the manuscript because amino-acid specific assignments of the peaks were not available and because data from another group indicated that the published three-dimensional structure was incorrect. The absence of a correct three-dimensional structure would certainly be good reason to refrain from publishing a figure in which the resonance shifts were mapped onto a structural representation. On the other hand, neither the resonance assignments or a three-dimensional structure would be necessary to conclude from the spectra that the protein did not undergo a major structural change, as indicated in the draft figure legend and Dr. Skalicky's comments

In retrospect, the NMR data were probably a more accurate measure of the temperature-dependent conformational properties of hepcidin than were the deeply flawed CD data discussed in the previous section of this report. Although Dr. Skalicky's response suggests that the published CD data are consistent with the NMR data subsequently published by Jordan et al., those authors state:

"The observed temperature dependent structural change in hepcidin is intriguing and of particular interest in the context of ferroportin binding. It seems, however, that the temperature-dependent activity observed in previously published ferroportin internalization assays (52) does not correlate with the temperature dependence of its loop conformation; in the range from 15 to 4 °C, the observed 90% drop in activity (52) is significantly larger than the 15% change in the population distribution (Fig. 3C ) between the two limiting structures. Moreover, the observed loss of secondary structure at 4 °C in the CD spectra (52) and

1042

multimerization of hepcidin (16) are inconsistent with the current observations of identically folded and monomeric hepcidin within the 20 to 53 °C temperature range."

(Reference 52 is Paper 10 under consideration here.)

From the responses of Drs. De Domenico, Kaplan, Ganz and Skalicky, the authors appear not to have considered the NMR and CD data to be contradictory, and it is not known whether or not this question was ever discussed explicitly. Thus, there is no evidence to indicate that the removal of the NMR data from the paper was a conscious attempt to hide or obscure such a contradiction. On the other hand, the final outcome was the publication of flawed data and the omission of data that was subsequently confirmed and expanded upon. The process leading to this outcome raises questions about the management of the research, as discussed below.

**Summary of findings for Paper 10.**

As noted in the introduction to this section of the report, the initial allegations regarding paper 10 concerned the reproducibility of the peptide-binding assay for hepcidin. The Committee does not feel that it can address this question from the information available, and a resolution will most likely require additional experiments. However, our examination of the data for this paper has revealed evidence for the following instances of scientific misconduct:

1. Misrepresentation of experimental uncertainties in the error bars for many of the graphs.
2. Manipulation of data so as to change a significant conclusion (the CD spectra in the main panel of Fig. 4A).
3. Fabrication of data (in the inset of Fig. 4A and in Fig. 4C).

In his response to the initial draft of this report, the attorney representing Dr. De Domenico, Mr. Ryan B. Bell, challenges the Committee's conclusions regarding this paper, particularly conclusions based on the absence of computer files associated with the error bar calculations. As noted in the section on Paper 6, federal ORI policies specifically state that the absence of data in the research record can be interpreted as evidence of misconduct. Furthermore, the conclusions of misconduct with respect to the error bars are based on those computer files that <u>were</u> found and showed that the published error estimates were based on fewer values than specifically stated in the papers. The Committee did not attempt to draw conclusions regarding the figures for which the calculations could not be found.

With respect to the CD data, Mr. Ryan states that "The Committee has failed to point to a single piece of evidence suggesting that the falsifications of CD spectra were carried out by Dr. De Domenico." and suggests that they might have been carried out by Dr. Kay or Dr. Ganz. By Dr. De Domenico's own account, Dr. Kay saw only the initial set of data, in their raw form, and the final figures. Her statements that Dr. Ganz played a role in the analysis have been contradicted not only by Dr. Ganz but by Dr. Kaplan, who, according to Dr De Domenico, served as an intermediary in Dr. Ganz's involvement in this aspect of the paper. The statements of Dr. Ganz and Kaplan are supported by an e-mail message indicating that Dr. Ganz was not aware of the CD data until after the figures had been completed. In support of her statements, Dr. De Domenico has provided an e-mail exchange (Appendix 24 of her response to the draft report), which she indicates shows Dr. Ganz's involvement in analyzing the CD data. In fact, however, this e-mail refers only to NMR data, is dated well after the CD figures were completed, and is entirely consistent with Dr. Ganz's account. The issue of Dr. Ganz's involvement in the CD data is discussed further in the section on alterations of the research record.

Mr. Bell also argues that "Dr. De Domenico knows very little about CD analysis-too little, in fact, to have attempted or carried off a manipulation of this complex data." Dr. De Domenico makes a similar statement in her "detailed response." Without reference to Dr. De Domenico's specific expertise, the Committee notes only that the manipulations were not, in fact, very complicated. All that was required was a rough idea of what a CD spectrum of hepcidin should look like (provided by Dr. Ganz's previous publication), and the ability to manipulate a few data points and draw spline curves with the SigmaPlot program.

In addition to the specific details of these breaches of scientific standards, the Committee's investigation revealed very troubling aspects of the mode of collaboration among the paper's authors. In her responses to our questions, Dr. De Domenico stressed that she and others in the Kaplan lab lacked expertise in the CD and NMR methods used, making them dependent on their collaborators for interpretation of the data. However, the

communication among the authors appears to have been very limited, likely contributing to the publication of falsified and fabricated data.

In the case of the CD data, the collaborator was Dr. Michael Kay, who appears to have been minimally involved in the data processing or analysis.  From his account and that of Dr. De Domenico, Dr. Kay saw only the raw data for the first set of data recorded, on the basis of which he recommended that Dr. De Domenico repeat the experiments with samples of known protein concentration so that the data could be properly scaled. If such experiments were performed, no data from them can be found, and the published figures are based on the initial, unscaled and manipulated data.  Dr. Kay states that he did review two versions of the manuscript, but was unaware of Dr. De Domenico's use of only a small fraction of the data points to draw a spline curves. As the author of the paper specifically associated with the CD experiments, Dr. Kay must be bear some of the responsibility for the falsification and fabrication.

Dr. De Domenico's responses to questions regarding the CD and NMR data, in which she repeatedly shifts responsibility to her collaborators, are also troubling.  For instance, she states "Dr. De Domenico does not recall who decided to pick every 10nm for the figure generation."  It is extremely unlikely that Dr. Kay would have suggested this, and Dr. Ganz indicates, in contradiction to Dr. De Domenico's account, that he played no role in analyzing the CD data.  Even if Dr. Ganz did play a role, the CD spectra in his laboratory's earlier publication were not manipulated in this way, and there is no reason to believe that he would suggest it.  With regard to the NMR data, Dr. De Domenico indicates that she played no role in interpreting the spectra or the decision not to include them in the paper, even though she was the first author.

If, as she indicates, Dr. De Domenico did not participate in decisions regarding authorship or the inclusion of data, this raises serious questions regarding Dr. Kaplan's role as principal investigator and mentor.  At the very least, the decision to exclude data is one that Dr. De Domenico, as a trainee and first author, should have been part of.  In addition, there appears to have been little or no discussion among the various collaborators, especially Drs. Kay and Skalicky.  Given the expertise of these two individuals, it is unlikely that the contradiction between the CD and NMR data would have gone unnoticed if they each been fully aware of both sets of results.  Particularly in light of his own lack of expertise in these techniques, Dr. Kaplan should have ensured that all of the data were shared among the participants.

In summary, the Committee concludes that this paper contains instances of data falsification and data fabrication and that this paper should be retracted.  The circumstances leading to the publication of falsified and fabricated data indicate flaws in the management of the laboratory and collaboration.

**PAPER 11**

**Citation:** Kieffer, C., Skalicky, J. J., Morita, E., De Domenico, I., Ward, D. M., Kaplan, J. and Sundquist, W. I. (2008). Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding. *Dev Cell* **15**: 62-73.

**ALLEGATION**

In Fig. 5B of paper #11, a set of western blot bands was "intentionally duplicated, inserted and the splice was patched up."  [see figure below]

### Figure 5B

eft 3 lanes are identical
to the right 3 lanes



The splice site

**COMMITTEE FINDINGS**

In follow-up correspondence and/or discussions with Drs. De Domenico, Kaplan, Sundquist and Kieffer, all agreed that the published gel image had been inappropriately manipulated.  The preponderance of evidence indicates that the manipulation was done by Dr. De Domenico:

(a)  The files that were evidently used to prepare the manipulated image were found on Dr. De Domenico's hard drive.  These include "collin1.psd" (file 11-5-1, a scan of a developed film) and "collin final new.tif" (file 11-5-5, created in PhotoShop)  [see figure on right].



from "collin1.psd"

from "collin final new.tif"

(b)  The final version of Fig. 5 was assembled by Dr. Kieffer (the first author of paper #11) from images supplied by Dr. De Domenico.  [see appended letter from Drs. Sundquist & Kieffer]

---

(c)  In discussions with the Investigation Committee, Dr. De Domenico did not deny that she created the manipulated image.

**ADDITIONAL FINDINGS**

The Investigation Committee identified other problems with Fig. 5A and 5B in this paper.  The images used to assemble panels A and B were found in three files on Dr. De Domenico's hard drive: "collin1.psd", "collin2.psd", and "collin3.psd", which are scans of developed western blot films.  Comparisons of the film images and the published figure raised several new concerns.  These problems were all present in the assembled image file "collin final new.tif" prepared by Dr. De Domenico [refer to boxed numbers in the figure below].



1.  These four image panels in the published figure are oriented upside-down relative to the original film image and MW standard ladders marked on the films (file 11-5-1;file 11-5-2).  In the three panels boxed in red, the band shapes indicate that the orientation is incorrect in the published figure.  In the fourth (unboxed) panel, the orientation of the MW labels on the film is incorrect.  Given the location of the computer files, Dr. De Domenico must have committed these errors and manipulations.

2.  The MW marker labels on this film imply that the gel was run in the top-down direction (because the red marker should be closer to the top of the gel) [see figure at right].  Thus, the lower bands are consistent with the size of CHMP6 (~33 kDa), purportedly the protein band represented in the image.  However, the band shapes indicate that the gel was most likely run in the bottom-up direction, so the MW markers appear to be incorrect.  Were the MW standards marked on the developed film so as to be consistent with the size of CHMP6?  What is the second band in the "siRNA control" lane?  Why is it not present in the "CHMP6 siRNA" lane?  The figure legend and methods make no mention of an unrelated protein that crossreacts with anti-CHMP6 serum. These errors and ambiguities cast doubt on the provenance and true identity of the bands labeled "anti-CHMP6" in the published figure.



3. These two panels of the published figure supposedly represent protein bands detected with different antisera. However, they appear to originate from the same gel [see film at right]. Note that all bands run at virtually the same position. And yet, there are two different sets of MW marker labels, implying that the two bands on the left have a size consistent with tubulin, whereas the six bands on the right have a size consistent with ferroportin.



In discussions with the Investigation Committee, Dr. De Domenico explained that actually two partial membranes were placed in the cassette side-by-side and that the resulting alignment of the bands from the two gels was strictly coincidental. If this explanation were true, one would expect to detect some discontinuity in the background from the two membranes. If the membranes were derived from two different gels, one would expect that the spacing of the MW markers would be different on the two gels, because the markers would have migrated further in the gel on the right. If the membranes were derived from a blot of the same gel (at least 11 lanes), then cut apart and processed with different antibodies, the markers would have run the same distance from the gel origin. Clearly, this is not the case; the MW ladder markings exhibit identical spacing, but different distances from the gel origin. The Committee concludes that these bands are from the same gel and western blot and do not represent proteins that reacted with different antibodies, as claimed in the published figure. The true identity of the proteins represented in these panels and their relationship, if any, to the published experiment are unclear.

**Statements to the Investigation Committee regarding western blots for Paper 11**

In the course of its investigation of duplicated and spliced lanes in a western blot published in Fig.5 of paper 11, the Committee reconstructed the figure in question using files found on Dr. De Domenico's computer and discovered that images of lanes from a single film were used to represent western blots with two different antibodies (anti-Fpn and anti-tubulin), as shown below:



(The lanes labeled to represent the anti-Fpn blot are inverted about the horizontal axis in the published figure.) Given the nature of the western blot procedure it is physically impossible for the same autoradiograph to represent blots with two-different antibodies.

Dr. De Domenico was presented with this evidence during the interview of 7-17-12 and responded by stating that the image shown above represented two separate blots placed next to each other in the film cassette. Members of the Committee noted that this seemed unlikely since the bands in the gel line up almost exactly and there is no obvious discontinuity between the two parts of the image. None the less, Dr. De Domenico insisted that there were two separate blots.

The image below is from the same computer file (11-5-2), but has been adjusted to increase contrast:



Even with greatly enhanced contrast, there is no indication that this image came from two blots. Also, with the edges of the blot more clearly delineated, there does not appear to be room for the molecular-weight marker lanes drawn on the film, especially on the left-hand side of the blot.

1048

In order for Dr. De Domenico's explanation to be valid, the following conditions would have to be satisfied:

1. The two gels were run for different times, such that the tubulin and the Fpn-GFP fusion protein (with approximate molecular weights of 55,000 and 90,000, respectively) migrated to the same position on the blot.

2. The band intensities, for two unrelated proteins probed with different antibodies, for the two blots match almost exactly.

3. The two blots were cut and aligned with remarkable precision so as to hide any discontinuity.

If, as required by point 1 above, the gels were run for very different times, the separation of the marker bands would be expected to be quite different. In the image below, the markers on the left-hand side have been duplicated and aligned with those on the right-hand side:



There does not appear to be any significant difference in the spacing of the markers.

The Committee concludes that the image used to represent blots with two different antibodies almost certainly represents, instead, a single blot. One, at least, of the blots in the published figure must, therefore, be a falsification. Dr. De Domenico's statements to the Committee are unlikely to be true.


**SUMMARY**

The Committee finds that Fig. 5 of paper #11 contains several instances of data fabrication and/or misrepresentation in images manipulated by Dr. De Domenico. Thus, the experimental results reported in Fig. 5A and 5B are not supported by the data presented. This raises substantial concerns about the reliability of the other experimental data provided Dr. De Domenico and the Kaplan lab for this collaborative study. At the very least, the conclusions drawn from the experiments documented in Fig. 5 should be formally retracted.

**Alterations of the Research Record**

**Evidence for misrepresentations to the Inquiry and Investigation Committees and alteration of the research record following receipt of allegations**

During the investigation, there were instances in which materials or information provided by Dr. De Domenico appeared to have been improperly manipulated or gave the appearance of intention to mislead the Investigation Committee. Specific examples are detailed below.

**1.    Manipulation of an autoradiograph film for Paper 1.**

One of the original allegations made in November 2011 concerned the duplication of western blots shown in Figs. 2, 3 and 5 of Paper 1.  In response to these allegations, Dr. De Domenico provided to the Inquiry Committee a labeled film purported to represent the correct results for some of these figures, specifically Figs. 2Aii, 2B and 5. Two scans of this film, the context of which is discussed in detail in the section devoted to Paper 1, are reproduced below:



File 1-2-1
From Ivana De Domenico's computer



Scan of film in sequestered notebook
(scanned 10-27-2012)

The image on the left is from a file (dated 7-20-11) found on a copy of the hard drive from Dr. De Domenico's computer.  The extensively labeled image on the right is a scan of the film presented to the Inquiry Committee.  The film in this form was included in notebooks sequestered by the Research Integrity Office on 11-9-11.  A scan of the film with the same labeling (except for the adhesive labels visible above) was also found on Dr. De Domenico's computer drive (file 1-2-3, dated 10-29-11).  Comparisons of these images led the Investigation Committee to question the fidelity of the later labels.

---

1050

Viewed without the subsequent labeling, the film on the left is remarkable for the consistency and symmetry of the blots. The minimal labeling suggests that the blots were to be used for Figs. 1B, 1C, 2A, 2B, 5 and 7. The published versions of Figs. 1C, 2A, 2B and 5 all included blots showing biotin-streptavidin fractionation of plasma membrane and cytoplasmic proteins. Although Fig. 7 did not show this type of experiment, it would have been appropriate for this figure as well. Except for the one labeled 1B, each of the blots displays four lanes, each with a single clear band, separated by a single blank lane. In each blot, the regions to the left and right of the visible lanes are completely blank (as revealed in both the scan image and direct inspection of the film), as is the central lane. From the minimally-labeled film, it would appear that the blots were the results of a set of carefully planned experiments. The correspondence between the initial labels and the published figures indicate that these gels were run specifically to prepare the final figures. However, the labeled film shown above on the right indicates an almost haphazard loading of samples, with controls added in different positions and with the "PM" and "FT" and the "NS" and "N4" samples organized differently in the different gels.

The blot for Fig. 2 was of particular concern to the Investigation Committee, who discussed it with Dr. De Domenico twice, on 7-2-12 and 7-17-12. The current handwritten labels on the film indicate that this was a 12-lane gel, rather than the 10-lane gels apparently used in the majority of the films examined by the committee. During the 7-2-12 interview, the Committee questioned this point, as the width of the bands in the Fig. 2B blot is similar to those in the other 10-well gels on the film. The Committee noted that if the 10-well and 12-well gels are the same width and run in the same electrophoresis apparatus, then the well width of the 12-well gel should be smaller than that of a 10-well gel. In addition, the full width of the lanes indicated on the film is about 9.4 cm, as compared to the standard mini-gel width of 8.6 cm.

When questioned about this discrepancy on 7-2-12, Dr. De Domenico insisted that a 12-lane gel had been used and that the labels were correct. Shortly after the interview, she provided ordering information for 12-lane pre-cast gels supplied by Bio-Rad. To substantiate the use of twelve-well gels in his lab, Dr. Kaplan provided the committee with a twelve-well comb during his interview on 7-3-12.

During the 7-17-12 interview, this film was again discussed, and Dr. De Domenico stated that the discrepancy between the widths of the different gels was explained by swelling of the 12-lane gel. In support of this argument, she showed a photograph of a 12-well comb and gel, indicating that the gel had swelled beyond the width of the comb:



Dr. De Domenico also provided an e-mail exchange with a Bio-Rad representative. Although she asked why a 12-lane gel might swell more than a 10-lane gel, the representative did not address this question, but stated:

> "It looks like your bands/lanes seem to get wider towards the bottom of the gel. Too much salt in the sample can cause the effect of lane pinching/broadening."

Since all the blots on the film appear to represent very similar experiments, this does seem to be a likely explanation for the different gel widths. (It also is not clear whether or not the gel has really swelled more towards the bottom, or if this is a perspective effect in the photograph.) In the 7-17-12 interview, Dr. De

Domenico also suggested that the greater swelling of the gel for Fig. 2B might be due to the use of a different gel type (Tris-HCl vs. Tris-Tricine, both of which are sold by Bio-Rad).

In considering Dr. De Domenico's assertion that a 12-lane gel was used for Fig. 2B and had swollen more than the 10-lane gels, the Committee overlaid images of 10- and 12-lane combs onto the film scan:



The 12-well comb in the images is the one provided to the Committee by Dr. Kaplan, and the 10-well comb is from the laboratory of one of the Committee members and has the same overall width (8.3 cm) as the 12-well comb. The images of the combs were made with a flatbed scanner using a resolution to match that of the film scan. As shown on the left, the 10-well comb matched all of the blots (with the possible exception of the blot labeled "1B", where the bands appear to have spread more than in the other gels). In contrast, when the 12-well comb is overlaid on the autoradiogram for Fig. 2B (upper right panel), there is a clear mismatch between the comb and bands. In order to match the bands, the image of the comb has to be stretched by 20%, as shown in the lower panel on the right. In contrast, the example of a swelled gel provided to the Committee by Dr. De Domenico appears to have swelled by about the width of one lane, or about 10%.

Having considered this issue at length, the Committee does not find Dr. De Domenico's explanations plausible, for the following reasons:

1.  We are aware of no reason that a 12-lane gel would swell more than a 10-well gel.

2.  The spacing of bands on the gel matches closely that of a 10-well comb, and of the other blots. It seems unlikely that a 12-lane gel would swell just enough to match the 10-well gels.

3. The required amount of swelling, 20% in a linear dimension, is quite large, and twice that shown in the example provided by Dr. De Domenico.

4. The example provided by Dr. De Domenico did not include any control, such as a 10-lane gel prepared under the same conditions.

The Committee also notes that in all of the blots represented on this film, for each of the samples for which reduced protein concentration in the cytoplasmic (flow-through) fraction is reported, the lane lies either in the center lane flanked by four lanes with detectable bands, or at the extreme sides of the lanes with bands. Furthermore, the absence of signal in these lanes appears to be absolute. This placement of the "negative" samples is dependent on the placement of control lanes, which shows no consistency among the different blots.  In the interviews on 7-2-12 and 7-17-12, Dr. De Domenico was specifically asked about the three control lanes indicated on the left-hand side of the blot for Fig. 2B.  In the first interview, she indicated that these were controls for this experiment, and that two or three controls were typically included in all experiments.  In the second interview, however, she stated that they were actually samples from another experiment performed by a technician and that the 12-lane gel was used in order to avoid running an additional gel.

The Committee concludes that the labels on the film presented to the Inquiry Committee most likely represent a falsification of data and that the labels on other blots (e.g. Figs. 1C and 7) on this film may have been falsified as well. Specifically, it appears that the labels were configured to place the ones indicating reduced protein concentrations in the flow-through fractions at positions where either no sample or molecular weight markers were actually loaded.

It is unclear when the labels currently on the films were added.  Examination of draft manuscripts and correspondence on Dr. De Domenico's computer indicates that the biotin-streptavidin experiments were performed in response to reviewers' comments on the original manuscript (submitted on 4-20-11).  The scan file with minimal labels has a date of 7-20-11, consistent with the experiments having been performed between the original submission date and the submission of the final revised manuscript, on 9-10-11.  A scan of the film with the more extensive labels was also found on Dr. De Domenico's computer, with a file date of 10-29-11, the day after Dr. Kaplan was notified by the journal of allegations concerning this paper, and 10 days before the notebooks were sequestered by the Research Integrity Officer.

If, as suggested above, the labeled film represents a falsification, then we must also conclude that Dr. De Domenico deliberately misled both the Inquiry and Investigation Committees.  When the issues outlined above were raised during interviews with the Investigation Committee, Dr. De Domenico adamantly denied that there had been any relabeling of the film to falsify the research record.

## 2.  Incorrect dates on films and notes for Paper 6

The notebooks currently held by the Research Integrity Office include autoradiography films and handwritten notes for experiments shown in paper 6.  These films were presented by Dr. De Domenico to the Inquiry Committee, which identified several inconsistencies between the films and the published figures.  In their responses to the Inquiry Committee's report, Drs. De Domenico and Kaplan stated that they had re-examined the films and corresponding notes and found, in most cases, that the notes supported the labels shown in the published figures.

The Investigation Committee revisited this issue during interviews with Drs. De Domenico and Kaplan, asking how they could be sure that the notes, rather than the labels on the film, were correct.  Dr. Kaplan acknowledged uncertainty, but Dr. De Domenico repeatedly insisted that the notes were the correct record.

Following these interviews, the Committee noted that nearly all of the dates on the films and notes were subsequent to the submission date of the manuscript (or the revised manuscript for a figure added in the revision).  In the one case (for Fig. 5A) for which the date on the film (4-2-10) precedes the submission date, a scan file of this film on Dr. De Domenico's computer is dated eight months earlier (8-3-2009).

It seems very unlikely that records would have been incorrectly dated in this way at the time the experiments were performed. At the least, the dates on the films and notes were most likely added several months after the work was done, and it is possible that the notes themselves were written then. This may have occurred after receipt of the allegations.

## 4. Notes for CD spectra in paper 10

Following the discovery of incorrect manipulations, and likely fabrication, of the circular dichroism spectra shown in Fig. 4 of paper 10, Dr. De Domenico was asked (on 9-5-12) to provide an account of the recording of these spectra and the data processing leading to the figure. Although she was aware at this time of the Committee's concern regarding the use of only the data points separated by 10 nm, she was not aware that the Committee had discovered evidence of falsification or fabrication. In response to this request, Dr. De Domenico delivered another notebook to the Research Integrity Officer's office on 9-11-12. In addition to printouts of some of the CD spectra, this notebook contained several pages of handwritten notes, with dates of 8-7-07, 8-17-07 and 9-1-07. The handwritten pages, along with relevant e-mail correspondence included in the notebook, have been scanned and are provided as a pdf file named "cd-nmr-notes.pdf".

Almost all of these notebook pages refer to instructions from "Tom" regarding the handling of the CD data, and the notes indicate that the data were sent to "Tom" for approval. These notes appear to support Dr. De Domenico's claim that Dr. Tomas Ganz played a major role in the analysis of the CD data.

In the context of the Committee's concern regarding unpublished NMR spectra, Dr. Ganz was specifically asked about his role in both the CD and NMR studies, though he was not informed of the evidence for manipulation of the CD spectra. Dr. Ganz's response is quoted in part below:

"In general, my participation in this paper was very limited except that our group provided key reagents for the study, including the hepcidin forms that are one of the subjects of this paper."

"The first version of the paper, which I received by e-mail on October 28, 2007, did not contain the NMR data, only the CD spectra. I first became aware of the NMR/CD data on Sept. 13, 2007 as a result of the e-mail quoted below."

The e-mail message, from Dr. Kaplan, is copied below:

Dear Tom
I tried calling you today. Just got back from vacation in San Diego- Met
Pauline Lee the day after you did- she gave me your regards. We are in the
final throes of sending you a manuscript. One of the punch lines is that
hepcidin does not bind to Fpn at low temperature because of an increased
rate of dissociation. The driving force is a change in hepcidin
conformation at low temperature. We can show this by CD and by molecular
sieve chromatography (at low temp- hepcidin forms a dimer). we have also
done one dimensional NMR and can see changes. Our NMR guy ( Jack Skalicki)
send Hans Vogel an email asking him for assignments- he never answered. If
we get the assignments then we can model the changes in hepcidin occurring
at low temp. Is it possible for you to ask him for that data? HEP20 does
not show the low temp changes- either by CD or by molecular sieve
chromatography.
The data is pretty compelling and (to me) interesting. Ivana is in Italy
and except for the NMR modeling data we have everything done. Diane and I
are working on the english and we hope to send you a readable version next
week.

Jerry

Note that this message is dated 9-13-07, twelve days after the latest date in the notes provided by Dr. De Domenico. Furthermore, a draft figure containing the CD spectra in their final form was found on Dr. De Domenico's computer, with a date of 9-3-07.

After receiving the information above from Dr. Ganz (and after receiving comments on the initial draft of this report from all of the parties), the Committee asked Dr. Kaplan (via e-mail) about the CD data. The specific questions asked of Dr. Kaplan are listed below, along with his responses:

1. Can you confirm the authorship and date of the e-mail message above [referring to the e-mail dated 9/13/07) ?

   I confirm that I wrote and sent that email to Dr Ganz

2. Do you know whether Dr. Ganz was sent or made aware of the CD data prior to 13 Sept. 2007?

   I believe that Dr. Ganz did not see the CD data prior to my email. It is, however, possible that we discussed it by phone, as we had numerous conversations about data as experiments were performed

3. Did Dr. Ganz play any role in the processing or analysis of the CD data?

   To my knowledge Dr. Ganz was not involved in the processing or analysis of the CD data. I think it is correct that he saw the data in near final form. I have found an email that indicates that we discussed a potential phone call regarding the manuscript on or about November 1. I do not remember if we had the conversation or what the conversation was about. He certainly saw the data as presented in the manuscript as he and Dr. Nemeth made comments/corrections relating to CD in the Methods, Results and Figure Legends of the manuscript prior to submission. (See attached manuscript drafts edited by Drs. Ganz and Nemeth. I received two versions of their comments V3 and V4 on the same day Nov6- I have enclosed both versions). I do not know who sent Dr. Ganz the manuscript- I cannot find an email from me to him with that attachment; I think Dr. Diane Ward sent him the manuscript

4. Did you serve as an intermediate in any communications regarding the CD data analysis, in particular passing on instructions from Dr. Ganz to Dr. De Domenico, or sending the data to Dr. Ganz for his comments?

   To my knowledge all of his comments about the CD data are reflected by his edits in the manuscript. . I do not recall passing on any comments from Dr Ganz to Dr. De Domenico regarding CD.

The responses from both Dr. Ganz and Dr. Kaplan, supported by the e-mail message of 9/13/07, clearly contradict the contents of the notebook pages provided by Dr. De Domenico to the RIO on 9/11/12 . Since Dr. Ganz is now in an adversarial relationship with Drs. De Domonico and Kaplan, the Committee recognizes that some caution is required in considering the statements from all of the parties. We note, however, that Dr. Ganz statements regarding the CD data were in response to questions concerning NMR spectra, and he was not informed of any irregularities regarding the CD at that time.

In her response to the initial draft of this report, Dr. De Domenico provided an e-mail exchange (Appendix 24 of her response) in support of her statements that Dr. Ganz was involved in the analysis of the CD data. However, this exchange (a message from Dr. Jack Skalicky to Dr. De Domenico and forwarded from her to Dr. Ganz) concerns only NMR data and is dated 10/29/07. These messages thus provide no support for the authenticity of the notebook pages.

The preponderance of evidence leads the Committee to conclude that the notebook pages provided by Dr. De Domenico on 9-11-12 were most likely created after she became aware of concerns regarding the CD spectra and were intended to mislead the Committee and shift responsibility to Dr. Ganz.

## SUMMARY OF HARD DRIVES AND DVD

### Notes on the computer drives and files used in RIO investigation 02-2111

Several different computer hard drives containing data from the respondents' computers were provided to the Investigation Committee. The following is a summary of the origins of these drives, as understood by the Committee, and their use in the investigations.

All of these drives were prepared, by the University Information Technology Office, from computers used by Drs. De. Domenico, Kaplan and Ward. Drives 1 and 2 were initially examined in the Research Integrity Office by one of the Committee members. Subsequently, secondary copies of these and the other drives were made available to the Committee members to use in their own offices.

**Drive 1:** Copied from Dr. De Domenico's computer on 9 November 2011, following the initiation of the inquiry. Examination of this drive by a Committee member on 24 June 2012 revealed that nearly all of the files on this drive were micrograph images organized in directories, most of which were named by date. Although this drive was identified as being a copy of Dr. De Domenico's computer drive, it appeared to be a copy of an auxiliary disk used specifically for image storage. Much of the material on this drive appeared to also be stored on a large number of CDs contained in notebooks sequestered by the Research Integrity Officer.

The drive also contained files that appeared to have been collected specifically for the inquiry, with the directory name "To Dr. Botkin". Most of the files in this directory appear to be related to one of the papers involving zebrafish.

**Drive 2:** Copied from Dr. Kaplan's computer on 5 March 2012, the day after receipt of the second set of allegations. This drive was examined by a Committee member on 24 June 2012, and was found to contain what appears to be a full copy of the system disk of Dr. Kaplan's computer. Several directories on this drive were found to contain manuscript drafts and correspondence regarding the papers under investigation. Image files containing figures for these papers were also found, but these were generally composite images for the final figures. No files containing primary data were identified on this drive.

This drive was not used further in the investigation.

**Drive 3:** A copy of a hard drive used for backups in the Kaplan laboratory. This copy was made in March 2012 with help from Diane Ward. This drive contained a variety of material, including laboratory data bases and backups of multiple computers, including Dr. Ward's. The most recent backup was dated 2 February 2006.

The only material found to be relevant to the investigation was a directory containing figures for paper 8, including multiple versions of the figures alleged to have been made from spliced blot images. These included both original film scans and composite images.

The files that appeared to be relevant to the figures in paper 8 were copied to a Committee member's computer for future reference.

**Drive 4:** After discovering that Drive 1 did not contain most of the files expected to be present on Dr. De Domenico's primary computer, the Committee requested that a full copy of her computer's drive be prepared. On 28 June 2012 the University IT office made copies of the system drives for both Dr. De Domenico's desktop computer and a new laptop computer. For these drives, the University IT office prepared forensic copies, which were retained by that office. A secondary copy was provided to the Research Integrity Office and the Committee.

The drive copied from Dr. De Domenico's laptop computer was not found to contain useful information for the investigation and was not used further.

The drive copied from Dr. De Domenico's desktop computer, however, was found to contain directories with files relevant to all of the challenged papers. These were found in either the "Desktop" or "Documents" directory of Dr. De Domenico's user directory.

Most of the investigation of this drive was carried out by one Committee member, who made a further copy for his own use, using the program Carbon Copy Cloner to insure that all of the data, including file dates, were preserved.  To minimize the chances of altering the files and date information, the write permissions for all of the copied contents were turned off.

The Committee also asked the Universtiy Information Technology Office to scan the forensic copy of Dr. De Domenico's desktop computer drive, specifically asking the staff to identify Excel and SigmaPlot files that had been deleted in the previous year.  The staff was unable to find evidence of such files.

**Scans of Autoradiography Films and Notes in Laboratory Notebooks:** Much of the research record examined by the Investigation Committee was in the form of autoradiography films of western blots, which were contained in loose-leaf notebooks sequestered by the Research Integrity Officer.  These notebooks also contained handwritten notes for the experiments.  To provide documentation for the Committee's report and an electronic record of key films, one of the Committee members scanned selected films and notes on 9-27-12.  The scans were made in the Research Administration Office.

**File Catalog:** The files from Dr. De Domenico's computer relevant to the investigation were found in a number of different directories, many of which are partial duplications of others.  For instance, files for paper 10, were found in directories named "Peptide", "Peptide Fpn", "Peptide Fpn from home", "Peptide Fpn from ivana" and "Peptide Fpn from ivana v1".  Within these directories, there are often further duplications of directories and files. In order to keep track of the various files used in the investigation, the Committee has prepared a catalog in the form of an Excel worksheet, and this catalog, along with copies of the original files, are provided on a DVD supplement to the report.

Each file has been given an identifier code of the form:

> paper number – figure number – index number

For instance, file 8-1A-1 is the first file relevant to Figure 1A of paper 8.  The catalog includes the file name, its directory path on the original disk, the last date of modification, as well as brief notes regarding the file contents.

The copies of the files provided with this report have been organized into directories for each of the papers and have been renamed by prepending the original name with the identifier code.  Thus, for the example above, the original file "Figure3a.tif" has been renamed "8-1A-1_Figure3a.tif".  The files on the DVD should be identical, other than the added name prefixes, to those on the forensic disk copy held by the Information Technology Office.

The DVD also contains the scans of notebook pages and films, as well as other documents collected by the Committee.

**INVESTIGATION COMMITTEE MEMBERS**
University of Utah Case: 02-2011
Federal Office of Research Integrity Case: DIO 4554
December 14, 2012

H. Joseph Yost, Ph.D.
Investigation Committee Chairman
Professor, Department of Neurobiology & Anatomy

David Goldenberg, Ph.D.
Professor, Department of Biology

Elizabeth Leibold, Ph.D.
Professor, Molecular Medicine Program

John "Sandy" Parkinson, Ph.D.
Distinguished Professor, Department of Biology

Guy Zimmerman, M.D.
Associate Chair, Department of Internal Medicine

1058

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Jeff Botkin [Jeffrey.Botkin@hsc.utah.edu] |
| **Sent:** | Monday, December 17, 2012 4:51 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Cc:** | Robert Payne |
| **Subject:** | DIO 4554 |

Dear Dr. Dahlberg — My sincere apologies for trying the patience of ORI.

The final investigation report was received on 12/10/12. It is extensive and, unfortunately, the Vice President for Research and our Senior VP for Health Sciences/Dean of the School of Medicine were not able to review the materials and collaborate on an institutional response before they left for the holidays. We will not have an institutional decision until early January.

I am prepared to send you the report and other relevant materials in time for our 12/19/12 deadline if that is most appropriate. However, one of the respondents has objected to this approach based on the possibility that the report, absent a potentially more lenient institutional decision, will negatively bias ORI.

In addition, our institutional misconduct policy permits a respondent to appeal to a Consolidated Hearing Committee at the University. This is an ad hoc committee under the auspices of the Academic Senate and generally can be conducted within 3 – 6 weeks of the appeal. This is conducted as a hearing and not as a new investigation. An appeal decision by the respondent(s) would follow the institutional decision regarding sanctions. (I understand that federal policy anticipates that appeals should have been complete within the 120 period for the investigation.)

So is our initial submission to ORI most appropriate tomorrow, after the institutional determination is made, or after the appeal process is complete?

My hope is that the complexity of the case and thoroughness of the report will, in part, justify our extended process but my apologies nonetheless. Thanks for your guidance.

Best regards,

-- Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
University of Utah
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

---

**From:** <Dahlberg>, "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>
**Date:** Friday, October 5, 2012 3:10 PM

**To:** Jeffrey Botkin <jeffrey.botkin͟␣␣␣.utah.edu>
**Cc:** "Dahlberg, John E (HHS/OASH)" <John.Dahlberg@hhs.gov>, "Fleming, Sheila P (HHS/OASH)" <Sheila.Fleming@hhs.gov>, "Garfinkel, Susan J (HHS/OASH)" <Susan.Garfinkel@hhs.gov>
**Subject:** RE: DIO 4554

Jeff,

As you might expect, ORI is concerned that respondents have an ample, although not excessive, opportunity to address draft reports and that institutions fully address whatever rebuttals are provided, since our work is simplified and can proceed more rapidly when we receive a well crafted report that fully addresses the issues, as well as mitigating and exacerbating circumstances. ORI therefore grants a total of 60 days for this process. Our current date is October 19, 2012, so we will expect your final report on or before December 19, 2012.

Regards, John

John Dahlberg, Ph.D.
Deputy Director
Office of Research Integrity
240-453-8800
john.dahlberg@hhs.gov
ORI Web Site: http://ori.hhs.gov/

---

**From:** Jeff Botkin [mailto:Jeffrey.Botkin@hsc.utah.edu]
**Sent:** Friday, October 05, 2012 5:12 PM
**To:** Dahlberg, John E (HHS/OASH)
**Subject:** DIO 4554
**Importance:** High

Dear Dr. Dahlberg — The Investigation Committee submitted its report on 10/2/12 and I shared the report with the respondents, Drs De Domenico and Kaplan, on 10/3/12. Our institutional policy permits a comment period for them of 10 days.

The report is 95 pages in length and addresses 20 allegations involving 11 publications. Dr. De Domenico plans to submit detailed comments on the report and, with the support of her external legal counsel, has requested an extension of the comment period to 40 days. I believe federal policy permits a 30 day comment period.

I want to give her an opportunity to fully respond to the report and I want to provide the University an opportunity to fully consider her comments.

Can I reasonably request another extension from you and, if so, what do think might be most appropriate in this circumstance? Thanks for your guidance.

Best regards,

Jeff

Jeffrey R. Botkin, MD, MPH
Professor of Pediatrics and Medical Ethics

1069

Associate Vice President for Research
75 South 2000 East #108
Salt Lake City, Utah 84112-8930
Phone: 801-581-7170

1070



## VICE PRESIDENT FOR RESEARCH
THE UNIVERSITY OF UTAH

January 9, 2013

Ivana De Domenico, Ph.D., Assistant Professor
Department of Internal Medicine
Jerry Kaplan, Ph.D., Professor
Department of Pathology
School of Medicine
University of Utah

Re: *Allegations of research misconduct*

Dear Drs. De Domenico and Kaplan:

The allegations of research misconduct directed at you have now been the subject of
an initial inquiry and a thorough investigation conducted according to the
university's policies and procedures. You have had ample opportunity to review and
respond to the Investigation Committee's findings and the Committee has
incorporated your responses into their final report, submitted December 14, 2012.

The Committee found irregularities in ten papers you published together between
2007 and 2011. These irregularities are characterized by the Committee as
sufficiently numerous and serious that they "constitute misrepresentations of the
primary data" and indicate "a reckless disregard for the integrity of the research
record". In the summary of their findings on p. 4 of the report, the Committee
members concluded that a preponderance of the evidence they considered
supported findings of 1) a persistent pattern of reckless disregard for appropriate
representation of primary data in the published papers, 2) falsification and
misrepresentation of data in several specific cases, and 3) fabrication of data in one
case. The Committee also found evidence that some primary research records were
deliberately altered to hide misconduct or direct responsibility to others.

With respect to Dr. De Domenico, the Committee concludes that, in keeping with
University of Utah policy 6.1.1 Rev. 2, section 6, Dr. De Domenico engaged in
scientific research misconduct. The Committee finds by a preponderance of the
evidence that Dr. De Domenico's conduct  1) resulted in significant departures from
accepted practices of the research community for maintaining the integrity of the
research record and 2) constitutes reckless disregard of accepted practices.

With respect to Dr. Kaplan, the Committee does not find research misconduct
because it found no evidence that Dr. Kaplan directly contributed to the
misrepresentation or manipulation of the data. However, the Committee finds "a
systematic lack of attention to detail on Dr. Kaplan's part, coupled with
inappropriate and unacceptable distance from primary findings and their reduction

to figures and other displays for publication that led to ignoring data or inconsistencies that were contrary to the perceptions or conclusions of a paper".

I have reviewed the investigation Committee's report and your responses to the Committee's findings and have decided to accept the findings of the Investigation Committee on behalf of the University of Utah. I believe that the preponderance of the evidence supports the Committee's conclusions concerning research misconduct by Dr. De Domenico. Although I am troubled by the evidence that Dr. De Domenico may have altered the primary research records to hide misconduct, it was not necessary to accept this finding to conclude that research misconduct occurred.

I also accept the finding of the Investigation Committee that although Dr. Kaplan did not commit research misconduct, he is responsible for serious failures of oversight in collaborative research with Dr. De Domenico.

I am referring the Committee's report and my decision to Senior Vice President for Health Sciences Vivian Lee to determine the appropriate sanctions in this matter.

Sincerely,

Thomas N. Parks, Ph.D.
Vice President for Research

cc: Vivian S. Lee, M.D., Ph.D., M.B.A.

2

1072

January 18, 2012

Ivana De Domenico, Ph.D
Department of Internal Medicine
School of Medicine
University of Utah

                RE:  Sanctions for Research Misconduct

Dear Dr. De Domenico:

        I have had the opportunity to carefully review the final report of the Investigation
Committee dated December 14, 2012 (the "Report").  I have also reviewed Vice President
Parks' letter to you and Dr. Kaplan dated January 9, 2013. I concur with the findings and
conclusions of the Report and accept the recommendation of the Investigation Committee for
the revocation of your appointment as a tenure-track faculty member at the University of
Utah.  Absent an appeal on your part, this recommendation will become final and your
position at the University will be terminated effective **January 31, 2013**.

        If you wish to appeal the findings, conclusions and recommendations of the
Investigation Committee, your appeal must be filed with the Office of the Academic Senate by
no later than **January 28, 2013**.

                                Sincerely,

                                Vivian S. Lee, M.D., Ph.D., M.B.A.
                                Senior Vice President for Health Sciences

cc:     Thomas N. Parks, Ph.D.
        Jeffrey R. Botkin, M.D, PMH
        John R. Hoidal, M.D.



THE
UNIVERSITY
OF UTAH

Jeffrey R. Botkin, M.D., M.P.H.

Associate Vice President for Research Integrity

75 South 2000 East #108  Salt Lake City, Utah 84112  (801) 581-7170  FAX (801) 585-9588

June 10, 2013

RECEIVED JUN 11 A 11: 29

John Dahlberg, Ph.D.
Director, Division of Investigative Oversight
Office of Research Integrity

RE: DIO #4554
Utah Misconduct case #02-2011

Dear Dr. Dahlberg:
Enclosed is the institutional report regarding this case. The University
determined that Dr. Ivana De Domenico was guilty of research misconduct.

In paper format, I am enclosing the RIO Report, the Investigation Committee
Report, Dr. De Domenico's response to the Investigation Committee Report, and
a copy of the University of Utah Research Misconduct Policy.

Enclosed are the following materials in electronic format:

- Disc labeled Case Files:
  - The RIO report
  - The allegations in PowerPoint format
  - Copies of the scientific publications in PDF format
  - The report of the Inquiry Committee
  - The report of the Investigation Committee
  - The responses of the respondents to the Investigation Report
  - The report of the University Consolidated Hearing Committee
  - The University of Utah Research Misconduct policy
- A disc labeled Investigation Files that contains supplemental data and
  figures prepared by the Investigation Committee

Please let me know if you would like any additional materials. Thank you for
your guidance during this process. I look forward to working with ORI to
address these concerns.

Best regards,

Jeffrey R. Botkin, MD, MPH
Research Integrity Officer
University of Utah

1078



January 28, 2013

The Office of the Academic Senate
University of Utah
115 Park Building
201 Presidents Circle, Room 115
Salt Lake City, UT 84112

Re:     *Request for Consolidated Hearing Committee Hearing on*
        *behalf of Dr. Ivana De Domenico*

**Ryan B. Bell**
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3383 DIRECT
801 532-7543 FAX
rbell@rqn.com
www.rqn.com

To the Officers and Members of the Academic Senate,

This firm represents Dr. Ivana De Domenico in connection with the ethical proceedings that have been conducted against her by the University of Utah's Office of Research Integrity and Compliance, University Case No. 02-2011.

Accompanying this letter is a completed Request for Hearing by the Consolidated Hearing Committee, dated January 28, 2013, which we hereby submit to the Office of the Academic Senate on Dr. De Domenico's behalf. We also take the opportunity here to provide the following details of this appeal, which are requested in the intake form.

**Statement Setting Forth the Basis for Appeal.**  The allegations against Dr. De Domenico are complex and involve a number of scientific papers. A detailed statement setting forth Dr. De Domenico's defenses against these allegations is provided herewith as document 3 within the provided binder. To state the basis of this appeal more succinctly, Dr. De Domenico maintains that she has not engaged in research misconduct as defined by University Policy 7-001 sec. V(D)(6)(b). That is, while Dr. De Domenico acknowledges that papers she co-authored contained errors, no such errors were "committed intentionally, knowingly, or in reckless disregard of accepted practices."

The process conducted against Dr. De Domenico was materially flawed and in direct violation of University policy in a number of respects, which had the direct result of depriving Dr. De Domenico of a fair hearing before the Investigation Committee that examined her conduct. Further, the Investigation Committee failed to adhere to the proper standard of fault, requiring a "preponderance of evidence" against Dr. De Domenico to hold her guilty of research misconduct. The committee repeatedly leapt to unfounded conclusions and drew improper assumptions in clear violation of that standard. Finally, Dr. De Domenico has explained persuasively that much of

A  P R O F E S S I O N A L  C O R P O R A T I O N

The Office of the Academic Senate
University of Utah
January 28, 2013
Page 2

the scientific data which has come under fire was not attributable to her, was
not erroneous, and has been replicated by independent sources, establishing
that Dr. De Domenico could not have had any motive for falsification. A
more complete statement of these points is set forth in Dr. De Domenico's
complete response to the Investigation Committee.

      **Statement Setting Forth Desired Relief.** Dr. De Domenico seeks to
have the Investigation Committee's finding of research misconduct
withdrawn, to have its recommended sanctions reversed, and to have the
University's decision of termination revoked.

      **Relevant Documentation.** We provide herewith a binder containing
several documents of relevance to this appeal, as follows:

1. October 2, 2012 Initial Report of Investigation Committee
2. November 16, 2012 Cover Letter to Response to Investigation
   Report
3. November 16, 2012 Response to Investigation Report
4. Detailed Additional In-Line Response to Committee Report
5. Appendix to Response to Investigation Report
6. Supplemental Response Regarding Paper 10
7. Appendix 1 to Supplemental Response
8. Appendix 2 to Supplemental Response
9. December 10, 2012 De Domenico Letter to University
   Administrators
10. December 14, 2012 Final Report of Investigation Committee
11. January 9, 2013 Thomas Parks Letter
12. January 17, 2013 Vivian Lee Letter

      Dr. De Domenico looks forward to a complete hearing before a
Consolidated Hearing Committee. As a matter of scheduling, while we note
the committee's power to schedule in its discretion, we wish to alert you to
some important scheduling issues. First, I will be traveling away from Salt
Lake City from February 15 through the 18th. Dr. De Domenico is traveling
to Italy for her wedding—an event for which many guests have already made
travel plans, and which thus cannot be cancelled—between March 1 through
March 20. Finally, I will be traveling out of the country from April 14
through April 21. We would appreciate accommodations for these events, and
will work with the Committee toward a mutually agreeable schedule for this
appeal.

The Office of the Academic Senate
University of Utah
January 28, 2013
Page 3


      Please do not hesitate to contact me with any questions or further
instructions.

               Sincerely,

               RAY QUINNEY & NEBEKER P.C.

               Ryan B. Bell

1218680

Memorandum

To:    Consolidated Hearing Committee

From:    The Investigation Committee (individually named below)
         Jeffrey R. Botkin, MD, MPH
         John R. Hoidal, MD
         Vivian S. Lee, MBA, MD, Ph.D.
         Thomas Parks, Ph.D.

Date:    March 15, 2013

Re:      Ivana De Domenico Research Misconduct Appeal:  Response

---

This matter comes to the CHC as an appeal from the findings, conclusions and recommendations of the Research Misconduct Investigation Committee (the "Investigation Committee"). Regulations Library, Policy 6-002, Section 10 (B)(8)(a). The charge of the Consolidated Hearing Committee is to make a determination, "by a preponderance of the evidence, [whether] the respondent(s) engaged in research misconduct."  Policy 6-0012(D)(iii)(8).

The Investigation Committee, in this case was comprised of the following individuals who each have significant research experience and expertise:

    H. Joseph Yost, Ph.D., Professor, Department of Neurobiology and Anatomy
    David Goldberg, Ph.D., Professor, Department of Biology
    Elizabeth Liebold, Ph.D., Professor, Molecular Medicine Program
    John "Sandy" Parkinson, Ph.D., Distinguished Professor, Department of Biology
    Guy Zimmerman, M.D., Department of Internal Medicine

These individuals were selected to serve on the Investigation Committee without objection from Dr. De Domenico.  They dedicated themselves to carefully reviewing the multiple allegations and extensive research record for over nine-months and devoted hundreds of hours of their time to this process.  In the end, they reached a unanimous decision that Dr. De Domenico had in fact engaged in research misconduct.

Although the CHC, by policy, must examine the evidence and come to its own conclusions on the issue of research misconduct, the CHC should take into consideration the thorough and complex nature of the investigation and accord the Investigation Committee significant deference in this process.  Vice Presidents Parks and Lee are impressed by the tremendous work of the Investigation Committee and are convinced that the Committee appropriately concluded that Dr. De Domenico engaged in research misconduct as defined in the federal regulations.  Even if Dr. De Domenico's actions had not met the federal standards for research misconduct, her dismissal would need to be upheld.  Her conduct clearly and seriously deviated from the practices accepted in the

research community and clearly violated her professional obligations. Regulations Library, Policy 6-316, Section 4(c)(2).

For her appeal, Dr. De Domenico has submitted a cover letter from her legal counsel and various materials that she previously submitted on November 16, 2012 as her response to the initial draft report of the Investigation Committee. The Investigation Committee considered the November 16, 2012 materials and then issued its Final Report on December 14, 2012 (the "Final Report"). The Final Report carefully and thoroughly addresses all of the scientific issues, findings and conclusions related to the research misconduct investigation. Therefore, Respondents are submitting the Final Report, attached as Exhibit A, as the Respondents' position paper on those findings and conclusions.

In addition to the scientific issues, Dr. De Domenico's attorney has raised a number of legal issues challenging the research misconduct process followed in this case. She also challenges the legal standards applied by the Investigation Committee. This memorandum addresses the additional legal arguments presented by her attorney in the memorandum dated November 16, 2012.

I.    The Investigation Committee Appropriately Reconsidered All Allegations of Research Misconduct

A.    The Inquiry Committee's Factual Findings Supported the Decision to Proceed with an Investigation

Dr. De Domenico asserts that because the Inquiry Committee did not "uncover evidence of intent to deceive or misrepresent data" and did not recommend that the matter proceed to investigation by an Investigation Committee, it was improper for the University's Research Integrity Officer, Dr. Jeffrey R. Botkin, to form an Investigation Committee to consider all of the research misconduct allegations. Dr. De Domenico asserts that proceeding with the investigation violated federal law and University policy. This assertion is incorrect.

According to the federal regulations which govern the research misconduct process, the role of the Inquiry Committee is to "decide if an allegation warrants an investigation." 42 C.F.R. § 93.307(d). The Inquiry Committee is not charged with reaching the ultimate determination regarding the existence or non-existence of research misconduct and is not required to do a full review of all of the evidence. Rather, its role is simply to "conduct an initial review of the evidence" to determine whether a more complete investigation is warranted. § 93.307(c). An investigation is warranted if the Inquiry Committee reaches the preliminary conclusion that "the allegation **may have some substance**." § 93.307(d)(2) (emphasis added).

In this case, the Inquiry Committee found multiple errors in the published data for eleven research papers. The committee found additional errors beyond those in the original allegations which "were identified by the committee and not by Dr. De Domenico." (See the Inquiry Committee Report, p. 3, attached as Exhibit B). The committee found "extreme carelessness on the part of Dr. De Domenico in preparing the figures" for many of these papers. Id. at p. 4. The Committee found that "each of these papers, and perhaps others from these combined authors, contain misrepresentations of

3854

the primary results and thus deviate significantly from accepted scientific practice."  Id.
Although the Inquiry Committee did not find "evidence of intent to deceive or
misrepresent the data from the experiments in question", it was questionable whether the
issue of "intent" was even within the purview of the Inquiry Committee.  Arguably, upon
a finding of errors, extreme carelessness, misrepresentations of the original data, and
significant deviations from accepted scientific practice, the Inquiry Committee had no
choice but to find "some substance" to the research misconduct allegations which, as
explained above, required a more detailed investigation.

 As the inquiry wound to an end, Dr. Botkin was conflicted about the next steps in
the process.  He was concerned about the serious errors found in the research papers but
was not anxious to proceed with a time consuming investigation if the problems
amounted simply to honest error.  He was unwilling to terminate the investigation
without guidance and support from the federal Office of Research Integrity ("ORI").

 In January of 2012, Dr. Botkin contacted ORI to inquire about the appropriate
next steps.  He noted that the Inquiry Committee had found a "pattern of sloppy science
but no direct evidence of willful data manipulation.  In response ORI noted "what is often
a tricky matter of differentiating between sloppy behavior and a significant pattern of
alterations of images that implies a level of intent."  (See the email from Jeff Dahlberg,
January 20, 2012, attached as Exhibit C).  Dr. Dahlberg's suggestion was to "send the
inquiry report to ORI (with all of the documents relied upon by the committee), and by
citing 42 C.F.R. 93.316, ask us if it is appropriate to consider not moving to an
investigation even though there is evidence for possible research misconduct.  DIO staff
can evaluate the preliminary findings of the inquiry committee and evaluate whether
there is any possibility that they might rise to the level of recklessness or even knowing
or intentional representation that we could find legally sufficient."  Id.

 The Inquiry Committee completed its analysis and finalized its report on February
16, 2012.  By March 1, 2012, Dr. Botkin had determined to take ORI's advice and was
preparing to forward the Inquiry Committee report to ORI for its consideration and
advice under 42 C.F.R. 93.316.  Before forwarding the report to ORI, on March 4, 2012,
the University received a second set of allegations of research misconduct concerning
other papers authored by Dr. De Domenico.  Because of the close call on the original
allegations, and because the new allegations appeared to have at least "some substance,"
Dr. Botkin made the decision to proceed with a full investigation of all of the allegations,
old and new.  On March 5, 2012, Dr. Botkin informed ORI that the University would be
proceeding with an investigation.  In response, Dr. Dahlberg wrote:  "Thanks for letting
us know.  As you probably know, the complainant has sent us additional concerns, so
even without seeing the inquiry report, it appears that an investigation would be the
appropriate way to evaluate the large number of concerns."  (See the email from John
Dahlberg, March 5, 2012, attached as Exhibit D).

 The Investigation Committee was formed and charged with considering all of the
allegations of research misconduct.  Unlike the Inquiry Committee, it was the role of the

3855

Investigation Committee to thoroughly investigate all of the evidence and to reach a determination on each separate allegation of research misconduct.  42 C.F.R. § 93.313.[1]

B.    Investigation Committees May/Must Investigate New Information of Research Misconduct

Dr. De Domenico has suggested that the University should have conducted an initial inquiry on each new allegation of research misconduct and that failure to do a separate inquiry into new allegations deprived her of due process. This is not correct. The federal rules contemplate that new information about research misconduct might arise during the investigation phase.  The Investigation Committee is charged with pursuing "diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of additional instances of possible research misconduct, and continue the investigation to completion." 42 C.F.R. § 93.310(h).  The rules do not contemplate that each new allegation of misconduct is entitled to a separate inquiry.  Dr. De Domenico was made aware during the investigation phase of each new allegation of potential research misconduct and was given ample opportunity to provide information to the Committee in response to those allegations. This is all that is required by the law and University policy in order to satisfy Dr. De Domenico's due process rights.

II.    Dr. De Domenico Had Ample Opportunity to Respond to the Research Misconduct Allegations

Dr. De Domenico asserts that she was deprived of the opportunity to fully defend herself against the research misconduct allegations because she was not interviewed concerning the allegations relating to Paper 10.  The federal rules contemplate that the Investigation Committee will interview each respondent as part of the research misconduct process.  42 C.F.R. § 93.310 (g).  Although the rules require a "thorough and sufficiently documented" investigation, they do not require multiple interviews on every potential aspect of the investigation.

In this case, the Investigation Committee interviewed Dr. De Domenico during three separate days in July of 2012.  In addition, the committee corresponded with Dr. De Domenico through Dr. Botkin's office on relevant aspects of the investigation, including issues concerning Paper 10.  Dr. De Domenico had numerous opportunities during the investigation to state her position on the allegations.  The Investigation Committee's initial draft report was issued to Dr. De Domenico on October 2, 2012.  Although University policy only allowed Dr. De Domenico ten (10) days to provide a written response to this report, because of the complexity of the case, she was given an additional thirty (30) days to prepare her response.  Dr. De Domenico was provided the committee's

---

[1] Dr. De Domenico has suggested that it was "double jeopardy" for the Investigation Committee to reconsider the finding and recommendations of the Inquiry Committee on papers 2-5 and then to draw a different conclusion on the existence of research misconduct.  (Respondent's Memorandum, p. 19).  Not only was this not "double jeopardy" it was exactly the role assigned to the Investigation Committee by the federal regulations.  The Investigation Committee was the only committee charged to thoroughly review all of the evidence and to make a finding of research misconduct.

4

3856

complete analysis on October 2, 2012 and had forty (40) days to provide any additional arguments/documentation supporting her position before the final report was issued.

III.     The Investigation Committee Applied the Appropriate Burdens and Standards of Proof

As Dr. De Domenico notes in her legal memorandum, the Investigation Committee's charge was to determine by a preponderance of evidence whether Dr. De Domenico engaged in research misconduct.  42 C.F.R. § 93.104(c).  According to the federal regulations, "*[p]reponderance of the evidence* means proof by information that, compared with that opposing it, leads to the conclusions **that the fact at issue is more probably true than not**." 42 C.F.R. § 93.219 (emphasis added).  The University has the burden of proof in the first instance for making a finding of research misconduct.  42 C.F.R. § 93.106(b)(1).  However, Dr. De Domenico has the burden of "going forward with, and the burden of proving, by a preponderance of evidence, any and all affirmative defenses raised."  § 93.106(b)(2).  Moreover, she has the burden "of going forward with and proving by a preponderance of evidence any mitigating factors that are relevant to a decision to impose administrative actions following a research misconduct proceeding." § 93.106(b)(3).

In this case, the research record speaks for itself.  It is undisputed that each of the eleven research papers contained irregularities and that cumulatively there were errors in over 20 figures throughout the papers.  "The large number of instances, over a period of several years, [suggested to the Committee] a reckless disregard for the integrity of the research record, as opposed to the occasional lapses that might occur in any laboratory." (Investigation Committee Report, p. 1).  Moreover, the nature of several of the irregularities led the Committee to conclude that "this disregard for integrity extended beyond negligence to instances of intentional falsification . . . and the fabrication of data."  Id.

In the face of this overwhelming evidence, the committee found that the preponderance of evidence standard had been met.  Having reached this conclusion, it was not the obligation of the Committee to assume "honest error" on the part of Dr. De Domenico. Rather, it was Dr. De Domenico's burden to present evidence to refute the evidence of her reckless and, in certain circumstances, intentional misconduct.  Not only was she unable to present such evidence, the Committee found that she "minimize[ed] the severity of the 'irregularities' and lack[ed] remorse for the errors during interactions with the Committee."  Id. at p.6.  This behavior indicated to the Committee "that Dr. De Domenico is unaware of, or indifferent to, the requirements for ethical representation of the primary research data in publications."  Id.[2]

---

[2] It is instructive to note that when Health and Human Services is considering what administrative actions to take during its research misconduct investigation, it looks at the same factors examined by the Investigation Committee including the level of intent, whether the misconduct is isolated or part of a continuing pattern, the impact on the research, and whether or not the respondent accepts responsibility for the misconduct.  42 C.F.R. § 93.408.

5

IV.     The Absence of Original Research Records is Evidence of Research Misconduct

The Investigation Committee was very troubled by Dr. De Domenico's inability, in multiple instances, to locate and point the Committee to the original research data underpinning many of the erroneous figures in the research papers. Dr. De Domenico asserts that "where there is an absence of data thought necessary to fill in a gap or clarify a discrepancy, that absence cannot be held against the respondent, but must weigh against a finding of misconduct." (Respondent's Memorandum, p. 11). She misunderstands the law. The federal regulations clearly provides as follows:

> The destruction, absence of, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the institution or HHS establishes that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community.

42 C.F.R. § 93.106 (emphasis added).

The Investigation Committee noted that it is a "requirement that researchers maintain the integrity of research data and records pertinent to publications [and] the absence of primary data can be seen as evidence for practices outside the standards of the field." (Investigation Committee Report, p.2). In other words, it was Dr. De Domenico's obligation, as the lead or corresponding author on ten of the eleven papers, to preserve the integrity of the research record and her failure to protect and produce that record in numerous instances was, at best, a significant departure from accepted practices in her research community. Contrary to the claims in her legal memorandum, Dr. De Domenico was specifically asked to provide the original research data underlying the erroneous figures in the research papers. In some cases, she produced incomplete information. In others she failed to provide any data. (Investigation Committee Report, p. 44). Under these circumstances, federal law required the Committee to consider the absence of the primary research data as evidence of research misconduct.

V.      The Investigation Committee  Considered Dr. De Domenico's Arguments
        Regarding Paper 1 and Did Not Find Her Explanations Credible

Dr. De Domenico asserts that the Investigation Committee "failed to properly ascertain and weigh the evidence relating to [the figures in Paper 1]." (Respondent's Memorandum, p. 15). To the contrary, the Committee considered each of Dr. De Domenico's arguments. They simply found the arguments unpersuasive. Please see the Committee's analysis regarding Paper 1 and its views regarding Dr. De Domenico's explanations for the irregularities. (Investigation Committee Report, pp. 10-19). Based upon the evidence before the Committee, including the explanations of Dr. De Domenico, the Committee concluded that "the film for Figures 2Aii, 2B and 5 was deliberately mislabeled in order to show the results desired by the authors. This suggests that the primary record was altered and that the labeled film is falsified." (Investigation Committee Report, p. 19).

3858

VI.     The Irregularities in Papers 2-5 Are Evidence of Recklessness

       For Papers 2-5, Dr. De Domenico argues that the Investigation Committee should
not have reconsidered these papers as evidence of research misconduct.  As previously
explained, it was the obligation of the Investigation Committee, and not the Inquiry
Committee, to thoroughly review all of the evidence and to reach the ultimate
determination regarding research misconduct.  The Investigation Committee considered
Papers 2-5 in the context of the entire record.  "Given the large number of such errors, the
Committee concluded that there was a persistent pattern of reckless disregard for
appropriate presentation of primary data in the published papers."  (Investigation
Committee Report, p. 4).

VII.     Dr. De Domenico's Inability to Produce Original Data for Paper 6 Is
         Evidence of Research Misconduct

       Dr. De Domenico's principal legal argument regarding Paper 6 is that the
Committee should not have considered Dr. De Domenico's failure to produce the original
data underlying her figures as evidence of potential misconduct.   As explained above,
federal law requires such an inference.  The Committee noted that "Dr. De Domenico
was specifically asked to identify the files associated with the error bar calculations for
this and other papers.  This request was made on 7/26/12, allowing more than two months
to respond before the Committee submitted its report."  (Investigation Committee Report,
p. 44).  Moreover, the Committee found Dr. De Domenico's explanation concerning
some of the missing data, that SigmaPlot data was lost during a transfer from a Windows
computer to a Macintosh computer, particularly suspect.  As the committee noted:  "In
fact, the files that are most conspicuously missing are the Microsoft Excel files in which,
according to Dr. De Domenico, the error calculations were carried out.  Excel files are
compatible with both the Windows and Macintosh systems and are routinely transferred
between the two."  (Investigation Committee Report, p. 44).

VIII.     Dr. Ward's Shared Responsibility for the Errors in Papers 7 and 8 Does Not
          Relieve Dr. De Domenico of Her Responsibility for those Errors

       In her legal analysis of Papers 7 and 8, Dr. De Domenico complains that the
Committee placed undue emphasis on Dr. De Domenico, and not enough emphasis on
Dr. Ward who played a substantive role in preparing the figures for Papers 7 and 8.  In
fact, the Committee found both of these individuals responsible for the errors in Papers 7
and 8.  "It appears that Drs. De Domenico and Ward had full control over presentation of
the experimental data and both of them must be held responsible for the
misrepresentations that have come to light.  The Investigation Committee considers it
unlikely that these errors were due to simple carelessness during the preparation of the
figures for publication."  (Investigation Committee Report, p.49).  However, as noted by
Dr. De Domenico, Dr. Ward was not the subject of the research misconduct investigation.
Moreover, although the Committee found Dr. Ward equally responsible for the issues in
Papers 7 & 8, the Committee found Dr. De Domenico to be the common thread
throughout all of the eleven papers examined by the Committee.  Just because Dr. Ward
shared responsibility for the errors in these two papers does not somehow excuse Dr. De

3859

Domenico's own culpability for the errors in these papers and all of the others examined by the Committee.[3]

IX.    It Was Dr. De Domenico's Burden to Explain the Confusing Research Record for Paper 9

Dr. De Domenico asserts that the Committee applied the wrong burden of proof because it required her to explain the clear discrepancies in the research record. The allegation relating to Paper 9 was that Figure 3A was "digitally spliced together from separate gels and inappropriately manipulated." The Committee concluded that there was no attempt to hide the splice. However, it found that the "more important concern was whether the input and eluate samples were from the same experiment as the flow through samples and whether the samples were processed at the same time. This is critical in order to compare the relative amounts of protein in each sample." (Investigation Committee Report, pp. 55-56). Based upon the inconsistencies found in the "execution of the experiments and in the preparation of the figures, [the Committee concluded that] little confidence can be placed on the accuracy of the published data." Id. at p. 56. Under federal law, it was Dr. De Domenico's responsibility to provide an adequate explanation for these inconsistencies. 42 C.F.R. § 93.106(b).

X.    The Investigation Committee Carefully and Thoroughly Examined the Evidence Concerning Paper 10.

In her counsel's memorandum, Dr. De Domenico asserts that the Investigation Committee failed to understand the evidence relating to Paper 10. To the contrary, the Investigation Committee described in great detail its analysis of the problems with Paper 10. The Committee spent nearly a quarter of its report addressing these problems (Investigation Committee Report, pp. 57-83). Respondents refer the CHC to the Investigation Report for this careful scientific analysis.

Besides her general challenge to the Committee's scientific conclusions regarding Paper 10, Dr. De Domenico also asserts that others (specifically Dr. Kay and Dr. Ganz) may have manipulated the CD Spectra data and that she lacked the sophistication to make

---

[3] It is also important to note that the Committee did not give Dr. Ward a pass on her conduct. With respect to Dr. Ward, the Committee found:

> Dr. Ward performed unacknowledged splicing of western blot images, some of which were obvious in the figures. The Committee does not understand how Dr. Ward could have built the figures with bands upside-down and other obvious errors. The large number of irregularities and mistakes suggests that there was a lack of attention to detail, failure to examine the raw data, inadequate mentorship in protecting the fidelity of the data, and failure to insist on rigorous and clear assurances of the integrity of the data. The Committee found no evidence that there was intent to deceive or manipulate data on the part of Dr. Ward. Nevertheless, the sloppiness and carelessness in the production of the figures, and the laxness in the examination of the primary data were disconcerting to the Committee and suggest a dereliction of responsibility to assure the accurate presentation of primary data.

(Investigation Committee Report, p. 7).

8

those manipulations.[4]  The Committee considered and was not persuaded by these arguments.  The Committee noted that by Dr. De Domenico's own admissions, Dr. Kay "saw only the initial set of data, in their raw form, and the final figures" and, therefore, could not be responsible for the manipulation. (Investigation Committee Report, p. 82).  With respect to Dr. Ganz, the evidence showed that "Dr. Ganz was not aware of the CD data until after the figures were completed."  Id.

With respect to her claim of lack of sophistication, the Committee notes "that the manipulations were not, in fact, complicated.  All that was required was a rough idea of what a CD spectrum of hepcidin should look like (provided by Dr. Ganz's previous publication), and the ability to manipulate a few data points and draw spline curves with the SigmaPlot program."  Id.

The analysis and findings of the Committee regarding Paper 10 are well founded and quite damning.  Dr. De Domenico failed to sustain her burden of proving her affirmative defenses.

XI. <u>Dr. De Domenico Has Failed to Raise or Prove any Affirmative Defenses for the Apparent Falsification in Paper 11</u>

After a careful analysis of the evidence regarding Paper 11, the Investigation Committee concluded that for Figure 5B, the "bands are from the same gel and western blot and do not represent proteins that reacted from different antibodies, as claimed in the published figure." (Investigation Report, p. 86).  Moreover, the Committee found that "the image used to represent blots with two different antibodies almost certainly represents instead, a single blot.  One, at least, of the blots in the published figure must, therefore, be a falsification."  Dr. De Domenico's statements to the Committee are unlikely to be true."  Id. at p. 88.  Therefore, the preponderance of evidence led to a finding of research misconduct.  In the face of this compelling evidence, it was Dr. De Domenico's burden to show from the research record that this was not the case.  As conceded in her memorandum, she was not able to do this.[5]

XII.     <u>Research Misconduct May Exist Even if a Published Conclusion is Accurate</u>

Dr. De Domenico argues that all of the research results in the eleven papers have been validated and that this is evidence that no research misconduct occurred.  In response to this argument, the Investigation Committee stated:

It is entirely possible, as claimed by the respondents, that many or all of the results are reproducible.  However, subsequent reproducibility of a

---

[4] Dr. De Domenico also complains that the Committee's investigation went beyond the original allegations, that the committee applied an inappropriate inference for any missing original data, and that she did not get an interview with the Committee that she was entitled to get.  These arguments are the same arguments made generally and specifically with other papers and have already been addressed in this memorandum.
[5] Again Dr. De Domenico complains that missing data from the research record should not be construed against her even though federal law requires this negative inference.

3861

scientific observation by the same research group or by other groups does not address the questions of whether or not the original experimental data were accurately represented in the published papers. The reckless or deliberate misrepresentation of research results is unacceptable, even if other data may support the conclusions. <u>Research misconduct can occur through faulty practices and processes that lead to a published conclusion, even if that conclusion eventually is found to be correct.</u>

(Investigation Committee Report, p. 1) (emphasis added).

<u>Conclusion</u>

The Investigation Committee conducted a lengthy and thorough investigation of the allegations of research misconduct. They reported their findings and analysis in their extensive ninety-seven page Final Report. Their findings and conclusions are compelling. In the face of the overwhelming evidence of research misconduct, the burden shifted to Dr. De Domenico to assert and to prove affirmative defenses that would adequately explain the research record or would otherwise relieve her of her apparent responsibility for the misconduct. She simply did not meet this burden. Under these circumstances, federal law required the Committee to find research misconduct. Dismissal was the only appropriate sanction for Dr. De Domenico's egregious conduct in this case and the CHC should support the final decision of Senior Vice President Dr. Vivian Lee.

10

the notes, ignoring that on that occasion I was with Ms. Subdury all the time looking through books in the underground level where Dr. Botkin keeps all the sequestered books.

My last comment is that The Complainants concluded that my *"conduct clearly and seriously deviated from the practices accepted in the research community and clearly violated her professional obligation"* I agree that I made mistakes and I admitted them. However, a few years ago I started my independent research and a senior scientist at the University (Dr. Li) and outside investigators directed me to conduct a rigorous research. This is supported by the fact that even the Investigation Committee reported that the publication from Dr. De Domenico's laboratory had no irregularities (Paper 4). I have to believe that my research and conduct now as an independent investigator is correct otherwise Dr. Zimmermann, head of research in the Medicine Department and member of the Investigation Committee, would never have presented the discovery on Giant Cell Arteritis from my laboratory during a University philanthropic event. It is still unclear to me how he can do that and a few days later accuse me of research misconduct and recommend my dismissal from my faculty appointment. I have asked for an explanation from multiple people: Drs. Botkin, Lee, Park, etc., but never got a response. I'm still hopeful that this Panel may have an answer for me.

Sincerely
Ivana De Domenico

Salt Lake City, September 24, 2012

Dear Dr. Botkin,

I have been out of my office. However, I had the opportunity to review the notes from my interviews. I had made some changes and sent them to Heather as word documents with track changes.

With this letter I would like to ask you a clarification: I noticed that the inappropriate comments made by Dr. Goldenberg during my interviews (i.e. that I deserve to be fired (interview 7-2-2012) and that I'm a liar (interview 7-17-2012)) are not reported. I understand that maybe this is not important for your decision's process but it might important for future actions, if necessary. From the start of this investigation I feel to have been emotionally abused during my interviews and this made my defense very hard and uncomfortable. In conclusion, if you think is appropriated, I would like that somewhere Dr. Goldenberg's comments and insinuations will be reported.

Please understand that the above request is not an escape, I'm aware that the mistakes were made and I'm always admitted them but I believe I deserve a fair and impartial investigation from each member.   I have been cooperative with the investigation but I feel been retaliated continually by some member of the committee. Furthermore, this investigation has entered the public domain.

I also request to obtain a copy of the original files (image and pdf files) generated by Dr. Goldenberg.  These files were showed during all my interviews as well during Diane and Jerry's interviews. The files show his personal reconstruction of the data/published figures using electronic files or data from the notebooks stored in your office.  Every time these files were presented was very hard for me to understand how they were put together.

I would like to thank Your and Heather to professionally and kindly assist me in this difficult process.

Sincerely
Ivana De Domenico

| Paper | Error in published figure/s | Direct Involvement | Additional Responsibility | Ultimate Responsibility for scientific accuracy | Appendix |
|---|---|---|---|---|---|
| 1 | yes | De Domenico | Multiple | Kaplan | a |
| 2 | yes | Ward/Kaplan | Ward | Kaplan | a, b |
| 3 | no | Ward/Kaplan | Ward | Kaplan | b,c |
| 4 | no | none | | De Domenico | d |
| 5 | yes | De Domenico | Multiple | Kaplan | e |
| 6 | yes | De Domenico | Ward | Kaplan | b |
| 7 | yes | Ward | Ward | Kaplan | f |
| 8 | yes | Ward | Ward | Kaplan | f |
| 9 | yes | Ward | Ward | Kaplan | f |
| 10 | no | none | | Kaplan | g |
| 11 | yes | De Domenico | Multiple (De Domenico/ Ward) | Kaplan | h |

Appendix

a. Experiments and scanning of western blots were done by Dr. Kaplan/Ward's employees.  All the western blots were in one film, which was the primary problem during the preparation of figures by De Domenico.  Several data were not found for this paper because they were kept in the books removed by Nazzicone.

b. De Domenico did not work on the final figure, she was out of the country during the resubmission see <u>Reference I</u>: screen shots of an email showing Dr. Ward asking for raw data and informing De Domenico that the paper was submitted.

c. De Domenico made all the figures and ran the experiments with other Kaplan/Ward's employees.

d. This paper (in red) did not have any errors. The investigation Committee agrees.

e. An outside investigator took the images of each embryo with different exposures, see <u>Reference II</u>. De Domenico when assembling the figure used a wrong image but no Photoshop manipulation was performed.

f. Dr. Ward generated the figures.

g. This paper has no published errors identified by the allegation. Dr. Kay's response in the Investigation Report suggests that Dr. Ward and Dr. Kaplan led the manuscript and figures' preparation after De Domenico and other technicians carried out the experiments and possibly drafted figures.

h. Immunofluorescence was run by Ward and De Domenico.  All the western blots were done by Dr. Kaplan/Ward's employees. Dr. De Domenico assembled the figure. See <u>Reference III</u>  for more details.

Slip sheet for CD containing Audio Recording of April 29, 2013
University of Utah Consolidated Hearing Committee Hearing

**University of Utah**
**Consolidated Hearing Committee**
**Complaint – Research Misconduct**

Respondent: Dr. Ivana DeDomenico

Complainants: Dr. Thomas Parks & Dr. Vivian Lee

Panel Report and Recommendations

May 8, 2013

**Overview**

This is a proceeding to hear charges against Assistant Professor Ivana DeDomenico in the Department of Internal Medicine, Division of Hematology. The charges in this matter were brought by the Senior Vice-President for Health Sciences and the Vice-President for Research following a report by an Investigation Committee dated December 14, 2012. A hearing panel was convened by the President of the Academic Senate and a hearing was conducted on April 29, 2013.

The CHC Panel has concluded that Dr. DeDomenico has engaged in research misconduct by "reckless disregard of accepted practices" in her area of research.

The Panel also finds that her behavior was part of a larger pattern of complicity in misconduct within the Kaplan laboratories. We emphasize that the institutional responsibility for these matters should not end with sanctions against Dr. DeDomenico.

**Research Misconduct Policy and Procedure**

UU Policy 7-001(IV)(H):

"Misconduct" or "Misconduct in Research" means fabrication, falsification, plagiarism, or other practices that seriously deviate from those practices that are commonly accepted within the research community for proposing, conducting, or reporting research. It does not include honest error or honest difference in interpretations or judgments of data.

UU Policy 7-001(V)(6):

A finding of misconduct requires that:

1. There is a significant departure from accepted practices of the research community for maintaining the integrity of the research record.

2. The misconduct be committed intentionally, or knowingly, or in reckless disregard of accepted practices and

3. The allegation is proven by a preponderance of evidence.

UU Policy 6-002(III)(10)(D)(3)(b):

viii. Complaints alleging misconduct in sponsored research.

The CHC must find, by a preponderance of the evidence, that the respondent(s) engaged in research misconduct as defined in Policy 7-001.

In summary, to find the Respondent guilty of research misconduct, the Complainants bear the burden of proof to show (1) by a preponderance of the evidence (2) that the Respondent committed fabrication, falsification, or serious deviations from accepted research practices, (3) with intent, knowledge, or reckless disregard of accepted practices.

**Charges and Response**

The chronology of this matter is a bit murky. Apparently, it began in the fall of 2011 with concerns expressed by editors of a journal in which one of Respondent's papers had been published. This concern was communicated to the University's Research Integrity Officer, Dr. Jeffrey Botkin, who contacted the Respondent and her mentor, Dr. Jerry Kaplan. In the meantime, additional concerns were communicated from the Federal Office of Research Integrity from an informant "who wished to remain anonymous," but who later was identified as a previous collaborator on published papers, a professor at UCLA, Dr. Tomas Ganz.

A total of 11 published papers have been examined in the course of these proceedings. Those papers are numbered 1-11 in the attached table. The numbering corresponds to the examination that was conducted by prior committees as explained here. The irregularities discussed in those examinations fall into three main categories, all dealing with figures published as if they reflected results of laboratory experiments: (1) misrepresentation of images from films of laboratory experiments (gels transferred to "western blot" images and then scanned into computer files), (2) misleading or erroneous creation of graph curves reflecting CD (circular dichroism) data, (3) and inaccurate error bars. The types of errors found in each paper are indicated in the attached table.

Dr. Botkin convened an Inquiry Committee on December 22, 2011, and charged the committee to look at alleged irregularities in three papers. The Inquiry Committee expanded its scope to six papers and submitted its report on February 16, 2012, with findings of errors with regard to several blot figures. A review by an independent statistician, however, found no significant difficulty with the error bars in those papers. The Inquiry Committee finished with these conclusions:

> The Committee did not uncover evidence of intent to deceive or misrepresent the data from the experiments in question. Rather, there was extreme carelessness on the part of Dr DeDomenico in preparing the figures and little oversight from Dr. Kaplan in ensuring that the figures accurately reflected the primary data. . . . [W]e recommend that all papers jointly authored by Drs. DeDomenico and Kaplan be independently reevaluated, and if additional errors are found, that these be fully disclosed to the editors of the journals involved.

Shortly thereafter, on March 4, 2012, Dr. Botkin received allegations again from Dr. Ganz of additional errors in two other published papers. Dr. Botkin met with Drs. DeDomenico and Kaplan on March 5, 2012, and informed them of his decision to convene an Investigation Committee with regard to all questioned papers. That committee was formed in April 2012. It examined not just the six papers initially in question but went further to examine five additional papers on which Drs. DeDomenico and Kaplan were co-authors. The committee produced a preliminary report on October 2, 2012, to which the Respondents were allowed to comment, and then produced its final report on December 14, 2012.

The Final Report of the Investigation Committee provided this summary conclusion:

> From its investigation, the Committee has concluded that the irregularities . . . constitute misrepresentations of the primary data and reflect a serious breakdown in the processes required to ensure that the scientific literature is a faithful record of research results. The large number of instances, over a period of several years, indicates a reckless disregard for the integrity of the research record, as opposed to the occasional lapses that might occur in any laboratory, and the resulting record is now nearly impossible to reconstruct.

The Investigation Committee also declared that it found instances of intentional falsification or fabrication of data. The CHC Panel has concluded, as explained below, that there likely was intentional falsification of published data or images, but we could not determine by a preponderance of the evidence that these items were the work of Dr. DeDomenico.

Thus, the CHC finding of misconduct is based on reckless disregard of accepted practice, a finding heavily influenced by the number of departures from established norms over an extended period. We recognize that the "accepted practices" in this particular laboratory and some of its collaborating laboratories may have countenanced the carelessness and obfuscation described by both prior committees, but these irregularities exceeded both accepted practice in the broader research community in which Respondent was educated as well as basic norms of right and wrong.

## Evidence

This proceeding has produced a rather voluminous record. The principal items of evidence consisted of the report of the Investigation Committee (a 97 page document thoroughly examining the graphs and images in all 11 papers), detailed responses of Respondent to that analysis, testimony at the hearing by Dr. Yost explaining some of the key points in the Investigation Committee report, testimony in support of Dr. DeDomenico by Drs. Kaplan and Coulombe, and statements by Respondent herself.

To simplify understanding of the record, the CHC Panel constructed a table listing each paper by number along with the types of alleged irregularities, the Investigating Committee conclusions regarding the allegations, and some indication of the evidence behind those conclusions.

At the hearing, Dr. Yost produced a PowerPoint and oral presentation focusing on three of the papers (## 1, 10, & 11) that seemed to be the key evidence of either intentional or reckless disregard of accepted practices. To clarify our own conclusions, the Panel will likewise concentrate here on those same three papers. What we have gleaned from these and Dr. Yost's summary is that there was intentional misrepresentation of data in at least one instance but we cannot determine who did it, that Drs. DeDomenico and Kaplan as either lead author or senior author bore responsibility for spotting what seemed in at least two instances to be attention-getting misrepresentations, that Dr. Ward was probably responsible for at least one irregularity that was beyond the knowledge base of Dr. DeDomenico, and that in sum total the number of instances of irregularities in these papers shows reckless disregard for accepted practices in the research community.

We have not taken instances of missing data to count against Dr. DeDomenico except in those instances in which she was constructing figures for publication and should have had the data to support those figures.

## Respondent's Procedural Concerns

Dr. DeDomenico objected to Dr. Botkin's convening of an Investigation Committee. She asserted that the procedure violated University regulations, federal law, and due process. There were two separate sets of issues raised – one set of issues regarding the original six papers and the other regarding the additional five papers. The Chair treated these objections as a motion to dismiss and issued a ruling on April 17, 2013.

With regard to the first set of papers, the argument is that the Investigation was not warranted at all because the Inquiry Committee did not recommend further investigation after reviewing the papers that were subject of the original Inquiry. DeDomenico points out that no provision of law or University policy empowers the RIO to determine independently that an investigation is warranted or to act against the finding of the Inquiry Committee. The University position was that the Inquiry Committee found "some substance" to the allegations of misconduct on the initial papers and that in the midst of determining how to proceed at that point, more allegations came in, at which point Botkin decided, with the federal RIO's blessing, to proceed with the investigation phase.

There are two important interests at stake in these proceedings, the importance of research integrity to the University and due process to the individual. The Chair agreed that the federal office could not speak for the University with regard to our procedures.

With regard to the first six papers, the Inquiry Committee did find "that each of these papers, and perhaps others from these combined authors, contain misrepresentations of the primary results and thus deviate significantly from accepted scientific practice." The committee then recommended that "all papers jointly authored by Drs. DeDomenico and Kaplan be independently reevaluated." Although not a formal recommendation for the convening of an Investigation Committee, the conclusions did encourage the RIO to proceed further in light of departures from accepted scientific practice. Indeed, the University regulations do not explicitly preclude the RIO from convening an Investigation Committee in the absence of a formal recommendation from the Inquiry Committee. Although the regulations require the convening of an Investigation Committee when the Inquiry Committee recommends it, the integrity of the University could mandate an Investigation in any event. This prospect flows from the requirement that the "inquiry record must contain sufficiently detailed documentation of the inquiry to permit a later assessment of the reasons for determining that an investigation was not warranted," and the requirement that the records be maintained in a secure manner for at least three years. All of these provisions look toward the prospect of a follow-up investigation at a later date.

Given that new allegations with respect to additional papers then surfaced, it was understandable that the RIO chose to manage procedures to ensure a thorough investigation, which resulted in charges brought before the CHC which must make its own findings on the evidence presented to it. Under these circumstances, the lack of an Inquiry Committee on the additional papers was not a sufficiently fundamental flaw as to require dismissal just to protect the integrity of University processes.

It is possible, however, with due process in mind, that Respondent was prejudiced in her ability to respond to the allegations by the timing of the two committee proceedings and the resulting methods of the Investigation. Under these circumstances, the Chair suggested that she explain any harm or prejudice that she experienced from the procedural posture of the proceedings.

In her written and oral statements, she did suggest that she would have been better prepared to respond to allegations if there had been an Inquiry Committee on the additional papers. She also pointed to a paucity of personal interaction with the Investigation Committee and to open hostility from one member of the Investigation Committee.

With regard to ability to respond, she did meet with the Committee three times and was given six weeks to respond to a preliminary report of the Committee, which she did in rather thorough fashion. With regard to personal hostility, when the Panel asked the Chair of the Investigation Committee about this, he responded that passions naturally run high in charges of misconduct and that that he did not perceive any bias or prejudice on the part of the one rather outspoken member of the Committee. Respondent did not pursue this issue further during the hearing.

## Findings

The hearing panel finds the following facts established by a preponderance of the evidence:

1. Paper 11 contained images that were intentionally manipulated to present false data. This was done by computer copying of information from one scanned image to another or in some instances by splicing of gel images to make one image. While the Panel agrees that this manipulation does appear to have been intentional, we cannot conclude that it was done by Dr. DeDomenico as opposed to an unknown third person. Nevertheless, the error appears so obvious that it should have been caught by a responsible lead or senior author.

2. Paper 1 contained several instances of flipped or mislabeled images. Although neither the Committee nor this Panel has found that these irregularities were intentional, the number and severity show reckless disregard to accepted practices. (Recklessness in this instance consists of proceeding with publication in the face of a very substantial risk of disseminating inaccurate information to the scientific community. The substantiality of risk stems from the number and severity of the errors.)

3.  Paper 10 contained misleading graphs of CD data. The graphs were misleading by having been "smoothed out" in violation of usual practice in the field and fabricated by switching the sign of one data point so that the first half of the graph was inverted. Also significant and unlikely was that the CD data had exactly the same magnitude in different tables with a couple of exceptions; in addition, it was significant that the fabricated data were inconsistent with the conclusions of the paper. Dr. Kaplan testified that these graphs were produced by Dr. Ward and that he did not expect Dr. DeDomenico to have expertise with regard to these processes. Indeed, although Dr. DeDomenico was listed as lead author on this paper, it seems that she had little or nothing to do with the experiments leading to the contested portions of the paper. The Investigation Committee laid the blame for these errors squarely on the procedures in Dr. Kaplan's laboratory.

4.  The Investigation Committee listed 3 instances of what they described as "Alteration of Research Record." These are highlighted at the end of the attached table. For the following reasons, the CHC Panel is not persuaded by a preponderance of the evidence that the alleged alterations of research records can be laid at the feet of Dr. DeDomenico:

    a.  As stated above, the CHC Panel cannot find that Dr. DeDomenico was responsible for the intentional manipulation in Paper 11.

    b.  Nor do we find the alleged falsification in Paper 6 to be supported by the record. The Committee stated: "At the least, the dates on the films and notes were most likely added several months after the work was done, and it is possible that the notes themselves were written then. This may have occurred after receipt of the allegations." But MAY HAVE is not enough for our purposes; the evidence that she fabricated notebook pages is confusing and not sufficiently persuasive of intentional falsification.

    c.  With regard to Paper 10, the e-mail strings regarding handling of the CD data do not include Dr. Ward, on whom Dr. Kaplan stated that he relied for the CD data presentation.

5.  There are multiple instances of errors in 10 of the 11 papers examined. The only one in which no errors were found was the one in which Dr. DeDomenico was the "Senior Author," meaning that other authors were responsible for the initial preparation of data, charts, and images. As first author on the other papers, she bore responsibility for checking all graphs and figures against the raw data and then maintaining an adequate record from which later researchers could replicate the experiment. Her explanations of these errors all relied on asserting that someone else did key parts of the work, but in almost all instances she was responsible for producing the actual images that were presented to the publisher. For two reasons, her explanations are inadequate:

    a.  if true, then her explanations show a lack of control over data for which she was responsible as first author or preparer of the figure for publication

    b.  it strains credulity that so many people could make similar errors without her catching at least some of them

6.  In summary, our findings on the overall record are similar to what we found with regard to Paper 1. Although the Panel does not find that intentional irregularities can be attributed to Dr. DeDomenico, the number and severity of errors in the publications where she is first author show reckless disregard for accepted practices. Recklessness consists of proceeding with publication in the face of a very substantial risk of disseminating inaccurate information to the scientific community. The substantiality of risk stems from the number of publications affected and the severity of the errors.

**Conclusions**

Based on the above findings, the panel concludes

1. Dr. DeDomenico violated the Faculty Code through Research Misconduct based on "reckless disregard of accepted practices."

2. There was complicity in this misconduct within the laboratory that goes substantially beyond Dr. DeDomenico.

**Recommendations**

1. The Panel regretfully concurs with the Investigation Committee's recommendation that Dr. DeDomenico be terminated or allowed to resign from the University.

2. The Panel is concerned that the University take full appropriate action with regard to the institutional difficulties uncovered in this proceeding. The problems outlined by the Investigation Committee are not likely to be resolved with one termination and one retirement. Thus, we recommend further investigation of the laboratory procedures uncovered in this investigation.

Respectfully submitted,

*Wayne McCormack*    5/3/13

Wayne McCormack, Chair, College of Law

Richard Dorsky, Neurobiology & Anatomy

Scott Wright, Nursing

Jon Rainier, Chemistry

Darrell Davis, Medicinal Chemistry

Mikhail Skliar (Alternate), Chemical Engineering

4050

### Table of Investigation Committee Report Items Regarding Dr. DeDomenico

| Paper & Date | Problem | Evidence & Invest. Comm Conclusions | Lead Author | Senior Author |
|---|---|---|---|---|
| 1 (2011) | blot manipulation | no indication of where original film is located -Kaplan's files not examined for originals or notebooks - her computer had no files deleted - she says "three people participated in experiments" - not clear who had control of blots and films but she was primary author | DeDomenico | Kaplan |
| | error bars | Stoddard found no problem with calculations but doubted veracity of original data | | |
| 2 (2008) | blots flipped & duplicated | "We were unable to establish a cogent explanation for these irregularities aside from the possibilities of carelessness, negligence, capriciousness with flagrant or reckless disregard for fidelity of the published report of the original data, and/or intent." Kaplan did not rule out possibility of carelessness in lab processes. | DeDomenico | Kaplan |
| 3 (2009) | duplication of data in two publications | "The findings are most consistent with carelessness, but the Committee could not exclude negligence, capriciousness with flagrant or reckless disregard for fidelity of the original data, or intent." | DeDomenico | Kaplan |
| 4 (2009) | duplication of data in two publications | "The data in Figure 4A in Paper 4 appear to be correct as labeled, based on the statements of Drs. Kaplan and De Domenico. Therefore, the duplication and misrepresentation were in Paper 3, the PNAS article." | Koenig | DeDomenico |
| 5 (2007) | same photo shown twice | "In summary regarding this allegation, the Investigation Committee concludes that there was duplication of data in this publication. The findings are suggestive of carelessness, but the Committee cannot exclude negligence, extreme capriciousness, or intent." Code in notebooks "illicitly discarded by dismissed technician" | DeDomenico | Kaplan |
| 6 (2011) | error bars | "The issue of error bars was not discussed further with her or Dr. Kaplan in the interviews." Kaplan stated that the processes for calculating these were consistent with his scientific expertise. | DeDomenico | Kaplan |
| | fig. 4B blot disparities | "Our major conclusion is that the path from the primary data to the publication has been so poorly documented and corrupted by relabeling that no confidence can be placed on the published figure." | | |
| | fig. 5B film date disparities | "The available records are inadequate to determine whether the published figure was correctly labeled. The inconsistencies between the dates shown on the film, the notes and the submission date raise additional doubts about the reliability of the notes." | | |

| | | | | |
|---|---|---|---|---|
| 6 (cont'd) | general concerns | "The failure of Dr. De Domenico to provide the computer files documenting the data analysis in the published paper (and the failure of the Committee to find such files through a systematic search) is evidence of recklessness in maintaining the research record." Her response is that Committee was asked to look at Kaplan's records and no request was made to Kaplan for original data. | | |
| 7 & 8 (2007) | gel lane inaccuracies | Kaplan stated that cell expansion easily accounts for apparent lane violations | DeDomenico | Kaplan |
| | inaccurate splicing of gel images | "It appears that Drs. De Domenico and Ward had full control over presentation of the experimental data and both of them must be held responsible for the misrepresentations that have come to light. The Investigation Committee considers it unlikely that these errors were due to simple carelessness during the preparation of the figures for publication. The Committee is also struck by the conspicuous failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication." | | |
| 9 (2007) | splicing of gels | "Based on the inconsistencies in the execution of the experiments and in the preparation of the figures, little confidence can be placed on the accuracy of the published data." No finding of intent or reckless disregard. Ward stated she was responsible for making figures. | DeDomenico | Kaplan |
| 10 (2008) | error bars | Kaplan stated that statistical analysis was consistent with his scientific practices. | DeDomenico | Kaplan |
| | CD graphs | Kaplan stated that he saw no problem with "smoothing" of data and that he knew DeDomenico had no expertise in CD. No finding of intent from the Invest. Committee. | | |
| | NMR data | Kaplan stated that he did not trust the data so omitted it. | | |
| | general concerns | DeDomenico was not involved in these experiments. Committee stated: "Particularly in light of his own lack of expertise in these techniques, Dr. Kaplan should have ensured that all of the data were shared among the participants. In summary, the Committee concludes that this paper contains instances of data falsification and data fabrication and that this paper should be retracted. The circumstances leading to the publication of falsified and fabricated data indicate flaws in the management of the laboratory and collaboration." | | |
| 11 | blot manipulation | "substantial concerns" that published images were misrepresentations of scans | Kieffer | Kaplan -- DeDomenico is contributor |

4052

| "Alteration of Research Record" | | | | |
|---|---|---|---|---|
| Allegation 1 (paper 1) | 12 cell / 10 cell issue | Kaplan stated that he had seen "swelling" account for the apparent disparity | | |
| Allegation 2 (paper 6) | incorrect dates on film and notebook pages | "At the least, the dates on the films and notes were most likely added several months after the work was done, and it is possible that the notes themselves were written then. This may have occurred after receipt of the allegations." No direct evidence that she altered dates and particularly not after allegations | | |
| Allegation 3 [IC labelled 4] (paper 11) | CD data | "The preponderance of evidence leads the Committee to conclude that the notebook pages provided by Dr. De Domenico on 9-11-12 were most likely created after she became aware of concerns regarding the CD spectra and were intended to mislead the Committee and shift responsibility to Dr. Ganz." Kaplan made it clear that he did not expect CD expertise from DeDomenico. He stated that "I think Dr. Ward sent Ganz the manuscript." | | |

Paper 1: De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. (2011). The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin. Cell Metabolism Nov 2;14(5):635-46

Paper 2: De Domenico I, Lo E, Ward DM, Kaplan J. Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with JAK2. Proceedings of the National Academy of Sciences USA 2009; 106: 3800-3805

Paper 3: De Domenico I, Zhang TI, Koenig CL, Branch RW, London N, Lo E, Daynes RA, Kushner JP, Li D, Ward DM, Kaplan J. Hepcidin mediates transcriptional changes that modulate acute cytokine-induced inflammatory responses in mice. Journal of Clinical Investigation 2010; 120: 2395-2405.

Paper 4: Koenig CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I. Toll-like receptors mediate induction of hepcidin in mice infected with Borrelia borgdorferi. Blood 2009; 114: 1913-1918.

Paper 5: De Domenico, Vaughn MB, Yoon D, Kushner JP, Ward DM, Kaplan J. Zebrafish as a model for defining the functional impact of mammalian ferroportin mutations. Blood 2007; 110: 3780-3783.

Paper 6: De Domenico I., Vaughn, M.B, Paradkar, P.N., Lo, E., Ward, D.M. and Kaplan, J. (2011) Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. Cell Metabolism. 13, 57-67.

Paper 7: De Domenico, I., D. M. Ward, M. C. di Patti, S. Y. Jeong, S. David, G. Musci & J. Kaplan (2007). "Ferroxidase activity is required for the stability of cell surface ferroportin in cells expressing GPI-ceruloplasmin" EMBO J 26(12): 2823-2831.

Paper 8: De Domenico, I., D. M. Ward, C. Langelier, M. B. Vaughn, E. Nemeth, W. I. Sundquist, T. Ganz, G. Musci and J. Kaplan (2007). "The molecular mechanism of hepcidin-mediated ferroportin down-regulation." Mol Biol Cell 18(7): 2569-2578.

Paper 9: De Domenico, I, McVey Ward, D, Musci, G and Jerry Kaplan. "Evidence for the multimeric structure of ferroportin." Blood 2007 Mar 1;109(5):2205-9

PAPER 10: De Domenico I., Nemeth, E., Nelson, J.M., Philips, J.D., Ajioka, R.S., Kay, M.S., Kushner, J.P., Ganz, T, Ward, D.M. and Kaplan, J. (2008) The hepcidin-binding site on ferroportin is evolutionarily conserved. Cell Metabolism. 8, 146-156.

PAPER 11: Kieffer, C., Skalicky, J. J., Morita, E., De Domenico, I., Ward, D. M., Kaplan, J. and Sundquist, W. I. (2008). Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding. Dev Cell 15: 62-73.

President David W. Pershing
May 15, 2013
Page 5

The University may attempt to clear her away as if she is the sole problem, but it cannot escape the fact that Dr. De Domenico is being held solely responsible for mistakes that arose from her having been improperly trained by the University, placed within a dysfunctional workplace that is part of the University, and expected to identify and correct errors caused by the culture of a university laboratory. Such negligent training, responsibility for which is ultimately at the feet of the University, is a legal wrong for which she may seek legal redress. It should not now be compounded with the unduly harsh sanction of termination.

Moreover, Dr. De Domenico is very troubled by information she has received that the University has given preferential treatment to others involved in the papers at issue. As mentioned, Dr. Ward was not even investigated in connection with these papers, although she has now been shown to have been responsible for significant errors therein. Perhaps more troubling, Dr. De Domenico has learned that the University allowed Dr. Kaplan to retire quietly, with a generous benefits package, in lieu of receiving a formal sanction for the problems in his laboratory. Thus, Dr. Kaplan now has the benefit of maintaining his reputation and retirement, free of any formal stigma, while the University benefits from maintaining the flow of funding granted to him for years to come. The clear conflict of interest in this decision—which differs so starkly from the treatment of the lower-profile foreign national who was Dr. Kaplan's inferior within his organization—raises serious concerns regarding the University's handling of this matter, concerns that Dr. De Domenico is not inclined to leave unexamined.

## Conclusions

Dr. De Domenico accepts that she has made mistakes, and takes responsibility for those mistakes. She has worked very hard to understand how these mistakes could have been made and how they may always be prevented in the future. Her mistakes were serious, but were unintentional, and were partly caused by factors beyond her control, factors that were in the control of other University faculty members.

In the interest of justice, Dr. De Domenico asks that you reduce the sanction recommended by the Panel. Dr. De Domenico would accept a reduced position—one removed from the tenure track—or any supervision or probation that you believe to be warranted. She is currently working under Dean Li in a highly productive and scientifically important project, where Dr. Li provides close supervision and active mentoring. Indeed, Dr. Guy Zimmerman, who served on the Investigation Committee in this case, touted the work of her current laboratory to a group of University donors just a few days prior to signing the Investigation Committee report accusing her of



THE
UNIVERSITY
OF UTAH

**David W. Pershing**
President
*Distinguished Professor*

201 Presidents Circle, Room 203 • Salt Lake City, Utah 84112-9008 • 801-581-5701 • president@utah.edu

June 3, 2013

VIA US Mail and E-mail

Dr. Ivana De Domenico
2551 Sherwood Drive
Salt Lake City, UT 84108

**Re: Complaint of Research Misconduct against Ivana De Domenico**

Dear Dr. De Domenico:

I have reviewed and considered the information and written materials pertaining to the Complaint against you alleging misconduct in sponsored research in violation of University of Utah Policy 7-001, and your responsive documentation to that Complaint. I have also reviewed the report and recommendation of the Consolidated Hearing Committee (CHC) and your Response to the CHC report.

After carefully and thoroughly considering all of the materials related to this matter, I am persuaded to agree with the findings of the CHC that you engaged in research misconduct in violation of Policy 7-001.

Therefore, pursuant to Section 10 E. of Policy 6-002, I hereby accept the findings of the CHC, as well as the CHC's recommendation that you be dismissed from the University. This is the University's final decision in this matter.

Sincerely,

David W. Pershing

DWP/lm

cc:   Vivian S. Lee, Complainant and Senior Vice President for Health Sciences
      Thomas N. Parks, Complainant and Vice President for Research
      John R. Hoidal, Chair, Department of Internal Medicine
      Jeffrey R. Botkin, Associate Vice President for Research Integrity
      Wayne McCormack, Consolidated Hearing Committee Chair
      Ryan Bell, Counsel for Ivana De Domenico
      Robert Payne, Office of General Counsel
      Julie Thomas, Office of General Counsel

4060

RAY QUINNEY & NEBEKER

September 6, 2013

**VIA EMAIL & U.S. MAIL**

4554
2013 SEP 10  P 12: 55

John Dahlberg, Ph.D.
Deputy Director
U.S. Department of Health and Human Services
Office of Research Integrity
1101 Wooton Parkway, Suite 750
Rockyville, Maryland 20852
john.dahlberg@hhs.gov

Ryan B. Bell
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3383 DIRECT
801 532-7543 FAX
rbell@rqn.com
www.rqn.com

Re: Dr. Ivana De Domenico

Hello Dr. Dahlberg,

I write to follow up on our communications a few months ago,
regarding Dr. De Domenico. As you will recall, we received information that
the packet of materials sent to ORI by the University of Utah may not have
included the complete set of relevant documents, including documents
submitted by Dr. De Domenico during the investigation and appeal
proceedings at the University.

I wrote to you on July 1 to request that your office send me a copy of
the index of documents provided to you by the University, as a means of
assuring that all relevant documents have been forwarded. I want to reiterate
that request. Given that any potential proceeding by ORI may not involve
direct participation by Dr. De Domenico, it is important to us that you have all
of the documents available, to assist ORI in comprehending the relevant facts.

Thus, we ask that you please inform us as to exactly what documents
you have received from the University of Utah. A simple means of carrying
this out would be to send us whatever index or cover pages were forwarded to
you, listing the provided documents. It would also likely be fairly simple to
make a copy of the submission, if it came in a digital format, and provide that
for us to review. Our interest is simply in confirming that no important
documents have been left out of the submission.

A  PROFESSIONAL  CORPORATION

4061

Thank you for your attention to this request.  Please feel free to contact me if you have any concerns.

Sincerely,

RAY QUINNEY & NEBEKER P.C.

Ryan B. Bell

1248367

## Dahlberg, John E (HHS/OASH)

| | |
|---|---|
| **From:** | Wes Sundquist <wes@biochem.utah.edu> |
| **Sent:** | Tuesday, November 12, 2013 5:33 PM |
| **To:** | Dahlberg, John E (HHS/OASH) |
| **Cc:** | Collin Kieffer; Robert Payne; Jeff Botkin; Thomas N Parks |
| **Subject:** | Correspondence Regarding ORI case #4554 |
| **Attachments:** | Sundquist and Kieffer ORI letter with Appendices.pdf |

Dear Dr. Dahlberg:

Dr. Collin Kieffer and I wish to update our statements regarding ORI case #4554 in light of several important events that have transpired since we previously wrote letters to Dr. Jeffrey Botkin and the University of Utah Misconduct Investigation Committee. The enclosed letter reiterates that we did not commit, nor were we aware of the inappropriate manipulations of Figs. 5A and 5B prior to publication of our 2008 *Developmental Cell* paper (Kieffer *et al.* "Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding" (2008) *Dev. Cell*, **63**, 73). We have also provided an independent summary of the evidence that we were neither directly involved in, nor aware of the inappropriate figure manipulations.

Drs. Robert Payne, University of Utah Associate General Counsel, and Dr. Jeffrey Botkin, Associate Vice President for Research Integrity (both cc'd) have confirmed that they agree with our descriptions of the processes and conclusions from the investigations and reports of the University of Utah Investigation Committee and the Consolidated Hearing Committee, and that their agreements match the official positions of the University of Utah. Dr. Botkin has also confirmed that the emails and files that we refer to in our letter are present in the files that he and his colleagues sequestered from Dr. Ivana De Domenico's hard drive during the investigation and that we have contacted Dr. Daniel Wainstock, the Editor of Developmental Cell, to discuss publication of an erratum that corrects the record.

Thank you for your consideration, and please feel free to contact me if you have any further questions.

Yours sincerely,

Wes Sundquist

--
Wes Sundquist
15 N Medical Drive
Bldg. 565, Room 4100
Department of Biochemistry
University of Utah
Salt Lake City, UT 84112-5650
801-585-5402
wes@biochem.utah.edu
https://wasatch.biochem.utah.edu/wes/

1


The University of Utah
Department of Biochemistry

Wesley I. Sundquist, Ph.D.
**Department of Biochemistry**
15 N Medical Dr. East, Rm 4100
Salt Lake City, Utah 84112-5650
Phone (801) 585-5402
Fax (801) 581-7959
wes@biochem.utah.edu
November 12, 2013

John Dahlberg, Ph.D.
Deputy Director
Office of Research Integrity
john.dahlberg@hhs.gov

**Re: ORI case #4554**

Dear Dr. Dahlberg:

This letter updates our three previous letters to Dr. Jeffrey Botkin, Associate Vice President for Research Integrity, and to University of Utah Misconduct Investigation Committee (IC) dated July 19, July 26, and October 12, 2012. We reiterate that we did not commit, nor were we aware of the inappropriate manipulations of Figs. 5A and 5B prior to publication of our 2008 *Developmental Cell* paper (Kieffer *et al.* "Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding" (2008) *Dev. Cell*, **63**, 73). However, we wish to update our statements in light of several important events that have transpired since we wrote the previous letters. We also wish to provide an independent summary of the evidence that we were neither directly involved in, nor aware of the inappropriate figure manipulations.

## Point 1. The IC and Consolidated Hearing Committee (CHC) have issued reports since we wrote our initial letters, and both of those committees exonerated us.

In their report of December 14, 2012, the IC investigation team concluded that we were not involved in the figure manipulations and that: "Given the subtlety of the image manipulation, the Committee finds that Dr. Sundquist and Dr. Kieffer might not be expected to have noticed the manipulations, and that they are not culpable for these problems in their paper." They also discovered, however, that the inappropriate manipulations were much more extensive than we knew when we wrote our 2012 letters. At that time, we were only aware that lanes in Fig. 5B showing tubulin loading controls had been duplicated and spliced together inappropriately. The IC report makes it clear that the images used to create Figs. 5A and 5B were also unacceptably manipulated or misrepresented in several additional ways. We accept that the IC investigation was thorough and correct, and we would certainly have commented more extensively on these disturbing problems had we known about them when we wrote our earlier letters.

Dr. De Domenico subsequently appealed the IC decision to the University of Utah CHC and their report of May 8, 2013 concluded that Dr. De Domenico violated the Faculty Code and committed "Research Misconduct based on reckless disregard of accepted practices". Neither of us participated in the CHC process and we believe that the wording in the original CHC report should have been more precise on the important issue of exactly who was responsible for the inappropriate manipulations in Figs. 5A and 5B. Fortunately, the CHC subsequently published an erratum (dated August 26, 2013 and provided here as Appendix 1) making it clear that they believe that the problems in our figures "… should have been caught by Dr. DeDomenico, who was the author responsible for contributing the data.". They also stated that they agreed fully with the IC conclusion that "Dr. Sundquist and Dr. Kieffer might not have been expected to have noticed the manipulations, and were not culpable for these problems in their paper." Similarly, Dr. David Pershing, President of the University of Utah, sent Dr. Sundquist an official letter in which he states he does

he does not "find that you or your colleagues Dr. Kieffer, Dr. Morita or Dr. Skalicky were aware of, or bear any responsibility for, the manipulations of figures 5A and 5B in Paper 11 (*i.e., our Developmental Cell paper*)" (see Appendix 2 for a copy of the letter). We accept and appreciate these clarifications.

**Point 2. All of the scientists involved in our study have acknowledged that the experiments presented in Figs. 5A and 5B were performed by Dr. De Domenico (a postdoctoral associate in the Kaplan Laboratory) or by a Kaplan lab technician under her direction, and that she compiled the initial figure, which contained the lane duplications and other inappropriate manipulations.**

**1) We both wish to state again for the record that neither of us was aware that the tubulin loading controls were duplicated and spliced together in Fig. 5B until Dr. Botkin informed us of that allegation as part of the IC investigation process, and that we were not aware of the additional serious problems with Figs. 5A and 5B until we learned of them by reading the IC report.**

**2) Dr. Kaplan, the head of the laboratory in which the data for Figs. 5A and 5B were collected and compiled, has also acknowledged for the record that the inappropriate manipulations occurred in his laboratory and not ours.**
A copy of Dr. Kaplan's letter is provided as Appendix 3. In the letter, he states: "I wish to state, for the record, that the problems with data generation and presentation arose within my laboratory, and not in the laboratories or from the work of the above listed collaborators (*a list that includes all of the co-authors of the Developmental Cell paper from the Sundquist laboratory, including Drs. Sundquist and Kieffer*). I also wish to state that I do not believe that our collaborators and coauthors could have been expected to catch the problems with these studies given their reasonable believe that work coming from my laboratory would be performed, compiled and presented accurately to them." Dr. Botkin (cc'd) has confirmed that he has the original copy of this letter in his files.

**3) Dr. De Domenico has also admitted that the manipulated figure came from her.**
On June 21, 2012, Dr. De Domenico sent an email with an enclosed letter to Dr. Botkin in which she stated: "Today, Saturday July 21 I met Dr. Sundsquist and he asked me to send you a letter of clarification where it is stated that the error for the figure came from our laboratory. I told Dr. Sundsquist that I already sated this to you and the Investigation Committee. However, I felt morally obligated to generated the attached file as requested by Dr. Sundsquist." (quoted from her email). She further stated: "In summary: I believe that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist shows already the error." (quoted from the enclosed letter itself). Copies of the email and the enclosed letter are provided in Appendix 4, and Dr. Botkin has confirmed that he has the original copy of the email and the letter in his files. It is our second-hand understanding that Dr. De Domenico may no longer be willing to admit that she was responsible for the image manipulations, but her initial written admission to Dr. Botkin and her oral admissions to the IC committee seem clear (as documented in the original IC report).

We document that all of the other coauthors on the *Developmental Cell* paper also hold this same view. Thus, all of the scientists who were involved in this affair have acknowledged that the experiments presented in Fig. 5A and 5B were performed by Dr. De Domenico (or by a Kaplan lab technician under her direction) and that she alone compiled the initial figure, which contained the lane duplications and all other inappropriate manipulations.

**Point 3. The independent documentary evidence also demonstrates that Dr. De Domenico was the person who modified the blot inappropriately.**

4065

The reconstructed trail of emails and documents summarized below demonstrates unequivocally that the improper manipulations occurred while the data were still under Dr. De Domenico's control and that those manipulations occurred before we ever saw the results. These records provide a reliable time line of the events that occurred on March 3, 2008, which was the date that the manipulated image was first created. Dr. Botkin has confirmed that his group was able to sequester the original copies of these emails from Dr. De Domenico's computer hard drive.

Email #1 (from Dr. De Domenico to Dr. Kieffer, 8:40 am on 3/3/2008)
```
From: Ivana De Domenico
Sent: Mon 3/3/2008 8:40 AM
To: Collin Kieffer
Subject: results
Collin,
I have all western blot results and they look good. I will scan them and
try to make a Photoshop file. Let me know when you will pick up them.
ivana
```

Email #2 (reply from Dr. Kieffer to Dr. De Domenico, 1:21 pm on 3/3/2008)
```
From: Collin Kieffer
Sent: Monday, March 03, 2008 1:21 PM
To: Ivana De Domenico
Subject: RE: results

Ivana,

Is there a time today that I can stop by and gather the western results?
I am almost finished going through the fluorescence results and I am
thinking I can stop by to get the identities of the images on tuesday
morning.  Let me know your schedule and thank you for all of the effort
you have put into this project.

Collin
```

Email #3 (reply from Dr. De Domenico to Drs. Kieffer and Sundquist, 1:30 pm on 3/3/2008)

```
From: Ivana De Domenico
Sent: Monday, March 03, 2008 1:30 PM
To: Collin Kieffer; Wes Sundquist
Subject: RE: results
Attachment: Collin final sm.tif

Dear Collin and Wes,
Attached are the western results. Collin, we have a meeting tomorrow until 10:30,
after that you can come anytime.
Ivana
```

The important points are that: 1) Dr. De Domenico's email written at 8:40am on 3/3/08 says that she is going to scan the blots and make a Photoshop (tif) file, 2) Dr. Kieffer's reply email, which was written at 1:21 pm, says that he will pick up the files, and 3) Dr. De Domenico's reply email, which was written at 1:30pm, says that she has now created the files and included them as attachments to the email message. The Photoshop files that Dr. Domenico created were called "Collin final.tif" (a larger file) and "Collin final sm.tif" (an exact copy, except at lower resolution to make a smaller file). A copy of Collin final sm.tif is provided as Appendix 5. Dr. Botkin has confirmed that electronic versions of those files were recovered from both Dr. De Domenico's computer hard drive and from Dr. Kieffer's computer hard drive. 4) The files themselves show that they were created were created at 12:26pm and 12:27pm, respectively, on 3/3/08. This is

3

completely consistent with the timeline in the email stream shown above. Importantly, the time stamps prove that the files were made *before* Dr. Kieffer was aware that they existed or could have picked them up or seen them. 5) Finally, and most importantly, these figures already include *all* of the inappropriate manipulations that were ultimately identified by the IC committee, including: A) The splice duplication of lanes 7-9 and lanes 10-12 of the anti-tubulin loading control (which ultimately became the lower right panel in Fig. 5B), B) The four panels that were published upside down relative to the original film images (IC report point 1, p. 85), C) The problematic anti-CHMP6 blot that ultimately became the upper blot in Fig. 5A (IC report point 2, p. 85), and D) The problematic anti-tubulin and anti-Fpn panels that appear to have come from a single blot, but ultimately became the bottom panel of Fig. 5A and the right middle panel of Fig. 5B, respectively (IC report point 3, p. 86-88). <u>Thus, the very first image that Dr. De Domenico ever provided to us already contained ALL of the inappropriate manipulations described by the IC.</u>

Dr. De Domenico later added CHMP6 loading controls (which ultimately became the two upper, anti-Myc panels in Fig. 5B) and provided us with an updated image file that also included those panels (called collin final new.tif, created March 12, 2008). That image also contained all of the same problematic panels, and Dr. Botkin has confirmed that it was recovered from the hard drives of both Dr. De Domenico and Dr. Kieffer.

The IC also recovered the precursor files used to make these image files from Dr. De Domenico's drive, and they state: "The images used to assemble panels A and B were found in three files on Dr. De Domenico's hard drive: "collin1.psd", "collin2.psd", and "collin3.psd", which are scans of developed western blot films. Comparisons of the film images and the published figure raised several new concerns. These problems were all present in the assembled image file "collin final new.tif" prepared by Dr. De Domenico" (IC report, p. 85). In short, all of the manipulated figures and their precursor images were recovered from Dr. De Domenico's notebooks and hard drive, and no one in the Sundquist lab had access to those files.

## Point 4. Subsequent rearrangements and quantification of the figure panels did not alter the original inappropriate manipulations.

The final published figure was created by rearranging the blot images provided by Dr. De Domenico and by quantifying the intensity of the bands in the western blots. None of these actions created or altered the original inappropriate manipulations. Dr. Kieffer has provided details of how he compiled the final figure from Dr. De Domenico's images (for details, see his document entitled "072312_Botkin_Inquiry_Document_Description" on the DVD entitled "Data_Inquiry_Information_for_Dr._Botkin", and associated files). That document shows that he did not introduce any of the inappropriate manipulations in the process of creating the final figure (because they were already there). Similarly, the process of quantifying band intensities did not introduce the inappropriate manipulations, and we are happy to provide a detailed description of that process upon request.

## Point 5. We take this matter very seriously and have complied with the recommendations in the IC report. Specifically, we have repeated the relevant experiments and found that our conclusions were correct, and we have notified *Developmental Cell* about the inappropriate manipulations in Figs. 5A and 5B from our original publication.

The IC recommended that "Dr. Sundquist repeat the experiment, and recently has been informed that repeat experiments are in progress, in collaboration with Dr. Ward. Regardless of the outcome, Dr. Sundquist should submit an erratum to the journal.".

4

In brief, we have collaborated with Drs. Ward and Kaplan to repeat the experiments shown in Figs. 5A and 5B (which were the only experiments in the paper that were entirely performed and provided to us by Dr. De Domenico). All of the repetitions support our original claims, and we are happy to provide data and full details. We are also convinced that the remainder of our *Developmental Cell* paper, with the exception of Figs. 5A and 5B, was performed with high standards of accuracy and integrity and that our conclusions were correct. We understand, of course, that being right in our conclusions does not mitigate the very serious problem that the figure that we originally published did not faithfully represent experimental results.

With Dr. Botkin's assistance, we have also now contacted the editor of *Developmental Cell*, Dr. Daniel Wainstock, and informed him of the problems with Fig. 5A and 5B in our original publication. We have asked him to publish an erratum that makes it clear that there were problems with these figures, and we are currently awaiting his decision on this matter.

In summary, all of the scientists involved in this work have acknowledged that the experiments presented in Figs. 5A and 5B were performed and compiled by Dr. De Domenico. Similarly, the IC and CHC reports, and the documentary record all support our claim that Dr. De Domenico introduced the inappropriate manipulations before we could have seen them. We appreciate this opportunity to clarify our role in this unfortunate situation, and we are happy to provide any additional information that you might require.

Yours sincerely,

Collin D. Kieffer, Ph.D.
Postdoctoral Fellow
California Institute of Technology

Wesley I. Sundquist, Ph.D.
Benning Professor and Co-Chair
University of Utah Department of Biochemistry

Cc:
Jeffrey R. Botkin, Associate Vice President for Research Integrity, University of Utah
Robert Payne, Associate General Counsel, University of Utah
Thomas Parks, Vice President for Research, University of Utah

4068

Appendix #1

CHC HEARING PANEL

IVANA DEDOMENICO

CORRECTIONS TO REPORT OF MAY 8, 2013

Revision dated August 26, 2013 by the CHC Panel

1. The last sentence of Finding #1 in the May 8 CHC Report, referring to manipulation of data in Paper #11, read: "Nevertheless, the error appears so obvious that it should have been caught by a responsible lead or senior author." This statement was intended to mean that the error should have been caught by Dr. DeDomenico, who was the contributor of the data, but who was not the lead or senior author on that paper. That sentence should have read "Nevertheless, the error should have been caught by Dr. DeDomenico, who was the author responsible for contributing the data." Indeed the Investigation Committee Report specifically found: "Given the subtlety of the image manipulation, the Committee finds that Dr. Sundquist and Dr. Kieffer might not be expected to have noticed the manipulations, and that they are not culpable for these problems in their paper." The CHC Panel is in full agreement with the Investigation Committee regarding the responsibility for the figures in question in Paper #11.

2. Also with regard to Paper #11, the "Table of Investigation Committee Report Items" incorrectly identified Dr. Kaplan as the senior author rather than Dr. Sundquist.

3. In the table "Alteration of Research Record," Allegation 3 describes alterations in the CD data; the table incorrectly lists Paper 11 as the paper in question. The correct citation is: PAPER 10: De Domenico I., Nemeth, E., Nelson, J.M., Philips, J.D., Ajioka, R.S., Kay, M.S., Kushner, J.P., Ganz, T, Ward, D.M. and Kaplan, J. (2008) The hepcidin-binding site on ferroportin is evolutionarily conserved. Cell Metabolism. 8, 146-156.

4069

Appendix #2



THE
UNIVERSITY
OF UTAH

**David W. Pershing**
President
*Distinguished Professor*

201 Presidents Circle, Room 203 • Salt Lake City, Utah 84112-9008 • 801-581-5701 • president@utah.edu

June 18, 2013


Via Email and Campus Mail

Wesley I. Sundquist, Ph.D.
Department of Biochemistry
4100 EEJMRB
Campus Mail

Re: Research Misconduct Proceedings and Decision

Dear Dr. Sundquist:

I understand that you have raised serious concerns about the findings and recommendation of the Consolidated Hearing Committee (CHC) as they relate to the following research paper: Kieffer, C., Skalicky, J. J., Morita, E., De Domenico, I., Ward, D. M., Kaplan, J. and Sundquist, W. I. (2008). Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding. Dev Cell 15: 62-73. This paper was referred to as Paper 11 in the research misconduct proceedings.

As you may know, the charge of the CHC was to consider the appeal of Dr. De Domenico who appealed both the findings of research misconduct that were levied against her and the sanctions imposed for her research misconduct. The CHC ultimately concluded that Dr. De Domenico had engaged in reckless disregard of accepted scientific practices concerning several papers under review and recommended that she be terminated from her employment. I, as the decision maker, supported these findings and recommendations.

The CHC was not charged to determine whether others, besides Dr. De Domenico, bore any responsibility for the errors in the various research papers. That was the charge of the Investigation Committee. Although the CHC expressed certain opinions in this regard, I did not view this as their responsibility, and my decision should not be read as an endorsement of these extra findings.

With respect to Paper 11, I disagree with the opinions of the CHC and do not find that you or your colleagues Dr. Kieffer, Dr. Morita, or Dr. Skalicky were aware of, or bear any responsibility for, the manipulations of figures 5A and 5B in Paper 11. This

Wesley I. Sundquist, Ph.D.
June 18, 2013
Page 2

was the opinion of the Investigation Committee and I concur with that opinion. Although the errors in figures 5A and 5B must be made known to the journal, I have asked the Research Integrity Office at the University to make clear to the journal that you and your colleagues were not found to be responsible for, or even aware of, the problems with these figures.

I hope this alleviates your concerns. This is the official position of the University on the subject matter and you are free to share this letter freely with anyone you chose.

Sincerely,

David W. Pershing

DWP/bf

cc:    Thomas N. Parks
       Jeffrey R. Botkin

Appendix #3



THE
UNIVERSITY
OF UTAH

July 16, 2013

Jeffrey R. Botkin, M.D., M.P.H.
Professor of Pediatrics and Medical Ethics
Associate Vice President for Research
University of Utah

Robert W. Payne
Associate General Counsel
University of Utah

Dear Jeff and Robert:

As you know, it has come to my attention that a series of papers from my laboratory have
serious problems with inaccurate data presentation and analysis. I am dismayed by the
extent of these problems, and I am committed to working with you and others to
understand how these problems arose. These problems have affected publications with a
number of collaborators and coauthors including: Michael Kay, Wes Sundquist, Collin
Kiefer, Jack Skalicky, Eiji Morita, and Charles Langelier. I wish to make it clear that
these collaborators and coauthors had no involvement in generating the primary data and
in developing the presentation of that data.

I wish to state, for the record, that the problems with data generation and presentation
arose within my laboratory, and not in the laboratories or from the work of the above
listed collaborators. I also wish to state that I do not believe that our collaborators and
coauthors could have been expected to catch the problems with these studies given their
reasonable belief that work coming from my laboratory would be performed, compiled
and presented accurately to them.

These problems are very disturbing to me and as the laboratory director I take
responsibility for the work that emerges from my laboratory. I also want to make it clear,
however, that I have not ever knowingly misrepresented the conclusions from
experiments done in my laboratory.

Jerry Kaplan
Professor,
Department of Pathology
University of Utah

Department of Pathology
School of Medicine
30 North 1900 East
Salt Lake City, Utah 84132-2501
(801) 581-4390
FAX (801) 585-7376

Appendix #4

**From:** Ivana De Domenico <ivana.dedomenico@path.utah.edu>
**Date:** Saturday, July 21, 2012 11:46 AM
**To:** Jeff Botkin <Jeffrey.Botkin@hsc.utah.edu>
**Cc:** Ivana De Domenico <ivana.dedomenico@path.utah.edu>
**Subject:** PHI: Kieffer et al, clarification 7-21-2012

Dear Dr. Botkin,

Today, Saturday July 21 I met Dr. Sundsquist and he asked me to send you a letter of clarification where it is stated that the error for the figure came from our laboratory. I told Dr. Sundsquist that I already sated this to you and the Investigation Committee. However, I felt morally obligated to generated the attached file as requested by Dr. Sundsquist.

The file summarizes all the events regarding this allegation and also contains some of the exchanged email between me, Dr. Kieffer and Dr. Sundsquist.


I will stop by your office on Monday morning, as Heather suggested, to pick Cds and leave for the Committee the copy of my presentation from the third interview on July 19.


Thank you.

I apologize for continuously disturbing you during weekend.

Sincerely
Ivana

Dear Dr. Botkin,

Today, July 21, 2012, I met Dr. Sundquist and he requested to clarify to you and the Investigation Committee that the duplication for the tubulin blot came from our laboratory for the allegation Kieffer et al, 2008. I already stated this on July 17, 2012 during my second interview and few days earlier to you. However, I'm going with this letter to summarize the events as requested.

Dr. Sundquist also reported that he sent a statement to the Investigation Committee yesterday, July 20, 2012.

Events details:

As stated on July, 17 2012 during the second interview with the Investigation Committee:

1. the western blots for the publication under consideration were run in our laboratory by a tech and a image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008 (see attached email).
2. As stated in the email in the same (March 3, 2008) day Dr. Kieffer came and "gather the western results", (see attached email). I do not remember what he picked up. All repeats and the correct tubulin western blots still in our notebook. It is missing only the films were the duplication is coming from.
3. Quantification was done as stated in the paper: "Blots were scanned and quantified using Quanti One software (BioRad)." and "Average fluorescence per cell was calculated with ImageJ (rsbweb.nih.gov) software". According to the exchanged emails Dr. Dr. Kieffer did the quantifications BUT it is hard for me to reconstruct the event.

In summary: I believe that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist shows already the error. According to the emails and notes some of the western blots and data quantification should be in Dr. Kieffer's notebook. However, Dr. Sundquist this morning verbally communicated that Dr. Kieffer does not have the western blots and he might have the quantification analysis.

Sincerely
Ivana De Domenico

4074

Appendix #5





4075

4554

**Dahlberg, John E (HHS/OASH)**

| | |
|---|---|
| **From:** | Dahlberg, John E (HHS/OASH) |
| **Sent:** | Monday, June 02, 2014 3:11 PM |
| **To:** | Wes Sundquist |
| **Cc:** | Jeff Botkin; Dahlberg, John E (HHS/OASH) |
| **Subject:** | RE: Correspondence Regarding ORI case #4554 |

Dear Dr. Sundquist,

I did receive your letter in November 2013. As you know, this case has been complicated and time consuming, but ORI does review the complete record once we have received the final investigation report from an institution and our independent oversight review can commence.

Sincerely,

John Dahlberg, Ph.D.
Deputy Director
Office of Research Integrity
240-453-8800
john.dahlberg@hhs.gov
ORI Web Site: http://ori.hhs.gov/

**From:** Wes Sundquist [mailto:wes@biochem.utah.edu]
**Sent:** Monday, June 02, 2014 2:38 PM
**To:** Dahlberg, John E (HHS/OASH)
**Cc:** Jeff Botkin
**Subject:** FW: Correspondence Regarding ORI case #4554

Dear Dr. Dahlberg:

I am writing to follow up on my previous email to you that included a letter and documentation. In the letter, Collin Kieffer and I explained our position on ORI case #4554. I realize that the original email (cc'd below) likely went through to you without a problem, but I have been thinking that I should follow up just to make absolutely certain of that. Would you please acknowledge that you received this email message and the enclosure and passed it along to the appropriate investigator(s)?

Thank you for your consideration, and I would be happy to provide any additional information that you require.

Best,
Wes Sundquist

--
Wes Sundquist
15 N Medical Drive
Bldg. 565, Room 4100
Department of Biochemistry
University of Utah
Salt Lake City, UT 84112-5650
801-585-5402
wes@biochem.utah.edu
https://wasatch.biochem.utah.edu/wes/

1

4076

RAY QUINNEY & NEBEKER

September 19, 2014    4554

John Dahlberg, Ph.D.
Deputy Director
Susan Garfinkel, Ph.D.
Director, Division of Investigative Oversight
U.S. Dep't. of Health and Human Services
Office of Research Integrity
1101 Wootton Pkwy., Ste. 750
Rockville, MD 20852

**Ryan B. Bell**
ATTORNEY AT LAW

PO Box 45385
Salt Lake City, Utah
84145-0385

36 South State Street
Suite 1400
Salt Lake City, Utah
84111

801 532-1500 FIRM
801 323-3383 DIRECT
801 532-7543 FAX
rbell@rqn.com
www.rqn.com

Dear. Drs. Dahlberg & Garfinkel:

This firm represents Dr. Ivana De Domenico, a former Assistant Professor at the University of Utah, Department of Internal Medicine. Dr. De Domenico was accused of research misconduct and was the subject of an inquiry and investigation process, which concluded with the issuance of a Consolidated Hearing Committee Report on May 8, 2013 recommending her termination, followed by her removal from the University. While the Hearing Committee did not find grounds to support charges of falsification and fabrication, they did find misconduct on the basis of recklessness.

Dr. De Domenico vigorously opposed the accusations made against her, and continues to maintain that her accusers were incorrect and were motivated by bad faith. She also alleges that the University's treatment of her was discriminatory, and has begun legal proceedings to litigate the merits of that position.

In connection with Dr. De Domenico's discrimination proceedings, it has come to light that the University of Utah submitted a final report to your office in June 2013 relaying the decision of the Consolidated Hearing Committee. However, I asked Dr. Jeffrey Botkin, the University's Vice President for Research Integrity, to confirm that he sent the complete file to ORI, which would include documents submitted by Dr. De Domenico in her defense. He would not offer any assurance that he had done so. During the lengthy and complicated proceedings conducted by the University of Utah, Dr. De Domenico submitted a number of papers and evidentiary items establishing her defenses and making arguments rebutting the accusations against her. Without these documents, your office's file would be incomplete and harmfully one-sided.

I write for three reasons. First, we provide herewith a set of documents that will be useful in the event that ORI undertakes an oversight review of the University's determinations. We strongly believe that any such

September 19, 2014
Page 2

review would be woefully incomplete without inclusion of the materials
submitted by Dr. De Domenico. In this proceeding, the University essentially
acted as both judge and prosecutor, and thus a review of only the documents
generated by the University would provide an extremely prejudicial account
of the relevant facts. The University disregarded or misinterpreted a number
of important facts Dr. De Domenico raised in her defense, and any reliance on
the University's conclusions, without reference to contrary evidence, will only
compound the University's mistakes. We therefore request that the materials
enclosed herewith be added to ORI's official record of this proceeding, and all
such materials be made part of any additional oversight review undertaken by
ORI.

Secondly, given the amount of time that has passed since the
University concluded its investigation, we request an update from ORI
regarding its intentions with regard to Dr. De Domenico's case. While we
understand that ORI follows its own internal procedures and timelines, we
wish to convey that Dr. De Domenico's life and career have been thrown into
disarray by the University's proceedings, and that the continuing threat of
additional process continues to complicate her pursuit of new
opportunities. Dr. De Domenico is entitled to finality in this process. If ORI
has already determined not to make additional conclusions or review of Dr.
De Domenico's actions, please advise. Alternatively, if Dr. De Domenico's
case may yet be reviewed by ORI at some point, we ask that ORI convey its
plans, to provide something upon which Dr. De Domenico may rely in her
career planning. Being forced to operate under the threat of additional action
has become a significant and ultimately prejudicial burden on Dr. De
Domenico and her ability to earn a living.

Finally, we wish to communicate to you that Dr. De Domenico has
discovered a number of new facts not available to her during the period of the
investigation that significantly buttress her defenses. For example, it came to
light after the investigation was closed that Drs. Kaplan and Ward, two senior
co-authors not censured by the Consolidated Hearing Committee, made
changes to one of the main papers under review without Dr. De Domenico's
knowledge, after she had approved it for publication. These changes created
problems in the paper for which Dr. De Domenico was later held
responsible. The co-authors continue to seek and receive federal research
funding even though Dr. De Domenico and others have reported substantial
errors in their work. Further, the University altered its final report to protect
another co-author with a vested interest in the outcome, Dr. Wes Sundquist,
whom Dr. De Domenico believes was responsible for the errors in one
published paper. This alteration was made specifically at the request of Dr.
Sundquist, and over Dr. De Domenico's objection, further complicating the
procedural improprieties that compromised the University's investigation

September 19, 2014
Page 3

from the very beginning. A number of other problems have infected the
University's process, several of which have come to light only recently. This
provides further reason for ORI to involve Dr. De Domenico in any oversight
review it performs on this case.

In summary, we ask that ORI add the attached materials to its file and
include in any oversight review it undertakes, that it advise as to whether it
currently intends or does not intend to conduct a review of Dr. De Domenico's
case, and that it provide an opportunity for Dr. De Domenico to submit
additional argument and evidence, if an additional review is initiated. If you
find reference in your files to any materials that have not been sent to you,
please let me know and I will be happy to provide them to you.

Please feel free to contact me with any questions regarding the above.

Sincerely,

RAY QUINNEY & NEBEKER P.C.

Ryan B. Bell

1295852

4080

The Inquiry Committee did not recommend that further investigation be conducted. A detailed response was received from Drs. De Domenico and Kaplan on 2/22/12. The respondents acknowledge multiple errors and intend to work with the journals in question to address these concerns.

My assessment is that the Inquiry Committee has done a thorough job in reviewing the primary data and interviewing the respondents. The respondents have been fully cooperative through the inquiry and they acknowledge the multiple errors made in the preparation of manuscripts. As observed by the Inquiry Committee, the pattern of problems identified in the figures does not suggest an intent to deceive. The allegation concerning the antibody was addressed by emails provided by Dr. Kaplan documenting the acquisition of the antibody from Cell Signaling. The allegation concerning the error bars was addressed through independent analysis by a statistician. The error bars are accurate with respect to the primary datasets obtained.

As the Research Integrity Officer, I will not pursue a full investigation of these allegations for research misconduct. The federal Office of Research Integrity was notified of the allegations and will receive a full report from my office. They may initiate an investigation.

This summary, allegations, the report of the Inquiry Committee, and the response of the respondents will be shared with the journal editors who contacted me about these concerns and with the independent investigator who documented irregularities in the manuscripts in question (the complainants).



## Timeline

11/2/11 – I received an email from Dr. Kaplan notifying me of concerns by the journal Cell Metabolism.

11/3/11 – I received an email from Nikla Emambokus, Ph.D. Editor, Cell Metabolism, raising concerns about figures in a journal article in the November 2011 issue, "The Role of Ubiquitination in Hepcidin-Independent and Hepcidin-Dependent Degradation of Ferroportin" by De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The journal had been contacted by a group of ten concerned readers about the apparent irregularities in the manuscript figures. The editor indicated that there had been communication with Dr. Kaplan about the concerns but a decision was made to notify me in my capacity as Research Integrity Officer.

11/3/11 - Additional material received from an outside investigator documenting concerns about figures.

11/7/11 An email was received from Ushma S. Neill, Ph.D., Executive Editor, The Journal of Clinical Investigation regarding the concerns in the JCI publication: Ivana De Domenico, Tian Y. Zhang, Curry L. Koening, Ryan W. Branch, Nyall London, Eric Lo, Raymond A. Daynes, James P. Kushner, Dean Li,

2

4083

nature of the data (band or no band) and the symmetry of the panel lead to erroneous figures but did not lead to misrepresentation of the data. These mistakes were made in the assembly of the figures for publication, the conclusions of the figures are correct. All the previous publication and discoveries by Dr. De Domenico and Dr. Kaplan were validated by publications from others, as detailed below.

We had originally contacted the editors from *Cell Metabolism*, *PNAS*, *JCI* and *Blood* and now after the investigation is concluded we are planning to fully disclose the errors with the editors of the journals and have ready errata of the now corrected figures.

We are able to replace each figure with repeat experiments (these data are in Dr. Botkin's custody) or by re-running the original samples. As was noted by the committee the original samples were coded, inventoried and stored in a laboratory freezer.

We are embarrassed by the duplicated images but there was no duplicity involved. They were mistakes, but again there was no attempt at falsification. New policies in the laboratory will prevent a recurrence. These policies, suggested also by the committee, include: stripping gels for loading control rather than using a separate gel, not erasing labels on the film before scanning during figure preparation and not having more than two gels in each film. We currently have an individual from outside of the lab that analyzes the data for each figure for publications. Finally, Dr. Kaplan will personally supervise the generation of the figures.

Sincerely
Jerry Kaplan
Ivana De Domenico

# ORI Finding 1 – Figure 5B of *Dev. Cell* 2008





**Gradient map** illustrating image splicing

**Gradient map** with white arrows indicating duplicated bands



# ORI Finding 1 – Figure 5B of *Dev. Cell* 2008

**Fig 5B**





**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

# ORI Finding 2 – Figure 1C of *Cell Met.* Nov. 2011

**Fig 1C**

**Gradient map** illustrating duplicated bands that were flipped horizontally; yellow box outlines reoriented images; white box outlines PM (plasma membrane) label





Gradient Map →

Copied & **flipped horizontally**

# ORI Finding 2 – Figure 1C of *Cell Met.* Nov. 2011



**Fig 1C**

IP: Streptavidin

Copied & **flipped horizontally**

Merged

Merged

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

# ORI Finding 3 – Figures 1D and 3 of *Cell Met.* Nov. 2011



**Fig 1D**

HEK293T + Dynamin K44A
IP: GFP

**Gradient map** illustrating duplicated bands; white arrows highlight shared morphologies

**Fig 3**

# ORI Finding 3 – Figures 1D and 3 of *Cell Met.* Nov. 2011

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

**Fig 1D**

HEK293T + Dynamin K44A
IP: GFP



**Fig 3**



Merged

Merged

# ORI Finding 4 – Figures 2Aii and 2B of *Cell Met.* Nov. 2011

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image



# ORI Finding 4 – Figures 2Aii and 2B of *Cell Met.* Nov. 2011



**Fig 2Aii**

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

Copied and **Flipped Horizontally**

Merged

**Fig 2B**

Merged

# ORI Finding 5 – Figures 2Aii and 5 of *Cell Met.* Nov. 2011



**Fig 2Aii**

IP: Streptavidin

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

Copied, **Darkened, and Flipped Horizontally**

**Fig 5**

Merged

IP: Streptavidin

Merged



# ORI Finding 6 – Figure 4B of *Cell Met.* Jan. 2011 and autoradiogram film

**Fig 4B (Top Left)**

**Film found in Respondent's lab notebook**

"IDD"

**Figure 4B** (Top Panel) reports **no treatment** with Endo H; Respondent's laboratory notebook reports **treatment** with **Endo H**.

**labeling magnified**

**Page 10**

# ORI Finding 6 – Figure 4B of *Cell Met.* Jan. 2011 and autoradiogram film



**Fig 4B (Top Left)**

Copied **and Flipped Horizontally**

Merged

**Respondent's lab notebook**

Merged

Respondent's film reporting + **Endo H** treatment is the source for the top panel for **Figure 4B**, which purports to represent samples without Endo H treatment **(- Endo H)**.

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image

# ORI Finding 6 – Figure 4B of *Cell Met.* Jan. 2011 and autoradiogram film



**Fig 4B**

**Film found in Respondent's lab notebook**

Respondent's film (reporting the presence of iron (+ **Fe**)) is the source for both the Bottom Panel of **Figure 4B,** which reports the presence of iron (+ **Fe**), and the Top Panel of **Figure 4B**, which reports the absence of iron (- **Fe**).

**Page 12**

# ORI Finding 6 – Figure 4B of *Cell Met.* Jan. 2011 and autoradiogram film

**Fig 4B**



Copied **and Flipped Horizontally and Vertically**

**Respondent's lab notebook**

Merged

**Color overlay**: Red areas identify the same features and position; white and black features are unique to each image



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 240
Rockville, MD, 20852

Phone: 240-453-8200
FAX:   301-594-0043

**CONFIDENTIAL/SENSITIVE**

Ivana Frech, Ph.D.
771 Highland Park Ave.
Coralville, IA 52241-3378

RE:  ORI Case No. 2017-05

Dear Dr. Frech:

This is to notify you that the Office of Research Integrity (ORI) in the U.S. Department of Health and Human Services (HHS) is making findings of research misconduct under 42 C.F.R. Part 93 against you based on the evidence and findings of an investigation by the University of Utah (UU) and additional information obtained and analysis conducted by ORI during its oversight review of this investigation.

The following sets forth a summary of ORI's findings of research misconduct and HHS' proposed administrative actions. This notice also provides information about your opportunity to contest these findings and actions. A more detailed charging document setting forth the basis for ORI's findings of research misconduct and the HHS administrative actions is enclosed.

## I.    Summary of ORI's Findings of Research Misconduct

**ORI Findings**: ORI finds that you (Respondent) intentionally, knowingly, or recklessly engaged in research misconduct by falsifying and/or fabricating research results in three (3) published papers funded by the U.S. Public Health Service (PHS).

Specifically, ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in three (3) published papers.

In the enclosed charging document and the attached and incorporated exhibits, ORI has provided a detailed description of the facts and circumstances supporting its findings of research misconduct.

4783

**CONFIDENTIAL/SENSITIVE**

Dr. Ivana Frech                    ORI Case No. 2017-05                    Page 2

**II.  <u>Definition of Research Misconduct</u>**

42 C.F.R. Part 93 defines *research misconduct* as:

> fabrication, falsification, or plagiarism in proposing, performing, or
> reviewing research, or in reporting research results.  (a) Fabrication
> is making up data or results and recording or reporting them.
> (b) Falsification is manipulating research materials, equipment, or
> processes, or changing or omitting data or results such that the research is
> not accurately represented in the research record.
> (c) Plagiarism is the appropriation of another person's ideas, processes,
> results, or words without giving appropriate credit.
> (d) Research misconduct does not include honest error or differences of
> opinion.

**III.  <u>Proposed HHS Administrative Actions</u>**

**A.  <u>Debarment</u>**

The Deputy Assistant Secretary for Acquisitions (Debarring Official), the HHS official
authorized to impose debarment, has reviewed these findings and finds that the research
misconduct involved in this case provides a cause for debarment under 2 C.F.R. § 180.800(d).
HHS adopted and gave regulatory effect to 2 C.F.R. Part 180 at 2 C.F.R. Part 376.

The Debarring Official proposes debarring you for a period of three (3) years from
participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement
transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

Some of the significant consequences of debarment are:

- You will be ineligible to be a participant in a federal agency transaction that is a
  covered transaction (including grants and cooperative agreements); or act as a
  principal of a person participating in one of those covered transactions; except as
  provided in 2 C.F.R. §§ 180.135, 315, and 420.  *See* 2 C.F.R. §§ 180.130 and
  376.995.

- You will be excluded from receiving contracts, and agencies shall not solicit offers
  from, award contracts to, or consent to subcontracts with you, unless the agency head
  determines that there is a compelling reason for such action. You also will be excluded
  from conducting business with the Government as an agent or representative of other
  contractors. *See* 48 C.F.R. §§ 9.401, 9.405.

- Your name will be placed in the "System for Award Management" (SAM), which is
  maintained by the General Services Administration.

**CONFIDENTIAL/SENSITIVE**

Dr. Ivana Frech                          ORI Case No. 2017-05                          Page 3

### B. Additional Administrative Actions

It is proposed that you be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three (3) years.

It also is proposed that ORI will send a notice to the pertinent journal of the following published paper that requires retraction or correction, in accordance with 42 C.F.R. § 93.407(a)(1) and § 93.411(b):

- Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014

## IV. Opportunity to Contest ORI's Findings of Research Misconduct

In accordance with the PHS Policies on Research Misconduct, Subpart E, you may contest the ORI findings of research misconduct and proposed HHS administrative actions by requesting an administrative hearing before an administrative law judge with the HHS Departmental Appeals Board (DAB). Your hearing request must be in writing, signed by you or your attorney, and sent to the DAB and ORI within 30 days of receipt of this letter. 42 C.F.R. § 93.501. If you do not request a hearing, the research misconduct findings and administrative actions set forth above will become effective 30 days from the date of receipt of this letter.

The DAB may be experiencing delays in processing documents received by mail. To avoid delay, the DAB strongly encourages parties to file hearing requests through its online e-filing system. You may register for and access the online filing system at https://dab.efile.hhs.gov/.

If you do not have access to the Internet to use the DAB's online e-filing system, you must send your hearing request by certified mail, or other equivalent (i.e., with a verified method of delivery) to:

Chief Administrative Law Judge
Departmental Appeals Board
Department of Health and Human Services
MS 6132
330 Independence Ave., S.W.,
Cohen Building, Room G-644, Washington, DC  20201

**CONFIDENTIAL/SENSITIVE**
Dr. Ivana Frech                          ORI Case No. 2017-05                          Page 4

For further information, you can find the PHS Policies on Research Misconduct, 42 C.F.R. Part 93, on the ORI website at:

http://ori.hhs.gov/sites/default/files/42_cfr_parts_50_and_93_2005.pdf

Please be advised that the PHS Policies on Research Misconduct, Subpart E, provide for a hearing only to address "a genuine dispute over facts material to the findings of research misconduct or proposed administrative actions." 42 C.F.R. § 93.503(a). Thus, any request for a hearing should identify the specific material facts in the ORI findings of research misconduct that you dispute, including a statement of the reason(s) for disputing the finding(s) and proposed administrative action(s).

You also must send a complete copy of your hearing request, including enclosures, by certified mail, or other equivalent (i.e., with a verified method of delivery) to:

> Sheila Garrity, JD, MPH, MBA
> Director
> Office of Research Integrity
> 1101 Wootton Parkway, Suite 240
> Rockville, MD  20852-5003

If you do not request a hearing, the research misconduct findings and administrative actions set forth above will become effective 30 days from the date of receipt of this letter.

Sincerely,

Sheila R.
Garrity -S
Digitally signed by
Sheila R. Garrity -S
Date: 2023.06.22
16:07:24 -04'00'

katrina brisbon (Jul 3, 2023 15:05 EDT)

Sheila Garrity, JD, MPH, MBA                    H. Katrina Brisbon
Director                                        Deputy Assistant Secretary for Acquisitions
Office of Research Integrity                     and Suspension and Debarment Official

Enclosures

cc: Dr. Tara A. Schwetz, Agency Research Integrity Liaison Officer, NIH, w/o Exhibits
    Erin Rothwell, Ph.D., Research Integrity Officer, University of Utah

## THE OFFICE OF RESEARCH INTEGRITY'S FINDINGS
## OF RESEARCH MISCONDUCT AGAINST IVANA FRECH, PH.D.

The Office of Research Integrity ("ORI") makes findings of research misconduct against Ivana Frech, Ph.D. (formerly "Ivana De Domenico") ("Respondent"), former Assistant Professor in the Department of Internal Medicine in the University of Utah ("UU") School of Medicine. ORI's findings are based on evidence and findings of an investigation conducted by UU, ORI's oversight review of UU's investigation, and additional analysis conducted by ORI in its oversight review. UU submitted an investigation report to ORI (the "UU Report"), incorporated herein by reference and attached hereto as Charge Letter Exhibit ("**C.L. Ex.**") **1**.

## I.    JURISDICTION

### A.  ORI's Authority

1.    ORI has the statutory and regulatory authority to make findings of research misconduct and propose administrative actions. *See* 42 U.S.C. § 289b; 42 C.F.R. Part 93.

### B.  Definition of Research Misconduct

2.    Under 42 C.F.R. Part 93:

> *Research misconduct* means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.
>
> (a) Fabrication is making up data or results and recording or reporting them.
>
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
>
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
>
> (d) Research misconduct does not include honest error or differences of opinion.

42 C.F.R. § 93.103.

3.    A finding of research misconduct made under 42 C.F.R. Part 93 requires that—

> (a) There be a significant departure from accepted practices of the relevant research community; and
>
> (b) The misconduct be committed intentionally, knowingly, or recklessly; and
>
> (c) The allegation is proven by a preponderance of the evidence.

42 C.F.R. § 93.104.

4787

### C.  U.S. Public Health Service Financial Support

4.  The questioned research was supported by the following U.S. Public Health Service ("PHS"), National Institutes of Health ("NIH"), grants:

    a.  National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK") grant R01 DK070947, "Mechanism and Regulation of Iron Export by Ferroportin," Dr. Jerry Kaplan, Principal Investigator (P.I.), from 05/15/2005-06/30/2015. **C.L. Ex. 2**.

    b.  NIDDK grant R01 DK090257, "Regulation of Iron Homeostasis," Dr. Ivana De Domenico, P.I., from 09/30/2010-06/30/2015. **C.L. Ex. 3**.

    c.  NIDDK grant R01 DK030534, "Factors regulating the cellular uptake of iron," Dr. Jerry Kaplan, P.I., from 01/01/1982-01/31/2019. **C.L. Ex. 4**.

    d.  National Institute of General Medical Sciences ("NIGMS") grant P50 GM082545, "Center for the Structural Biology of Cellular Host Elements in Egress, Trafficking, and Assembly of HIV," Dr. Wesley I. Sundquist, P.I., from 08/27/2007-07/31/2022. **C.L. Ex. 5**.

    e.  National Institute of Allergy and Infectious Diseases ("NIAID") grant R01 AI051174, "Biochemistry of HIV-1 Membrane Recognition and Budding," Dr. Wesley Sundquist, P.I., from 02/01/2002-03/31/2022. **C.L. Ex. 6**.

    f.  National Heart, Lung, and Blood Institute ("NHLBI") grant R01 HL026922, "Receptor Mediated Endocytosis in Aveolar Macrophages," Dr. Jerry Kaplan, P.I., from 05/01/1981-05/31/2013. **C.L. Ex. 7**.

### D.  Records That Contain Falsified and/or Fabricated Research Results

5.  ORI's findings of research misconduct concern the falsification and/or fabrication of figures reported in the following PHS-supported published papers:

    a.  Kieffer C, Skalicky JJ, Morita E, De Domenico I, Ward DM, Kaplan J, Sundquist WI. Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014 ("*Dev. Cell* 2008") ("Paper 11" in UU Report). **C.L. Ex. 8**.

    b.  De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role of Ubiquitination in Hepcidin-independent and Hepcidin-dependent Degradation of Ferroportin. *Cell Metab.* 2011 Nov 2;14(5):635-46. doi: 10.1016/j.cmet.2011.09.008. ("*Cell Met*. Nov. 2011") ("Paper 1" in UU Report). **C.L. Ex. 9**. Retracted: *Cell Met*. 2012 Jun 6;15(6):927. doi: 10.1016/j.cmet.2012.04.107. **C.L. Ex. 10**.

    c.  De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J. Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion. *Cell Metab.* 2011 Jan 5;13(1):57-67. doi: 10.1016/j.cmet.2010.12.003 ("*Cell Met*. Jan. 2011") ("Paper 6" in UU Report). **C.L. Ex. 11**. Retracted: *Cell Met*. 2012 Jun 6;15(6):927. doi: 10.1016/j.cmet.2012.04.012. **C.L. Ex. 10**.

## II.   SUMMARY OF ORI FINDINGS AND HHS PROPOSED ADMINISTRATIVE ACTIONS

6.   ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers.

7.   ORI finds that these acts constitute a significant departure from accepted practices of the relevant research community. *See* 42 C.F.R. § 93.104(a).

8.   ORI finds by a preponderance of the evidence that Respondent's intentional, knowing, or reckless falsification and/or fabrication of data constitutes research misconduct within the meaning of 42 C.F.R. §§ 93.103 and 93.104.

9.   The Deputy Assistant Secretary for Acquisitions and Suspension and Debarment Official (Debarring Official) proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

10.   HHS also proposes that for a period of three (3) years, Respondent be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

11.   In addition, ORI finds that *Dev. Cell* 2008 should be retracted or corrected. *Cell Met*. Jan. 2011 and *Cell Met*. Nov. 2011 already have been retracted by the journal *Cell Metabolism*.

12.   In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes to send to the journal *Developmental Cell* a notice of ORI's findings and of the need for retraction or correction of *Dev. Cell* 2008.

## III.   FACTUAL BACKGROUND

### A. Respondent's Background

13.   Respondent received a B.S. in biological science in 2002 from the University of Messina, Italy, and a Ph.D. in 2005 from the University of Messina.

14.   From 2005-2007, Respondent was a postdoctoral fellow in the laboratory of Dr. Jerry Kaplan, a professor in the UU School of Medicine's Department of Pathology, and from 2007-2008, Respondent was a research associate in the Kaplan laboratory. In 2008, Respondent was promoted to research assistant professor in the Department of Internal Medicine at UU.

15.   In June 2013, UU terminated Respondent's employment.

**B. Scientific Background and Respondent's Research**

16.     Iron is essential for life, but its levels must be tightly regulated in animals. Excess amounts of iron either within cells or in blood and other extracellular fluids are toxic. Regulation of iron homeostasis is important for normal physiological function, and its dysregulation is implicated in a number of diseases, including anemias.

17.     It is well established that the regulation of iron levels in human blood is controlled by two proteins, hepcidin ("HEP") and ferroportin ("FPN"). As an iron transporter, FPN is a transmembrane protein that exports iron out of cells and into the bloodstream. When HEP binds the FPN iron transporter protein, it inactivates FPN, and as a result less iron is pumped from inside cells into the blood plasma. Once FPN is internalized by the binding of HEP, it undergoes lysosomal degradation (i.e., FPN protein is broken down in a regulated manner inside the cell) such that the total concentration of the FPN protein in the cell decreases. The downregulation of FPN is dependent on proteins that mediate cell membrane remodeling through membrane budding events.

18.     Respondent's research involved studies of the molecular mechanisms of cellular iron regulation. Respondent's three papers that are the subject of ORI's findings presented seminal data on mechanisms of the regulation of FPN by HEP and ferritin, thereby adding to the body of knowledge regarding the ability of an individual to appropriately respond to changes in the environment through regulation of iron homeostasis.

**C. Allegations and UU's Research-Misconduct Proceeding**

19.     In November 2011, a complainant contacted UU's Research Integrity Officer ("RIO") and ORI with allegations of research misconduct against Respondent, including in *Cell Met.* Nov. 2011 (referenced as "Paper 1" in the UU Report) and *Cell Met.* Jan. 2011 (referenced as "Paper 6" in the UU Report).

20.     On November 8, 2011, the RIO met with Respondent and Dr. Kaplan for initial interviews. On the same day, the RIO sequestered laboratory notebooks that included autoradiography films and handwritten notes.

21.     In December 2011, UU initiated an inquiry into the allegations. The inquiry committee met with Respondent and with Dr. Kaplan to discuss the allegations.

22.     The complainant submitted additional allegations to the RIO in March, May, and June 2012, including allegations involving *Dev. Cell* 2008 (referenced as "Paper 11" in the UU Report).

23.     In April 2012, UU initiated an investigation into all of the allegations and later added the May and June 2012 allegations to its investigation.

24.     The investigation committee interviewed multiple witnesses, including Respondent, Dr. Kaplan, Dr. Diane Ward (Associate Professor in the UU Department of Pathology and a coauthor on the papers at issue), and the complainant.

25.     The committee also posed questions regarding the *Dev. Cell* 2008 allegations to Dr. Collin Kieffer and Dr. Wesley Sundquist, both in the Biochemistry Department at UU School of

Medicine and coauthors of *Dev. Cell* 2008. Dr. Sundquist and Dr. Kieffer responded jointly on July 19, 2012. **C.L. Ex. 14**. On July 21, 2012, Respondent sent to the RIO an email with a letter attachment describing Respondent's responsibility for the falsification in Figure 5B of *Dev. Cell* 2008. **C.L. Ex. 13**. Drs. Sundquist and Kieffer provided a follow-up response to the investigation committee on July 26, 2012, confirming Respondent's responsibility for that falsification. **C.L. Ex. 15**.

26.    After providing Respondent with the opportunity to comment on its draft investigation report (*see, e.g.*, **C.L. Ex. 12** (Detailed Response to Investigation Report)), the investigation committee issued its final investigation report (the UU Report) on December 14, 2012, recommending findings of research misconduct against Respondent and termination of employment, which UU accepted in January 2013.

27.    Respondent appealed the research misconduct findings and sanctions to the UU Office of the Academic Senate. A Consolidated Hearing Committee (CHC) panel conducted a hearing in April 2013. The CHC panel issued its report and recommendations in May 2013 and concluded that Respondent had engaged in research misconduct under UU policy by "reckless disregard of accepted practices." It agreed with the investigation committee's recommendation to terminate Respondent's employment or allow Respondent to resign.

28.    In June 2013, the President of UU accepted the recommendations of the CHC.

29.    UU sent the investigation report to ORI on June 10, 2013.

## IV.    ORI'S FINDINGS OF RESEARCH MISCONDUCT

30.    ORI's Division of Investigative Oversight conducted an oversight review of the UU investigation.

31.    ORI made the following six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot and autoradiogram images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers.

**<u>ORI FINDING #1</u>:  Respondent intentionally, knowingly, or recklessly falsified and/or fabricated a western blot image in Figure 5B (right bottom panel) of *Dev. Cell* 2008 by reusing and relabeling an image of three western blot bands to represent the results of different experiments.**

Figure 5 of *Dev. Cell* 2008 ("Paper 11" in the UU Report) reports on research involving charged multivesicular body protein 6 (CHMP6), which mediates FPN downregulation. Figure 5 demonstrates that "silencing" CHMP6 using a silencing RNA (siRNA) strategy prevents the hepcidin-dependent downregulation through lysosomal degradation of FPN,

whereas a control siRNA does not. **C.L. Ex. 8** (*Dev. Cell* 2008) at 7. Use of siRNA is a common method in cell and molecular biology to target and reduce a specific target protein to study its function.

32.    According to *Dev. Cell* 2008, Figure 5B shows western blot analyses of HEP-induced FPN-GFP[1] downregulation in human embryonic kidney 293 (HEK 293) cells in the presence of wild type and mutant CHMP6.

33.    The western blot bands in the middle panel (labeled "anti-FPN") show FPN levels in the presence of wild type ("WT") and mutant CHMP6 proteins and in the presence or absence of endogenous CHMP6.

34.    The western blot image panel in the bottom row (labeled "anti-α-Tubulin") of Figure 5B, right panel, shows six α-tubulin bands, which serve as an internal loading control to ensure that any differences in FPN levels shown in the middle row (labeled "anti-FPN") are due to a biological process and not differences in total protein loaded across lanes.

35.    In the bottom-right western blot image panel corresponding to the α-tubulin loading control in published Figure 5B (CHMP6 siRNA + FPN-GFP tubulin loading control), the image of the three bands in lanes 7-9 is identical to the image of the three bands in lanes 10-12. Thus, the image of α-tubulin bands in lanes 7-9 was duplicated, spliced into a composite image, and relabeled to represent different α-tubulin bands in lanes 10-12. *See* **C.L. Ex. 18** (ORI Image Analysis) at 1-2.

36.    Falsification and/or fabrication of loading controls is significant because loading controls validate the amount of protein in each lane. Changes reported in the protein of interest (FPN) could result from unequal loading of sample in each lane or other technical issues, as opposed to the proposed regulatory mechanism of protein targeting and degradation.

37.    Respondent created the composite image containing the duplicated α-tubulin bands. *See* **C.L. Ex. 13** (July 21, 2012, Respondent email and attached letter to Botkin (stating that "a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008" and that "the duplication came from me")); **C.L. Ex. 14** (July 19, 2012, Kieffer & Sundquist Letter to Botkin); **C.L. Ex. 15** (July 26, 2012, Kieffer and Sundquist Letter to Botkin); **C.L. Ex. 16** (Nov. 12, 2013 Kieffer and Sundquist letter to Dahlberg).

38.    It is implausible that the reuse and relabeling of the image is attributable to honest error rather than intentional and knowing falsification and/or fabrication because the duplication occurred within an image panel and thus involved splicing two images together to make a composite image of six bands in a row.

---

[1]Green fluorescent protein ("GFP") is a protein tag commonly attached to a protein of interest in molecular biology. The tag allows a researcher to distinguish FPN introduced into the cell from the naturally occurring FPN and visualize FPN expression under different conditions using traditional techniques in biochemistry, molecular biology, and microscopy.

39.     Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

40.     Respondent intentionally, knowingly, or recklessly falsified and/or fabricated the bottom right panel in Figure 5B of *Dev Cell* 2008.

41.     Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**<u>ORI FINDING #2</u>:  Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images in Figure 1C (top and bottom panels) of *Cell Met.* Nov. 2011 by reusing and relabeling an image of western blot bands to represent the results of two different experiments.**

42.     *Cell Met.* Nov. 2011 proposes a second mechanism of FPN inactivation that does not require the hormone HEP. **C.L. Ex. 9**. The model reported in the paper proposes that this second HEP-independent mechanism involves the direct "sensing" of internal cellular iron levels, presumably by the FPN protein itself. In the model proposed in the paper, FPN becomes internalized inside the cell when iron levels inside the cell are low (iron is required for cellular processes within the cell). This result would constitute a very important finding for the field of iron regulation and human physiology because the requirement for HEP in iron regulation is so well established.

43.     Figure 1C of *Cell Met.* Nov. 2011 supports the paper's hypothesis that depletion of iron within the cell leads to HEP-independent FPN degradation. **C.L. Ex. 9** at 3. In Figure 1C, Respondent engineered HEK 293 cells to express FPN protein that was fused with a GFP tag. In the western blot results shown in Figure 1C: lane 1 indicates cells without iron (ferric ammonium citrate, or "FAC") supplementation for 18 hrs; lane 2 indicates cells without iron (FAC) supplementation for 36 hrs; and lane 3 shows cells supplemented with iron (FAC) for 36 hrs. As would be expected by the model, the amount of FPN on the plasma membrane ("PM") (therefore able to transport iron out of the cell) goes away after depriving the cells of iron for 36 hrs (lane 2). According to both the original HEP-dependent and new HEP-independent models, the FPN transporter would be expected to be internalized inside the cell when iron levels are low.

44.     Figure 1C, top right panel, shows a western blot analysis of affinity-purified samples and the flow through from FPN-GFP-expressing cells in the presence of and absence of FAC or DFX.[2]  The western blot bands show the amount of FPN retained in the PM (in the "PM" row) versus the amount of FPN inside the cell's cytoplasm (in the "FT," or flow

---

[2]Deferasirox (DFX) is a strong iron chelator, i.e., it renders nearly all iron unavailable in a biological context. Therefore, with DFX treatment, one would hypothesize that nearly all detectable FPN would be internalized (as shown in the FT subpanel lane 4), as iron levels are scarce and the cell would conserve internal supplies.

through, row) after removal (lanes 1 and 2) or supplementation (lane 3) with FAC or treatment with DFX.

45.     The top row, labeled "PM," in Figure 1C of *Cell Met.* Nov. 2011 is an image of western blot bands showing the amount of FPN retained in the PM with or without FAC at certain time intervals, or without FAC but with DFX treatment (lane 4). The bottom row, labeled "FT," is an image of western blot bands showing the amount of FPN inside the cell's cytoplasm under the same experimental conditions.

46.     Respondent reused and relabeled the same image of four western blot bands in the top and bottom panels. In particular, the image of the bands in lanes 1-4 in the upper panel ("PM"), representing FPN-GFP found in the PM, is a copy, flipped horizontally, of the image of the bands in lanes 1-4 in the lower panel ("FT"), representing FPN-GFP found in the flow through. *See* **C.L. Ex. 18** (ORI Image Analysis) at 3-4.

47.     Respondent is the first author of *Cell Met.* Nov. 2011.

48.     Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

49.     Respondent knowingly and intentionally duplicated and horizontally flipped the western blot bands in both PM and FT rows to show ideal results, strongly supporting Respondent's hypothesis, in which all of the FPN protein was completely accounted for in either the PM or internal cytoplasmic (FT) fractions.

50.     Respondent would have understood that in a perfect experimental system, the total amount of FPN in Respondent's experiments would be expected to be: FPN (TOTAL) = FPN on PM + FPN inside the cell (FT). For example, in lanes 2 and 3, the intensity of each protein band (PM + FT) ideally would sum to account for all FPN in the cell. There are many steps in this biochemical assay, including purifying out the protein by binding it to affinity beads (leading to some protein loss) and then eluting the protein off the beads (also leading to some protein loss) for the western blot. As some protein loss is unavoidable at nearly all these steps, ideal results could not be achieved without knowing and intentional falsification and/or fabrication.

51.     The manipulation of the copied western blot bands also shows that the falsification and/or fabrication is attributable to intentional and knowing conduct rather than honest error.

52.     Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

53.     Respondent intentionally, knowingly, or recklessly falsified and/or fabricated Figure 1C (top right panel) of *Cell Met.* Nov. 2011.

54. Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #3**:  **Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images in Figures 1D and 3 of *Cell Met*. Nov. 2011 by reusing and relabeling one image to represent the results of two different experiments.**

55. According to *Cell Met.* Nov. 2011, Figure 1D shows that FPN is targeted for degradation in HEK 293 cells by modifying the amino acid lysine at position 253 through a process known as ubiquitination. **C.L. Ex. 9** at 3. Ubiquitination is a protein modification that specifically occurs on lysine (abbreviated as "K") amino acid residues in proteins that can signal that protein for targeted degradation. By reporting equal FPN-GFP levels in the western blot image of the right panel of Figure 1D, Respondent showed that lack of a ubiquitin band in the K253A (i.e., lysine substituted for an alanine (A) that cannot be modified) column was not attributed to different FPN protein expression or recovery levels, but rather that the specific lysine at amino acid 253 was modified.

56. According to *Cell Met.* Nov. 2011, Figure 3 shows that the enzyme Nedd4-2 is required for the internalization and degradation of FPN-GFP in HEK 293 cells genetically engineered to stably express the FPN-GFP gene (Figure 1D shows HEK 293 cells that do not have this genetic modification). Figure 3 represents a different experiment that claims to identify the specific ubiquitin ligase (i.e., the protein enzyme that adds the ubiquitin to the lysine) as Nedd4-2. **C.L. Ex. 9** at 5. In Figure 3, Respondent alleges that depletion of the Nedd4-2 enzyme in lane 4 prevents internalization of FPN-GFP in the presence of hepcidin.

57. Respondent reused and relabeled FPN-GFP western blot bands in Figure 1D to also represent GFP western blot bands in Figure 3 (lanes 3 and 4). In particular, the lower right blot image panel (labeled GFP and treated with DFX) in Figure 1D is identical to the blot image in the last two lanes of the middle panel (Nedd4-2 column) in Figure 3 (labeled GFP and treated with or without HEP) after cropping out lanes one and two. *See* **C.L. Ex. 18** (ORI Image Analysis) at 5-6. Therefore, Respondent reused and relabeled control data in Figure 1D to also represent key experimental results from a different experiment to claim to identify the specific enzyme (Nedd4-2) required for FPN-GFP ubiquitination, internalization, and subsequent degradation. Thus, the same western blot images in Figures 1D and 3 were used to represent results from different experiments using different cell lines -- one an unmodified cell line and one cell line genetically modified with FPN-GFP stable gene integration.

58. Respondent is the first author of *Cell Met.* Nov. 2011.

59. Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

60.	The image manipulation (cropping of the larger image to create the smaller image) shows that the image reuse and relabeling was not honest error but rather knowing and intentional falsification and/or fabrication.

61.	Moreover, this falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

62.	Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figure 1D and Figure 3 of *Cell Met.* Nov. 2011.

63.	Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #4**:  **Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images in Figures 2Aii and 2B of *Cell Met.* Nov. 2011 by reusing and relabeling one image as representing the results of two different experiments.**

64.	According to *Cell Met.* Nov. 2011, Figure 2Aii purportedly shows that Nedd4-2 is the specific enzyme (ubiquitin ligase) responsible for FPN internalization and degradation. **C.L. Ex. 9** at 4. Nedd4-2 is a family member of ubiquitin ligases previously known to regulate ion channels, so Respondent hypothesized that the FPN iron ion transporter would be regulated by a similar mechanism.

65.	In Figure 2Aii, Respondent purportedly shows that FPN-GFP is internalized 36 hours after expressing the protein in HEK 293 cells (compare band intensity in column 1, lane 1 (N.S. 18h) with column 3, lane 1 (N.S. 36h)). However, when the cells are depleted of the Nedd4-2 ubiquitin ligase using siRNA, FPN-GFP was not degraded (compare band intensity in column 2, lane 1 (Nedd4-2 18h) with column 4, lane 1 (Nedd4-2 36h)). Therefore, these results support that Nedd4-2 is required for FPN internalization under normal conditions (i.e., iron levels were not manipulated in this experiment).[3]

66.	According to *Cell Met.* Nov. 2011, Figure 2B shows that Nedd4-2 depletion prevents cells from internalizing FPN during iron depletion (DFX treatment). **C.L. Ex. 9** at 4. Therefore, these results support that Nedd4-2 also is required for appropriate FPN regulation when iron levels are low (versus Figure 2Aii, which shows Nedd4-2 degradation under normal iron conditions).

---

[3]The samples purportedly cseparated into two fractions: plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic). FPN identified in the FT fraction presumably represents internalized FPN.

67. The two panels in the upper row of Figure 2Aii purportedly represent HEK 293 cells that have expressed FPN-GFP for 18 hours (left panel) or 36 hours (right panel). These cells allegedly were treated either with a non-targeting control siRNA or Nedd4-2 specific siRNA.

68. The two panels in the upper row of Figure 2B purportedly represent HEK 293 cells that have expressed FPN-GFP and were treated with a non-targeting control siRNA or Nedd4-2 specific siRNA just as in Figure 2Aii. However, in Figure 2B the cells purportedly were treated with DFX (+, right panel) or served as controls (-, left panel). DFX strongly binds to iron and makes it unavailable to the cells. Therefore, Figure 2B supports the model that Nedd4-2 also is required for FPN degradation when cells experience low levels of iron.

69. The image of the western blot bands in the top right panel of Figure 2Aii is a copy of the image of the western blot bands in the top right panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 7.

70. The image of the western blot bands in the top left panel of Figure 2Aii is a copy, flipped horizontally, of the image of the western blot bands in the top left panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 8.

71. Thus, the same western blot images are used to represent different experimental treatments.

72. Respondent is the first author of *Cell Met.* Nov. 2011.

73. Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

74. It was not honest error but rather knowing and intentional falsification and/or fabrication because the top left panel in Figure 2Aii was copied, flipped horizontally, and relabeled to represent a different experiment in Figure 2B. Additionally, the corresponding bottom panels for both figures are from different source images.

75. Further, the corresponding FT panels are different but support the expected outcome for the different illustrated experiments. For example, the FPN-GFP internalization shown in Figure 2B (FT) purports to demonstrate impressively that no detectable FPN is internalized during iron depletion when Nedd4-2 is absent. Also, the falsification and/or fabrication supports the authors' hypothesis that Nedd4-2 is the specific ubiquitin ligase that targets FPN for degradation. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error.

76. Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

77.   Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figures 2Aii and 2B of *Cell Met.* Nov. 2011.

78.   Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #5**:  **Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images in Figures 2Aii and 5 of *Cell Met.* Nov. 2011 by reusing and relabeling one image as representing the results of two different experiments.**

79.   According to *Cell Met.* Nov. 2011, Figure 5 shows that treatment of cells with zinc maintains FPN on the PM, thereby partially blocking FPN-GFP internalization and subsequent degradation. **C.L. Ex. 9** at 7. This result supports the authors' hypothesis that FPN can transport other metal ions in addition to iron (Fe), specifically manganese (Mn) and zinc (Zn).

80.   *Cell Met.* Nov. 2011 Figure 2Aii, in contrast, shows a different experiment. As previously described in Finding #4, Figure 2Aii tests the authors' hypothesis that the internalization of the FPN-GFP iron transporter is regulated by the ubiquitin ligase Nedd4-2 under normal conditions. The western blot depicted in Figure 2Aii purportedly demonstrates that depletion of Nedd4-2 in HEK 293 cells prevents the normal internalization of FPN-GFP. Therefore, the results presented in Figure 2Aii, if true, would have provided important insight into the normal regulation of the FPN iron transporter.

81.   In the upper image panel in Figure 5, the top panel was labeled as FPN-GFP from the "PM," for plasma membrane. The samples purportedly were separated into two fractions: plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic).

82.   In the lower left image panel in Figure 2Aii, the bottom left panel was labeled as FPN-GFP from the "FT."

83.   The first and second lanes in the lower left panel in Figure 2Aii are identical to the two right lanes (+DFX and +ZnSO$_4$/+DFX) in the upper panel in Figure 5. The image in Figure 2Aii is flipped horizontally and has a lighter contrast than the identical image in Figure 5. *See* **C.L. Ex. 18** (ORI Image Analysis) at 9.

84.   Thus, the same image was used by Respondent to support both a model where FPN is degraded under normal iron conditions in Figure 2Aii and a different model in Figure 5, notably that FPN is promiscuous and also binds zinc (Zn) in addition to its well-established iron (Fe) binding partner.

85.   Thus, the same western blot images were used to represent results from different, unrelated experiments.

86.    The manipulation (flipping and contrast adjustment) of the duplicated images shows that the falsification and/or fabrication was knowing and intentional rather than honest error.

87.    The results as presented in Figure 5 support the authors' hypothesis that FPN is promiscuous for other positive metal ions. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error. The falsifications and/or fabrications provide a more-detailed understanding of the regulation of FPN, thereby increasing the overall novelty and impact of this study in the field of iron physiology.

88.    Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

89.    Respondent is the first author of *Cell Met.* Nov. 2011.

90.    Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

91.    Respondent intentionally, knowingly, or recklessly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figures 2Aii and 5 of *Cell Met.* Nov. 2011.

92.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #6**:  **Respondent intentionally, knowingly, or recklessly falsified and/or fabricated images in Figure 4B (top and bottom left panels) of *Cell Met.* Jan. 2011 by reusing and relabeling an image of an autoradiogram to misrepresent the reported experimental conditions and results.**

93.    *Cell Met.* Jan. 2011 ("Paper 6" in the UU Report) examined the synthesis and subsequent intracellular trafficking of ferritin in response to changes in cytosolic iron concentration. The reported experiments involved synthesizing a protein in a test tube (in vitro) and in the presence of the radioactively labeled amino acid methionine ($^{35}$S-methionine). The relative abundance and molecular weight of the resulting protein under different treatment conditions was determined by isolating the (radioactive) protein of interest, subjecting the sample to gel electrophoresis, and imaging by autoradiogram (X-ray film exposed to the radioactive protein samples). Like a western blot, the intensity of the resulting bands correlates with protein abundance.

94.    According to *Cell Met.* Jan. 2011, the results reported in Figure 4 demonstrate that iron depletion induces ferritin secretion. **C.L. Ex. 11** at 5. Figure 4B purportedly shows

autoradiograms of ceruloplasmin[4] protein recovery under different experimental conditions, including the presence or absence of Endo H (an enzyme that removes a specific sugar modification from proteins), iron (Fe), the protease PK, and the strong detergent Triton.

95.    The top left image panel of Figure 4B reported the results of experiments without treatment with Endo-H ("- Endo H") and without iron treatment ("-Fe").

96.    The bottom left image panel of Figure 4B reported the results of experiments without Endo H ("- Endo H") and with iron treatment ("+Fe").

97.    Respondent's laboratory notebook contained a labeled film of an autoradiogram. **C.L. Ex. 17** (nb_6_4B-1.tif). The autoradiography film is labeled with Respondent's initials ("IDD"). *See id.*

98.    The autoradiography film from the laboratory notebook shows the same sets of bands that appear in the left two image panels in Figure 4B but flipped.

99.    Specifically, Figure 4B's top left image panel shows bands in lanes labeled -Endo H / -Fe. The same set of bands appears on the right-hand side of the autoradiogram in lanes labeled +Endo H / +Fe but flipped horizontally. *See* **C.L. Ex. 18** (ORI Image Analysis) at 10-11.

100.   Thus, identical images were labeled differently to represent different experimental conditions (with or without Endo H and with or without iron) in the Figure 4B top left panel and the autoradiogram.

101.   Figure 4B's bottom left image panel shows a set of bands that also appears on the left-hand side of the autoradiogram, in lanes labeled -Endo H / +Fe, but flipped both horizontally and vertically, i.e., around both the x and y axes.

102.   In response to the inquiry committee's finding that the lower left panel of Figure 4B was flipped compared to the original film, Respondent stated: "The committee is correct that the panel was flipped around the vertical axis BUT represents the lanes as published." **C.L. Ex. 1** at 33.

103.   However, the protein standards or molecular weights marked on the film are critical in interpreting whether the Endo-H treatment cleaved off the hypothesized glycosylation modification. If cleaved, the band would run at a smaller molecular weight since the glycosylation modification. If not cleaved, it would add mass to the protein. Alternatively, if ceruloplasmin is not glycosylated, the band would run at the same size as a band not treated with Endo-H. Thus, inversion of the image misrepresents the molecular weight and the overall conclusion that the ceruloplasmin protein undergoes a glycosylation modification.

104.   The bands as reported in Figure 4B's bottom left image panel do not match the conditions and molecular weight represented in the X-ray film for those bands. The images in Figure 4B

---

[4]Ceruloplasmin is an enzyme important in copper and iron transport. Low levels of ceruloplasmin in the blood can have adverse health effects and are often indicative of liver disease.

and the autoradiogram report different conditions and protein masses under those specific conditions.

105.    The falsification and/or fabrication was intentional and knowing and did not result from honest error. The bands in the lower left panel of Figure 4B were flipped vertically and horizontally. Inadvertent, vertical flipping of both the right- and left-hand sets of bands in the film would not lead to the bands in the bottom left image panel to be selectively flipped horizontally.

106.    Moreover, both the right- and left-hand sets of bands in the film were labeled as deriving from experiments with iron treatment. Inadvertent flipping of the images in the film around the vertical axis would not have changed that labeling. However, in Figure 4B's top left image panel, the image of bands from the autoradiogram is shown in lanes labeled "-Fe." *See* **C.L. Ex. 18** (ORI Image Analysis) at 12-13. Thus, Respondent's honest error argument is not credible.

107.    If only inadvertent flipping had occurred, the molecular weight markers shown in the bottom left and right image panels would have corresponded to the markers in the film, as flipping around the vertical axis would not have changed the molecular markers' positions on the vertical axis. The bands as reported in the figure do not match the conditions and molecular weight represented in the X-ray film.

108.    The paper's authors hypothesized that ceruloplasmin is modified by glycosylation. The falsified and/or fabricated images in Figure 4B support this hypothesis. This is significant, as additional insight into this regulatory process increases the understanding of iron regulation and overall impacts the field of iron physiology. However, Respondent's autoradiogram indicated no difference in the molecular weight of ceruloplasmin when treated with Endo H, which would fail to support this hypothesis and reduce the novelty of the research findings in Figure 4B.

109.    Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error.

110.    Respondent is the first author of *Cell Met.* Jan. 2011.

111.    Respondent intentionally, knowingly, or recklessly falsified and/or fabricated Figure 4B of *Cell Met.* Jan 2011 (UU Report "Paper 1").

112.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

## V.     AGGRAVATING AND MITIGATING FACTORS

113.  Under 42 C.F.R. § 93.408, HHS considered aggravating and mitigating factors in determining appropriate HHS administrative actions and their terms. The HHS Debarring Official also considered factors in 2 C.F.R. § 180.860 in determining to debar Respondent and the length of Respondent's debarment period. The applicable factors in this case are described below.

114.  Respondent's actions were knowing and intentional. 42 C.F.R. § 93.408(a).

115.  Respondent solely planned, initiated, and carried out the wrongdoing. 2 C.F.R. § 180.860(f).

116.  Respondent's research misconduct was not an isolated event but rather was a pattern that occurred over the course of several years in three (3) PHS-supported papers. 42 C.F.R. § 93.408(b).

117.  Respondent's research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare. 42 C.F.R. § 93.408(c); *see also* 2 C.F.R. §180.860(a). (Respondent's misconduct resulted in actual and potential harm or impact that resulted and may result from Respondent's wrongdoing.)

118.  Specifically, Respondent's falsified and/or fabricated research results were included in three (3) PHS-supported published papers and utilized funds that PHS otherwise could have spent on research that was not falsified or fabricated.

119.  Respondent's falsifications and/or fabrications led to retraction of two (2) published papers and ORI's finding that an additional paper should be retracted or corrected.

120.  Chronic dysregulation of iron in blood plasma leads to anemia (low plasma iron) or tissue damage and serious inflammation (high plasma iron). Specifically, the HEP/FPN regulatory axis is targeted in both the diagnosis and treatment of various iron disorders. Respondent's proposed new mechanism for inactivating FPN, particularly in a HEP-independent manner, would have been considered a significant and exciting finding in the field on which other basic and clinical researchers would and/or did follow up. Thus, Respondent's fabricated and/or falsified research papers led to waste of valuable time and resources.

121.  According to Web of Science™, an index of metrics based on international citation activity of science journals, books, and scientific proceedings reflects that, as of April 19, 2023, Respondent's three affected papers have been cited by others a total of 142 times in the scientific literature.

122.  Respondent failed to accept responsibility for Respondent's misconduct and failed to recognize the seriousness of Respondent's misconduct. 42 C.F.R. § 93.408(e); 2 C.F.R. §180.860(g).

123.  As a mitigating factor, Respondent cooperated with the institution's research-misconduct proceeding. Respondent also admitted to the creation of certain figures and the duplication of one of the images in question. 42 C.F.R. § 93.408(e).

## VI.    RESEARCH MISCONDUCT IS A CAUSE FOR DEBARMENT

124.    Respondent's falsification and/or fabrication in three published papers constitutes research misconduct under 42 C.F.R. Part 93.

125.    The purpose of debarment is to protect the federal government from an individual who has proven to be untrustworthy. *See Kimon J. Angelides*, DAB No. 1677 (1999).

126.    Moreover, the policy underlying debarment is that the federal government should conduct business only with responsible contractors and grantees. *See Dr. Paul F. Langlois*, DAB No. 1409 (1993), 1993 WL 742594 (DAB May 6, 1993).

127.    The HHS Departmental Appeals Board has held that "[t]he scientific community functions on trust and openness; once that trust is breached, the harm from incidents of fabrication and falsification of data is far greater than simply discrediting the work known to be false or fabricated." *Id.*

128.    Respondent's intentional, knowing, or reckless research misconduct establishes a lack of trustworthiness and is so serious and compelling in nature that it demonstrates a lack of present responsibility to be a steward of federal funds. 2 C.F.R. § 180.800(d).

129.    Respondent should be debarred.

## VII.    HHS ADMINISTRATIVE ACTIONS AGAINST RESPONDENT

130.    Based on the preponderance of the evidence supporting the ORI findings of research misconduct stated herein, the HHS Debarring Official proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

131.    HHS also proposes that, for a period of three (3) years, the Respondent be prohibited from serving in any advisory capacity to PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

132.    In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes that ORI will send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev. Cell* 2008.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 240
Rockville, MD, 20852

Phone   240-453-8800
FAX:   301-594-0043
Email:  alexander.runko@hhs.gov

**CONFIDENTIAL/SENSITIVE**

July 11, 2023

Ivana Frech, Ph.D.
771 Highland Park Ave.
Coralville, IA 52241-3378

RE:  ORI Case No. 2017-05

Dear Dr. Frech:

Please email Wayne Wu, Information Technology Specialist, ORI, at wayne.wu@hhs.gov to request access to the Exhibits referenced in the enclosed charging documents. Mr. Wu will provide you with a Box.com invite link. You will be able to access the Exhibits via that link for thirty (30) days.

If you have any additional questions about accessing the Exhibits, please contact Mr. Wu at wayne.wu@hhs.gov or me at alexander.runko@hhs.gov, or either of us at 240-453-8800.

Sincerely,

Alexander P.
Runko -S

Digitally signed by Alexander P.
Runko -S
Date: 2023.07.11 12:00:33 -04'00'

Alexander Runko, Ph.D.
Director
Division of Investigative Oversight
Office of Research Integrity

4804



Paul S. Thaler
Attorney At Law

900 Seventh Street, NW
Suite 725
Washington, DC 20001

T: 202.466.4110
pthaler@cohenseglias.com
www.cohenseglias.com

August 17, 2023

**VIA ELECTRONIC MAIL (lucy.stark@hhs.gov)**
Lucy M. Stark, Ph.D., J.D.
Senior Attorney
Office of the General Counsel, Public Health Division
Public Health and Science Branch
U.S. Department of Health and Human Services

      *Re:  Dr. Ivana De Domenico*

Dear Dr. Stark:

      I am writing on behalf of Dr. Ivana Frech (formerly Ivana De Domenico, the name she used during the time period involving the research at issue in this matter), in response to your August 16, 2023 email declining to resolve the pending proceeding via settlement.  In that email, ORI notes that Dr. Frech "is listed as an author on several research papers published in 2017-2021 that cite NIH funding" and is included on grant applications submitted to NIH between 2016 and 2018 "as research scientist or Senior/Key Personnel."  However, the circumstances surrounding these papers and grant applications demonstrate that Dr. Frech has, in fact, not participated in PHS-funded research since 2013.

## I.      The Papers Published in 2017-2021

### a.     2021 JCI Paper

      Dr. Frech is most recently identified as an author of a paper published in the *Journal of Clinical Investigation* in 2021.[1]  As an initial matter, the 2021 JCI Paper was published on May 25, 2021, nearly two years after Dr. Frech ceased all research activity entirely (when she declined to follow Dr. Fenghuang Zhan to the University of Arkansas ("UA")).[2]  Indeed, the paper was not

---

[1] Li C, Xia J, Franqui-Machin R, Chen F, He Y, Ashby TC, Teng F, Xu H, Liu D, Gai D, Johnson SK, van Rhee F, Janz S, Shaughnessy Jr. JD, Tricot G, Frech I, Zhan F. "TRIP13 modulates protein deubiquitination and accelerates tumor development and progression of B cell malignancies." *J. Clin Invest.* 2021 Jul 15;131(14):e146893. doi: 10.1172/JCI146893 (the "2021 JCI Paper").

[2] As Dr. Frech was employed in Dr. Zhan's lab at the University of Iowa ("UI"), his departure necessitated the end of her time in his lab on December 18, 2019 and, eventually, the end of her employment at UI as of May 1, 2020. *See* Attachment 1, Frech Resignation Letter.  Dr. Frech's contract with UI was intended to run to September 2020. Thus, although Dr. Frech's last day in Dr. Zhan's lab was December 18, 2019, she remained employed by UI, but was placed on Paid Time Off pending identification of a new position for her.  Due to factors including the COVID-

4805

Lucy M. Stark, Ph.D., J.D.
August 17, 2023
Page 2

even submitted to the journal until December 15, 2020, approximately a full year after Dr. Frech left UI (and, as a result, left research entirely).

More importantly, the federal funding to Dr. Zhan cited in the 2021 JCI Paper (Grant R01CA236814 from the National Cancer Institute ("NCI")) was not awarded until May 28, 2020 – after Dr. Zhan had already joined UA, and after Dr. Frech's involvement in any research had ceased.[3] *See* https://reporter.nih.gov/search/5oXleNRk3kSnIUdmfHs9iQ/project-details/9883275 (last visited August 17, 2023). Thus, although the 2021 JCI Paper cites PHS funding, Dr. Frech's research activities related to the paper were not supported by that funding.

Of all the papers at issue between 2017 and 2021, the 2021 JCI Paper is the only one for which Dr. Frech assisted in any experiment. Specifically, Dr. Frech helped the first author, Dr. Can Li, perform one experiment. Dr. Frech did so solely because there was ***no PHS funding*** supporting this paper at the time.

**b. 2020 JNCI Paper**

The majority of the PHS funding that supported the 2020 JNCI Paper[4] was awarded to Dr. Janz – as the paper itself acknowledges. Dr. Frech never worked in Dr. Janz's lab, and her activities related to this publication were not supported by the grants awarded to Dr. Janz. It is Dr. Frech's understanding that, as with the 2021 JCI Paper, the grants awarded to Dr. Janz were listed in the 2020 JCI Paper because they supported Dr. Janz's salary.

The only other PHS funding supporting the 2020 JNCI Paper was a NIH Center Core Grant, P30 CA086862. This grant is part of a UI Department of Hematology project that supports UI core facilities. None of Dr. Frech's work in Dr. Zhan's lab involved these grant funds.

As reflected in the 2020 JNCI Paper's "Funding" section, the work by Dr. Zhan and his lab – including Dr. Frech – was supported purely by non-PHS funding. Thus, Dr. Frech had no involvement in any PHS funding supporting the 2020 JNCI Paper.

---

19 pandemic, no suitable position was available, and Dr. Frech was asked to resign, which she did. At no point from December 18, 2019 onwards did Dr. Frech conduct any research activities at UI or elsewhere.

[3] The other NCI grant cited in the 2021 JCI Paper, Grant R01CA151354, was awarded to Dr. Siegfried Janz. However, Dr. Frech did no work in Dr. Janz's lab, and had no involvement with any research funded by this grant. It is Dr. Frech's understanding that Grant R01CA151354 was only listed in the paper because Dr. Janz's salary was paid from the grant funds.

[4] Gao M, Bai H, Jethava Y, Wu Y, Zhu Y, Yang Y, Xia J, Cao H, Franqui-Machin R, Nadiminti K, Thomas GS, Salama ME, Altevogt P, Bishop G, Tomasson M, Janz S, Shi J, Chen L, Frech I, Tricot G, Zhan F. "Identification and Characterization of Tumor-Initiating Cells in Multiple Myeloma." *J Natl Cancer Inst.* 2020 May 1;112(5):507-515. doi: 10.1093/jnci/djz159 (the "2020 JNCI Paper").

Lucy M. Stark, Ph.D., J.D.
August 17, 2023
Page 3

### c. Papers Supported by NCI Grant R01CA152105

The papers published in 2017 and 2018 all identify the same, singular NCI grant awarded to Dr. Zhan (Grant R01CA152105) as the primary source of PHS funding. These papers are: (1) the 2018 JCI Paper;[5] (2) the 2017 JHO Paper;[6] (3) the 2017 EBioMedicine Paper;[7] (4) the 2017 Oncotarget Paper;[8] and (5) the 2017 Leukemia Paper.[9]

Grant R01CA152105 was awarded before Dr. Frech joined Dr. Zhan's lab. More specifically, Grant R01CA152105 was initially awarded in June 2010, more than five years before Dr. Frech arrived at UI. *See* https://reporter.nih.gov/search/5AQfLllRn0G23BxCXm13YA/project-details/7947521 (last visited August 17, 2023). Dr. Frech began working in Dr. Zhan's lab on or about September 29, 2015. *See* Attachment 2, 2015-08-24 Email with Zhan (agreeing to a start date of September 29, 2015); Attachment 3, 2015-09 Emails with Pruter (agreeing to complete appointment paperwork on September 29, 2015, and reflecting a delayed arrival in Iowa). Grant R01CA152105 was renewed annually through 2014. In June 2014, more than a year before Dr. Frech joined the lab, it was re-awarded again. *See* https://reporter.nih.gov/search/5AQfLllRn0G23BxCXm13YA/project-details/8677780 (last visited August 17, 2023). At the time Dr. Frech joined the lab, it was her understanding that the funding from the grant had ended, but that Dr. Zhan had reapplied for it. *See*, *e.g.*, Attachment 4, 2015-06-27 Summary Statement (reflecting a requested start date of October 1, 2015). This renewal was ultimately denied. *See*, *e.g.*, *id*. at p. 7-8 (noting that "this is an interesting proposal with some strengths but numerous weaknesses").[10]

---

[5] Franqui-Machin R, Hao M, Bai H, Gu Z, Zhan X, Habelhah H, Jethava Y, Qiu L, Frech I, Tricot G, Zhan F. "Destabilizing NEK2 overcomes resistance to proteasome inhibition in multiple myeloma." *J Clin Invest*. 2018 Jul 2;128(7):2877-2893. doi: 10.1172/JCI98765 (the "2018 JCI Paper").

[6] Gu Z, Xia J, Xu H, Frech I, Tricot G, Zhan F. "NEK2 Promotes Aerobic Glycolysis in Multiple Myeloma Through Regulating Splicing of Pyruvate Kinase." *J Hematol Oncol*. 2017 Jan 13;10(1):17. doi: 10.1186/s13045-017-0392-4 (the "2017 JHO Paper").

[7] Xia J, Xu H, Zhang X, Allamargot C, Coleman KL, Nessler R, Frech I, Tricot G, Zhan F. "Multiple Myeloma Tumor Cells are Selectively Killed by Pharmacologically-dosed Ascorbic Acid." *EBioMedicine*. 2017 Apr;18:41-49. doi: 10.1016/j.ebiom.2017.02.011 (the "2017 EBioMedicine Paper").

[8] Zhan X, Yu W, Franqui-Machin R, Bates ML, Nadiminti K, Cao H, Amendt BA, Jethava Y, Frech I, Zhan F, Tricot G. "Alteration of mitochondrial biogenesis promotes disease progression in multiple myeloma." *Oncotarget*. 2017 Nov 27;8(67):111213-111224. doi: 10.18632/oncotarget.22740 (the "2017 Oncotarget Paper").

[9] Hao M, Franqui-Machin R, Xu H, Shaughnessy Jr. J, Barlogie B, Roodman D, Quelle DE, Janz S, Tomasson MH, Sanderson RD, Qiu L, Frech I, Tricot G, Zhan F. "NEK2 induces osteoclast differentiation and bone destruction via heparanase in multiple myeloma." *Leukemia*. 2017 Jul;31(7):1648-1650. doi: 10.1038/leu.2017.115 (the "2017 Leukemia Paper").

[10] According to NIH RePORTER, the 2014 renewal of the grant was active until May 31, 2016. *See* https://reporter.nih.gov/search/5AQfLllRn0G23BxCXm13YA/project-details/8677780. However, given that the requested renewal in 2015 proposed a start date of October 1, 2015, this may be erroneous. *See also* https://reporter.nih.gov/search/5AQfLllRn0G23BxCXm13YA/project-details/7947521 (reflecting the initial award

4807

Lucy M. Stark, Ph.D., J.D.
August 17, 2023
Page 4

Grant R01CA152105 is the *only* source of PHS funding identified in support of the 2017 JHO Paper and the 2017 Oncotarget Paper.  In addition to Grant R01CA152105, the 2018 JCI Paper acknowledges NIH Lymphoma Spore grant P50 CA097274, and Cancer Center Support Grant NIH P30 CA086862.  As noted above, Dr. Frech was not supported by the P30 grant, which is part of a UI Department of Hematology project that supports UI core facilities.  Similarly, the P50 grant supported an interdisciplinary team of investigators at both UI and the Mayo Clinic in the Lymphoma SPORE program.  Dr. Frech's work in Dr. Zhan's lab was not supported by or a part of this program.  Dr. Zhan was aware of Dr. Frech's pending ORI matter and was respectful of her desire to avoid involvement with PHS funding.

As with the 2018 JCI Paper, the 2017 EBioMedicine Paper acknowledges the P30 grant (P30CA086862) as well as Grant R01CA152105.  The 2017 EBioMedicine Paper also acknowledges funding from NIH Grant 1S10RR018998-01.  Grant 1S10RR018998-01, however, was awarded to Dr. Michael J. Welsh in 2004, and ended in early 2005, long before Dr. Frech joined    UI.    *See*    https://reporter.nih.gov/search/5mvHcEaTSkm-KuAlGV4sbw/project-details/6733441 (last visited August 17, 2023).

Finally, in addition to Grant R01CA152105, the 2017 Leukemia Paper acknowledges PHS support from Grants R21CA143887 and R01CA138340.  Grant R01CA138340 was awarded to Dr. Ralph D. Sanderson at the University of Alabama at Birmingham.  Dr. Frech does not know how Dr. Sanderson contributed to the 2017 Leukemia Paper, and did no work supported by Dr. Sanderson's grant.  Although Grant R21CA143887 was awarded to Dr. Zhan, it concluded in April 2013, more than two years before Dr. Frech joined Dr. Zhan's lab at UI.  *See* https://reporter.nih.gov/search/usQLfs4vt0Wi7U2iF_pNPw/project-details/8079477 (last visited August 17, 2023).

For these reasons, Dr. Frech's involvement in each of these papers was unrelated to and was not supported by any PHS funding.

## II.    The Grant Applications Submitted in 2016-2018

To Dr. Frech's knowledge, Dr. Zhan had no active PHS grants during her time in his lab (*i.e.*,    September    2015    to    December    2019).    *See*,    *e.g.*, https://reporter.nih.gov/search/ueNDFDQtEkit2ayt9XU0WQ/projects?sort_field=fiscal_year&sort_order=desc (last visited August 17, 2023) (reflecting a gap in awards to Dr. Zhan from 2014 to 2020).  While Dr. Frech was aware that Dr. Zhan was submitting grant applications during this time, she had no role in performing any experiments to generate preliminary data for these applications, would not have been a co-PI or investigator, and fully intended to leave the lab if at any point any PHS funding was awarded.  This was never necessary, as none of the grants Dr.

---

of the grant, and reflecting an overall Project End Date of May 31, 2015).  Indeed, the records for each renewal of the grant reflect a Project End Date of May 31, 2015, with the notable exception of the record for the 2014 renewal, increasing the likelihood that the May 31, 2016 end date reflected there is erroneous.  Regardless, it was – and remains – Dr. Frech's understanding that the grant had expired before she joined Dr. Zhan's lab, and that none of her work in the lab was supported by this grant.

Lucy M. Stark, Ph.D., J.D.
August 17, 2023
Page 5

Zhan submitted during this time were funded. Dr. Frech's inclusion in the grant applications was due solely to the fact that she was a lab member, and, to Dr. Frech's knowledge, Dr. Zhan's standard practice was to include all lab members in his grant applications.

Throughout Dr. Frech's time in Dr. Zhan's lab, Dr. Zhan openly shared with her the scores and summary statements his grant applications received. To reiterate, had it reached a point where any of the PHS grants would have been awarded, Dr. Frech would have resigned. To the best of Dr. Frech's knowledge and belief, at no point during her time in the lab was any PHS funding used. Instead, funding came from non-profits, private entities, university start up funds, and other non-PHS sources. As noted above, although Dr. Zhan included Dr. Frech's name on grant applications based on her status as a lab member, he was aware that she wanted to avoid any involvement in PHS funding.

**III.    Conclusion**

We and Dr. Frech regret any lack of clarity in our August 15, 2023 letter that led to the impression that Dr. Frech had, in fact, been supported by PHS funds during her time in Dr. Zhan's lab. We believe that the additional information reflected above makes it abundantly clear that Dr. Frech did not receive any PHS funding and did not engage in any research or other activities supported by PHS funds during her time in Dr. Zhan's lab. In light of these clarifications, we respectfully ask that ORI reconsider its decision not to resolve this matter through a mutually agreeable settlement. On behalf of Dr. Frech, we thank you, Dr. Runko, and ORI for your time and consideration. We look forward to hearing from you.

Very truly yours,

Paul S. Thaler

cc:    (via email)
       Dr. Alexander Runko
       Dr. Ivana Frech

4809



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 240
Rockville, MD, 20852

Phone: 240-453-8200
FAX:   301-594-0043

August 29, 2023

Ivana Frech, Ph.D.
c/o Paul S. Thaler
Attorney at Law
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW
Suite 725
Washington, DC 20001

TRANSMITTED VIA EMAIL TO: pthaler@cohenseglias.com

RE: Notice of Administrative Actions -- ORI 2017-05

Dear Dr. Frech:

In a letter sent to you via United Parcel Service (UPS) on July 18, 2023, the Office of Research Integrity (ORI), U.S. Department of Health and Human Services (HHS), notified you that based on the evidence and findings of an investigation conducted by the University of Utah (UU) and additional analysis conducted by ORI during its oversight review, ORI had made findings of research misconduct against you. ORI found that you engaged in research misconduct under 42 C.F.R. Part 93 in research supported by U.S. Public Health Service (PHS) funds, specifically National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK), National Institutes of Health (NIH), grants R01 DK070947, R01 DK090257, and R01 DK030534, National Institute of General Medical Sciences (NIGMS), NIH, grant P50 GM082545, National Institute of Allergy and Infectious Diseases (NIAID), NIH, grant R01 AI051174, and National Heart, Lung, and Blood Institute (NHLBI), NIH, grant R01 HL026922.

In its notification letter, ORI advised you of proposed administrative actions and gave you an opportunity to request a hearing on the findings and proposed administrative actions before an Administrative Law Judge with the HHS Departmental Appeals Board. As you have not requested a hearing within the required 30-day period, the following administrative actions have been implemented:

- You are debarred from participating in "covered transactions" as defined in 42 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1) for a period of three (3) years, beginning on August 21, 2023.

4812

Page 2 – Dr. Frech

- You are prohibited from serving in any advisory capacity to PHS including, but not limited to, service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three (3) years, beginning on August 21, 2023.

- In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS will send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev Cell.* 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014.

In accordance with PHS policy, your name also has been entered in the PHS ALERT system. Your name will remain in the system for a period of three (3) years, beginning on August 21, 2023, and ending on August 20, 2026.

Pursuant to ORI procedures, a brief summary of the misconduct finding and administrative actions will be placed in the *Federal Register*, the *NIH Guide for Grants and Contracts*, and the *ORI Newsletter* and on the ORI website.

Sincerely,

Sheila R.
Garrity -S

Digitally signed by Sheila
R. Garrity -S
Date: 2023.08.29
15:01:37 -04'00'

Sheila Garrity, JD, MPH, MBA
Director
Office of Research Integrity

cc:  Mr. Zachary Mitchell, Research Integrity Officer, Office of Research Integrity and
       Compliance, UU
     Dr. Tara A. Schwetz, ARILO, NIH
     Dr. Michael Lauer, AERIO, NIH
     Dr. Patricia Valdez, ERIO, NIH
     Dr. Karl Malik, RIO, NIDDK
     Dr. Matthew Portnoy, RIO, NIDDK
     Dr. Dorit Zuk, RIO, NIGMS
     Dr. Matthew Fenton, RIO, NIAID
     Dr. Kenneth Santora, RIO, NIAID
     Dr. Laura Hsu, RIO, NHLBI
     Dr. Laura Moen, RIO, NHLBI
     Ms. Tracy Sumner, DIO, ORI

**From:** Szakaly, Christina (HHS/OGC) [mailto:Christina.Szakaly@hhs.gov]
**Sent:** Tuesday, November 21, 2017 9:09 AM
**To:** Ryan Bell <rbell@kunzlerlaw.com>
**Subject:** FW: Office of Research Integrity Matter

Mr. Bell,

Your email indicates that you need additional time to review your files.  It is possible for me to extend our deadline a few more days; however, before I agree to that extension, I would like to know whether you plan to respond to our settlement offer by the new deadline.  If I move the deadline to Tuesday, November 28th, do you plan to respond to our settlement offer by that date?  I understand there was a delay before you could obtain your files; however, this new extension would be almost a three-week extension from the original deadline of November 8, 2017.

If we do not settle this case, ORI plans to file a charge letter seeking to debar your client from receiving Federal funds, including NIH-grant funds.  Alternatively, the proposed settlement agreement would allow your client to receive supervision and education, instead of debarment.

As you know, the University of Utah's Investigation Report included more publications and figures than were included in the proposed voluntary settlement agreement.  The Charge Letter, which ORI plans to file in order to formally charge your client with research misconduct, may include more findings of research misconduct, more figures, and more publications than were included in the proposed voluntary settlement agreement.

I want to caution you that my client may refuse to authorize any settlement with Dr. De Domenico in December because ORI will have a different Director acting at that time.  If Dr. De Domenico is interested in settlement, I suggest that she consider our proposed settlement offer while I still have authorization to settle this case.  If you do not respond to our settlement offer in time, it would be unfortunate if Dr. De Domenico loses her opportunity to settle for lesser research misconduct findings and loses her opportunity to avoid debarment.

Best regards,

Christina

U.S. Department of Health and Human Services
Office of the General Counsel, Public Health Division
Public Health and Science Branch
Christina.Szakaly@hhs.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IVANA FRECH,

     Plaintiff,

      v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

     Defendants.

Civil Action No. 1:23-cv-02530 (CRC)

## DECLARATION OF ALEXANDER RUNKO, PH.D.

I, Alexander Runko Ph.D., declare as follows:

1.      I am the Director of the Division of Investigative Oversight in the Office of Research Integrity ("ORI") of the U.S. Department of Health and Human Services ("HHS").

2.      ORI's mission is to protect the health and safety of the public, promote the integrity of Public Health Service ("PHS")-supported extramural and intramural research, and conserve public funds. ORI's jurisdiction extends to biomedical or behavioral research funded by a wide range of PHS agencies, including: the National Institutes of Health, Food and Drug Administration (except for allegations of misconduct in regulatory research monitored by the FDA), Centers for Disease Control and Prevention, Indian Health Service, Substance Abuse and Mental Health Services Administration, Health Resources and Services Administration, Agency for Healthcare Research and Quality, Agency for Toxic Substances and Disease Registry, the Office of the Assistant Secretary for Health, and the Offices of the Regional Health Administrator.

4819

3.    An institution may only receive PHS funds for biomedical or behavioral research if it has an active assurance on file with ORI stating that it has developed research misconduct policies and will comply with 42 C.F.R. Part 93 and its own policies and procedures. ORI is responsible for ensuring that PHS funds for biomedical and behavioral research are awarded only to institutions with active assurances. In Fiscal Year ("FY") 2022, ORI managed more than 5,800 institutional assurance records. ORI also has a compliance program to determine whether institutions are complying with Part 93 when responding to allegations of research misconduct.

4.    In addition to its assurance and compliance programs, ORI conducts oversight reviews of institutional investigations in research-misconduct cases to determine whether institutions have met the requirements of 42 C.F.R. Part 93.

5.    As part of its oversight-review responsibilities, ORI provides technical assistance and procedural guidance to institutions responding to allegations of research misconduct that involve PHS-funded research. In FY 2022, ORI provided approximately 700 technical-assistance sessions to institutional officials.

6.    In addition to conducting oversight reviews of institutional research-misconduct proceedings, ORI may make its own research-misconduct findings, separate from and independent of institutions' findings, and propose HHS administrative actions against respondents who have committed research misconduct in PHS-funded research.

7.    ORI receives several hundred allegations each year. For example, in FY 2022, ORI received 269 allegations of research misconduct and closed 78 cases. ORI closed 93 cases in FY 2015; 41 cases in FY 2016; 45 cases in FY 2017; 59 cases in FY 2018; 72 cases in FY 2020; and 95 cases in FY 2021.

4820

8.      ORI has a staff of about six to eight scientist-investigators devoted to oversight review of institutional proceedings. Over the past decade, on average, ORI has generally had between approximately six to eight full-time scientist-investigators on staff. In FY 2022, for example, ORI had seven scientist-investigators on staff.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge, the foregoing statements are true and correct.

Dated:  February 20, 2024

Alexander P.
Runko -S

Digitally signed by Alexander P.
Runko -S
Date: 2024.02.20 14:56:11
-05'00'

Alexander Runko, Ph.D.
Director of Division of Investigative Oversight
Office of Research Integrity

3

Stephen D. Tobin
Attorney At Law



900 Seventh Street, NW
Suite 725
Washington, DC 20001

T: 202.466.4110
stobin@cohenseglias.com
www.cohenseglias.com

September 24, 2024

<u>**VIA ELECTRONIC MAIL**</u>
H. Katrina Brisbon
HHS SDO and Deputy Assistant Secretary for Acquisitions
c/o Bradley G, Silverman, Esq.
bradley.silverman@usdoj.gov

*Re:  Dr. Ivana Frech*

Dear Ms. Brisbon:

Please accept this submission on behalf of Dr. Ivana Frech with respect to your July 18, 2023 proposed debarment action, which became a final administrative action on August 19, 2023. The below provides an amplification of information already in the administrative record as well as information that we believe you may not have considered, or had an opportunity to consider, prior to proposing Dr. Frech for debarment.  It is our hope that an examination of this information will lead you to conclude that Dr. Frech's continued debarment is not warranted and that she is presently responsible.

## I.    Introduction

The government uses the debarment process to exclude persons who are not presently responsible.  *See* 2 C.F.R. § 180.125(b).  However, debarment is a discretionary act.  *See* 2 C.F.R. § 180.845 ("the [debarring] official need not debar you even if a cause for debarment exits"); 2 C.F.R. § 180.800 ("A federal agency *may* debar a person for …) (emphasis added); 42 C.F.R. § 93.407 ("In response to a research misconduct proceeding, HHS *may* impose administrative actions that include … debarment") (emphasis added).  And so, a Suspension and Debarring Official ("SDO") must consider the "seriousness of [the] acts and omissions and … mitigating and aggravating factors."  *See* 2 C.F.R. § 180.845.  A non-exhaustive list of mitigating and aggravating factors is set forth in applicable research misconduct and non-procurement debarment regulations. *See* 42 C.F.R. § 93.408; 2 C.F.R. § 180.860.

In this matter, we believe it critical that you evaluate a mitigating factor that was not reflected as a consideration in the July 2023 proposed debarment action. Specifically, we ask that you consider Dr. Frech's conduct prior to and after the underlying circumstances that gave rise to the debarment action, as it provides a more holistic picture of who Dr. Frech was then, and, more significantly, who she is now.  In our view, this is especially important in any calculus of Dr. Frech's present responsibility given that the conduct in issue occurred more than 13 years ago (and

Pennsylvania  |  New Jersey  |  New York  |  Delaware  |  District of Columbia  |  Florida  |  Kentucky

H. Katrina Brisbon
September 23, 2024
Page 2

over a decade following the University of Utah's ("UU") provision of its investigative record to HHS's Office of Research Integrity ("ORI")). In the main, the narrative of Dr. Frech over the last decade tells the story of a person who has long emerged from the pall cast over her as a result of reckless laboratory-wide practices implemented and overseen by trusted research mentors and her maturation into a trustworthy and philanthropic colleague and community member.

In addition to her character and unblemished professional history in the research, medical, and hospital administration fields since the events giving rise to HHS' debarment action, there are a number of other mitigating factors that support non-debarment that we believe HHS has either overlooked or misunderstood. For example, HHS listed Dr. Frech's failure to accept responsibility for the misconduct and her failure to recognize its seriousness as an aggravating factor in favor of debarment. However, as discussed in more detail below, the administrative record reflects that Dr. Frech, on a number of occasions, did express remorse for what happened and acknowledged that she had made mistakes, although she contends that those mistakes were not intentional or done knowingly – a position fully backed-up by UU's investigation and an internal oversight review of that investigation. Dr. Frech's vigorous protestation of ORI's specific charges and her remorse that reckless laboratory-wide practices led to the publication of incorrect research images are not mutually exclusive to one another. Because ORI's charge letter does not address what, if any, consideration was given to Dr. Frech's acceptance of responsibility and remorse, a mitigation factor weighing against debarment, we believe these actions must be properly considered in a debarment decision.

Additionally, HHS concluded that Dr. Frech's "actions were knowing and intentional" and that she "solely planned, initiated, and carried out the wrongdoing." *See* Charge Letter at p. 16. However, as discussed herein, these conclusions are not supported by the administrative record and certainly are not aligned with UU's findings following its extensive investigation.

Similarly, HHS concluded that Dr. Frech was personally responsible for the manipulation of Figure 5B in a paper published in *Dev. Cell* in 2008 (also referred to as "Paper 11" by UU). *See* Charge Letter at p. 5-7. As described below, Dr. Frech was not solely responsible for any falsification or fabrication of this figure, and, as UU recognized, the available evidence could not lead to a conclusion that she (as opposed to another person) had deliberately altered the image at issue.

For these reasons, and as explained more fulsomely below, a preponderance of the evidence demonstrates that Dr. Frech's debarment is not warranted and that she is presently responsible.

## II.     Dr. Frech is Presently Responsible[1]

A.   Employment at the University of Iowa and Dr. Fenghuang Zhan's Laboratory

---

[1] Please find attached Dr. Frech's declaration (Attachment 8) in which she addresses a number of items discussed in this section of the submission.

H. Katrina Brisbon
September 23, 2024
Page 3

After receiving UU's final investigation report in or about December 2012, Dr. Frech appealed UU's findings and recommendations to a Consolidated Hearing Committee ("CHC") at UU. The CHC heard her appeal on April 29, 2013, and issued its report on May 8, 2013. Although finding that Dr. Frech engaged in research misconduct "based on 'reckless disregard of accepted practices'[,]" the CHC—like the UU investigation itself—concluded that there were systemic issues in the lab that went well beyond Dr. Frech. *See* Attachment 1, CHC Report at p. 6. Nevertheless, the CHC upheld UU's decision to terminate Dr. Frech's employment at the university, which was done in or about June 2013. Of course, acting in reckless disregard is not the equivalent of acting intentionally or knowingly.

In any event, Dr. Frech, acutely aware of the potential consequences of a research misconduct finding and ORI's need for time to conduct its oversight review of UU's investigation, refrained from immediately seeking a new position in research. Instead, Dr. Frech stepped away from science altogether and obtained her MBA. ORI received the entirety of the record of UU's investigative process in or about June 2013. At or about that time, Dr. Frech had been told it would take approximately six months for ORI to complete its review. More than two years after UU's investigation concluded, during which time Dr. Frech had abstained from engaging in any scientific research—federally funded or otherwise—ORI's oversight review was still ongoing. At that time, in or about September 2015, Dr. Frech was offered a position as an assistant research scientist in Dr. Fenghuang Zhan's lab at the University of Iowa ("UI"). Through her then counsel, Dr. Frech informed ORI about her intent to accept the offer, sought an update on the status of ORI's review, and asked ORI for guidance on whether her research activities should be supervised or if there were other measures that should be taken. ORI did not respond.

In the absence of the requested guidance, and given that it had been more than two years since ORI's oversight review began, Dr. Frech accepted the job opportunity, but disclosed the UU findings and ORI's ongoing review to UI. Dr. Frech and UI agreed that her work would be overseen and monitored by an internal Data Monitoring Committee consisting of Dr. Zhan, Dr. Guido Tricot, and Dr. Zhan's lab manager. *See* Attachment 2, Oversight and Research Monitoring Plan. To date, no questions or concerns have ever been raised regarding Dr. Frech's research activities over the four years that she was a member of Dr. Zhan's lab.

The above conduct, and the transparency with which it was carried out, is not the actions of someone with a propensity for acting irresponsibly. To the contrary, following initiation of UU's investigation, Dr. Frech cooperated fully and frankly with the investigation, answered questions completely and candidly, and initiated contact with ORI to keep the office up-to-date on her professional endeavors as well as to stay abreast of ORI's review process. Moreover, Dr. Frech affirmatively disclosed the existence of ORI's ongoing review of UU's investigation to Dr. Zhan's lab and proactively worked with UI to establish a framework under which her work was overseen and monitored so that her employment did not undermine the important and vital work UI was performing. Indeed, in her position at UI, Dr. Frech flourished. Her dedication, mentoring, attention to detail, and other contributions to Dr. Zhan's lab were highlighted in a spotlight article on UI's Department of Internal Medicine blog in December 2018. *See* https://internalmedicineiowa.org/2018/12/03/december-2018-ivana-frech/ (last visited September 23, 2024). This included noting Dr. Frech's burgeoning interest in health care administration

4824

H. Katrina Brisbon
September 23, 2024
Page 4

(noting that "she is still curious about what she could bring to a more purely administrative role"), and her work in managing lab staff and mentoring younger researchers. *See id.* Notably, by the time the blog was published in 2018, Dr. Frech's role had evolved and she became a manager of the lab, "essentially running the operations side of a small business, from keeping track of grant funding to making sure enough reagents are stocked." *See id.* At no point were there, or have there ever been, any concerns or irregularities pertaining to Dr. Frech's stewardship of lab funds, whether from grants or otherwise.

    B.   Dr. Frech Has Taken Responsibility and Recognized the Seriousness of the Conduct At Issue

The Charge Letter identified Dr. Frech's purported unwillingness to accept responsibility as an aggravating factor in the decision to debar her. *See* Charge Letter at p. 16. Respectfully, that conclusion diminishes the several occasions on which Dr. Frech expressed regret over the situation. However, as mentioned above, she does, in good faith, contest ORI's specific findings – her defenses, of course, have support in the evidentiary record developed by UU. That is, Dr. Frech's defenses are not fantastical, and she should not be penalized for the sincerity with which she asserts them.

As to Dr. Frech's expression of remorse for the situation, in her April 24, 2013 letter to Prof. McCormack, the Chair of the CHC panel, Dr. Frech stated "I agree that I made mistakes and I admitted them." AR 3908. In a September 24, 2012 letter to Dr. Botkin, Dr. Frech similarly acknowledged "I'm aware that the mistakes were made and I'm [*sic*] always admitted them but I believe I deserve a fair and impartial investigation from each member." AR 3914. During the CHC hearing, Dr. Frech professed, "I'm extremely sorry and deeply regret the mistakes I made." AR 4044 at 2:47:19. In that same hearing, Dr. Frech also offered that, "Here, today, is my last chance to save my career in science acknowledging that these mistakes will haunt me for the rest of my life. As I said, I have always felt extremely remorseful during the investigation …." *Id.*, at 2:51:18. Finally, Dr. Frech acknowledged, "[I]t is true that I have made some unintentional mistakes, for which I apologize and have taken responsibility." *Id.*, at 2:53:20.

Aside from these direct statements, Dr. Frech's attorney conveyed to UU's president that Dr. Frech "accepts that she has made mistakes, and takes responsibility for those mistakes." *See* AR 4058. Additionally, the University's Research Integrity Officer, in reporting the Inquiry Committee's failure to identify instances of intentional data fabrication or falsification, noted that Dr. Frech "acknowledge[d] multiple errors and [her intent] to work with the journals to address these concerns." *See* AR 4083; *see also* AR 4104 ("we are embarrassed by the duplicated images...").

In sum, Dr. Frech has accepted responsibility for the underlying conduct at issue, but has also repeatedly and justifiably maintained that responsibility did not necessarily equate to research misconduct. Because the decision to debar Dr. Frech viewed her purported failure to accept responsibility as an aggravating factor, instead of a mitigating factor, Dr. Frech would ask that HHS re-evaluate Dr. Frech's debarment and present responsibility.

H. Katrina Brisbon
September 23, 2024
Page 5

### C.  Mercy Hospital

In or about December 2019, Dr. Zhan left UI for a position at the University of Arkansas. Having already moved from Utah to Iowa, Dr. Frech decided not to uproot her family a second time and declined Dr. Zhan's offer to move with him.[2]  Dr. Frech's employment at UI ended in or about May 2020, and she found new employment as a lab administrator at Mercy Hospital, a community hospital in Iowa City.

In her new role with Mercy Hospital, Dr. Frech had numerous responsibilities that demonstrate that, although she was not engaged in research, she acted responsibly and ethically in her duties and in the handling of all funds and activities.  Dr. Frech's responsibilities included:

- *Operational and Management Responsibilities:*
  - Operational oversight and planning for the Hospital Laboratory, the Laboratory Administration office and its subdivisions (including Billing, Personnel, and overall human resource management of 58 hospital lab employees), Specimen Collection and Management, Lab Support Services, Lab Information Systems, Quality Assurance (QA) and Point of Care Testing (POCT);
  - Providing administrative guidance for managers and supervisors over the five analytical testing divisions (Blood Bank, Chemistry/Toxicology, Hematology/Urinalysis, Histology, and Microbiology);
  - Operational management and administration of the Morgue and Autopsy process.
- *Capital and Operating Budget Development*:
  - Responsible for operating and capital budgets, creative development of administrative systems;
  - Responsible for the fiscal operation of the department.
- *Compliance and Quality Responsibilities*:
  - Implementation of new technologies;
  - Directing lab-wide initiatives;
  - Serving as a high-level liaison between the Hospital Laboratory, the Department of Public Health, and both existing and potential clients of the lab;
  - Ensuring that the laboratory remains compliant with all Federal, State and Local regulatory requirements and accreditation standards that pertain to clinical laboratories;
  - Developing and maintaining effective working relationships among laboratory personnel and other hospital departments to ensure a culture of safety;
  - Coordinating and evaluating performance of MLS and/or MT students training in the hospital laboratory from colleges in the area;

---

[2] Because Dr. Frech was employed in Dr. Zhan's lab at UI, his departure necessitated the end of her time in his lab in or about December 2019.  Dr. Frech continued to be employed at UI until or about May 2020, because her contract with UI was intended to run until September 2020.  Because Dr. Zhan's lab at UI closed with his departure, Dr. Frech was placed on Paid Time Off pending identification of a new position for her.  Due to factors including the COVID-19 pandemic, no suitable position was available, and Dr. Frech was asked to resign—which she did.  At no point from December 2019 onwards did Dr. Frech conduct any research activities at UI or elsewhere.

H. Katrina Brisbon
September 23, 2024
Page 6

- o  Making daily rounds in Laboratory to judge effectiveness of operation, utilization of personnel and supplies, and general ethical and professional atmosphere.

- • _General Compliance Supervisor Duties_:
  - o  CMS/CAP qualified to perform the duties of the technical supervisor, clinical consultant, general supervisor, and testing personnel for the high complexity laboratory license.
- • _Committee member_:
  - o  Blood Utilization (Chair), Stroke, Trauma, Infection Control, Emergency Room, Antimicrobial Stewardship, and Patient Safety Committee.
- • _Clinical_:
  - o  Working in partnership with the Medical Director to ensure all quality standards are achieved, maintained, and monitored.

In short, Dr. Frech's position at Mercy Hospital did not involve any research whatsoever. Unfortunately, Dr. Frech's employment at this community hospital ended abruptly on January 30, 2024, when Mercy Hospital was acquired by UI. Her separation from the hospital was solely due to UI's policy not to employ anyone who has been debarred by the federal government, regardless of the position. That said, UI, as a testament to Dr. Frech's longstanding valuable contributions at Mercy Hospital, repeatedly represented to Dr. Frech that, in the absence of a debarment, it would like to have her in the same position, with the same job duties, that she had been in for years before UI acquired the hospital. _See, e.g._, Attachment 3, 2024-01-31 Fogt Email ("I am hopeful that your client will be able to resolve the debarment issue expeditiously so that UI can extend a new employment offer"); Attachment 4, 2024-02-20 Fogt Letter ("should Dr. Frech's debarment order be lifted soon, we would be willing to extend a new offer of employment"). Similar statements were made directly to Dr. Frech in conversations with others at the hospital. In fact, when presenting Dr. Frech with a dismissal letter on January 30, then-Chief Integration Officer Deborah Berini and HR Director (formerly also Mercy Hospital's HR Director) Peg Brubaker told Dr. Frech that if the debarment were lifted, Dr. Frech would be rehired. In an email informing staff that Dr. Frech would not transition to UI along with the rest of the team, Ms. Berini "recognize[d] the significant impact Ivana has made during her tenure. The Mercy team has shared that, despite the hurdles posed by the pandemic and other challenges, Ivana and her team achieved commendable growth in outreach labs, maintaining excellent customer service and a strong connection to our local communities." _See_ Attachment 5, 2024-01-31 Berini Message.

As was the case with her work in Dr. Zhan's lab, Dr. Frech's colleagues at Mercy Hospital were impressed by her work ethic, responsibility, and drive. To buttress the positive impact that Dr. Frech imparted on her colleagues at Mercy Hospital as well as the reputation for integrity she fastidiously cultivated while employed there, we attach the statement of Ms. Bernadine Brandenburg, the former Chief Integrity Officer and Director of Compliance and Risk Management. Attachment 6, 2024-08-21 Brandenburg Letter. Ms. Brandenburg observes that Dr. Frech "upholds the highest integrity, morals, and ethical character" and notes that Dr. Frech "was swift to report compliance and legal issues and work through acceptable solutions, with the organization and its patients at the forefront of any intentions." _See id._

H. Katrina Brisbon
September 23, 2024
Page 7

        D.  Dr. Frech's Community Work

        Dr. Frech's good character is also reflected in her extensive philanthropic activities over
the past decade.  From 2013 to 2015, Dr. Frech was a member of the American Heart Association
Community Leadership Committee, the Junior League of Salt Lake City, and a participant in the
Salt Lake City Government Internship Project, leading to the development and implementation of
the Low Income Pass Program (also known as the Hive Pass).  In these roles, Dr. Frech was
responsible for assisting in educational activities, translating documents for diverse communities,
organizing events to bring together medical care providers and community members in need,
mentoring activities, and more.  Since 2021, she has served on the UI Patient and Family Advisory
Board ("PFAB").  *See*, *e.g.*, Attachment 7, FY23 PFAB Annual Report at p. 12.  The PFAB meets
on alternate months to help improve patient care and patient experiences at UI Health Care
facilities.  *See* https://uihc.org/patient-and-family-advisory-board-pfab (last visited September 23,
2024); *see also* Attachment 8, Frech Declaration.

        Tying all of the above together, Dr. Frech, in effect, proactively debarred herself for
approximately a decade before HHS imposed a three-year debarment, more than a year of which
has already passed.  Regardless of any lack in formality or action by HHS in her doing so, the net
result is that government public health service funds have been protected from Dr. Frech for a
decade.  In that time, there has not been a single allegation of any impropriety committed by Dr.
Frech.  And so, Dr. Frech's decadeslong conduct since the events at issue has demonstrated her
ability to be trusted as a steward of public funds, both now and in the future.  This is a critical fact
that warrants strong consideration by HHS.  Indeed, courts have found that the length of time
between the misconduct and a debarment action is a factor that the debarring official is to consider
as it "appear[s] to diminish the force of the [misconduct] as an indication of present responsibility."
*Roemer v. Hoffmann, et al.*, 419 F. Supp. 130, 132 (D.D.C. 1976).  Beyond just this gap in time,
the court in *Roemer* observed also that matters of the plaintiff's conduct before and after the
misconduct were relevant indicators of the plaintiff's present responsibility.  *Id.*; *see also*
*Silverman v. U.S. Depart. of Defense*, 817 F. Supp. 846, 849 (S.D. Cal. 1993) ("The *Roemer* court's
analysis of present responsibility was properly focused on the seriousness of the offense, *the length
of time that had passed since the offense, and the contractor's conduct in the interim*") (emphasis
added).

        In short, Dr. Frech's work and other activities in her community over the past decade
demonstrate that—even if ORI's findings of research misconduct were warranted—the issues in
the lab she was a member of at UU have long been overshadowed by Dr. Frech's longstanding and
extensive dedication to service, ethics, and improving her community.  That is, over the last
decade, Dr. Frech has proven herself to be a trustworthy, responsible, respected, and valued
member of the community without a single allegation of misconduct in any of her professional or
public endeavors.  Accordingly, she asks that you find her to be presently responsible.

H. Katrina Brisbon
September 23, 2024
Page 8

### III.    Dr. Frech Did Not Solely Plan, Initiate, and Carry Out Any Wrongdoing

According to the Charge Letter, Dr. Frech "solely planned, initiated, and carried out the wrongdoing." *See* Charge Letter at p. 16.  This conclusion is not aligned with the evidence in this matter, including both UU's investigation and the CHC Report.  In fact, ORI has not brought forth any evidence whatsoever that Dr. Frech *solely* planned, initiated, and carried out the subject conduct.  As described above, following extensive review of the evidentiary record, the learned members of the CHC review concluded that there were systemic problems within Dr. Kaplan's lab, and that responsibility for the conduct that ORI has attributed exclusively to Dr. Frech went substantially beyond her—including to Dr. Kaplan, Dr. Diane Ward, and others.  For the research at issue in this matter, Dr. Frech was a member of Dr. Kaplan's lab; both Dr. Kaplan and Dr. Ward (who managed Dr. Kaplan's lab) supervised Dr. Frech and her work in the lab.  Drs. Kaplan and Ward, as the senior authors and PIs, also had ultimate responsibility for the manuscripts and figures therein, which they submitted to journals.

In any event, UU's Investigation Committee determined that Dr. Frech was *not* solely responsible for the errors, noting that Dr. Kaplan, Dr. Ward, and others all also had varying degrees of responsibility.  *See* Final UU Investigation Report at AR 967-969.  In fact, the Investigation Committee suggested that Dr. Kaplan should be relieved "of his senior leadership duties" based on his role in the errors and the "systematic" issues in his lab.  *See id.* at AR 967-968.  UU's Investigation Committee found not only that there was "[e]xtensive carelessness and negligence in data reporting" but was also "struck by the conspicuous failure of all coauthors, *particularly Drs. Ward and Kaplan*, to catch and correct these mistakes before publication." *See id.* at AR 965 (emphasis added).

Similarly, because the CHC concluded that the "complicity in [the] misconduct within the laboratory . . . goes substantially beyond Dr. [Frech]," and that the responsibility was shared with Dr. Kaplan, Dr. Ward, and possibly others, there should be "further investigation of the laboratory procedures uncovered in this investigation."  *See* Attachment 1, CHC Report at p. 6; *see also id.* at p. 1 ("The Panel also finds that [Dr. Frech's] behavior was part of a larger pattern of complicity in misconduct within the Kaplan laboratories.  We emphasize that the institutional responsibility for these matters should not end with sanctions against Dr. [Frech]"); p. 5 (expressly noting that, with respect to one of the papers, "[t]he Investigation Committee laid the blame for these errors squarely on the procedures in Dr. Kaplan's laboratory").  Dr. Frech is unaware of *any* actions taken by ORI to hold Dr. Kaplan and Dr. Ward accountable for the same conduct that ORI holds Dr. Frech accountable.

Furthermore, UU's investigation expressly disclaimed engaging in *any* review of publications arising from Dr. Kaplan's lab for which Dr. Frech was *not* a coauthor.  *See* Final UU Investigation Report at AR 968.  This is important because, as Dr. Frech demonstrated during the CHC hearing, other publications from Dr. Kaplan's lab for which she was not an author and had no role in the underlying research contained the same sort of errors as those at issue in the allegations against her.  *See* Attachment 9, Examples of Other Kaplan Papers with Errors.  Notably, although Dr. Frech was the first author of two of the three papers at issue in this matter, those two papers were both published in 2011, approximately *three years* after Dr. Frech had left Dr.

H. Katrina Brisbon
September 23, 2024
Page 9

Kaplan's lab and become a research assistant professor with her own lab. Thus, by the time these two manuscripts were being drafted, Dr. Frech was necessarily reliant on Dr. Kaplan and his lab members to provide her with the data to be utilized in the figures.

This is also seen in the evidence developed during UU's process, as reflected in the CHC's conclusion that "although Dr. [Frech] was listed as lead author on this paper, it seems that she had *little or nothing to do with the experiments* leading to the contested portions of the paper." *See* Attachment 1, CHC Report at p. 5 (emphasis added). We acknowledge that the CHC made this statement in relation to a paper not at issue in ORI's findings. Nevertheless, the CHC went on to state it could "*not* find that intentional irregularities can be attributed to Dr. [Frech]" with respect to *any* of the papers; only that "the number and severity of errors in the publications where she is first author show *reckless disregard* for accepted practices." *See id*. (emphasis added). The CHC's conclusion that Dr. Frech was reckless inherently recognized that although she was responsible for generating the figures, that any research misconduct finding against her was based on a lack of checking the images provided to her against the raw data to ensure accuracy. *See id*.

The conclusion that Dr. Frech solely planned, initiated, and carried out the wrongdoing ignores the great weight of evidence in this matter demonstrating that there were systemic issues in Dr. Kaplan's lab. Because there is a lack of evidence that Dr. Frech "*solely* planned, initiated, and carried out the wrongdoing," an allegation that served as an aggravating factor in the debarment decision, Dr. Frech requests that you re-evaluate this factor in deciding whether Dr. Frech's continued debarment is warranted.

### IV.    Dr. Frech Was Not Personally Responsible for Figure 5B

According to the Charge Letter, Dr. Frech is responsible for fabricating or falsifying Figure 5B in the *Dev. Cell* 2008 Paper ("Paper 11" in the UU Investigation Report and CHC Report). *See* Charge Letter at p. 5-7. Notably, this allegation is the only one for which the CHC concluded that it appeared images may have been manipulated intentionally. *See* Attachment 1, CHC Report at p. 4. Critically, however, the CHC expressly stated that "we *cannot conclude* that it was done by Dr. [Frech] as opposed to an unknown third person." *See id*. (emphasis added); *see also id*. at p. 5 ("As stated above, the CHC Panel cannot find that Dr. [Frech] was responsible for the intentional manipulation in Paper 11").

In reaching a different conclusion, ORI relies on an email and letter that Dr. Frech sent to UU's Research Integrity Officer ("RIO") during the investigation on "July 21, 2012 . . . stating 'a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008' and that 'the duplication came from me[.]'" *See* Charge Letter at p. 6; *see also* AR 763. As an initial matter, Dr. Frech sent that communication to the RIO at Dr. Wesley Sundquist's request. *See* AR 762. Dr. Frech complied with Dr. Sundquist's request because he threatened to fire Dr. Frech if she did not do so. Additionally, we note that ORI's conclusion ignores the context of the quoted text for the latter quote; Dr. Frech wrote that she "*believe[d]* that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist [*sic*] shows already the error." *See* AR 763 (emphasis added). Importantly, Dr. Frech also stated that "[a]ccording to the emails and notes some of the western blots and data quantification should be in Dr. Kieffer's notebook.

H. Katrina Brisbon
September 23, 2024
Page 10

However, Dr. Sundquist this morning verbally communicated that Dr. Kieffer does not have the western blots and he might have the quantification analysis." *See id.* Furthermore, Dr. Frech also wrote that the March 3, 2008 email indicates that Dr. Kieffer came to Dr. Kaplan's lab and took some of the results, with "[a]ll repeats and the correct tubulin western blots still in our notebook. It is missing only the films w[h]ere the duplication is coming from." *See id.* In short, even if Dr. Frech was correct that she sent a duplicated image to Drs. Kieffer and Sundquist, *none* of the evidence—including her statement in the email—suggests that she had deliberately or intentionally manipulated the image; only that she is the one who sent the image to them.

During the UU investigation, UU's IT Department conducted a forensic analysis of Dr. Frech's computers. This review, requested by the Investigation Committee, found *no* evidence that Dr. Frech had manipulated or destroyed any files or data. *See, e.g.*, Attachment 10, Frech CHC Hearing Presentation at p. 7. These facts were discussed during the CHC hearing, the audio recording of which is in the administrative record.

## V.    Conclusion

Since UU's research misconduct process concluded with Dr. Frech's loss of employment in 2013, Dr. Frech has taken extreme care to ensure that she conducts herself responsibly in all aspects of her life, including the research she engaged in while a member of Dr. Zhan's lab. After leaving his lab, she avoided research entirely for years, having changed careers to one where she did not think she would need to be concerned with federal funding. Circumstances beyond her control, however, led to a second termination over conduct that took place more than a decade ago. To be clear, Dr. Frech has no intention of re-engaging in any scientific research. Quite simply, Dr. Frech just wants the opportunity to return to work with her colleagues and friends at the hospital as, by now, Dr. Frech has been in a practical state of debarment for over *11 years*. The government's interest in protecting public funds from Dr. Frech has been well-served over that time. Accordingly, Dr. Frech respectfully requests that you find her presently responsible and conclude the agency's debarment action.

We thank you, Ms. Brisbon, and HHS for your consideration of this information. We look forward to hearing from you.

Sincerely,

Stephen D. Tobin

Cc:    Dr. Ivana Frech (via email)

4831

<u>Plan for oversight and monitor research conduct by Dr. Ivana Frech</u>

A. **Purpose**: this document establishes the requirements for data monitoring plan in research by Dr. Ivana Frech

B. **Scope**: this plan applies to all the research activities of Dr. Ivana Frech at the University of Iowa.

C. **Data Monitoring Committee (DMC)**: Dr. Tricot, Dr. Zhan and Dr. Zhan's laboratory manager will review data generated by Dr. Frech to assess both validity and integrity. This committee will issue recommendations regarding the continuation, modification or termination of the research. Depending upon the experiments this committee can involve other individuals for the analysis of the research data (i.e. statisticians).

- This committee will:

  I. Conduct monthly interim monitoring
  II. Be responsible for creation, implementation and compliance with Dr. Frech's research.
  III. Be ensuring that the activities of Dr. Frech in the given research are carried out appropriable.
  IV. Oversight and analysis of the research data to assure the validity of the research.
  V. Be ensuring that the data generated are described in laboratory notebooks in sufficient details to permit examination for the purpose of replicating the research, responding to question that may result from others, establishing authenticity of the records and confirming the validity of the conclusions. Meticulous record keeping will be requested.
  VI. Request as standard practice to record data in ink in an indexed permanently bound laboratory notebook with consecutively numbered pages. Research methods, including statistical treatments, should be either described in the notebook or referenced by citation to some other primary or secondary source. Information on materials used, along with their sources, should be recorded. Entries should not be erased or whited out. If mistakes are to be corrected, a thin line should be drawn through the erroneous entry so as not to obscure it and an initialed dated correction written separately, along with an explanatory note, near the original entry or in the margin. All entries or at least all pages of a notebook should be dated.  If some data are obtained as

printouts from instruments or computers, these printouts should be appropriately labeled and pasted into the notebook or stored securely and referenced in the notebook as to storage location. If unique critical materials, such as cell lines, are prepared or discovered, they should be preserved and appropriately labeled, and explicit instructions should be written in the notebook as to where they are stored. Extensive data sets may be stored either as hard copy or on disks. In such cases, carefully documented definitions for codes should be included, together with rules for applying them to the experimental, clinical, or field data and notes.

VII. Oversee the storage of electronic data and images from a variety of laboratory instruments.

VIII.       Require that all the experimental data are reported not only that ones that support conclusions.

IX. Oversee photo-images to make sure not to misrepresent the research data.

X. Ensure that another member from Dr. Zhan's laboratory will reproduce and confirm Dr. Frech's research data conclusion(s).

XI. Ensure that another member from Dr. Zhan's laboratory will be with Dr. Frech during microscope images acquisitions.

XII. Request that during laboratory meeting Dr. Frech will show original western blot images and scanned images.

XIII.       Assess Dr. Frech overall capabilities and accountability.

XIV.       Not assign responsibility of supervising other laboratory personnel for the first 12 months.

XV. Provide mentoring in ethics in all research activities.


        The purpose of this plan is to ensure data integrity, improve quality and promote high standards and to identify if research misconduct or fraud is committed.  To facilitate the monitoring process Dr. Zhan will generate targeted checklists to monitor Dr. Frech' activities. These checklists will vary from study to study and will be available to Dr. Lentz, Dr. Rosenthal, the HCCC, the CCOM and the UI Office of the VP for Research at anytime.
        In case the DMC will discover that Dr. Frech' action constituted research misconduct will promptly communicate to all the above parties and proceed to Dr. Frech's dismissal.

4833

**Paul E. Simon**

| | |
|---|---|
| **From:** | Fogt, Kyle T <kyle-fogt@uiowa.edu> |
| **Sent:** | Wednesday, January 31, 2024 3:38 PM |
| **To:** | Paul S. Thaler |
| **Cc:** | Paul E. Simon |
| **Subject:** | RE: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506] |

Paul – Thank you for the call today.  I am hopeful that your client will be able to resolve the debarment issue expeditiously so that UI can extend a new employment offer.  Please let me know once the debarment issue has been resolved.  In the meantime, please don't hesitate to reach out if you want to discuss further.

Regards,
Kyle


Kyle T. Fogt, J.D.
Deputy Counsel
Office of the General Counsel
University of Iowa
200 Hawkins Drive, 1344 JCP | Iowa City, IA 52242-1009
Phone: 319-467-5904 | Cell: 319-504-8185 | Fax: 319-384-8572
Kyle-fogt@uiowa.edu


**From:** Paul S. Thaler <pthaler@cohenseglias.com>
**Sent:** Wednesday, January 31, 2024 2:03 PM
**To:** Fogt, Kyle T <kyle-fogt@uiowa.edu>
**Cc:** Paul E. Simon <PSimon@cohenseglias.com>
**Subject:** RE: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506]

Thanks again, Kyle for the courtesy of the call we had.  We appreciate your, and your client's, sensitivities to our client's situation and willingness to consider our analysis.  We will review the applicable policies and regulations and provide you with our thoughts.  Our client and we further appreciate UI's desire to bring Dr. Frech back once the debarment issue is resolved.

Very best regards,

Paul

**Paul S. Thaler** ▪ Partner
**Cohen Seglias Pallas Greenhall & Furman PC**
900 Seventh St., N.W., Suite 725 ▪ Washington, DC 20001
P: 202.466.4110 ▪ D: 202.587.4750



**Confidentiality Note:** This electronic message and any attachments ("message") is intended for use only by the individual or entity to which it is addressed and may contain information that is confidential, protected by the attorney-

1

4834

client privilege, and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, please reply to the sender that you received the message in error and delete all copies of the message from your computer and network. Dissemination, copying, or other use of this message by any person or entity other than the intended recipient is strictly prohibited.

Circular 230 Disclosure: To ensure compliance with IRS Circular 230, we inform you that any tax advice contained in this message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

---

**From:** Fogt, Kyle T <kyle-fogt@uiowa.edu>
**Sent:** Wednesday, January 31, 2024 11:46 AM
**To:** Paul S. Thaler <pthaler@cohenseglias.com>; Paul E. Simon <PSimon@cohenseglias.com>
**Cc:** Jorgensen, James D <james-jorgensen@uiowa.edu>; Clamon, Joseph B <joseph-clamon@uiowa.edu>
**Subject:** RE: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506]

Paul – 2:30 pm EST today works for me.  Look forward to talking with you then.  Thanks.


Kyle T. Fogt, J.D.
Deputy Counsel
Office of the General Counsel
University of Iowa
200 Hawkins Drive, 1344 JCP | Iowa City, IA 52242-1009
Phone: 319-467-5904 | Cell: 319-504-8185 | Fax: 319-384-8572
Kyle-fogt@uiowa.edu


---

**From:** Paul S. Thaler <pthaler@cohenseglias.com>
**Sent:** Wednesday, January 31, 2024 10:45 AM
**To:** Fogt, Kyle T <kyle-fogt@uiowa.edu>; Paul E. Simon <PSimon@cohenseglias.com>
**Cc:** Jorgensen, James D <james-jorgensen@uiowa.edu>; Clamon, Joseph B <joseph-clamon@uiowa.edu>
**Subject:** RE: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506]

Dear Kyle,

Thanks for getting back to us.  Sure, we can talk today.  Would 2:30 pm EST work for you?  I believe that would be 1:30 your time.  If that works, we will circulate call-in instructions.

Best regards,

Paul

**Paul S. Thaler** ▪ Partner
**Cohen Seglias Pallas Greenhall & Furman PC**
900 Seventh St., N.W., Suite 725 ▪ Washington, DC 20001
P: 202.466.4110 ▪ D: 202.587.4750



**Confidentiality Note:** This electronic message and any attachments ("message") is intended for use only by the individual or entity to which it is addressed and may contain information that is confidential, protected by the attorney-

4835

client privilege, and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, please reply to the sender that you received the message in error and delete all copies of the message from your computer and network. Dissemination, copying, or other use of this message by any person or entity other than the intended recipient is strictly prohibited.

Circular 230 Disclosure: To ensure compliance with IRS Circular 230, we inform you that any tax advice contained in this message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

**From:** Fogt, Kyle T <kyle-fogt@uiowa.edu>
**Sent:** Wednesday, January 31, 2024 9:46 AM
**To:** Paul S. Thaler <pthaler@cohenseglias.com>; Paul E. Simon <PSimon@cohenseglias.com>
**Cc:** Jorgensen, James D <james-jorgensen@uiowa.edu>; Clamon, Joseph B <joseph-clamon@uiowa.edu>
**Subject:** RE: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506]

Dear Mr. Thaler and Mr. Simon,

Mr. Jorgensen forwarded me your January 30 letter regarding Dr. Frech.  I am handling this matter on behalf of the University.  I'd suggest we find some time for a phone call to discuss further.  Please let me know when you might be free for a quick call today.

Regards,
Kyle


Kyle T. Fogt, J.D.
Deputy Counsel
Office of the General Counsel
University of Iowa
200 Hawkins Drive, 1344 JCP | Iowa City, IA 52242-1009
Phone: 319-467-5904 | Cell: 319-504-8185 | Fax: 319-384-8572
Kyle-fogt@uiowa.edu


**From:** "Paul E. Simon" <PSimon@cohenseglias.com>
**Date:** January 30, 2024 at 8:20:43 PM CST
**To:** "Jorgensen, James D" <james-jorgensen@uiowa.edu>
**Cc:** "Paul S. Thaler" <pthaler@cohenseglias.com>
**Subject: [External] Dr. Ivana Frech - Rescission of UI Health Care Transition Agreement [CSPGF-ACTIVE.FID710506]**


Dear Mr. Jorgensen,

Please see the attached letter on behalf of Paul S. Thaler regarding the above referenced matter.  We hope that you are doing well and we look forward to hearing from you.

Sincerely,
Paul

**Paul E. Simon**

4836

Attorney At Law
**Cohen Seglias Pallas Greenhall & Furman PC**
900 Seventh St., N.W., Suite 725
<image001.gif>
Washington, DC 20001
P: 202.466.4110
<image001.gif>
D: 202.587.4751

**Confidentiality Note:** This electronic message and any attachments ("message") is intended for use only by the individual or entity to which it is addressed and may contain information that is confidential, protected by the attorney-client privilege, and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, please reply to the sender that you received the message in error and delete all copies of the message from your computer and network. Dissemination, copying, or other use of this message by any person or entity other than the intended recipient is strictly prohibited.

**Circular 230 Disclosure:** To ensure compliance with IRS Circular 230, we inform you that any tax advice contained in this message is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding Federal tax penalties, or (ii) promoting or marketing any transaction or matter discussed herein.

4837



**Office of the General Counsel**

200 Hawkins Drive
Iowa City, Iowa 52242-1009
319-467-5904
uiowa.edu

February 20, 2024

**<u>VIA EMAIL ONLY</u>**
Mr. Paul S. Thaler
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW, Suite 725
Washington, DC 200001
**pthaler@cohenseglias.com**

    Re:  *Ivana Frech*

Dear Mr. Thaler:

      On behalf of the University of Iowa ("UI"), I write in response to your letter dated February 9, 2024, regarding Dr. Ivana Frech.

      We have reviewed your letter containing your opinion that UI's "employment of Dr. Frech in the role she previously served in at Mercy would not constitute a violation of applicable HHS regulations or federal laws pertaining to Medicare, Medicaid, or other Federal healthcare programs." Although it is possible that Dr. Frech's prior employment with Mercy would not have been impacted by her debarment order, we cannot say the same with respect to her potential employment with UI, particularly in light of UI's many federal grants and contracts.

      Even if your opinion was correct, your letter glosses over the fact that UI Health Care's Screening and Exclusion Policy clearly provides that it will not "knowingly employ or engage in a business relationship with individuals or entities if such individuals or entities have been excluded, debarred, or are otherwise ineligible to participate in federal government programs." Pursuant to this policy, UI Health Care is precluded from employing Dr. Frech so long as she is subject to debarment.

      In short, UI will not be re-extending an offer of employment to Dr. Frech so long as she is subject to debarment. Of course, as I conveyed during our January 31, 2024 call, should Dr. Frech's debarment order be lifted soon, we would be willing to extend a new offer of employment. Please let us know if Dr. Frech is successful in resolving her debarment.

            Very truly yours,

            */s/ Kyle T. Fogt*
            Deputy Counsel

Cc:   Bradley Haws, CEO, UI Hospitals & Clinics and Associate Vice President, UI Health Care

From: "Kathryn M. Howard" <Kathryn.Howard@mercyic.org>

Date: January 31, 2024 at 7:19:25 AM CST

To: Hospital Employees <HospitalEmployees@mercyic.org>, Clinic Employees <ClinicEmployees@mercyic.org>, Employed APPs <employedapps@mercyic.org>, Primary Care Providers <msprimarycareproviders@mercyicia.onmicrosoft.com>, Specialty Care Providers <msspecialtycareproviders@mercyicia.onmicrosoft.com>, Independent Providers <independentproviders@mercyic.org>

Subject: Lab & Infusion Leadership

## A MESSAGE FROM DEB BERINI

Good morning,

I am sad to share that Ivana Frech will not be part of the transition from Mercy to UI Health Care. In my short time with the team, I have come to recognize the significant impact Ivana has made during her tenure. The Mercy team has shared that, despite the hurdles posed by the pandemic and other challenges, Ivana and her team achieved commendable growth in outreach labs, maintaining excellent customer service and a strong connection to our local communities.

We extend our best wishes to Ivana for success and fulfillment in her next chapter, and we sincerely thank her for the dedication and service she provided to Mercy and our patients.

During this interim period, Jim Ross, Associate Director of Operations from the Pathology Department on our University Main Campus, will be supporting laboratory services and Kim Volk will work with Infusion Services. We appreciate their commitment to ensuring continuity and excellence in the services provided.

We also appreciate your continued collaboration and support for Jim and Kim as we navigate this transition together.

Kindly,
Deb Berini
Interim Chief Administrative Officer
Chief Integration Officer

August 21, 2024

RE:     Ivana Frech Character Letter

To Whom It May Concern;

My name is Bernadine Brandenburg, and I am the former Chief Integrity Officer and Director of Compliance and Risk Management at Mercy Hospital in Iowa City, Iowa. I am writing to attest to the many respectable qualities of Ivana Frech whom I have known for over five years in various capacities, including Laboratory Director at Mercy Hospital.

I have witnessed first-hand Ms. Frech's commitment and dedication to managing the hospital and outreach laboratories. During the time we have worked together, Ms. Frech was responsible for leading a team of over 70 professionals and the operation of the laboratory, including the employment of personnel who are competent to perform medical test procedures, record and report test results promptly, accurately and proficiently, and for assuring compliance with the applicable health care regulations. Despite the barriers posed by the pandemic and other industry challenges, Ms. Frech directed her team tirelessly through an unprecedented stressful and demanding state of affairs. During the pandemic and after, through Ms. Frech's leadership, the laboratory achieved commendable growth in Mercy Hospital's outreach lab business while maintaining excellent customer service and a strong connection and reputation with local communities.

Ms. Frech exhibited an impressive work ethic and an ability to independently manage a wide range of diverse responsibilities both competently and efficiently. She always demonstrated curiosity and enthusiasm while executing all tasks in a timely fashion. In my compliance role, I worked with Ms. Frech through many compliance and legal matters for the organization. Ms. Frech was swift to report compliance and legal issues and work through acceptable solutions, with the organization and its patients at the forefront of any intentions.

I have had the opportunity to get to know Ms. Frech and I can say without a doubt that she upholds the highest integrity, morals, and ethical character in all I have witnessed. She prides herself on hard work, never leaving a job unfinished yet completing it with the highest of standards. On a personal level, I am grateful to consider Ms. Frech a trustworthy colleague and friend. She is steadfast and loyal in both capacities. I consider her a talented and lovely human being, and I feel privileged to be associated with her.


Respectfully,


Bernadine R. Brandenburg MJ BSN RN CPHRM CHC

4841

UNIVERSITY OF IOWA
HEALTH CARE

# Patient and Family Advisory Board

University of Iowa Health Care
Office of the Patient Experience

FY23 Annual Report

# Patient and Family Advisory Board

The Patient and Family Advisory Board (PFAB) is led by the Office of the Patient Experience (OPE) and serves to enhance the delivery of patient and family-centered health care at University of Iowa Health Care.

The advisory board provides a mechanism for families to work in partnership with hospital staff develop and refine policies, practices, specialized services, and facilities. Additionally, the PFAB will provide a forward-thinking perspective on institutional issues related to customer service, health care quality, and patient safety.

# Table of Contents

PFAB FY23 Highlights................................................................................Page 4

Leadership...........................................................................................Page 5

Our Members .......................................................................................Page 6

Our Mission .........................................................................................Page 7

Our Impact...........................................................................................Page 8

Our Future Plans .................................................................................Page 9

How to Apply........................................................................................Page 9

PFAB Member Testimonials..................................................................Page 10

Thank you ...........................................................................................Page 12

# Patient and Family Advisory Board FY23

**18** Patient and Family Advisory Board Members

**20+** Services in which our members receive care

**300+** Volunteer hours

## Composition of Patient and Family Advisory Board

- 28% Providers and administrators
- 72% Patients

## Member involvement

Chart shows projects by strategic dimension (updated March 2023)



# Leadership



**Theresa Brennan, MD**

Chief Medical Officer

Executive Sponsor



**Alexander Nance**

Director, Office of the Patient Experience

Board Leader



**Josh Paxton**

Program Coordinator



**Kristi VerHeecke**

Patient Chairperson



**Shannon Sampson**

Patient Vice-Chair

4846

# Our members

**18** Patients and patient representatives

**7+** Staff representatives

- Administration
- Office of the Patient Experience
- Volunteer Services
- Nursing leadership
- Rotating leaders from throughout the institution

**20+** Services in which our members receive care

## Member engagement outside of the Patient and Family Advisory Board

Giving back not only to health care, but our communities at large, as well

- Bird House of Iowa City
- Cedar Rapids Firefighter
- Foundation
- Cedar Rapids Police Department
- Volunteer Corps
- Church
- Courage Ride
- Linn County Safe Kids Coalition
- Myotonic Dystrophy Foundation
- Professional Advocates in Life
- Sciences Certified Patient Advocates
- St. Vincent de Paul
- TREND Community
- Ambassadors-DM1
- 100+ Women Who Care

4847

# UI Health Care's Mission



**Education**

Teaching and training tomorrow's health care providers.

**Research**

Bringing new discoveries and new treatments.

**Patient Care**

Providing high-quality primary and specialty care services.

## Advisory board goals

Made up of patients, families, and caregivers, the goal of the advisory board is to allow patients and families to:

- Give input into health care practices and programs
- Have a safe place to voice their concerns and give input to their care
- Form a collaborative relationship with the health care team that it culturally sensitive, respectful, and compassionate

University of Iowa Health Care Patient and Family Advisory Board

# Our Impact

## Design projects

- Members voted to improve scope and structure of board roles
- Members provided feedback on the patient's perspective in the design of the new North Liberty facility
- Members aided in redesign of pre-operative folders
  - Improve and standardize the information our surgical patients receive

## Quality improvement

- Additional classification of patient equity concerns
  - Working to build more equitable health care
- Increased patient education during infusions
  - Ensuring these patients have a full understanding of their treatment
- Members completed usability testing to improve patient educational materials
  - Creating materials that are easy to read and understand
  - 13 documents totaling 30 pages

## Collaboration

- Members subgroup collaborated with leadership to interview new PFAB members
- Working with Beryl Institute to establish national PFAB collaboration
  - Members collaborate with other Big 10 councils
- Increasing diversity, equity, and inclusion (DEI)
  - Developing a more inclusive group that represents our communities

## Provided feedback

- Nursing recruitment efforts
- Nursing evidence-based practices
  - Safe medication administration through peripheral IV to reduce injuries
  - Increased patient education
  - Support during end-of-life decisions
  - Improved orientation process for oncology nurses
  - Prevention of post-operative nausea
- Safety and security measures in offsite clinics
- Patient education materials
- Patient perspective on new North Liberty Facility

# Our Future Plans

- Continue developing the PFAB's scope and impact in the Iowa City community and beyond
- Expand partnerships within the hospital and community to enhance the delivery of patient-centered care at UI Health Care
- Become a world-class PFAB through member engagement, representation, and contributions that help improve care for all patients and families

# How to Apply

Meetings occur every other month via Zoom at 5:30-7:30 p.m.

Members are expected to attend five out of six meetings per year

Know someone who would provide great insight and value to the organization? Visit **uihc.org/pfab** or call the Office of the Patient experience at **319-356-1802** to learn more about the Patient and Family Advisory Board.

Selected applicants will be contacted quarterly for an interview with a small group with the advisory board.

# Office of the Patient Experience Contact Information

200 Hawkins Drive, Iowa City, Iowa 52242

319-356-1802

uihc-pfab@uiowa.edu

# Why We Serve

**Chuck Connerly**

I have benefitted greatly from UI Health Care over the last eight years. Indeed, UI Health Care has been a lifesaver for me. Because of my appreciation and respect for the work of UI Health Care's staff, I wanted to give back in some way that will hopefully benefit patients and families.

One of the most rewarding aspects about being a PFAB member is the opportunity to meet other individuals who have also been patients at UI Health Care and learning about their commitment and passion for enhancing medical care. Everyone has an important story to tell and each of us are committed to the provision of outstanding medical care at UI Health Care.

**Kristin Semler**

I joined PFAB because I was looking for an opportunity to give back to my community. As a lifelong patient of UI Health Care, I thought this would be a perfect fit for me to be able to make a positive impact on other people.

Seeing some of our ideas put into action is very rewarding. Having a say in changes that occur at the hospital helps give me a feeling that I am making an impact.

**Kristi VerHeecke**

I absolutely love this hospital and I wanted to be a part of the board to continue to help the hospital and providers have a better understanding from the perspective of patients and families. I have enjoyed working in partnership with staff and providers at University of Iowa Hospital to improve the patient experiences.

**Shannon Sampson**

I got involved with PFAB because I felt it would be a way for me to give back to UI Health Care after they took such great care of me. I also felt it to be a way for me to help other families.

One of the most rewarding aspects of being a PFAB member has been using my experience and giving feedback on current or new ideas for UI Health Care.

**Andrew Wright**

I joined the PFAB to improve outcomes for patients and families as well as improve the experiences and interactions at UI Health Care.

**Leann Putz**

I have been coming to UIHC since 2002, after the birth of my first child. All three of my sons regularly see their specialty providers in the Children's Hospital, IRL and Johnston outreach clinic. We have also seen providers in the Cedar Falls outreach clinic. I have been a surgical patient at UIHC as well. I have been an RN for 23 years and feel that my medical experience coupled with the number of years I have been regularly following at UIHC, would allow me to bring experiences from different viewpoints; a patient, a mother, and a nurse.

University of Iowa Health Care Patient and Family Advisory Board

# Thank you to our board members!

| | |
|---|---|
| Shannon Sampson | Theresa Brennan, MD |
| Kristi VerHeecke | Alexander Nance |
| Phil Lewis | Kip Pedersen |
| Andrew Wright | Josh Paxton |
| Ann Morris | Emily Ward |
| Brian Lees | Michelle Altmaier |
| Robert Alloway | Kelly Petrulevich |
| Katie Ron | Jean Reed |
| Julie Lowe | Ivana Frech |
| Charles Connerly | Kay Weiler |
| Phil Kutzco | Leann Putz |
| Brad Zude | Peter Nkumu |

**DECLARATION OF IVANA FRECH**

Pursuant to 28 U.S.C. § 1746, I, Ivana Frech, hereby declare and state as follows:

1. In 2015, two years following my termination from the University of Utah, I was offered the opportunity to join Dr. Fenghuang Zhan's lab at the University of Iowa as an assistant research scientist. At that time, I was aware that ORI's review of the University of Utah's research misconduct findings against me was ongoing. Accordingly, I fully disclosed to Dr. Zhan and other members of the University of Iowa, the existence of both the University of Utah's findings and ORI's review.

2. The University of Iowa and Dr. Zhan agreed with me that my work at the university would be overseen and monitored by an internal Data Monitoring Committee. That committee was made up of Dr. Zhan, Dr. Guido Tricot, and Dr. Zhan's then-lab manager.

3. In the entirety of my time with Dr. Zhan's lab, no one ever raised a concern with the veracity or accuracy of my work, nor did anyone ever question my professionalism and integrity. To the contrary, the University of Iowa recognized me for many positive attributes, observing that "Dr. Frech's title, Assistant Research Scientist, does not scratch the surface of just how invaluable she is as lab manager for Dr. Frank Zhan, Professor in the Division of Hematology, Oncology, and Blood and Marrow Transplantation." https://internalmedicineiowa.org/2018/12/03/december-2018-ivana-frech/

4. In his interview for the University of Iowa article, Dr. Zhan was quoted as saying:

   *Ivana is an invaluable mentor who helps our students to develop projects, ask focused questions, design experiments, and accurately interpret data. She emphasizes the importance of academic integrity and best lab practices, creating a positive lab culture. With many projects running simultaneously, it is easy for a student's efforts to become mired or overwhelmed and escape notice. Under Ivana's guidance, the efforts of our lab are efficiently organized and no one has the opportunity to slip through the cracks. We are training better scientists for her effort.*

5. One of the other scientists in the lab, Dr. Rey Franqui-Machin, had this to say about me:

   She taught me discipline and how to think critically to answer the most difficult research questions. Her attention to technical detail and her capacity to convert data into a coherent and comprehensive story placed her among the most influential and positive mentors I had during my time at Iowa.

6. I feel the above statements and the publication of the article by the University of Iowa itself are important to consider with respect to my present responsibility because they speak to my conduct and character many years after my time at the University of Utah.

4854

This article is also important because the University of Iowa and Dr. Zhan knew about the findings at the University of Utah as well as ORI's ongoing review but still believed strongly in my value and integrity by publishing the article.

7. Aside from my time in Dr. Zhan's lab, I was involved in several philanthropic endeavors from 2013 to 2015. For example, I was a member of the American Heart Association Community Leadership Committee and volunteered at various community health fairs to share information on heart disease, strokes, and healthy living. I also did blood pressure readings and provided informal education to screening participants.

8. Beyond my work with the American Heart Association, I was a member of the Junior League of Salt Lake City. Specifically, I was involved in the Junior League Community Assistance and Resource Event (CARE) Fair. CARE Fair was an event organized and directed by the Junior League of Salt Lake City for families needing routine medical, dental, and vision services along with community assistance information. In addition, CARE Fair provided translators for several different languages to assist the immigrant and refugee population, who often do not have access to health care. In addition to free health and dental services, we gave away bike helmets and car seats.

9. In addition to the CARE Fair, I was also active in the Women Helping Women project, in which volunteers collect, prepare, and distribute donated professional women's clothing. These clothes are given to women entering the workforce and who are in transition towards self-sufficiency. Clients are referred to the project by government and social service agencies. As part of this project, I mentored women that were in the process of "re-entering" society following felony convictions and looking for a job.

10. While pursuing my MBA, I did an internship with the Salt Lake City Mayor's Office. There, I was tasked with starting a low-income city transportation pass with a goal of making transportation more affordable and accessible for the city's underserved population. The program was started on a trial basis and ultimately became a success. The program, "Hive Pass," is still active today. As a result of my effort, I was offered a paid position with the mayor's office.

11. Since 2021, I have been a board member of the University Iowa Patient and Family Advisory Board (PFAB). PFAB is a group of patients, family members, caregivers, and members of the University of Iowa's Health Care team. PFAB shares information, discusses topics of importance, and collaborates on improvement strategies aimed at making a positive impact on patient care and the patient experience. PFAB provides feedback and presents suggestions to improve the patient care experience. See the following links:  https://uihc.org/patient-and-family-advisory-board-pfab; https://www.healthcare.uiowa.edu/marcom/uihc/patient_and_family_advisory_board/PFAB-Annual-Report-FY23.pdf.

12. In closing, I want to address any concerns that HHS has regarding my acceptance of responsibility and my recognition of the seriousness of the conduct underlying ORI's findings and my debarment. As I have always maintained, mistakes were made at the

2

University of Utah.  I acknowledge them and I accept responsibility for them, as I have for many years.  More than that, I regret that these mistakes detracted from the hard work that everyone involved in the research at the University of Utah put into our work.  The mistakes made in Dr. Kaplan's lab diminished those efforts and for that I am sorry.  But, as I hope you can see from the information provided above, I am not the same person I was 13 years ago.  I am much more than that.  Since my separation from the University of Utah, I have established myself as a valued and dedicated member of my community without a single allegation or insinuation that I have conducted myself in any manner other than with honesty and integrity.  Thus, I would ask that you assess my present responsibility in a holistic picture, rather than with just a snapshot from over a decade ago.

I assure you that I have no ambition to return to research.  I loved my job at Mercy Hospital and want nothing more to come from this than the opportunity to rejoin my colleagues and friends there under its new ownership.  For all of these reasons, I ask that you conclude I am presently responsible and terminate my debarment.

I declare under penalty of perjury that forgoing is true and correct.

Executed on September 23, 2024.

_____
IVANA FRECH

3

4856

Below are evidences that confirm that the laboratory under Drs. Kaplan and Ward was consistently misrepresenting the results in paper despite me contribution or not. For not understandable reason ORI has decided to ignore this information reported to them multiple times (i.e. CHC presentation, CHC audio)

Paper I:

Blue arrows show the authors that accused me to be the solo responsible during my investigation.

Red arrow shows the duplication of the western blot band





Paper II:

Also discovered by a blogger, same type of duplication for western blot.





Paper III:

The legend describe the experiment that was not performed as explained see below for details.

THE JOURNAL OF BIOLOGICAL CHEMISTRY  VOL. 286, NO. 44, pp. 38488–38497, November 4, 2011
© 2011 by The American Society for Biochemistry and Molecular Biology, Inc.   Printed in the U.S.A.

# Yap5 Protein-regulated Transcription of the *TYW1* Gene Protects Yeast from High Iron Toxicity*

Received for publication, July 26, 2011, and in revised form, September 6, 2011  Published, JBC Papers in Press, September 14, 2011, DOI 10.1074/jbc.M111.286666

Liangtao Li, Xuan Jia, Diane M. Ward, and Jerry Kaplan[1]
*From the Department of Pathology, School of Medicine, University of Utah, Salt Lake City, Utah 84132*

**Background:** Yeast cells respond to high environmental iron by altering gene transcription.
**Results:** The high iron-sensing transcription factor Yap5 induces transcription of the iron-sulfur cluster-containing enzyme Tyw1.
**Conclusion:** The sequestration of iron by incorporation into protein-bound iron-sulfur clusters protects cells from iron toxicity.
**Significance:** Decreased free cytosolic iron is central for protection of iron toxicity.



*Figure legend from the author:*

**Overexpression of truncated *TYW1* affects cellular iron accumulation.** *A*,....*B*......, *C*, wild-type and *erg25-2* cells were transformed with either a control vector or a plasmid containing t-*TYW1*(1−199). Transformed cells were streaked on CMM−Ura/Gal (*CM-URA/Gal*) or iron-limited bathophenanthroline disulfonate (*BPS*)/Gal plates. Cells were grown for 3 days and photographed.

Misrepresentation: 1. the authors did not disclosure that were using 2 vectors.
                   2. the vectors pTF63 was not listed in all paper

Manipulation of data: 1. the authors did not performed the experiment with the same plasmid
                      2. the authors are aware that pTF63 is not a gal plasmid
                      3. the authors's description of all experiment did not explain the use of different vectors
                      4. the results of this experiment run with the same plasmid could be different

52

4860

**Definition of Research Misconduct**:

"Misconduct" or "Misconduct in Research" means fabrication, falsification, plagiarism, or other practices that seriously deviate from those practices that are commonly accepted within the research community for proposing, conducting, or reporting research. **It does not include honest error or honest difference in interpretations or judgments of data.**

University Policy 7-001(4)(H) (emphasis added)

In determining whether HHS or the institution has carried the burden of proof imposed by this part, the finder of fact shall give due consideration to admissible, credible evidence of honest error or difference of opinion presented by the respondent.

42 C.F.R. §93.106(b)(2)

1

**Further Definitions**:

1. Fabrication is making up results and recording or reporting the fabricated results.

2. Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.

University Policy 7-001(4)(H)

4862

**A finding of misconduct requires that**:

1. There is a significant departure from accepted practices of the research community for maintaining the integrity of the research record.

2. The misconduct be committed intentionally, or knowingly, or in reckless disregard of accepted practices and

3. The allegation is proven by a preponderance of evidence.

University Policy 7-001(V)(D)(6)

3

## Proof by a Preponderance

The preponderance of the evidence "means the greater weight of the evidence, or as sometimes stated, such degree of proof that the greater probability of truth lies therein." *Handy v. United States Bank, N.A.,* 2008 UT App. 9, ¶ 25, 177 P.3d 80, 88 (Utah Court of Appeals)

"[Preponderance of the evidence] means the greater weight of the evidence, or as sometimes stated, such degree of proof that the greater probability of truth lies therein.  A choice of probabilities does not meet this requirement.  It creates only a basis for conjecture . . ."

*Alvarado v. Tucker,* 268 P.2d 986, 988 (Utah 1954)  (Utah Supreme Court)

**Initiation of Investigation Committee:**

**If the Inquiry Committee determines**, on the basis of the initial inquiry, that reasonable cause exists **for believing that an investigation is warranted**, the Research Integrity Officer will notify, in writing, the respondent(s) against whom the allegation was made that an investigation will take place and the appropriate Dean(s).

University Policy 7-001(V)(D) (emphasis added)

5

**Treatment of Missing Records:**

The destruction, absence of, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the institution or HHS establishes by a preponderance of the evidence that the respondent intentionally, knowingly, or recklessly had research records and destroyed them, had the opportunity to maintain the records but did not do so, or maintained the records and failed to produce them in a timely manner **and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community**.

42 C.F.R. § 93.106(b)(1) (emphasis added)

6

4866

# Forensic Review of Dr. De Domenico's Hard Drive

Investigation Committee:

"The drive copied from Dr. De Domenico's desktop computer . . . was found to contain directories with files relevant to all of the challenged papers . . . .

The committee also asked the Universtiy [sic] Information Technology Office to scan the forensic copy of Dr. De Domenico's desktop computer drive, **specifically asking the staff to identify Excel and SigmaPlot files that had been deleted** in the previous year.  **The staff was unable to find evidence of such files.**"

Investigation Committee Report at 95-96 (emphasis added)

7

## Greg Stoddard, Expert Biostatistician, Regarding Error Bars in Paper 1

"From the data in the laboratory notebooks, the figures, both the height of the bars in the bar charts, representing the mean, as well as the length of the error bars, representing the standard errors, were correctly drawn."

Statement of Dr. Stoddard, attached at p. 6 to Inquiry Committee Report (submitted to CHC panel as Document 22 in Document Appendix of Dr. De Domenico, tab 5 of binder) (also noting an error in bars but characterizing it as a "typo.")

**Laboratory Management and Coordination**

If, as she indicates, Dr. De Domenico did not participate in decisions regarding authorship or the inclusion of data, this raises serious questions regarding Dr. Kaplan's role as principal investigator and mentor.  At the very least, the decision to exclude data is one that Dr. De Domenico, as a trainee and first author, should have been part of.  In addition, there appears to have been little or no discussion among the various collaborators, especially Drs. Kay and Skalicky.  Given the expertise of these two individuals, it is unlikely that the contradiction between the CD and NMR data would have gone unnoticed if they each been fully aware [sic] of both sets of results.  Particularly in light of his own lack of expertise in these techniques, Dr. Kaplan should have ensured that all of the data were shared among the participants. . . . The circumstances leading to the publication of falsified and fabricated data indicate flaws in the management of the laboratory and collaboration.

Investigation Report at 83

9

# Committee Confusion Regarding Error Bars in Paper 10

Regarding Dr. De Domenico's explanation of the error bars:

"The meaning of this statement is not entirely clear to the Committee . . ."

"These statements leave a great deal of ambiguity . . ."

Investigation Committee Report at 66.

4870

# TIMELINE GRAPH – 13 Years



De Domenico Timeline

Project 1 = (Paper1 + Paper2 + Paper3 + Paper5 + Paper6+ Paper7 + Paper8 + Paper9 + Paper10)
Principal Investigator (PI): Dr. Kaplan; Co-PI: Dr. Ward (NIDDK RO1 grants)

11

4871

| Paper | Error in published figure/s | Direct Involvement | Responsibility | Responsibility for the scientific accuracy | Appendix |
|---|---|---|---|---|---|
| 1 | yes | De Domenico | Multiple | Kaplan | a |
| 2 | yes | Ward/Kaplan | Ward | Kaplan | a, b |
| 3 | no | Ward/Kaplan | Ward | Kaplan | b,c |
| 4 | no | none | | De Domenico | d |
| 5 | yes | De Domenico | Multiple | Kaplan | e |
| 6 | yes | De Domenico | Ward | Kaplan | b |
| 7 | yes | Ward | Ward | Kaplan | f |
| 8 | yes | Ward | Ward | Kaplan | f |
| 9 | yes | Ward | Ward | Kaplan | f |
| 10 | no | none | | Kaplan | g |
| 11 | yes | De Domenico | Multiple (De Domenico/Ward) | Kaplan | h |

4872

## Appendix

a.  Experiments and scanning of western blots were done by Dr. Kaplan/Ward's employees. All the western blots were in one film and that make most of the problem during the preparation of figures by De Domenico. Several data were not found for this paper because were kept in the books removed by Nazzicone.

b.  De Domenico did not work on the final figure, she was out of the country during the resubmission see Reference I: screen shots of an email showing Dr. Ward asking for raw data and inform De Domenico that the paper was submitted.

c.  De Domenico made all the figures and run the experiments with other Dr. Kaplan/Ward's employees.

d.  This paper (in red) did not have error. The investigation Committee agreed.

e.  An outside investigator took the images of each embryos with different exposure, see Reference II. De Domenico when assembled the figure took a wrong images but not Photoshop manipulation was performed.

f.   Dr. Ward generated the figures.

g.  This paper has not published errors identified by the allegation. Dr. Kay's response in the Investigation Report suggest that Dr. Ward and Dr. Kaplan led the manuscript and figures' preparation after De Domenico and other technicians carried out the experiments and maybe drafted figures. As in the Investigation Report page 77: *"In November 2007, Jerry Kaplan handed me a late-stage printed manuscript draft (including figures) for my review. On 11/16, I e-mailed Jerry a list of comments and asked for an electronic file to allow me to make more detailed comments using "track changes" mode. I received an electronic version of the manuscript text from Diane Ward (Peptide manuscript v6doc.doc) that did not include figures. On 11/25, I sent annotated manuscript corrections to Diane. On 11/26, I answered a followup question from Diane (about the y-axis of CD plots). "*

h.  Immunofluorescence was run by Ward and De Domenico. All the western blots were done by Dr. Kaplan/Ward's employees. Dr. De Domenico assembled the figure. See Reference III  for more details.

13

4873

**Paper 1:** De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J (2011). The role of ubiquitination in hepcidin-Independent and hepcidin-dependent degradation of ferroportin. *Cell Metabolism* Nov 2;14(5):635-46.

## The paper has been retracted

**Background:**

In this paper images (bands) were reused in the same publication and the the complaint (Ganz)  stated that the error bars were too small for this types of experiment.

This paper was discussed with the Inquiry committee in two different interviews. The Inquiry committee agreed  with Dr. De Domenico that nature of the data" band or not band" lead to the errors. A statistician analyzed the error bars and did not find mistakes according to the Botkin's report.  The Investigation Committee did not believe in Dr. De Domenico and accuse her that she falsified the data. Dr. Goldenberg was in charge of this publication because he  prepared his own reconstructions of the figures.

**Dr. De Domenico made all the figures but the experiments were run by other and the western scanned by other.  All the western blots were in one film and that make most of the problem during the preparation of the figures.  Several data were not found for this paper because were kept in the books stole by Nazzicone**

14

4874



Film in the book



One of the scan gave to Dr. De Domenico from the technician during the figure preparation. The film has been flip horizontally

4875

**Paper 2:** De Domenico I, Lo E, Ward DM, Kaplan J (2009). Hepcidin-induced internalization of ferroportin requires binding and cooperative interaction with JAK2. *PNAS,* 106: 3800-3805.

## A correction has been published

**Background:**

    One panel in figure 1, 2 and 3 was re-used. Regarding the band re-used in Figure 3B that mistake was found by the inquiry committee however they assume that the bands were the same but the original film for this experiment was stoled but the Investigation Committee was sure that misrepresentation occurred even in absence of the original film.

**Dr. De Domenico made all the figures but the experiments were run by other and the western scanned by other.  All the western blots were in one film and that make most of the problem during the preparation of the figures.  Several data were not found for this paper because were kept in the books stole by Nazzicone.**

**Dr. Ward worked on the final version of the Figures before resubmission as shown in the Table and  Dr. De Domenic was not in the country when this happen.**

16

**Paper 3**: De Domenico I, Zhang TI, Koenig CL, Branch RW, London N, Lo E, Daynes RA, Kushner JP, Li D, Ward DM, Kaplan J (2010).  Hepcidin mediates transcriptional changes that modulate acute cytokine-induced inflammatory responses in mice.  *Journal of Clinical Investigation* 20:2395-2405.

## A Corrigendum has been published

**Background:** a same blot was present in two different publication (Paper 2 and 3).

**Dr. De Domenico made all the figures and run  the experiments with others. The Inquiry committee reviewed this and agreed with Dr. De Domenico that the mistakes happen because in the first submission paper 2 and 3 were one single article. Subsequently this article was split and this originated the use of a figure twice (<u>here there is not misrepresentation</u>).**

17

4877

**Paper 4:** Koenig CL, Miller JC, Nelson JM, Ward DM, Kushner JP, Bockenstedt LK, Weis JJ, Kaplan J, De Domenico I (2009). Toll-like receptors mediate induction of hepcidin in mice infected with *Borrelia borgdorferi. Blood*,114:19 13-1918. Submitted March 6, 2009, accepted June 13, 2009.

**Background:** same microscopy images in the same paper (Paper 4 and 3). The inquiry and the Investigation Committee agreed that Paper 4 was correct the duplication was in Paper 3.

**Note: this is the only paper which Dr. De Domenico is senior author responsible for the validity of the data:**

**Cited from "The Report" , Investigation Committee:**

**SUMMARY OF FINDINGS**

The Investigation Committee found multiple irregularities in ten of eleven publications. **No irregularities were detected in Paper 4;** etc….

18

4878

**Paper 5:** De Domenico, Vaughn MB, Yoon D, Kushner JP, Ward DM, Kaplan J (2007). Zebrafish as a model for defining the functional impact of mammalian ferroportin mutations. *Blood* 110:3780-3783.

## A correction has been published.

**Background:** same fish images was used twice.

**The Inquiry Committee concluded that for each mutant fish were taken more exposure and one exposure was used for the wrong mutant.**

**De Domenico made all the figures  BUT the images were taken by an other investigator and given to Dr. De Domenico as electronic file.**

19

4879



These images demonstrated that who capture the embryo's images took more exposure of the same fish

20

4880

**Paper 6:** De Domenico I., Vaughn, M.B, Paradkar, P.N., Lo, E., Ward, D.M. and Kaplan, J. (2011). Decoupling ferritin synthesis from free cytosolic iron results in ferritin secretion. *Cell Metabolism* 13, 57-67.

## This paper is retracted

**Background:** this paper was analyzed because the complaint stated that the error bars were too small.

**De Domenico drafted the figures and run some experiments with others. Dr. Ward while De Domenico was in Italy worked on the figures for submission (email next page)**



| Message | |

Delete | Reply | Reply All | Forward | Move | Rules | Junk | Unread | Categorize | Follow Up

## Ferritin manuscript

Diane Ward

Sent: Monday, December 28, 2009 11:15 AM

To: Ivana De Domenico

Ivana,

Hope your holiday has been a good one. I have a question on the ferritin manuscript. Hopefully you have it with you. In Figure 2 you load cells for 24 hours with FAC, treat with BFA to block secretion and measure media and cell ferritin levels. Why don't you see an additive effect of BFA....that cytosol and media in BFA treatment add up to without BFA? Similarly, in 2C where you silence Mon1a (only blocking secretion), why don't you see an additive amount of ferritin in cells? These treatments should only block secretion, but ferritin should still be being synthesized and found in the cytosol so you would expect an additive effect. If not, then these treatments look like they are also inhibiting protein synthesis.

I am working my way through the manuscript and may have other questions. I will send another email later.

diane

22

4882





Example of Error bars





| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 1 | +FAC +BCS+ pEGFP | 132.0000 | 3.2146 | |
| 2 | +FAC+Fpn-GFP | 29.5000 | 3.0000 | |
| 3 | +FAC+BCS+Fpn-GFP | 81.3333 | 3.5119 | |
| 4 | +FAC+BCS+Fpn-GFP+Cu | 36.3333 | 5.0332 | |

C6 Fpn-GFP error

25

4885



Example of data generated by
a technician in Dr. Kaplan
laboratory for Paper 6

Allegation slide provided by Dr. Botkin

# Figure 7B

## • Error bars are too small to reflect the error of the technique and stated replicates

Scale mislabeled



Statistics for Figure 7B ELISA to analyze cytosolic ferritin (N=3 per displayed bar)

| Sample: bars in graph from left to right | Mean* | SEM* | SD* | CV* |
|---|---|---|---|---|
| +FAC empty vector | 224.3 | 1.8 | 3.1 | 0.01 |
| +/- FAC empty vector | 189.7 | 6.1 | 10.5 | 0.06 |
| +FAC mFpn | 241.0 | 2.3 | 4.0 | 0.02 |
| +/- FAC mFpn | 46.0 | 2.1 | 3.6 | 0.08 |
| +FAC cFpn | 224.3 | 2.7 | 4.7 | 0.02 |
| +/- FAC cFpn | 62.0 | 1.5 | 2.6 | 0.04 |

Consistently much smaller than what is expected for the technique

Erhardt JG et al. J Nutr. 2004: % CV for ferritin ELISA = 11.4 i.e. CV = 0.11

27

4887

Statistics for Figure 7B ELISA to analyze cytosolic ferritin
(N=3 per displayed bar)

| Sample: bars in graph from left to right | Mean* | SEM* | SD* | CV* |
|---|---|---|---|---|
| +FAC empty vector | 224.3 | 1.8 | 3.1 | 0.01 |
| +/- FAC empty vector | 189.7 | 6.1 | 10.5 | 0.06 |
| +FAC mFpn | 241.0 | 2.3 | 4.0 | 0.02 |
| +/- FAC mFpn | 46.0 | 2.1 | 3.6 | 0.08 |
| +FAC cFpn | 224.3 | 2.7 | 4.7 | 0.02 |
| +/- FAC cFpn | 62.0 | 1.5 | 2.6 | 0.04 |

*Mean = arithmetic mean, which is height of error bar
 SEM = standard error of the mean, which is the displayed error bar
 SD = standard deviation
 CV = coefficient of variation = SD/Mean

(For completeness, in Figure 7B, the two top y-axis labels are shown as 300 and 350, but should be 250 and 300, to correctly reflect the data  That is just a typo, however, and is not pertinent to the concern that was raised.)

We see that the coefficient of variation (CV) is less than 0.1 for every test condition. Dr████████ had pointed out that these should be at least 11.0 for independent experiments.  In the Cell Metabolism article, these data are reported as having come from independent experiments.

I have seen something like this before at the U of Utah.  A graduate student had well-to-well variability that was very small, similar to these data.  It arose from all wells being filled from a flask holding the solution that contained the cells, so essentially there was only one experiment. The faculty mentor informed me she had a flawed experiment, as she had not introduced sufficient experiment-to-experiment variability.

Perhaps something like that occurred, so that the data actually are not from "independent" experiments.  However, according to the Erhardt paper Table 2 shown above, there should have been a CV of at least 5, simply from the variabilitity in the ELISA method, using samples from the same experiment (as least as far as my naïve understanding of the problem).

3128                                                           ERHARDT ET AL.

*Comment De Domenico to Dr. Stoddard:*

Dr. Stoddard is correct that for these experiments we used cells that came from the same flasks. The biological variability is due to different transfections each time. <u>The Erhardt cited by Dr. Ganz paper analyzed serum samples and not cell lysates or culture media.</u>

*Application of serum and standards on the plate.* After the coated plates were washed, 100 μL diluted serum and standard samples were added to the wells.

---

ELISA method for each indicator to perform these measurements simultaneously increasing the method efficiency and providing a more comprehensive picture of the VA and iron status.

## MATERIALS AND METHODS

### Chemicals and other materials

The following chemicals were used as purchased: $NaH_2PO_4$, $Na_2HPO_4$, NaCl, citric acid, phosphoric acid, 3,3',5,5'-tetramethylbenzidine dihydrochloride (TMB), 30% $H_2O_2$ (Sigma).

*Capture antibodies.* Capture antibodies were as follows: ferritin (Code A0133, Dako), anti-sTfR (Cat. No. 4Tr26; Clone 23D10, Hytest), RBP (Code A0040, Dako), CRP (Code A0073, Dako Denmark).

*Detection antibodies.* Detection antibodies were as follows: anti-ferritin-horseradish peroxidase (HRP) (Code P0145, Dako), anti-sTfR-HRP (Cat. No. 4Tr26-c; Clone 13E4, Hytest), anti-RBP-HRP (Code P0304, Dako), anti-CRP-HRP (Code P0227, Dako).

Serum control samples (Liquicheck, Bio-Rad) were used as standards for the calibration curves. Quality control (QC) samples were prepared from serum samples with a low and high content of analytes.

### ELISA procedure

*Coating 96-well plates with capture antibody.* Antibodies were diluted in coating buffer (0.01 mol/L phosphate buffer, 0.15 mol/L NaCl, pH 7.2). To 96-well plates (Maxi sorb C-shape, Nunc) was added 100 μL of appropriately diluted antibody. The plates were covered with parafilm and were incubated overnight in the refrigerator. The antibody concentrations for coating were anti-ferritin, 0.05 μg/well (1:5000); anti-sTfR, 0.1 μg/well (1:10000); anti-RBP, 0.82 μg/well (1:1000); and anti-CRP, 0.05 μg/well (1:20,000).

The following morning the plates were emptied by inversion over a sink and prewashed by pouring wash buffer (0.01 mol/L phosphate buffer, pH 7.2, 0.5 mol/L NaCl, 0.1% Tween 20) over the plate and then slinging the buffer out into a sink. This was repeated 3 times, each time leaving the wash buffer 3–5 min in the wells. After the last wash any remaining wash buffer was removed by tapping the inverted plate on a paper towel.

*Application of serum and standards on the plate.* After the coated plates were washed, 100 μL diluted serum and standard samples were added to the wells.

It is essential to place the patient samples and calibration standards in a way that minimizes biased readings to obtain reliable results. Therefore the measurement was done in duplicate and the 2 replicate samples were placed in different positions on the plate. The same procedure was done for the standards. A typical example for the arrangement of the samples on a plate is shown in **Figure 1**. A copy of this figure was also placed under the 96-well plate, which helps in finding the correct well during pipetting.

*Dilution scheme for serum.* The serum dilution scheme was as follows: D1, 15 μL serum + 150 μL wash buffer (1:11 dilution performed in 1.7-mL microtubes); D2, 10 μL D1 + 1500 μL wash

buffer (1:1661 dilution performed in 1.7-mL microtubes or a 96-deep-well plate).

*Volumes of diluted serum applied to the final reaction plate.* The following volumes were applied to the final reaction plate: ferritin, 100 μL D1 (1:11 final dilution); sTfR, 100 μL D2 (1:1661 final dilution); RBP: 25 μL D2 (1:6644 final dilution); CRP: 50 μL D2 (1:3322 final dilution).

For sTfR, RBP, and CRP the diluted serum was applied using a 12-channel pipette from the 96-deep-well plate or a plate that was filled with the D2 dilution of the samples. Before addition of the diluted serum to the plate, the wells for RBP and CRP were filled with the necessary amount of wash buffer to obtain a final volume of 100 μL.

*Preparation of standards.* A commercially available control sample from Bio-Rad (Liquichek Immunology Control, Level 3) was used to obtain a calibration curve on each plate. The manufacturer provides values for many analytes and methods of analysis. We calculated the mean value of all methods mentioned for each analyte of interest and used this value as the basis for further dilutions to obtain a calibration curve. The values were 296.9 μg/L for ferritin, 2.87 μmol/L for RBP, and 54.33 mg/L for CRP. Because no values were available for sTfR, we used a commercially available kit (Ramco Laboratories) to measure the concentration of sTfR (8.93 mg/L). To get calibration curves in the physiologically most interesting range we used the dilution scheme of **Table 1**.

After 2-h incubation at room temperature, the plate washing procedure was repeated as described above at the coating step. If a large number of samples is measured timing is critical: the samples and the standards should be incubated for similar amounts of time.

*Detection antibody binding.* A total of 100 μL of diluted HRP coupled antibodies in coating buffer was added to the wells. The detection antibody concentrations were anti-ferritin-HRP, 0.015 μg/well (1:8000); anti-sTfR-HRP, 0.015 μg/well (1:15000); anti-RBP-HRP, 0.06 μg/well (1:2000); and anti-CRP-HRP, 0.016 μg/well (1:4000).

The plates were again incubated for 1 h at room temperature and the standard washing step was repeated.

*Color reagent and plate development.* To prepare the color reagent, 1 mg TMB (predissolved in DMSO) was added to 12 mL 0.1 mol/L citric acid phosphate buffer (pH 5.2). The TMB citric acid buffer solution can be prepared in larger amounts and stored frozen in 12-mL portions. To prevent border effects, it is essential that the plate and the color reagent are both at room temperature. Before the addition of 100 μL of this color reagent to each well 2 μL of 30% $H_2O_2$ was mixed in to the 12-mL TMB solution. After sufficient blue color development (~5–10 min) the reaction was stopped by the addition of 100 μL/well of 1 mol/L phosphoric acid. Each well was measured at 450 nm with the reference wavelength set at 650 nm. Although it is possible to measure without a reference wavelength, the use of this reference wavelength can improve the quality of the measurement.

### Optimization of serum dilution, antibody concentration, and other tests

To make the measurement more economical, we reduced the antibody concentration (starting from 1 μg/well) and checked different serum dilutions. We selected the dilution that had a good regression coefficient for the standard curve and gave an appropriate color reaction within 10 min.

To evaluate the washing procedure, longer incubation with the wash buffer, higher Tween concentration, and an automatic washer were tested. None of these changes improved the CV or the background of the measurement. We also did not see any effect of other brands of plates specifically designed for ELISA tests. Blocking of the plates with an agent like albumin, dried skim milk, or gelatin usually resulted in a higher CV. The content of Tween in the wash buffer seemed high enough to prevent nonspecific reactions. We saw a positive effect of a blocking procedure in the sTfR assay, but only when the water quality was poor. Bacterial proteins might interfere with the sTfR assay if no blocking step is applied. PBS and bicarbonate buffers were equivalent for the capture antibody coating step.



**FIGURE 1** Typical example for the arrangement of the samples on a 96-well plate (01–40: patient samples; BL, L1–L5: standards, QC1 and QC2 quality controls).

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
| B | BL | L1 | L2 | L3 | L4 | L5 | BL | L1 | L2 | L3 | L4 | L5 |
| C | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| D | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
| E | 37 | 38 | 39 | 40 | QC1 | QC2 | 01 | 02 | 03 | 04 | 05 | 06 |
| F | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| G | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| H | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | QC1 | QC2 |



Example of Error bars in culture cells from the literature

246    J. P. Gnana-Prakasam and others





**Figure 2    Ferritin accumulation in *Hfe⁻/⁻* mouse serum, retina and RPE**

Ferritin levels were determined by ELISA. (A) Ferritin levels in sera ($n = 4$) obtained from 18-month-old wild-type mice (WT) and age-matched *Hfe⁻/⁻* mice (KO). (B) Ferritin levels in retinal tissues ($n = 6$) and RPE cell preparations ($n = 4$) obtained from 18-month-old wild-type mice and age-matched *Hfe⁻/⁻* mice. $*P < 0.05$; $**P < 0.001$.

the H- and L-ferritin staining was significantly greater in 18-month-old wild-type mouse retinas compared with 8-week-old mouse retinas of the same genotype.

We then quantified ferritin levels by ELISA using serum samples, retinal tissues and RPE cells prepared from 18-month-old *Hfe⁻/⁻* mice and age-matched wild-type mice (Figure 2). There was a significant increase in ferritin levels in *Hfe⁻/⁻* mice compared with control mice; the increase was evident in serum (2.4-fold; $P < 0.001$), retina (2.5-fold; $P < 0.001$) and RPE (2.0-fold; $P < 0.05$). IRPs also regulate the levels of TfR1, but by a mechanism different from that involved in the regulation of ferritin levels. Increased cellular iron decreases the expression of TfR1 by influencing the stability of *Tfr1* mRNA. To complement

30

4890

**Paper 7**: De Domenico, I., D. M. Ward, M. C. di Patti, S. Y. Jeong, S. David, G. Musci & J. Kaplan. (2007). Ferroxidase activity is required for the stability of cell surface ferroportin in cells expressing GPI-ceruloplasmin. *EMBO J*, 26(12):2823-2831.

**Paper 8:** De Domenico, I., D. M. Ward, C. Langelier, M. B. Vaughn, E. Nemeth, W. I. Sundquist, T. Ganz, G. Musci and J. Kaplan (2007). "The molecular mechanism of hepcidin-mediated ferroportin down-regulation." *Mol Biol Cell* 18(7):2569-2578.

## Dr. Ward generated the figures

**Background:** the allegation was that in several figures gel images were spliced but not those with the loading control. Also Figure 4E (paper7) and 3D (paper 8) shared 2 bands. The bands or blots were manipulated. Blots were found but  Dr. De Domenico did not  know how Dr. Ward generated the misrepresented data. The committee found different electronic version of the same figure in  Dr. Ward's computer.

**Dr. De Domenico did not assembly the figures for these publications. The statement that the committee reported from Dr. Ward " the digitized films often weren't explicitly or clearly labeled, in which case Dr. De Domenico would identify the lanes and labels to use in the figure" we believe that was said to concentrate the fault on Dr. De Domenico. How a senior investigator organize a figure for publication and working with material that was explicitly or clear labeled?**
**Dr. De Domenico did not make these figure and she does not know how two different papers sharing the same bands the committee did not accuse Dr. Ward of manipulation however Dr. De Domenico had nothing to do with the assembly.**

31

4891

**Paper 9:** De Domenico Ivana, Diane McVey Ward, Givoanni Musci and Jerry Kaplan (2007). Evidence for the multimeric structure of ferroportin. *Blood* Mar 1;109(5):2205-9.

## Dr. Ward generated the figures

**Background:** Photoshop manipulation of 1 figure. The investigation Committee found the original films and the repeats. However the Committee found that the original blot was labeled in one scan as showed in the published figure and in other scan differently.

**The Committee did not consider that Dr. Ward labeled the figure too. However the original scan that she used was not found (Dr. Ward explained that in her computer folder that file was missed because not copied, the Committee believed. How it is possible that all entire folder is copied and just one file not?**

**Dr. De Domenico is not responsible for the Photoshop's manipulation the case remain unclear about the labeling because Dr. Ward did not provided the scan that she used.**

4892

**Paper 10:** De Domenico I., Nemeth, E, Nelson, JM, Philips, JD, Ajioka, RS, Kay, MS, Kushner, JP, Ganz, T, Ward, DM and Kaplan, J (2008). The hepcidin-binding site on ferroportin is evolutionarily conserved. *Cell Metabolism* 8:146-156.

**B**ackground: Dr. Ganz stated that his laboratory and others (never disclosure a name) can not reproduce the assay published in the paper. Dr. De Domenico gave to the Committee multiple proves that the assay is reproduced by other and validated by publication from other laboratories and letter of support by Dr. McClain. Kaplan.

The Investigation Committee decided that can not exanimated the validity of the assay but one member of the Committee, Dr. Goldenberg, started analyzed the CD analysis and searching in Dr. De Domenico's computer. His conclusion were that Dr. De Domenico fabricated the data for Figure 4A and C because he did not find the original files. Dr. De Domenico stated multiple time that the experiment under discussion was not run or analyzed by her. She provided the name of the technician but the Committee never asked info to him or Dr. Kaplan

**Dr. De Domenico drafted the figures and run some experiments. Dr. Ward finalize figures and paper see statement by Dr. Kay Investigation Report page 77**

33

4893

File from Dr. Botkin

De Domenico et al. (2008) Cell Metabolism 8, 146-156. (Paper 10)
Figure 4A.

**Published Figure**



SigmaPlot file: "Figure x paper/CD 1.JNB"



| VAR1 | Pep 37C | Hep 37 | Pep+Hep 37 | Pep 4C | Hep 4C | Pep+Hep 4C |
|------|---------|--------|------------|--------|--------|------------|
| 200 | -4.371 | 13.385 | 7.232 | -3.184 | -2.032 | -1.66 |
| 210 | -2.635 | -7.6 | -9.477 | -2.489 | -3.37 | -2.277 |
| 220 | -1.755 | -2.471 | -5.26 | -1.615 | -2.485 | -1.715 |
| 230 | -1.05 | -0.659 | -2.314 | -0.574 | -1.478 | -1.111 |
| 240 | -0.524 | -0.391 | -0.932 | -0.72 | -1.129 | -0.859 |
| 250 | 0.084 | -0.335 | -0.656 | -0.335 | -0.656 | -0.416 |

7/25                                    1

The date for this figure is  August 26
(peptide from Ivana/paper folder/CD1)

The date for this figure is August 17
(peptide from Ivana/paper folder/figure x
paper sigma plot/CD1)

34

4894

**Note: from the pdf sent by Dr. Botkin appears that the color for the lines is different between the electronic file and published figures**



File found by the Committee:
(peptide from Ivana/paper folder/figure x
paper sigma plot/CD1)

35



Figure in: peptide from Ivana/paper folder/
figure x  paper sigma plot/CD1)

4896



Green line

**Conclusion: the same raw data were used for the 2 graphs.**
**The graph highlighted by the Committee was not the final one.**

**From Dr. Botkin's request:**

The concern is whether the plots as presented have been smoothed and distorted in such a way that they do not appropriately represent the primary data.

**Response:**

1. The CD analysis was run in Dr. Kay laboratory from February 2007 to August 2007, according to email stored by Dr. De Domenico and laboratory notes.
Couple experiments were run by Dr. De Domenico and others by technician.

2. The raw data were given to Dr. De Domenico or the technician by floppy disk or print out. The  Machine used was attached to a PC computer very old.

3. Dr. De Domenico does not recall who suggested to pick every 10nm for the figure generation.

4. Dr. De Domenico sent one set of the data to Dr. Kay for analysis see email next page when she personal run the experiment.

38

Dear Ivana,

Greetings. I finally had a chance to look over the data you sent. The only mistake I see is that each data set should have the blank subtracted from it. Your data has blank-sample (rather than sample-blank). This correction will flip the sign of the data, but won't affect the comparisons. It does look like you have a pretty significant difference between 4 and 37 C. As I told Jerry, I would repeat this CD data to confirm it and try to get accurate peptide concentrations using UV absorbance.

Let me know when you'd like to use the CD again (2 days notice is best, so I can re-order a liquid N2 tank if necessary).

Thanks,
Michael

Dr Kay,

I made the graphic in excel, can you please take a look? I do not know if my graphic are right probably not...

Jerry would like to meet with you if there is some significant difference when the two peptide are together at 37C and 4C like we see in our assay where at 4C there is not interaction.

Thanks for the help.

Ivana

---

**From:** Michael Kay (Biochem)
**Sent:** Wednesday, August 01, 2007 4:17 PM
**To:** Ivana De Domenico
**Subject:** Re: kaplan

Dear Ivana,

I have reserved the CD for you on Friday. I will be available to help you get started @ 10:30.

Best Wishes,

Michael

On Jul 31, 2007, at 10:41 AM, Ivana De Domenico wrote:

Dr Kay,

Finally we are ready for do a CD analysis, is it possible Friday morning around 10:30?

Thank you

Ivana

Ivana De Domenico PhD,
University of Utah
School of Medicine
Dept of Pathology
1900 E 30 North RM 5B310
Salt Lake City UT 84132 - 2501
Tel: 801-581-4901

39

## Update on Circular Dichroism (CD analysis)

In the final Investigation Report, the Committee stated that the CD performed by the company Alliance Protein Laboratories under the direction of Dr. Tsunomo Arakawa, an expert in the field, was "*apparently meant to refute the conclusion of the Investigation Committee, they are, in fact, significantly different from the published data and contradict the conclusion drawn in the paper*" (Page 5 Report)[Make sure this quote is EXACTLY correct.  Also check the cite- doesn't appear on page 5].  Dr. De Domenico sent to Dr. Arakawa, blinded regarding this investigation, the reconstructed figure from Dr. Goldenberg and he does not understand or agree with the reconstruction. However, he clearly stated that his analysis shows that "the CD intensity gradually changes with temperature," the same conclusion drawn by the authors of paper 10.

It is important to point out that the Committee believes that a manipulation of Figure 4 for paper 10 has been made at the data point 200nm leading to a dramatic change in the shape of the curve (Page 71 Report). However, the authors in the paper never emphasized this dramatic change at 200 nm reported by the Committee.  The data point in the paper that was considered was 210 nm (figure 4A insert). Therefore, there would have been little reason for Dr. Domenico to manipulate one point and then not "use" the manipulation to make a point in the paper. It may well be that the person who transferred the data from Excel to Sigmaplot did not copy the "-" sign, and later readers did not catch the error.

40

4900



Message

Delete   Reply   Reply All   Forward         Move         Rules ▾        Unread   Categorize   Follow Up
                                                          Junk ▾

**Re: R: NMR paper**

Jack J. Skalicky

Sent: Tuesday, September 4, 2007 10:14 AM

To: Ivana De Domenico

Hi Ivana,

I'll send this figure in the afternoon. Has Jerry had any success in
obtaining the chemical shifts for hepcidin?

Jack

> Jack,
> please, can you send to us the data about the NMR, what you showed to
> us last week. we have to send a draft of the paper to the patent
> office as soon is possible.
> thanks
> Ivana
>
> --------------------------------------------------------------------
> *Da:* Jack J. Skalicky [mailto:u04311463@umail.utah.edu]
> *Inviato:* gio 23/08/2007 18.04
> *A:* Ivana De Domenico
> *Oggetto:* NMR paper
>
> Ivana,
>
> The NMR structure paper that you gave me to read does already address
> the dimerization issue. The authors have proposed a dimer model based on
> some NOEs they observe for the Hepcidin-25 peptide, they also have shown
> the aggregation state is concentration dependent for the Hepcidin-25
> peptide but independent of concentration for the Hepcidin-20 peptide. I
> suspect what we are observing at lo T is populating of the dimeric (or
> higher order) state of the peptide.
>
> Jack
>
> --
> Jack J. Skalicky, Research Assistant Professor
> Director Univ. of Utah Biomolecular NMR Center
> http://www.biochem.utah.edu/nmr/
> skalicky@biochem.utah.edu
>
> University of Utah - School of Medicine
> Department of Biochemistry
> 15 N Medical Drive East RM 4100 Bldg. 565
> Salt Lake City UT 84112-5650
> 801-585-9658 (NMR Center)
> 801-585-7363 (Office)
> 801-581-7959 (Fax)


--
Jack J. Skalicky, Research Assistant Professor
Director Univ. of Utah Biomolecular NMR Center
http://www.biochem.utah.edu/nmr/
skalicky@biochem.utah.edu

University of Utah - School of Medicine
Department of Biochemistry
15 N Medical Drive East RM 4100 Bldg. 565
Salt Lake City UT 84112-5650
801-585-9658 (NMR Center)
801-585-7363 (Office)
801-581-7959 (Fax)

> This email suggests that Dr.
> Kaplan was in communication
> with Dr. Ganz before October
> 29, date that Dr. Ganz reported
> to the Committee. this will
> agree with De Domenico's
> notes. The Committee believed
> that the notes were falsified.

41

**Paper 11:** Kieffer, C., Skalicky, JJ, Morita, E, De Domenico, I, Ward, DM, Kaplan, J and Sundquist, W I (2008). Two distinct modes of ESCRT-III recognition are required for VPS4 functions in lysosomal protein targeting and HIV-1 budding. *Dev Cell* 15: 62-73.

Background: bands were re-used in the same publication.  Dr. De Domenico made the figures according the technician instruction.  However the original film was not found. Dr. Kieffer   said he did not have it even if it is clear he need it for the quantification of the band.
An email to Dr. De Domenico by Dr. Kieffer suggested that he picked up the film. Dr. Sundquist to accuse Dr. De Domenico told the Committee that they quantified the western using the image made by Dr. De Domenico. However, in their publication said that they use a computer program that required the original film. The Committee decided to ignore this part of Dr. De Domenico's defense.

**De Domenico made  the figures but the experiments were run by her and Dr. Ward. Western blots were run by the technician that also scanned the film.  De Domenico drafted the figure. Gave to Dr. Kieffer. No more communication after that. Dr. Sundquist stated to Dr. Botkin (next slides) that they never had the original blots because they used image J to quantify bands. However his testimony contradicts his own published experimental procedure. The Experimental procedure agreed that Dr. Kieffer had the original film. <span style="color:red">In a meeting with Dr. Botkin, De Domenico requested to see Dr. Kieffer's books but he said that was not possible because the books were not completed because Dr. Kieffer left Dr. Sundquist laboratory but never organized his books. In July Dr. Sundquist, on a Saturday morning, told De Domenico to send an email in same day to tell Dr. Botkin that she was responsible for everything because. De Domenico did it (see email next page).</span>**

42

4902



### PHI: Kieffer et al, clarification 7-21-2012

Ivana De Domenico

Sent: Saturday, July 21, 2012 11:46 AM

To: Jeff Botkin

Cc: Ivana De Domenico

📎 To Dr. Botkin July21, 2012.docx (846.3 KB)  (Preview)

⚠ This message is high priority.

Dear Dr. Botkin,

Today,  Saturday July 21  I met Dr. Sundsquist and he asked me to send you a letter of clarification where it is stated that the error for the figure came from our laboratory.  I told Dr. Sundsquist that I already sated this to you and the Investigation Committee.  However, I felt morally obligated to generated the attached file as requested by Dr. Sundsquist.

The file summarizes all the events regarding this allegation and also contains some of the exchanged email between me, Dr. Kieffer and Dr. Sundsquist.

I will stop by your office on Monday morning, as Heather suggested,  to pick Cds and leave for the Committee the copy of my presentation from the third interview on July 19.

Thank you.

I apologize for continuously disturbing you during weekend.

Sincerely
Ivana



44



"In summary, we are convinced that Ivana De Dominico had to have been the person who manipulated the blots because: a) no one, including Ivana, seems to disagree on that point, b) the emails and files show that she created the relevant Photoshop files of the blots before Collin first picked them up and that they already contained the duplicated lanes, c) neither Ivana nor anyone else seems to have the original film version of the blot, or an image that shows the original blot without duplicated lanes, and d) **there is no reason that Collin should have ever had the original film versions of the blots because his image j analyses were performed on scanned, digital tif files, not on films.**"

45

4905

**Ferroportin Downregulation Assays**

**CHMP6 Depletion and Reconstitution**—HEK293T cells were transfected with non-specific or CHMP6 siRNA oligonucleotides at final concentrations of 50−100 nM using OligofectAMINE (Invitrogen) as previously described (De Domenico et al., 2007; Langelier et al., 2006). 24 to 48 h post-transfection, cells were trypsinized and plated onto 60-mm plates without or with coverslips (for Western or fluorescence analyses, respectively). 24 h later, the cells were co-transfected with 5 μg pEGFP-N1-FPN and 5 μg wild-type or mutant siRNA-resistant CHMP6 expression constructs using Nucleofector technology (Amaxa) according to the manufacturer's directions. After an additional 18 h, cells were incubated in the presence of cyclohexamide (75 μg/ml) for 2 hours followed by incubation ± 1 μg/ml hepcidin for 1 h prior to epifluorescence analysis. Fluorescent images were captured on an Olympus BX51 microscope using an Olympus U-CMAD-Z camera and a 60x/1.30 NA oil-immersion objective lens. Images were acquired using Picture Frame 2.5 software (Olympus America).

**Western Blot Analyses**—Western analyses were conducted in the same way, but with incubation ± hepcidin for 4 hours. Cell lysates were prepared as described previously (De Domenico et al., 2007), and samples were normalized for the total protein concentration using the bicinchoninic acid assay (Pierce) prior to loading. Western detection used either anti-GFP (1:10,000, ab6556; Abcam); mouse anti-tubulin (1:1000; GeneTex); rabbit anti-CHMP6 (1:1000, Covance), or mouse anti-Myc, (1:1000, Abcam) followed by either peroxidase-conjugated goat anti-mouse IgG (1:10,000; Jackson ImmunoResearch Laboratories) or peroxidase-conjugated goat anti-rabbit IgG (1:10,000; Jackson ImmunoResearch Labs). Blots were scanned and quantified using Quanti One software (BioRad).

**Quantification of Average Ferroportin-GFP Fluorescence**—Average fluorescence per cell was calculated with ImageJ (rsbweb.nih.gov) software. Individual cells were outlined in freehand mode and the background corrected average fluorescence was calculated for >100 cells for each condition analyzed in two separate experiments (one blinded).



*Dev Cell*. Author manuscript; available in PMC 2008 November 24.

NIH-PA Author Manuscript    NIH-PA Author Manuscript

**Conclusion as published : the Image J software was used for fluorescence quantification. Quanti One software was used for western blots quantification.**

4906

# Role in the  publications under consideration:

**Of 11 publications:  Dr. Kaplan is the senior authors in nine, Dr. De Domenico in one and**

**Dr. Sundquist in one as.**

**<span style="color:red">The only publication (Paper 4) that Dr. De Domenico is responsible not irregularities were found by the Committee.</span>**

47

4907

American Physiological Society

AMERICAN JOURNAL OF PHYSIOLOGY
Cell Physiology

HOME | CURRENT ISSUE | IN PRESS | ARCHIVES | FEEDBACK | SUBSCRIBE | ALERTS | HELP

**Institution: University of Utah**

## PERSPECTIVES IN CELL PHYSIOLOGY

→ Expand

# Authorship: why not just toss a coin?

**This Article**

Am J Physiol Cell Physiol
**September 2008** vol. 295
no. 3 **C567–C575**

🔓 **Free. Read about APS free content.**

**Full Text** *Free*
**Full Text (PDF)** *Free*

### Table 3.

*Requirements and responsibilities of coauthors*

| Author Category | Contribution and Responsibility to the Work and Publication |
|---|---|
| First author | Fulfills ICMJE authorship criteria. |
| | Performs bulk of the experimental work. |
| Senior author | Fulfills ICMJE authorship criteria. |
| | Typically the last person on an authorship list. |
| | Directs, oversees, and guarantees the authenticity of the work. |
| | Takes responsibility for the scientific accuracy, valid methodology, analysis, and conclusions of all work described in the paper. |
| | Able to explain all of the results described in the paper. |
| Corresponding author | Fulfills ICMJE authorship criteria. |
| | Typically assumed by the first or senior author. |
| | Communicates with editors and readers. |
| | Provides specific information on the contributions of all coauthors to the paper. |
| | Ensures that all authors are aware of and approve the submission of the manuscript, its content, authorship, and order of authorship. |
| Middle/contributing author | Fulfills ICMJE authorship criteria. |
| | Contributions do not rise to those of first or senior author. |
| | Order of middle/contributing authors should reflect their relative contributions to the paper. |

• ICMJE, International Committee of Medical Journal Editors.



48

4908

**DATA NOT FOUND BY THE COMMITTEE = Dr. De Domenico fabricated the data**
**Case 13-ORI-NO3 CAP-HHS COMMITTEE = Dr. De Domenico fabricated the data**
**(Investigation's Committee conclusion)**

1.   Sigma plots files were not found because originated in a PC computer that
     Dr. Ward (lab manager in Dr. Kaplan's laboratory) replaced in a Mac. However the Mac that the Committee analyzed
     was not the immediate one after the PC.  See below for details:

     **PC: replaced by Mac1, Mac1 to Dr. De Domenico;  After about 2 year  Mac1 was reformatted
     for Eric Lo, Dr. De Domenico got a Mac2. This is the computer that the Investigation Committee
     analyzed.**

2.   Western Blot missed were kept in the laboratory notebooks took by Nazzicone.

3.   CD analysis (data from Dr. Kay's  lab). The data missing are that one generated by Eric Lo. The Committee never
     asked Mr. Lo or Dr. Kaplan regarding the files they just assumed  that Dr. De Domenico fabricated the data and she
     lied.

4.   Some data not found in Dr. De Domenico's books were not there because the experiments were run by others. <u>The
     Committee never asked Dr. Kaplan to  find files or notes from the other his employs that they worked in these
     project.</u>
     **Note: it is interesting that the Committee believed in Dr. Ward that the scan for paper 9
     was not copied (however she had all the other scans for that paper just missing only that
     one). When Dr. De Domenico reported that some files were not copied they do not believe.**

5. Westerns not found for paper 11. the committee accused Dr. Domenico. Dr. Kieffer , first author, said he did not have it
   even if it is clear he need it for the quantification of the band.An email to Dr. De Domenico by Dr. Kieffer suggested that
   he picked up the film.

**From "The Report":**

*……..The Committee recognizes that Dr. Kaplan is a leader in his field, and that the irregularities outlined in this report appear to be isolated to publications generated predominantly by Dr. De Domenico's work.*

**Dr. De Domenico's  response:**

*……….The committee appears very discriminating by stating " The Committee recognizes that Dr. Kaplan is a leader in his field, and that the irregularities outlined in this report appear to be isolated to publications generated predominantly by Dr. De Domenico's work.". The committee does not have proves to state this they never analyzed paper where Dr. De Domenico is not an author.*

**<span style="color:red">Next slides are examples of misrepresentation in paper were Dr. De Domenico was involved but Dr. Ward made the figure (in one she is first author) and Dr. Kaplan is the senior author.</span>**

THE JOURNAL OF BIOLOGICAL CHEMISTRY VOL. 286, NO. 44, pp. 38488–38497, November 4, 2011
© 2011 by The American Society for Biochemistry and Molecular Biology, Inc.    Printed in the U.S.A.

# Yap5 Protein-regulated Transcription of the *TYW1* Gene Protects Yeast from High Iron Toxicity*

Received for publication, July 26, 2011, and in revised form, September 6, 2011 Published, JBC Papers in Press, September 14, 2011, DOI 10.1074/jbc.M111.286666

**Liangtao Li, Xuan Jia, Diane M. Ward, and Jerry Kaplan[1]**
*From the Department of Pathology, School of Medicine, University of Utah, Salt Lake City, Utah 84132*

**Background:** Yeast cells respond to high environmental iron by altering gene transcription.
**Results:** The high iron-sensing transcription factor Yap5 induces transcription of the iron-sulfur cluster-containing enzyme Tyw1.
**Conclusion:** The sequestration of iron by incorporation into protein-bound iron-sulfur clusters protects cells from iron toxicity.
**Significance:** Decreased free cytosolic iron is central for protection of iron toxicity.

**C.**



**CM-URA/Gal plate**                    **BPS/Gal plate**

WT vector                              WT vector

*erg25-2 t-tyw1*          *erg25-2 vector*          *erg25-2 t-tyw1*          *erg25-2 vector*

***Figure legend from the author:***
**Overexpression of truncated *TYW1* affects cellular iron accumulation.** *A,….B……, C,*
wild-type  and *erg25-2* cells were transformed with either a control vector
or a plasmid containing t-*TYW1*(1–199). Transformed cells were streaked on
CMM−Ura/Gal (*CM-URA/Gal*) or iron-limited bathophenanthroline disulfonate
(*BPS*)/Gal plates. Cells were grown for 3 days and photographed.

Misrepresentation: 1. the authors did not disclosure that were using 2 vectors.
                   2. the vectors pTF63 was not listed in all paper

Manipulation of data: 1. the authors did not performed the experiment  with the same plasmid
                   2. the authors are aware that pTF63 is not a gal plasmid
                   3. the authors's description of all experiment did not explain the use of
                       different vectors
                   4. the results of this experiment run with the same plasmid could be
                       different

52

4912

THE JOURNAL OF BIOLOGICAL CHEMISTRY Vol. 280, No. 11, Issue of March 18, pp. 10548–10555, 2005
© 2005 by The American Society for Biochemistry and Molecular Biology, Inc. Printed in U.S.A.

# The Role of LIP5 and CHMP5 in Multivesicular Body Formation and HIV-1 Budding in Mammalian Cells*

Received for publication, December 6, 2004, and in revised form, January 10, 2005
Published, JBC Papers in Press, January 11, 2005, DOI 10.1074/jbc.M413734200

Diane McVey Ward‡, Michael B. Vaughn‡, Shelly L. Shiflett‡§, Paul L. White¶,
Amanda L. Pollock‡, Joshua Hill‡, Rachel Schnegelberger‡, Wesley I. Sundquist¶,
and Jerry Kaplan‡‖

From the University of Utah Health Sciences Center, Departments of ‡Pathology and ¶Biochemistry,
Salt Lake City, Utah 84132



Fig.4

53

4913

αCHMP5

55 ——
40 ——
33 ——
CHMP5 ——→
24 ——

54

4914

## SUPPLEMENTAL DECLARATION OF IVANA FRECH

Pursuant to 28 U.S.C. § 1746, I, Ivana Frech, hereby declare and state as follows:

1. In January 2021, leadership at Mercy Hospital, where I was employed in an administrative role at the time, tasked me with providing administrative management of the hospital's infusion center. Consequently, I became the laboratory and infusion center director.

2. After assuming this role, I observed that some patients were being denied chemotherapy because their insurance would not cover the treatment, and patients could not afford the cost out-of-pocket.

3. As administrative director, it was not a part of my duties to become involved when these denials arose because the hospital care coordinator teams and the ordering providers are the bodies involved in the peer-to-peer review process – the process in which a healthcare team discusses the need for a drug with a physician that works for the payer in order to obtain prior authorization approval or appeal a previously denied request for treatment coverage.

4. Mercy Hospital was a smaller hospital and, unfortunately, the impact of the COVID-19 pandemic had depleted hospital resources and staffing at the time. One of the consequences was that the infusion center did not have a dedicated advocate to challenge denials of insurance coverage for critical chemotherapy treatment.

5. After hearing about these coverage denials, I acted because I believed that none of our patients should be denied cancer treatment and that someone needed to advocate for them. Accordingly, I took over the peer-to-peer review process and, together with my infusion team, challenged the insurance providers' denials.

6. From when I began challenging denials until I lost my position during the transition from Mercy to the University of Iowa in January 2024, no patient was denied treatment anymore.

7. Regrettably, I have been told by former colleagues that since I was separated from my position no one has taken over this responsibility and insurance providers are again denying treatment coverage.


I declare under penalty of perjury that forgoing is true and correct.

Executed on September 25, 2024.


_____
IVANA FRECH

4915



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 240
Rockville, MD, 20852

Phone:  240-453-8200
FAX:   301-594-0043

November 8, 2024

**CONFIDENTIAL/SENSITIVE**

Ivana Frech, Ph.D.
c/o Stephen D. Tobin, J.D.
Attorney At Law
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW
Suite 725
Washington, DC 20001

TRANSMITTED VIA EMAIL TO: stobin@cohenseglias.com

RE:  ORI Case No. 2017-05; *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.)

Dear Dr. Frech:

Pursuant to the voluntary remand in *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.), ECF No. 31, this letter sets forth the Office of Research Integrity's (ORI) findings of research misconduct and the Department of Health and Human Services' (HHS) proposed administrative actions, including debarment, after review and consideration of Dr. Frech's submission and reexamination of the findings and administrative actions.

The following sets forth a summary of ORI's findings of research misconduct and HHS' proposed administrative actions. A more detailed charging document setting forth the basis for ORI's findings of research misconduct and the proposed HHS administrative actions is enclosed.

I.     <u>Summary of ORI's Findings of Research Misconduct</u>

**ORI Findings**: ORI finds that you (Respondent) intentionally and knowingly engaged in research misconduct by falsifying and/or fabricating research results in three (3) published papers funded by the U.S. Public Health Service (PHS).

Specifically, ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by

4916

CONFIDENTIAL/SENSITIVE
Dr. Ivana Frech                     ORI Case No. 2017-05                     Page 2

reusing, relabeling, and manipulating images to falsely report data in three (3) published papers.

In the enclosed charging document and the attached and incorporated exhibits, ORI has provided a detailed description of the facts and circumstances supporting its findings of research misconduct.

## II. Definition of Research Misconduct

42 C.F.R. Part 93 defines *research misconduct* as:

> fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.  (a) Fabrication is making up data or results and recording or reporting them.
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
> (d) Research misconduct does not include honest error or differences of opinion.

## III. Proposed HHS Administrative Actions

### A. Debarment

The Deputy Assistant Secretary for Acquisitions (Debarring Official), the HHS official authorized to impose debarment, has reviewed these findings and finds that the research misconduct involved in this case provides a cause for debarment under 2 C.F.R. § 180.800(d). HHS adopted and gave regulatory effect to 2 C.F.R. Part 180 at 2 C.F.R. Part 376.

The Debarring Official proposes debarring you for a period of three (3) years from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

Some of the significant consequences of debarment are:

- You will be ineligible to be a participant in a federal agency transaction that is a covered transaction (including grants and cooperative agreements); or act as a principal of a person participating in one of those covered transactions; except as provided in 2 C.F.R. §§ 180.135, 315, and 420.  *See* 2 C.F.R. §§ 180.130 and 376.995.

4917

**CONFIDENTIAL/SENSITIVE**
Dr. Ivana Frech                    ORI Case No. 2017-05                    Page 3

- You will be excluded from receiving contracts, and agencies shall not solicit offers from, award contracts to, or consent to subcontracts with you, unless the agency head determines that there is a compelling reason for such action. You also will be excluded from conducting business with the Government as an agent or representative of other contractors. *See* 48 C.F.R. §§ 9.401, 9.405.

- Your name will be placed in the "System for Award Management" (SAM), which is maintained by the General Services Administration.

**B.   Additional Administrative Actions**

It is proposed that you be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three (3) years.

It also is proposed that HHS will send a notice to the pertinent journal of the following published paper that requires retraction or correction, in accordance with 42 C.F.R. § 93.407(a)(1) and § 93.411(b):

- Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014

Sincerely,

Sheila R.
Garrity -S
Digitally signed by
Sheila R. Garrity -S
Date: 2024.11.08
07:29:41 -05'00'

*HKBrisbon*
HKBrisbon (Nov 8, 2024 12:59 EST)

Sheila Garrity, JD, MPH, MBA          H. Katrina Brisbon
Director                              Deputy Assistant Secretary for Acquisitions
Office of Research Integrity          and Suspension and Debarment Official

Enclosures

4918

<u>**THE OFFICE OF RESEARCH INTEGRITY'S AMENDED FINDINGS**</u>
<u>**OF RESEARCH MISCONDUCT AGAINST IVANA FRECH, PH.D.**</u>

The Office of Research Integrity ("ORI") makes findings of research misconduct against Ivana Frech, Ph.D. (formerly "Ivana De Domenico") ("Respondent"), former Assistant Professor in the Department of Internal Medicine in the University of Utah ("UU") School of Medicine. ORI's findings are based on evidence and findings of an investigation conducted by UU, ORI's oversight review of UU's investigation, and additional analysis conducted by ORI in its oversight review. UU submitted an investigation report to ORI (the "UU Report"), incorporated herein by reference and attached hereto as Charge Letter Exhibit ("**C.L. Ex.**") **1**.

## I.   JURISDICTION

### A.  ORI's Authority

1.     ORI has the statutory and regulatory authority to make findings of research misconduct and propose administrative actions.  *See* 42 U.S.C. § 289b; 42 C.F.R. Part 93.

### B.  Definition of Research Misconduct

2.     Under 42 C.F.R. Part 93:

> *Research misconduct* means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.
>
> (a) Fabrication is making up data or results and recording or reporting them.
>
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
>
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
>
> (d) Research misconduct does not include honest error or differences of opinion.

42 C.F.R. § 93.103.

3.     A finding of research misconduct made under 42 C.F.R. Part 93 requires that—

> (a) There be a significant departure from accepted practices of the relevant research community; and
>
> (b) The misconduct be committed intentionally, knowingly, or recklessly; and

4919

(c) The allegation is proven by a preponderance of the evidence.

42 C.F.R. § 93.104.

## C.  U.S. Public Health Service Financial Support

4.    The questioned research was supported by the following U.S. Public Health Service
      ("PHS"), National Institutes of Health ("NIH"), grants:

    a.    National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK")
      grant R01 DK070947, "Mechanism and Regulation of Iron Export by
      Ferroportin," Dr. Jerry Kaplan, Principal Investigator (P.I.), from 05/15/2005-
      06/30/2015. **C.L. Ex. 2**.

    b.    NIDDK grant R01 DK090257, "Regulation of Iron Homeostasis," Dr. Ivana De
      Domenico, P.I., from 09/30/2010-06/30/2015. **C.L. Ex. 3**.

    c.    NIDDK grant R01 DK030534, "Factors regulating the cellular uptake of iron,"
      Dr. Jerry Kaplan, P.I., from 01/01/1982-01/31/2019. **C.L. Ex. 4**.

    d.    National Institute of General Medical Sciences ("NIGMS") grant P50 GM082545,
      "Center for the Structural Biology of Cellular Host Elements in Egress,
      Trafficking, and Assembly of HIV," Dr. Wesley I. Sundquist, P.I., from
      08/27/2007-07/31/2022. **C.L. Ex. 5**.

    e.    National Institute of Allergy and Infectious Diseases ("NIAID") grant R01 AI051174,
      "Biochemistry of HIV-1 Membrane Recognition and Budding," Dr. Wesley
      Sundquist, P.I., from 02/01/2002-03/31/2022. **C.L. Ex. 6**.

    f.    National Heart, Lung, and Blood Institute ("NHLBI") grant R01 HL026922,
      "Receptor Mediated Endocytosis in Alveolar Macrophages," Dr. Jerry Kaplan,
      P.I., from 05/01/1981-05/31/2013. **C.L. Ex. 7**.

## D.  Records That Contain Falsified and/or Fabricated Research Results

5.    ORI's findings of research misconduct concern the falsification and/or fabrication of
      figures reported in the following PHS-supported published papers:

    a.    Kieffer C, Skalicky JJ, Morita E, De Domenico I, Ward DM, Kaplan J, Sundquist
      WI. Two Distinct Modes of ESCRT-III Recognition are Required for VPS4
      Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008
      Jul;15(1):62-73. Doi: 10.1016/j.devcel.2008.05.014 ("*Dev. Cell* 2008") ("Paper 11"
      in UU Report). **C.L. Ex. 8**.

    b.    De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role

of Ubiquitination in Hepcidin-independent and Hepcidin-dependent Degradation of Ferroportin. *Cell Metab.* 2011 Nov 2;14(5):635-46. Doi: 10.1016/j.cmet.2011.09.008. ("*Cell Met*. Nov. 2011") ("Paper 1" in UU Report). **C.L. Ex. 9**. Retracted: *Cell Met*. 2012 Jun 6;15(6):927. Doi: 10.1016/j.cmet.2012.04.017. **C.L. Ex. 10**.

    c.    De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J. Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion. *Cell Metab*. 2011 Jan 5;13(1):57-67. doi: 10.1016/j.cmet.2010.12.003 ("*Cell Met*. Jan. 2011") ("Paper 6" in UU Report). **C.L. Ex. 11**. Retracted: *Cell Met*. 2012 Jun 6;15(6):927. doi: 10.1016/j.cmet.2012.04.012. **C.L. Ex. 10**.

## II.   SUMMARY OF ORI FINDINGS AND HHS PROPOSED ADMINISTRATIVE ACTIONS

6.    ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers.

7.    ORI finds that these acts constitute a significant departure from accepted practices of the relevant research community. *See* 42 C.F.R. § 93.104(a).

8.    ORI finds by a preponderance of the evidence that Respondent's intentional, knowing, or reckless falsification and/or fabrication of data constitutes research misconduct within the meaning of 42 C.F.R. §§ 93.103 and 93.104.

9.    The Deputy Assistant Secretary for Acquisitions and Suspension and Debarment Official (Debarring Official) proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

10.    HHS also proposes that for a period of three (3) years, Respondent be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

11.    In addition, ORI finds that *Dev. Cell* 2008 should be retracted or corrected. *Cell Met*. Jan. 2011 and *Cell Met*. Nov. 2011 already have been retracted by the journal *Cell Metabolism*.

12.    In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes to send to the journal *Developmental Cell* a notice of ORI's findings and of the need for retraction or correction of *Dev. Cell* 2008.

## III.  FACTUAL BACKGROUND

### A.  Respondent's Background

13.    Respondent received a B.S. in biological science in 2002 from the University of Messina, Italy, and a Ph.D. in 2005 from the University of Messina.

14.    From 2005-2007, Respondent was a postdoctoral fellow in the laboratory of Dr. Jerry Kaplan, a professor in the UU School of Medicine's Department of Pathology, and from 2007-2008, Respondent was a research associate in the Kaplan laboratory. In 2008, Respondent was promoted to research assistant professor in the Department of Internal Medicine at UU.

15.    In June 2013, UU terminated Respondent's employment.

### B.  Scientific Background and Respondent's Research

16.    Iron is essential for life, but its levels must be tightly regulated in animals. Excess amounts of iron either within cells or in blood and other extracellular fluids are toxic. Regulation of iron homeostasis is important for normal physiological function, and its dysregulation is implicated in a number of diseases, including anemias.

17.    It is well established that the regulation of iron levels in human blood is controlled by two proteins, hepcidin ("HEP") and ferroportin ("FPN"). As an iron transporter, FPN is a transmembrane protein that exports iron out of cells and into the bloodstream. When HEP binds the FPN iron transporter protein, it inactivates FPN, and as a result less iron is pumped from inside cells into the blood plasma. Once FPN is internalized by the binding of HEP, it undergoes lysosomal degradation (i.e., FPN protein is broken down in a regulated manner inside the cell) such that the total concentration of the FPN protein in the cell decreases. The downregulation of FPN is dependent on proteins that mediate cell membrane remodeling through membrane budding events.

18.    Respondent's research involved studies of the molecular mechanisms of cellular iron regulation. Respondent's three papers that are the subject of ORI's findings presented seminal data on mechanisms of the regulation of FPN by HEP and ferritin, thereby adding to the body of knowledge regarding the ability of an individual to appropriately respond to changes in the environment through regulation of iron homeostasis.

### C.  Allegations and UU's Research-Misconduct Proceeding

19.    In November 2011, a complainant contacted UU's Research Integrity Officer ("RIO") and ORI with allegations of research misconduct against Respondent, including in *Cell Met*. Nov. 2011 (referenced as "Paper 1" in the UU Report) and *Cell Met*. Jan. 2011 (referenced as "Paper 6" in the UU Report).

20.    On November 8, 2011, the RIO met with Respondent and Dr. Kaplan for initial interviews. On the same day, the RIO sequestered laboratory notebooks that included autoradiography films and handwritten notes.

21.    In December 2011, UU initiated an inquiry into the allegations. The inquiry committee met with Respondent and with Dr. Kaplan to discuss the allegations.

22.    The complainant submitted additional allegations to the RIO in March, May, and June 2012, including allegations involving *Dev. Cell* 2008 (referenced as "Paper 11" in the UU Report).

23.    In April 2012, UU initiated an investigation into all of the allegations and later added the May and June 2012 allegations to its investigation.

24.    The investigation committee interviewed multiple witnesses, including Respondent, Dr. Kaplan, Dr. Diane Ward (Associate Professor in the UU Department of Pathology and a coauthor on the papers at issue), and the complainant.

25.    The committee also posed questions regarding the *Dev. Cell* 2008 allegations to Dr. Collin Kieffer and Dr. Wesley Sundquist, both in the Biochemistry Department at UU School of Medicine and coauthors of *Dev. Cell* 2008. Dr. Sundquist and Dr. Kieffer responded jointly on July 19, 2012. **C.L. Ex. 14**.

26.    On July 21, 2012, Respondent sent to the RIO an email with a letter attachment describing Respondent's responsibility for the falsification in Figure 5B of *Dev. Cell* 2008 and admitting that "a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008," and "the duplication came from me." **C.L. Ex. 13**. Drs. Sundquist and Kieffer provided a follow-up response to the investigation committee on July 26, 2012, confirming Respondent's responsibility for the falsification in Figure 5B of *Dev. Cell* 2008. **C.L. Ex. 15**.

27.    The investigation committee provided Respondent with the opportunity to comment on its draft investigation report. In her response, Respondent admitted that she "generated the figures in" *Cell Met.* Nov. 2011. **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

28.    The investigation committee issued its final investigation report (the UU Report) on December 14, 2012, recommending findings of research misconduct against Respondent in ten distinct publications and termination of Respondent's employment. **C.L. Ex. 1**.

29.    The investigation committee "found no evidence that Dr. Kaplan directly contributed to the misrepresentation or manipulation of data." **C.L. Ex. 1** at 6. It faulted him, however, for "a systematic lack of attention to detail," "inappropriate and unacceptable distance from the primary findings," "lax oversight," and "systematic failure of supervision of Dr. De Domenico." *Id.* The investigation committee noted "the conspicuous failure of all

coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication." *Id.* at 4.

30.    In January 2013, UU accepted the investigating committee's findings and recommendations. **C.L. Ex. 19**.

31.    Respondent appealed the research misconduct findings and sanctions to the UU Office of the Academic Senate. **C.L. Ex. 20**.

32.    In the Table of Admissions that she submitted during her appeal, Respondent stated, as to the figures of *Cell Met.* Nov. 2011, that "[a]ll the western blots were in one film, which was the primary problem during the preparation of figures by De Domenico." **CL Ex. 21**.

33.    As for Figure 5B of *Dev. Cell* 2008, she stated in the Table of Admissions that "Dr. De Domenico assembled the figure." *Id.*

34.    For Figure 4B of *Cell Met*. Jan. 2011, Respondent stated in the same document that "De Domenico did not work on the *final* figure, she was out of the country during the resubmission." *Id.* (emphasis added).

35.    A Consolidated Hearing Committee (CHC) panel conducted a hearing in April 2013. **C.L. Ex. 22**.

36.    The Panel did not conduct a *de novo* review of the available evidence. **C.L. Ex. 22** at 3. Instead, "[t]o simplify understanding of the record, [the Panel] constructed a table listing each paper by number along with the types of alleged irregularities, the Investigating Committee conclusions regarding the allegations, and some indication of the evidence behind those conclusions." *Id.*

37.    The Panel issued its report and recommendations in May 2013 and concluded that Respondent had engaged in research misconduct under UU policy by "reckless disregard of accepted practices." *Id.* at 1.

38.    Regarding *Cell Met.* Nov. 2011, the Panel found that Respondent's falsifications were the result of reckless disregard of accepted practices. *Id.* at 4. But the Panel did not consider her admission that she had prepared the figures.

39.    The Panel found that *Dev. Cell* 2008 "contained images that were intentionally manipulated to present false data," and that "[t]his was done by computer copying of information from one scanned image to another or in some instances by splicing of gel images to make one image." **C.L. Ex. 22** at 4. The Panel determined that it "cannot conclude that it was done by Dr. De Domenico as opposed to an unknown third person." *Id.* The Panel, however, did not address her admission she had assembled the figure.

40.    As for *Cell Met.* Jan. 2011, the Panel appeared to focus on an allegation that Respondent

had fabricated laboratory notebook pages and found that "the evidence that she fabricated notebook pages is confusing and not sufficiently persuasive of intentional falsification." *Id.* at 5.

41.    The Panel found that "[t]here was complicity in this misconduct within the laboratory that goes substantially beyond Dr. De Domenico," insofar as other coauthors should have spotted the errors in the publications. *Id.* at 6. But the Panel did not find that anyone else in the laboratory intentionally or knowingly manipulated research results or otherwise engaged in research misconduct.

42.    The CHC Panel agreed with the investigation committee's recommendation to terminate Respondent's employment or allow Respondent to resign.

43.    In June 2013, the President of UU accepted the recommendations of the CHC. **C.L. Ex. 23**.

44.    UU sent the investigation report to ORI on June 10, 2013.

## IV.    ORI'S FINDINGS OF RESEARCH MISCONDUCT

45.    ORI's Division of Investigative Oversight received the investigation report and the CHC Panel report and conducted an oversight review of the UU investigation.

46.    As part of this review, ORI conducted its own image analysis of Frech's work. **C.L. Ex. 18**. ORI also reviewed evidence that the CHC Panel did not address in its report.

47.    On September 24, 2024, Respondent wrote to the Debarring Official (the September 2024 letter) with information and argument for consideration.

48.    ORI and the SDO considered Respondent's September 2024 letter and its attachments in amending this charge letter.

49.    Based on the evidence from the UU investigation and ORI's own independent analysis, ORI made the following (6) findings of research misconduct against Respondent, finding by a preponderance of the evidence that she intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images by reusing, relabeling, and/or manipulating images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers, namely, *Dev. Cell* 2008, *Cell Met.* Nov. 2011, and *Cell Met.* Jan. 2011.

**ORI FINDING #1**:  **Respondent intentionally and knowingly falsified and/or fabricated a western blot image in Figure 5B (right bottom panel) of *Dev. Cell* 2008 by reusing and relabeling an image of three western blot bands to represent the results of different experiments.**

50.     Figure 5 of *Dev. Cell* 2008 ("Paper 11" in the UU Report) reports on research involving charged multivesicular body protein 6 (CHMP6), which mediates FPN downregulation. Figure 5 demonstrates that "silencing" CHMP6 using a silencing RNA (siRNA) strategy prevents the hepcidin-dependent downregulation through lysosomal degradation of FPN, whereas a control siRNA does not. **C.L. Ex. 8** (*Dev. Cell* 2008) at 7. Use of siRNA is a common method in cell and molecular biology to target and reduce a specific target protein to study its function.

51.     According to *Dev. Cell* 2008, Figure 5B shows western blot analyses of HEP-induced FPN-GFP[1] downregulation in human embryonic kidney 293 (HEK 293) cells in the presence of wild type and mutant CHMP6.

52.     The western blot bands in the middle panel (labeled "anti-FPN") show FPN levels in the presence of wild type ("WT") and mutant CHMP6 proteins and in the presence or absence of endogenous CHMP6.

53.     The western blot image panel in the bottom row (labeled "anti-α-Tubulin") of Figure 5B, right panel, shows six α-tubulin bands, which serve as an internal loading control to ensure that any differences in FPN levels shown in the middle row (labeled "anti-FPN") are due to a biological process and not differences in total protein loaded across lanes.

54.     In the bottom-right western blot image panel corresponding to the α-tubulin loading control in published Figure 5B (CHMP6 siRNA + FPN-GFP tubulin loading control), the image of the three bands in lanes 7-9 is identical to the image of the three bands in lanes 10-12. Thus, the image of α-tubulin bands in lanes 7-9 was duplicated, spliced into a composite image, and relabeled to represent different α-tubulin bands in lanes 10-12. *See* **C.L. Ex. 18** (ORI Image Analysis) at 1-2.

55.     Falsification and/or fabrication of loading controls is significant because loading controls validate the amount of protein in each lane. Changes reported in the protein of interest (FPN) could result from unequal loading of sample in each lane or other technical issues, as opposed to the proposed regulatory mechanism of protein targeting and degradation.

56.     Respondent created the composite image containing the duplicated α-tubulin bands. *See* **C.L. Ex. 13** (July 21, 2012, Respondent email and attached letter to Botkin (stating that

---

[1] Green fluorescent protein ("GFP") is a protein tag commonly attached to a protein of interest in molecular biology. The tag allows a researcher to distinguish FPN introduced into the cell from the naturally occurring FPN and visualize FPN expression under different conditions using traditional techniques in biochemistry, molecular biology, and microscopy.

"a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008" and that "the duplication came from me")); **C.L. Ex. 14** (July 19, 2012, Kieffer & Sundquist Letter to Botkin); **C.L. Ex. 15** (July 26, 2012, Kieffer and Sundquist Letter to Botkin); **C.L. Ex. 16** (Nov. 12, 2013 Kieffer and Sundquist letter to Dahlberg).

57.     It is implausible that the reuse and relabeling of the image is attributable to honest error rather than intentional and knowing falsification and/or fabrication because the duplication occurred within an image panel and thus involved splicing two images together to make a composite image of six bands in a row.

58.     Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

59.     In her September 2024 letter, Respondent claims that she "was not personally responsible for Figure 5B." Sept. 24, 2024 Letter at 9.

60.     She acknowledges that the CHC panel found the manipulation in this figure to have been intentional and does not contest this finding. *Id.*

61.     Respondent points to the CHC Panel's statement that "we cannot conclude that it was done by Dr. De Domenico as opposed to an unknown third person." Sept. 24, 2024 Letter at 9 (quoting CHC report at 4, 5 ("As stated above, the CHC Panel cannot find that Dr. De Domenico was responsible for the intentional manipulation in Paper 11")).

62.     The CHC, however, did not address either Respondent's admissions in her July 12, 2012, email to the RIO or in her April 2013 appeal papers, whereas ORI weighed this evidence in concluding that Respondent was the one who intentionally and knowingly manipulated the image.

63.     Respondent claims that she "sent that [July 12, 2012] communication to the RIO at Dr. Wesley Sundquist's request . . . because he threatened to fire Dr. Frech if she did not do so." Sept. 24, 2024 Letter at 9. However, months later, in her April 2013 appeal to the CHC panel, Respondent reaffirmed that she "assembled the figure" in *Dev. Cell* 2008. **C.L. Ex. 21** (Table of Admissions).

64.     Respondent also claims:

> ORI's conclusion ignores the context of the quoted text for the latter quote; Dr. Frech wrote that she "believe[d] that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist [sic] shows already the error." See AR 763 (emphasis added). Importantly, Dr. Frech also stated that "[a]ccording to the emails and notes some of the western blots and data quantification should be

in Dr. Kieffer's notebook. However, Dr. Sundquist this morning verbally communicated that Dr. Kieffer does not have the western blots and he might have the quantification analysis." See id. Furthermore, Dr. Frech also wrote that the March 3, 2008 email indicates that Dr. Kieffer came to Dr. Kaplan's lab and took some of the results, with "[a]ll repeats and the correct tubulin western blots still in our notebook. It is missing only the films w[h]ere the duplication is coming from." See id. In short, even if Dr. Frech was correct that she sent a duplicated image to Drs. Kieffer and Sundquist, none of the evidence—including her statement in the email—suggests that she had deliberately or intentionally manipulated the image; only that she is the one who sent the image to them.

Sept. 24, 2024 Letter at 9-10. Whether Dr. Kieffer at some point possessed the western blot films for scanning and quantification of the proteins in the blot has no bearing on Respondent's culpability for the image duplication in the figure, as scanning western blot films for quantification does not change the raw image and is not part of figure assembly.

65.    Respondent asserts: "During the UU investigation, UU's IT Department conducted a forensic analysis of Dr. Frech's computers. This review, requested by the Investigation Committee, found no evidence that Dr. Frech had manipulated or destroyed any files or data. See, e.g., Attachment 10, Frech CHC Hearing Presentation at p. 7. These facts were discussed during the CHC hearing, the audio recording of which is in the administrative record." Sept. 24, 2024 Letter at 10. Respondent misrepresents what the Investigation Report quote on page 7 of Respondent's presentation (Attachment 10) actually states, namely: "The committee also asked the Universtiy [sic] Information Technology Office to scan the forensic copy of Dr. De Domenico's desktop computer drive, specifically asking the staff to identify Excel and SigmaPlot files that had been deleted in the previous year. The staff was unable to find evidence of such files." Excel and SigmaPlot files are not at issue in Figure 5B of *Dev Cell* 2008 and instead relate to findings that ORI did not make. Thus, this statement is irrelevant to ORI's finding regarding Respondent's falsification and/or fabrication of Figure 5B of *Dev Cell* 2008. Moreover, the Investigation Report does not state that the UU IT Department found no evidence that Respondent had manipulated or destroyed any files or data.

66.    Respondent intentionally and knowingly falsified and/or fabricated the bottom right panel in Figure 5B of *Dev Cell* 2008.

67.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #2**:  **Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figure 1C (top and bottom panels) of** *Cell Met.* **Nov. 2011 by reusing and relabeling an image of western blot bands to represent the results of two different experiments.**

68.     *Cell Met.* Nov. 2011 proposes a second mechanism of FPN inactivation that does not require the hormone HEP. **C.L. Ex. 9.** The model reported in the paper proposes that this second HEP-independent mechanism involves the direct "sensing" of internal cellular iron levels, presumably by the FPN protein itself. In the model proposed in the paper, FPN becomes internalized inside the cell when iron levels inside the cell are low (iron is required for cellular processes within the cell). This result would constitute a very important finding for the field of iron regulation and human physiology because the requirement for HEP in iron regulation is so well established.

69.     Figure 1C of *Cell Met.* Nov. 2011 supports the paper's hypothesis that depletion of iron within the cell leads to HEP-independent FPN degradation. **C.L. Ex. 9** at 3. In Figure 1C, Respondent engineered HEK 293 cells to express FPN protein that was fused with a GFP tag. In the western blot results shown in Figure 1C: lane 1 indicates cells without iron (ferric ammonium citrate, or "FAC") supplementation for 18 hrs; lane 2 indicates cells without iron (FAC) supplementation for 36 hrs; and lane 3 shows cells supplemented with iron (FAC) for 36 hrs. As would be expected by the model, the amount of FPN on the plasma membrane ("PM") (therefore able to transport iron out of the cell) goes away after depriving the cells of iron for 36 hrs (lane 2). According to both the original HEP-dependent and new HEP-independent models, the FPN transporter would be expected to be internalized inside the cell when iron levels are low.

70.     Figure 1C, top right panel, shows a western blot analysis of affinity-purified samples and the flow through from FPN-GFP-expressing cells in the presence of and absence of FAC or DFX.[2]  The western blot bands show the amount of FPN retained in the PM (in the "PM" row) versus the amount of FPN inside the cell's cytoplasm (in the "FT," or flow through, row) after removal (lanes 1 and 2) or supplementation (lane 3) with FAC or treatment with DFX.

71.     The top row, labeled "PM," in Figure 1C of *Cell Met.* Nov. 2011 is an image of western blot bands showing the amount of FPN retained in the PM with or without FAC at certain time intervals, or without FAC but with DFX treatment (lane 4). The bottom row, labeled "FT," is an image of western blot bands showing the amount of FPN inside the cell's cytoplasm under the same experimental conditions.

72.     Respondent reused and relabeled the same image of four western blot bands in the top and bottom panels. In particular, the image of the bands in lanes 1-4 in the upper panel

---

[2] Deferasirox (DFX) is a strong iron chelator, i.e., it renders nearly all iron unavailable in a biological context. Therefore, with DFX treatment, one would hypothesize that nearly all detectable FPN would be internalized (as shown in the FT subpanel lane 4), as iron levels are scarce and the cell would conserve internal supplies.

("PM"), representing FPN-GFP found in the PM, is a copy, flipped horizontally, of the image of the bands in lanes 1-4 in the lower panel ("FT"), representing FPN-GFP found in the flow through. *See* **C.L. Ex. 18** (ORI Image Analysis) at 3-4.

73.    Respondent is the first author of *Cell Met.* Nov. 2011.

74.    Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

75.    Respondent knowingly and intentionally duplicated and horizontally flipped the western blot bands in both PM and FT rows to show ideal results, strongly supporting Respondent's hypothesis, in which all of the FPN protein was completely accounted for in either the PM or internal cytoplasmic (FT) fractions.

76.    Respondent would have understood that in a perfect experimental system, the total amount of FPN in Respondent's experiments would be expected to be: FPN (TOTAL) = FPN on PM + FPN inside the cell (FT). For example, in lanes 2 and 3, the intensity of each protein band (PM + FT) ideally would sum to account for all FPN in the cell. There are many steps in this biochemical assay, including purifying out the protein by binding it to affinity beads (leading to some protein loss) and then eluting the protein off the beads (also leading to some protein loss) for the western blot. As some protein loss is unavoidable at nearly all these steps, ideal results could not be achieved without knowing and intentional falsification and/or fabrication.

77.    The manipulation of the copied western blot bands also shows that the falsification and/or fabrication is attributable to intentional and knowing conduct rather than honest error or mere recklessness.

78.    Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or recklessness only.

79.    Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

80.    ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

81.    First, ORI found that Respondent's manipulation of images involved affirmative acts such as duplication and flipping, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

82.    Second, the manipulated results always supported Respondent's scientific hypotheses.

83.    Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

84.    These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

85.    Respondent intentionally and knowingly falsified and/or fabricated Figure 1C (top right panel) of *Cell Met.* Nov. 2011.

86.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #3**:  **Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figures 1D and 3 of *Cell Met.* Nov. 2011 by reusing and relabeling one image to represent the results of two different experiments.**

87.    According to *Cell Met.* Nov. 2011, Figure 1D shows that FPN is targeted for degradation in HEK 293 cells by modifying the amino acid lysine at position 253 through a process known as ubiquitination. **C.L. Ex. 9** at 3. Ubiquitination is a protein modification that specifically occurs on lysine (abbreviated as "K") amino acid residues in proteins that can signal that protein for targeted degradation. By reporting equal FPN-GFP levels in the western blot image of the right panel of Figure 1D, Respondent showed that lack of a ubiquitin band in the K253A (i.e., lysine substituted for an alanine (A) that cannot be modified) column was not attributed to different FPN protein expression or recovery levels, but rather that the specific lysine at amino acid 253 was modified.

88.    According to *Cell Met.* Nov. 2011, Figure 3 shows that the enzyme Nedd4-2 is required for the internalization and degradation of FPN-GFP in HEK 293 cells genetically engineered to stably express the FPN-GFP gene (Figure 1D shows HEK 293 cells that do not have this genetic modification). Figure 3 represents a different experiment that claims to identify the specific ubiquitin ligase (i.e., the protein enzyme that adds the ubiquitin to the lysine) as Nedd4-2. **C.L. Ex. 9** at 5. In Figure 3, Respondent alleges that depletion of the Nedd4-2 enzyme in lane 4 prevents internalization of FPN-GFP in the presence of hepcidin.

89.    Respondent reused and relabeled FPN-GFP western blot bands in Figure 1D to also represent GFP western blot bands in Figure 3 (lanes 3 and 4). In particular, the lower right blot image panel (labeled GFP and treated with DFX) in Figure 1D is identical to the blot image in the last two lanes of the middle panel (Nedd4-2 column) in Figure 3 (labeled GFP and treated with or without HEP) after cropping out lanes one and two. *See* **C.L. Ex. 18** (ORI Image Analysis) at 5-6. Therefore, Respondent reused and relabeled control data in Figure 1D to also represent key experimental results from a different experiment to claim to identify the specific enzyme (Nedd4-2) required for FPN-GFP

ubiquitination, internalization, and subsequent degradation. Thus, the same western blot images in Figures 1D and 3 were used to represent results from different experiments using different cell lines -- one an unmodified cell line and one cell line genetically modified with FPN-GFP stable gene integration.

90.  Respondent is the first author of *Cell Met.* Nov. 2011.

91.  Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

92.  The image manipulation (cropping of the larger image to create the smaller image) shows that the image reuse and relabeling was not honest error or even mere recklessness, but rather knowing and intentional falsification and/or fabrication.

93.  Moreover, this falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

94.  Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

95.  ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

96.  First, ORI found that Respondent's manipulation of images involved affirmative acts such as duplication and cropping, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

97.  Second, the manipulated results always supported Respondent's scientific hypotheses.

98.  Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

99.  These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

100.  Respondent intentionally and knowingly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figure 1D and Figure 3 of *Cell Met.* Nov. 2011.

101.  Respondent's falsification and/or fabrication constitutes a significant departure from

accepted practices of the relevant research community.

**ORI FINDING #4**:  **Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figures 2Aii and 2B of *Cell Met.* Nov. 2011 by reusing and relabeling one image as representing the results of two different experiments.**

102.    According to *Cell Met.* Nov. 2011, Figure 2Aii purportedly shows that Nedd4-2 is the specific enzyme (ubiquitin ligase) responsible for FPN internalization and degradation. **C.L. Ex. 9** at 4. Nedd4-2 is a family member of ubiquitin ligases previously known to regulate ion channels, so Respondent hypothesized that the FPN iron ion transporter would be regulated by a similar mechanism.

103.    In Figure 2Aii, Respondent purportedly shows that FPN-GFP is internalized 36 hours after expressing the protein in HEK 293 cells (compare band intensity in column 1, lane 1 (N.S. 18h) with column 3, lane 1 (N.S. 36h)). However, when the cells are depleted of the Nedd4-2 ubiquitin ligase using siRNA, FPN-GFP was not degraded (compare band intensity in column 2, lane 1 (Nedd4-2 18h) with column 4, lane 1 (Nedd4-2 36h)). Therefore, these results support that Nedd4-2 is required for FPN internalization under normal conditions (i.e., iron levels were not manipulated in this experiment).[3]

104.    According to *Cell Met.* Nov. 2011, Figure 2B shows that Nedd4-2 depletion prevents cells from internalizing FPN during iron depletion (DFX treatment). **C.L. Ex. 9** at 4. Therefore, these results support that Nedd4-2 also is required for appropriate FPN regulation when iron levels are low (versus Figure 2Aii, which shows Nedd4-2 degradation under normal iron conditions).

105.    The two panels in the upper row of Figure 2Aii purportedly represent HEK 293 cells that have expressed FPN-GFP for 18 hours (left panel) or 36 hours (right panel). These cells allegedly were treated either with a non-targeting control siRNA or Nedd4-2 specific siRNA.

106.    The two panels in the upper row of Figure 2B purportedly represent HEK 293 cells that have expressed FPN-GFP and were treated with a non-targeting control siRNA or Nedd4-2 specific siRNA just as in Figure 2Aii. However, in Figure 2B the cells purportedly were treated with DFX (+, right panel) or served as controls (-, left panel). DFX strongly binds to iron and makes it unavailable to the cells. Therefore, Figure 2B supports the model that Nedd4-2 also is required for FPN degradation when cells experience low levels of iron.

107.    The image of the western blot bands in the top right panel of Figure 2Aii is a copy of the image of the western blot bands in the top right panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 7.

---

[3] The samples purportedly separated into two fractions: plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic). FPN identified in the FT fraction presumably represents internalized FPN.

108.   The image of the western blot bands in the top left panel of Figure 2Aii is a copy, flipped horizontally, of the image of the western blot bands in the top left panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 8.

109.   Thus, the same western blot images are used to represent different experimental treatments.

110.   Respondent is the first author of *Cell Met.* Nov. 2011.

111.   Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

112.   It was not honest error but rather knowing and intentional falsification and/or fabrication because the top left panel in Figure 2Aii was copied, flipped horizontally, and relabeled to represent a different experiment in Figure 2B. Additionally, the corresponding bottom panels for both figures are from different source images.

113.   Further, the corresponding FT panels are different but support the expected outcome for the different illustrated experiments. For example, the FPN-GFP internalization shown in Figure 2B (FT) purports to demonstrate impressively that no detectable FPN is internalized during iron depletion when Nedd4-2 is absent. Also, the falsification and/or fabrication supports the authors' hypothesis that Nedd4-2 is the specific ubiquitin ligase that targets FPN for degradation. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error or recklessness.

114.   Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

115.   Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

116.   ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

117.   First, ORI found that Respondent's manipulation of images involved affirmative acts, namely, duplication and flipping, which are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

118.   Second, the manipulated results always supported Respondent's scientific hypotheses.

119.   Third, Respondent's behavior was part of a broad pattern of manipulation across multiple

papers.

120.    These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

121.    Respondent intentionally and knowingly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figures 2Aii and 2B of *Cell Met.* Nov. 2011.

122.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #5**:  **Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figures 2Aii and 5 of *Cell Met.* Nov. 2011 by reusing and relabeling one image as representing the results of two different experiments.**

123.    According to *Cell Met.* Nov. 2011, Figure 5 shows that treatment of cells with zinc maintains FPN on the PM, thereby partially blocking FPN-GFP internalization and subsequent degradation. **C.L. Ex. 9** at 7. This result supports the authors' hypothesis that FPN can transport other metal ions in addition to iron (Fe), specifically manganese (Mn) and zinc (Zn).

124.    *Cell Met.* Nov. 2011 Figure 2Aii, in contrast, shows a different experiment. As previously described in Finding #4, Figure 2Aii tests the authors' hypothesis that the internalization of the FPN-GFP iron transporter is regulated by the ubiquitin ligase Nedd4-2 under normal conditions. The western blot depicted in Figure 2Aii purportedly demonstrates that depletion of Nedd4-2 in HEK 293 cells prevents the normal internalization of FPN-GFP. Therefore, the results presented in Figure 2Aii, if true, would have provided important insight into the normal regulation of the FPN iron transporter.

125.    In the upper image panel in Figure 5, the top panel was labeled as FPN-GFP from the "PM," for plasma membrane. The samples purportedly were separated into two fractions: plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic).

126.    In the lower left image panel in Figure 2Aii, the bottom left panel was labeled as FPN-GFP from the "FT."

127.    The first and second lanes in the lower left panel in Figure 2Aii are identical to the two right lanes (+DFX and +ZnSO$_4$/+DFX) in the upper panel in Figure 5. The image in Figure 2Aii is flipped horizontally and has a lighter contrast than the identical image in Figure 5. *See* **C.L. Ex. 18** (ORI Image Analysis) at 9.

128.    Thus, the same image was used by Respondent to support both a model where FPN is degraded under normal iron conditions in Figure 2Aii and a different model in Figure 5, notably that FPN is promiscuous and also binds zinc (Zn) in addition to its well-

established iron (Fe) binding partner.

129.    Thus, the same western blot images were used to represent results from different, unrelated experiments.

130.    The manipulation (flipping and contrast adjustment) of the duplicated images shows that the falsification and/or fabrication was knowing and intentional rather than honest error.

131.    The results as presented in Figure 5 support the authors' hypothesis that FPN is promiscuous for other positive metal ions. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error. The falsifications and/or fabrications provide a more-detailed understanding of the regulation of FPN, thereby increasing the overall novelty and impact of this study in the field of iron physiology.

132.    Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

133.    Respondent is the first author of *Cell Met.* Nov. 2011.

134.    Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

135.    Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

136.    ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

137.    First, ORI found that Respondent's manipulation of images involved affirmative acts namely, duplication, flipping and contrast adjustment, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

138.    Second, the manipulated results always supported Respondent's scientific hypotheses.

139.    Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

140.    These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

141.    Respondent intentionally and knowingly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figures 2Aii and 5 of *Cell Met.* Nov. 2011.

142.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #6**:  **Respondent intentionally and knowingly falsified and/or fabricated images in Figure 4B (top and bottom left panels) of *Cell Met.* Jan. 2011 by reusing and relabeling an image of an autoradiogram to misrepresent the reported experimental conditions and results.**

143.    *Cell Met.* Jan. 2011 ("Paper 6" in the UU Report) examined the synthesis and subsequent intracellular trafficking of ferritin in response to changes in cytosolic iron concentration. The reported experiments involved synthesizing a protein in a test tube (in vitro) and in the presence of the radioactively labeled amino acid methionine ($^{35}$S-methionine). The relative abundance and molecular weight of the resulting protein under different treatment conditions was determined by isolating the (radioactive) protein of interest, subjecting the sample to gel electrophoresis, and imaging by autoradiogram (X-ray film exposed to the radioactive protein samples). Like a western blot, the intensity of the resulting bands correlates with protein abundance.

144.    According to *Cell Met*. Jan. 2011, the results reported in Figure 4 demonstrate that iron depletion induces ferritin secretion. **C.L. Ex. 11** at 5. Figure 4B purportedly shows autoradiograms of ceruloplasmin[4] protein recovery under different experimental conditions, including the presence or absence of Endo H (an enzyme that removes a specific sugar modification from proteins), iron (Fe), the protease PK, and the strong detergent Triton.

145.    The top left image panel of Figure 4B reported the results of experiments without treatment with Endo-H ("- Endo H") and without iron treatment ("-Fe").

146.    The bottom left image panel of Figure 4B reported the results of experiments without Endo H ("- Endo H") and with iron treatment ("+Fe").

147.    Respondent's laboratory notebook contained a labeled film of an autoradiogram. **C.L. Ex. 17** (nb_6_4B-1.tif). The autoradiography film is labeled with Respondent's initials ("IDD"). *See id.*

148.    The autoradiography film from the laboratory notebook shows the same sets of bands that appear in the left two image panels in Figure 4B but flipped.

---

[4] Ceruloplasmin is an enzyme important in copper and iron transport. Low levels of ceruloplasmin in the blood can have adverse health effects and are often indicative of liver disease.

149.    Specifically, Figure 4B's top left image panel shows bands in lanes labeled -Endo H / -Fe. The same set of bands appears on the right-hand side of the autoradiogram in lanes labeled +Endo H / +Fe but flipped horizontally. *See* **C.L. Ex. 18** (ORI Image Analysis) at 10-11.

150.    Thus, identical images were labeled differently to represent different experimental conditions (with or without Endo H and with or without iron) in the Figure 4B top left panel and the autoradiogram.

151.    Figure 4B's bottom left image panel shows a set of bands that also appears on the left-hand side of the autoradiogram, in lanes labeled -Endo H / +Fe, but flipped both horizontally and vertically, i.e., around both the x and y axes.

152.    In response to the inquiry committee's finding that the lower left panel of Figure 4B was flipped compared to the original film, Respondent stated: "The committee is correct that the panel was flipped around the vertical axis BUT represents the lanes as published." **C.L. Ex. 1** at 33.

153.    However, the protein standards or molecular weights marked on the film are critical in interpreting whether the Endo-H treatment cleaved off the hypothesized glycosylation modification. If cleaved, the band would run at a smaller molecular weight since the glycosylation modification. If not cleaved, it would add mass to the protein. Alternatively, if ceruloplasmin is not glycosylated, the band would run at the same size as a band not treated with Endo-H. Thus, inversion of the image misrepresents the molecular weight and the overall conclusion that the ceruloplasmin protein undergoes a glycosylation modification.

154.    The bands as reported in Figure 4B's bottom left image panel do not match the conditions and molecular weight represented in the X-ray film for those bands. The images in Figure 4B and the autoradiogram report different conditions and protein masses under those specific conditions.

155.    The falsification and/or fabrication was intentional and knowing and did not result from honest error. The bands in the lower left panel of Figure 4B were flipped vertically and horizontally. Inadvertent, vertical flipping of both the right- and left-hand sets of bands in the film would not lead to the bands in the bottom left image panel to be selectively flipped horizontally.

156.    Moreover, both the right- and left-hand sets of bands in the film were labeled as deriving from experiments with iron treatment. Inadvertent flipping of the images in the film around the vertical axis would not have changed that labeling. However, in Figure 4B's top left image panel, the image of bands from the autoradiogram is shown in lanes labeled "-Fe." *See* **C.L. Ex. 18** (ORI Image Analysis) at 12-13. Thus, Respondent's honest error and recklessness arguments are not credible.

157. If only inadvertent flipping had occurred, the molecular weight markers shown in the bottom left and right image panels would have corresponded to the markers in the film, as flipping around the vertical axis would not have changed the molecular markers' positions on the vertical axis. The bands as reported in the figure do not match the conditions and molecular weight represented in the X-ray film.

158. The paper's authors hypothesized that ceruloplasmin is modified by glycosylation. The falsified and/or fabricated images in Figure 4B support this hypothesis. This is significant, as additional insight into this regulatory process increases the understanding of iron regulation and overall impacts the field of iron physiology. However, Respondent's autoradiogram indicated no difference in the molecular weight of ceruloplasmin when treated with Endo H, which would fail to support this hypothesis and reduce the novelty of the research findings in Figure 4B.

159. Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

160. Respondent is the first author of *Cell Met.* Jan. 2011.

161. The autoradiography film in Respondent's laboratory notebook corresponding to Figure 4B of *Cell Met.* Jan. 2011 is labeled with Respondent's initials ("IDD"). **C.L. Ex. 17** (nb_6_4B-1.tif).

162. The manipulation is similar in kind to the specific types of manipulation in images and figures that Respondent has admitted she generated.

163. Respondent stated in her Table of Admissions that she "did not work on the *final* figure, she was out of the country during the resubmission." **C.L. Ex. 21** (emphasis added).

164. Respondent's artful denial of working on the final figure conspicuously avoids stating that she had a role before that in creating the figure prior to resubmission. This, along with the ambiguity of "final," is evidence that she assembled the figure at an earlier stage and simply did not conduct the final review prior to resubmission. This is especially so as her statement with respect to Figure 4B is in contrast to her statements for other papers in the same Table of Admissions that she prepared figures (without specifying whether they were final).

165. The CHC Panel appeared to focus on an allegation that Respondent had fabricated laboratory notebook pages, the evidence of which it found "confusing." *Id.* at 5. ORI, however, makes a finding on Respondent's falsification and/or fabrication of the figure in *Cell Met.* Jan. 2011, and thus, the Panel's confusion is not relevant to ORI's finding.

166.    Respondent intentionally and knowingly falsified and/or fabricated Figure 4B of *Cell Met.* Jan 2011 (UU Report "Paper 6").

167.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

168.    The HHS SDO would find the same period of debarment appropriate even if Respondent were not responsible for the falsification and/or fabrication in Figure 4B of *Cell Met.* Jan. 2011.

## V.    PROPOSED HHS ADMINISTRATIVE ACTIONS

169.    Under 42 C.F.R. § 93.408, HHS considered aggravating and mitigating factors in determining appropriate HHS administrative actions and their terms. The HHS Debarring Official also considered factors in 2 C.F.R. § 180.860 in determining to debar Respondent and the length of Respondent's debarment period.

### A.  Debarment

170.    The information in this charge letter indicates that Respondent lacks the present responsibility to participate federal government procurement and nonprocurement programs.

171.    The information from this record provides cause for debarment provided in 2 C.F.R. § 180.800(d): "Any other cause of so serious or compelling a nature that it affects your present responsibility."

172.    Debarment is generally for a period not to exceed three years. 2 C.F.R. § 180.865(a).

173.    Based on the preponderance of the evidence supporting the ORI findings of research misconduct stated herein, the HHS Debarring Official proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

### 1.  Research Misconduct is a Cause for Debarment

174.    Respondent's falsification and/or fabrication as set forth in this charge letter constitutes research misconduct under 42 C.F.R. Part 93.

175.    The purpose of debarment is to protect the federal government from an individual who has proven to be untrustworthy. *See Kimon J. Angelides*, DAB No. 1677 (1999).

176.    Moreover, the policy underlying debarment is that the federal government should conduct business only with responsible contractors and grantees. *See Dr. Paul F. Langlois*, DAB No. 1409 (1993), 1993 WL 742594 (DAB May 6, 1993).

177. The HHS Departmental Appeals Board has held that "[t]he scientific community functions on trust and openness; once that trust is breached, the harm from incidents of fabrication and falsification of data is far greater than simply discrediting the work known to be false or fabricated." *Id.*

178. Respondent's intentional, knowing, or reckless research misconduct establishes a lack of trustworthiness and is so serious and compelling in nature that it demonstrates a lack of present responsibility to be a steward of federal funds. 2 C.F.R. § 180.800(d).

## 2. Respondent Lacks Present Responsibility

179. In her September 2024 letter, Respondent argues that she is presently responsible.

180. But Respondent never took responsibility for her knowing and intentional research misconduct that is at issue in this case. In her September 2024 letter, Respondent refers to "the several occasions on which Dr. Frech expressed regret over the situation," but these expressions were only that she "made mistakes" that were "unintentional." Sept. 24, 2024 Letter at 4.

181. Even today, Respondent continues to deny that she committed knowing and intentional misconduct. In fact, she expressly "contends that those mistakes were not intentional or done knowingly" and that "reckless laboratory-wide practices led to the publication of incorrect research images." Sept. 24, 2024 Letter at 2. In Respondent's September 23, 2024, declaration, appended to her September 2024 letter, she states that "mistakes were made" and that she "accept[s] responsibility for them," that she "regret[s] that these mistakes detracted from the hard work that everyone involved in the research at the University of Utah put into our work. The mistakes made in Dr. Kaplan's lab diminished those efforts and for that I am sorry." Frech Decl. ¶ 12. But she does not state that she was the one who falsified and/or fabricated the figures and does not admit that her "mistakes" were intentional and knowing falsification or fabrication.

182. These statements are far from accepting responsibility for the intentional and knowing research misconduct that is the subject of this charge letter.

183. According to her September 24, 2024, letter, Respondent's most recent position as a hospital administrator at Mercy Hospital, which she states she held from May 2020 through January 2024, "did not involve any research whatsoever." However, based on the responsibilities of the position listed in her letter, the position appeared to include responsibilities adjacent to covered transactions. The letter also states that Dr. Frech wishes to return to this position, and thus, she still presents a risk.

184. Thus, the SDO does not find Respondent presently responsible.

## 3. Aggravating and Mitigating Factors

4941

185.    As discussed above, Respondent's actions were knowing and intentional. 42 C.F.R. §
        93.408(a).

186.    Respondent solely planned, initiated, and carried out the wrongdoing. 2 C.F.R. §
        180.860(f).

187.    Respondent claims that UU determined that she was not solely responsible for the errors.
        Sept. 24, 2024 Letter at 8. However, this mischaracterizes the evidence in the record,
        which does not show that anyone else contributed to her intentional and knowing
        research misconduct in the three papers at issue. Although the UU investigation
        committee found that Dr. Kaplan, as the laboratory's leader, was lax in his oversight of
        and systematically failed in supervising Respondent, it also "found no evidence that [he]
        directly contributed to the misrepresentation or manipulation of data." **C.L. Ex. 1** at 6.
        The investigation committee "[wa]s also struck by the conspicuous failure of all
        coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before
        publication." *Id.* at 4. The fact that Dr. Kaplan was lax in his oversight and that Drs.
        Ward and Kaplan should have caught Respondent's falsifications and/or fabrications does
        not render them culpable for, or mean that they assisted Respondent plan, initiate, or
        carry out, her research misconduct. Indeed, Respondent does not claim, and ORI found
        no evidence, that anyone else assembled the figures that are the subject of ORI's findings
        or otherwise intentionally falsified or fabricated those figures. And the UU investigation
        revealed no evidence indicating that anyone else was responsible for committing the
        research misconduct found by ORI.

188.    In her September 2024 letter, Respondent also claims:

        > Furthermore, UU's investigation expressly disclaimed engaging in any review of
        > publications arising from Dr. Kaplan's lab for which Dr. Frech was not a
        > coauthor. See Final UU Investigation Report at AR 968. This is important
        > because, as Dr. Frech demonstrated during the CHC hearing, other publications
        > from Dr. Kaplan's lab for which she was not an author and had no role in the
        > underlying research contained the same sort of errors as those at issue in the
        > allegations against her. See Attachment 9, Examples of Other Kaplan Papers with
        > Errors.

        Sept. 24, 2024 Letter at 8. The concerns that Respondent raised for the first time at her
        CHC appeal and listed in Attachment 9 to her September 2024 letter are not directed at
        the research misconduct findings that ORI made and its conclusion that Respondent alone
        committed the falsifications and/or fabrications at issue in these particular ORI findings.

189.    Even if Respondent were not solely responsible for committing the research misconduct
        found by ORI, this would not affect the proposed three-year debarment term.

190.    Respondent's research misconduct was not an isolated event but rather was a pattern that

occurred over the course of several years in three (3) PHS-supported papers. 42 C.F.R. § 93.408(b); *see also* 2 C.F.R.§ 180.860(b) (frequency of incidents and/or duration of the wrongdoing).

191.    Respondent's research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare. 42 C.F.R. § 93.408(c); *see also* 2 C.F.R. §180.860(a) (Respondent's misconduct resulted in actual and potential harm or impact that resulted and may result from Respondent's wrongdoing.).

192.    Research misconduct undermines the integrity of the scientific community and can lead to severe and irreparable harm. The consequences of research misconduct include losing public trust in science; wasting of public funds and resources; harming the research record; distorting the research process; and even adversely impacting public health and safety.

193.    Respondent's falsified and/or fabricated research results were included in three (3) PHS-supported published papers and utilized funds that PHS otherwise could have spent on research that was not falsified or fabricated.

194.    Respondent's falsifications and/or fabrications led to retraction of two (2) published papers and ORI's finding that an additional paper should be retracted or corrected.

195.    Chronic dysregulation of iron in blood plasma leads to anemia (low plasma iron) or tissue damage and serious inflammation (high plasma iron). Specifically, the HEP/FPN regulatory axis is targeted in both the diagnosis and treatment of various iron disorders. Respondent's proposed new mechanism for inactivating FPN, particularly in a HEP-independent manner, would have been considered a significant and exciting finding in the field on which other basic and clinical researchers would and/or did follow up. Thus, Respondent's fabricated and/or falsified research papers led to waste of valuable time and resources.

196.    According to Web of Science™, an index of metrics based on international citation activity of science journals, books, and scientific proceedings reflects that, as of April 19, 2023, Respondent's three affected papers have been cited by others a total of 142 times in the scientific literature.

197.    As discussed above, Respondent failed to accept responsibility for her misconduct and failed to recognize the seriousness of her misconduct. 42 C.F.R. § 93.408(e); 2 C.F.R. §180.860(g). Respondent's September 24, 2024, letter states "the administrative record reflects that Dr. Frech, on a number of occasions, did express remorse for what happened and acknowledged that she had made mistakes, although she contends that those mistakes were not intentional or done knowingly." However, Respondent has not sufficiently accepted responsibility for the research misconduct that is at issue in this case. ORI determined that Respondent's research misconduct was knowing and intentional. Respondent continues to maintain that she did not falsify and/or fabricate the figures, and she does not admit that her

"mistakes" were intentional and knowing falsification or fabrication.

198.  As a mitigating factor, Respondent cooperated with the institution's research-misconduct proceeding. Respondent also admitted to the creation of certain figures and the duplication of one of the images in question. 42 C.F.R. § 93.408(e); 2 C.F.R. §180.860(i).

199.  Due to the large and growing volume of ORI's responsibilities relative to its staffing levels, some time has elapsed since Respondent committed her research misconduct. Respondent cites *Roemer v. Hoffmann*, 419 F. Supp. 130, 132 (D.D.C. 1976), and *Silverman v. U.S. Dep't of Defense*, 817 F. Supp. 846, 849 (S.D. Cal. 1993), to support her argument that the length of time between the misconduct and a debarment action is a factor that the debarring official is to consider. Although *Roemer* lists, among various factors that should be considered in that case, "the length of time which had passed since the offense and since the conviction," it certainly does not state that the length of time is dispositive, only that it should be considered. In *Silverman*, the government admitted that it did not consider mitigating factors such as the government's continuing to enter into contracts with plaintiffs for six years after the events that gave rise to the debarment action, and the plaintiff's motivation in pleading guilty. 817 F. Supp. at 849. Under 2 C.F.R. § 180.860(s), HHS considered the length of time elapsed, but found, on balance, that debarment was still appropriate because of countervailing factors discussed in this charge letter, including Respondent's failure, even today, to accept responsibility for and recognize the seriousness of her misconduct.

200.  In her September 2024 letter, Respondent describes a number of her activities in the years since UU's research misconduct determination, arguing that they show that she is presently responsible. These include her business school education, her employment in Dr. Fenghuang Zhan's laboratory at the University of Iowa ("Iowa") and at Mercy Hospital, and various community and philanthropic activities. Sept. 24, 2024 Letter at 7 ("Dr. Frech's good character is also reflected in her extensive philanthropic activities over the past decade."). She also attaches letters and declarations that purport to attest to her good character and charitable activities. *See, e.g.*, Sept. 24, 2024 Letter Atts. 5, 6, 8; 9/25/2024 Supplemental Frech Declaration. She cites *Roemer* and *Silverman* to support that her interim purportedly good conduct should be considered in the debarment decision. Even if HHS were to accept the truth of the assertions and validity of the documents Respondent submitted, they would not be dispositive, particularly in light of the countervailing factors discussed in this charge letter that contraindicate her present responsibility. None of these activities and documents diminish the appropriateness of her debarment or its length.

201.  With respect to her conduct in the years after she left UU, Respondent claims that she "refrained from immediately seeking a new position in research" after the UU investigation and "stepped away from science altogether and obtained her MBA." Letter at 3. She self-servingly characterizes those approximately two years as her purposefully "abstain[ing] from engaging in any scientific research—federally funded or otherwise,"

*id.*, although there is no evidence or reason to believe that Respondent went to business school in order to protect government funds.

202.    Respondent also claims that she "informed ORI about her intent to accept the offer" of a position as an assistant research scientist in the Zhang lab and "asked ORI for guidance on whether her research activities should be supervised or if there were other measures that should be taken." ORI has no record of such a communication.

203.    Respondent further claims that she "accepted the job opportunity, but disclosed the UU findings and ORI's ongoing review to UI," and that "she and UI agreed that her work would be overseen and monitored by an internal Data Monitoring Committee consisting of Dr. Zhan, Dr. Guido Tricot, and Dr. Zhan's lab manager." She attached a document titled "Oversight and Research Monitoring Plan" to her letter. Sept. 24, 2024 Letter at 3, Attachment 2. She also claimed that she "affirmatively disclosed the existence of ORI's ongoing review of UU's investigation to Dr. Zhan's lab and proactively worked with UI to establish a framework under which her work was overseen and monitored so that her employment did not undermine the important and vital work UI was performing." *Id.*

204.    Whether she did in fact proactively disclose this information to Dr. Zhan or to Iowa, either at the outset of her employment there or ever, is supported only by her assertion and an undated, unsigned document titled "Oversight and Research Monitoring Plan." There is no evidence other than Respondent's say so that this document represents a plan that UI and/or Dr. Zhan agreed to.

205.    Moreover, even after the original charge letter was issued, she has not been transparent about her involvement with federally funded research while working in the Zhan laboratory. In an August 15, 2023, letter, she wrote to ORI through her counsel that she "has neither sought, received, nor participated in research supported by PHS funding since leaving UU in 2013" and that "none of the research she participated in at UI involved PHS funding." **C.L. Ex. 24** (Aug. 15, 2023 Letter) at 1.

206.    In fact, Respondent was listed as an author on several research papers from the Zhan Laboratory published in 2017-2021 that cite NIH funding as supporting the published research, and her reported author contributions included performing, designing, and supervising experiments and analyzing data. **C.L. Ex. 26**. And she was listed as research scientist or Senior/Key Personnel on three grant applications submitted to NIH in 2016-2018. **C.L. Ex. 27**.

207.    After ORI raised this point to Respondent, she claimed, through counsel, in an August 17, 2023, letter to ORI that "the circumstances surrounding these papers and grant applications demonstrate that Dr. Frech has, in fact, not participated in PHS-funded research since 2013." **C.L. Ex. 25** at 1.

208.    This statement is false. While she claims that she assisted in experiments for just a single

PHS-funded paper, **C.L. Ex. 25** at 2, she does not deny that she performed analysis relating to other PHS-funded experiments. While she claims that she was not involved with PHS funds granted to certain other researchers, *id.* at 2, 4, she does not deny that she was in active collaboration with those researchers in their PHS-funded research. And while she asserts that certain PHS grants that funded research projects on which she worked had ended by the time she joined the laboratory, *id.* at 3-4, she does not deny that she used equipment and materials that the laboratory had procured using PHS funds back when those grants were active.

209.    And conspicuously, she at times appears to back away from any categorical assertion that she never participated in PHS-funded research in the Zhan Laboratory, offering more nuanced and hedging language. At one point, she claims that Dr. Zhan had no active PHS grants while she worked at his laboratory "[t]o [her] knowledge." **C.L. Ex. 25** at 4. Elsewhere, she says "it was her understanding that the funding from the grant had ended," *id.* at 3—ambiguous words that suggest that at least one PHS grant funding a project of hers might have been active at the time.

210.    Moreover, Respondent participated in research supported by other sources of federal funds since leaving UU. For example, she published research in 2017 to 2021 funded by the Departments of Defense and Veterans Affairs, as these publications' Acknowledgements expressly recognize. **C.L. Ex. 26** at 39-65.

211.    Indeed, as Respondent herself described in a 2018 University of Iowa interview, "As manager of the Zhan lab, she [Respondent] is essentially running the operations side of a small business, from keeping track of grant funding to making sure enough reagents are stocked. She also helps manage the staff, making sure international members have visa issues resolved and that new hires are integrated smoothly. Dr. Frech also works closely with the younger researchers, training them and helping them launch their own projects, providing supervision and advice where necessary." **C.L. Ex. 28** at 3.

212.    Respondent's apparent recent lack of candor about her involvement in the Zhan Laboratory's federally funded research and attempts to procure PHS funding underscores her lack of present responsibility.

213.    In her September 2024 letter, Respondent claims that her most-recent "position at Mercy Hospital did not involve any research whatsoever," Sept. 24, 2024 Letter at 6, and that she has "no intention of re-engaging in any scientific research," *id.* at 10. However, a debarment's scope is not limited to research grants but to all covered transactions.

214.    Respondent argues that, "[t]o date, no questions or concerns have ever been raised regarding Dr. Frech's research activities over the four years that she was a member of Dr. Zhan's lab," Sept. 24, 2024 Letter at 3, and that "[a]t no point were there, or have there ever been, any concerns or irregularities pertaining to Dr. Frech's stewardship of lab funds, whether from grants or otherwise." *Id.* at 4. The absence of any allegations does

not mean the absence of misconduct; HHS has not examined her conduct.

**B.  Prohibition on Serving in Advisory Capacity to PHS**

215.    HHS proposes that, for a period of three (3) years, Respondent be prohibited from serving in any advisory capacity to PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

**C.  Correction of the Research Record**

216.    In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes that ORI will send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev. Cell* 2008.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

Washington, D.C.  20201

<u>**VIA ELECTRONIC MAIL**</u>

Stephen D. Tobin, Esq.
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW
Suite 725
Washington, DC 20001
Email: stobin@cohenseglias.com

   Re: Notice of Final Debarment Decision for Ivana Frech, Ph.D.

Dear Mr. Tobin:

   On July 18, 2023, the United States Department of Health and Human Services (HHS) sent a Notification Letter, which enclosed a Charge Letter, to your client, Ivana Frech, Ph.D., via United Parcel Service (UPS). The Notification Letter and Charge Letter informed Dr. Frech that based on the evidence and findings of an investigation conducted by the University of Utah (UU), and additional analysis conducted by the Office of Research Integrity (ORI) during its oversight review, ORI had made findings of research misconduct against her.

   Specifically, ORI found that Dr. Frech engaged in research misconduct under 42 C.F.R. Part 93 in research supported by U.S. Public Health Service (PHS) funds, specifically National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK), National Institutes of Health (NIH), grants R01 DK070947, R01 DK090257, and R01 DK030534, National Institute of General Medical Sciences (NIGMS), NIH, grant P50 GM082545, National Institute of Allergy and Infectious Diseases (NIAID), NIH, grant R01 AI051174, and National Heart, Lung, and Blood Institute (NHLBI), NIH, grant R01 HL026922. ORI made six findings of research misconduct based on the preponderance of the evidence that Dr. Frech intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in three published papers. The July 18, 2023, HHS Charge Letter and November 8, 2024, HHS Amended Charge Letter, which this Notice of Final Decision is enclosed with, provide further detail regarding ORI's findings.

   In the HHS Notification Letter and Charge Letter, Dr. Frech was advised of proposed administrative actions and given the opportunity to request a hearing on the findings and proposed administrative actions before an Administrative Law Judge with the HHS Departmental Appeals Board (DAB). As Dr. Frech did not request a hearing within the required 30-day period, the following administrative actions were implemented, effective August 19, 2023:

- Dr. Frech was debarred from participating in "covered transactions" as defined in 42 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1) for a period of three years, beginning on August 21, 2023.
- Dr. Frech was prohibited from serving in any advisory capacity to PHS including, but not limited to, service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three years, beginning on August 21, 2023.
- In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS would send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev Cell*. 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014.

On August 29, 2023, a civil complaint was filed in the United States District Court for the District of Columbia, *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.), pursuant to 5 U.S.C. § 701, the Administrative Procedure Act, related to Dr. Frech's debarment. On April 1, 2024, the United States District Court for the District of Columbia remanded the matter to HHS.

## RESPONDENT'S RESPONSE

On September 24, 2024, you, as Dr. Frech's designated attorney representative in this matter, transmitted a letter via electronic mail addressed to me, the HHS SDO, for consideration of the debarment action against Dr. Frech. The September 24, 2024, letter stated that it was providing an amplification of information already in the administrative record, as well as information that Dr. Frech believed the HHS SDO may not have considered, or had an opportunity to consider, prior to proposing Dr. Frech for debarment. The letter stated that Dr. Frech hoped that an examination of this information would lead the HHS SDO to conclude that Dr. Frech's continued debarment was not warranted and that she was presently responsible. The letter included the following attachments:

- Attachment 1 – May 8, 2013, UU Consolidated Hearing Committee (CHC) Complaint - Research Misconduct for Dr. Ivana Frech
- Attachment 2 – Undated Plan for oversight and monitor research conduct by Dr. Ivana Frech
- Attachment 3 – January 31, 2024, Email from Kyle T. Fogt, Deputy Counsel at University of Iowa (UI) concerning Dr. Ivana Frech
- Attachment 4 – February 20, 2024, Letter from Kyle T. Fogt, Deputy Counsel at University of Iowa concerning Dr. Ivana Frech
- Attachment 5 – January 31, 2024, Message from Deb Berini, Interim Chief Administrative Officer and Chief Integration Officer at University of Iowa Health Care (UIHC) concerning Dr. Ivana Frech
- Attachment 6 – August 21, 2023, Ivana Frech Character Letter from Bernadine Brandenburg, former Chief Integrity Officer and Director of Compliance and Risk Management at Mercy Hospital
- Attachment 7 – UIHC, Office of the Patient Experience FY23 Annual Report
- Attachment 8 – September 23, 2024, Declaration of Dr. Ivana Frech

- Attachment 9 – Examples of Other UU Dr. Kaplan Laboratory Papers with Errors
- Attachment 10 – Dr. Ivana Frech CHC Hearing Presentation

In addition, on September 25, 2024, a Supplemental Declaration by Dr. Ivana Frech was transmitted to the HHS SDO for consideration.

## DISCUSSION

Pursuant to 2 C.F.R. Part 180 (the Nonprocurement Common Rule), which the HHS adopted and gave regulatory effect to at 2 C.F.R. Subpart 376.10, a Federal Government agency may debar an individual from participating in Federal Government procurement and nonprocurement programs, should the SDO determine that individual is not presently responsible and based on "any other cause of so serious or compelling a nature that it affects the present responsibility of the individual." *See* 2 C.F.R. § 180.800(d).

The Nonprocurement Common Rule at 2 C.F.R. § 180.860 lists a number of mitigating and aggravating factors a debarring official may consider in determining whether to debar an individual and in determining the length of the debarment period. As the HHS SDO, I may also consider other factors, as appropriate, in light of the circumstances of a particular case. In consideration of the unique details of this matter, I have determined that factors (c-e), (h), and (j-r) were either not applicable or not relevant to the circumstances of this case, or otherwise there is not enough information in the record for me to assess the applicability of these factors to this case. The following aggravating and mitigating factors were taken into consideration for this matter:

- *2 C.F.R § 180.860(a) – The actual or potential harm or impact that results or may result from the wrongdoing.*

    Research misconduct undermines the integrity of the scientific community and can lead to severe and irreparable harm. The consequences of research misconduct include losing public trust in science; wasting of public funds and resources; harming the research record; distorting the research process; and even adversely impacting public health and safety. Accordingly, HHS expects that everyone involved in HHS-funded research, including PIs, researchers, and administrators, will promote research integrity in fulfillment of HHS's missions. The scientific research enterprise is built on a deep foundation of trust and shared values. As the National Academies wrote in their 2019 On Being a Scientist report, "this trust will endure only if the scientific community devotes itself to exemplifying and transmitting the values associated with ethical scientific conduct." Research misconduct, including falsifying and/or fabricating data, is contrary to ethical values and conduct.

    I find that Dr. Frech's past wrongdoing continues to present harm because she has not accepted responsibility for the wrongdoing, as evidenced by the fact that Dr. Frech continues to deny that she committed knowing and intentional misconduct, despite the findings presented by ORI. Regarding present responsibility, it is important to understand that it is viewed prospectively – forward looking – as it relates to protecting

the Federal Government from improper business conduct by individuals and entities that are not responsible.

As such, based on the information in the record, I find Dr. Frech's research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare. Therefore, I find this to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(b) – The frequency of incidents and/or duration of the wrongdoing*

As documented in ORI's findings, Dr. Frech's research misconduct was not an isolated event. There were three Public Health Service (PHS)-supported papers that were developed over the covered time period and impacted multiple grants. ORI's findings also identified six instances of research misconduct.

Therefore, based on the information in the record, I find Dr. Frech's research misconduct over several years and multiple PHS-supported grants to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(f) – Whether and to what extent you planned, initiated, or carried out the wrongdoing.*

The September 24, 2024, letter, claims that UU determined that Dr. Frech was not solely responsible for the errors. This mischaracterizes the evidence in the record, however, which does not show that anyone else contributed to Dr. Frech's intentional and knowing research misconduct in the three papers at issue. Although the UU investigation committee found that Dr. Kaplan, as the laboratory's leader, was lax in his oversight of and systematically failed in supervising Dr. Frech, it also found no evidence that Dr. Kaplan directly contributed to the misrepresentation or manipulation of data. The UU investigation committee also noted the failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct the mistakes before publication. Despite the fact that Dr. Kaplan was lax in his oversight, and Drs. Ward and Kaplan should have caught Dr. Frech's falsifications and/or fabrications, this does not render them culpable for, or mean that they assisted in the planning, initiating, or carrying out, of Dr. Frech's research misconduct. Indeed, Dr. Frech does not claim, and ORI found no evidence, that anyone else assembled the figures that are the subject of ORI's findings or otherwise intentionally falsified or fabricated those figures. And the UU investigation revealed no evidence indicating that anyone else was responsible for committing the research misconduct found by ORI.

The September 24, 2024, letter also claims that UU's investigation expressly disclaimed engaging in any review of publications arising from Dr. Kaplan's lab for which Dr. Frech was not a coauthor. The letter claims that Dr. Frech demonstrated during the CHC hearing that other publications from Dr. Kaplan's lab, for which she was not an author and had no role in the underlying research, contained the same sort of errors as those at issue in the allegations against her. However, the concerns that Dr. Frech raised

for the first time at her CHC appeal and listed in Attachment 9 to the September 24, 2024, letter are not directed at the research misconduct findings that ORI made and its conclusion that Dr. Frech alone committed the falsifications and/or fabrications at issue in these particular ORI findings.

Therefore, based on the information in the record, I find this to be an applicable aggravating factor in this case. However, even if Dr. Frech were not solely responsible for committing the research misconduct found by ORI, this would not affect the proposed three-year debarment term.

- *2 C.F.R. § 180.860(g) – Whether you have accepted responsibility for the wrongdoing and recognize the seriousness of the misconduct that led to the cause for debarment.*

I acknowledge that the September 24, 2024, letter states "the administrative record reflects that Dr. Frech, on a number of occasions, did express remorse for what happened and acknowledged that she had made mistakes, although she contends that those mistakes were not intentional or done knowingly." However, I do not find that Dr. Frech has sufficiently accepted responsibility for the research misconduct that is at issue in this case. As established in the HHS Charge Letter and HHS Amended Charge Letter, ORI determined that Dr. Frech's research misconduct was knowing and intentional. Dr. Frech continues to maintain that she did not falsify and/or fabricate the figures, and she does not admit that her "mistakes" were intentional and knowing falsification or fabrication. As such, I find Dr. Frech's statements to be disingenuous and far from accepting responsibility for the intentional and knowing research misconduct that is the underlying cause for debarment.

Therefore, based on the information in the record, I find Dr. Frech's failure to sufficiently accept responsibility for the wrongdoing to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(i) – Whether you have cooperated fully with the government agencies during the investigation and any court or administrative action. In determining the extent of cooperation, the debarring official may consider when the cooperation began and whether you disclosed all pertinent information known to you.*

As established in the HHS Charge Letter and HHS Amended Charge Letter, Dr. Frech cooperated with the institution's research-misconduct proceeding. Therefore, based on the information in the record, I find this to be an applicable mitigating factor in this case.

- *2 C.F.R. § 180.860(s) – Other factors that are appropriate to the circumstances of a particular case.*

<u>Duration of Time Since the Wrongdoing</u>

As a mitigating factor, the September 24, 2024, letter argues that the length of time between when the misconduct occurred and when the debarment action was implemented should be considered. I acknowledge the amount of time that passed between, and in making the debarment decision, the length of time that elapsed was considered. On balance, debarment was determined to still be appropriate because of countervailing factors discussed herein and in the HHS Charge Letter and HHS Amended Charge Letter, including Dr. Frech's failure, even today, to accept responsibility for and recognize the seriousness of her misconduct. Therefore, based on the information in the record, I do not find the duration of time to be a mitigating factor in this case.

Position at Mercy Hospital

According to the September 24, 2024, letter, Dr. Frech's most recent position as a hospital administrator at Mercy Hospital, which she held from May 2020 through January 2024, "did not involve any research whatsoever." However, based on the responsibilities of the position listed in the letter, the position appeared to include responsibilities adjacent to covered transactions. The letter also states that Dr. Frech wishes to return to this position, and thus, she still presents a risk. Therefore, based on the information in the record, I find this to be an aggravating factor in this case.

Philanthropic Activities and Character References

As a mitigating factor, the September 24, 2024, letter cited Dr. Frech's philanthropic activities since UU's research misconduct determination, arguing that this demonstrates that she is presently responsible. These include her business school education, her employment in Dr. Fenghuang Zhan's laboratory at UI and at Mercy Hospital, and various community and philanthropic activities, including serving as member of the American Heart Association Community Leadership Committee, the Junior League of Salt Lake City, participating in the Salt Lake City Government Internship Project, and leading the development and implementation of the Low Income Pass Program, and serving on the UI Patient and Family Advisory Board (PFAB). In addition, the supporting documentation included letters and declarations that purported to attest to her good character and charitable activities. While I commend Dr. Frech's contributions to the community and acknowledge the character references presented, I do not find these activities and statements to be relevant to the underlying debarment cause and wrongdoing at issue, which is research misconduct. I do not find that any of these activities and character references, or purported good conduct, are appropriate to diminish Dr. Frech's period of debarment or its length. Therefore, based on the information in the record, I do not find Dr. Frech's philanthropic activities and character references to be a mitigating factor in this case.

## DECISION

Pursuant to 2 C.F.R. Part 180, and based on the information presented in the administrative record and findings herein, including the aggravating and mitigating factors set forth in this document, I have determined that Dr. Frech's research misconduct is of so serious a

nature that a debarment period is necessary to protect the United States Federal Government's interests. *See* 2 C.F.R. § 180.800(d). In making this determination, I acknowledge that Dr. Frech did present some mitigating information, as stated above, which I took into consideration, but it was not sufficient to demonstrate that Dr. Frech is presently responsible to participate in Federal Government procurement and nonprocurement programs.

Therefore, pursuant to 2 C.F.R. Part 180, which was adopted and given regulatory effect by HHS at 2 C.F.R. Subpart 376.10, I hereby impose Dr. Frech's debarment for a period of three years, which term is retroactive to August 20, 2023. Under the three-year period of debarment, Dr. Frech will remain ineligible through August 20, 2026. The debarment is effective for covered transactions subject to the prohibitions of 2 C.F.R. §180 and contracts that are subject to the Federal Acquisition Regulation (48 C.F.R. chapter 1), throughout the executive branch of the United States Federal Government, unless an agency head or an authorized designee grants an exception in writing.

Sincerely,

*HKBrisbon*
HKBrisbon (Nov 6, 2024 12:41 EST)
H. Katrina Brisbon
Suspension & Debarment Official and
  Deputy Assistant Secretary for Acquisitions

cc: Paul Simon, Esq.
    Cohen Seglias Pallas Greenhall & Furman PC
    Email: psimon@cohenseglias.com

**SUPPLEMENTAL DECLARATION OF IVANA FRECH**

Pursuant to 28 U.S.C. § 1746, I, Ivana Frech, hereby declare and state as follows:

1. In January 2021, leadership at Mercy Hospital, where I was employed in an administrative role at the time, tasked me with providing administrative management of the hospital's infusion center.  Consequently, I became the laboratory and infusion center director.

2. After assuming this role, I observed that some patients were being denied chemotherapy because their insurance would not cover the treatment, and patients could not afford the cost out-of-pocket.

3. As administrative director, it was not a part of my duties to become involved when these denials arose because the hospital care coordinator teams and the ordering providers are the bodies involved in the peer-to-peer review process – the process in which a healthcare team discusses the need for a drug with a physician that works for the payer in order to obtain prior authorization approval or appeal a previously denied request for treatment coverage.

4. Mercy Hospital was a smaller hospital and, unfortunately, the impact of the COVID-19 pandemic had depleted hospital resources and staffing at the time.  One of the consequences was that the infusion center did not have a dedicated advocate to challenge denials of insurance coverage for critical chemotherapy treatment.

5. After hearing about these coverage denials, I acted because I believed that none of our patients should be denied cancer treatment and that someone needed to advocate for them. Accordingly, I took over the peer-to-peer review process and, together with my infusion team, challenged the insurance providers' denials.

6. From when I began challenging denials until I lost my position during the transition from Mercy to the University of Iowa in January 2024, no patient was denied treatment anymore.

7. Regrettably, I have been told by former colleagues that since I was separated from my position no one has taken over this responsibility and insurance providers are again denying treatment coverage.

I declare under penalty of perjury that forgoing is true and correct.

Executed on September 25, 2024.

_____
IVANA FRECH

4915



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Assistant Secretary for Health
Office of Research Integrity
1101 Wootton Parkway, Suite 240
Rockville, MD, 20852

Phone:  240-453-8200
FAX:    301-594-0043

November 8, 2024

**CONFIDENTIAL/SENSITIVE**

Ivana Frech, Ph.D.
c/o Stephen D. Tobin, J.D.
Attorney At Law
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW
Suite 725
Washington, DC 20001

TRANSMITTED VIA EMAIL TO: stobin@cohenseglias.com

RE:  ORI Case No. 2017-05; *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.)

Dear Dr. Frech:

Pursuant to the voluntary remand in *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.), ECF No. 31, this letter sets forth the Office of Research Integrity's (ORI) findings of research misconduct and the Department of Health and Human Services' (HHS) proposed administrative actions, including debarment, after review and consideration of Dr. Frech's submission and reexamination of the findings and administrative actions.

The following sets forth a summary of ORI's findings of research misconduct and HHS' proposed administrative actions. A more detailed charging document setting forth the basis for ORI's findings of research misconduct and the proposed HHS administrative actions is enclosed.

**I.    Summary of ORI's Findings of Research Misconduct**

**ORI Findings**: ORI finds that you (Respondent) intentionally and knowingly engaged in research misconduct by falsifying and/or fabricating research results in three (3) published papers funded by the U.S. Public Health Service (PHS).

Specifically, ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by

4916

CONFIDENTIAL/SENSITIVE
Dr. Ivana Frech                    ORI Case No. 2017-05                    Page 2

reusing, relabeling, and manipulating images to falsely report data in three (3) published papers.

In the enclosed charging document and the attached and incorporated exhibits, ORI has provided a detailed description of the facts and circumstances supporting its findings of research misconduct.

## II. Definition of Research Misconduct

42 C.F.R. Part 93 defines *research misconduct* as:

> fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results. (a) Fabrication is making up data or results and recording or reporting them.
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
> (d) Research misconduct does not include honest error or differences of opinion.

## III. Proposed HHS Administrative Actions

### A. Debarment

The Deputy Assistant Secretary for Acquisitions (Debarring Official), the HHS official authorized to impose debarment, has reviewed these findings and finds that the research misconduct involved in this case provides a cause for debarment under 2 C.F.R. § 180.800(d). HHS adopted and gave regulatory effect to 2 C.F.R. Part 180 at 2 C.F.R. Part 376.

The Debarring Official proposes debarring you for a period of three (3) years from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

Some of the significant consequences of debarment are:

- You will be ineligible to be a participant in a federal agency transaction that is a covered transaction (including grants and cooperative agreements); or act as a principal of a person participating in one of those covered transactions; except as provided in 2 C.F.R. §§ 180.135, 315, and 420. *See* 2 C.F.R. §§ 180.130 and 376.995.

4917

**CONFIDENTIAL/SENSITIVE**
Dr. Ivana Frech                           ORI Case No. 2017-05                           Page 3

- You will be excluded from receiving contracts, and agencies shall not solicit offers from, award contracts to, or consent to subcontracts with you, unless the agency head determines that there is a compelling reason for such action. You also will be excluded from conducting business with the Government as an agent or representative of other contractors. *See* 48 C.F.R. §§ 9.401, 9.405.

- Your name will be placed in the "System for Award Management" (SAM), which is maintained by the General Services Administration.

**B.  Additional Administrative Actions**

It is proposed that you be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three (3) years.

It also is proposed that HHS will send a notice to the pertinent journal of the following published paper that requires retraction or correction, in accordance with 42 C.F.R. § 93.407(a)(1) and § 93.411(b):

- Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014

Sincerely,

Sheila R.
Garrity -S
Digitally signed by
Sheila R. Garrity -S
Date: 2024.11.08
07:29:41 -05'00'

*HKBrisbon*
HKBrisbon (Nov 8, 2024 12:59 EST)

Sheila Garrity, JD, MPH, MBA                H. Katrina Brisbon
Director                                    Deputy Assistant Secretary for Acquisitions
Office of Research Integrity                and Suspension and Debarment Official

Enclosures

4918

## THE OFFICE OF RESEARCH INTEGRITY'S AMENDED FINDINGS
## OF RESEARCH MISCONDUCT AGAINST IVANA FRECH, PH.D.

The Office of Research Integrity ("ORI") makes findings of research misconduct against Ivana Frech, Ph.D. (formerly "Ivana De Domenico") ("Respondent"), former Assistant Professor in the Department of Internal Medicine in the University of Utah ("UU") School of Medicine. ORI's findings are based on evidence and findings of an investigation conducted by UU, ORI's oversight review of UU's investigation, and additional analysis conducted by ORI in its oversight review. UU submitted an investigation report to ORI (the "UU Report"), incorporated herein by reference and attached hereto as Charge Letter Exhibit ("**C.L. Ex.**") **1**.

## I.   JURISDICTION

### A.  ORI's Authority

1.    ORI has the statutory and regulatory authority to make findings of research misconduct and propose administrative actions.  *See* 42 U.S.C. § 289b; 42 C.F.R. Part 93.

### B.  Definition of Research Misconduct

2.    Under 42 C.F.R. Part 93:

> *Research misconduct* means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.
>
> (a) Fabrication is making up data or results and recording or reporting them.
>
> (b) Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.
>
> (c) Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.
>
> (d) Research misconduct does not include honest error or differences of opinion.

42 C.F.R. § 93.103.

3.    A finding of research misconduct made under 42 C.F.R. Part 93 requires that—

> (a) There be a significant departure from accepted practices of the relevant research community; and
>
> (b) The misconduct be committed intentionally, knowingly, or recklessly; and

4919

      (c) The allegation is proven by a preponderance of the evidence.

42 C.F.R. § 93.104.

## C.  U.S. Public Health Service Financial Support

4.  The questioned research was supported by the following U.S. Public Health Service ("PHS"), National Institutes of Health ("NIH"), grants:

    a.  National Institute of Diabetes and Digestive and Kidney Diseases ("NIDDK") grant R01 DK070947, "Mechanism and Regulation of Iron Export by Ferroportin," Dr. Jerry Kaplan, Principal Investigator (P.I.), from 05/15/2005-06/30/2015. **C.L. Ex. 2**.

    b.  NIDDK grant R01 DK090257, "Regulation of Iron Homeostasis," Dr. Ivana De Domenico, P.I., from 09/30/2010-06/30/2015. **C.L. Ex. 3**.

    c.  NIDDK grant R01 DK030534, "Factors regulating the cellular uptake of iron," Dr. Jerry Kaplan, P.I., from 01/01/1982-01/31/2019. **C.L. Ex. 4**.

    d.  National Institute of General Medical Sciences ("NIGMS") grant P50 GM082545, "Center for the Structural Biology of Cellular Host Elements in Egress, Trafficking, and Assembly of HIV," Dr. Wesley I. Sundquist, P.I., from 08/27/2007-07/31/2022. **C.L. Ex. 5**.

    e.  National Institute of Allergy and Infectious Diseases ("NIAID") grant R01 AI051174, "Biochemistry of HIV-1 Membrane Recognition and Budding," Dr. Wesley Sundquist, P.I., from 02/01/2002-03/31/2022. **C.L. Ex. 6**.

    f.  National Heart, Lung, and Blood Institute ("NHLBI") grant R01 HL026922, "Receptor Mediated Endocytosis in Alveolar Macrophages," Dr. Jerry Kaplan, P.I., from 05/01/1981-05/31/2013. **C.L. Ex. 7**.

## D.  Records That Contain Falsified and/or Fabricated Research Results

5.  ORI's findings of research misconduct concern the falsification and/or fabrication of figures reported in the following PHS-supported published papers:

    a.  Kieffer C, Skalicky JJ, Morita E, De Domenico I, Ward DM, Kaplan J, Sundquist WI. Two Distinct Modes of ESCRT-III Recognition are Required for VPS4 Functions in Lysosomal Protein Targeting and HIV-1 Budding. *Dev Cell.* 2008 Jul;15(1):62-73. Doi: 10.1016/j.devcel.2008.05.014 ("*Dev. Cell* 2008") ("Paper 11" in UU Report). **C.L. Ex. 8**.

    b.  De Domenico I, Lo E, Yang B, Korolnek T, Hamza I, Ward DM, Kaplan J. The Role

of Ubiquitination in Hepcidin-independent and Hepcidin-dependent Degradation of Ferroportin. *Cell Metab.* 2011 Nov 2;14(5):635-46. Doi: 10.1016/j.cmet.2011.09.008. ("*Cell Met.* Nov. 2011") ("Paper 1" in UU Report). **C.L. Ex. 9**. Retracted: *Cell Met.* 2012 Jun 6;15(6):927. Doi: 10.1016/j.cmet.2012.04.017. **C.L. Ex. 10**.

c.   De Domenico I, Vaughn MB, Paradkar PN, Lo E, Ward DM, Kaplan J. Decoupling Ferritin Synthesis from Free Cytosolic Iron Results in Ferritin Secretion. *Cell Metab.* 2011 Jan 5;13(1):57-67. doi: 10.1016/j.cmet.2010.12.003 ("*Cell Met.* Jan. 2011") ("Paper 6" in UU Report). **C.L. Ex. 11**. Retracted: *Cell Met.* 2012 Jun 6;15(6):927. doi: 10.1016/j.cmet.2012.04.012. **C.L. Ex. 10**.

## II.   SUMMARY OF ORI FINDINGS AND HHS PROPOSED ADMINISTRATIVE ACTIONS

6.   ORI makes six (6) findings of research misconduct based on the preponderance of the evidence that Respondent intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers.

7.   ORI finds that these acts constitute a significant departure from accepted practices of the relevant research community. *See* 42 C.F.R. § 93.104(a).

8.   ORI finds by a preponderance of the evidence that Respondent's intentional, knowing, or reckless falsification and/or fabrication of data constitutes research misconduct within the meaning of 42 C.F.R. §§ 93.103 and 93.104.

9.   The Deputy Assistant Secretary for Acquisitions and Suspension and Debarment Official (Debarring Official) proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

10.   HHS also proposes that for a period of three (3) years, Respondent be prohibited from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

11.   In addition, ORI finds that *Dev. Cell* 2008 should be retracted or corrected. *Cell Met.* Jan. 2011 and *Cell Met.* Nov. 2011 already have been retracted by the journal *Cell Metabolism*.

12.   In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes to send to the journal *Developmental Cell* a notice of ORI's findings and of the need for retraction or correction of *Dev. Cell* 2008.

### III.  FACTUAL BACKGROUND

#### A.  Respondent's Background

13.     Respondent received a B.S. in biological science in 2002 from the University of Messina, Italy, and a Ph.D. in 2005 from the University of Messina.

14.     From 2005-2007, Respondent was a postdoctoral fellow in the laboratory of Dr. Jerry Kaplan, a professor in the UU School of Medicine's Department of Pathology, and from 2007-2008, Respondent was a research associate in the Kaplan laboratory. In 2008, Respondent was promoted to research assistant professor in the Department of Internal Medicine at UU.

15.     In June 2013, UU terminated Respondent's employment.

#### B.  Scientific Background and Respondent's Research

16.     Iron is essential for life, but its levels must be tightly regulated in animals. Excess amounts of iron either within cells or in blood and other extracellular fluids are toxic. Regulation of iron homeostasis is important for normal physiological function, and its dysregulation is implicated in a number of diseases, including anemias.

17.     It is well established that the regulation of iron levels in human blood is controlled by two proteins, hepcidin ("HEP") and ferroportin ("FPN"). As an iron transporter, FPN is a transmembrane protein that exports iron out of cells and into the bloodstream. When HEP binds the FPN iron transporter protein, it inactivates FPN, and as a result less iron is pumped from inside cells into the blood plasma. Once FPN is internalized by the binding of HEP, it undergoes lysosomal degradation (i.e., FPN protein is broken down in a regulated manner inside the cell) such that the total concentration of the FPN protein in the cell decreases. The downregulation of FPN is dependent on proteins that mediate cell membrane remodeling through membrane budding events.

18.     Respondent's research involved studies of the molecular mechanisms of cellular iron regulation. Respondent's three papers that are the subject of ORI's findings presented seminal data on mechanisms of the regulation of FPN by HEP and ferritin, thereby adding to the body of knowledge regarding the ability of an individual to appropriately respond to changes in the environment through regulation of iron homeostasis.

#### C.  Allegations and UU's Research-Misconduct Proceeding

19.     In November 2011, a complainant contacted UU's Research Integrity Officer ("RIO") and ORI with allegations of research misconduct against Respondent, including in *Cell Met*. Nov. 2011 (referenced as "Paper 1" in the UU Report) and *Cell Met*. Jan. 2011 (referenced as "Paper 6" in the UU Report).

20.  On November 8, 2011, the RIO met with Respondent and Dr. Kaplan for initial interviews. On the same day, the RIO sequestered laboratory notebooks that included autoradiography films and handwritten notes.

21.  In December 2011, UU initiated an inquiry into the allegations. The inquiry committee met with Respondent and with Dr. Kaplan to discuss the allegations.

22.  The complainant submitted additional allegations to the RIO in March, May, and June 2012, including allegations involving *Dev. Cell* 2008 (referenced as "Paper 11" in the UU Report).

23.  In April 2012, UU initiated an investigation into all of the allegations and later added the May and June 2012 allegations to its investigation.

24.  The investigation committee interviewed multiple witnesses, including Respondent, Dr. Kaplan, Dr. Diane Ward (Associate Professor in the UU Department of Pathology and a coauthor on the papers at issue), and the complainant.

25.  The committee also posed questions regarding the *Dev. Cell* 2008 allegations to Dr. Collin Kieffer and Dr. Wesley Sundquist, both in the Biochemistry Department at UU School of Medicine and coauthors of *Dev. Cell* 2008. Dr. Sundquist and Dr. Kieffer responded jointly on July 19, 2012. **C.L. Ex. 14**.

26.  On July 21, 2012, Respondent sent to the RIO an email with a letter attachment describing Respondent's responsibility for the falsification in Figure 5B of *Dev. Cell* 2008 and admitting that "a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008," and "the duplication came from me." **C.L. Ex. 13**. Drs. Sundquist and Kieffer provided a follow-up response to the investigation committee on July 26, 2012, confirming Respondent's responsibility for the falsification in Figure 5B of *Dev. Cell* 2008. **C.L. Ex. 15**.

27.  The investigation committee provided Respondent with the opportunity to comment on its draft investigation report. In her response, Respondent admitted that she "generated the figures in" *Cell Met.* Nov. 2011. **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9.

28.  The investigation committee issued its final investigation report (the UU Report) on December 14, 2012, recommending findings of research misconduct against Respondent in ten distinct publications and termination of Respondent's employment. **C.L. Ex. 1**.

29.  The investigation committee "found no evidence that Dr. Kaplan directly contributed to the misrepresentation or manipulation of data." **C.L. Ex. 1** at 6. It faulted him, however, for "a systematic lack of attention to detail," "inappropriate and unacceptable distance from the primary findings," "lax oversight," and "systematic failure of supervision of Dr. De Domenico." *Id.* The investigation committee noted "the conspicuous failure of all

coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before publication." *Id.* at 4.

30.     In January 2013, UU accepted the investigating committee's findings and recommendations. **C.L. Ex. 19**.

31.     Respondent appealed the research misconduct findings and sanctions to the UU Office of the Academic Senate. **C.L. Ex. 20**.

32.     In the Table of Admissions that she submitted during her appeal, Respondent stated, as to the figures of *Cell Met.* Nov. 2011, that "[a]ll the western blots were in one film, which was the primary problem during the preparation of figures by De Domenico." **CL Ex. 21**.

33.     As for Figure 5B of *Dev. Cell* 2008, she stated in the Table of Admissions that "Dr. De Domenico assembled the figure." *Id.*

34.     For Figure 4B of *Cell Met*. Jan. 2011, Respondent stated in the same document that "De Domenico did not work on the *final* figure, she was out of the country during the resubmission." *Id.* (emphasis added).

35.     A Consolidated Hearing Committee (CHC) panel conducted a hearing in April 2013. **C.L. Ex. 22**.

36.     The Panel did not conduct a *de novo* review of the available evidence. **C.L. Ex. 22** at 3. Instead, "[t]o simplify understanding of the record, [the Panel] constructed a table listing each paper by number along with the types of alleged irregularities, the Investigating Committee conclusions regarding the allegations, and some indication of the evidence behind those conclusions." *Id.*

37.     The Panel issued its report and recommendations in May 2013 and concluded that Respondent had engaged in research misconduct under UU policy by "reckless disregard of accepted practices." *Id.* at 1.

38.     Regarding *Cell Met.* Nov. 2011, the Panel found that Respondent's falsifications were the result of reckless disregard of accepted practices. *Id.* at 4. But the Panel did not consider her admission that she had prepared the figures.

39.     The Panel found that *Dev. Cell* 2008 "contained images that were intentionally manipulated to present false data," and that "[t]his was done by computer copying of information from one scanned image to another or in some instances by splicing of gel images to make one image." **C.L. Ex. 22** at 4. The Panel determined that it "cannot conclude that it was done by Dr. De Domenico as opposed to an unknown third person." *Id.* The Panel, however, did not address her admission she had assembled the figure.

40.     As for *Cell Met.* Jan. 2011, the Panel appeared to focus on an allegation that Respondent

had fabricated laboratory notebook pages and found that "the evidence that she fabricated notebook pages is confusing and not sufficiently persuasive of intentional falsification." *Id.* at 5.

41.     The Panel found that "[t]here was complicity in this misconduct within the laboratory that goes substantially beyond Dr. De Domenico," insofar as other coauthors should have spotted the errors in the publications. *Id.* at 6. But the Panel did not find that anyone else in the laboratory intentionally or knowingly manipulated research results or otherwise engaged in research misconduct.

42.     The CHC Panel agreed with the investigation committee's recommendation to terminate Respondent's employment or allow Respondent to resign.

43.     In June 2013, the President of UU accepted the recommendations of the CHC. **C.L. Ex. 23**.

44.     UU sent the investigation report to ORI on June 10, 2013.

## IV.     ORI'S FINDINGS OF RESEARCH MISCONDUCT

45.     ORI's Division of Investigative Oversight received the investigation report and the CHC Panel report and conducted an oversight review of the UU investigation.

46.     As part of this review, ORI conducted its own image analysis of Frech's work. **C.L. Ex. 18**. ORI also reviewed evidence that the CHC Panel did not address in its report.

47.     On September 24, 2024, Respondent wrote to the Debarring Official (the September 2024 letter) with information and argument for consideration.

48.     ORI and the SDO considered Respondent's September 2024 letter and its attachments in amending this charge letter.

49.     Based on the evidence from the UU investigation and ORI's own independent analysis, ORI made the following (6) findings of research misconduct against Respondent, finding by a preponderance of the evidence that she intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images by reusing, relabeling, and/or manipulating images to falsely report data in eight (8) figures included in three (3) PHS-supported published papers, namely, *Dev. Cell* 2008, *Cell Met.* Nov. 2011, and *Cell Met.* Jan. 2011.

**ORI FINDING #1**:  **Respondent intentionally and knowingly falsified and/or fabricated a western blot image in Figure 5B (right bottom panel) of** *Dev. Cell* **2008 by reusing and relabeling an image of three western blot bands to represent the results of different experiments.**

50.    Figure 5 of *Dev. Cell* 2008 ("Paper 11" in the UU Report) reports on research involving charged multivesicular body protein 6 (CHMP6), which mediates FPN downregulation. Figure 5 demonstrates that "silencing" CHMP6 using a silencing RNA (siRNA) strategy prevents the hepcidin-dependent downregulation through lysosomal degradation of FPN, whereas a control siRNA does not. **C.L. Ex. 8** (*Dev. Cell* 2008) at 7. Use of siRNA is a common method in cell and molecular biology to target and reduce a specific target protein to study its function.

51.    According to *Dev. Cell* 2008, Figure 5B shows western blot analyses of HEP-induced FPN-GFP[1] downregulation in human embryonic kidney 293 (HEK 293) cells in the presence of wild type and mutant CHMP6.

52.    The western blot bands in the middle panel (labeled "anti-FPN") show FPN levels in the presence of wild type ("WT") and mutant CHMP6 proteins and in the presence or absence of endogenous CHMP6.

53.    The western blot image panel in the bottom row (labeled "anti-α-Tubulin") of Figure 5B, right panel, shows six α-tubulin bands, which serve as an internal loading control to ensure that any differences in FPN levels shown in the middle row (labeled "anti-FPN") are due to a biological process and not differences in total protein loaded across lanes.

54.    In the bottom-right western blot image panel corresponding to the α-tubulin loading control in published Figure 5B (CHMP6 siRNA + FPN-GFP tubulin loading control), the image of the three bands in lanes 7-9 is identical to the image of the three bands in lanes 10-12. Thus, the image of α-tubulin bands in lanes 7-9 was duplicated, spliced into a composite image, and relabeled to represent different α-tubulin bands in lanes 10-12. *See* **C.L. Ex. 18** (ORI Image Analysis) at 1-2.

55.    Falsification and/or fabrication of loading controls is significant because loading controls validate the amount of protein in each lane. Changes reported in the protein of interest (FPN) could result from unequal loading of sample in each lane or other technical issues, as opposed to the proposed regulatory mechanism of protein targeting and degradation.

56.    Respondent created the composite image containing the duplicated α-tubulin bands. *See* **C.L. Ex. 13** (July 21, 2012, Respondent email and attached letter to Botkin (stating that

---

[1] Green fluorescent protein ("GFP") is a protein tag commonly attached to a protein of interest in molecular biology. The tag allows a researcher to distinguish FPN introduced into the cell from the naturally occurring FPN and visualize FPN expression under different conditions using traditional techniques in biochemistry, molecular biology, and microscopy.

"a[n] image was generated by me and sent to Dr. Kieffer and Sundquist on March 3, 2008" and that "the duplication came from me")); **C.L. Ex. 14** (July 19, 2012, Kieffer & Sundquist Letter to Botkin); **C.L. Ex. 15** (July 26, 2012, Kieffer and Sundquist Letter to Botkin); **C.L. Ex. 16** (Nov. 12, 2013 Kieffer and Sundquist letter to Dahlberg).

57.   It is implausible that the reuse and relabeling of the image is attributable to honest error rather than intentional and knowing falsification and/or fabrication because the duplication occurred within an image panel and thus involved splicing two images together to make a composite image of six bands in a row.

58.   Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

59.   In her September 2024 letter, Respondent claims that she "was not personally responsible for Figure 5B." Sept. 24, 2024 Letter at 9.

60.   She acknowledges that the CHC panel found the manipulation in this figure to have been intentional and does not contest this finding. *Id.*

61.   Respondent points to the CHC Panel's statement that "we cannot conclude that it was done by Dr. De Domenico as opposed to an unknown third person." Sept. 24, 2024 Letter at 9 (quoting CHC report at 4, 5 ("As stated above, the CHC Panel cannot find that Dr. De Domenico was responsible for the intentional manipulation in Paper 11")).

62.   The CHC, however, did not address either Respondent's admissions in her July 12, 2012, email to the RIO or in her April 2013 appeal papers, whereas ORI weighed this evidence in concluding that Respondent was the one who intentionally and knowingly manipulated the image.

63.   Respondent claims that she "sent that [July 12, 2012] communication to the RIO at Dr. Wesley Sundquist's request . . . because he threatened to fire Dr. Frech if she did not do so." Sept. 24, 2024 Letter at 9. However, months later, in her April 2013 appeal to the CHC panel, Respondent reaffirmed that she "assembled the figure" in *Dev. Cell* 2008. **C.L. Ex. 21** (Table of Admissions).

64.   Respondent also claims:

> ORI's conclusion ignores the context of the quoted text for the latter quote; Dr. Frech wrote that she "believe[d] that the duplication came from me because the draft image sent to Drs. Kieffer and Sundsquist [sic] shows already the error." See AR 763 (emphasis added). Importantly, Dr. Frech also stated that "[a]ccording to the emails and notes some of the western blots and data quantification should be

4927

in Dr. Kieffer's notebook. However, Dr. Sundquist this morning verbally communicated that Dr. Kieffer does not have the western blots and he might have the quantification analysis." See id. Furthermore, Dr. Frech also wrote that the March 3, 2008 email indicates that Dr. Kieffer came to Dr. Kaplan's lab and took some of the results, with "[a]ll repeats and the correct tubulin western blots still in our notebook. It is missing only the films w[h]ere the duplication is coming from." See id. In short, even if Dr. Frech was correct that she sent a duplicated image to Drs. Kieffer and Sundquist, none of the evidence—including her statement in the email—suggests that she had deliberately or intentionally manipulated the image; only that she is the one who sent the image to them.

Sept. 24, 2024 Letter at 9-10. Whether Dr. Kieffer at some point possessed the western blot films for scanning and quantification of the proteins in the blot has no bearing on Respondent's culpability for the image duplication in the figure, as scanning western blot films for quantification does not change the raw image and is not part of figure assembly.

65. Respondent asserts: "During the UU investigation, UU's IT Department conducted a forensic analysis of Dr. Frech's computers. This review, requested by the Investigation Committee, found no evidence that Dr. Frech had manipulated or destroyed any files or data. See, e.g., Attachment 10, Frech CHC Hearing Presentation at p. 7. These facts were discussed during the CHC hearing, the audio recording of which is in the administrative record." Sept. 24, 2024 Letter at 10. Respondent misrepresents what the Investigation Report quote on page 7 of Respondent's presentation (Attachment 10) actually states, namely: "The committee also asked the Universtiy [sic] Information Technology Office to scan the forensic copy of Dr. De Domenico's desktop computer drive, specifically asking the staff to identify Excel and SigmaPlot files that had been deleted in the previous year. The staff was unable to find evidence of such files." Excel and SigmaPlot files are not at issue in Figure 5B of *Dev Cell* 2008 and instead relate to findings that ORI did not make. Thus, this statement is irrelevant to ORI's finding regarding Respondent's falsification and/or fabrication of Figure 5B of *Dev Cell* 2008. Moreover, the Investigation Report does not state that the UU IT Department found no evidence that Respondent had manipulated or destroyed any files or data.

66. Respondent intentionally and knowingly falsified and/or fabricated the bottom right panel in Figure 5B of *Dev Cell* 2008.

67. Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**<u>ORI FINDING #2</u>: Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figure 1C (top and bottom panels) of *Cell Met.* Nov. 2011 by reusing and relabeling an image of western blot bands to represent the results of two different experiments.**

68.    *Cell Met.* Nov. 2011 proposes a second mechanism of FPN inactivation that does not require the hormone HEP. **C.L. Ex. 9.** The model reported in the paper proposes that this second HEP-independent mechanism involves the direct "sensing" of internal cellular iron levels, presumably by the FPN protein itself. In the model proposed in the paper, FPN becomes internalized inside the cell when iron levels inside the cell are low (iron is required for cellular processes within the cell). This result would constitute a very important finding for the field of iron regulation and human physiology because the requirement for HEP in iron regulation is so well established.

69.    Figure 1C of *Cell Met.* Nov. 2011 supports the paper's hypothesis that depletion of iron within the cell leads to HEP-independent FPN degradation. **C.L. Ex. 9** at 3. In Figure 1C, Respondent engineered HEK 293 cells to express FPN protein that was fused with a GFP tag. In the western blot results shown in Figure 1C: lane 1 indicates cells without iron (ferric ammonium citrate, or "FAC") supplementation for 18 hrs; lane 2 indicates cells without iron (FAC) supplementation for 36 hrs; and lane 3 shows cells supplemented with iron (FAC) for 36 hrs. As would be expected by the model, the amount of FPN on the plasma membrane ("PM") (therefore able to transport iron out of the cell) goes away after depriving the cells of iron for 36 hrs (lane 2). According to both the original HEP-dependent and new HEP-independent models, the FPN transporter would be expected to be internalized inside the cell when iron levels are low.

70.    Figure 1C, top right panel, shows a western blot analysis of affinity-purified samples and the flow through from FPN-GFP-expressing cells in the presence of and absence of FAC or DFX.[2]  The western blot bands show the amount of FPN retained in the PM (in the "PM" row) versus the amount of FPN inside the cell's cytoplasm (in the "FT," or flow through, row) after removal (lanes 1 and 2) or supplementation (lane 3) with FAC or treatment with DFX.

71.    The top row, labeled "PM," in Figure 1C of *Cell Met.* Nov. 2011 is an image of western blot bands showing the amount of FPN retained in the PM with or without FAC at certain time intervals, or without FAC but with DFX treatment (lane 4). The bottom row, labeled "FT," is an image of western blot bands showing the amount of FPN inside the cell's cytoplasm under the same experimental conditions.

72.    Respondent reused and relabeled the same image of four western blot bands in the top and bottom panels. In particular, the image of the bands in lanes 1-4 in the upper panel

---

[2] Deferasirox (DFX) is a strong iron chelator, i.e., it renders nearly all iron unavailable in a biological context. Therefore, with DFX treatment, one would hypothesize that nearly all detectable FPN would be internalized (as shown in the FT subpanel lane 4), as iron levels are scarce and the cell would conserve internal supplies.

("PM"), representing FPN-GFP found in the PM, is a copy, flipped horizontally, of the image of the bands in lanes 1-4 in the lower panel ("FT"), representing FPN-GFP found in the flow through. *See* **C.L. Ex. 18** (ORI Image Analysis) at 3-4.

73. Respondent is the first author of *Cell Met.* Nov. 2011.

74. Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

75. Respondent knowingly and intentionally duplicated and horizontally flipped the western blot bands in both PM and FT rows to show ideal results, strongly supporting Respondent's hypothesis, in which all of the FPN protein was completely accounted for in either the PM or internal cytoplasmic (FT) fractions.

76. Respondent would have understood that in a perfect experimental system, the total amount of FPN in Respondent's experiments would be expected to be: FPN (TOTAL) = FPN on PM + FPN inside the cell (FT). For example, in lanes 2 and 3, the intensity of each protein band (PM + FT) ideally would sum to account for all FPN in the cell. There are many steps in this biochemical assay, including purifying out the protein by binding it to affinity beads (leading to some protein loss) and then eluting the protein off the beads (also leading to some protein loss) for the western blot. As some protein loss is unavoidable at nearly all these steps, ideal results could not be achieved without knowing and intentional falsification and/or fabrication.

77. The manipulation of the copied western blot bands also shows that the falsification and/or fabrication is attributable to intentional and knowing conduct rather than honest error or mere recklessness.

78. Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or recklessness only.

79. Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

80. ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

81. First, ORI found that Respondent's manipulation of images involved affirmative acts such as duplication and flipping, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

82.    Second, the manipulated results always supported Respondent's scientific hypotheses.

83.    Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

84.    These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

85.    Respondent intentionally and knowingly falsified and/or fabricated Figure 1C (top right panel) of *Cell Met.* Nov. 2011.

86.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**<u>ORI FINDING #3</u>:  Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figures 1D and 3 of *Cell Met.* Nov. 2011 by reusing and relabeling one image to represent the results of two different experiments.**

87.    According to *Cell Met.* Nov. 2011, Figure 1D shows that FPN is targeted for degradation in HEK 293 cells by modifying the amino acid lysine at position 253 through a process known as ubiquitination. **C.L. Ex. 9** at 3. Ubiquitination is a protein modification that specifically occurs on lysine (abbreviated as "K") amino acid residues in proteins that can signal that protein for targeted degradation. By reporting equal FPN-GFP levels in the western blot image of the right panel of Figure 1D, Respondent showed that lack of a ubiquitin band in the K253A (i.e., lysine substituted for an alanine (A) that cannot be modified) column was not attributed to different FPN protein expression or recovery levels, but rather that the specific lysine at amino acid 253 was modified.

88.    According to *Cell Met.* Nov. 2011, Figure 3 shows that the enzyme Nedd4-2 is required for the internalization and degradation of FPN-GFP in HEK 293 cells genetically engineered to stably express the FPN-GFP gene (Figure 1D shows HEK 293 cells that do not have this genetic modification). Figure 3 represents a different experiment that claims to identify the specific ubiquitin ligase (i.e., the protein enzyme that adds the ubiquitin to the lysine) as Nedd4-2. **C.L. Ex. 9** at 5. In Figure 3, Respondent alleges that depletion of the Nedd4-2 enzyme in lane 4 prevents internalization of FPN-GFP in the presence of hepcidin.

89.    Respondent reused and relabeled FPN-GFP western blot bands in Figure 1D to also represent GFP western blot bands in Figure 3 (lanes 3 and 4). In particular, the lower right blot image panel (labeled GFP and treated with DFX) in Figure 1D is identical to the blot image in the last two lanes of the middle panel (Nedd4-2 column) in Figure 3 (labeled GFP and treated with or without HEP) after cropping out lanes one and two. *See* **C.L. Ex. 18** (ORI Image Analysis) at 5-6. Therefore, Respondent reused and relabeled control data in Figure 1D to also represent key experimental results from a different experiment to claim to identify the specific enzyme (Nedd4-2) required for FPN-GFP

ubiquitination, internalization, and subsequent degradation. Thus, the same western blot images in Figures 1D and 3 were used to represent results from different experiments using different cell lines -- one an unmodified cell line and one cell line genetically modified with FPN-GFP stable gene integration.

90. Respondent is the first author of *Cell Met.* Nov. 2011.

91. Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

92. The image manipulation (cropping of the larger image to create the smaller image) shows that the image reuse and relabeling was not honest error or even mere recklessness, but rather knowing and intentional falsification and/or fabrication.

93. Moreover, this falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

94. Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

95. ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

96. First, ORI found that Respondent's manipulation of images involved affirmative acts such as duplication and cropping, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

97. Second, the manipulated results always supported Respondent's scientific hypotheses.

98. Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

99. These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

100. Respondent intentionally and knowingly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figure 1D and Figure 3 of *Cell Met.* Nov. 2011.

101. Respondent's falsification and/or fabrication constitutes a significant departure from

accepted practices of the relevant research community.

**ORI FINDING #4**:  **Respondent intentionally and knowingly falsified and/or fabricated western blot images in Figures 2Aii and 2B of *Cell Met.* Nov. 2011 by reusing and relabeling one image as representing the results of two different experiments.**

102.    According to *Cell Met.* Nov. 2011, Figure 2Aii purportedly shows that Nedd4-2 is the specific enzyme (ubiquitin ligase) responsible for FPN internalization and degradation. **C.L. Ex. 9** at 4. Nedd4-2 is a family member of ubiquitin ligases previously known to regulate ion channels, so Respondent hypothesized that the FPN iron ion transporter would be regulated by a similar mechanism.

103.    In Figure 2Aii, Respondent purportedly shows that FPN-GFP is internalized 36 hours after expressing the protein in HEK 293 cells (compare band intensity in column 1, lane 1 (N.S. 18h) with column 3, lane 1 (N.S. 36h)). However, when the cells are depleted of the Nedd4-2 ubiquitin ligase using siRNA, FPN-GFP was not degraded (compare band intensity in column 2, lane 1 (Nedd4-2 18h) with column 4, lane 1 (Nedd4-2 36h)). Therefore, these results support that Nedd4-2 is required for FPN internalization under normal conditions (i.e., iron levels were not manipulated in this experiment).[3]

104.    According to *Cell Met.* Nov. 2011, Figure 2B shows that Nedd4-2 depletion prevents cells from internalizing FPN during iron depletion (DFX treatment). **C.L. Ex. 9** at 4. Therefore, these results support that Nedd4-2 also is required for appropriate FPN regulation when iron levels are low (versus Figure 2Aii, which shows Nedd4-2 degradation under normal iron conditions).

105.    The two panels in the upper row of Figure 2Aii purportedly represent HEK 293 cells that have expressed FPN-GFP for 18 hours (left panel) or 36 hours (right panel). These cells allegedly were treated either with a non-targeting control siRNA or Nedd4-2 specific siRNA.

106.    The two panels in the upper row of Figure 2B purportedly represent HEK 293 cells that have expressed FPN-GFP and were treated with a non-targeting control siRNA or Nedd4-2 specific siRNA just as in Figure 2Aii. However, in Figure 2B the cells purportedly were treated with DFX (+, right panel) or served as controls (-, left panel). DFX strongly binds to iron and makes it unavailable to the cells. Therefore, Figure 2B supports the model that Nedd4-2 also is required for FPN degradation when cells experience low levels of iron.

107.    The image of the western blot bands in the top right panel of Figure 2Aii is a copy of the image of the western blot bands in the top right panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 7.

---

[3] The samples purportedly separated into two fractions: plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic). FPN identified in the FT fraction presumably represents internalized FPN.

4933

108.  The image of the western blot bands in the top left panel of Figure 2Aii is a copy, flipped horizontally, of the image of the western blot bands in the top left panel of Figure 2B. *See* **C.L. Ex. 18** (ORI Image Analysis) at 8.

109.  Thus, the same western blot images are used to represent different experimental treatments.

110.  Respondent is the first author of *Cell Met.* Nov. 2011.

111.  Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

112.  It was not honest error but rather knowing and intentional falsification and/or fabrication because the top left panel in Figure 2Aii was copied, flipped horizontally, and relabeled to represent a different experiment in Figure 2B. Additionally, the corresponding bottom panels for both figures are from different source images.

113.  Further, the corresponding FT panels are different but support the expected outcome for the different illustrated experiments. For example, the FPN-GFP internalization shown in Figure 2B (FT) purports to demonstrate impressively that no detectable FPN is internalized during iron depletion when Nedd4-2 is absent. Also, the falsification and/or fabrication supports the authors' hypothesis that Nedd4-2 is the specific ubiquitin ligase that targets FPN for degradation. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error or recklessness.

114.  Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

115.  Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

116.  ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

117.  First, ORI found that Respondent's manipulation of images involved affirmative acts, namely, duplication and flipping, which are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

118.  Second, the manipulated results always supported Respondent's scientific hypotheses.

119.  Third, Respondent's behavior was part of a broad pattern of manipulation across multiple

papers.

120.    These pieces of evidence show that Respondent's research misconduct was intentional
        and knowing, not merely reckless.

121.    Respondent intentionally and knowingly falsified and/or fabricated western blot images
        by reusing and relabeling one image to represent the results of different experiments in
        Figures 2Aii and 2B of *Cell Met.* Nov. 2011.

122.    Respondent's falsification and/or fabrication constitutes a significant departure from
        accepted practices of the relevant research community.

**ORI FINDING #5**:  **Respondent intentionally and knowingly falsified and/or fabricated
western blot images in Figures 2Aii and 5 of *Cell Met*. Nov. 2011 by reusing and relabeling
one image as representing the results of two different experiments.**

123.    According to *Cell Met.* Nov. 2011, Figure 5 shows that treatment of cells with zinc
        maintains FPN on the PM, thereby partially blocking FPN-GFP internalization and
        subsequent degradation. **C.L. Ex. 9** at 7. This result supports the authors' hypothesis that
        FPN can transport other metal ions in addition to iron (Fe), specifically manganese (Mn)
        and zinc (Zn).

124.    *Cell Met.* Nov. 2011 Figure 2Aii, in contrast, shows a different experiment. As previously
        described in Finding #4, Figure 2Aii tests the authors' hypothesis that the internalization
        of the FPN-GFP iron transporter is regulated by the ubiquitin ligase Nedd4-2 under
        normal conditions. The western blot depicted in Figure 2Aii purportedly demonstrates
        that depletion of Nedd4-2 in HEK 293 cells prevents the normal internalization of FPN-
        GFP. Therefore, the results presented in Figure 2Aii, if true, would have provided
        important insight into the normal regulation of the FPN iron transporter.

125.    In the upper image panel in Figure 5, the top panel was labeled as FPN-GFP from the
        "PM," for plasma membrane. The samples purportedly were separated into two fractions:
        plasma membrane (PM, or cell surface) or flow through (FT, or cytoplasmic).

126.    In the lower left image panel in Figure 2Aii, the bottom left panel was labeled as FPN-
        GFP from the "FT."

127.    The first and second lanes in the lower left panel in Figure 2Aii are identical to the two
        right lanes (+DFX and +ZnSO$_4$/+DFX) in the upper panel in Figure 5. The image in
        Figure 2Aii is flipped horizontally and has a lighter contrast than the identical image in
        Figure 5. *See* **C.L. Ex. 18** (ORI Image Analysis) at 9.

128.    Thus, the same image was used by Respondent to support both a model where FPN is
        degraded under normal iron conditions in Figure 2Aii and a different model in Figure 5,
        notably that FPN is promiscuous and also binds zinc (Zn) in addition to its well-

established iron (Fe) binding partner.

129.    Thus, the same western blot images were used to represent results from different, unrelated experiments.

130.    The manipulation (flipping and contrast adjustment) of the duplicated images shows that the falsification and/or fabrication was knowing and intentional rather than honest error.

131.    The results as presented in Figure 5 support the authors' hypothesis that FPN is promiscuous for other positive metal ions. This also shows that the falsification and/or fabrication was knowing and intentional and not honest error. The falsifications and/or fabrications provide a more-detailed understanding of the regulation of FPN, thereby increasing the overall novelty and impact of this study in the field of iron physiology.

132.    Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

133.    Respondent is the first author of *Cell Met.* Nov. 2011.

134.    Respondent generated the figures in *Cell Met.* Nov. 2011 (UU Report "Paper 1"). *See* **C.L. Ex. 12** (Detailed Response to Investigation Report) at 9; **C.L. Ex. 21** (Table of Admissions).

135.    Respondent argues that the CHC panel found Respondent's research misconduct to be reckless rather than intentional and knowing. Sept. 24, 2024 Letter at 3, 9.

136.    ORI, however, considered several pieces of evidence that the CHC Panel did not. And that evidence showed that Respondent's research misconduct was intentional and knowing.

137.    First, ORI found that Respondent's manipulation of images involved affirmative acts namely, duplication, flipping and contrast adjustment, acts that are difficult to ascribe to honest error, or even mere recklessness, suggesting that Respondent acted knowingly and intentionally.

138.    Second, the manipulated results always supported Respondent's scientific hypotheses.

139.    Third, Respondent's behavior was part of a broad pattern of manipulation across multiple papers.

140.    These pieces of evidence show that Respondent's research misconduct was intentional and knowing, not merely reckless.

141.    Respondent intentionally and knowingly falsified and/or fabricated western blot images by reusing and relabeling one image to represent the results of different experiments in Figures 2Aii and 5 of *Cell Met.* Nov. 2011.

142.    Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

**ORI FINDING #6**:  **Respondent intentionally and knowingly falsified and/or fabricated images in Figure 4B (top and bottom left panels) of *Cell Met.* Jan. 2011 by reusing and relabeling an image of an autoradiogram to misrepresent the reported experimental conditions and results.**

143.    *Cell Met.* Jan. 2011 ("Paper 6" in the UU Report) examined the synthesis and subsequent intracellular trafficking of ferritin in response to changes in cytosolic iron concentration. The reported experiments involved synthesizing a protein in a test tube (in vitro) and in the presence of the radioactively labeled amino acid methionine ($^{35}$S-methionine). The relative abundance and molecular weight of the resulting protein under different treatment conditions was determined by isolating the (radioactive) protein of interest, subjecting the sample to gel electrophoresis, and imaging by autoradiogram (X-ray film exposed to the radioactive protein samples). Like a western blot, the intensity of the resulting bands correlates with protein abundance.

144.    According to *Cell Met*. Jan. 2011, the results reported in Figure 4 demonstrate that iron depletion induces ferritin secretion. **C.L. Ex. 11** at 5. Figure 4B purportedly shows autoradiograms of ceruloplasmin[4] protein recovery under different experimental conditions, including the presence or absence of Endo H (an enzyme that removes a specific sugar modification from proteins), iron (Fe), the protease PK, and the strong detergent Triton.

145.    The top left image panel of Figure 4B reported the results of experiments without treatment with Endo-H ("- Endo H") and without iron treatment ("-Fe").

146.    The bottom left image panel of Figure 4B reported the results of experiments without Endo H ("- Endo H") and with iron treatment ("+Fe").

147.    Respondent's laboratory notebook contained a labeled film of an autoradiogram. **C.L. Ex. 17** (nb_6_4B-1.tif). The autoradiography film is labeled with Respondent's initials ("IDD"). *See id.*

148.    The autoradiography film from the laboratory notebook shows the same sets of bands that appear in the left two image panels in Figure 4B but flipped.

---

[4] Ceruloplasmin is an enzyme important in copper and iron transport. Low levels of ceruloplasmin in the blood can have adverse health effects and are often indicative of liver disease.

149.    Specifically, Figure 4B's top left image panel shows bands in lanes labeled -Endo H / -Fe.
The same set of bands appears on the right-hand side of the autoradiogram in lanes labeled
+Endo H / +Fe but flipped horizontally. *See* **C.L. Ex. 18** (ORI Image Analysis) at 10-11.

150.    Thus, identical images were labeled differently to represent different experimental
conditions (with or without Endo H and with or without iron) in the Figure 4B top left
panel and the autoradiogram.

151.    Figure 4B's bottom left image panel shows a set of bands that also appears on the left-
hand side of the autoradiogram, in lanes labeled -Endo H / +Fe, but flipped both
horizontally and vertically, i.e., around both the x and y axes.

152.    In response to the inquiry committee's finding that the lower left panel of Figure 4B was
flipped compared to the original film, Respondent stated: "The committee is correct that
the panel was flipped around the vertical axis BUT represents the lanes as published."
**C.L. Ex. 1** at 33.

153.    However, the protein standards or molecular weights marked on the film are critical in
interpreting whether the Endo-H treatment cleaved off the hypothesized glycosylation
modification. If cleaved, the band would run at a smaller molecular weight since the
glycosylation modification. If not cleaved, it would add mass to the protein.
Alternatively, if ceruloplasmin is not glycosylated, the band would run at the same size as
a band not treated with Endo-H. Thus, inversion of the image misrepresents the
molecular weight and the overall conclusion that the ceruloplasmin protein undergoes a
glycosylation modification.

154.    The bands as reported in Figure 4B's bottom left image panel do not match the conditions
and molecular weight represented in the X-ray film for those bands. The images in Figure 4B
and the autoradiogram report different conditions and protein masses under those specific
conditions.

155.    The falsification and/or fabrication was intentional and knowing and did not result from
honest error. The bands in the lower left panel of Figure 4B were flipped vertically and
horizontally. Inadvertent, vertical flipping of both the right- and left-hand sets of bands in
the film would not lead to the bands in the bottom left image panel to be selectively
flipped horizontally.

156.    Moreover, both the right- and left-hand sets of bands in the film were labeled as deriving
from experiments with iron treatment. Inadvertent flipping of the images in the film
around the vertical axis would not have changed that labeling. However, in Figure 4B's
top left image panel, the image of bands from the autoradiogram is shown in lanes
labeled "-Fe." *See* **C.L. Ex. 18** (ORI Image Analysis) at 12-13. Thus, Respondent's
honest error and recklessness arguments are not credible.

4938

157.   If only inadvertent flipping had occurred, the molecular weight markers shown in the bottom left and right image panels would have corresponded to the markers in the film, as flipping around the vertical axis would not have changed the molecular markers' positions on the vertical axis. The bands as reported in the figure do not match the conditions and molecular weight represented in the X-ray film.

158.   The paper's authors hypothesized that ceruloplasmin is modified by glycosylation. The falsified and/or fabricated images in Figure 4B support this hypothesis. This is significant, as additional insight into this regulatory process increases the understanding of iron regulation and overall impacts the field of iron physiology. However, Respondent's autoradiogram indicated no difference in the molecular weight of ceruloplasmin when treated with Endo H, which would fail to support this hypothesis and reduce the novelty of the research findings in Figure 4B.

159.   Moreover, the falsification and/or fabrication of an image was not an isolated event, but rather part of a pattern of image reuse, relabeling, and manipulation in multiple figures across three papers, as discussed throughout these findings. This further supports that Respondent's falsification and/or fabrication was intentional and knowing and did not result from honest error or even mere recklessness.

160.   Respondent is the first author of *Cell Met.* Jan. 2011.

161.   The autoradiography film in Respondent's laboratory notebook corresponding to Figure 4B of *Cell Met.* Jan. 2011 is labeled with Respondent's initials ("IDD"). **C.L. Ex. 17** (nb_6_4B-1.tif).

162.   The manipulation is similar in kind to the specific types of manipulation in images and figures that Respondent has admitted she generated.

163.   Respondent stated in her Table of Admissions that she "did not work on the *final* figure, she was out of the country during the resubmission." **C.L. Ex. 21** (emphasis added).

164.   Respondent's artful denial of working on the final figure conspicuously avoids stating that she had a role before that in creating the figure prior to resubmission. This, along with the ambiguity of "final," is evidence that she assembled the figure at an earlier stage and simply did not conduct the final review prior to resubmission. This is especially so as her statement with respect to Figure 4B is in contrast to her statements for other papers in the same Table of Admissions that she prepared figures (without specifying whether they were final).

165.   The CHC Panel appeared to focus on an allegation that Respondent had fabricated laboratory notebook pages, the evidence of which it found "confusing." *Id.* at 5. ORI, however, makes a finding on Respondent's falsification and/or fabrication of the figure in *Cell Met.* Jan. 2011, and thus, the Panel's confusion is not relevant to ORI's finding.

166.  Respondent intentionally and knowingly falsified and/or fabricated Figure 4B of *Cell Met.* Jan 2011 (UU Report "Paper 6").

167.  Respondent's falsification and/or fabrication constitutes a significant departure from accepted practices of the relevant research community.

168.  The HHS SDO would find the same period of debarment appropriate even if Respondent were not responsible for the falsification and/or fabrication in Figure 4B of *Cell Met.* Jan. 2011.

## V.    PROPOSED HHS ADMINISTRATIVE ACTIONS

169.  Under 42 C.F.R. § 93.408, HHS considered aggravating and mitigating factors in determining appropriate HHS administrative actions and their terms. The HHS Debarring Official also considered factors in 2 C.F.R. § 180.860 in determining to debar Respondent and the length of Respondent's debarment period.

### A.  Debarment

170.  The information in this charge letter indicates that Respondent lacks the present responsibility to participate federal government procurement and nonprocurement programs.

171.  The information from this record provides cause for debarment provided in 2 C.F.R. § 180.800(d): "Any other cause of so serious or compelling a nature that it affects your present responsibility."

172.  Debarment is generally for a period not to exceed three years. 2 C.F.R. § 180.865(a).

173.  Based on the preponderance of the evidence supporting the ORI findings of research misconduct stated herein, the HHS Debarring Official proposes that for a period of three (3) years, Respondent be debarred from participating in "covered transactions" as defined in 2 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1).

#### 1.   Research Misconduct is a Cause for Debarment

174.  Respondent's falsification and/or fabrication as set forth in this charge letter constitutes research misconduct under 42 C.F.R. Part 93.

175.  The purpose of debarment is to protect the federal government from an individual who has proven to be untrustworthy. *See Kimon J. Angelides*, DAB No. 1677 (1999).

176.  Moreover, the policy underlying debarment is that the federal government should conduct business only with responsible contractors and grantees. *See Dr. Paul F. Langlois*, DAB No. 1409 (1993), 1993 WL 742594 (DAB May 6, 1993).

177. The HHS Departmental Appeals Board has held that "[t]he scientific community functions on trust and openness; once that trust is breached, the harm from incidents of fabrication and falsification of data is far greater than simply discrediting the work known to be false or fabricated." *Id.*

178. Respondent's intentional, knowing, or reckless research misconduct establishes a lack of trustworthiness and is so serious and compelling in nature that it demonstrates a lack of present responsibility to be a steward of federal funds. 2 C.F.R. § 180.800(d).

### 2. Respondent Lacks Present Responsibility

179. In her September 2024 letter, Respondent argues that she is presently responsible.

180. But Respondent never took responsibility for her knowing and intentional research misconduct that is at issue in this case. In her September 2024 letter, Respondent refers to "the several occasions on which Dr. Frech expressed regret over the situation," but these expressions were only that she "made mistakes" that were "unintentional." Sept. 24, 2024 Letter at 4.

181. Even today, Respondent continues to deny that she committed knowing and intentional misconduct. In fact, she expressly "contends that those mistakes were not intentional or done knowingly" and that "reckless laboratory-wide practices led to the publication of incorrect research images." Sept. 24, 2024 Letter at 2. In Respondent's September 23, 2024, declaration, appended to her September 2024 letter, she states that "mistakes were made" and that she "accept[s] responsibility for them," that she "regret[s] that these mistakes detracted from the hard work that everyone involved in the research at the University of Utah put into our work. The mistakes made in Dr. Kaplan's lab diminished those efforts and for that I am sorry." Frech Decl. ¶ 12. But she does not state that she was the one who falsified and/or fabricated the figures and does not admit that her "mistakes" were intentional and knowing falsification or fabrication.

182. These statements are far from accepting responsibility for the intentional and knowing research misconduct that is the subject of this charge letter.

183. According to her September 24, 2024, letter, Respondent's most recent position as a hospital administrator at Mercy Hospital, which she states she held from May 2020 through January 2024, "did not involve any research whatsoever." However, based on the responsibilities of the position listed in her letter, the position appeared to include responsibilities adjacent to covered transactions. The letter also states that Dr. Frech wishes to return to this position, and thus, she still presents a risk.

184. Thus, the SDO does not find Respondent presently responsible.

### 3. Aggravating and Mitigating Factors

4941

185.   As discussed above, Respondent's actions were knowing and intentional. 42 C.F.R. §
       93.408(a).

186.   Respondent solely planned, initiated, and carried out the wrongdoing. 2 C.F.R. §
       180.860(f).

187.   Respondent claims that UU determined that she was not solely responsible for the errors.
       Sept. 24, 2024 Letter at 8. However, this mischaracterizes the evidence in the record,
       which does not show that anyone else contributed to her intentional and knowing
       research misconduct in the three papers at issue. Although the UU investigation
       committee found that Dr. Kaplan, as the laboratory's leader, was lax in his oversight of
       and systematically failed in supervising Respondent, it also "found no evidence that [he]
       directly contributed to the misrepresentation or manipulation of data." **C.L. Ex. 1** at 6.
       The investigation committee "[wa]s also struck by the conspicuous failure of all
       coauthors, particularly Drs. Ward and Kaplan, to catch and correct these mistakes before
       publication." *Id.* at 4. The fact that Dr. Kaplan was lax in his oversight and that Drs.
       Ward and Kaplan should have caught Respondent's falsifications and/or fabrications does
       not render them culpable for, or mean that they assisted Respondent plan, initiate, or
       carry out, her research misconduct. Indeed, Respondent does not claim, and ORI found
       no evidence, that anyone else assembled the figures that are the subject of ORI's findings
       or otherwise intentionally falsified or fabricated those figures. And the UU investigation
       revealed no evidence indicating that anyone else was responsible for committing the
       research misconduct found by ORI.

188.   In her September 2024 letter, Respondent also claims:

              Furthermore, UU's investigation expressly disclaimed engaging in any review of
              publications arising from Dr. Kaplan's lab for which Dr. Frech was not a
              coauthor. See Final UU Investigation Report at AR 968. This is important
              because, as Dr. Frech demonstrated during the CHC hearing, other publications
              from Dr. Kaplan's lab for which she was not an author and had no role in the
              underlying research contained the same sort of errors as those at issue in the
              allegations against her. See Attachment 9, Examples of Other Kaplan Papers with
              Errors.

       Sept. 24, 2024 Letter at 8. The concerns that Respondent raised for the first time at her
       CHC appeal and listed in Attachment 9 to her September 2024 letter are not directed at
       the research misconduct findings that ORI made and its conclusion that Respondent alone
       committed the falsifications and/or fabrications at issue in these particular ORI findings.

189.   Even if Respondent were not solely responsible for committing the research misconduct
       found by ORI, this would not affect the proposed three-year debarment term.

190.   Respondent's research misconduct was not an isolated event but rather was a pattern that

occurred over the course of several years in three (3) PHS-supported papers. 42 C.F.R. § 93.408(b); *see also* 2 C.F.R.§ 180.860(b) (frequency of incidents and/or duration of the wrongdoing).

191.   Respondent's research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare. 42 C.F.R. § 93.408(c); *see also* 2 C.F.R. §180.860(a) (Respondent's misconduct resulted in actual and potential harm or impact that resulted and may result from Respondent's wrongdoing.).

192.   Research misconduct undermines the integrity of the scientific community and can lead to severe and irreparable harm. The consequences of research misconduct include losing public trust in science; wasting of public funds and resources; harming the research record; distorting the research process; and even adversely impacting public health and safety.

193.   Respondent's falsified and/or fabricated research results were included in three (3) PHS-supported published papers and utilized funds that PHS otherwise could have spent on research that was not falsified or fabricated.

194.   Respondent's falsifications and/or fabrications led to retraction of two (2) published papers and ORI's finding that an additional paper should be retracted or corrected.

195.   Chronic dysregulation of iron in blood plasma leads to anemia (low plasma iron) or tissue damage and serious inflammation (high plasma iron). Specifically, the HEP/FPN regulatory axis is targeted in both the diagnosis and treatment of various iron disorders. Respondent's proposed new mechanism for inactivating FPN, particularly in a HEP-independent manner, would have been considered a significant and exciting finding in the field on which other basic and clinical researchers would and/or did follow up. Thus, Respondent's fabricated and/or falsified research papers led to waste of valuable time and resources.

196.   According to Web of Science™, an index of metrics based on international citation activity of science journals, books, and scientific proceedings reflects that, as of April 19, 2023, Respondent's three affected papers have been cited by others a total of 142 times in the scientific literature.

197.   As discussed above, Respondent failed to accept responsibility for her misconduct and failed to recognize the seriousness of her misconduct. 42 C.F.R. § 93.408(e); 2 C.F.R. §180.860(g).  Respondent's September 24, 2024, letter states "the administrative record reflects that Dr. Frech, on a number of occasions, did express remorse for what happened and acknowledged that she had made mistakes, although she contends that those mistakes were not intentional or done knowingly." However, Respondent has not sufficiently accepted responsibility for the research misconduct that is at issue in this case. ORI determined that Respondent's research misconduct was knowing and intentional. Respondent continues to maintain that she did not falsify and/or fabricate the figures, and she does not admit that her

"mistakes" were intentional and knowing falsification or fabrication.

198. As a mitigating factor, Respondent cooperated with the institution's research-misconduct proceeding. Respondent also admitted to the creation of certain figures and the duplication of one of the images in question. 42 C.F.R. § 93.408(e); 2 C.F.R. §180.860(i).

199. Due to the large and growing volume of ORI's responsibilities relative to its staffing levels, some time has elapsed since Respondent committed her research misconduct. Respondent cites *Roemer v. Hoffmann*, 419 F. Supp. 130, 132 (D.D.C. 1976), and *Silverman v. U.S. Dep't of Defense*, 817 F. Supp. 846, 849 (S.D. Cal. 1993), to support her argument that the length of time between the misconduct and a debarment action is a factor that the debarring official is to consider. Although *Roemer* lists, among various factors that should be considered in that case, "the length of time which had passed since the offense and since the conviction," it certainly does not state that the length of time is dispositive, only that it should be considered. In *Silverman*, the government admitted that it did not consider mitigating factors such as the government's continuing to enter into contracts with plaintiffs for six years after the events that gave rise to the debarment action, and the plaintiff's motivation in pleading guilty. 817 F. Supp. at 849. Under 2 C.F.R. § 180.860(s), HHS considered the length of time elapsed, but found, on balance, that debarment was still appropriate because of countervailing factors discussed in this charge letter, including Respondent's failure, even today, to accept responsibility for and recognize the seriousness of her misconduct.

200. In her September 2024 letter, Respondent describes a number of her activities in the years since UU's research misconduct determination, arguing that they show that she is presently responsible. These include her business school education, her employment in Dr. Fenghuang Zhan's laboratory at the University of Iowa ("Iowa") and at Mercy Hospital, and various community and philanthropic activities. Sept. 24, 2024 Letter at 7 ("Dr. Frech's good character is also reflected in her extensive philanthropic activities over the past decade."). She also attaches letters and declarations that purport to attest to her good character and charitable activities. *See, e.g.*, Sept. 24, 2024 Letter Atts. 5, 6, 8; 9/25/2024 Supplemental Frech Declaration. She cites *Roemer* and *Silverman* to support that her interim purportedly good conduct should be considered in the debarment decision. Even if HHS were to accept the truth of the assertions and validity of the documents Respondent submitted, they would not be dispositive, particularly in light of the countervailing factors discussed in this charge letter that contraindicate her present responsibility. None of these activities and documents diminish the appropriateness of her debarment or its length.

201. With respect to her conduct in the years after she left UU, Respondent claims that she "refrained from immediately seeking a new position in research" after the UU investigation and "stepped away from science altogether and obtained her MBA." Letter at 3. She self-servingly characterizes those approximately two years as her purposefully "abstain[ing] from engaging in any scientific research—federally funded or otherwise,"

4944

*id.*, although there is no evidence or reason to believe that Respondent went to business school in order to protect government funds.

202. Respondent also claims that she "informed ORI about her intent to accept the offer" of a position as an assistant research scientist in the Zhang lab and "asked ORI for guidance on whether her research activities should be supervised or if there were other measures that should be taken." ORI has no record of such a communication.

203. Respondent further claims that she "accepted the job opportunity, but disclosed the UU findings and ORI's ongoing review to UI," and that "she and UI agreed that her work would be overseen and monitored by an internal Data Monitoring Committee consisting of Dr. Zhan, Dr. Guido Tricot, and Dr. Zhan's lab manager." She attached a document titled "Oversight and Research Monitoring Plan" to her letter. Sept. 24, 2024 Letter at 3, Attachment 2. She also claimed that she "affirmatively disclosed the existence of ORI's ongoing review of UU's investigation to Dr. Zhan's lab and proactively worked with UI to establish a framework under which her work was overseen and monitored so that her employment did not undermine the important and vital work UI was performing." *Id.*

204. Whether she did in fact proactively disclose this information to Dr. Zhan or to Iowa, either at the outset of her employment there or ever, is supported only by her assertion and an undated, unsigned document titled "Oversight and Research Monitoring Plan." There is no evidence other than Respondent's say so that this document represents a plan that UI and/or Dr. Zhan agreed to.

205. Moreover, even after the original charge letter was issued, she has not been transparent about her involvement with federally funded research while working in the Zhan laboratory. In an August 15, 2023, letter, she wrote to ORI through her counsel that she "has neither sought, received, nor participated in research supported by PHS funding since leaving UU in 2013" and that "none of the research she participated in at UI involved PHS funding." **C.L. Ex. 24** (Aug. 15, 2023 Letter) at 1.

206. In fact, Respondent was listed as an author on several research papers from the Zhan Laboratory published in 2017-2021 that cite NIH funding as supporting the published research, and her reported author contributions included performing, designing, and supervising experiments and analyzing data. **C.L. Ex. 26**. And she was listed as research scientist or Senior/Key Personnel on three grant applications submitted to NIH in 2016-2018. **C.L. Ex. 27**.

207. After ORI raised this point to Respondent, she claimed, through counsel, in an August 17, 2023, letter to ORI that "the circumstances surrounding these papers and grant applications demonstrate that Dr. Frech has, in fact, not participated in PHS-funded research since 2013." **C.L. Ex. 25** at 1.

208. This statement is false. While she claims that she assisted in experiments for just a single

PHS-funded paper, **C.L. Ex. 25** at 2, she does not deny that she performed analysis relating to other PHS-funded experiments. While she claims that she was not involved with PHS funds granted to certain other researchers, *id.* at 2, 4, she does not deny that she was in active collaboration with those researchers in their PHS-funded research. And while she asserts that certain PHS grants that funded research projects on which she worked had ended by the time she joined the laboratory, *id.* at 3-4, she does not deny that she used equipment and materials that the laboratory had procured using PHS funds back when those grants were active.

209.   And conspicuously, she at times appears to back away from any categorical assertion that she never participated in PHS-funded research in the Zhan Laboratory, offering more nuanced and hedging language. At one point, she claims that Dr. Zhan had no active PHS grants while she worked at his laboratory "[t]o [her] knowledge." **C.L. Ex. 25** at 4. Elsewhere, she says "it was her understanding that the funding from the grant had ended," *id.* at 3—ambiguous words that suggest that at least one PHS grant funding a project of hers might have been active at the time.

210.   Moreover, Respondent participated in research supported by other sources of federal funds since leaving UU. For example, she published research in 2017 to 2021 funded by the Departments of Defense and Veterans Affairs, as these publications' Acknowledgements expressly recognize. **C.L. Ex. 26** at 39-65.

211.   Indeed, as Respondent herself described in a 2018 University of Iowa interview, "As manager of the Zhan lab, she [Respondent] is essentially running the operations side of a small business, from keeping track of grant funding to making sure enough reagents are stocked. She also helps manage the staff, making sure international members have visa issues resolved and that new hires are integrated smoothly. Dr. Frech also works closely with the younger researchers, training them and helping them launch their own projects, providing supervision and advice where necessary." **C.L. Ex. 28** at 3.

212.   Respondent's apparent recent lack of candor about her involvement in the Zhan Laboratory's federally funded research and attempts to procure PHS funding underscores her lack of present responsibility.

213.   In her September 2024 letter, Respondent claims that her most-recent "position at Mercy Hospital did not involve any research whatsoever," Sept. 24, 2024 Letter at 6, and that she has "no intention of re-engaging in any scientific research," *id.* at 10. However, a debarment's scope is not limited to research grants but to all covered transactions.

214.   Respondent argues that, "[t]o date, no questions or concerns have ever been raised regarding Dr. Frech's research activities over the four years that she was a member of Dr. Zhan's lab," Sept. 24, 2024 Letter at 3, and that "[a]t no point were there, or have there ever been, any concerns or irregularities pertaining to Dr. Frech's stewardship of lab funds, whether from grants or otherwise." *Id.* at 4. The absence of any allegations does

not mean the absence of misconduct; HHS has not examined her conduct.

**B.  Prohibition on Serving in Advisory Capacity to PHS**

215.   HHS proposes that, for a period of three (3) years, Respondent be prohibited from serving in any advisory capacity to PHS including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant.

**C.  Correction of the Research Record**

216.   In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS proposes that ORI will send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev. Cell* 2008.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Office of the Secretary

                                                                          Washington, D.C.  20201

<u>**VIA ELECTRONIC MAIL**</u>

Stephen D. Tobin, Esq.
Cohen Seglias Pallas Greenhall & Furman PC
900 Seventh Street, NW
Suite 725
Washington, DC 20001
Email: stobin@cohenseglias.com

      Re: Notice of Final Debarment Decision for Ivana Frech, Ph.D.

Dear Mr. Tobin:

      On July 18, 2023, the United States Department of Health and Human Services (HHS) sent a Notification Letter, which enclosed a Charge Letter, to your client, Ivana Frech, Ph.D., via United Parcel Service (UPS). The Notification Letter and Charge Letter informed Dr. Frech that based on the evidence and findings of an investigation conducted by the University of Utah (UU), and additional analysis conducted by the Office of Research Integrity (ORI) during its oversight review, ORI had made findings of research misconduct against her.

      Specifically, ORI found that Dr. Frech engaged in research misconduct under 42 C.F.R. Part 93 in research supported by U.S. Public Health Service (PHS) funds, specifically National Institute of Diabetes and Digestive and Kidney Diseases (NIDDK), National Institutes of Health (NIH), grants R01 DK070947, R01 DK090257, and R01 DK030534, National Institute of General Medical Sciences (NIGMS), NIH, grant P50 GM082545, National Institute of Allergy and Infectious Diseases (NIAID), NIH, grant R01 AI051174, and National Heart, Lung, and Blood Institute (NHLBI), NIH, grant R01 HL026922. ORI made six findings of research misconduct based on the preponderance of the evidence that Dr. Frech intentionally and knowingly falsified and/or fabricated western blot and autoradiogram images related to mechanisms of cellular iron regulation by reusing, relabeling, and manipulating images to falsely report data in three published papers. The July 18, 2023, HHS Charge Letter and November 8, 2024, HHS Amended Charge Letter, which this Notice of Final Decision is enclosed with, provide further detail regarding ORI's findings.

      In the HHS Notification Letter and Charge Letter, Dr. Frech was advised of proposed administrative actions and given the opportunity to request a hearing on the findings and proposed administrative actions before an Administrative Law Judge with the HHS Departmental Appeals Board (DAB). As Dr. Frech did not request a hearing within the required 30-day period, the following administrative actions were implemented, effective August 19, 2023:

4948

- Dr. Frech was debarred from participating in "covered transactions" as defined in 42 C.F.R. § 180.200 and procurement transactions covered under the Federal Acquisition Regulation (48 C.F.R. chapter 1) for a period of three years, beginning on August 21, 2023.
- Dr. Frech was prohibited from serving in any advisory capacity to PHS including, but not limited to, service on any PHS advisory committee, board, and/or peer review committee, or as a consultant for a period of three years, beginning on August 21, 2023.
- In accordance with 42 C.F.R. §§ 93.407(a)(1) and 93.411(b), HHS would send to the journal *Developmental Cell* a notice of ORI's findings and the need for retraction or correction of *Dev Cell*. 2008 Jul;15(1):62-73. doi: 10.1016/j.devcel.2008.05.014.

On August 29, 2023, a civil complaint was filed in the United States District Court for the District of Columbia, *Frech v. Department of Health and Human Services et al.*, No. 23-2530 (CRC) (D.D.C.), pursuant to 5 U.S.C. § 701, the Administrative Procedure Act, related to Dr. Frech's debarment. On April 1, 2024, the United States District Court for the District of Columbia remanded the matter to HHS.

## RESPONDENT'S RESPONSE

On September 24, 2024, you, as Dr. Frech's designated attorney representative in this matter, transmitted a letter via electronic mail addressed to me, the HHS SDO, for consideration of the debarment action against Dr. Frech. The September 24, 2024, letter stated that it was providing an amplification of information already in the administrative record, as well as information that Dr. Frech believed the HHS SDO may not have considered, or had an opportunity to consider, prior to proposing Dr. Frech for debarment. The letter stated that Dr. Frech hoped that an examination of this information would lead the HHS SDO to conclude that Dr. Frech's continued debarment was not warranted and that she was presently responsible. The letter included the following attachments:

- Attachment 1 – May 8, 2013, UU Consolidated Hearing Committee (CHC) Complaint - Research Misconduct for Dr. Ivana Frech
- Attachment 2 – Undated Plan for oversight and monitor research conduct by Dr. Ivana Frech
- Attachment 3 – January 31, 2024, Email from Kyle T. Fogt, Deputy Counsel at University of Iowa (UI) concerning Dr. Ivana Frech
- Attachment 4 – February 20, 2024, Letter from Kyle T. Fogt, Deputy Counsel at University of Iowa concerning Dr. Ivana Frech
- Attachment 5 – January 31, 2024, Message from Deb Berini, Interim Chief Administrative Officer and Chief Integration Officer at University of Iowa Health Care (UIHC) concerning Dr. Ivana Frech
- Attachment 6 – August 21, 2023, Ivana Frech Character Letter from Bernadine Brandenburg, former Chief Integrity Officer and Director of Compliance and Risk Management at Mercy Hospital
- Attachment 7 – UIHC, Office of the Patient Experience FY23 Annual Report
- Attachment 8 – September 23, 2024, Declaration of Dr. Ivana Frech

- Attachment 9 – Examples of Other UU Dr. Kaplan Laboratory Papers with Errors
- Attachment 10 – Dr. Ivana Frech CHC Hearing Presentation

In addition, on September 25, 2024, a Supplemental Declaration by Dr. Ivana Frech was transmitted to the HHS SDO for consideration.

## DISCUSSION

Pursuant to 2 C.F.R. Part 180 (the Nonprocurement Common Rule), which the HHS adopted and gave regulatory effect to at 2 C.F.R. Subpart 376.10, a Federal Government agency may debar an individual from participating in Federal Government procurement and nonprocurement programs, should the SDO determine that individual is not presently responsible and based on "any other cause of so serious or compelling a nature that it affects the present responsibility of the individual." *See* 2 C.F.R. § 180.800(d).

The Nonprocurement Common Rule at 2 C.F.R. § 180.860 lists a number of mitigating and aggravating factors a debarring official may consider in determining whether to debar an individual and in determining the length of the debarment period. As the HHS SDO, I may also consider other factors, as appropriate, in light of the circumstances of a particular case. In consideration of the unique details of this matter, I have determined that factors (c-e), (h), and (j-r) were either not applicable or not relevant to the circumstances of this case, or otherwise there is not enough information in the record for me to assess the applicability of these factors to this case. The following aggravating and mitigating factors were taken into consideration for this matter:

- *2 C.F.R § 180.860(a) – The actual or potential harm or impact that results or may result from the wrongdoing.*

    Research misconduct undermines the integrity of the scientific community and can lead to severe and irreparable harm. The consequences of research misconduct include losing public trust in science; wasting of public funds and resources; harming the research record; distorting the research process; and even adversely impacting public health and safety. Accordingly, HHS expects that everyone involved in HHS-funded research, including PIs, researchers, and administrators, will promote research integrity in fulfillment of HHS's missions. The scientific research enterprise is built on a deep foundation of trust and shared values. As the National Academies wrote in their 2019 On Being a Scientist report, "this trust will endure only if the scientific community devotes itself to exemplifying and transmitting the values associated with ethical scientific conduct." Research misconduct, including falsifying and/or fabricating data, is contrary to ethical values and conduct.

    I find that Dr. Frech's past wrongdoing continues to present harm because she has not accepted responsibility for the wrongdoing, as evidenced by the fact that Dr. Frech continues to deny that she committed knowing and intentional misconduct, despite the findings presented by ORI. Regarding present responsibility, it is important to understand that it is viewed prospectively – forward looking – as it relates to protecting

the Federal Government from improper business conduct by individuals and entities that are not responsible.

As such, based on the information in the record, I find Dr. Frech's research misconduct had a significant impact on the proposed and reported research record, other researchers, institutions, and the public health or welfare. Therefore, I find this to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(b) – The frequency of incidents and/or duration of the wrongdoing*

As documented in ORI's findings, Dr. Frech's research misconduct was not an isolated event. There were three Public Health Service (PHS)-supported papers that were developed over the covered time period and impacted multiple grants. ORI's findings also identified six instances of research misconduct.

Therefore, based on the information in the record, I find Dr. Frech's research misconduct over several years and multiple PHS-supported grants to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(f) – Whether and to what extent you planned, initiated, or carried out the wrongdoing.*

The September 24, 2024, letter, claims that UU determined that Dr. Frech was not solely responsible for the errors. This mischaracterizes the evidence in the record, however, which does not show that anyone else contributed to Dr. Frech's intentional and knowing research misconduct in the three papers at issue. Although the UU investigation committee found that Dr. Kaplan, as the laboratory's leader, was lax in his oversight of and systematically failed in supervising Dr. Frech, it also found no evidence that Dr. Kaplan directly contributed to the misrepresentation or manipulation of data. The UU investigation committee also noted the failure of all coauthors, particularly Drs. Ward and Kaplan, to catch and correct the mistakes before publication. Despite the fact that Dr. Kaplan was lax in his oversight, and Drs. Ward and Kaplan should have caught Dr. Frech's falsifications and/or fabrications, this does not render them culpable for, or mean that they assisted in the planning, initiating, or carrying out, of Dr. Frech's research misconduct. Indeed, Dr. Frech does not claim, and ORI found no evidence, that anyone else assembled the figures that are the subject of ORI's findings or otherwise intentionally falsified or fabricated those figures. And the UU investigation revealed no evidence indicating that anyone else was responsible for committing the research misconduct found by ORI.

The September 24, 2024, letter also claims that UU's investigation expressly disclaimed engaging in any review of publications arising from Dr. Kaplan's lab for which Dr. Frech was not a coauthor. The letter claims that Dr. Frech demonstrated during the CHC hearing that other publications from Dr. Kaplan's lab, for which she was not an author and had no role in the underlying research, contained the same sort of errors as those at issue in the allegations against her. However, the concerns that Dr. Frech raised

Final Notice of Debarment Decision for Ivana Frech, Ph.D.                                    page 5

for the first time at her CHC appeal and listed in Attachment 9 to the September 24, 2024, letter are not directed at the research misconduct findings that ORI made and its conclusion that Dr. Frech alone committed the falsifications and/or fabrications at issue in these particular ORI findings.

Therefore, based on the information in the record, I find this to be an applicable aggravating factor in this case. However, even if Dr. Frech were not solely responsible for committing the research misconduct found by ORI, this would not affect the proposed three-year debarment term.

- *2 C.F.R. § 180.860(g) – Whether you have accepted responsibility for the wrongdoing and recognize the seriousness of the misconduct that led to the cause for debarment.*

I acknowledge that the September 24, 2024, letter states "the administrative record reflects that Dr. Frech, on a number of occasions, did express remorse for what happened and acknowledged that she had made mistakes, although she contends that those mistakes were not intentional or done knowingly." However, I do not find that Dr. Frech has sufficiently accepted responsibility for the research misconduct that is at issue in this case. As established in the HHS Charge Letter and HHS Amended Charge Letter, ORI determined that Dr. Frech's research misconduct was knowing and intentional. Dr. Frech continues to maintain that she did not falsify and/or fabricate the figures, and she does not admit that her "mistakes" were intentional and knowing falsification or fabrication. As such, I find Dr. Frech's statements to be disingenuous and far from accepting responsibility for the intentional and knowing research misconduct that is the underlying cause for debarment.

Therefore, based on the information in the record, I find Dr. Frech's failure to sufficiently accept responsibility for the wrongdoing to be an applicable aggravating factor in this case.

- *2 C.F.R. § 180.860(i) – Whether you have cooperated fully with the government agencies during the investigation and any court or administrative action. In determining the extent of cooperation, the debarring official may consider when the cooperation began and whether you disclosed all pertinent information known to you.*

As established in the HHS Charge Letter and HHS Amended Charge Letter, Dr. Frech cooperated with the institution's research-misconduct proceeding. Therefore, based on the information in the record, I find this to be an applicable mitigating factor in this case.

- *2 C.F.R. § 180.860(s) – Other factors that are appropriate to the circumstances of a particular case.*

<u>Duration of Time Since the Wrongdoing</u>

As a mitigating factor, the September 24, 2024, letter argues that the length of time between when the misconduct occurred and when the debarment action was implemented should be considered. I acknowledge the amount of time that passed between, and in making the debarment decision, the length of time that elapsed was considered. On balance, debarment was determined to still be appropriate because of countervailing factors discussed herein and in the HHS Charge Letter and HHS Amended Charge Letter, including Dr. Frech's failure, even today, to accept responsibility for and recognize the seriousness of her misconduct. Therefore, based on the information in the record, I do not find the duration of time to be a mitigating factor in this case.

Position at Mercy Hospital

According to the September 24, 2024, letter, Dr. Frech's most recent position as a hospital administrator at Mercy Hospital, which she held from May 2020 through January 2024, "did not involve any research whatsoever." However, based on the responsibilities of the position listed in the letter, the position appeared to include responsibilities adjacent to covered transactions. The letter also states that Dr. Frech wishes to return to this position, and thus, she still presents a risk. Therefore, based on the information in the record, I find this to be an aggravating factor in this case.

Philanthropic Activities and Character References

As a mitigating factor, the September 24, 2024, letter cited Dr. Frech's philanthropic activities since UU's research misconduct determination, arguing that this demonstrates that she is presently responsible. These include her business school education, her employment in Dr. Fenghuang Zhan's laboratory at UI and at Mercy Hospital, and various community and philanthropic activities, including serving as member of the American Heart Association Community Leadership Committee, the Junior League of Salt Lake City, participating in the Salt Lake City Government Internship Project, and leading the development and implementation of the Low Income Pass Program, and serving on the UI Patient and Family Advisory Board (PFAB). In addition, the supporting documentation included letters and declarations that purported to attest to her good character and charitable activities. While I commend Dr. Frech's contributions to the community and acknowledge the character references presented, I do not find these activities and statements to be relevant to the underlying debarment cause and wrongdoing at issue, which is research misconduct. I do not find that any of these activities and character references, or purported good conduct, are appropriate to diminish Dr. Frech's period of debarment or its length. Therefore, based on the information in the record, I do not find Dr. Frech's philanthropic activities and character references to be a mitigating factor in this case.

## DECISION

Pursuant to 2 C.F.R. Part 180, and based on the information presented in the administrative record and findings herein, including the aggravating and mitigating factors set forth in this document, I have determined that Dr. Frech's research misconduct is of so serious a

nature that a debarment period is necessary to protect the United States Federal Government's interests. *See* 2 C.F.R. § 180.800(d). In making this determination, I acknowledge that Dr. Frech did present some mitigating information, as stated above, which I took into consideration, but it was not sufficient to demonstrate that Dr. Frech is presently responsible to participate in Federal Government procurement and nonprocurement programs.

Therefore, pursuant to 2 C.F.R. Part 180, which was adopted and given regulatory effect by HHS at 2 C.F.R. Subpart 376.10, I hereby impose Dr. Frech's debarment for a period of three years, which term is retroactive to August 20, 2023. Under the three-year period of debarment, Dr. Frech will remain ineligible through August 20, 2026. The debarment is effective for covered transactions subject to the prohibitions of 2 C.F.R. §180 and contracts that are subject to the Federal Acquisition Regulation (48 C.F.R. chapter 1), throughout the executive branch of the United States Federal Government, unless an agency head or an authorized designee grants an exception in writing.

Sincerely,

*HKBrisbon*
HKBrisbon (Nov 6, 2024 12:41 EST)
H. Katrina Brisbon
Suspension & Debarment Official and
  Deputy Assistant Secretary for Acquisitions

cc:  Paul Simon, Esq.
     Cohen Seglias Pallas Greenhall & Furman PC
     Email: psimon@cohenseglias.com